UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

KENNETH KRYS and CHRISTOPHER STRIDE as
Joint Official Liquidators of SPHINX LTD., *et al.*,

                                Plaintiffs,

             -against-

CHRISTOPHER SUGRUE, *et al.*,

                         Defendants.

------------------------------------------------ x

Index No. 08 Civ. 3065

**AFFIDAVIT OF**
**BRIAN H. BRICK**

BRIAN H. BRICK, being duly sworn, deposes and says as follows:

    1.    I am associated with the law firm of Dechert LLP, attorneys for defendant Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG") in the above-captioned action. As such, I am fully familiar with the facts and circumstances set forth herein. I submit this affidavit in support of BAWAG's motion for an order referring Counts XXIV, XXV, and XXVII of the complaint as alleged against BAWAG to the United States Bankruptcy Court for the Southern District of New York.

    2.    Annexed hereto as Exhibit A is a true and correct copy of the June 2, 2006 Stipulation and Order of Settlement (the "BAWAG Settlement") executed by the parties in the adversary proceeding entitled *BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft v. Refco Inc., et al.*, Adv. Pro. No. 05-03161 (RDD) (Bankr. S.D.N.Y.) (the "Adversary Proceeding"), within the chapter 11 cases entitled *In re: Refco Inc., et al.*, Case No. 05-60006 (RDD) (Jointly Administered) (Bankr. S.D.N.Y.) (the "Refco Bankruptcy Cases").

    3.    Annexed hereto as Exhibit B is a true and correct copy of the July 6, 2006 Order Approving and Clarifying Stipulation and Order of Settlement and Resolving Certain

Objections entered by the Hon. Robert D. Drain, United States Bankruptcy Judge in the Adversary Proceeding.

4.    Annexed hereto as Exhibit C is a true and correct copy of the December 14, 2006 Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries, filed in the Refco Bankruptcy Cases.

5.    Annexed hereto as Exhibit D is a true and correct copy of the December 15, 2006 Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of its Direct and Indirect Subsidiaries entered by Judge Drain in the Refco Bankruptcy Cases.

6.    Annexed hereto as Exhibit E is a true and correct copy of plaintiffs' complaint in the above-captioned action initially filed on March 5, 2008 in the Supreme Court of the State of New York, County of New York, bearing index number 600653/08.

7.    Annexed hereto as Exhibit F is a true and correct copy of the July 10, 1984 standing order of reference to bankruptcy judges in and for the United States District Court for the Southern District of New York signed by then-Acting Chief Judge Robert J. Ward.

8.    Annexed hereto as Exhibit G is a redacted copy of the April 21, 2006 Amended Answer, Affirmative Defenses, and Counterclaims filed by the Official Committee of Unsecured Creditors of Refco Inc. in the Adversary Proceeding.

_____
Brian H. Brick

Sworn to before me this
2nd day of April 2008.

_____
Notary Public

FRANCES RAPILLO
NOTARY PUBLIC, State of New York
No. 01RA4716812
Qualified in Richmond County
Commission Expires October 31, 2010

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REFCO INC., <u>et</u> <u>al.</u>,<br><br>      Debtors. | Chapter 11<br><br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| BAWAG P.S.K. BANK FÜR ARBEIT<br>UND WIRTSCHAFT UND<br>ÖSTERREICHISCHE POSTSPARKASSE<br>AKTIENGESELLSCHAFT,<br><br>      Plaintiff,<br><br>  - against -<br><br>REFCO INC., <u>et</u> <u>al.</u>,<br><br>      Defendants,<br><br>  - and -<br><br>THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS OF REFCO<br>INC. <u>ET</u> <u>AL.</u>, on behalf of REFCO<br>GROUP LTD., LLC,<br><br>      Intervenor-<br>      Defendant and<br>      Counterclaim<br>      Plaintiff. | Adv. Pro. No. 05-03161 (RDD) |

## STIPULATION AND ORDER OF SETTLEMENT

WHEREAS, on November 16, 2005, BAWAG P.S.K. Bank für Arbeit und

Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("<u>BAWAG</u>," and together with

all its subsidiaries and "<u>Affiliates</u>" (as defined in 11 U.S.C. § 101(2)) including, without

limitation, the entities listed on Attachment "<u>A</u>" annexed hereto, the "<u>BAWAG Entities</u>")

commenced in this Court (the "Court") the above-captioned adversary proceeding (the "Adversary Proceeding") by filing a complaint (the "Complaint") asserting claims related to BAWAG's loan of more than $400 million to the Phillip R. Bennett Three Year Annuity Trust, Refco Group Holdings Inc. ("RGHI" and, together with RGHI's current or former shareholders, the Bennett Trust and Phillip R. Bennett, the "RGHI Entities"), and allegedly others on October 10, 2005 (the "RGHI Loan");

WHEREAS, on April 17, 2006, the Official Committee of Unsecured Creditors (the "Committee") of Refco Inc. and its affiliated debtors and debtors in possession including, without limitation, Refco Capital Markets, Ltd. ("Debtors," and, to the extent a party in the Adversary Proceeding, the "Refco Defendants," and, together with all debtor and non-debtor Affiliates of Refco Inc. including, without limitation, the entities listed on Attachment "B" annexed hereto, "Refco"), on behalf of defendant Refco Group Ltd., LLC ("RGL"),[1] filed an amended answer and counterclaim (the "Counterclaim") in the Adversary Proceeding asserting, among other things, (i) claims seeking to recover allegedly fraudulent transfers totaling at least $1.325 billion (collectively, the "Fraudulent Transfer Claims") subsequently transferred to BAWAG from RGL's initial transferee; and (ii) claims seeking damages arising out of BAWAG's alleged aiding and abetting of breaches of fiduciary duty by Phillip R. Bennett (the "Aiding and Abetting Claims");

WHEREAS, at the time of the filing of the Counterclaim, at the request of the Committee, the Court entered an *ex parte* order of attachment and temporary restraining order, dated April 25, 2006, freezing BAWAG's assets in the United States up to an amount equal to

---

[1]     References herein to the Committee shall be deemed to be on behalf of the Committee and, to the extent the context requires, RGL.  References to RGL shall be deemed to include the Committee to the extent of RGL's rights to enforce or waive any term or condition under this Stipulation and Order.

$1.325 billion (the "Attachment Order");

WHEREAS, upon the agreement of the Committee and BAWAG, on May 1, 2006, the Court modified the Attachment Order freezing and attaching certain of BAWAG's assets in specified New York accounts in the minimum aggregate amount of $1.156 billion, as reflected in an order of the Court entered on May 3, 2006, as further amended by order of the Court entered on May 11, 2006 (as may be further amended by order of the Court, the "Amended Attachment Order");

WHEREAS, on the date hereof, the Office of the United States Attorney for the Southern District of New York (the "USAO") entered into that certain non-prosecution agreement with BAWAG and some or all of the BAWAG Shareholders (as defined below) (the "Non-Prosecution Agreement") pursuant to which, among other things, the USAO agreed to refrain from prosecution of the BAWAG Entities, including such BAWAG Shareholders, conditioned upon BAWAG performing all obligations under this Stipulation and Order;

WHEREAS, the USAO has committed and agreed, pursuant to a Letter Agreement dated June 2, 2006, a copy of which is annexed hereto as Attachment "C," to transfer to the RGL estate, for distribution pursuant to the terms of this Stipulation and Order and title 11 of the United States Code (the "Bankruptcy Code"), not less than fifty percent (50%) of any funds forfeited by BAWAG (the "BAWAG Forfeited Funds") under or in connection with the Non-Prosecution Agreement and any related proceeding (the "USAO Distribution");

WHEREAS, (i) Anteilsverwaltung BAWAG P.S.K. Aktiengesellschaft ("AVB") directly or indirectly owns one-hundred  percent (100%) of the equity of BAWAG; and (ii) AVB is owned by the following entities:  (x) Österreichische Gewerkschaftliche Solidarität Privatstiftung (771.677 shares); (y) Österreichischer Gewerkschaftsbund ("ÖGB") (72.000

shares); and (z) ÖGB Vermögensverwaltungsgesellschaft m.b.H. (731.323 shares), the sole

shareholder of which is Die ÖGB Beteiligungsgesellschaft m.b.H, which in turn is owned by

ÖGB ((i), (ii)(x), (ii)(y), and (ii)(z), collectively the "BAWAG Shareholders");

WHEREAS, the Committee, the Refco Defendants, and BAWAG (collectively,

the "Parties") have agreed to settle the Adversary Proceeding, with the agreement, consent, and

support of Refco and the BAWAG Shareholders, on the terms set forth herein, and without

admitting any wrongdoing, and each of the Parties specifically denying the allegations made

against it in the Adversary Proceeding; and

WHEREAS, the Court has determined that the proposed settlement is in the best

interests of the Debtors' bankruptcy estates and is supported by valid, fair, and reasonably

equivalent consideration to BAWAG because, among other things, (i) the Debtors will be

afforded the opportunity, in accordance with the Allocation Order (as defined below), to share in

a substantial recovery from BAWAG, and will receive the benefit of the BAWAG Parties

Release (as defined below), in a manner that maximizes value for their creditors; and (ii)

BAWAG and the BAWAG Shareholders, which will receive the benefit of the Refco Parties

Release and additional releases and the prompt dissolution of the Amended Attachment Order,

will be afforded the opportunity to stabilize their business, rehabilitate their reputation, and

enhance the prospects for a sale of BAWAG's business in a manner that preserves substantial

value for BAWAG and BAWAG's direct or indirect stakeholders.

NOW, THEREFORE, IT IS STIPULATED AND AGREED, BY AND AMONG

THE PARTIES, SUBJECT TO APPROVAL BY THE COURT, THAT:

1.    Guaranteed Settlement Amount:

a.    Initial and Deferred Payments.  BAWAG shall (i) within 10 days of
this Stipulation and Order becoming a Final Order (the date of the

making of the Initial Payment (as defined below) being hereinafter called the "Initial Payment Date"), cause to be irrevocably transferred (subject to Sections 3 and 4(c) hereof) to RGL, pursuant to wire instructions to be provided by the Committee, the amount of $75 million in immediately available funds (the "Initial Payment"); and (ii) subject to this Stipulation and Order becoming a Final Order, on the date (the "Deferred Payment Date") that is the earliest to occur of (x) the consummation of a Sale Transaction (as defined below) with a Transaction Value (as defined below) equal to or greater than $500,000,000, (y) one year from the date of entry of this Stipulation and Order by the Court, and (z) the commencement of (1) an insolvency or similar proceeding in respect of BAWAG by BAWAG or the BAWAG Shareholders or (2) an involuntary (including mandatory) insolvency or similar proceeding in respect of BAWAG, other than a proceeding commenced by BAWAG or the BAWAG Shareholders, that has not been dismissed within 120 days of commencement, cause to be irrevocably transferred (subject to Sections 3 and 4(c) hereof) to RGL, pursuant to wire instructions to be provided by the Committee, the amount of $262,500,000, plus accrued interest on said amount (the "Interest Component") from and after the Initial Payment Date to and including the Deferred Payment Date at the rate of 3.5% per annum (the "Deferred Payment"), each on the terms set forth below; provided, however, that the Surety Provider (as defined below) may waive the triggers set forth above in clause (ii)(x), (y), or (z) at any time prior to the Deferred Payment Date by delivering a written notice of such waiver to RGL and the Committee (the date such notice is received, in form and substance reasonably satisfactory to RGL and the Committee, the "Waiver Date"), without penalty, and partial payment shall be permitted in increments of at least $50 million (any such payment for which triggers have been waived, an "Early Payment"); provided, further, that in the event of any such waiver(s), interest shall cease to accrue on any Early Payment(s) as of the applicable Waiver Date, and RGL shall transfer to BAWAG any amount of the Deferred Payment attributable to interest on any Early Payment accruing after the applicable Waiver Date promptly upon RGL's receipt of the Deferred Payment.  Nothing herein shall prevent BAWAG from paying the Deferred Payment in full in cash on the Initial Payment Date, in lieu of posting the Acceptable Surety (as defined below); provided, that in such event, the Deferred Payment shall be satisfied exclusively from the cash assets that are the subject of the Amended Attachment Order.  The Initial Payment together with the Deferred Payment shall comprise the "Guaranteed Settlement Amount." Notwithstanding anything herein to the contrary, the Initial Payment Date shall not occur earlier than July 31, 2006, unless such date restriction is waived in writing by the Committee; provided, however, that in the event that all of the conditions to consummation

of this Stipulation and Order, including, without limitation, this Stipulation and Order becoming a Final Order, shall have occurred prior to July 31, 2006, and BAWAG is ready, willing, and able to deliver (i) the Initial Payment and the Acceptable Surety for the Deferred Payment to RGL and (ii) the equivalent of the Initial Payment and the Acceptable Surety for the Deferred Payment to, or as directed by, the USAO, the Committee shall agree to modify the Amended Attachment Order by reducing the attached assets to $675,000,000 in cash, pending the Initial Payment Date; provided, further, that, in such event, BAWAG shall agree in any such modified Amended Attachment Order, that if the Initial Payment Date does not subsequently occur on or before August 10, 2006 due to BAWAG's failure to consummate this Stipulation and Order, the Committee and the USAO shall be authorized to cause the Initial Payment, the Deferred Payment, and the initial payment and deferred payment components of the BAWAG Forfeited Funds to be made from such $675,000,000.

b.  Matters Concerning Initial Payment.  Pending entry of the Allocation Order, and subject to the terms thereof, the Initial Payment shall be maintained in an account of RGL.

c.  Matters Concerning Deferred Payment.  If the Deferred Payment is not paid in full in cash in accordance with Section 1(a) hereof, the Deferred Payment shall be made by and from the assets of the Surety Provider (as defined below), and the Acceptable Surety (as defined below) shall be furnished on or before the Initial Payment Date, payable immediately upon demand on the earlier of the Deferred Payment Date and the Waiver Date, without any reduction, limitation, impairment, termination, defense, offset, counterclaim, or recoupment. If the Deferred Payment is paid in full in cash in accordance with Section 1(a) hereof, all references in this Stipulation and Order to receipt of the Acceptable Surety for the Deferred Payment shall be deemed to include receipt of the Deferred Payment. Pending entry of the Allocation Order, and subject to the terms thereof, the Deferred Payment shall be maintained in an account of RGL. Nothing contained herein shall be deemed, interpreted, or construed to discharge RGL or other Debtors, if applicable, from their obligations under Sections 3 and 4(c) hereof.

d.  BAWAG Shareholders Commitment.  The BAWAG Shareholders hereby jointly and severally guarantee the obligations of BAWAG to perform this Stipulation and Order, other than payment of the Guaranteed Settlement Amount, and agree to (i) use reasonable best efforts to cause BAWAG to perform all of its obligations hereunder, and (ii) provide assistance and cooperation, including financial accommodations, to BAWAG if necessary to BAWAG's performance

of all of its obligations hereunder, except as specified above. Without limiting the generality of the foregoing, the BAWAG Shareholders hereby agree to pay, and shall take all steps reasonably necessary, including any corporate action, to ensure delivery of, the Contingent Payment (as defined below), if such payment becomes due and payable hereunder.

e.  Acceptable Surety. "Acceptable Surety" shall mean a "direct pay" letter of credit or surety bond drawn in favor of RGL substantially in the form annexed hereto as Attachment "D" to be issued by a United States financial institution (the "Surety Provider") that is unaffiliated with BAWAG, has a credit rating by Standard & Poor's of not lower than "AA," and is otherwise reasonably acceptable to the Committee. In all events, the Acceptable Surety shall provide, and BAWAG hereby agrees, that draws on the Acceptable Surety will be paid on the earlier of (x) the Deferred Payment Date and (y) the Waiver Date, and the commencement of an insolvency or similar proceeding in respect of BAWAG shall not be a defense to payment by the Surety Provider. The Acceptable Surety shall be payable solely from the Surety Provider's own funds, and not from any collateral or other property of BAWAG or BAWAG's Affiliates.

f.  Matters Concerning BAWAG Forfeited Funds. It is the express intention of the Parties that the BAWAG Forfeited Funds shall consist of not less than the same amount, in each case, as the Initial Payment, the Deferred Payment, and the Contingent Payment. In the event that (i) any component of the BAWAG Forfeited Funds is less than the corresponding component of the Initial Payment, the Deferred Payment, or the Contingent Payment, taken individually, or (ii) the portion of the BAWAG Forfeited Funds that is equivalent to the Contingent Payment is not delivered to the USAO within 30 days of the date RGL receives the Contingent Payment, then BAWAG shall pay fifty percent (50%) of such shortfall (the "USAO Shortfall") to RGL, as additional amounts comprising, and included for all purposes in the definitions of, the Initial Payment, the Deferred Payment, or the Contingent Payment, as the case may be, subject to any terms and conditions governing the RGL Payments herein; provided, however, that BAWAG shall have no liability for any failure by the USAO to transfer to the RGL estate the USAO Distribution; provided, further, that in no event shall BAWAG be required to pay the USAO Shortfall if, or to the extent that, the sum of the Guaranteed Payments and the USAO Distribution equals $506,250,000, plus the Interest Component on $393,750,000.

2.    Contingent Participation Right. BAWAG and the BAWAG Shareholders

intend to seek to sell BAWAG or BAWAG's business or to effect a recapitalization of BAWAG,

provided, however, that the determination as to whether to consummate any such transactions shall be within the sole discretion of BAWAG and the BAWAG Shareholders. If, within two years of the date of entry of this Stipulation and Order by the Court (the "Outside Date"), BAWAG, any of its Affiliates, or any of the Securityholders (as defined below) consummate, or enter into a definitive agreement to consummate, a Sale Transaction (as defined below) that provides for a Transaction Value (as defined below) in excess of €1,800,000,000, or any series of Sale Transactions, whether or not related, that provide for an aggregate Transaction Value in excess of €1,800,000,000, BAWAG and the BAWAG Shareholders, to the extent specified in Section 1(d) hereof, shall pay to the RGL estate, for distribution as provided in the Allocation Order, an amount (the "Contingent Payment") equal to 15% of the amount by which the Transaction Value of such Sale Transaction or Sale Transactions exceeds €1,800,000,000; provided, however, that the Contingent Payment shall not exceed $100,000,000. The Contingent Payment(s) payable under this Section 2 shall be paid contemporaneously with the consummation of the Sale Transaction or Sale Transactions that give rise to the obligation to make such Contingent Payment. For currency conversion purposes, all amounts paid shall be converted into U.S. dollars on the date such payment is made; provided, however, that any consideration payable in installments shall be deemed to have been paid in a single payment at the consummation of the Sale Transaction. In the event that any of the consideration is represented by payments that are contingent upon the happening of any event other than the passage of time then such payments shall be paid to the RGL estate if and when received by BAWAG or the BAWAG Shareholders, as the case may be. The Contingent Payment shall be paid in cash, except that if the consideration received in the Sale Transaction consists of non-cash components, and there is an insufficient amount of cash components to satisfy the

Contingent Payment, BAWAG shall be permitted to pay the Contingent Payment in the same

form of non-cash components; provided, however, that the relative proportion of cash and non-

cash components of the Contingent Payment shall be the same, or shall have a greater proportion

of cash, as compared with the cash and non-cash components of the consideration paid in the

Sale Transaction.

For purposes of this Stipulation and Order:

a. The term "Sale Transaction" means, from and after the date of filing of
the Counterclaim, (i) any merger, consolidation, amalgamation or
other similar transaction or series of transactions involving BAWAG
or any of its subsidiaries; (ii) any Transfer (as defined below) or
issuance, directly or indirectly, in a single transaction or any series of
transactions, whether or not related, of the shares of capital stock of
BAWAG or Rights (as defined below) representing, in the aggregate,
more than 50% of the outstanding voting power or entitlement to
distributions, income, or other economic rights of BAWAG (including
any Transfer of any entity (or of control of any entity) that is a
Securityholder (as defined below); (iii) any Transfer in a single
transaction or series of transactions, whether or not related, of a
majority of the assets of BAWAG and its subsidiaries on a
consolidated basis (including deposit accounts); (iv) any
recapitalization or restructuring of the capital stock of BAWAG in
which Securityholders receive cash, securities (other than Qualified
Equity Securities (as defined below)) or other assets; (v) any dividend
(other than a dividend payable solely in Qualified Equity Securities of
BAWAG), distribution, profit participation, return of capital,
redemption or repurchase of shares of capital stock of BAWAG; (vi)
any issuance by BAWAG of shares of capital stock or other securities,
or profit participation, representing more than a majority of the voting
power or entitlement to distributions, income or other economic rights
of BAWAG; and (vii) any other similar transaction in which the
Securityholders receive any consideration or other value relating,
directly or indirectly, to their shares of capital stock in BAWAG.

Notwithstanding the foregoing, a Sale Transaction shall not include (i)
any transaction that is solely between or among BAWAG and/or any
of its direct and indirect wholly-owned subsidiaries; (ii) any sale of
assets that served as collateral for indebtedness of unrelated third
parties to BAWAG or its subsidiaries that was received by BAWAG
or its subsidiaries upon foreclosure of such assets or otherwise in
connection with an event of default under such indebtedness; provided

that (x) such indebtedness was extended by BAWAG or its subsidiaries in the ordinary course of its business, and (y) the proceeds received upon such sale were applied to reduce the indebtedness of such third party; (iii) a transaction under clause (iv) or (v) of the definition of Sale Transaction if (x) the aggregate amount of cash or the aggregate fair market value of any securities or other assets received by Securityholders in any such transaction or transactions after the date of the Counterclaim is less than €250,000,000, (y) such transaction is not related to, or done in contemplation of any other Sale Transaction, and (z) such transaction occurs prior to the first occurrence of any Sale Transaction; (iv) any infusion necessary to comply with the requirements for supplementary capital within the meaning of Section 23 of the Austrian Banking Act in the form of non-convertible subordinated debt which is either replacing existing supplementary capital or which is incremental capital not in excess of €250,000,000 ("Supplementary Capital") and (v) any credit to Tier 1 capital ("Tier 1 Capital") which BAWAG may receive through the establishment of one or more special purpose vehicles (each, an "SPV") by BAWAG as part of a consortium with other banks or insurance companies, in which BAWAG is the controlling person; it being understood, however, (w) that the Supplementary Capital and Tier 1 Capital shall not afford any voting rights or participation in profits in BAWAG or any BAWAG subsidiary, other than an SPV, to BAWAG, any BAWAG subsidiary or any third party, (x) no party shall have any preferential rights to receive distributions out of such special purpose vehicle, provided, that after January 1, 2008, any investors in an SPV shall be entitled to receive preferential distributions from earnings on the investments made by such SPV, (y) the assets of such special purpose vehicle shall be invested solely in Eurobonds or other similarly fixed income securities not issued by any participant in such transaction and (z) the Supplementary Capital and Tier 1 Capital shall not be excluded from the definition of a Sale Transaction, if any entity providing Supplementary Capital or Tier 1 Capital is also engaging in any other Sale Transaction in connection therewith (an SPV meeting all such requirements being referred to herein as a "Qualifying SPV"); and (vi) the return of capital to any investor in an SPV upon dissolution or liquidation thereof.

b. For purposes of this Section 2, if BAWAG or any of its Affiliates issue any securities, rights, options or other similar instruments that are convertible into or exchangeable for shares of capital stock of BAWAG ("Rights"), then (i) the shares of capital stock issuable upon conversion, exchange or exercise of the Rights shall be deemed to have been issued at the time of the issuance of the Rights, regardless of whether such Rights are immediately exercisable or exercisable only upon the happening of certain events or the passage of time, and (ii)

the consideration for such issuance shall be deemed to be the aggregate consideration paid for such Rights plus any additional amounts payable upon conversion, exchange or exercise of the Rights; provided, that in the event such Rights are convertible debt securities that were issued after the date of filing of the Counterclaim to and held by any Affiliate of BAWAG or a BAWAG Shareholder and are paid in accordance with their terms prior to the occurrence of any Sale Transaction, then such Rights shall not be deemed to have been issued.

c.  The term "Qualified Equity Securities" means ordinary shares of BAWAG, or any other shares of capital stock of BAWAG that (i) ranks *pari passu* as to distributions of dividends and rights upon liquidation with the ordinary shares; (ii) votes generally as a class with the ordinary shares; (iii) does not have any other voting rights other than as set forth in clause (ii) above; (iv) is not redeemable, either mandatorily, at the option of the company or at the option of the holder, or required to be repurchased, in any such case, whether immediately, after the passage of time, or upon the occurrence or non-occurrence of any event; and (v) is not convertible into or exchangeable for any other securities (other than Qualified Equity Securities) either mandatorily or at the option of the company or at the option of the holder, or required to be repurchased, in any such case, whether immediately, after the passage of time, or upon the occurrence or non-occurrence of any event.

d.  The term "Securityholder" means any (i) BAWAG Shareholder and (ii) any other holder of any shares of capital stock or subordinated debt securities of BAWAG or of any options, rights, warrants, convertible or exchangeable securities or other similar rights entitling such person to acquire any capital stock or subordinated debt securities of BAWAG, whether or not currently exercisable.

e.  The term "Transfer" means any direct or indirect transfer, sale, assignment, lease or license of any securities or assets, any grant of the right to receive the economic benefits of any securities or assets, any satisfaction or discharge of debts, or any similar transaction.

f.  Transaction Value. The amount received or deemed to be received in any Sale Transaction shall equal, in each case as applicable, the sum, without duplication, of (i) the aggregate amount of cash, and the aggregate fair market value of any securities or assets other than cash, received by Securityholders or BAWAG and its Affiliates, as the case may be, and any other elements of value received by any Securityholder or BAWAG and its Affiliates, directly or indirectly, arising out of or relating to any Sale Transaction; (ii) the aggregate fair market value of capital stock or other securities of BAWAG retained

by Securityholders after such transaction, which shall be calculated as if 100% of BAWAG or its assets or businesses had been sold by dividing: (x) the total proceeds and other consideration received or receivable by Securityholders or BAWAG and its Affiliates in connection with a Sale Transaction, by (y) the percentage of assets or ownership which is sold in connection with such Sale Transaction; (iii) all amounts paid pursuant to clause (iv) or (v) of the definition of Sale Transaction after the date of commencement of the Counterclaim to the date of consummation of the Sale Transaction regardless of whether payment of such amounts resulted in a Sale Transaction; (iv) the amount by which any liabilities of any Securityholder are forgiven, eliminated, reduced, or deferred beyond their current maturity in connection with, or related, directly or indirectly, to, any Sale Transaction (including, (x) in the case of any amendment or modification of any such liabilities, the difference between such liability prior to the amendment or modification and the fair market value of such liability after such amendment or modification and (y) in the case of any credit bid or similar transaction with respect to securities of BAWAG or assets of BAWAG or its Affiliates, the principal amount of and accrued interest on the debt being used in the credit bid); (v) indebtedness, other than Supplementary Capital raised after the date of the commencement of the Counterclaim, Tier 1 Capital credited after the date of the commencement of the Counterclaim as a result of the establishment of a Qualifying SPV, deposit obligations, the posting of the Acceptable Surety and covered bonds, of BAWAG and its subsidiaries that are assumed by any other person in connection with the Sale Transaction; and (vi) any net increase in indebtedness, other than Supplementary Capital raised after the date of the commencement of the Counterclaim, Tier 1 Capital credited after the date of the commencement of the Counterclaim as a result of the establishment of a Qualifying SPV, deposit obligations, the posting of the Acceptable Surety and covered bonds, of BAWAG and its Affiliates after the date of commencement of the Counterclaim to the date of consummation of the Sale Transaction (any such amount, the "Transaction Value").

g. <u>Computation of Transaction Value</u>. For purposes of computing the Transaction Value, the fair market value of securities or other assets shall be (i) in the case of securities, if the securities are listed or traded on any national or international securities exchange, the average of the volume weighted average sales prices on such exchanges for each of the five trading days immediately preceding the date as of which the fair market value is being determined, if the securities are not listed or traded on any national or international securities exchange, and the Committee and Refco do not agree with the valuation determined in good faith by the managing board of AVB or BAWAG, as applicable,

then the fair market value thereof as determined by an internationally recognized valuation expert retained jointly by BAWAG, the Committee, and Refco and (ii) in the case of other assets, if the Committee and Refco do not agree with the valuation determined in good faith by the managing board of BAWAG, the fair market value thereof as determined by an internationally recognized valuation expert retained jointly by BAWAG, the Committee, and Refco. In the case of any jointly retained valuation expert, the reasonable and customary fees, costs, and expenses shall be borne equally by BAWAG, on the one hand, and the Committee and Refco, on the other. In the event that an internationally recognized expert cannot be agreed upon by BAWAG, the Committee, and Refco, then each of the foregoing shall be entitled to retain its own expert, and the Court shall determine the Transaction Value and any fair market value necessary to such computation. AVB shall provide such information to the managing board of BAWAG as is available to it and is reasonably requested to enable the managing board of BAWAG to make the valuation determinations required by this paragraph. Neither BAWAG nor the BAWAG Shareholders shall be deemed to have received any consideration solely as a result of the guarantee by any BAWAG Shareholder of the payment of the Guaranteed Settlement Amount or the guaranty of the Republic of Austria issued on May 16, 2006 by federal statute or any extension thereof of up to €900,000,000 of certain loans extended by BAWAG.

h.  Insider Transactions. In the event of any Sale Transaction involving an Insider (as defined below), the Committee shall have the right, subject to any retention requirements set forth in the Bankruptcy Code, to have an internationally recognized investment banking firm (the "Committee Banker") determine whether the value received in such Sale Transaction was fair, from a financial point of view, to BAWAG or the BAWAG Shareholders, as the case may be, and if the Committee Banker determines such value is not fair, the Transaction Value received in such Sale Transaction shall be equal to such amount as is determined by the Committee Banker to be fair, from a financial point of view, to BAWAG or the BAWAG Shareholders, as the case may be; provided, however, that BAWAG shall also have the right to have an internationally recognized investment banking firm (the "BAWAG Banker") make an independent determination of the fairness of the value received in the Sale Transaction, from a financial point of view, to BAWAG or the BAWAG Shareholders, as the case may be, and in the event of disagreement between the Committee Banker and the BAWAG Banker, the Committee Banker and the BAWAG Banker shall endeavor in good faith to resolve any disagreement. If the Committee Banker and the BAWAG Banker are unable to resolve the disputed matter, the Court shall determine

whether the value received in such Sale Transaction was fair, from a financial point of view, to BAWAG or the BAWAG Shareholders, as the case may be.  In the event the Committee determines to retain the Committee Banker to perform the services described in this sub-paragraph, the Committee Banker will be retained on customary terms and conditions including, without limitation, reasonable and customary fees, costs and expenses to be borne equally by BAWAG, on the one hand (provided that such fees, costs and expenses, if any, to be borne by BAWAG shall not, in any event, exceed a total of $500,000), and the Committee and Refco, on the other, as well as customary indemnification provisions, provided that BAWAG will not be required to indemnify the Committee Banker for any claims or causes of action brought by or on behalf of the Committee or Refco. "Insider" means (i) any BAWAG Shareholder, (ii) any director or executive of BAWAG or any BAWAG Shareholder, (iii) any Austrian governmental or quasi-governmental agency, authority or instrumentality, (iv) any Austrian financial institution or insurance company, (v) any person who has direct or indirect material relationships whether contractual or not with any BAWAG Shareholder other than solely as a result of their interest in BAWAG and (vi) any Affiliate of any person specified in clauses (i) through (v) above; provided, however, that "Insider" shall not include any of the foregoing if (A) the Sale Transaction generates the $100,000,000 Contingent Payment in full or (B) the Sale Transaction is selected as the highest bid following the submission of "final and best bids" by two or more bona fide bidders at least one of which does not fall within the definition of Insider.

i.  Committee Monitor.  The Committee shall have the right, subject to any retention requirements set forth in the Bankruptcy Code, to engage the Committee Banker to monitor any Sale Transaction.  In that role, the Committee Banker will be provided access to all information pertaining to such Sale Transaction, including (1) being promptly informed by the BAWAG Banker's team leader (or high-level designee if such team leader is not available) of all material discussions with prospective bidders, and (2) being invited to material briefings, updates, or strategy sessions or meetings with BAWAG management; provided, that (i) the BAWAG Banker shall be the sole banker for any Sale Transaction; (ii) the Committee Banker shall not, without the consent of BAWAG or the BAWAG Banker (x) solicit or otherwise have any contact with prospective bidders for any Sale Transaction, including responding to inquiries from prospective bidders with anything other than a direction to contact the BAWAG Banker, (y) make any public announcement regarding any Sale Transaction except to the extent any such information is already public, or (z) engage in any discussions or negotiations regarding any

Sale Transaction; it being understood that no representative of the Committee Banker may be present at meetings or negotiations with prospective bidders regarding any Sale Transaction without the consent of the BAWAG Banker in its sole discretion. To the extent a representative of the Committee Banker is requested to attend any such meeting or negotiation, it shall not interfere with the discussions, negotiations, or consummation of a Sale Transaction. The Committee Banker will promptly refer any inquiries from prospective bidders with respect to a Sale Transaction to the BAWAG Banker. In the event the Committee Banker is retained as monitoring banker, payment of the Committee Banker's fees for such role, as well as its costs and expenses, shall be paid by the Debtors' estates in proportion to their rights to receive the Guaranteed Settlement Amount. It is also further agreed by the BAWAG Parties that the Committee Banker shall be released from any applicable laws imposing secrecy to the limited extent necessary to permit the Committee Banker to report to the Committee and/or Refco, subject to a confidentiality agreement binding on the Committee Banker and on the parties to whom it reports, in form and substance reasonably satisfactory to BAWAG, being in effect at such time. BAWAG shall provide customary indemnification to the Committee Banker, provided that BAWAG will not be required to indemnify for any claims or causes of actions brought by or on behalf of the Committee or Refco.

The Parties agree that this Section 2 shall be construed liberally such that any transaction with a similar purpose or result to one which is within the definition of a Sale Transaction shall be considered a Sale Transaction.

      3.    <u>Condition to Distribution of RGL Payments</u>. Any creditor of the Debtors electing or deemed to have elected by failing to opt out of a deemed election (each, an "<u>Electing Creditor</u>") to receive any portion of the Initial Payment, the Deferred Payment, the Contingent Payment, or the USAO Distribution (collectively, the "<u>RGL Payments</u>"), whether pursuant to a plan of reorganization, liquidation, or otherwise, shall be required to provide to the BAWAG Parties (as defined below) a release of all claims or actions arising from or related to Refco or the RGHI Entities, and any transactions involving such parties, including but not limited to claims or actions arising from or related to (a) the allegations set forth in the Complaint and the

Counterclaim, (b) the allegations set forth in the Adversary Proceeding, or (c) any allegations

that could have been made by any of the Refco Parties, which release may be provided, among

other methods, by making an election (or failing to opt out of a deemed election) on the ballot in

respect of any plan of reorganization or liquidation proposed in any of the Debtors' chapter 11

cases (a "Plan") or in such other document as may be approved by the Court, or upon such other

means as is necessary to accomplish the same result in the event one or more of the Debtors'

bankruptcy cases is or becomes a case under chapter 7 of the Bankruptcy Code or is dismissed

(the "Electing Creditor Release"); and any portion of the RGL Payments that would have been

made to creditors but for their election not to receive their share of the RGL Payments shall be

returned to BAWAG. Any creditor of the Debtors entitled to receive distributions of the RGL

Payments shall have the right to assign, pledge, hypothecate, or otherwise transfer all or part of

such distributions, including, without limitation, to a liquidating trust established in accordance

with a Plan, in all cases in accordance with applicable law, provided such creditor and any

transferee provide the BAWAG Parties the release described above. Notwithstanding the

references in this Stipulation and Order to distribution of the RGL Payments to creditors, nothing

herein shall prevent the RGL Payments from being distributed to shareholders of any of the

Debtors, which may include other Debtors or their Affiliates, to the extent consistent with the

Bankruptcy Code; provided, however, the required conditions imposed on distributions to

creditors described above shall apply equally to such shareholders; provided, further, that any

distribution of the RGL Payments to a Debtor shall be for further distribution to such Debtor's

creditors or, to the extent consistent with the Bankruptcy Code, such Debtor's shareholders, and

such further distribution (including any mediate or intermediate transfers of such distributions)

shall not cause the RGL Payments to lose their identity as RGL Payments, and the required

conditions imposed on distributions described above shall apply equally to all further

distributees.

    4.    <u>Releases</u>.

        a.    <u>Refco Parties Release</u>.  Upon (i) receipt by RGL of the Initial Payment and the Acceptable Surety for the Deferred Payment and (ii) receipt by the USAO of the equivalent of the Initial Payment and the Acceptable Surety for the Deferred Payment, in each case payable to or as directed by the USAO, and provided that the Non-Prosecution Agreement shall contain not less than an equivalent amount of the Contingent Payment as part of the BAWAG Forfeited Funds, the Refco Parties (as defined below) hereby forever release, acquit, and discharge the BAWAG Entities and the BAWAG Shareholders and any of their current officers and directors (to the extent listed on Attachment "<u>A</u>"), advisors, attorneys, and representatives, and all of their respective successors (excluding the RGHI Entities, if any, collectively, the "<u>BAWAG Parties</u>") from and against any and all claims or actions belonging to Refco, their current officers and directors, or the Debtors' bankruptcy estates, whether direct, derivative, or otherwise, and whether known or unknown, secured or unsecured, contingent or absolute, liquidated or unliquidated, perfected or unperfected, choate or inchoate, filed or unfiled, noticed or unnoticed, or recorded or unrecorded, including, but not limited to (i) all claims relating or related to the allegations contained in the Complaint and the Counterclaim, (ii) all claims that could have been asserted in the Adversary Proceeding or any other claim that could have been brought by or on behalf of Refco or the Committee, (iii) all claims that would be barred by principles of *res judicata* or other similar preclusive principles had the claims and defenses asserted or that could have been asserted in the Adversary Proceeding been fully litigated and resulted in a final judgment or order, and (iv) all claims relating to the former ownership or control of BAWAG Overseas, Inc., by any of the BAWAG Parties (the "<u>Refco Parties Release</u>"); <u>provided</u>, <u>however</u>, that the Refco Parties Release shall have no effect on and shall not operate to release any claims or potential claims the Committee or Refco may have relating to any obligations created by this Stipulation and Order, including any obligations relating to the Acceptable Surety; <u>provided</u>, <u>further</u>, that in the event that there is any balance remaining in such Refco Party's account with BAWAG as of April 27, 2006, less any transfers or withdrawals made by such Refco Party subsequent to such date, including, without limitation, account number 00110-040-903 at BAWAG or one of the other BAWAG Entities in the

name of REFCO Finanzierungsberatungs GmbH in Liqu.,
BAWAG shall pay such amount to such entity and such obligation,
if any, shall not be part of the Refco Parties Release. For
avoidance of doubt, the Refco Parties do not release any claims or
actions against any party other than the BAWAG Parties. The
Refco Parties expressly waive the provisions, rights, and benefits
of California Civil Code § 1542, to the extent applicable, and of
any other statutory provision that is similar, comparable, or
equivalent to California Civil Code § 1542. The Refco Parties
acknowledge: (i) Refco may have sustained damages, expenses,
and losses in connection with the subject matter of the foregoing
release that are presently unknown or not suspected, and that such
damages, expenses, and losses, if any, may give rise to additional
damages, expenses, and losses in the future that are not now
anticipated by them; and (ii) that this Stipulation and Order and the
foregoing release have been negotiated and agreed upon despite
this realization and, being fully advised, expressly and
intentionally waive any and all rights they may have under any
statute limiting releases of unknown claims, including but not
limited to California Civil Code § 1542, which reads as follows:

SECTION 1542. GENERAL RELEASE. A GENERAL
RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN
HIS OR HER FAVOR AT THE TIME OF EXECUTING THE
RELEASE, WHICH IF KNOWN BY HIM OR HER MUST
HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR.

b.    BAWAG Parties Release. Upon occurrence of the Initial Payment
Date, the BAWAG Parties, including any successors in interest,
hereby forever release, acquit, and discharge Refco, the Committee
and its members solely in their capacities as Committee members,
and any of Refco's current officers and directors (to the extent
listed on Attachment "B"), advisors, attorneys, and representatives,
and all of their respective successors (excluding the RGHI Entities,
if any, each, a "Refco Party" and, collectively, the "Refco Parties")
from and against any and all claims or actions, whether direct,
derivative, or otherwise, and whether known or unknown, secured
or unsecured, contingent or absolute, liquidated or unliquidated,
perfected or unperfected, choate or inchoate, filed or unfiled,
noticed or unnoticed, or recorded or unrecorded, including, but not
limited to (i) all claims relating or related to the allegations
contained in the Complaint and the Counterclaim; (ii) all claims
that could have been asserted in the Adversary Proceeding or any
other claim that could have been brought by or on behalf of the
BAWAG Parties; (iii) all claims that would be barred by principles

of *res judicata* or similar preclusive principles had the claims and defenses asserted or that could have been asserted in the Adversary Proceeding been fully litigated and resulted in a final judgment or order; and (iv) all claims relating or related to the payment in the approximate amount of $50 million made by BAWAG under a guaranty issued on or about June 5, 2005 to satisfy the obligations of Refco Capital Markets, Ltd. to Rietumu Bank with respect to a certain reverse repurchase transactions (the "RB Claims") (the "BAWAG Parties Release"); provided, however, that the BAWAG Parties Release shall have no effect on and shall not operate to release any claims or potential claims the BAWAG Parties may have relating or related to any obligations created by this Stipulation and Order. For the avoidance of doubt, the BAWAG Parties do not release any claims or actions against any party other than the Refco Parties. The BAWAG Parties expressly waive the provisions, rights, and benefits of California Civil Code § 1542, to the extent applicable, and of any other statutory provision that is similar, comparable, or equivalent to California Civil Code § 1542. The BAWAG Parties acknowledge: (i) BAWAG may have sustained damages, expenses, and losses in connection with the subject matter of the foregoing release that are presently unknown or not suspected, and that such damages, expenses, and losses, if any, may give rise to additional damages, expenses, and losses in the future that are not now anticipated by them; and (ii) that this Stipulation and Order and the foregoing release have been negotiated and agreed upon despite this realization and, being fully advised, expressly and intentionally waive any and all rights they may have under any statute limiting releases of unknown claims, including but not limited to California Civil Code § 1542, which reads as follows:

SECTION 1542. GENERAL RELEASE. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

c.   Executory Nature. In the event that (i) this Stipulation and Order is, for any reason, (x) not approved by the Court or (y) subsequently materially modified, vacated, or reversed, (ii) any party fails to perform any of its obligations hereunder, or (iii) RGL is required to disgorge any portion of the Guaranteed Settlement Amount or the Contingent Payment (other than any portion of such amount or payment returned to BAWAG pursuant to Section 3 hereof), the Parties shall be restored to their respective rights and

positions as they existed immediately prior to execution of this Stipulation and Order, and, among other things, the releases herein and the rights regarding Claim Over (as defined below) shall be deemed, for all purposes, null and void. In such event, the Court shall retain exclusive jurisdiction to fashion appropriate relief in aid of restoring the Parties to the *status quo ante*, including the restoration of all rights under the Amended Attachment Order.

5.    <u>No Claim by BAWAG Parties</u>.  Subject to the protections of Section 4(c) of this Stipulation and Order, the BAWAG Parties shall not file, and shall withdraw with prejudice, any proof of claim in any bankruptcy cases of the Debtors including, without limitation, in respect of the payment of the Guaranteed Settlement Amount, the Contingent Payment, the RGHI Loan, or the RB Claims, including pursuant to 11 U.S.C. § 502(h).  In the event any such proof of claim is filed by or for the benefit of the BAWAG Parties, or any claim is scheduled by any of the Debtors in favor of the BAWAG Parties, this Stipulation and Order shall be a complete defense to such claim and, without any further notice or order of the Court, any claims agent retained in any of the Debtors' cases shall be authorized and directed to expunge such proof of claim from the claims register.

6.    <u>Claims Reduction</u>.

a.    "<u>Claim Over</u>" means any claim for contribution, indemnification, or reimbursement by any third party not party to this Stipulation and Order (an "<u>Unnamed Party</u>" and, collectively, the "<u>Unnamed Parties</u>") against the BAWAG Parties that (i) directly or indirectly arises out of or is based upon, related to, or connected with the relationship between the BAWAG Parties and Refco or its directors, officers, and/or their respective Affiliates and (ii) is for recovery of amounts that such Unnamed Party paid or owes to Refco or the Debtors' estates pursuant to a judgment or award by a court of competent jurisdiction or settlement.  "Claim Over" shall not include any claim based on a written indemnity agreement, such claims being expressly excluded.

b.    <u>Protection from Claim Over</u>.  Subject only to Section 4(c) hereof, the BAWAG Parties shall have protection from liability to any Unnamed Party on any Claim Over for amounts owed or paid by such Unnamed Party to Refco or the Debtors' estates, which shall

include, for purposes of this provision, the Committee.

i.   To effectuate this protection of the BAWAG Parties, the Court orders that any judgment obtained by Refco or the Debtors' estates against an Unnamed Party shall be reduced by the percentage that reflects the proportionate responsibility of the BAWAG Parties (as a percentage of the aggregate responsibility of all potentially culpable parties, whether or not party to the particular action), if any, for the particular injuries that are the subject of the judgment (the "Judgment Reduction"), as determined by the Court or, if there is a jury trial, by the jury if charged to make such determination.

ii.   The obligation of Refco and the Debtors' estates under this Section 6 shall be accomplished by judgment reduction, partial or complete release, settlement credit, setoff, election to recover exclusively under an award for which there is no Claim Over, or such other method as may be permitted by applicable law at the election of Refco or the Debtors; this obligation exists only to the extent necessary to effectuate the Parties' intent to protect the BAWAG Parties from all Claims Over. Such judgment reduction, settlement credit, partial or complete release, or setoff shall be in an amount or percentage equal to the Judgment Reduction (and no more), which is sufficient to compensate the Unnamed Party for the loss of its Claim Over. The BAWAG Parties shall reasonably cooperate with Refco and the Debtors' estates and the Court in determining the appropriate amount of any judgment reduction, partial or complete release, settlement credit, setoff, exclusive recovery election, or other applicable credit.

iii.   Notwithstanding any other provision of this Stipulation and Order, neither Refco nor the Debtors' estates shall have any obligation to provide Claims Over protection in an amount greater than the amount awarded to them against Unnamed Parties.

iv.   Nothing in this Stipulation and Order shall require Refco or the Debtors' estates to reduce a judgment, award or settlement obtained against an Unnamed Party if such Unnamed Party has no Claim Over against the BAWAG Parties. If Refco or the Debtors' estates obtain a judgment that consists of multiple awards, including (A) one or more causes of action for which the Unnamed Party has or asserts a Claim Over against the BAWAG Parties and (B) one or more causes of action for which the Unnamed Party does not have or assert a Claim Over against the BAWAG Parties, then if an award-specific

reduction fully protects the BAWAG Parties from Claims Over, Refco and the Debtors' estates need only reduce those awards for which the Unnamed Party has a Claim Over.

v.    Nothing in this Stipulation and Order shall require the Committee, Refco, or the Debtors' estates to provide legal counsel to the BAWAG Parties, to defend them from Claims Over, or to reimburse the BAWAG Parties for legal or other costs and expenses incurred, directly or indirectly, as a result of a Claim Over.

vi.   For the avoidance of doubt, in any proceeding to determine the amount of a Claim Over, the Counterclaim, and the allegations of fact contained therein, shall not be admissible as evidence of the liability of the BAWAG Parties for a Claim Over or the proportionate responsibility of any party.

c.    <u>Bar Order</u>.  All Unnamed Parties are permanently barred and enjoined from commencing or prosecuting any action against the BAWAG Parties based on a Claim Over.  To make this bar order reciprocal, the BAWAG Parties are permanently barred and enjoined from commencing or prosecuting any action against Unnamed Parties for recovery of a Claim Over by the BAWAG Parties for any amounts paid pursuant to this Stipulation and Order.

d.    <u>Reciprocal Obligations</u>.  In the event that the BAWAG Parties obtain one or more judgments or awards against any Unnamed Party, and such Unnamed Party asserts a Claim Over or its equivalent against Refco, the BAWAG Parties shall, *mutatis mutandis,* perform the obligations imposed on the Debtors or their estates in this Section 6.  Refco shall be entitled to the protection of the barring injunction to the same extent as the BAWAG Parties for actions for Claim Over or its equivalent; <u>provided, however,</u> that Refco shall reasonably cooperate with the BAWAG Parties and the Court in determining the appropriate amount of any judgment reduction, partial or complete release, settlement credit, setoff, exclusive recovery election, or other applicable credit.

7.    <u>Allocation of Consideration Provided by BAWAG</u>.  All rights of the

Debtors or other parties in interest with respect to allocation among the Debtors of the RGL

Payments and the costs incurred by or on behalf of the Debtors' estates in connection with the

Adversary Proceeding, the Counterclaim, and the settlement embodied herein (i) are expressly

reserved; (ii) shall be determined by an order of the Court entered on or before the date a Plan is confirmed (the "Allocation Order"), which may be an order confirming such Plan; and (iii) shall be determined upon notice to, and the opportunity to object by BAWAG, the Debtors, any trustee appointed in any of the Debtors' bankruptcy cases, and any other party in interest in these cases; provided, however, that the RGL Payments shall be used solely to satisfy the prepetition claims against one or more of the Debtors (the entitlement of a particular Debtor to receive any portion of the RGL Payments for further distribution having been determined by the Court). In entering the Allocation Order, the Court shall consider, among other things (x) the relative merits of any claims that have been, may be, or could have been asserted by any of the Debtors' estates, and the defenses thereto, without any presumption in favor of or against RGL with respect to the facts and causes of action alleged in the Counterclaim or for having obtained the Attachment Order or Amended Attachment Order, (y) the value of the BAWAG Parties Release, and (z) any other matter deemed appropriate by the Court. Any party (other than any of the BAWAG Parties) with a valid, perfected, non-avoidable security interest in a Debtor's interest in the RGL Payments shall be entitled to adequate protection for the use of such RGL Payments, if any, to the extent required by section 363(e) of the Bankruptcy Code.

   8. Subsequent Challenge.  In light of (i) the material reduction in the amount of the Fraudulent Transfer Claims and Aiding and Abetting Claims (not less than $1.325 billion) reflected in the Guaranteed Settlement Amount and the Contingent Payments; (ii) the Refco Parties Release; (iii) the benefit to the continued conduct of BAWAG's and the BAWAG Shareholders' business entailed in the expedited resolution of these claims at materially reduced levels; and (iv) the deference to and approvals received by Austrian regulatory, political, and economic concerns reflected in this Stipulation and Order, none of the stipulations and

agreements contained herein, the Initial Payment, the Deferred Payment, the Acceptable Surety

(including the Surety Provider's obligation to pay the Deferred Payment), or the Contingent

Payment shall be subject to subsequent challenge, avoidance, disgorgement, or turnover, on any

theory, under the law of any relevant jurisdiction, and without regard to any contrary result

dictated by comity or similar considerations.   If, notwithstanding the foregoing prohibition, any

Refco Party is required to disgorge any portion of the Initial Payment, the Deferred Payment, the

Acceptable Surety, or the Contingent Payment, then notwithstanding anything to the contrary

herein, the BAWAG Shareholders shall jointly and severally indemnify and hold such Refco

Party harmless for any loss (including, without limitation, reasonable attorney's fees and out-of-

pocket expenses) thus incurred by reimbursing such party for any and all amounts turned over or

otherwise paid to the BAWAG Parties or any person or entity, including, without limitation, a

bankruptcy trustee, receiver, or liquidator, acting on behalf of the BAWAG Entities or their

stakeholders; provided, however, that such indemnification and hold harmless obligations shall

not arise in circumstances when such challenge, disgorgement, turnover, or similar theory occurs

in an insolvency or bankruptcy proceeding commenced against any BAWAG Party by a Refco

Party, or by any creditor of Refco, in such capacity.

   9. Continuation of the Attachment Order.  Until (i) receipt of the Initial

Payment and the Acceptable Surety for the Deferred Payment by RGL and (ii) receipt of the

equivalent of the Initial Payment and the Acceptable Surety for the Deferred Payment by or as

directed by the USAO, the Amended Attachment Order shall continue to be in full force and

effect.  Upon the occurrence of (i) and (ii) of the first sentence of this section, the Amended

Attachment Order shall automatically be vacated, dissolved, and no longer of any force or effect,

and the Committee shall promptly submit to the Court for entry the proposed form of order

vacating the Amended Attachment Order in the form annexed hereto as Attachment "E."

        10.    <u>Dismissal of Adversary Proceeding</u>.  Upon approval of this Stipulation and Order, counsel for the Parties shall execute the form of Stipulation of Partial Dismissal annexed hereto as Attachment "F" (the "<u>Stipulation of Dismissal</u>") and counsel for the Committee shall hold the executed form in escrow.  Upon (i) receipt by RGL of the Initial Payment and the Acceptable Surety for the Deferred Payment, and (ii) receipt by the USAO of the equivalent of the Initial Payment and the Acceptable Surety for the Deferred Payment, in each case payable to or as directed by the USAO, counsel for the Committee will file the executed Stipulation of Dismissal with the Court.

        11.    <u>Third Party Approvals</u>.  This Stipulation and Order is expressly subject to (i) the approval of all representatives with authority to sue and grant releases on behalf of the estates of the Debtors, including Refco, LLC and Refco Capital Markets, Ltd.; and (ii) Harrison J. Goldin in his capacity as Chief Executive Officer of Refco Inc., the ultimate of parent of all non-debtor Affiliates of the Debtors, each of the foregoing to be obtained within fifteen (15) days of execution of this Stipulation and Order by the Committee and BAWAG, unless waived or modified by the Committee and BAWAG in writing.  This Stipulation and Order shall become a binding and enforceable obligation against BAWAG if and when it is binding on the other Parties hereto, and provided that the Financial Market Authority (Finanzmarktaufsicht) does not effectively reject the settlements embodied herein in accordance with established regulatory standards and Austrian banking laws, by delivering written notice of such rejection to the Parties (the "<u>BAWAG Condition</u>") on or before fifteen (15) days following execution of this Stipulation and Order by the Committee and BAWAG.  Notwithstanding anything to the contrary herein, BAWAG (and not any Refco-related party) shall be responsible for clearing permissibility of this

Stipulation and Order and its fulfillment in accordance with the laws of Austria; provided, however, that the Refco Parties shall reasonably cooperate with BAWAG in seeking such permission. In the event of any violation of Austrian law, the enforceability of this Stipulation and Order shall not be affected and each of BAWAG and the BAWAG Shareholders shall indemnify and hold the Refco Parties fully harmless for any penalty, fee, fine, or other charge which may be imposed by any non-United States authority on such parties out of or in connection with this Stipulation and Order or its performance, and for any attendant loss, including reasonable attorney's fees and out-of-pocket expenses. Notwithstanding anything to the contrary herein, the Committee and the Refco Defendants (and not any BAWAG-related party) shall be responsible for obtaining approval of this Stipulation and Order by the Court; provided, however, that BAWAG and the BAWAG Parties shall reasonably cooperate with the Committee and the Refco Defendants in seeking such Court approval.

      12.    Court Approval; Consummation; Binding Effect. This Stipulation and Order is expressly subject to and contingent upon its approval by the Court. In the event that (A) this Stipulation and Order, or any portion hereof, (i) shall not have been approved by the Court within 45 days of execution by the Committee and BAWAG, (ii) shall not have been affirmed by the United States District Court for the Southern District of New York (the "District Court") within 60 days of a timely notice of appeal, if any, from this Court's approval, (iii) shall not have been affirmed by the United States Court of Appeals for the Second Circuit (the "Court of Appeals") within 60 days of a timely notice of appeal, if any, from the District Court's affirmance, or (iv) shall not have become a Final Order within 120 days of entry of this Stipulation and Order, or (B) receipt by (i) RGL of the Initial Payment and the Acceptable Surety for the Deferred Payment and (ii) the USAO of the equivalent of the Initial Payment and the

Acceptable Surety for the Deferred Payment, in each case payable to or as directed by the USAO, and provided that the Non-Prosecution Agreement shall contain not less than an equivalent amount of the Contingent Payment as part of the BAWAG Forfeited Funds, shall not have occurred within 10 days of this Stipulation and Order becoming a Final Order, then, in any such event, or in the event the District Court or the Court of Appeals shall have reversed or vacated, in whole or in part, a lower court's approval of this Stipulation and Order, this Stipulation and Order shall be of no further force and effect, and neither this Stipulation and Order nor any negotiations and writings in connection with this Stipulation and Order shall in any way be construed as or deemed to be evidence of or an admission on behalf of any party hereto regarding any claim or right that such party may have against any other party hereto.  The Parties agree jointly to seek and pursue an expedited resolution of any appeal.

        13.    <u>Mutual Dependence</u>.  Notwithstanding anything to the contrary in this Stipulation and Order or the Non-Prosecution Agreement, (i) the execution of the Non-Prosecution Agreement and any required approvals of the USAO Distribution shall be a condition precedent to effectiveness of this Stipulation and Order, and any failure to satisfy the monetary obligations of the Non-Prosecution Agreement shall be a breach of this Stipulation and Order, with respect to which Refco and the Committee shall have the right  to seek relief from the Court; and (ii) the execution and approval by the Court of this Stipulation and Order shall be a condition precedent to effectiveness of the Non-Prosecution Agreement, and any failure to satisfy the monetary obligations of this Stipulation and Order shall be a breach of the Non-Prosecution Agreement; it being understood by the Parties that a material integral part of the consideration to be obtained by the Committee and Refco is dependent upon performance by BAWAG of its monetary obligations under the Non-Prosecution Agreement.

14.    <u>Continuing Jurisdiction</u>. The Parties agree that the Court will retain exclusive jurisdiction over the Adversary Proceeding pending the Stipulation of Dismissal becoming a Final Order. "<u>Final Order</u>" shall mean an entered order that has not been stayed, vacated, or reversed, or materially modified or amended, and as to which: (i) the time to seek review, reargument, or rehearing has expired, and as to which no appeal or motion or petition for certiorari, review, or rehearing is pending, or (ii) if a stay, appeal, review, reargument, rehearing, or certiorari has been sought, the order or judgment has been affirmed, or the request for stay, review, reargument, rehearing, or certiorari has been denied and the time to seek further stay, appeal, review, reargument, rehearing, or certiorari has expired, as a result of which such order or judgment has become final and non-appealable in accordance with applicable law; <u>provided</u>, <u>however</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Rule 9024 of the Federal Rules of Bankruptcy Procedure, may be but has not then been filed with respect to such order, shall not cause such order not to be a Final Order.

15.    <u>Settlement as "Agreement."</u> The signatories hereto agree that, upon this Stipulation and Order becoming a Final Order, this Stipulation and Order constitutes not only an order of the Court, but also an agreement enforceable as a written contract, and each of the signatories commits to comply with its undertakings pursuant to the terms hereof.

16.    <u>Governing Law</u>. Except to the extent governed by the provisions of the Bankruptcy Code, this Stipulation and Order shall be governed by, subject to, and interpreted in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in New York without regard to principles of conflicts or choice of law or any other law that would make the laws of any jurisdiction other than the State of New York applicable hereto.

17.    <u>Consent to Jurisdiction</u>.  The Parties hereby consent to the jurisdiction of

the Court, or the District Court for the Southern District of New York solely in the event these

cases are closed and the Court declines to reopen these cases, and agree that this shall be the

exclusive jurisdiction for any action seeking to enforce or interpret the terms of this Stipulation

and Order, including any issues relating to Claims Over.  The Parties also consent to the

reopening of any closed case of any or all of the Debtors for the purpose of interpreting or

enforcing the terms of this Stipulation and Order.  The Parties further consent to personal

jurisdiction in the Court and to service of process through service upon counsel of record in the

Adversary Proceeding; <u>provided</u>, <u>however</u>, that such consent shall be limited to matters arising

from or relating to this Stipulation and Order, including any issues relating to Claims Over.

18.    <u>Entire Agreement</u>.  This Stipulation and Order shall constitute the entire

agreement between the parties relating to the subject matter herein and, subject to the protections

described in Section 4(c) hereof, supersedes any and all prior agreements, negotiations,

representations and understandings, whether written or oral, between the parties and may not be

released, supplemented or modified in any manner except by further written agreement signed by

a duly authorized officer or representative of each of the parties.

19.    <u>Authority</u>.  As of (x) the date hereof and (y) the date this Stipulation and

Order becomes a Final Order, (A) the Parties represent and warrant to each other that: (i) the

signatories to this Stipulation and Order are authorized to execute this Stipulation and Order;

(ii) each has full power and authority to enter into this Stipulation and Order, including to grant

the Refco Parties Release and the BAWAG Parties Release, as applicable, subject to the terms

hereof, it being agreed that Refco and BAWAG, as the case may be, shall indemnify and hold the

other harmless in the event any of the Refco Parties or the BAWAG Parties, respectively,

commences an action that is released pursuant to Section 4 hereof; (iii) this Stipulation and Order

is duly executed and delivered, and constitutes a valid and binding agreement in accordance with

its terms; and (B) BAWAG and the BAWAG Shareholders represent and warrant that: (i) the

BAWAG Shareholders are the sole direct and indirect shareholders of BAWAG, with individual

holdings in the amount set forth in the recitals of this Stipulation and Order, and (ii) this

Stipulation and Order is in conformity with all applicable laws of Austria; provided, that in the

event any permits or similar authorization is required under the laws of Austria to consummate

this Stipulation and Order, BAWAG and the BAWAG Shareholders shall be jointly and

severally liable to obtain such permits or authorization, at their sole cost and expense.

  20. Successors and Assigns. Neither this Stipulation and Order nor any of the

rights, interests, or obligations hereunder may be voluntarily assigned, in whole or in part, by any

of the Parties without the prior written consent of the other Parties. Any purported assignment

not permitted under this section shall be null and void. This Stipulation and Order shall be

binding upon, inure to the benefit of, and be enforceable by, the Parties hereto and their

respective successors, including, without limitation, any trustee, liquidator, receiver, or other

representative or assignee by operation of law in any insolvency proceeding (including pursuant

to any plan of reorganization) of any of the Parties.

  21. Counterparts Acceptable. This Stipulation and Order may be executed in

one or more counterparts and by facsimile, all of which shall be considered effective as an

original signature.

  22. Notices. Any and all notices to be provided pursuant to this Stipulation

and Order shall be delivered by electronic mail, overnight courier, or facsimile, in each case

confirmed by telephone and, in the case of electronic mail or facsimile, also confirmed by first

class registered mail to the persons listed on the signature page hereto.  Upon receipt by the

Committee or RGL of any notice from BAWAG or the BAWAG Shareholders, the Committee

or RGL, as the case may be, shall promptly provide copies of such notice to any trustees

appointed for the Debtors.

SIGNATURE PAGES FOLLOW

Signature Page
Stipulation and Order of Settlement
Bawag P.S.K. v. Refco Inc., et al.
Dated:  June 2, 2006


MILBANK, TWEED, HADLEY & McCLOY LLP


By:   /s/ Luc A. Despins
      Luc A. Despins (LD 5141)
      Scott A. Edelman (SE 5247)
      Susheel Kirpalani (SK 8926)
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Counsel for Official Committee of Unsecured
Creditors of Refco Inc., et al., and on behalf of Refco
Group Ltd., LLC*


DECHERT LLP


By:   /s/  Joel H. Levitin
      Joel H. Levitin  (JL 5814)
      Andrew J. Levander  (AL 5987)
      Guy Petrillo (GP 5891)
30 Rockefeller Plaza
New York, New York 10036
(212) 698-3500

*Counsel for BAWAG P.S.K. Bank für Arbeit und
Wirtschaft und Österreichische Postsparkasse
Aktiengesellschaft*

BAWAG P.S.K. Bank für Arbeit und Wirtschaft und
Österreichische Postsparkasse Aktiengesellschaft,
On Behalf Of BAWAG Entities

By: /s/ Dr. Ewald Nowotny  and Stephan Koren
      Pursuant to Authority Conveyed By Resolution
      of the Supervisory Board of BAWAG

Signature Page
Stipulation and Order of Settlement
Bawag P.S.K. v. Refco Inc., et al.

AS TO SECTIONS 1(d), 2, 4(b), 8, 11, 15 and
19
BAWAG SHAREHOLDERS

Anteilsverwaltung BAWAG P.S.K.
Aktiengesellschaft

By:  /s/ Heinrich Gehl    Clemens Schneider


Österreichische  Gewerkschaftliche  Solidarität
Privatstiftung

By:  /s/ Erich Foglar
        Franz Zwickl
        Eleanore Hostasch

Österreichischer Gewerkschaftsbund

By:  /s/  Rudolf Hundstorfer
        Clemens Schneider

ÖGB Vermögensverwaltungsgesellschaft
m.b.H.

By:    /s/ Erich Foglar   Josef Burianek

REFCO INC. and Its Debtor Affiliates Other Than Refco LLC and Refco Capital Markets Ltd.


By:___/s/ Harrison J. Goldin_____
   Authorized Representative


Non-Debtor Affiliates of REFCO INC.


By:___/s/ Harrison J. Goldin_____
   Harrison J. Goldin
   Chief Executive Officer



REFCO, LLC


By:___/s/ Albert S. Togut, as Chapter 7 Trustee
   Authorized Representative



REFCO CAPITAL MARKETS, LTD.


By:___/s/ Marc S. Kirschner, as Chapter 11 Trustee
   Authorized Representative

34

Stipulation and Order of Settlement
Bawag P.S.K. v. Refco Inc., et al.


SO ORDERED THIS __ DAY OF JUNE, 2006:


_____
Honorable Robert D. Drain
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REFCO INC., <u>et al.</u>,<br><br>                 Debtors. | Chapter 11<br><br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| BAWAG P.S.K. BANK FÜR ARBEIT<br>UND WIRTSCHAFT UND<br>ÖSTERREICHISCHE POSTSPARKASSE<br>AKTIENGESELLSCHAFT,<br><br>               Plaintiff,<br><br>    - against -<br><br>REFCO INC., <u>et al.</u>,<br><br>               Defendants,<br><br>    - and -<br><br>THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS OF REFCO<br>INC. <u>ET AL.</u>, on behalf of REFCO<br>GROUP LTD., LLC,<br><br>               Intervenor-<br>               Defendant and<br>               Counterclaim<br>               Plaintiff. | Adv. Pro. No. 05-03161 (RDD) |

**ORDER APPROVING AND CLARIFYING STIPULATION AND ORDER OF**
**SETTLEMENT AND RESOLVING CERTAIN OBJECTIONS**

       Upon (A) the Stipulation and Order of Settlement, executed by the parties on June

2, 2006 and annexed hereto as Exhibit "A" (the "<u>Stipulation and Order</u>"); (B) the Order, Under

Federal Rule of Bankruptcy Procedure 9019, Approving a Settlement Between, Among Others,

Albert Togut, as the Chapter 7 Trustee of Refco, LLC, and BAWAG P.S.K. Bank für Arbeit und

Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft, entered by this Court contemporaneously herewith in In re Refco, LLC, No. 05-60134; (C) the motion of the Official Committee of Unsecured Creditors (the "Committee") of Refco, Inc. to approve the Stipulation and Order of Settlement, dated June 5, 2006 (the "Motion"); (D) the Order approving the form and manner of notice of the Motion, dated June 9, 2006 (the "Notice Order"); (E) the limited objection of the Refco Underwriters dated June 20, 2006; (F) the limited objection of Grant Thornton LLP dated June 20, 2006; (G) the Limited Objection and Supplement thereto of the *Ad Hoc* Committee of Equity Holders dated June 20 and 22, 2006, respectively; (H) the conditional objection of Bank of America, N.A., As Administrative Agent, dated June 20, 2006; (I) the limited objection of the Lead Plaintiffs dated June 22, 2006; and the limited response of the VR Entities ("VR") to the objections of the Bank of America and the Lead Plaintiffs, dated June 26, 2006 (the "VR Response"); and notice in accordance with the Notice Order having been provided; and good cause having been shown, and the Court finding that the terms of the Stipulation and Order and this order clarifying certain terms of the Stipulation and Order were negotiated at arm's length and in good faith, without collusion, and for reasonably equivalent value, and represent a fair settlement and compromise that falls within the range of reasonable litigation outcomes, and the Stipulation and Order, as clarified and modified herein is in the best interests of the Debtors' estates; and for all the reasons set forth by Court in its bench ruling, which is incorporated herein, on the record of the hearing held on June 30, 2006, it is hereby

ORDERED, ADJUDGED AND DECREED that the Stipulation and Order is approved as if entered by the Court, subject to the following changes:

1.     Notwithstanding the terms of the Stipulation and Order, the following entities are <u>not</u> included in the definition of "Affiliates" of Refco Inc.: (a) Refco Diversified

Futures Fund (in voluntary liquidation) f/k/a Refco Winton Diversified Futures Fund; (b) Refco

Advantage Multi-Manager Fund - Futures Series I (in voluntary liquidation); (c) Refco SPhinX

Managed Futures Index Fund, Ltd.; (d) SPhinX Managed Futures Index Fund, LP; or (e) S&P

Managed Futures Index Fund, LP.

    2.    For avoidance of doubt, the following entities are <u>not</u> included in the

Stipulation and Order's definition of "Affiliates" of BAWAG:  (a) Bank Frick & Co.

Aktiengesellschaft; (b) Thomas Hackl; and (c) BAWAG Overseas, Inc.

    3.    The following language shall be added immediately following the last

sentence of Section 3:

> In the event that any Electing Creditor is required to disgorge the entirety
> of the RGL Payments it receives, the releases granted by such Electing
> Creditor shall be deemed, for all purposes, null and void.

    4.    Section 6(b)(i) of the Stipulation and Order shall be replaced in its entirety

by the following:

> To effectuate this protection of the BAWAG Parties, the Court orders that any
> judgment obtained by Refco or the Debtors' estates against an Unnamed Party (a
> "<u>Judgment</u>") that awards damages or other monetary relief for which the
> BAWAG Parties may also bear responsibility in whole or in part ("<u>Common</u>
> <u>Damages</u>") shall be reduced by the greater of (x) the percentage that reflects the
> proportionate responsibility of the BAWAG Parties, if any, for Common
> Damages, and (y) the portion, if any, of the aggregate consideration provided to
> Refco or the Debtors' estates by the BAWAG Parties pursuant to this Stipulation
> and Order determined to be attributable to Common Damages (the greater of (x)
> and (y), the "<u>Judgment Reduction</u>").  The issue of whether any injuries or
> damages are common and the value of the aggregate consideration, if any,
> provided for Common Damages to Refco or the Debtors' estates pursuant to this
> Stipulation and Order shall be determined by the Court or, solely in the event the
> Court is divested of jurisdiction, the reference is withdrawn with respect to the
> foregoing matters, or the Court orders otherwise, such other court having
> jurisdiction over such matters.  Any allocation to the BAWAG Parties of any
> proportionate responsibility for any Common Damages shall be determined by the
> court entering the relevant Judgment or, if a jury trial, by the jury in such court,
> or, solely in the event such court so orders, the Court.  All arguments by Refco,
> the Debtors' estates or any Unnamed Party as to whether a Judgment awards

Common Damages, the proportionate responsibility of the BAWAG Parties, the portion, if any, of the aggregate consideration provided to Refco or the Debtors' estates by the BAWAG Parties attributable to Common Damages, or the amount of the Judgment Reduction are, except as provided in this Stipulation and Order, expressly reserved. Notwithstanding anything to the contrary contained in this Stipulation and Order, the provision by an Electing Creditor, including, without limitation, an Unnamed Party that has a Claim Over, of an Electing Creditor Release under Section 3 hereof shall not affect either that Electing Creditor's right to obtain a Judgment Reduction or the amount of any such Judgment Reduction in accordance with this section 6(b)(i).

5.    Section 6(b)(ii) of the Stipulation and Order shall be replaced in its

entirety by the following:

The BAWAG Parties shall reasonably cooperate with Refco and the Debtors' estates and the Court in determining the appropriate amount of any Judgment Reduction.

6.    Section 6(b)(vi) of the Stipulation and Order shall be deleted in its

entirety.

7.    The first sentence of Section 6(c) shall be replaced by the following:

Except to the extent that Section 4(c) is triggered, all Unnamed Parties are permanently barred and enjoined from commencing or prosecuting any action against the BAWAG Parties based on a Claim Over. Nothing in this Stipulation and Order, including this Section 6(c), shall bar or permit discovery by any Unnamed Party of the BAWAG Parties in any proceeding. The rights and objections of Unnamed Parties and the BAWAG Parties with respect to discovery on any issue are expressly reserved and not the subject of this Stipulation and Order.

8.    The first two sentences of Section 7 shall be replaced in their entirety by

the following:

All rights of the Debtors or other parties in interest, including any non-debtor Affiliates of Refco Inc. that furnish releases under Section 4(a) hereof (the "Eligible Non-Debtor Affiliates"), with respect to allocation among the Debtors and Eligible Non-Debtor Affiliates of the Aggregate Settlement Consideration (as defined below) and the costs incurred by or on behalf of the Debtors' estates and the Eligible Non-Debtor Affiliates in connection with the Adversary Proceeding, the Counterclaim, and the settlement embodied herein (i) are expressly reserved; (ii) shall be

determined by an order of the Court entered on or before the date a Plan is
confirmed (the "Allocation Order"), which may be an order confirming
such Plan; and (iii) shall be determined upon notice to, and the opportunity
to object by BAWAG, the Debtors, the Eligible Non-Debtor Affiliates,
any trustee appointed in any of the Debtors' bankruptcy cases, and any
other party in interest in these cases; provided, however, that the
Aggregate Settlement Consideration shall be used solely to satisfy the
prepetition claims against and, to the extent consistent with the
Bankruptcy Code, the prepetition equity interests in one or more of the
Debtors or the Eligible Non-Debtor Affiliates (the entitlement of a
particular Debtor or Eligible Non-Debtor Affiliate to receive any portion
of the Aggregate Settlement Consideration for further distribution having
been determined by the Court).  In entering the Allocation Order, the
Court shall consider, among other things (i) the relative merits of any
claims that have been, may be, or could have been asserted by any of the
Debtors' estates or the Eligible Non-Debtor Affiliates, and the defenses
thereto, without any presumption in favor of or against RGL with respect
to the facts and causes of action alleged in the Counterclaim or for having
obtained the Attachment Order or Amended Attachment Order; (ii) the
value of the BAWAG Parties Release, including the waiver of any claims
that the BAWAG Parties asserted, or could have asserted, against any of
the Debtors or Eligible Non-Debtor Affiliates (taking into account any
defenses, counterclaims and offsets related thereto); and (iii) any other
matter deemed appropriate by the Court on an objective basis with respect
to each of the Debtors. For purposes hereof, "Aggregate Settlement
Consideration" shall mean the sum of the RGL Payments and the
consideration that would have been provided on account of any claims or
causes of action asserted, or that could have been asserted, against the
Debtors or Eligible Non-Debtor Affiliates by the BAWAG Parties
demonstrated to have value  (taking into account any defenses,
counterclaims and offsets related thereto); provided, however, that in the
event any Debtor or Eligible Non-Debtor Affiliate is deemed to have
received a benefit from the BAWAG Parties Release that exceeds the
value allocated to such Debtor or Eligible Non-Debtor Affiliate, then such
beneficiary shall redistribute such excess benefit, taking into account any
defenses, offsets and counterclaims, to those entities entitled to such value,
all in accordance with the Allocation Order; provided, further, that (i) any
such redistribution shall be included in the definition of RGL Payments
for purposes of Section 3 of the Stipulation and Order; and (ii) any
Eligible Non-Debtor Affiliate that receives, directly or indirectly, any
portion of the Aggregate Settlement Consideration shall (x) only distribute
such portion pro rata to its prepetition creditors and/or shareholders and
(y) only if the recipient agrees to the Electing Creditor Release or has
already provided a Refco Parties Release, with any Aggregate Settlement
Consideration not being distributed to such creditors or shareholders being
returned to BAWAG.

9.     The deadline set forth in Section 12(B), nullifying the Stipulation and

Order if certain payments are not made within 10 days of the Stipulation and Order becoming a

Final Order, shall be subject to Section 1(a), which provides that, unless waived in writing by the

Committee, the Initial Payment Date shall not occur earlier than July 31, 2006.

10.     Attachment B to the Stipulation and Order shall be replaced by the version

of Attachment B annexed hereto as Exhibit "B."

11.     Annexed hereto as Exhibit "C", solely for ease of reference, is a

conformed version of the Stipulation and Order, as approved by this Order, redlined against the

version filed with the Motion on June 5, 2006.

12.     The objections timely filed in respect of the Motion are, to the extent not

consensually resolved or withdrawn on the record,  expressly denied.

13.     The VR Response and  VR's oral motion for enlargement pursuant to

Federal Rule of Bankruptcy Procedure 9006 are moot, overruled, or denied.


Dated: July 6, 2006
       New York, New York


_____/s/ Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Refco Inc., *et al.*, | : | Case No. 05-60006 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND
## CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

J. Gregory Milmoe
Sally McDonald Henry
J. Gregory St. Clair
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Refco Inc., *et al.*

Tina L. Brozman
Timothy B. DeSieno
Mark W. Deveno
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Attorneys for Marc S. Kirschner, the Chapter 11 Trustee
for Refco Capital Markets, Ltd.

Luc A. Despins
Susheel Kirpalani
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Attorneys for the Official Committee of Unsecured
Creditors of Refco Inc., *et al.*

David S. Rosner
Andrew K. Glenn
Jeffrey R. Gleit
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for the Additional Committee of Unsecured
Creditors of Refco Inc., *et al.*

Dated:   New York, New York
         December 14, 2006

# TABLE OF CONTENTS

Page

ARTICLE I DEFINED TERMS AND RULES OF INTERPRETATION ................................................................. 1
1.1    *Additional Committee* ................................................................................................................. 1
1.2    *Additional RCM Claim* ................................................................................................................ 1
1.3    *Ad Hoc Committee of Senior Subordinated Note Holders* ......................................................... 1
1.4    *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* ......................... 1
1.5    *Ad Hoc Equity Committee* ........................................................................................................... 2
1.6    *Ad Hoc Equity Committee Fees and Expenses* ........................................................................... 2
1.7    *Adjusted Contributing Debtors Distributive Assets* ................................................................... 2
1.8    *Administrative Claim* .................................................................................................................. 2
1.9    *Administrative/Priority Claims Reserve* .................................................................................... 2
1.10   *Administrative Claims Adjustment* ............................................................................................. 2
1.11   *Administrative Claims Objection Deadline* ................................................................................ 2
1.12   *Administrative Professionals* ..................................................................................................... 2
1.13   *Affiliate Debtor(s)* ...................................................................................................................... 2
1.14   *AlixPartners* ............................................................................................................................... 3
1.15   *Allotted Administrative Claims* .................................................................................................. 3
1.16   *Allowed* ....................................................................................................................................... 3
1.17   *"Allowed ... Claim"* ................................................................................................................... 3
1.18   *Asset Schedule* ........................................................................................................................... 3
1.19   *Ballot* .......................................................................................................................................... 3
1.20   *Bankruptcy Code* ........................................................................................................................ 3
1.21   *Bankruptcy Court* ....................................................................................................................... 3
1.22   *Bankruptcy Rules* ....................................................................................................................... 3
1.23   *Bar Date* ..................................................................................................................................... 3
1.24   *BAWAG* ....................................................................................................................................... 3
1.25   *BAWAG Allocation Order* ........................................................................................................... 3
1.26   *BAWAG Contingent Proceeds* .................................................................................................... 4
1.27   *BAWAG Guaranteed Proceeds* ................................................................................................... 4
1.28   *BAWAG Proceeds* ....................................................................................................................... 4
1.29   *BAWAG Settlement* ..................................................................................................................... 4
1.30   *Business Day* ............................................................................................................................... 4
1.31   *Capstone* ..................................................................................................................................... 4
1.32   *Cargill* ........................................................................................................................................ 4
1.33   *Cargill Administrative Claim* ..................................................................................................... 4
1.34   *Cash* ............................................................................................................................................ 4
1.35   *Cash-Out Option Agreement* ...................................................................................................... 4
1.36   *Chapter 11 Case(s)* ..................................................................................................................... 4
1.37   *Claim* .......................................................................................................................................... 4
1.38   *Claims Distribution Account* ...................................................................................................... 4
1.39   *Claims Objection Deadline* ........................................................................................................ 4
1.40   *Class* ........................................................................................................................................... 5
1.41   *Class Actions Claims* .................................................................................................................. 5
1.42   *Combined Recoveries* .................................................................................................................. 5
1.43   *Committees* .................................................................................................................................. 5
1.44   *Confirmation* ............................................................................................................................... 5
1.45   *Confirmation Date* ...................................................................................................................... 5
1.46   *Confirmation Hearing* ................................................................................................................ 5
1.47   *Confirmation Order* .................................................................................................................... 5
1.48   *Contributed Claims* ..................................................................................................................... 5
1.49   *Contributed Claims Recoveries* .................................................................................................. 5

| | | |
|---|---|---|
| 1.50 | *Contributing Debtors* | 5 |
| 1.51 | *Contributing Debtors BAWAG Proceeds* | 5 |
| 1.52 | *Contributing Debtors Cash Distribution* | 5 |
| 1.53 | *Contributing Debtors Distributive Assets* | 5 |
| 1.54 | *Contributing Debtors Effective Date Claims* | 6 |
| 1.55 | *Contributing Debtors General Unsecured BAWAG Proceeds* | 6 |
| 1.56 | *Contributing Debtors General Unsecured Claim* | 6 |
| 1.57 | *Contributing Debtors General Unsecured Distribution* | 6 |
| 1.58 | *Contributing Debtors Post-Effective Date Claims* | 6 |
| 1.59 | *Contributing Debtors Projection* | 6 |
| 1.60 | *Contributing Non-Debtor Affiliate* | 6 |
| 1.61 | *Contributing Non-Debtor Affiliate Management* | 6 |
| 1.62 | *Contributing Non-Debtor Affiliate Trigger Date* | 6 |
| 1.63 | *Convenience Claims* | 7 |
| 1.64 | *Credit Agreement* | 7 |
| 1.65 | *Creditors' Committee* | 7 |
| 1.66 | *Debtor* | 7 |
| 1.67 | *Debtors* | 7 |
| 1.68 | *Disbursing Agent* | 7 |
| 1.69 | *Disclosure Statement* | 7 |
| 1.70 | *Disputed Claim* | 7 |
| 1.71 | *"Disputed ... Claim"* | 7 |
| 1.72 | *Disputed Claim Amount* | 7 |
| 1.73 | *Disputed Claims Reserve* | 7 |
| 1.74 | *Distribution* | 7 |
| 1.75 | *Distribution Date* | 7 |
| 1.76 | *Distribution Record Date* | 8 |
| 1.77 | *Early Payment Order* | 8 |
| 1.78 | *Effective Date* | 8 |
| 1.79 | *Effective Beneficiaries* | 8 |
| 1.80 | *Employee Benefit Plans* | 8 |
| 1.81 | *ERISA* | 8 |
| 1.82 | *Estate(s)* | 8 |
| 1.83 | *Estimated Unsatisfied Credit Agreement Claims* | 8 |
| 1.84 | *Examiner* | 8 |
| 1.85 | *Examiner Order* | 8 |
| 1.86 | *Excess Priority Claims* | 8 |
| 1.87 | *Exhibit* | 8 |
| 1.88 | *Exhibit Filing Date* | 8 |
| 1.89 | *Fee Committee* | 8 |
| 1.90 | *Final Order* | 8 |
| 1.91 | *FXA* | 9 |
| 1.92 | *FXA Cash Accounts* | 9 |
| 1.93 | *FXA Convenience Claims* | 9 |
| 1.94 | *FXA Distributive Assets* | 9 |
| 1.95 | *FXA General Unsecured Claim* | 9 |
| 1.96 | *FXA General Unsecured Claim Distribution* | 9 |
| 1.97 | *FXCM* | 9 |
| 1.98 | *FXCM Committee* | 9 |
| 1.99 | *General Unsecured Claim* | 9 |
| 1.100 | *Holder* | 9 |
| 1.101 | *Houlihan* | 9 |
| 1.102 | *Impaired* | 9 |
| 1.103 | *Intercompany Claim* | 10 |
| 1.104 | *Interest* | 10 |

ii

| | | |
|---|---|---|
| 1.105 | *IPO Underwriter Claims Recovery* | 10 |
| 1.106 | *JPMC Fees and Expenses* | 10 |
| 1.107 | *Joinder Parties* | 10 |
| 1.108 | *Joint Sub-Committee* | 10 |
| 1.109 | *KK Japan* | 10 |
| 1.110 | *Leuthold* | 10 |
| 1.111 | *Lien* | 10 |
| 1.112 | *Litigation Claims* | 10 |
| 1.113 | *Litigation Trust* | 10 |
| 1.114 | *Litigation Trust Agreement* | 10 |
| 1.115 | *Litigation Trust Beneficiaries* | 10 |
| 1.116 | *Litigation Trust Committee* | 11 |
| 1.117 | *Litigation Trustee* | 11 |
| 1.118 | *Litigation Trust Interests* | 11 |
| 1.119 | *Loan Documents* | 11 |
| 1.120 | *Loans* | 11 |
| 1.121 | *MAC Contributing Debtors Assets* | 11 |
| 1.122 | *MAC RCM Assets* | 11 |
| 1.123 | *MCG Members* | 11 |
| 1.124 | *Master Ballot* | 11 |
| 1.125 | *Non-Debtor Affiliates* | 11 |
| 1.126 | *Non-Estate Refco Claims* | 12 |
| 1.127 | *Non-Tax Priority Claim* | 12 |
| 1.128 | *Old Equity Interests* | 12 |
| 1.129 | *Other Related Claim* | 12 |
| 1.130 | *Other Secured Claim* | 12 |
| 1.131 | *Person* | 12 |
| 1.132 | *Petition Date* | 12 |
| 1.133 | *Plan* | 12 |
| 1.134 | *Plan Administrator* | 12 |
| 1.135 | *Plan Administrator Agreement* | 13 |
| 1.136 | *Plan Committee* | 13 |
| 1.137 | *Plan Document* | 13 |
| 1.138 | *Plan Filing Date* | 13 |
| 1.139 | *Plan Proponents* | 13 |
| 1.140 | *Plan Support Agreement* | 13 |
| 1.141 | *Post-Confirmation RCM* | 13 |
| 1.142 | *Post-Petition Management* | 13 |
| 1.143 | *Pre-Conversion Administrative Claim Amount* | 13 |
| 1.144 | *Priority Claims* | 13 |
| 1.145 | *Priority Tax Claim* | 13 |
| 1.146 | *Private Actions Trust* | 13 |
| 1.147 | *Private Actions Trust Agreement* | 13 |
| 1.148 | *Private Actions Trust Election* | 13 |
| 1.149 | *Private Actions Trustee* | 13 |
| 1.150 | *Professional* | 14 |
| 1.151 | *Professional Fee Claim* | 14 |
| 1.152 | *Pro Rata* | 14 |
| 1.153 | *Qualifying Plan* | 14 |
| 1.154 | *Quarterly Distribution Date* | 14 |
| 1.155 | *RCM* | 14 |
| 1.156 | *RCM Administrative/Priority Claims Reserve* | 14 |
| 1.157 | *RCM Administrative Professional* | 14 |
| 1.158 | *RCM Advance* | 14 |
| 1.159 | *RCM BAWAG Proceeds* | 14 |

1.160   *RCM Cash Distribution* ...................................................................................14
1.161   *RCM Difference* ..............................................................................................14
1.162   *RCM Claims Distribution Account* ..................................................................15
1.163   *RCM Distribution Reserve* ...............................................................................15
1.164   *RCM Excess Priority Claims* ............................................................................15
1.165   *RCM FX/Unsecured Claims* .............................................................................15
1.166   *RCM FX/Unsecured Claims Distribution* .........................................................15
1.167   *RCM FX/Unsecured Convenience Claims* .........................................................15
1.168   *RCM Implied Deficiency Claim* ........................................................................15
1.169   *RCM Intercompany Claims* ..............................................................................15
1.170   *RCM Intercompany Claim Distribution* ...........................................................15
1.171   *RCM Leuthold Metals Claim* ............................................................................15
1.172   *RCM Leuthold Metals Claim Distribution* ........................................................15
1.173   *RCM Projection* ..............................................................................................15
1.174   *RCM Related Claims* .......................................................................................15
1.175   *RCM Related Claim Subordination Form* .........................................................16
1.176   *RCM Reserves* .................................................................................................16
1.177   *RCM Rights Distribution* .................................................................................16
1.178   *RCM Securities Customer Claims* .....................................................................16
1.179   *RCM Securities Customer Convenience Claims* .................................................16
1.180   *RCM Securities Customer Claims Distribution* .................................................16
1.181   *RCM Settlement Agreement* ..............................................................................16
1.182   *RCM Substantial Contribution Fees* .................................................................16
1.183   *RCM Trustee* ...................................................................................................17
1.184   *RCM Unclaimed Distribution Reserve* ..............................................................17
1.185   *RCM Wind-Down Reserve* ................................................................................17
1.186   *Reinstated* .......................................................................................................17
1.187   *Refco Entities* ..................................................................................................17
1.188   *Related Claims* ................................................................................................17
1.189   *Released/Subordinated Claims* .........................................................................17
1.190   *Released Parties* ..............................................................................................17
1.191   *Reorganized Debtors* .......................................................................................17
1.192   *Reorganized FXA* ............................................................................................17
1.193   *Reorganized Refco* ..........................................................................................17
1.194   *Reserves* .........................................................................................................17
1.195   *Restated Corporate Governance Documents* .....................................................17
1.196   *Retained Causes of Action* ..............................................................................17
1.197   *RGL* ................................................................................................................18
1.198   *RGL FXCM Distribution* .................................................................................18
1.199   *Rogers Funds* ..................................................................................................18
1.200   *Scheduled* .......................................................................................................18
1.201   *Schedules* ........................................................................................................18
1.202   *Secured Lender(s)* ...........................................................................................18
1.203   *Secured Lender Agent* ......................................................................................18
1.204   *Secured Lender BAWAG Proceeds* ...................................................................18
1.205   *Secured Lender Claims* .....................................................................................18
1.206   *Secured Lender Indemnification Claims* ...........................................................18
1.207   *Secured Lender Payment Date* ..........................................................................18
1.208   *Secured Lender Released Claims* .......................................................................18
1.209   *Secured Lender Releasee* ..................................................................................19
1.210   *Secured Lender's Collateral* .............................................................................19
1.211   *Securities Class Action Stipulation* ..................................................................19
1.212   *Senior Subordinated Note Allocation* ...............................................................19
1.213   *Senior Subordinated Note Claims* .....................................................................19
1.214   *Senior Subordinated Note Holder BAWAG Proceeds* ........................................19

iv

1.215  *Senior Subordinated Note Holder Distribution* ..........................................................19
1.216  *Senior Subordinated Note Holder Fee Distribution* ..................................................19
1.217  *Senior Subordinated Note Indenture* ........................................................................19
1.218  *Senior Subordinated Note Indenture Trustee* ...........................................................20
1.219  *Senior Subordinated Note Indenture Trustee Charging Lien* ...................................20
1.220  *Senior Subordinated Note Indenture Trustee Fees* ...................................................20
1.221  *Senior Subordinated Notes* ......................................................................................20
1.222  *Specified Difference* .................................................................................................20
1.223  *Subordinated Claim* .................................................................................................20
1.224  *Subsidiary Claims and Interests* ..............................................................................20
1.225  *Tranche A Litigation Trust Interests* .......................................................................20
1.226  *Tranche B Litigation Trust Interests* .......................................................................20
1.227  *Unclaimed Distribution Reserve* ..............................................................................20
1.228  *Unclassified Claims* .................................................................................................20
1.229  *Unimpaired* ...............................................................................................................20
1.230  *Voting Deadline* ........................................................................................................21
1.231  *Voting Record Date* ..................................................................................................21
1.232  *VR* .............................................................................................................................21
1.233  *VR/Leuthold Guarantee Claims* ...............................................................................21
1.234  *Wind-Down Reserves* ................................................................................................21

ARTICLE II CLASSIFICATION OF CLAIMS AND INTERESTS ......................................21
2.1  *Introduction* ...................................................................................................................21
2.2  *Classification of Claims and Interests of the Contributing Debtors* .............................22
2.3  *Classification of Claims of FXA* ....................................................................................23
2.4  *Classification of Claims of RCM* ...................................................................................23

ARTICLE III TREATMENT OF CLAIMS AND INTERESTS ............................................24
3.1  *Treatment of Claims and Interests of the Contributing Debtors* ...................................24
3.2  *Treatment of Claims of FXA* .........................................................................................26
3.3  *Treatment of Claims of RCM* ........................................................................................28
3.4  *Allowed Claims and Interests* .......................................................................................30
3.5  *Alternative Treatment* ...................................................................................................30
3.6  *Limitation on Recoveries* ..............................................................................................30
3.7  *Special Provision Regarding Unimpaired Claims* ........................................................30
3.8  *Claims and Interests of Non-Debtor Affiliates* ............................................................30
3.9  *Classification and Treatment of Intercompany Claims* ................................................31
3.10  *Claims of Debtors against RCM* ..................................................................................31

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN .........................................31
4.1  *Classes Entitled To Vote* ...............................................................................................31
4.2  *Acceptance By Impaired Classes* ..................................................................................31
4.3  *Presumed Acceptance by Unimpaired Classes* .............................................................31
4.4  *Classes Deemed to Reject the Plan* ...............................................................................31
4.5  *Summary of Classes Voting on the Plan* .......................................................................31
4.6  *Elimination Of Classes* .................................................................................................31
4.7  *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code* ...........................31

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN .......................................32
5.1  *Merger Of Subsidiaries Into Refco Inc.* .......................................................................32
5.2  *Continued Corporate Existence And Dissolution Of Reorganized Debtors* .................32
5.3  *Corporate Governance Documentation* ........................................................................32
5.4  *Directors, Managers And Officers; Effectuating Documents; Further Transactions* ...33
5.5  *The Plan Administrator* .................................................................................................33
5.6  *Administration of Post-Confirmation RCM* ..................................................................35

| 5.7 | *Litigation Trust* ............................................................................................ | 36 |
| 5.8 | *Private Actions Trust* ..................................................................................... | 38 |
| 5.9 | *No Revesting of Assets* .................................................................................. | 39 |
| 5.10 | *Preservation of Rights of Action; Settlement of Litigation* ............................ | 39 |
| 5.11 | *The Committees and the Plan Committee* ....................................................... | 40 |
| 5.12 | *Fee Committee* ............................................................................................... | 41 |
| 5.13 | *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests* ............................................................................................... | 41 |
| 5.14 | *Sources of Cash for Plan Distributions* .......................................................... | 42 |
| 5.15 | *Risk Sharing in Respect of Cargill Administrative Claim* ............................... | 42 |
| 5.16 | *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims* ......... | 42 |
| 5.17 | *Additional RCM Claim* ................................................................................... | 43 |
| 5.18 | *Contributing Debtors BAWAG Proceeds* ........................................................ | 43 |
| 5.19 | *Exemption from Transfer Taxes* ...................................................................... | 43 |
| 5.20 | *RCM Settlement Agreement and Conversion* ................................................... | 44 |
| 5.21 | *Allowance of VR/Leuthold Guarantee Claims* ................................................ | 44 |
| 5.22 | *Wind-Up of Non-Debtor Affiliates* ................................................................. | 44 |
| 5.23 | *FXCM* ............................................................................................................ | 44 |
| 5.24 | *Examiner* ........................................................................................................ | 45 |
| 5.25 | *Transfer of Tranche B Litigation Trust Interests* ............................................ | 45 |

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ........................................................ 45
| 6.1 | *RCM Rights Distribution* ................................................................................ | 45 |
| 6.2 | *Distributions for Claims Allowed as of the Effective Date* ............................. | 45 |
| 6.3 | *Distributions of Proceeds of the Litigation Trust* ........................................... | 45 |
| 6.4 | *Single Distribution* ........................................................................................ | 45 |
| 6.5 | *Accounts; Escrows; Reserves for the Reorganized Debtors* ............................ | 46 |
| 6.6 | *Accounts; Escrows; Reserves for the Post-Confirmation RCM* ....................... | 47 |
| 6.7 | *Interest and Penalties on Claims* .................................................................... | 49 |
| 6.8 | *Distributions by Disbursing Agent and RCM Trustee* ..................................... | 49 |
| 6.9 | *Delivery of Distributions and Undeliverable or Unclaimed Distributions* ...... | 49 |
| 6.10 | *Record Date for Distributions* ....................................................................... | 50 |
| 6.11 | *Distributions to Holders of Senior Subordinated Note Claims* ....................... | 50 |
| 6.12 | *Senior Subordinated Notes Indenture Trustee as Claim Holder* ...................... | 51 |
| 6.13 | *Allocation of Plan Distributions Between Principal and Interest* .................... | 51 |
| 6.14 | *Means of Cash Payment* ................................................................................. | 51 |
| 6.15 | *Withholding and Reporting Requirements* ...................................................... | 51 |
| 6.16 | *Setoffs* ........................................................................................................... | 51 |
| 6.17 | *Fractional Dollars* ........................................................................................ | 51 |
| 6.18 | *Release of Liens* ............................................................................................ | 51 |

ARTICLE VII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 52
| 7.1 | *Rejected Contracts and Leases* ...................................................................... | 52 |
| 7.2 | *Bar to Rejection Damages* .............................................................................. | 52 |
| 7.3 | *Assumed and Assigned Contracts and Leases* ................................................ | 52 |
| 7.4 | *Compensation and Benefit Programs* .............................................................. | 52 |
| 7.5 | *Treatment of RCM Executory Contracts and Unexpired Leases* ..................... | 52 |

ARTICLE VIII PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
UNLIQUIDATED CLAIMS AND INTERESTS ................................................ 52
| 8.1 | *Objection Deadline; Prosecution of Objections* ............................................. | 52 |
| 8.2 | *No Distributions Pending Allowance* .............................................................. | 53 |
| 8.3 | *Distributions After Allowance* ....................................................................... | 53 |

ARTICLE IX CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................53
    9.1     *Conditions to Confirmation* ................................................53
    9.2     *Conditions to Effective Date* ................................................54
    9.3     *Waiver of Conditions.* ................................................54
    9.4     *Consequences of Non-Occurrence of Effective Date* ................................................54

ARTICLE X EFFECT OF PLAN CONFIRMATION ................................................55
    10.1    *Binding Effect* ................................................55
    10.2    *Releases* ................................................55
    10.3    *Exculpation and Limitation of Liability* ................................................57
    10.4    *No Discharge of Claims; Injunction* ................................................57
    10.5    *Term of Bankruptcy Injunction or Stays* ................................................58
    10.6    *Continuation of Forex Adversary* ................................................58

ARTICLE XI RETENTION OF JURISDICTION ................................................58
    11.1    *Exclusive Jurisdiction of the Bankruptcy Court* ................................................58

ARTICLE XII MISCELLANEOUS PROVISIONS ................................................60
    12.1    *Effectuating Documents and Further Transactions* ................................................60
    12.2    *Corporate Action* ................................................60
    12.3    *Bar Dates for Certain Claims* ................................................60
    12.4    *Payment of Statutory Fees* ................................................61
    12.5    *Amendment or Modification of the Plan* ................................................61
    12.6    *Severability of Plan Provisions* ................................................61
    12.7    *Successors and Assigns* ................................................62
    12.8    *Revocation, Withdrawal, or Non-Consummation* ................................................62
    12.9    *Notice* ................................................62
    12.10    *Governing Law* ................................................63
    12.11    *Tax Reporting and Compliance* ................................................63
    12.12    *Filing of Additional Documents* ................................................63
    12.13    *Limit on Precedential Effect* ................................................63
    12.14    *Claims Preserved Pending Consummation* ................................................63
    12.15    *Continuation of RCM Settlement Agreement* ................................................63
    12.16    *Continuation of Early Payment Order* ................................................64

<u>EXHIBITS</u>

EXHIBIT A          LISTING OF AFFILIATE DEBTORS

EXHIBIT B          RCM SETTLEMENT AGREEMENT

EXHIBIT C          RESTATED CORPORATE GOVERNANCE DOCUMENTS

EXHIBIT D          EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED

EXHIBIT E          PLAN ADMINISTRATOR AGREEMENT

EXHIBIT F          LITIGATION TRUST AGREEMENT

EXHIBIT G          PRIVATE ACTIONS TRUST AGREEMENT

EXHIBIT H          ASSET SCHEDULE

EXHIBIT I          EARLY PAYMENT ORDER

EXHIBIT J          BYLAWS OF FXCM COMMITTEE

EXHIBIT K          NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION

EXHIBIT L          LISTING OF CONTRIBUTING NON-DEBTOR AFFILIATES

EXHIBIT M          PRIVATE ACTIONS TRUST ELECTION

## SCHEDULES

SCHEDULE 1.56          LIST OF CONTRIBUTING NON-DEBTOR AFFILIATE MANAGEMENT

SCHEDULE 2.2(c)        SUB-CLASSES OF CLAIMS AGAINST THE CONTRIBUTING DEBTORS

## INTRODUCTION

Refco Inc. and certain of its direct and indirect subsidiaries identified on the annexed Exhibit A along with co-Plan Proponents Marc S. Kirschner, the chapter 11 trustee of the Estate of Refco Capital Markets, Ltd., the Official Committee of Unsecured Creditors of Refco Inc., *et al.*, and the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* propose the following joint chapter 11 plan that contemplates the disposition of the Debtors' assets and the resolution of the outstanding Claims against and Interests in the Debtors and RCM. This Plan does not contemplate the disposition of assets or the resolution of Claims against and Interests in Refco, LLC as such Claims and Interests are being addressed separately in conjunction with the administration of the Refco, LLC chapter 7 case. In addition, although the Plan outlines certain aspects of the disposition of the assets of RCM and the votes by certain creditors of RCM will be solicited, the Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. In the event of such a conversion to chapter 7, this Plan shall constitute a settlement and compromise between the RCM Estate and the Debtors' Estates and among the Estates of the various Debtors and certain creditors, for which approval is sought simultaneously with the confirmation of this Plan. Furthermore, the Plan incorporates the terms of the Early Payment Order, a copy of which is attached hereto as Exhibit I. To the extent that the provisions herein, or in the Confirmation Order, differ from the terms of the Early Payment Order with respect to the treatment of the Secured Lenders, the terms of the Early Payment Order shall govern. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business, properties, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1    *Additional Committee* means the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by notice on August 3, 2006 (and as amended from time to time).

1.2    *Additional RCM Claim* means the additional Claim of RCM, if any, as more fully set forth in section 5.17 hereof.

1.3    *Ad Hoc Committee of Senior Subordinated Note Holders* means that certain *ad hoc* committee of Holders of Senior Subordinated Notes.

1.4    *Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses* means fees and expenses of counsel to the ad hoc committee of Holders of Senior Subordinated Notes subject to application pursuant to section 503(b) of the Bankruptcy Code, to which the parties to the Plan Support Agreement, other than the Debtors, may not object and (ii) the Debtors, in the event that they do object to such application, may object solely with respect to the reasonableness, compensability and allocation of the fees and expenses incurred.

   **1.5**  *Ad Hoc Equity Committee* means that certain *ad hoc* committee of equity interest holders of Refco Inc.

   **1.6**  *Ad Hoc Equity Committee Fees and Expenses* means up to $1.5 million in professional fees and expenses incurred by the Ad Hoc Equity Committee during the pendency of the Chapter 11 Cases.

   **1.7**  *Adjusted Contributing Debtors Distributive Assets* means the Contributing Debtors Distributive Assets after reduction for the payment of the RCM Excess Priority Claim.

   **1.8**  *Administrative Claim* means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without duplication: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors and RCM (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred after the Petition Date and prior to the Effective Date; (c) the amounts contributed to the Wind-Down Reserve; (d) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; (e) the Senior Subordinated Note Indenture Trustee Fees, (f) the JPMC Fees and Expenses, (g) the substantial contribution claims represented by the RCM Substantial Contribution Fees, the Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses and the Ad Hoc Equity Committee Fees and Expenses, to the extent allowed by the Bankruptcy Court; (h) any amounts due to RCM for the RCM Advance and (i) all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court.  In the event that the Chapter 11 Case of RCM is converted to a case administered under chapter 7, an Allowed Claim against RCM or its Estate of the type described above in respect of administering the RCM case in chapter 7 shall be included in the definition of Administrative Claim.

   **1.9**  *Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the Distribution to Holders of Administrative and Allowed Priority Claims against FXA and the Contributing Debtors.

   **1.10**  *Administrative Claims Adjustment* means an adjustment whereby the amount of the RCM Cash Distribution shall be reduced by the Pre-Conversion Administrative Claim Amount, if any.  For the avoidance of doubt, while the Administrative Claims Adjustment, if any, shall affect the timing and accounts from which Distributions in respect of Allowed Administrative Claims are made, such adjustment shall not affect the ultimate allocation of Administrative Claims as set forth in section 5.16 of this Plan.

   **1.11**  *Administrative Claims Objection Deadline* means the last day for filing an objection to any request for the payment of an Allowed Administrative Claim, which shall be (a) the later of (i) 60 days after the Effective Date or (ii) 30 days after the filing of such Administrative Claim or (b) such other date specified in this Plan or ordered by the Bankruptcy Court.  The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, or if approved by the Bankruptcy Court and reversed on appeal, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

   **1.12**  *Administrative Professionals* means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Plan Administrator (in their capacities as such).

   **1.13**  *Affiliate Debtor(s)* means, individually or collectively, the debtors and debtors-in-possession identified on Exhibit A annexed hereto.

      **1.14**    *AlixPartners* means collectively, AlixPartners LLC and its affiliate, AP Services, LLC.

      **1.15**    *Allotted Administrative Claims* means Allowed Administrative Claims accrued against RCM or the Contributing Debtors from the Petition Date through the Effective Date, but excluding (A) Allowed Administrative Claims paid prior to August 31, 2006, (B) rent and other ordinary operating expenses of the Debtors or RCM, (C) fees and commissions of the RCM Trustee, (D) repayment of the RCM Advance, and (E) the JPMC Fees and Expenses.

      **1.16**    *Allowed* means (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) that was incurred by the Debtors or RCM in the ordinary course of business during the Chapter 11 Cases; *provided, however,* that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; or (b) when used with respect to a Claim other than an Administrative Claim, such Claim against a Debtor or RCM or any portion thereof (i) that has been allowed by a Final Order of the Bankruptcy Court, (ii) as to which, on or by the Effective Date, (w) no proof of claim has been filed with the Bankruptcy Court and (x) the liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, (iii) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (y) no objection to its allowance has been filed by the Claims Objection Deadline or the Administrative Claims Objection Deadline (as applicable), or within any period specified by the Bankruptcy Code or an order of the Bankruptcy Court, or (x) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

      **1.17**    *"Allowed ... Claim"* means an Allowed Claim of the particular type or Class described.

      **1.18**    *Asset Schedule* means the schedule prepared by Houlihan to describe the estimated value of assets of the Debtors as of August 31, 2006, attached hereto as <u>Exhibit H</u>.

      **1.19**    *Ballot* means each of the ballot forms distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

      **1.20**    *Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter amended (if such amendment applies to the Debtors and RCM).

      **1.21**    *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

      **1.22**    *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

      **1.23**    *Bar Date* means the deadline established by the Bankruptcy Court by order dated March 27, 2006, for filing proofs of Claim in the Chapter 11 Cases.

      **1.24**    *BAWAG* means the BAWAG Parties as such term is defined in paragraph 4(a) of the Stipulation and Order of Settlement entered by the Bankruptcy Court on July 6, 2006 (Docket No. 2348).

      **1.25**    *BAWAG Allocation Order* means one or more orders of the Bankruptcy Court approving the allocation of the BAWAG Proceeds, which may include the Confirmation Order.

**1.26**    *BAWAG Contingent Proceeds* means an amount, if any, whether or not monetized prior to the Effective Date, of the BAWAG Proceeds up to $150,000,000 to be paid pursuant to the BAWAG Settlement upon a sale or recapitalization as set forth in the BAWAG Settlement within two (2) years of the date of approval of the BAWAG Settlement.

**1.27**    *BAWAG Guaranteed Proceeds* means that portion of the BAWAG Proceeds equal to a guaranteed amount of $506,250,000 in Cash paid pursuant to the BAWAG Settlement.

**1.28**    *BAWAG Proceeds* means the sum of (a) the BAWAG Guaranteed Proceeds plus (b) the BAWAG Contingent Proceeds, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement.

**1.29**    *BAWAG Settlement* means the settlement stipulation among the Creditors Committee, BAWAG, and the Refco Entities as approved by the Bankruptcy Court by an order entered on July 6, 2006.  A copy of the BAWAG Settlement is annexed as an Exhibit to the Disclosure Statement.

**1.30**    *Business Day* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.31**    *Capstone* means Capstone Advisory Group, LLC.

**1.32**    *Cargill* means Cargill, Incorporated and any of Cargill, Incorporated's affiliates who filed proofs of claim in any of the Chapter 11 Cases.

**1.33**    *Cargill Administrative Claim* means an Administrative Claim of Cargill, if any, against the Contributing Debtors.

**1.34**    *Cash* means legal tender of the United States of America and equivalents thereof.

**1.35**    *Cash-Out Option Agreement* means the agreement, if any, between one or more third parties and the Holders of Litigation Trust Interests to be executed as of the Effective Date establishing the terms and conditions by which third parties may purchase Litigation Trust Interests from such Holders, the form of which Cash-Out Option Agreement will be attached as an exhibit to the Litigation Trust Agreement.

**1.36**    *Chapter 11 Case(s)* means (a) when used with reference to a particular Debtor or RCM, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to the Debtors and RCM, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors and RCM in the Bankruptcy Court.

**1.37**    *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.38**    *Claims Distribution Account* means the account established and maintained by the Reorganized Debtors from which Distributions to Holders of Allowed Claims against the Contributing Debtors or FXA shall be made and from which reserves on behalf of the Reorganized Debtors will be funded for the benefit of Holders of Disputed Claims.

**1.39**    *Claims Objection Deadline* means the last day for filing objections to Claims against the Debtors and RCM, which day shall be (a) the later of (i) 90 days after the Effective Date or (ii) 60 days after the filing of a proof of claim for, or request for payment of, such Claim or (b) such other date as the Bankruptcy Court may order.  The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion.  In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Claims Objection Deadline.

1.40    *Class* means a category of Holders of Claims or Interests, as described in Article II hereof.

1.41    *Class Actions Claims* means (i) claims for violation of securities laws arising under and pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that currently are being asserted in the class action styled In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, 06-CIV 643 (GEL) (S.D.N.Y.) (the "Brokerage Customer Securities Litigation"), (ii) claims asserted in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, and (iii) other claims currently being asserted in class actions relating to the Debtors and RCM, if any.

1.42    *Combined Recoveries* means the aggregate of Contributed Claims Recoveries and recoveries obtained by the Private Actions Trust, net of the costs of administration of the Private Actions Trust, including, but not limited to, fees associated with the litigation of the Non-Estate Refco Claims.

1.43    *Committees* means, collectively, the Creditors' Committee and the Additional Committee.

1.44    *Confirmation* means the confirmation of the Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

1.45    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

1.46    *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

1.47    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.48    *Contributed Claims* means any and all Litigation Claims of the Debtors, RCM or their Estates (including claims being pursued by the Committees on behalf of the Debtors), which shall be contributed by the Debtors, RCM and their Estates to the Litigation Trust and, to the extent of any election, or deemed election, by Holders of RCM Related Claims to exchange and subordinate such Claims in accordance with section 6.6(c) of this Plan, such RCM Related Claims shall be deemed to remain unpaid liabilities of the Debtors and their Estates immediately prior to the contribution of Litigation Claims to the Litigation Trust. The term Contributed Claims shall specifically exclude the Released/Subordinated Claims.

1.49    *Contributed Claims Recoveries* means any recoveries obtained on account of the Contributed Claims net of the costs of administration of the Litigation Trust, including, but not limited to, fees associated with the litigation of the Contributed Claims.

1.50    *Contributing Debtors* means the Debtors excluding FXA.

1.51    *Contributing Debtors BAWAG Proceeds* means that portion of the BAWAG Proceeds that compose the Secured Lender BAWAG Proceeds, the Senior Subordinated Note Holder BAWAG Proceeds and the Contributing Debtors General Unsecured BAWAG Proceeds.

1.52    *Contributing Debtors Cash Distribution* means $94 million of Cash, which amount shall be adjusted, upwards or downwards, by an amount equal to the Specified Difference.

1.53    *Contributing Debtors Distributive Assets* means the assets of the Contributing Debtors after the payment of the Contributing Debtors Effective Date Claims, Allowed Other Secured Claims against the Contributing Debtors, Allowed Secured Lender Claims against the Contributing Debtors, the Senior Subordinated Note Holder Distribution, the Senior Subordinated Note Holder Fee Distribution (each to the extent payable under the Plan) and the funding of any required reserves (provided that upon the release of any funds from reserves for

payment of the Contributing Debtors General Unsecured Distribution or RCM Intercompany Claim Distribution, such released funds shall be counted as Contributing Debtors Distributive Assets). The term Contributing Debtors Distributive Assets shall include the assets of the Contributing Debtors reflected on the Asset Schedule and, without duplication, to the extent not inconsistent with the Asset Schedule, (i) any amounts paid to the Contributing Debtors or RCM on or after September 1, 2006, (ii) the BAWAG Proceeds, and (iii) any amounts paid to the Contributing Debtors or RCM from Non-Debtor Affiliates on or after September 1, 2006 (except to the extent any such amounts have been deemed "Assets in Place" or "Additional Property," as defined in the RCM Settlement Agreement, by applicable Court Orders); *provided, however,* that any amounts paid by direct or indirect subsidiaries of RCM on or after September 1, 2006 shall not constitute Contributing Debtors Distributive Assets. The term Contributing Debtors Distributive Assets shall not include any value in respect of the RGL FXCM Distribution nor any interest in Contributed Claims.

       **1.54**    *Contributing Debtors Effective Date Claims* means Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims and Allowed Administrative Claims accrued through and including the Effective Date, each to the extent required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan.

       **1.55**    *Contributing Debtors General Unsecured BAWAG Proceeds* means (i) $56,250,000 of the BAWAG Guaranteed Proceeds and (ii) a portion of the BAWAG Contingent Proceeds allocable to the Contributing Debtors Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases offered by the BAWAG Settlement, Holders of Allowed Contributing Debtors General Unsecured Claims.

       **1.56**    *Contributing Debtors General Unsecured Claim* means a General Unsecured Claim against a Contributing Debtor.

       **1.57**    *Contributing Debtors General Unsecured Distribution* means a Distribution from the Contributing Debtors Distributive Assets equal to (A) the Contributing Debtors Cash Distribution after reduction for the payment of the Allowed Contributing Debtors Post-Effective Date Claims plus (B) 50% of the RGL FXCM Distribution; *provided, however,* the amount of such Distribution under (A) and (B) shall not exceed 40% of the Allowed Contributing Debtors General Unsecured Claims. The Contributing Debtors General Unsecured Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

       **1.58**    *Contributing Debtors Post-Effective Date Claims* means Administrative Claims accrued after the Effective Date by the Contributing Debtors, which are required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan (including amounts, if any, in respect of repaying the RCM Advance).

       **1.59**    *Contributing Debtors Projection* means a projection of the Cash or value to be available from the MAC Contributing Debtors Assets for Distribution in respect of the Contributing Debtors Cash Distribution.

       **1.60**    *Contributing Non-Debtor Affiliate* means the Non-Debtor Affiliates listed on <u>Exhibit L</u> hereto who are reasonably expected to contribute assets to or release Claims against the Debtors or RCM pursuant to the provisions of this Plan, including, but not limited to, section 5.22.

       **1.61**    *Contributing Non-Debtor Affiliate Management* means the directors and officers of certain foreign Contributing Non-Debtor Affiliates, a list of which officers and directors is set forth on Schedule 1.56 hereto.

       **1.62**    *Contributing Non-Debtor Affiliate Trigger Date* means, with respect to any Contributing Non-Debtor Affiliate, the earlier of (i) the date at which such Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash (consistent with its books and records and claims pending against it) to the Contributing Debtors and RCM or, if insufficient Cash will be available (consistent with the Contributing Non-Debtor Affiliate's books and records and claims pending against it) for Distribution to the Contributing Debtors and RCM, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors, or, if such events occur

prior to the Effective Date, the Effective Date or (ii) a date determined by the RCM Trustee, with the consent of the Plan Committee, on notice to the Bankruptcy Court, as necessary to accomplish the purposes of clause (i) of this definition.

       **1.63**    *Convenience Claims* means collectively FXA Convenience Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims.

       **1.64**    *Credit Agreement* means the credit agreement, dated August 5, 2004 (as amended), among RGL as successor by merger to Refco Finance Holdings LLC, New Refco Group Ltd, LLC, the Secured Lender Agent and the Secured Lenders party thereto.

       **1.65**    *Creditors' Committee* means the Official Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on October 28, 2006, as reconstituted on March 29, 2006, July 21, 2006 and August 3, 2006 (and as amended from time to time).

       **1.66**    *Debtor* means any of Refco Inc. or the Affiliate Debtors in its individual capacity.

       **1.67**    *Debtors* means, collectively, Refco Inc. and all of the Affiliate Debtors.

       **1.68**    *Disbursing Agent* means, solely in its capacity as agent to effectuate Distributions on behalf of FXA and the Contributing Debtors pursuant to the Plan, the Plan Administrator or such other entity as may be designated by the Plan Proponents and appointed by the Bankruptcy Court as set forth in the Confirmation Order. For the avoidance of doubt, the RCM Trustee shall act as the Disbursing Agent for Post-Confirmation RCM.

       **1.69**    *Disclosure Statement* means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as it may be amended or supplemented from time to time.

       **1.70**    *Disputed Claim* means any Claim other than an Allowed Claim.

       **1.71**    *"Disputed ... Claim"* means a Disputed Claim of the type described.

       **1.72**    *Disputed Claim Amount* means (a) with respect to a contingent or unliquidated Claim, zero or the amount estimated by the Bankruptcy Court prior to the initial Distribution Date, for purposes of allowance, reserves or Distributions in respect of such Claim in accordance with section 502(c) of the Bankruptcy Code or (b) with respect to any Disputed Claim that is not contingent or unliquidated, the amount set forth in a timely filed proof of claim; *provided, however,* that for purposes of establishing the Disputed Claims Reserve, the Disputed Claim Amount shall not exceed an amount equal to the applicable deductible or self-retention portion plus any uninsured amount in respect of Disputed Claims that are covered by insurance.

       **1.73**    *Disputed Claims Reserve* means the reserve of Contributing Debtors Distributive Assets and FXA Distributive Assets established and maintained by the Reorganized Debtors for Holders of Disputed Claims; *provided, however,* that any reserve from Contributing Debtors Distributive Assets shall be a reserve from amounts to be paid on the Contributing Debtors Unsecured Claim Distribution and shall not result in a reserve against amounts to be paid on the RCM Cash Distribution in accordance with section 6.6(b) of this Plan.

       **1.74**    *Distribution* means any distribution pursuant to the Plan to the Holders of Allowed Claims.

       **1.75**    *Distribution Date* means the Effective Date (subject to section 6.2 hereof) or any Quarterly Distribution Date.

**1.76** **_Distribution Record Date_** means, with respect to all Claims other than Senior Subordinated Note Claims, initially the Voting Deadline (unless a different date is agreed to by the Plan Proponents and filed with the Bankruptcy Court) and thereafter, 45 days prior to each scheduled Distribution Date.

**1.77** **_Early Payment Order_** means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement of Controversies and Disputes Among the Debtors, the RCM Trustee, the Secured Lenders, and Certain Other Parties dated September 27, 2006 (Docket No. 2958) attached hereto as Exhibit I.

**1.78** **_Effective Date_** means the Business Day this Plan becomes effective as provided in Article IX hereof.

**1.79** **_Effective Beneficiaries_** means (i) the Litigation Trust Beneficiaries (other than RCM) and (ii) the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that benefit from RCM's beneficial interest in the Litigation Trust.

**1.80** **_Employee Benefit Plans_** means those "employee benefit plans" (as defined in Section 3(3) of ERISA (whether or not such plan is subject to ERISA)), other material plans, policies, programs, practice, agreements, and understandings or arrangements maintained, sponsored, or contributed to for the benefit of current or former employees of the Debtors.

**1.81** **_ERISA_** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

**1.82** **_Estate(s)_** means, individually, the estate of any of the Debtors or RCM and, collectively, the estates of all of the Debtors and RCM created under section 541 of the Bankruptcy Code.

**1.83** **_Estimated Unsatisfied Credit Agreement Claims_** has the meaning ascribed to such term in the Early Payment Order.

**1.84** **_Examiner_** means Joshua R. Hochberg, the examiner appointed by United States Trustee pursuant to 11 U.S.C. § 1104(c)(2) and approved by the Bankruptcy Court in accordance with the Examiner Order.

**1.85** **_Examiner Order_** means the Order Granting the Motion of the United States Trustee for the Appointment of an Examiner entered on March 16, 2006 (Docket No. 1487).

**1.86** **_Excess Priority Claims_** means that portion of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims against the Contributing Debtors and RCM, or their respective Estates, accrued through the Effective Date that exceed $180 million in the aggregate, excluding any amounts paid as of August 31, 2006, as more particularly set forth in section 5.16 of this Plan.

**1.87** **_Exhibit_** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

**1.88** **_Exhibit Filing Date_** means the date on which Exhibits to the Plan shall be filed with the Bankruptcy Court and posted on the refcodocket.com website, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties-in-interest.

**1.89** **_Fee Committee_** means the committee established by the Bankruptcy Court pursuant to the order entered on July 24, 2006 (Docket No. 2482).

**1.90** **_Final Order_** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment

thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided, however,* that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Bankruptcy Rules or any analogous rule may be, but has not been filed shall not cause an order not to be a Final Order.

1.91    ***FXA*** means Refco F/X Associates, LLC.

1.92    ***FXA Cash Accounts*** means the Cash accounts of FXA listed in the Schedules of FXA, which consist of the following accounts at the bank and with the account numbers designated herein: (i) Fleet Bank of New York, acct: 9421286511; (ii) Fleet Bank of New York, acct: 9421286589; (iii) Fleet Bank of New York, acct: 9421286693; (iv) Fleet Bank of New York, acct: 9421286896; (v) Fleet Bank of New York, acct: 9489924815; (vi) HK and Shanghai Banking Corp., acct: 009-030925-001; and (vii) Wachovia Bank, N.A., acct: 200017918646.

1.93    ***FXA Convenience Claims*** means any FXA General Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the FXA General Unsecured Claim to $10,000 on the applicable Ballot; *provided, however,* that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to FXA Convenience Claims shall be limited to $5 million. To the extent that the amount of FXA General Unsecured Claims electing to receive a FXA Convenience Claim exceeds $5 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $5 million cap is reached.

1.94    ***FXA Distributive Assets*** means (i) the FXA Cash Accounts, allocated as agreed or otherwise resolved between FXA and KK Japan, plus (ii) proceeds, if any, of the sale of the customer list of FXA.

1.95    ***FXA General Unsecured Claim*** means a General Unsecured Claim against FXA.

1.96    ***FXA General Unsecured Claim Distribution*** means a Distribution from the FXA Distributive Assets after the payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims against FXA, and less any amounts paid to the Holders of Allowed FXA Convenience Claims. The FXA General Unsecured Claim Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.97    ***FXCM*** means Forex Capital Markets, LLC.

1.98    ***FXCM Committee*** means a five person committee composed of the RCM Trustee and four creditors of either RCM or the Contributing Debtors (and chaired by the RCM Trustee) formed to coordinate on all matters relating to the disposition or distribution of RGL's 35% interest in FXCM.

1.99    ***General Unsecured Claim*** means a Claim that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Other Secured Claim, Secured Lender Claim, Senior Subordinated Note Claim, RCM Intercompany Claim, FXA Convenience Claim, RCM Securities Customer Claim, RCM Leuthold Metals Claim, RCM Securities Customer Convenience Claim, RCM FX/Unsecured Convenience Claim, Subordinated Claim or Old Equity Interest.

1.100    ***Holder*** means an entity holding a Claim or Interest and, with respect to Senior Subordinated Note Claims, the beneficial holder of the Senior Subordinated Notes.

1.101    ***Houlihan*** means Houlihan Lokey Howard & Zukin Capital Advisors, Inc.

1.102    ***Impaired*** means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**1.103**  *Intercompany Claim* means any Claim held by a Refco Entity against any other Refco Entity, including any intercompany book entries reflecting obligations owed by one Refco Entity with respect to any other Refco Entity.

**1.104**  *Interest* means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor or RCM, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

**1.105**  *IPO Underwriter Claims Recovery* means any recovery from a claim brought by the Litigation Trust against an underwriter in connection with the initial public offering of Refco Inc., net of the fees and expenses incurred in pursuing such recovery.

**1.106**  *JPMC Fees and Expenses* means the reasonable fees and expenses of JPMorgan Chase Bank, N.A., agreed to by RCM as part of that certain settlement between RCM and JPMorgan Chase Bank, N.A., approved by the Bankruptcy Court on [December 12, 2006 (docket no. _____)].

**1.107**  *Joinder Parties* has the meaning set forth in the RCM Settlement Agreement.

**1.108**  *Joint Sub-Committee* means the joint sub-committee comprised of the Committee and the Additional Committee pursuant to a stipulation and protocol approved by order of the Bankruptcy Court, dated August 17, 2006 (Docket No. 2711).

**1.109**  *KK Japan* means RefcoFX Japan KK.

**1.110**  *Leuthold* means, collectively, Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

**1.111**  *Lien* shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.112**  *Litigation Claims* means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or RCM may hold against any Person (after netting cross margin obligations, if applicable, to the extent required under the cross margining arrangement or to the extent determined necessary by the applicable Debtor or RCM) excluding the Released/Subordinated Claims and also excluding, with respect to RCM, any claims, rights of action, suits, or proceedings (A) pursuant to sections 547, 749 and to the extent a recovery is predicated on such sections, section 550 of the Bankruptcy Code, (B) to recover Assets in Place as defined in the RCM Settlement Agreement or (C) against RCM customers and creditors arising from trading or other ordinary course business transactions or contracts with RCM, including loan and deposit transactions; *provided, however*, that the claims commenced and settled by the Creditors' Committee against SPhinX Managed Futures Fund, LLC, and BAWAG shall not constitute Litigation Claims.

**1.113**  *Litigation Trust* means the trust established on the Effective Date to hold the Litigation Claims.

**1.114**  *Litigation Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Litigation Trust pursuant to the Plan attached as Exhibit F hereto.

**1.115**  *Litigation Trust Beneficiaries* means the Estate of RCM, Holders of Allowed Contributing Debtors General Unsecured Claims, Holders of Allowed FXA General Unsecured Claims, Holders of Allowed Contributing Debtors Subordinated Claims, Holders of Allowed Old Equity Interests and the Disputed Claims Reserve.

**1.116**    *Litigation Trust Committee* means the Committee established pursuant to section 5.7(d) of this Plan to participate in management of the Litigation Trust.

**1.117**    *Litigation Trustee* means the Person appointed pursuant to section 5.7(a) of the Plan to act as trustee of and administer the Litigation Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Private Actions Trustee.

**1.118**    *Litigation Trust Interests* means the beneficial interests in the Litigation Trust.

**1.119**    *Loan Documents* has the meaning ascribed to such term in the Early Payment Order.

**1.120**    *Loans* has the meaning ascribed to such term in the Early Payment Order.

**1.121**    *MAC Contributing Debtors Assets* means (x) the estimated value of the sum of the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds), less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the RCM Cash Distribution (without reduction for the Administrative Claims Adjustment), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan, provided that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.122**    *MAC RCM Assets* means (x) the estimated value of the sum of (A) the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds) less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the Contributing Debtors Cash Distribution (without adjustment for the Contributing Debtors Post-Effective Date Claims), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan; *provided, however,* that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

**1.123**    *MCG Members* has the meaning set forth in the RCM Settlement Agreement.

**1.124**    *Master Ballot* means the ballot distributed to brokers, nominees or other agents for Holders of the Senior Subordinated Notes to record the votes of the beneficial Holders of Senior Subordinated Notes.

**1.125**    *Non-Debtor Affiliates* means Refco LLC, Refco Canada Finance Inc., Refco Commodity Management Inc., Refco Administrative Services Inc., Refco Securities LLC, Refco Clearing LLC, Refco EasySolutions LLC, RefcoFund Management LLC, Haut Commodities LLC, Refco Local Divisions LLC, RefcoFund Holdings LLC, Refco Alternative Investments LLC, Refco Trading Services LLC, Refco Securities Ltd. (in liquidation), Refco Energy (UK) Ltd., Refco Ltd., Westminster Clearing Ltd., Refco Trading Services Ltd., Refco Trading Services (UK) Ltd., Refco Equity Derivatives Ltd., Refco Europe Ltd., Refco Overseas Ltd., Refco East Services Ltd. (in liquidation), Just Commodity Inc., Just (Dalian) Trading Co Ltd., Refco Capital Singapore Pte Ltd, Refco India Pvt Ltd, Refco Singapore Pte Ltd, Refco Investment Services Pte Ltd, Refco Forex Ltd (in liquidation), Refco Securities SA, Refco Trading Services (Gibraltar) Ltd., Refco Capital Markets International Ltd, Refco Capital Markets International Services Ltd, ACM Advanced Currency Markets SA, C.I. Investor Services, Limited. East Client Svc. Ltd., Eastern Refco (L) Labaun, Easylink Limited, Easyscreen Employee Services Limited, Easyscreen Ltd.. Easyscreen Trustees Limited, Forex Capital Markets, L.L.C., Forex Trading, L.L.C., Greenwich Europe Limited, Greenwich SA (Pty) Limited, Hanmag Refco Futures Corp, Just Commodity Pte. Ltd., Just Commodity Software Solutions Pte. Ltd., Kaf-Refco Futures (Malaysia), Lind-Waldock Financial Partners LLC, MacFutures, Mactechonologies Ltd, Market Educational Institute, LLC, MCC Futures Management L.P., Partners Capital Investment Group, LLC, Polaris-Refco Futures Co Ltd, Refco Canada Co., Refco Capital India Private Ltd.,

Refco Carlton Ltd, Refco Commodity India PVT Ltd., Refco Futures, AG (Zurich), Refco Futures GMbH (Hamburg), Refco Hong Kong Ltd., Refco International Investment Svc. Ltd., Refco Japan, Ltd., Refco Overseas Suisse SA, Refco Resources Ltd., Refco Sify Securities (India) Ltd, Refco Trading Services (Australia) PTY Ltd, S&P Managed Futures Index Fund, L.P., Sino Refco Investments Limited Partnership, Sino Refco Investments LLC, SN Bank Ltd, Sphinx Managed Futures Index Fund, L.P., Trafalgar Commodities Ltd, Wells Limited and Westminster-Refco Holding Company, LLC.

**1.126** *Non-Estate Refco Claims* means non-estate causes of action arising from any matter involving any Refco Entity including, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity, including, without limitation, all underwriters; *provided, however,* Non-Estate Refco Claims shall exclude (i) contract claims against third parties and (ii) Class Action Claims.

**1.127** *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

**1.128** *Old Equity Interests* means the common stock of Refco Inc. outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

**1.129** *Other Related Claim* means, other than an RCM Related Claim, any Claim or cause of action of any Holder of an Impaired Claim against RCM or any Debtor arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against its primary Debtor obligor or RCM; *provided, however,* that the term Other Related Claim shall not include any Claim, based on a contractual guarantee or other direct contractual undertaking, against RCM or any Debtor that is not such Holder's primary Debtor obligor.

**1.130** *Other Secured Claim* means a Claim (other than an Administrative Claim or Secured Lender Claim) that is secured by a lien on property in which a Debtor's Estate or RCM's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

**1.131** *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

**1.132** *Petition Date* means, with respect to a Debtor or RCM, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.133** *Plan* means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**1.134** *Plan Administrator* means the person designated pursuant to section 5.5 hereof prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan on behalf of the Contributing Debtors and FXA in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

**1.135** *Plan Administrator Agreement* means the agreement between and among the Contributing Debtors and the Plan Administrator specifying the rights, duties, and responsibilities of and to be performed by the Plan Administrator under the Plan, in substantially the same form as the agreement attached to the Plan as Exhibit E.

**1.136** *Plan Committee* means the committee as appointed pursuant to section 5.11(b) hereof as of the Effective Date, which will supervise and direct the Plan Administrator, to monitor implementation of the Plan, and to take such other actions and have such other rights as are set forth in the Plan, all as described in Article V of this Plan.

**1.137** *Plan Document* means the Plan, together with any contract, instrument, release, or other agreement or document entered into in connection with Plan.

**1.138** *Plan Filing Date* means September 14, 2006.

**1.139** *Plan Proponents* means the Debtors, the RCM Trustee and the Committees.

**1.140** *Plan Support Agreement* means that certain agreement among the RCM Trustee, certain Non-Debtor Affiliates, the Committees, certain individual customers and creditors of RCM and the Debtors, and the chapter 7 trustee for Refco, LLC, in his capacity as chapter 7 trustee for Refco, LLC, filed with the Bankruptcy Court on September 15, 2006 (Docket No. 2861).

**1.141** *Post-Confirmation RCM* means the estate of RCM on and after the entry of the Confirmation Order as administered by the RCM Trustee.

**1.142** *Post-Petition Management* means AlixPartners and Harrison J. Goldin, Goldin Associates, LLC, and any directors appointed to the board of directors of Refco Inc. subsequent to Mr. Goldin's appointment as Chief Executive Officer of Refco Inc. on January 25, 2006.

**1.143** *Pre-Conversion Administrative Claim Amount* means, if determined necessary by the RCM Trustee, any amount deposited by the Contributing Debtors into a reserve for the benefit of Holders of Administrative Claims against RCM arising or accruing prior to the date of conversion, if any, of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (including RCM Substantial Contribution Fees). The Pre-Conversion Administrative Claim Amount shall in no case exceed an amount equal to (i) $60 million plus (ii) the RCM Excess Priority Claims that RCM is responsible for bearing pursuant to section 5.16 of this Plan.

**1.144** *Priority Claims* means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

**1.145** *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.146** *Private Actions Trust* means the trust established on the Effective Date pursuant to section 5.8 of the Plan to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.

**1.147** *Private Actions Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan attached as Exhibit G hereto.

**1.148** *Private Actions Trust Election* means, in respect of a Holder of an Allowed Old Equity Interest, the agreement of such Holder to assign and contribute such Holder's Non-Estate Refco Claims, and the proceeds of Class Action Claims to the Private Actions Trust, which election shall be evidenced by the submission of the election form attached hereto as Exhibit M.

**1.149** *Private Actions Trustee* means the Person appointed pursuant to the Private Actions Trust Agreement of the Plan to act as trustee of and administer the Private Actions Trust and identified on or before

the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Litigation Trustee.

**1.150** *Professional* means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.151** *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

**1.152** *Pro Rata* means, with respect to Claims or Interests (i) within the same Class or sub-Class, the proportion that a Claim or Interest bears to the sum of all Claims or Interests, as the case may be, within such Class or sub-Class, and (ii) among all Classes, the proportion that a Class of Claims or Interests bears to the sum of all Claims or Interests, as the case may be; *provided, however,* that for purposes of distributing Litigation Trust Interests, Pro Rata share shall exclude Convenience Claims.

**1.153** *Qualifying Plan* has the meaning ascribed to such term in the Early Payment Order.

**1.154** *Quarterly Distribution Date* means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however,* that if the Effective Date is within 30 days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

**1.155** *RCM* means Refco Capital Markets, Ltd.

**1.156** *RCM Administrative/Priority Claims Reserve* means the Reserve account(s) to be established and maintained by the RCM Trustee, on behalf of Post-Confirmation RCM, to fund the Distribution to Holders of Administrative and Priority Claims against RCM.

**1.157** *RCM Administrative Professional* means any professional employed in the RCM Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise.

**1.158** *RCM Advance* means a post-petition advance, if any, by RCM to or for the benefit of one or more of the Contributing Debtors in the amount of up to $115 million.

**1.159** *RCM BAWAG Proceeds* means (i) $200,000,000.00 of the BAWAG Guaranteed Proceeds (whether directly allocated to RCM or recovered by RCM on account of its RCM Intercompany Claim), and (ii) a portion of the BAWAG Contingent Proceeds allocable to payment of the RCM Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases required by the BAWAG Settlement, Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims.

**1.160** *RCM Cash Distribution* means the sum of (i) $460 million of Cash (inclusive of RCM BAWAG Proceeds) payable from Contributing Debtor Distributive Assets, which amount shall be adjusted upwards or downwards, by an amount equal to the Specified Difference plus (ii) payment to RCM of any amounts available from the Contributing Debtors General Unsecured Distribution, to the extent that such amounts are not paid to Holders of Allowed Contributing Debtors General Unsecured Claims as a result of recoveries for Holders of Allowed Contributing Debtors General Unsecured Claims (from Contributing Debtors Distributive Assets and the RGL FXCM Distribution) having reached 40%; *provided, however,* such Distribution shall be subject to the Administrative Claims Adjustment.

**1.161** *RCM Difference* means the amount by which the Allowed amount of any RCM FX/Unsecured Claim filed by Cargill is reduced by allowance of the Cargill Administrative Claim.

1.162    *RCM Claims Distribution Account* means the account established and maintained by the Post-Confirmation RCM from which Distributions to Holders of Allowed Claims against RCM shall be made and from which reserves on behalf of RCM will be funded.

1.163    *RCM Distribution Reserve* means the reserve established by the Plan Administrator or RCM, as the case may be, to hold that portion of the RCM Cash Distribution and that portion of the RGL FXCM Distribution applicable to Holders of a right to demand an applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, but who have not tendered an RCM Related Claim Subordination Form.

1.164    *RCM Excess Priority Claims* means that portion of Excess Priority Claims that are to be borne by RCM pursuant to section 5.16 of this Plan.

1.165    *RCM FX/Unsecured Claims* has the meaning given to the term "FX/Unsecured Claim" in the RCM Settlement Agreement.

1.166    *RCM FX/Unsecured Claims Distribution* means the Distribution for Holders of RCM FX/Unsecured Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM FX/ Unsecured Convenience Claims.

1.167    *RCM FX/Unsecured Convenience Claims* means any RCM FX/Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM FX/Unsecured Claim to $10,000 on the applicable Ballot; *provided, however,* that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM FX/ Unsecured Convenience Claims shall be limited to $1.458 million. To the extent that the amount of RCM FX/Unsecured Claims reducing and electing treatment of such Claims as RCM FX/Unsecured Convenience Claims exceeds $1.458 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $1.458 million cap is reached.

1.168    *RCM Implied Deficiency Claim* has the meaning given to the term "Implied Deficiency Claim" in §8(b) of the RCM Settlement Agreement.

1.169    *RCM Intercompany Claims* means Claims of RCM against one or more of the Debtors. Unless and until Allowed in a definitive amount, for purposes of calculations herein, the RCM Intercompany Claims shall be deemed to be in an amount that is no less than the amount necessary to cause all Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims to receive payment in full.

1.170    *RCM Intercompany Claim Distribution* means the sum of (i) the RCM Rights Distribution, (ii) the Additional RCM Claim, (iii) 50% of the RGL FXCM Distribution, (iv) the RCM BAWAG Proceeds and (v) the allocable share of the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.171    *RCM Leuthold Metals Claim* has the meaning given to the term "Leuthold Metals Claim" in the RCM Settlement Agreement.

1.172    *RCM Leuthold Metals Claim Distribution* means the Distribution for Holders of RCM Leuthold Metals Claims set forth in the RCM Settlement Agreement.

1.173    *RCM Projection* means a projection of the Cash or value to be available from the MAC RCM Assets for Distribution in respect of the RCM Cash Distribution and the Additional RCM Claim.

1.174    *RCM Related Claims* means any Claim or cause of action of any Holder of an Impaired Claim against the Debtors and Non-Debtor Affiliates arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against RCM; *provided, however,* that the term RCM Related Claim shall not include any Claim of a Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim against any Contributing Debtor or FXA based on contractual guarantees or other direct contractual undertakings.

**1.175** *RCM Related Claim Subordination Form* means, in respect of a Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim, either (i) a ballot cast by such Holder in respect of the Plan whereby the Holder has elected (by means of not affirmatively opting out of such election) to (A) assign such Holder's RCM Related Claims against such Debtors, if any, to the Litigation Trust; (B) affirming its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate will be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing claims against and equity interests in the applicable Contributing Non-Debtor Affiliate (and that such RCM Related Claim may be deemed released upon the determination of the RCM Trustee, with the consent of the Plan Committee, in accordance with section 10.2(c) of the Plan); (C) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any; and (D) receive such Holder's applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution or (ii) any agreement, in a form satisfactory to the Plan Administrator, by which such Holder agrees to do the forgoing. For the avoidance of doubt, any ballot properly cast by the Voting Deadline and satisfying the conditions above shall be deemed to have been "provided" to the RCM Trustee and the Plan Administrator for purposes of section 6.6(c) of this Plan.

**1.176** *RCM Reserves* means (A) the RCM Disputed Claims Reserve, (B) the RCM Administrative/Priority Reserve, (C) the RCM Wind-Down Reserve, (D) the RCM Unclaimed Distribution Reserve, and (E) any other reserves required to be established by the RCM Trustee under the RCM Settlement Agreement.

**1.177** *RCM Rights Distribution* means the transfer to the RCM Trustee, as part of the RCM Intercompany Claims Distribution, of rights which will allow each Holder of an Allowed RCM Securities Customers Claim on account of its RCM Implied Deficiency Claim and each Holder of an Allowed RCM FX/Unsecured Claim to make a demand for payment from the Plan Administrator or RCM, as the case may be, for such Holder's Pro-Rata share of the RCM Distribution Reserve to the extent that such Holder satisfies the conditions set forth in section 6.6(c) of this Plan.

**1.178** *RCM Securities Customer Claims* has the meaning given to the term "Securities Customer Claims" in the RCM Settlement Agreement.

**1.179** *RCM Securities Customer Convenience Claims* means any RCM Securities Customer Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM Securities Customer Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM Securities Customer Convenience Claims shall be limited to $0.333 million. To the extent that the amount of RCM Securities Customer Convenience Claims reducing and electing treatment of such Claims as RCM Securities Customer Convenience Claims exceeds $0.333 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $0.333 million cap is reached.

**1.180** *RCM Securities Customer Claims Distribution* means the Distribution for Holders of RCM Securities Customer Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM Securities Customer Convenience Claims.

**1.181** *RCM Settlement Agreement* means, collectively, (i) the settlement agreement dated as of June 29, 2006 by and among the RCM Trustee and certain creditors of RCM and (ii) the Joinder Agreement dated as of July 20, 2006 between the RCM Trustee and the Rogers Funds, in each case as amended (copies of which are attached hereto as Exhibit B).

**1.182** *RCM Substantial Contribution Fees* means the approximate amount of $4.3 million constituting the substantial contribution Claim of the MCG Members and the Joinder Parties under sections 503(b)(3)(d), 507(a)(2) and 752(a) of the Bankruptcy Code as set forth in the RCM Settlement Agreement.

1.183   *RCM Trustee* means Marc S. Kirschner, the chapter 11 trustee appointed in the RCM Chapter 11 Case in connection with the March 22, 2006 order issued by the Bankruptcy Court authorizing appointment of one disinterested person as Chapter 11 trustee for the Estate of RCM. The term includes any successor chapter 11 trustee or, if the RCM Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7 of the Bankruptcy Code, the chapter 7 trustee.

1.184   *RCM Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for RCM pursuant to Article VI of the Plan.

1.185   *RCM Wind-Down Reserve* means a reserve, if determined necessary by the RCM Trustee, of up to $15 million from the Cash or value available for the RCM Cash Distribution, with the amount of such RCM Wind-Down Reserve to be subject to downward adjustment from time to time by the RCM Trustee, to the extent the RCM Trustee determines that RCM's wind-down expenses after the Effective Date will be less than $15 million.

1.186   *Reinstated* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

1.187   *Refco Entities* means the Debtors, RCM and the Non-Debtor Affiliates.

1.188   *Related Claims* means any RCM Related Claim or Other Related Claim.

1.189   *Released/Subordinated Claims* means the claims or causes of actions described in sections 10.2(a), (b), (c) and (d) of the Plan or claims or causes of action that have been otherwise released or waived pursuant to an order of the Bankruptcy Court (including, without limitation, the Early Payment Order).

1.190   *Released Parties* means, acting in such capacity, (i) the Post-Petition Management, (ii) the Secured Lender Releasees, (iii) the Senior Subordinated Note Indenture Trustee, its directors, officers, and employees (all in such capacity) and (iv) present and former holders of the Senior Subordinated Notes in their capacity as Holders of the Senior Subordinated Notes.

1.191   *Reorganized Affiliate Debtor* means any Affiliate Debtor on and after the Effective Date.

1.192   *Reorganized Debtors* means Reorganized Refco, Reorganized FXA and any Reorganized Affiliate Debtor.

1.193   *Reorganized FXA* means FXA on and after the Effective Date.

1.194   *Reorganized Refco* means Refco Inc. on and after the Effective Date.

1.195   *Reserves* means, collectively, the Disputed Claims Reserve, Unclaimed Distribution Reserve, Administrative/Priority Claims Reserve and the RCM Reserves (if held by the Plan Administrator, rather than the RCM Trustee) and the Wind-Down Reserve.

1.196   *Restated Corporate Governance Documents* means the restated corporate governance documents of the Reorganized Debtors in substantially the form attached to this Plan as Exhibit C.

1.197   *Retained Causes of Action* means all of the Debtors' and RCM's claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds,

bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments against any party, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, and regardless of whether arising in law, equity or under or pursuant to Chapter 5 of the Bankruptcy Code, including, but not limited to, the Litigation Claims. A non-exclusive list of the Retained Causes of Action is set forth on Exhibit K attached hereto.

1.198  *RGL* means Refco Group Limited LLC.

1.199  *RGL FXCM Distribution* means RGL's 35% interest in FXCM, which for purposes of the cap on Distributions to Holders of Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets and the RGL FXCM Distribution shall have a value equal to (i) if liquidated prior to the Effective Date, the value obtained through liquidation and (ii) if not liquidated prior to the Effective Date, a deemed value of $90 million.

1.200  *Rogers Funds* means Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.

1.201  *Scheduled* means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.202  *Schedules* means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors or RCM pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rules, as such schedules have been or may be further modified, amended, or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.203  *Secured Lender(s)* has the meaning assigned to the term "Lender(s)" in the Early Payment Order.

1.204  *Secured Lender Agent* has the meaning assigned to the term "Agent" in the Early Payment Order.

1.205  *Secured Lender BAWAG Proceeds* means $100 million of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed exclusively offered to pay and accepted by the Holders of Allowed Secured Lender Claims.

1.206  *Secured Lender Claims* has the meaning assigned to the term "Secured Claim" in the Early Payment Order.

1.207  *Secured Lender Indemnification Claims* means any and all Estimated Unsatisfied Credit Agreement Claims and all other claims of the Secured Lender Agent and/or the Secured Lenders of the type specified in paragraph 9(b) of the Early Payment Order.

1.208  *Secured Lender Payment Date* has the meaning assigned to the term "Payment Date" in the Early Payment Order.

1.209  *Secured Lender Released Claims* means any and all actual or potential demands, claims, causes of action (including, without limitation, derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity (including, without limitation, actions seeking to recharacterize, avoid, subordinate, set aside or disallow the liens or claims of any Secured Lender Releasee, or seeking turnover of property, damages or any other affirmative recovery from any Secured Lender Releasee, including, without limitation, any claim for contribution), whether asserted or unasserted, known or unknown, foreseen or unforeseen, pending or anticipated, arising under the Bankruptcy Code or under otherwise applicable law, that any Person ever had, now has or hereafter may have (whether by assignment or otherwise) based in whole or in part upon any act or failure to act by any of the Secured Lender Releasees, on or prior to the Secured Lender Payment Date, in contemplation of the execution of the Loan Documents, in connection

with the execution of the Loan Documents or the making or repayment of the Loans, or in connection with any transactions directly or indirectly related or connected in any way to the Loan Documents, the Secured Lender's Collateral, the use of proceeds of Loans made under the Loan Documents, or any other transactions related to or in connection with any of the foregoing.

**1.210** *Secured Lender Releasee* has the meaning assigned to the term "Lender Releasee" in the Early Payment Order.

**1.211** *Secured Lender's Collateral* has the meaning assigned to the term "Collateral" in the Early Payment Order.

**1.212** *Securities Class Action Stipulation* means that certain Stipulation and Agreement of Settlement entered into on September 7, 2006 between BAWAG and the lead plaintiffs in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, or any future settlement between the parties as contemplated therein.

**1.213** *Senior Subordinated Note Allocation* means an allocation of the Senior Subordinated Note Holder Fee Distribution on account of the Senior Subordinated Note Indenture Trustee Fees and Ad Hoc Committee of Senior Subordinated Note Holders Fees and Expenses, which allocation shall be agreed upon between the Senior Subordinated Note Indenture Trustee and the Senior Subordinated Note Ad Hoc Committee. Any amount of Senior Subordinated Note Indenture Trustee Fees not paid on account of such allocation may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

**1.214** *Senior Subordinated Note Claims* means all Claims of any kind arising from or related to the Senior Subordinated Notes, and including, without limitation, any Claims arising from any guarantees under the Senior Subordinated Note Indenture, which Claims shall be Allowed Claims in the amount of $397,413,324.50.

**1.215** *Senior Subordinated Note Holder BAWAG Proceeds* means $150,000,000 of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for releases required in the BAWAG Settlement, Holders of Allowed Senior Subordinated Note Claims.

**1.216** *Senior Subordinated Note Holder Distribution* means $331,522,195.30, which, pursuant to the compromises and settlements contained in this Plan document, constitutes 83.42% of the outstanding balance of principal and prepetition interest of the Senior Subordinated Note Claims. Such Distribution shall be paid to the Senior Subordinated Note Indenture Trustee on the Effective Date to the extent of available Cash after taking into account the funding of the Administrative/Priority Claims Reserve, with any balance paid from time to time to the Senior Subordinate Note Indenture Trustee from available Cash with interest accruing, beginning January 1, 2007, on the unpaid balance at the same rate of interest that Refco LLC earns on its invested Cash and cash equivalents, payable from the Senior Subordinated Note Holder BAWAG Proceeds and, to the extent of any deficiencies, the Contributing Debtors Distributive Assets.

**1.217** *Senior Subordinated Note Holder Fee Distribution* means an amount up to $6.0 million of the (i) Senior Subordinated Note Indenture Trustee Fees, and (ii) the Allowed Senior Subordinated Note Ad Hoc Committee Fees and Expenses. Such Distribution shall be paid on the Effective Date from the Contributing Debtors Distributive Assets to the Senior Subordinated Note Indenture Trustee and counsel to the Senior Subordinated Note ad hoc committee, subject to the Senior Subordinated Note Allocation. For the avoidance of doubt, any portion of the Senior Subordinated Note Indenture Trustee Fees not paid by the Senior Subordinated Note Holder Fee Distribution may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

**1.218** *Senior Subordinated Note Indenture* means the indenture dated as of August 5, 2004, among Refco Finance Holdings LLC (now known as Refco Group Ltd., LLC) and Refco Finance Inc., as issuers, and Wells Fargo Bank, National Association, as indenture trustee, relating to the Senior Subordinated Notes, as it may be amended, supplemented, or modified from time to time.

**1.219** *Senior Subordinated Note Indenture Trustee* means Wells Fargo Bank, National Association, the indenture trustee under the Senior Subordinated Note Indenture, or any successor thereto.

**1.220** *Senior Subordinated Note Indenture Trustee Charging Lien* means any Lien or other priority in payment or right available to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture or otherwise available to the Senior Subordinate Note Indenture Trustee under applicable law, for the payment of Senior Subordinated Note Indenture Trustee Fees.

**1.221** *Senior Subordinated Note Indenture Trustee Fees* means the fees, costs, expenses and indemnity claims of the Senior Subordinated Note Indenture Trustee and the fees and expenses of its counsel and financial advisor.

**1.222** *Senior Subordinated Notes* means the 9% Senior Subordinated Notes due 2012 issued by RGL and Refco Finance Inc. under the Senior Subordinated Note Indenture and guaranteed by certain of the Debtors.

**1.223** *Specified Difference* means 50% of the difference (positive or negative) between the value of the Adjusted Contributing Debtors Distributive Assets and $554 million (in making such calculation the Adjusted Contributing Debtors Distributive Assets shall not be subject to the Administrative Claims Adjustment); *provided, however,* that once the portion of the Contributing Debtors General Unsecured Distribution has reached 40% exclusive of the value of the Tranche A Litigation Trust Interests, 100% of the remainder of the positive difference shall be added to the RCM Cash Distribution.  For the avoidance of doubt, any BAWAG Proceeds received pursuant to the BAWAG Settlement, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement, shall be included in the calculation of Adjusted Contributing Debtors Distributive Assets.

**1.224** *Subordinated Claim* means any Claim which (i) is subordinated pursuant to section 510(c) of the Bankruptcy Code, (ii) arising from recision of a purchase or sale of a debt security of the Debtors, for damages arising from the purchase or sale of such debt security, or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, or  (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

**1.225** *Subsidiary Claims and Interests* means Claim against or an Interest in any of the Refco Entities held by any other Refco Entity other than the RCM Intercompany Claims.

**1.226** *Tranche A Litigation Trust Interests* means the Litigation Trust Interests distributed to (i) the RCM Estate, (ii) Holders of Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lender Claims or, the Senior Subordinated Note Claims) and (iii) the Holders of FXA General Unsecured Claims (which for the sake of clarity, shall not include FXA Convenience Class Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims) in accordance with section 5.7(c) hereof.

**1.227** *Tranche B Litigation Trust Interests* means interests in the Litigation Trust given by the beneficiaries of the Tranche A Litigation Trust Interests to Holders of Allowed Old Equity Interests that have made the Private Actions Trust Election and consisting of 3% of the first $500 million of Combined Recoveries, 7.5% of the Combined Recoveries greater than $500 million and 15% of the Combined Recoveries greater than $1 billion, as set forth in section 5.7(c) hereof.

**1.228** *Unclaimed Distribution Reserve* means the reserve or reserves established in respect of unclaimed Distributions for FXA and the Contributing Debtors pursuant to Article VI of the Plan.

**1.229** *Unclassified Claims* means Administrative Claims and Priority Tax Claims

**1.230** *Unimpaired* means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.231    *Voting Deadline* means [•], 2006 at [•] p.m. (prevailing Eastern Time).

1.232    *Voting Record Date* means [•].

1.233    *VR* means, collectively, VR Global Partners, L.P. and its affiliates.

1.234    *VR/Leuthold Guarantee Claims* means the Claims against RGL arising from (i) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Capital Group Ltd., (ii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Argentina Recovery Fund, Ltd., (iii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Global Partners, L.P., and (iv) that certain guarantee agreement, dated September 1, 2005 between Refco Group Ltd., LLC and Leuthold Funds, Inc. and (v) any other documents, agreements or transactions in any way related to (i) through (iv) above.

1.235    *Wind-Down Reserves* means the reserve accounts to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the administration of this Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.

*Rules Of Interpretation And Computation Of Time.* For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections and articles are references to sections and articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any Distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits.* All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036-6522 (Attn. David R. Hurst, Esq.), counsel to the Debtors or by downloading such Exhibits from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required), the Refco website at http://www.refcoinc.com or http://www.refcodocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control; *provided, however,* in all relevant cases, to the extent this Plan is inconsistent with the RCM Settlement Agreement, the RCM Settlement Agreement shall control.

## ARTICLE II

## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1    *Introduction.*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors and RCM. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

This Plan is premised on a consensual pooling of assets and liabilities by the Contributing Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases, including the Debtors, the RCM Trustee, the Committees, the Secured Lenders and certain of the Holders of Senior Subordinated Notes. If for any reason the Bankruptcy Court determines that such compromises and settlements, as embodied herein, should not be implemented as set forth herein, the Plan Proponents may elect to seek confirmation of the Plan on the basis of complete or partial substantive consolidation or on a Debtor by Debtor basis identifying sub-Classes of each of the listed Classes of Claims of the Contributing Debtors for each Contributing Debtor.

**The provisions set forth below also describe the classification of RCM Claims and Interests, but the provisions applicable to the RCM Claims and Interests are qualified in their entirety by reference to the RCM Settlement Agreement with respect to the Claims against RCM. To the extent that the summary below conflicts with the provisions of the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code shall govern. This Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of Claims between the Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan.**

The provisions set forth below also describe the classification of Secured Lender Claims, but the provisions applicable to the Secured Lender Claims are qualified in their entirety by reference to the Early Payment Order.

2.2     *Classification of Claims and Interests of the Contributing Debtors.*

(a)     *Unclassified Claims – Contributing Debtors* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)     *Unimpaired Classes of Claims – Contributing Debtors* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)     *Impaired Classes of Claims – Contributing Debtors* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - General Unsecured Claims.

Class 5(b) - Related Claims

Class 6 - RCM Intercompany Claims.

Class 7 - Subordinated Claims.

Each of Classes 4 and 5 shall contain sub-Classes corresponding to each of the Contributing Debtors. A schedule of such sub-Classes is attached hereto as Schedule 2.2(c).

(d)     *Impaired Classes of Interests – Contributing Debtors* (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 8 - Old Equity Interests.

**2.3     *Classification of Claims of FXA.***

(a)     *Unclassified Claims – FXA* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)     *Unimpaired Classes of Claims – FXA* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - FXA Non-Tax Priority Claims.

Class 2 - FXA Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)     *Impaired Classes of Claims – FXA* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - FXA General Unsecured Claims.

Class 5(b) - Related Claims.

Class 6 - FXA Convenience Claims.

Class 7 - FXA Subordinated Claims.

**2.4     *Classification of Claims of RCM.***

(a) *Unclassified Claims – RCM* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b) *Unimpaired Classes of Claims – RCM* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

(c) *Impaired Classes of Claims – RCM* (Classes 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan; Class 9 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 3 - RCM FX/Unsecured Claims.

Class 4 - RCM Securities Customer Claims.

Class 5 - RCM Leuthold Metals Claims.

Class 6 - RCM FX/Unsecured Convenience Claims.

Class 7 - RCM Securities Customer Convenience Claims.

Class 8 - Related Claims.

Class 9 - RCM Subordinated Claims.

## ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

**3.1** *Treatment of Claims and Interests of the Contributing Debtors.*

(a) *Unclassified Claims – Contributing Debtors*

(i) *Administrative Claims.* On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim against the Contributing Debtors, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by a Contributing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the Contributing Debtors or the Plan Administrator. Subsection (b) of the second sentence in this section 3.1(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii) *Priority Tax Claims.* On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the Contributing Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim against the Contributing Debtors, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Contributing Debtors or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b) *Unimpaired Classes of Claims – Contributing Debtors.*

(i) *Class 1 - Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim against the Contributing Debtors, each Holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii) *Class 2 - Other Secured Claims.* On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii) *Class 3 - Secured Lender Claims.* The Secured Lender Claims against the Contributing Debtors shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c) *Impaired Classes of Claims – Contributing Debtors.*

(i) *Class 4 - Senior Subordinated Note Claims.* On the Effective Date, each Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors shall receive, to the extent not previously paid, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Senior Subordinated Note Claim and any and all Claims against the Refco Entities, its Pro Rata share of the Senior Subordinated Note Holder Distribution (subject to the Senior Subordinated Note Indenture Trustee Charging Lien); and the Debtors shall pay the Senior Subordinated Note Holder Fee Distribution; *provided, however,* to the extent that a Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors elects to not receive the Senior Subordinated Note Holder BAWAG Proceeds, such Holder's Distribution shall consist of its Pro Rata share of the Senior Subordinated Note Holder Distribution less such Holder's portion of the Senior Subordinated Note Holder BAWAG Proceeds.

(ii)  *Class 5(a) - Contributing Debtors General Unsecured Claims*.  Subject to section 6.4 of this Plan, on the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 5(a) Contributing Debtors General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Contributing Debtors General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the Contributing Debtors General Unsecured Distribution; *provided, however,* to the extent that a Holder of an Allowed Class 5(a) General Unsecured Claim against the Contributing Debtors elects to not receive the Contributing Debtors General Unsecured BAWAG Proceeds, if any, such Holder's Distribution shall consist of its Pro Rata share of the Contributing Debtors General Unsecured Distribution less such Holder's portion of the Contributing Debtors General Unsecured BAWAG Proceeds.

(iii)  *Class 5(b) - Related Claims*.  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against any Contributing Debtor shall be subordinated and shall receive no Distribution from the Contributing Debtors Distributive Assets unless and until such time as all Holders of Allowed Contributing Debtors General Unsecured Claims and Allowed RCM Intercompany Claims have been paid in full; *provided, however,* that any Holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)  *Class 6 - RCM Intercompany Claims*.  On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), the RCM Trustee, on behalf of RCM, shall receive the RCM Intercompany Claim Distribution.

(v)  *Class 7 - Subordinated Claims*.  No Holder of a Class 7 Subordinated Claim against the Contributing Debtors shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

(d)  *Impaired Classes of Interests – Contributing Debtors*.

(i)  *Class 8 - Old Equity Interests*.  No Holder of a Class 8 Old Equity Interest shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 8 Old Equity Interest; *provide, however,* that Holders of Class 8 Old Equity Interests have been given certain rights to participate in the Litigation Trust and the Private Actions Trust as set forth in section 5.25 hereof.

**3.2**    ***Treatment of Claims of FXA.***

(a)  *Unclassified Claims – FXA*.

(i)  *Administrative Claims*.  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Administrative Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by FXA in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and FXA or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.2(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii) *Priority Tax Claims.* On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of FXA, each Holder of an Allowed Priority Tax Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which FXA or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b) *Unimpaired Classes of Claims – FXA.*

(i) *Class 1 - FXA Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim against FXA is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against FXA shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Class 1 FXA Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Class 1 FXA Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii) *Class 2 - FXA Other Secured Claims.* On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 2 Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Class 2 Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Class 2 Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Class 2 Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii) *Class 3 - FXA Secured Lender Claims.* The Secured Lender Claims against FXA shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims against FXA, to the extent not paid in Cash prior to the Effective Date, shall be paid in full in Cash. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c) *Impaired Classes of Claims – FXA.*

(i) *Class 4 - FXA Senior Subordinated Note Claims.* On the Effective Date, based on the agreements and settlement set forth in this Plan, each Holder of an Allowed Class 4 FXA Senior Subordinated Note Claim shall waive its share of the FXA General Unsecured Claims Distribution in return for the releases set forth in sections 10.2(a) and (b) of the Plan.

(ii) *Class 5(a) - FXA General Unsecured Claims.* On the Effective Date, each Holder of an Allowed Class 5(a) FXA General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 5(a) FXA General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the FXA General Unsecured Claim Distribution.

(iii) *Class 5(b) –Related Claims.* On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against FXA shall be subordinated and shall receive no Distribution from the FXA Distributive Assets unless and until such time as all Holders of Allowed FXA

General Unsecured Claims have been paid in full; *provided, however*, that any holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

   (iv) *Class 6 - FXA Convenience Claims*. On the Effective Date, each Holder of an Allowed Class 6 FXA Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 FXA Convenience Claim, Cash equal to 40% of its Allowed Class 6 FXA Convenience Claim. Holders of Allowed Class 6 FXA Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

   (v) *Class 7 - FXA Subordinated Claims*. No Holder of a Class 7 Subordinated Claim against FXA shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

  **3.3** *Treatment of Claims of RCM*.

   **The following section is a summary of the treatment of RCM Claims set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code. This Plan summary of the treatment of RCM Claims is qualified in its entirety by reference to the RCM Settlement Agreement. To the extent that the summary treatment below conflicts with the treatment afforded in the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement shall govern the treatment of RCM Claims.**

   (a) *Unclassified Claims – RCM*.

    (i) *Administrative Claim*. As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by RCM in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the RCM Trustee. Subsection (b) of the second sentence in this section 3.3(a)(i) of the Plan shall not be construed to avoid relieving the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

    (ii) *Priority Tax Claims*. As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the RCM Trustee, each Holder of an Allowed Priority Tax Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the RCM Trustee and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)    *Unimpaired Classes of Claims – RCM.*

(i)    *Class 1 - RCM Non-Tax Priority Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim against RCM on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against RCM shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)    *Class 2 - RCM Other Secured Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(c)    *Impaired Classes of Claims – RCM.*

(i)    *Class 3 - RCM FX/Unsecured Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 3 RCM FX/Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM FX/Unsecured Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM FX/Unsecured Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(ii)    *Class 4 - RCM Securities Customer Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 4 RCM Securities Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Securities Customer Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM Securities Customer Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(iii)    *Class 5 - RCM Leuthold Metals Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 5 RCM Leuthold Metals Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Leuthold Metals Claim, its Pro Rata share of the RCM Leuthold Metals Claim Distribution.

(iv)    *Class 6 – RCM FX/Unsecured Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 RCM FX/Unsecured Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 RCM FX/Unsecured Convenience Claim, Cash equal to 60% of its Allowed Class 6 RCM FX/Unsecured Convenience Claim.  Holders of Allowed Class 6 RCM FX/Unsecured Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)  *Class 7 – RCM Securities Customer Convenience Claims*.  On the Effective Date, each Holder of an Allowed Class 7 RCM Securities Customer Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 RCM Securities Customer Convenience Claim, Cash equal to 100% of its Allowed Class 7 RCM Securities Customer Convenience Claim.  Holders of Allowed Class 7 RCM Securities Customer Convenience Claims shall not receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(vi)  *Class 8 - Related Claims*.  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 8 Other Related Claim against RCM shall be subordinated and shall receive no Distribution from RCM unless and until such time as all Holders of Allowed RCM FX/Unsecured Claims, Allowed RCM Securities Customer Claims and Allowed RCM Leuthold Metals Claims have been paid in full.

(vii)  *Class 9 - RCM Subordinated Claims*.  No Holder of a Class 6 Subordinated Claim against RCM  shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 9 RCM Subordinated Claim.  On the Effective Date, all Class 9 RCM Subordinated Claims shall be cancelled and extinguished.

**3.4**    *Allowed Claims and Interests*.  Except as provided in the Early Payment Order, notwithstanding any provision herein to the contrary, the Disbursing Agent, on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall make Distributions only to Holders of Allowed Claims and Interests. A Holder of a Disputed Claim or Disputed Interest shall receive only a Distribution on account thereof when and to the extent that its Disputed Claim or Disputed Interest becomes an Allowed Claim or an Allowed Interest, as applicable.

**3.5**    *Alternative Treatment*.  Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other less favorable Distribution or treatment to which it, the Plan Proponents and FXA (in respect of FXA),  the Plan Administrator (in respect of the Contributing Debtors) or the RCM Trustee (in respect of RCM) may agree in writing.

**3.6**    *Limitation on Recoveries*.  Notwithstanding anything contained herein to the contrary but subject to interest on Claims set forth in section 5.7 of the Plan, in the event that each Holder of an Allowed Claim in any Class of Claims is to receive Distributions in excess of one hundred percent (100%) of each Holder's Allowed Claim in such Class, then, any amounts remaining to be distributed to such Holders in excess of one hundred percent (100%) shall be redistributed to Holders of Allowed Claims or Interests immediately junior to such class as set forth in Article III of this Plan and shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims or Interests, including, without limitation, the RCM Settlement Agreement and the Bankruptcy Code.

**3.7**    *Special Provision Regarding Unimpaired Claims*.  Except as otherwise provided in this Plan, the RCM Settlement Agreement or a Final Order of the Bankruptcy Court (including, without limitation, the Early Payment Order), nothing shall affect the Debtors', RCM's, the Reorganized Debtors' or Post-Confirmation RCM's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs against, or recoupments of Unimpaired Claims.

**3.8**    *Claims and Interests of Non-Debtor Affiliates*.  Claims of Non-Debtor Affiliates (other than those of Refco LLC) against the Debtors or RCM , unless otherwise resolved prior to the Effective Date, shall be released and receive no Distribution under the Plan; *provided, however*, that, notwithstanding such release of Claims, the Contributing Debtors, RCM and the Non-Debtor Affiliates may, but are not obligated to, treat such Claims as though they survive solely for purposes of entering into netting or similar arrangements between the Contributing Debtors, RCM and one or more Non-Debtor Affiliates.  Interests of Non-Debtor Affiliates shall be treated in accordance with the provisions of this Plan, including, but not limited to, sections 5.1 and 5.22 below.

     **3.9**    *Classification and Treatment of Intercompany Claims*. Except as provided herein, Intercompany Claims among the Debtors or RCM are deemed to be resolved and satisfied by the provisions of and in accordance with this Plan. Notwithstanding the compromises and settlements set forth herein, each such Intercompany Claim shall be deemed to be an unsatisfied liability of each of the Debtors and RCM immediately prior to their contribution of Contributed Claims to the Litigation Trust.

     **3.10**    *Claims of Debtors against RCM*. Notwithstanding anything in this Plan to the contrary, Claims against RCM held by any other Debtor will receive no Distribution consistent with the settlement among RCM and the Debtors contained in and implemented by this Plan.

                       •

**ARTICLE IV**

**ACCEPTANCE OR REJECTION OF THE PLAN**

     **4.1**    *Classes Entitled To Vote*. Each Impaired Class of Claims of the Contributing Debtors, FXA or RCM that is entitled to receive or retain property or any interest in property under the Plan is entitled to vote to accept or reject the Plan. By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote. Holders of Claims and Interests in Classes that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and such Holders are also not entitled to vote.

     **4.2**    *Acceptance By Impaired Classes*. An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

     **4.3**    *Presumed Acceptance by Unimpaired Classes*. Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are Unimpaired by this Plan. Under section 1126(f) of the Bankruptcy Code, Holders of such Claims or Interests are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims or Interests will not be solicited.

     **4.4**    *Classes Deemed to Reject the Plan*. Classes 7 and 8 of the Contributing Debtors, FXA Class 7 and RCM Class 9 are deemed to reject the Plan and, therefore, votes to accept or reject the Plan will not be solicited from Holders of Claims or Interests in such Classes.

     **4.5**    *Summary of Classes Voting on the Plan*. As a result of the provision of sections 4.3 and 4.4 of this Plan, only the votes of Holders of Claims of the Contributing Debtors in Classes 4, 5 and 6, Holders of FXA Claims in Classes 4, 5 and 6 and Holders of RCM Claims in Classes 3, 4, 5,6 ,7 and 8 will be solicited with respect to this Plan.

     **4.6**    *Elimination Of Classes*. Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

     **4.7**    *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*. To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

# ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1**    *a Of Subsidiaries Into Refco Inc.* As soon after the Effective Date that the Plan Administrator determines, in consultation with the Litigation Trustee, that it is appropriate, each of the Affiliate Debtors may be merged with and into Refco Inc., with Refco Inc. as the surviving entity. Notwithstanding anything to the contrary in this section of the Plan, mergers in fact of each of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section shall occur no earlier than the Effective Date. Upon the occurrence of such a merger, the Plan Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required documentation with applicable state governmental agencies to reflect the occurrence of such mergers.

**5.2**    *Continued Corporate Existence And Dissolution Of Reorganized Debtors.*

(a)    Refco Inc., FXA and, until they are wound up and dissolved, the Affiliate Debtors shall continue to exist as Reorganized Refco, Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the Effective Date pursuant to the certificate of incorporation, certificate of formation or other corporate governance document, as applicable, and by-laws, operating agreement or other corporate governance document in effect prior to the Effective Date, except to the extent that such corporate governance documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates, and making Distributions in accordance with the Plan.

(b)    As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan, the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in consultation with the Plan Committee, (i) provide for the retention and storage of the books, records, and files that shall have been delivered to or created by the Plan Administrator until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored, (ii) file a certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file the necessary paperwork with the Office of the Secretary of State for the State of Delaware to effectuate the dissolution of the Reorganized Debtors in accordance with the laws of the State of Delaware, and (iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors. Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.

(c)    The RCM Trustee shall have sole discretion with respect to determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

**5.3**    *Corporate Governance Documentation.* The certificate of incorporation of Reorganized Refco shall be restated to, among other things: (a) authorize issuance of one share of new common stock, $0.01 par value per share that will be held by the Plan Administrator; (b) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (c) limit the activities of the Reorganized Refco to matters related to the implementation of the Plan and to matters reasonably incidental thereto. The corporate governance documents of Reorganized FXA shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized FXA to matters related to the implementation of the Plan and to matters reasonably incidental thereto. To the extent that the Plan Administrator decides it necessary, the corporate governance documents of the Affiliate Debtors that will continue in existence following the Effective Date pending the wind up of their businesses shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of such Reorganized Affiliate Debtor to matters related to the implementation

of the Plan and to matters reasonably incidental thereto. The form of the restated corporate governance documents are attached hereto as Exhibit C.

        **5.4**    ***Directors, Managers And Officers; Effectuating Documents; Further Transactions.*** From and after the Effective Date, the Plan Administrator shall serve as the sole officer and director or manager, as applicable, of the Reorganized Debtors and the RCM Trustee shall serve as the sole representative of RCM. The Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

        **5.5**    ***The Plan Administrator.***

        (a)    *Appointment.* From and after the Effective Date, a person or entity designated by the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) prior to the Confirmation Date, shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

        (b)    *Plan Administrator Agreement.* Prior to or on the Effective Date, the Contributing Debtors and FXA shall execute a Plan Administrator Agreement in substantially the same form as Exhibit E hereto with the Plan Administrator. The form of Plan Administrator Agreement is hereby approved. Any nonmaterial modifications to the Plan Administrator Agreement by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of this Plan.

        (c)    *Separate Administration of the RCM Estates.* Notwithstanding anything herein to the contrary, all references in the Plan to the Plan Administrator shall refer exclusively to the administration of the Estates of the Contributing Debtors and FXA. The RCM Estate shall be administered separately by the RCM Trustee and the RCM Trustee shall wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

        (d)    *Rights, Powers, And Duties Of The Reorganized Debtors And The Plan Administrator.* The Reorganized Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan. Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Reorganized Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others:

        (i)    liquidating the Reorganized Debtors' assets;

        (ii)    investing the Cash of the Estates of the Reorganized Debtors, including, but not limited to, the Cash held in the Reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court;

        (iii)    calculating and paying all Distributions in accordance with the terms of the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court by the Plan Administrator to Holders of Allowed Claims;

(iv)   employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtors and their Estates;

(v)   making and filing tax returns for any of the Contributing Debtors, FXA or the Reorganized Debtors;

(vi)   as provided in Article V, objecting to Claims or Interests filed against the Estates of any of the Contributing Debtors, FXA or the Reorganized Debtors on any basis except to the extent such Claims or Interests have previously been allowed by a Final Order;

(vii)   seeking estimation of contingent or unliquidated Claims against the Contributing Debtors, FXA or the Reorganized Debtors under section 502(c) of the Bankruptcy Code;

(viii)   seeking determination of tax liability for the Contributing Debtors, FXA and the Reorganized Debtors under section 505 of the Bankruptcy Code;

(ix)   closing the Chapter 11 Cases of the Reorganized Debtors;

(x)   dissolving and winding up the Reorganized Debtors;

(xi)   exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement; and

(xii)   taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the Plan Administrator Agreement.

(e)     *Compensation Of The Plan Administrator.*  The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms and conditions of the Plan Administrator Agreement.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve.  The payment of the reasonable fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided, however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)     *Indemnification.*  The Reorganized Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer, director or manager, as applicable of the Reorganized Debtors), (ii) such individuals as may serve as officers, directors or managers, as applicable of the Reorganized Debtors, if any, and (iii) the Administrative Professionals (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan or Plan Administration Agreement.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve.  The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)     *Insurance.*  The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Reorganized Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Reorganized Debtors or their

Estates and (ii) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the Plan Administrator Agreement.

(h)    *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, after consultation with the Plan Committee, (i) to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims against any of the Contributing Debtors' or FXA's Estates, in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements of claims:

(i)    If the proposed face amount at which the Disputed Claim is to be allowed is less than or equal to $500,000, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party or Bankruptcy Court approval and the Plan Administrator shall have no liability to any party for the reasonableness of such settlement, except to the extent such settlement is determined by a Final Order to have been the product of the Plan Administrator's gross negligence or willful misconduct.

(ii)    If the proposed face amount at which the Disputed Claim is to be allowed is greater than $500,000, but less than or equal to $10 million, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized and empowered to settle such Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee approval or, if such approval of the Plan Committee is not forthcoming, upon Bankruptcy Court approval of such settlement.

(iii)    If the proposed face amount at which the Disputed Claim is to be allowed is greater than $10 million, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee and Bankruptcy Court approval of such settlement.

Other than as set forth in section 5.21 herein, parties in interest (other than the Reorganized Debtors and Plan Administrator, whose objection deadlines are set forth in section 8.1 of the Plan) shall have 90 days following the Effective Date to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates to the extent that under the Bankruptcy Code such parties are permitted (to the extent not previously allowed pursuant to the Plan or by order of the Bankruptcy Court), and have standing, to assert such objections. Notwithstanding anything to the contrary in this section of the Plan, Disputed Claims may not be resolved absent Bankruptcy Court approval under the procedures set forth in this section of the Plan until the date that is on or after 90 days following the Effective Date.

5.6    *Administration of Post-Confirmation RCM.*

(a)    *Rights, Powers, And Duties Of The RCM Trustee.*  The RCM Trustee shall retain and have all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the RCM Settlement Agreement or applicable law.  Such rights, powers, and duties, which shall be exercisable by the RCM Trustee on behalf of Post-Confirmation RCM and the RCM Estate pursuant to the Plan and the RCM Settlement Agreement, shall include, among others:

(i)    liquidating Post-Confirmation RCM's assets;

(ii)   investing Post-Confirmation RCM's Cash, including, but not limited to, the Cash held in any reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise order by the Bankruptcy Court;

(iii)   calculating and paying all Distributions to be made under the Plan, the RCM Settlement Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against RCM;

(iv)   employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Post-Confirmation RCM including professionals engaged for the valuation, sale or other disposition of Post-Confirmation RCM's assets or proceeds thereof;

(v)   making and filing tax returns, if any are required, for Post-Confirmation RCM;

(vi)   as provided in Article V, objecting to Claims or Interests filed against RCM or Post-Confirmation RCM on any basis except to the extent such Claims or Interests have previously been Allowed;

(vii)   seeking estimation of contingent or unliquidated Claims against RCM or Post-Confirmation RCM under section 502(c) of the Bankruptcy Code;

(viii)   seeking determination of tax liability, if any, for RCM and Post-Confirmation RCM under section 505 of the Bankruptcy Code;

(ix)   closing the RCM Chapter 11 Case or chapter 7 case;

(x)   dissolving and winding up Post-Confirmation RCM;

(xi)   exercising all powers and rights, and taking all actions, contemplated by or provided for in the RCM Settlement Agreement or applicable law; and

(xii)   taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the RCM Settlement Agreement or to administer the RCM Estate.

(b)   *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the RCM Trustee, on behalf of Post-Confirmation RCM, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder, under the RCM Settlement Agreement or by Court order (i) to object to any Claims or Interests filed against the RCM Estate and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle any such Disputed Claims asserted against RCM.

5.7   *Litigation Trust.*

(a)   *Establishment of the Litigation Trust.* The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as summarized below and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement attached hereto as <u>Exhibit F</u>. The Litigation Trustee will be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture

Trustee), and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing.

(b)    *Transfer of Assets.*  The transfer of the Contributed Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the Litigation Trust Beneficiaries as set forth herein.  On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust and the Litigation Trustee shall be a representative of the Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code with respect to the Contributed Claims. To the extent that any Contributed Claims cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Contributed Claims shall be deemed to have been retained by the Reorganized Debtors and RCM, as applicable, and the Litigation Trustee shall be deemed to have been designated as a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Contributed Claims on behalf of the Estates.  Notwithstanding the foregoing, all net proceeds of the Contributed Claims shall be transferred to the Effective Beneficiaries consistent with the remaining provisions of this Plan and the Litigation Trust Agreement.

(c)    *Structure of the Litigation Trust and Trust Distributions.*  The Litigation Trust shall be structured in a manner that provides for a Tranche A and a Tranche B.  All Contributed Claims Recoveries, whether applicable to Tranche A or Tranche B, will be distributed Pro Rata according to the beneficial interests in Tranche A and Tranche B.  The Litigation Trustee (in consultation with the Litigation Trust Committee) may establish further separate sub-Tranches, as necessary, in respect of the beneficial interests of the Litigation Trust Beneficiaries in Tranche A and Tranche B.  To the extent deemed "securities," the Litigation Trust Interests (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) will be exempt from registration to the extent provided in section 1145 of the Bankruptcy Code.

(i)    *Tranche A Litigation Trust Interests.*  Beneficiaries of Tranche A Litigation Trust Interests will be the RCM Estate (for Distribution in accordance with the RCM Settlement Agreements), Holders of Allowed Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lenders, the Senior Subordinated Note Indenture Trustee or the Holders of Senior Subordinated Notes) and Holders of Allowed FXA General Unsecured Claims (which for the sake of clarity, shall not include Holders of FXA Convenience Class Claims, RCM Securities Customer Convenience Claims or RCM FX/General Unsecured Convenience Claims) and such Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of the RCM Estate, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

(ii)    *Tranche B Litigation Trust Interests.*  Beneficiaries of Tranche B Litigation Trust Interests will be the Holders of Old Equity Interests who have made a Private Actions Trust Election and such Beneficiaries shall share the Tranche B Litigation Trust Interests Pro Rata based on the number of shares held by the Holders of such Interests or the number of shares previously held to the extent that the Holder has asserted a Claim related to such shares.

(d)    *Management of the Litigation Trust.*  The Litigation Trust shall be managed and operated by the Litigation Trustee.  A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings shall have certain approval rights on key issues relating to the operation and management of the Litigation Trust.  The Four members (other than VR) shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee).  No Holder of Tranche A Litigation Trust Interests (except to the extent such Holder is a member of the Litigation

Trust Committee) and no Holder of Tranche B Litigation Trust Interests shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust

      (e)    *Funding the Litigation Trust.* The Litigation Trust may be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the RCM Trustee, the Committees and the Super Majority (as defined in the RCM Settlement Agreement) or (ii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a Pro Rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in section 3.1 of this Plan. Any failure or inability of the Litigation Trust to obtain funding will not affect the consummation of this Plan.

      (f)    *Distributions by the Litigation Trust.* Any Contributed Claims Recoveries will first be used to repay the funding described in section 5.7(e) above and then will be transferred to the Disbursing Agent or the RCM Trustee, as applicable, for distribution to the Litigation Trust Beneficiaries as set forth herein. In addition, to the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code by reason of the Litigation Trustee's prosecution of the Litigation Claims, the Litigation Trustee will be responsible for making Distributions on account of such Claims from the assets of the Litigation Trust.

      (g)    *Cash-Out Option.* As set forth more fully in the Cash-Out Option Agreement, if any, the form of which would be attached as an exhibit to the Litigation Trust Agreement, one or more third parties may offer, to Purchase Litigation Trust Interests from the Litigation Trust Beneficiaries.

      (h)    *Duration of Trust.* The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms. The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.

      (i)    *Certain Federal Income Tax Matters.*

      (j)    For federal income tax purposes, the Debtors, RCM, the Litigation Trustee and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trust and issuance of Litigation Trust Interests as a transfer by the Debtors and RCM of the assets to the Effective Beneficiaries, followed by a transfer of such assets by the Effective Beneficiaries to the Litigation Trust in exchange for direct or indirect beneficial interests in the Litigation Trust. For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

      (k)    The Litigation Trustee, the Debtors and RCM will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Debtors, RCM, the Litigation Trust, the Litigation Trustee and the Effective Beneficiaries for all federal income tax purposes.

    **5.8**    *Private Actions Trust.*

      (a)    On the Effective Date the Private Actions Trust will be established on the terms set forth in the Private Actions Trust Agreement attached hereto as Exhibit G. The Private Actions Trust shall hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates. Beneficiaries of the Private Actions

Trust will be Holders of Contributing Debtors General Unsecured Claims, FXA General Unsecured Claims, RCM Securities Customer Claims, RCM FX/Unsecured Claims and those Old Equity Interests that make the Private Actions Trust Election, who shall be given interests in the Private Actions Trust to the same extent as in the Litigation Trust; *provided, however*, that a secondary purchaser of a Contributing Debtors General Unsecured Claim, FXA General Unsecured Claim, RCM Securities Customer Claim or RCM FX/Unsecured Claim may participate in the Private Actions Trust only if such purchaser has received an assignment of Non-Estate Refco Claims from the original holder of such claims and has elected to (i) assign such Non-Estate Refco Claims to the Private Actions Trust and (ii) assign (or cause to be assigned) its allocable share of any proceeds of Class Action Claims to the Private Actions Trust. The Private Actions Trust shall be managed and operated by the Private Actions Trustee. The Private Actions Trustee will be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust, and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings (in each case, only to the extent such parties have assigned their Non-Estate Refco Claims to the Private Actions Trust) shall have certain approval rights on key issues relating to the operation and management of the Private Actions Trust. The Four members (other than VR) shall be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust.

(b)    To the extent that any Non-Estate Refco Claims cannot be transferred to the Private Actions Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Non-Estate Refco Claims shall be deemed to have been retained by the grantor, as applicable, and the Private Actions Trustee shall be deemed to have been designated as a representative of such grantor to enforce and pursue such Non-Estate Refco Claims on behalf of such grantor. Notwithstanding the foregoing, all net proceeds of such Non-Estate Refco Claims shall be transferred to the Private Actions Trust Beneficiaries consistent with the other provisions of this Plan and the Private Actions Trust Agreement.

**5.9    *No Revesting of Assets*.** Other than as set forth herein, the remaining property of the respective Estates, other than the Contributed Claims, which shall be transferred to and vest in the Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date or Effective Date, but shall remain property of the respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement. From and after the Effective Date, all such property shall be distributed in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement, without further order of the Court (except as specifically required). For the avoidance of doubt, the Debtors' or RCM's insurance policies shall remain property of their respective Estates in accordance with this section of the Plan, and shall not be subject to the rejection provisions of section 7.1 of the Plan.

**5.10    *Preservation of Rights of Action; Settlement of Litigation***

(a)    *Preservation Of Rights Of Action*. Except as otherwise provided herein, the Confirmation Order, the RCM Settlement Agreement, or in any other Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors and RCM shall retain all Retained Causes of Action notwithstanding the Confirmation of the Plan and the occurrence of the Effective Date, to be administered and prosecuted after the Effective Date pursuant to the terms of the Plan.

(b)    *Settlement Of Litigation Claims Prior to the Effective Date*. At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors (and the RCM Trustee on behalf of RCM with respect to Litigation Claims of RCM) may settle any or all of the Litigation Claims with Bankruptcy Court approval pursuant to Bankruptcy Rule 9019, following notice to parties-in-interest and a hearing.

Any net proceeds obtained in respect of Litigation Claims prior to the Effective Date shall be contributed to the Litigation Trust.

### 5.11  *The Committees and the Plan Committee.*

(a)  *Dissolution of the Committees.*  The Committees shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and such other duties as they may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committees shall be dissolved and their members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committees' attorneys, accountants, professionals and other agents shall terminate, except with respect to (i) all Professional Fees and matters relating to the Fee Committee, (ii) any appeals of the Confirmation Order and (iii) the continuation and completion of any litigation to which the Creditors' Committee or the Additional Committee, as applicable, is a party as of the Effective Date.  All expenses of members of the Committees and the fees and expenses of the Committees' professionals through the Effective Date shall be paid in accordance with any applicable orders of the Bankruptcy Court.  Counsel to the Committees shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized hereunder without further court approval upon the submission of invoices to the Reorganized Debtors.  Following the Effective Date, subject to actual conflicts of interest, none of the Committees' professionals shall be precluded from representing any entity acting for any successor fiduciaries or other entities created by this Plan, including the Plan Administrator, Plan Committee, Litigation Trustee or any of the Reorganized Debtors.

(b)  *Creation of Plan Committee; Procedures.*

(i)  Unless there are no parties in interest willing to serve, on the Effective Date, the Plan Committee shall be formed and constituted.  The Plan Committee shall be of a size determined by and composed of members chosen by the Joint Sub-Committee (exclusive of the Senior Subordinated Note Indenture Trustee and any Holder of a Senior Subordinated Note Claim); *provided, however,* that the Plan Committee shall include VR, Leuthold and Cargill and shall include the Senior Subordinated Note Indenture Trustee until such time as all payments in respect of the Senior Subordinated Note Holder Distribution have been made.  All proposed members of the Plan Committee shall be disclosed to the Bankruptcy Court on or before the Confirmation Hearing.  Membership on the Plan Committee shall be on an institutional and not on an individual basis.  In the event that a member of the Plan Committee resigns from its position on the Plan Committee, the remaining members shall have the right to designate its successor on the Plan Committee as set forth in the Plan Administrator Agreement.  The Plan Committee shall, absent further order of the Bankruptcy Court, have not fewer than three members.

(ii)  In the event that there are fewer than three members of the Plan Committee for a period of sixty (60) consecutive days, then the Plan Administrator may, during such vacancy and thereafter, in its sole discretion, ignore any reference in the Plan, the Plan Administrator Agreement or the Confirmation Order to the Plan Committee, and all references to the Plan Committee's ongoing duties and rights in the Plan, the Plan Administrator Agreement and the Confirmation Order shall be null and void.

(c)  *Standing of Plan Committee.*  The Plan Committee shall have independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Plan Administrator, the Estates or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to Article XI of the Plan.

(d)  *Function and Duration; Compensation and Expenses.*  The Plan Committee shall have ultimate supervisory authority over the Plan Administrator (but shall have no authority over the RCM Trustee, the RCM Estate or the Litigation Trustee, in such capacity).  The Plan Administrator shall report to the Plan Committee and the Plan Committee shall have the power to remove the Plan Administrator with or without cause.  The Plan Committee (i) shall be responsible for (A) instructing and supervising the Reorganized Debtors and the Plan Administrator with respect to their responsibilities under the Plan and the Plan Administrator Agreement, (B)

reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof, (C) reviewing and approving objections to and proposed settlements of Disputed Claims against the Contributing Debtors, FXA or the Reorganized Debtors, (D) performing such other duties that may be necessary and proper to assist the Plan Administrator and its retained professionals, and (ii) shall remain in existence until such time as the final Distributions under the Plan have been made by the Disbursing Agent, on behalf of the Reorganized Debtors. The members of the Plan Committee shall serve without compensation for their performance of services as members of the Plan Committee, except that they shall be entitled to reimbursement of reasonable expenses by the Reorganized Debtors to be paid from the Wind-Down Reserve. The Plan Committee may retain counsel or other professionals who shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses to be paid from the Wind-Down Reserve upon the submission of invoices to the Reorganized Debtors; provided, however, that any disputes related to such fees and expenses may be brought before the Bankruptcy Court.

(e)    *Liability; Indemnification.* Neither the Plan Committee, nor any of its members or designees, nor any duly designated agent or representative of the Plan Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such member's willful misconduct or gross negligence. The Reorganized Debtors shall indemnify and hold harmless the Plan Committee and its members and designees, and any duly designated agent or representative thereof (in their capacity as such), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan. To the extent the Reorganized Debtors indemnify and holds harmless the Plan Committee and its members and designees, or any duly designated agent or representative thereof (in their capacity as such), as provided above, the legal fees and related costs incurred by counsel to the Plan Committee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be advanced to the Plan Committee (and the Plan Committee undertakes to repay such amounts if it ultimately shall be determined that the Plan Committee is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any applicable insurance.

5.12    *Fee Committee.* From and after the Confirmation Date, the members of the Fee Committee (including the RCM Trustee) and the Fee Committee's professionals shall continue to serve and be authorized to continue, in a manner consistent with practice before the Confirmation Date, to review, analyze, and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331, and 503 of the Bankruptcy Code. From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee to satisfy their duties and responsibilities. Notwithstanding the foregoing, unless otherwise provided by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the date which is six (6) months after the Confirmation Date and (ii) resolution of all duties of the Fee Committee set forth in this section of the Plan.

5.13    *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests.* With the exception of the equity interests of any Refco Entity held by any other Refco Entity pending wind-up and dissolution of such entities pursuant to this Plan, and except as otherwise provided in the Plan and in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Article V, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors or RCM under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; *provided, however,* that the Senior Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee to enforce the indemnity provisions of

the Senior Subordinated Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the Plan Committee, to make the Distributions to be made on account of Senior Subordinated Note Indenture Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall be cancelled and discharged. The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

   5.14 *Sources of Cash for Plan Distributions*. Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors and the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Reorganized Debtors' Cash balances and the liquidation of the Reorganized Debtors' and the Reorganized Debtors' remaining non-Cash assets, if any, including the Contributing Debtors BAWAG Proceeds. Cash payments to be made pursuant to the Plan to Holders of Allowed Claims and to the Senior Subordinated Note Indenture Trustee for the benefit of the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors (or any successor thereto) or, if the Disbursing Agent is an entity other than the Reorganized Debtors, the Disbursing Agent, which may be the Senior Subordinated Note Indenture Trustee. Distributions to be made on behalf of the RCM Estate pursuant to the Plan or the RCM Settlement Agreement shall be made by the RCM Trustee in accordance with the Plan, the RCM Settlement Agreement and applicable law.

   5.15 *Risk Sharing in Respect of Cargill Administrative Claim*. In the event that Cargill receives a Cargill Administrative Claim, the amount of such Claim shall be borne by RCM and the Contributing Debtors as follows: (i) to the extent the allowance of the Cargill Administrative Claim reduces the Allowed amount of any RCM FX/Unsecured Claim held by Cargill, RCM shall bear for the benefit of the Contributing Debtors a portion of the Cargill Administrative Claim equal to forty percent (40%) of the amount of the RCM Difference; (ii) the Contributing Debtors shall next pay an amount up to the remainder of the Cargill Administrative Claim Amount; *provided, however,* that such payment pursuant to this subsection (ii) shall be capped at the amount that would cause recoveries of Holders of Allowed Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets plus the Contributing Debtors portion of the RGL FXCM Distribution to fall below 30% of the face amount of such Allowed Contributing Debtors General Unsecured Claims; and (iii) if not yet paid in full, the remainder of the Cargill Administrative Claim will be borne by the Contributing Debtors and RCM equally. For the avoidance of doubt, amounts to be borne by the Contributing Debtors shall be deducted from the amounts available for the Contributing Debtors General Unsecured Distribution and amounts to be borne by RCM shall be deducted from the amounts available for the RCM Cash Distribution.

   5.16 *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims*. Payment of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims of the Contributing Debtors and of the RCM Estate and Allowed Administrative Claims of the Contributing Debtors and of the RCM Estate, other than amounts in respect of the RCM Advance, accrued through the Effective Date (excluding any amounts paid as of August 31, 2006) will be allocated such that RCM will first provide up to $60 million, the Contributing Debtors will next provide up to $120 million and to the extent that such Claims exceed $180 million in the aggregate, RCM and the Contributing Debtors will bear the cost of such excess (the "Excess Priority Claims") equally. Notwithstanding the preceding sentence, the Contributing Debtors may fund the payment of any Pre-Conversion Administrative Claim Amounts if and to the extent that the RCM Trustee and the Contributing Debtors determine such funding necessary to facilitate Distributions in respect of such amounts on the Effective Date; *provided, however,* that any amounts so paid by the Contributing Debtors shall be deducted from the RCM Cash Distribution in a manner that causes RCM to ultimately bear the cost of the Pre-Conversion Administrative Claim Amounts. FXA shall be responsible for all of its Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, *provided, however,* that professional services (other than those related to FXA's claims resolution process and issues unique to FXA after the initial date of the filing of this Plan) and overhead allocable to FXA in the period between the Plan Filing Date and the Plan Effective Date shall be borne by RCM and the Contributing Debtors as set forth in the preceding sentence. Only Allowed Administrative Claims accrued from the Petition Date through the Plan Effective Date that were or are paid after August 31, 2006 shall be counted toward the sharing allocation of the preceding three sentences; provided that the Contributing Debtors shall alone bear the cost of repaying the RCM Advance. To the extent RCM is responsible for bearing amounts in respect of Excess Priority Claims, payment of such amounts shall be made from Cash otherwise available for the RCM Cash Distribution. Allowed Administrative

Claims incurred by the Contributing Debtors after the Effective Date shall be borne by the Contributing Debtors out of the Cash or value that would otherwise be paid to Holders of Allowed Contributing Debtors General Unsecured Claims. Allowed Administrative Claims incurred by RCM after the Effective Date shall be borne by RCM from the RCM Wind-Down Reserve, and, to the extent the RCM Wind-Down Reserve is not sufficient to pay such Allowed Administrative Claims, such Claims shall be paid directly by RCM out of the Cash or value that would otherwise be paid to Holders of Allowed Securities Customer Claims and RCM FX/Unsecured Claims as more particularly set forth in the RCM Settlement Agreement. Allowed Administrative Claims incurred by FXA after the Effective Date shall be borne by the FXA out of the Cash or value that would otherwise be paid to Holders of Allowed FXA General Unsecured Claims. All costs and expenses of administering the Litigation Trust described in section 5.7 shall be separately funded by the Litigation Trust and shall not be included in the calculation of the allocations of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims above.

       **5.17**    *Additional RCM Claim*. If, at the conclusion of the claims reconciliation process, (x) the total Allowed Contributing Debtors General Unsecured Claims are less than $394 million, and (y) the Distributions to be made to Holders of Allowed Contributing Debtors General Unsecured Claims would result in a recovery for such Holders in excess of 35% from the sum of the Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution, RCM shall be entitled to an additional Claim. Specifically, RCM shall be entitled to an additional Claim equal to the positive difference between $394 million minus the amount of the Allowed Contributing Debtors General Unsecured Claims. This "Additional RCM Claim" shall participate Pro Rata in all Distributions from Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims that exceed the 35% recovery threshold set forth in clause (y) above; *provided, however*, that such Additional RCM Claim shall not be subject to the 40% limit on Distributions set forth in the Contributing Debtors General Unsecured Distribution.

       **5.18**    *Contributing Debtors BAWAG Proceeds*. Notwithstanding the actual timing and source of any payments hereunder, so long as not inconsistent with the BAWAG Allocation Order, (i) a portion of BAWAG Guaranteed Proceeds equal to $100 million will be deemed to have been received by the Contributing Debtors and paid to the Secured Lenders under the Early Payment Order, (ii) a portion of BAWAG Guaranteed Proceeds equal to $150 million will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Senior Subordinated Note Claims, (iii) a portion of BAWAG Guaranteed Proceeds equal to $56.25 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims, and (iv) a portion of BAWAG Guaranteed Proceeds equal to $200 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by RCM or the Contributing Debtors and made available for Distribution to Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan. To the extent that a Holder of an Allowed Senior Subordinated Note Claim against the Contributing Debtors, a Holder of an Allowed Contributing Debtors General Unsecured Claim, a Holder of an Allowed RCM Securities Customer Claim or a Holder of an Allowed RCM FX/Unsecured Claim elects not to receive its allocable share of the Senior Subordinated Note Holder BAWAG Proceeds, the Contributing Debtors General Unsecured BAWAG Proceeds or the RCM BAWAG Proceeds, as applicable, such portion of BAWAG Proceeds shall be returned to BAWAG in accordance with the BAWAG Settlement. For the avoidance of doubt, all BAWAG Contingent Proceeds (if any) shall be treated as part of the Contributing Debtors Distributive Assets and shall be shared between RCM (for distribution to Holders of Allowed Claims against RCM) and Holders of Contributing Debtors General Unsecured Claims pursuant to the sharing formulas set forth in this Plan.

       **5.19**    *Exemption from Transfer Taxes*. Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of any contract, lease, or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer

tax, or other similar tax. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property, approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan. Notwithstanding anything in this section of the Plan to the contrary, the exemption from taxes referenced in this section of the Plan shall only be to the extent permitted for under section 1146 of the Bankruptcy Code.

       **5.20**   *RCM Settlement Agreement and Conversion.*  This Plan incorporates the RCM Settlement Agreement in its entirety. On or prior to the Effective Date, the RCM Chapter 11 Case will, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM Chapter 11 Case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of claims between the chapter 7 Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan. In the event that the RCM Estate does not convert to chapter 7, the Distributions to RCM's creditors shall be governed by the terms of the RCM Settlement Agreement and this Plan.

       **5.21**   *Allowance of VR/Leuthold Guarantee Claims.* The VR/Leuthold Guarantee Claims shall be Allowed Contributing Debtors General Unsecured Claims (subject, however, to allowance of the underlying Claims against RCM) unless objected to by the Contributing Debtors prior to entry of the Confirmation Order. No party other than the Contributing Debtors shall be authorized to object to or otherwise challenge the VR/Leuthold Guarantee Claims. The Contributing Debtors will not object to or otherwise challenge the VR/Leuthold Guarantee Claims based on or related to any of the following theories or issues: the corporate structure or business practices of any of the Contributing Debtors; alter ego; substantive consolidation; fraud; or any other theories or causes of action similar to the foregoing. The Contributing Debtors, however, may object to the VR/Leuthold Guarantee Claims based on facts specific to a particular VR/Leuthold Guarantee Claim, including, but not limited to, objections based on Bankruptcy Code avoidance theories or challenges to the purported dollar amount of the asserted claims.

       **5.22**   *Wind-Up of Non-Debtor Affiliates.* All Non-Debtor Affiliates, other than the direct or indirect subsidiaries of RCM and Refco LLC, shall be wound up and dissolved as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to the Contributing Debtors and Refco LLC on account of intercompany balances (or equity dividends where applicable). All Non-Debtor Affiliates that are direct or indirect subsidiaries of RCM shall be wound up as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to RCM on account of intercompany balances (or equity dividends where appropriate). The direct and indirect subsidiaries of RCM shall be wound up and dissolved by the RCM Trustee and the remainder of the Non-Debtor Affiliates shall be wound up and dissolved by the Plan Administrator.

       **5.23**   *FXCM.* If not liquidated in advance of the Effective Date, RGL's 35% interest in FXCM shall become an interest of and be held by Reorganized Refco upon the merger of RGL into Reorganized Refco pursuant to section 5.1 of this Plan. The Plan Administrator shall exercise all rights of Reorganized Refco in respect of the 35% interest in FXCM. Notwithstanding the above, the FXCM Committee shall be formed to coordinate on all matters relating to the disposition or distribution of the 35% interest in FXCM. If not formed as of the Effective Date pursuant to the Plan Support Agreement, the members of the FXCM Committee, other than the RCM Trustee, shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). All decisions in respect of the disposition or distribution of the 35% interest in FXCM shall be made by Reorganized Refco; *provided, however,* that no such decision shall be made by Reorganized Refco without first consulting with the FXCM Committee and, to the extent permitted by applicable law, obtaining the consent of the FXCM Committee. Bylaws of the FXCM Committee shall be established by the FXCM Committee after its formation and shall be substantially in the form attached hereto as <u>Exhibit J</u>.

**5.24**     *Examiner*.  No provision of the Plan shall be construed as impairing the Examiner's investigation, and his authority to file his report in accordance with the provisions of the Examiner Order and the additional directions given by the Bankruptcy Court at the Hearing held on June 21, 2006, even if such investigation concludes, and such filing occurs, after the occurrence of the Effective Date.  Unless otherwise ordered by the Bankruptcy Court prior to the Effective Date, the procedures with respect to the filing and consideration of the Examiner's Fee Applications and Requests for Reimbursements of Expenses shall continue after the Effective Date in the same manner as prior to the Effective Date as provided in the Examiner Order.

**5.25**     *Transfer of Tranche B Litigation Trust Interests*.  In consideration of the litigation expenses and potential delay avoided by the withdrawal of the objections to this Plan asserted by the Ad Hoc Equity Committee, the Beneficiaries of Tranche A Litigation Trust Interests (the RCM Estate, Holders of Allowed Contributing Debtors General Unsecured Claims and Holders of Allowed FXA General Unsecured Claims) shall be deemed to have transferred to each Holder of an Allowed Class 8 Old Equity Interest who has made a Private Actions Trust Election a Pro Rata share of the Tranche B Litigation Trust Interests.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

**6.1**     *RCM Rights Distribution*.  On the Effective Date the Plan Administrator shall be deemed to have made the RCM Rights Distribution to the RCM Trustee and the Plan Administrator or the RCM Trustee, as the case may be, shall establish the RCM Distribution Reserve. Unless a Holder of an RCM FX/Unsecured Claim or RCM Securities Customer Claim has decided to not participate in the RCM Cash Distribution by electing not to (i) assign such Holder's RCM Related Claims, if any, to the Litigation Trust; (ii) affirm its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate shall be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing Claims against and equity Interests in the applicable Contributing Non-Debtor Affiliate, and (iii) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any, such Holder will receive its applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution.  Upon contribution of the RCM Related Claims against any Debtor to the Litigation Trust, such Claims will be deemed Allowed.

**6.2**     *Distributions for Claims Allowed as of the Effective Date*.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims against FXA, the Contributing Debtors or RCM that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable; *provided, however*, that the Disbursing Agent, on behalf of the Reorganized Debtors, shall not make Distributions to Holders of Allowed Claims (other than Allowed Secured Lender Claims) that are not Senior Subordinated Note Claims until all Reserves have been established and adequately funded in accordance with the terms of this Plan and the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution have been paid in full; *provided further, however*, that the RCM Trustee shall not be required to make Distributions until all RCM Reserves have been established and adequately funded in accordance with the terms of this Plan and the RCM Settlement Agreement.  Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

**6.3**     *Distributions of Proceeds of the Litigation Trust*.  Pursuant to the terms and conditions set forth in the Litigation Trust Agreement, the Litigation Trustee shall transfer all the Contributed Claims Recoveries to the Disbursing Agent or the RCM Trustee for Distribution in accordance with the provisions of this Plan and the RCM Settlement Agreement.

**6.4**     *Single Distribution*.  Except with respect to Allowed Secured Lender Claims and Senior Subordinated Note Claims, any Holder of a Claim asserted against more than one Debtor (or a Debtor and RCM), shall be entitled to a Distribution from only the Refco Entity with which such Holder was in privity or had another direct right to payment not predicated upon theories of fraud, piercing the corporate veil, alter ego, domination,

constructive trust or other equitable principles arising from a lack of knowledge of the true prepetition financial condition of the Refco Entities (whether that results in Distribution from RCM, FXA, or the Contributing Debtors), and all RCM Related Claims and Other Related Claims shall be subordinated and shall receive no Distribution from the assets of the applicable Debtor or RCM, as the case may be, unless and until such time as all Allowed General Unsecured Claims (or in the case of RCM, all Allowed RCM Securities Customer Claims, Allowed RCM FX/Unsecured Claims and Allowed Leuthold Metals Claims) against the applicable Debtor or RCM, as the case may be, have been paid in full; *provided, however,* that (A) any Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by RCM, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from RCM under this Plan), (B) any Holder of a Contributing Debtors General Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by such Contributing Debtor, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the guaranteeing Contributing Debtor shall not be limited to the amount remaining after recovery from non-guaranteeing Contributing Debtor under this Plan) and (C) any Holder of a Claim against FXA with an independent Claim against the Contributing Debtors or RCM based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by FXA, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from FXA under this Plan). In addition, subject to the earning of interest in respect of the Litigation Trust as set forth in section 5.7 of this Plan no Holder of a Claim against one or more Debtors (or a Debtor and RCM) shall receive a Distribution under the Plan that results in greater than a 100% recovery on such Holder's Claim (which, in the case of a Holder of both a primary Claim against a Debtor or RCM and a contractual guarantee from another Debtor or RCM, shall mean no more than a cumulative 100% recovery on the underlying Claim amount owed by the primary obligor).

      **6.5**    *Accounts; Escrows; Reserves for the Reorganized Debtors.* The Plan Administrator, on behalf of the Reorganized Debtors, in accordance with the provisions of the Plan Administrator Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The Plan Administrator shall dispose of non-Cash assets of the Estates of the Reorganized Debtors, if any, in accordance with the provisions of the Plan and the Plan Administrator Agreement.

      (a)    *Administrative/Priority Claims Reserve.* On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall, subject to the provisions of section 5.16 hereof, create and fund the Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of the Contributing Debtors and FXA, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The Plan Administrator may increase the amount of the Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the Claims Distribution Account.

      (b)    *Disputed Claims Reserve.*

      (i) The Plan Administrator shall create and fund the Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Contributing Debtors General Unsecured Distribution or the FXA General Unsecured Distribution, as applicable, that would have been made to each Holder of a Disputed Claim against the Contributing Debtors or FXA if such Claim were an Allowed Contributing Debtors General Unsecured Claim or an Allowed FXA General Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however,* that the Debtors, the Plan Administrator or the

Reorganized Debtors may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)    The Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims against the Contributing Debtors or FXA whose Claims have become Allowed Claims.

(iii)    If any Cash or Litigation Trust Interests remains in the Disputed Claims Reserve after all Disputed Claims against the Contributing Debtors and FXA have been resolved, such remaining assets shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however*, that, if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)    The Plan Administrator shall maintain two sub-accounts within the Disputed Claims Reserve for (i) the Contributing Debtors and (ii) FXA.

(c)    *Wind-Down Reserves.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator, on behalf of the Reorganized Debtors, shall create and fund the Wind-Down Reserve with sufficient Cash to administer the Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals. The Plan Administrator may make reasonable adjustments to the Wind-Down Reserve as necessary. Any Cash in the Wind-Down Reserve which is unnecessary for the administration of the Plan shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution to Holders of Allowed Claims against the Contributing Debtors or FXA, as applicable, in accordance with the terms hereof.

6.6    *Accounts; Escrows; Reserves for the Post-Confirmation RCM.*  The RCM Trustee, on behalf of Post-Confirmation RCM, in accordance with the provisions of the RCM Settlement Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, RCM Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The RCM Trustee shall dispose of non-Cash assets of the RCM Estate, if any, in accordance with the provisions of the Plan and the RCM Settlement Agreement and applicable law.

(a)    *RCM Administrative/Priority Claims Reserve.*  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee shall, subject to the provisions of section 5.16 hereof, create and fund the RCM Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of RCM, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The RCM Trustee may increase the amount of the RCM Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the RCM Claims Distribution Account. If the Chapter 11 Case of RCM is converted to a case in chapter 7, prior to any conversion the RCM Trustee shall be entitled to set aside appropriate reserves for Administrative Claims incurred or to be incurred prior to conversion, with the amounts of such Administrative Claims to be payable from the reserves upon allowance of the Claims therefor so long as the RCM Trustee has determined that there are or will be sufficient funds available to pay all Administrative Claims of the chapter 7 case.

(b)     *RCM Disputed Claims Reserve.*

(i)     The RCM Trustee shall create and fund the RCM Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Distribution that would have been made to each holder of a Disputed Claim against RCM if such Claim were an Allowed RCM Securities Customer Claim or RCM FX/Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however,* that the RCM, Post-Confirmation RCM or the RCM Trustee may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)     The RCM Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the RCM Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims whose Claims against RCM have become Allowed Claims.

(iii)     If any Cash or Litigation Trust Interests remain in the RCM Disputed Claims Reserve after all Disputed Claims against RCM have been resolved, such remaining amounts shall be transferred to Post-Confirmation RCM for Distribution in accordance with the terms of the Plan and the RCM Settlement Agreement. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim against RCM, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however,* that, if the estimate constitutes the maximum limitation on such Claim, the RCM Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)     The RCM Trustee shall maintain sub-accounts within the RCM Disputed Claims Reserve for RCM Securities Customer Claims and RCM FX/Unsecured Claims. Each sub-account shall be further subdivided for Assets in Place and Additional Property (each as defined in the RCM Settlement Agreement). The RCM Trustee may maintain such other reserves as are permitted by the RCM Settlement Agreement.

(v)     Distributions of Additional Property under the RCM Settlement Agreement on behalf of RCM Securities Customer Claims and RCM FX/Unsecured Claims shall be made Pro Rata (as such term is defined in the RCM Settlement Agreement). True up Distributions (as defined in the RCM Settlement Agreement) shall be made from time to time from Additional Property as determined by the RCM Trustee. The RCM Reserves shall take into account the requirement to true up with respect to Pro Rata (as defined in the RCM Settlement Agreement) shares of Additional Property.

(c)     *RCM Distribution Reserve.* On the Effective Date, the Plan Administrator shall create and fund the RCM Distribution Reserve. Each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the Plan Administrator with an RCM Related Claim Subordination Form shall receive from the Plan Administrator on the next available Distribution Date its allocable share (as determined by the RCM Trustee consistent with their elections) of the RCM Distribution Reserve (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot); *provided, however,* if the RCM Settlement Agreement is amended prior to the Confirmation Hearing so as to permit the RCM Trustee to receive conditional Distributions of Additional Property (as defined in the RCM Settlement Agreement) and to not require an immediate distribution of all assets received by the RCM Trustee to Holders of Allowed Claims against RCM, any amounts that would have been held in the RCM Distribution Reserve shall be transferred to the RCM Trustee who shall then distribute such funds on the next available Distribution Date to each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the RCM Trustee with an RCM Related

Claim Subordination Form (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot). In the event that any Holder of an RCM Related Claim has not provided an RCM Related Claim Subordination Form, but the RCM Related Claim of such Holder is subsequently expunged by objection of the Plan Administrator, the reserve in respect of such Claim shall be distributed (net of costs of expunging the RCM Related Claim) by the RCM Trustee or the Plan Administrator, as applicable, Pro Rata (as defined in the RCM Settlement Agreement) to such Holder and to those Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that provided the Plan Administrator or the RCM Trustee, as applicable, with an RCM Related Claim Subordination Form. In the event that any RCM Related Claim becomes an Allowed Claim, the reserve in respect of such Claim shall be deposited in the Claims Distribution Account for Distribution in accordance with the terms of this Plan.

        (d)    *RCM Wind-Down Reserve.* On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee or the Plan Administrator, as the case may be, on behalf of Post-Confirmation RCM, shall create and fund the RCM Wind-Down Reserve with sufficient Cash from the RCM Cash Distribution to administer the Plan and the RCM Settlement Agreement, including, but not limited to, compensation of the RCM Trustee and RCM Administrative Professionals. The RCM Trustee may make reasonable adjustments to the RCM Wind-Down Reserve as necessary. Any Cash in the RCM Wind-Down Reserve which is unnecessary for the administration of the Plan and the RCM Settlement Agreement shall be transferred to Post-Confirmation RCM for Distribution to Holders of Allowed Claims against RCM in accordance with the terms hereof.

        **6.7**    *Interest and Penalties on Claims.* Unless otherwise specifically provided for in this Plan, the Confirmation Order or another order of the Court (including, without limitation, the Early Payment Order), or if required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

        **6.8**    *Distributions by Disbursing Agent and RCM Trustee.* All Distributions under the Plan on behalf of the Reorganized Debtors shall be made by the Disbursing Agent at the direction of the Plan Administrator and all Distributions under the Plan and the RCM Settlement Agreement on behalf of RCM shall be made by the RCM Trustee. The Disbursing Agent and the RCM Trustee shall be deemed to hold all property to be distributed by each hereunder in trust for Persons entitled to receive the same. The Disbursing Agent and the RCM Trustee shall not hold an economic or beneficial interest in such property.

        **6.9**    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

        (a)    *Delivery Of Distributions In General.* Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' or RCM's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001; *provided, however,* Distributions on account of Senior Subordinated Note Claims shall be made to the Senior Subordinated Note Indenture Trustee who shall, in turn, administer such Distributions to the Holders of Senior Subordinated Note Claims in accordance with the terms of the Senior Subordinated Note Indenture. The Senior Subordinated Note Indenture Trustee shall be authorized but not required to effect any Distribution under the Plan through the book entry transfer facilities of The Depositary Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution. Distributions on account of Secured Lender Claims shall be made to the Secured Lender Agent, who shall in turn administer such Distributions in accordance with the terms of the Credit Agreement.

        (b)    *Undeliverable and Unclaimed Distributions.*

        (i)    *Holding and Investment of Undeliverable and Unclaimed Distributions.* If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent or the RCM Trustee, as applicable, as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent or the RCM Trustee, as applicable, is notified in writing of such Holder's then current address. Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as the case may be, until

such time as a Distribution becomes deliverable or is unclaimed in accordance with this section of the Plan. The accounts for the Unclaimed Distribution Reserve and RCM Unclaimed Distribution Reserve may be interest-bearing accounts, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof and any interest accruing on funds in the RCM Unclaimed Distribution Reserve shall be transferred to the RCM Trustee for Distribution in accordance with the terms of this Plan and the RCM Settlement Agreement.

(ii)    *After Distributions Become Deliverable.* The Disbursing Agent or RCM Trustee, as applicable, shall make all Distributions that have become deliverable or have been claimed since the Effective Date or the next Quarterly Distribution Date as soon as practicable after such Distribution has become deliverable.

(iii)    *Failure to Claim Undeliverable Distributions.* Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one year after the applicable date of Distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors, RCM or their Estates, the Reorganized Debtors, the Plan Administrator, Post-Confirmation RCM, the RCM Trustee or their property. In such cases, any Cash in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as applicable, for Distribution on account of such Claims for undeliverable or unclaimed Distributions shall become the property of the applicable Estate free of any restrictions thereon. Such unclaimed or undeliverable funds shall be transferred to the Reorganized Debtors or Post-Confirmation RCM, as applicable, to be distributed in accordance with the terms of the Plan or the RCM Settlement Agreement. Nothing contained in this Plan, the Plan Administrator Agreement or the RCM Settlement Agreement shall require the Disbursing Agent or the RCM Trustee to attempt to locate any Holder of an Allowed Claim.

(c)    *Time Bar to Cash Payments.* Checks issued by the Disbursing Agent or the RCM Trustee, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent or the RCM Trustee, as applicable, by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors or RCM, as the case may be, shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims or Interests in accordance with the terms of this Plan and the RCM Settlement Agreement, as applicable.

**6.10**    *Record Date for Distributions.* With respect to all Claims except Senior Subordinated Note Claims, the Disbursing Agent or the Plan Administrator or the RCM Trustee, as applicable, shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date. The Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date. No Distribution Record Date shall be established for Distributions on account of Senior Subordinated Note Claims.

**6.11**    *Distributions to Holders of Senior Subordinated Note Claims.* As a condition precedent to receiving any Distribution under this Plan on account of an Allowed Senior Subordinated Note Claim, the registered Holders (as defined in the Senior Subordinated Note Indenture) of such Senior Subordinated Note Claim shall surrender any certificate(s) evidencing such Senior Subordinated Note Claim in accordance with written instructions to be provided to such registered Holders (as defined in the Senior Subordinated Note Indenture) and the Senior Subordinated Note Indenture Trustee by the Plan Administrator (in consultation with the Senior Subordinated

Note Indenture Trustee, and consistent with customary market practice), unless waived in writing by the Debtors or the Plan Administrator.

**6.12** *Senior Subordinated Notes Indenture Trustee as Claim Holder*. Consistent with Bankruptcy Rule 3003(c), the Debtors or the Plan Administrator, as the case may be, shall recognize a proof of claim filed by the Senior Subordinated Notes Indenture Trustee in respect of the Senior Subordinated Notes Claims. Accordingly, any Senior Subordinated Note Claim, proof of which is filed by the registered or beneficial Holder of a Senior Subordinated Note Claim, may be disallowed as duplicative of any Senior Subordinated Note Claims of the Senior Subordinated Notes Indenture Trustee, without need for any further action or Bankruptcy Court order. For the avoidance of doubt, the Senior Subordinated Notes Indenture Trustee shall be authorized to distribute amounts received in respect of Senior Subordinated Note Holder Distributions.

**6.13** *Allocation of Plan Distributions Between Principal and Interest*. Except for Distributions made in respect of Allowed Secured Lender Claims, which shall be made in accordance with the Credit Agreement, to the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**6.14** *Means of Cash Payment*. Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Plan Administrator or the RCM Trustee, as applicable, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Plan Administrator or the RCM Trustee, as applicable. Cash payments to foreign creditors may be made, at the option of the Plan Administrator or the RCM Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.15** *Withholding and Reporting Requirements*. In connection with this Plan and all Distributions thereunder, the Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, on behalf of the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent, the Plan Administrator and the RCM Trustee, on behalf of the Reorganized Debtors and RCM, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.16** *Setoffs*. Unless prohibited by the terms of this Plan or any other Plan Document, the Plan Administrator on behalf of the Reorganized Debtors or the RCM Trustee on behalf of Post-Confirmation RCM, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever (other than the Released/Subordinated Claims) that the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Post-Confirmation RCM of any such claim that the Debtors, RCM, Post-Confirmation RCM or the Reorganized Debtors may have against such Holder.

**6.17** *Fractional Dollars*. Notwithstanding any other provision of the Plan, the Plan Administrator Agreement or the RCM Settlement Agreement, none of the Plan Administrator, the Reorganized Debtors, the RCM Trustee or RCM, as applicable, shall be required to make Distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**6.18** *Release of Liens*. Except as otherwise provided in this Plan or in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges, or other security interests (collectively, the "Mortgages") in and against the property of any Estate automatically shall be fully released and discharged, and all such property shall be free and

clear of all such Mortgages. Nothing in the Plan shall be deemed, asserted or construed to affect the Senior Subordinated Notes Indenture Trustee Charging Lien.

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1** *Rejected Contracts and Leases*. Except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is identified in Exhibit D to this Plan as a contract or lease to be assumed; *provided, however*, that the Debtors may amend such exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.2** *Bar to Rejection Damages*. If the rejection of an executory contract or unexpired lease pursuant to section 7.1 above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**7.3** *Assumed and Assigned Contracts and Leases*. Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases listed on <u>Exhibit D</u> to this Plan; *provided, however*, that the Debtors may amend such Exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.4** *Compensation and Benefit Programs*. All Employee Benefit Plans, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are subject to rejection in accordance with section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).

**7.5** *Treatment of RCM Executory Contracts and Unexpired Leases*. Notwithstanding the preceding sections of this Article VII, the RCM Trustee shall determine the appropriate treatment for the executory contracts and unexpired leases of RCM in accordance with applicable law and the RCM Settlement Agreement.

# ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**8.1** *Objection Deadline; Prosecution of Objections*. Subject to section 5.21 of this Plan, no later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Plan Administrator on behalf of the Reorganized Debtors, after consultation with the Plan Committee, may file objections to Claims or Interests against FXA and the Contributing Debtors that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. No later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the RCM

Trustee on behalf of Post-Confirmation RCM may file objections to Claims or Interests against RCM that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the ability of the Plan Administrator or the RCM Trustee, as applicable, to object to Claims or Interests, if any, filed or amended after the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable. Subject to limitations set forth in the Plan Administrator Agreement and the Plan, as applicable, the Plan Administrator shall be authorized to, and shall, dispose of all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court as may have jurisdiction the validity, nature, and/or amount thereof. The RCM Trustee shall have sole discretion and authority to object to any RCM Claims or Interests in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

8.2     *No Distributions Pending Allowance.* Notwithstanding any other provision of this Plan, no payments or Distributions shall be made with respect to any disputed portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by Final Order and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

8.3     *Distributions After Allowance.* The Disbursing Agent on behalf of the Reorganized Debtors and the RCM Trustee on behalf of RCM shall make payments and Distributions from the Disputed Claims Reserve and the RCM Disputed Claims Reserve, as applicable, to the Holder of any Disputed Claim or Interest that has become an Allowed Claim or Interest, or any portion of which has become Allowed, on the first Quarterly Distribution Date following the date that such Disputed Claim or Interest becomes an Allowed Claim. Such Distributions shall be made in accordance with the Plan, the Plan Administrator Agreement and the RCM Settlement Agreement, as applicable.

## ARTICLE IX

## CONFIRMATION AND CONSUMMATION OF THE PLAN

9.1     *Conditions to Confirmation.*

(a)     The Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents (and with respect to any matter affecting the Secured Lender Agent and/or the Secured Lenders, the Secured Lender Agent);

(b)     The Confirmation Date of this Plan shall have occurred on or before December 15, 2006; and

(c)     The Plan Proponents shall have determined and shall have filed with the Bankruptcy Court a notice confirming that the Allotted Administrative Claims are not reasonably expected to exceed, in the aggregate, $180 million;

(d)     Houlihan and Capstone shall have each filed with the Bankruptcy Court in advance of the Voting Deadline, its respective RCM Projection and Contributing Debtors Projection.

(e)     Either (i) both of the Houlihan and Capstone RCM Projections shall be equal to or exceed $430 million, or (ii) in the event that one such RCM Projection is less than $430 million and the other is equal to or exceeds $430 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate RCM Projection is equal to or exceeds $430 million; and

(f)     Either (i) both of the Houlihan and Capstone Contributing Debtors Projections shall be equal to or exceed $64 million, or (ii) in the event that one such Contributing Debtors Projection is less than $64 million and the other is equal to or exceeds $64 million, the Bankruptcy Court (after reviewing both RCM

Projections and the assumptions therein) shall have determined that the appropriate Contributing Debtors Projection is equal to or exceeds $64 million.

        **9.2**    *Conditions to Effective Date*. The Plan Proponents shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Proponents in accordance with the terms hereof prior to December 31, 2006:

        (a)    The Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents, shall have been entered and not thereafter stayed, reversed or vacated and shall, among other things, provide that:

        (i)    the Debtors, the Plan Administrator, on behalf of the Reorganized Debtors, and the RCM Trustee on behalf of Post-Confirmation RCM are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; and

        (ii)    the provisions of the Confirmation Order are non severable and mutually dependent.

        (b)    Unless the condition set forth in paragraph 15(a) of the Early Payment Order that the Early Payment Order shall have become a Final Order in full force and effect shall have been waived in accordance therewith, the Early Payment Order shall have become a Final Order and shall be in full force and effect;

        (c)    The RCM Settlement Agreement shall have been approved by the Bankruptcy Court and shall have become effective by satisfaction of all conditions to effectiveness therein.

        (d)    All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

        (e)    The Secured Lender Payment Date shall have occurred; and

        (f)    The Debtors shall have sufficient Cash to make all required payments to be made on the Effective Date.

        (g)    All amounts owed, as of the Effective Date, to the Secured Lender Agent and/or any Secured Lender pursuant to paragraph 12 of the Early Payment Order shall have been paid in full.

        **9.3**    *Waiver of Conditions*. Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Plan Proponents by agreement, without any notice to parties in interest or the Bankruptcy Court and without a hearing; *provided, however*, in the event that such waiver is not unanimous, the waiving Plan Proponents shall be required to obtain approval of the Bankruptcy Court to effect such waiver, following notice and a hearing and; *provided further*, the conditions set forth in the parenthetical of section 9.1(a) and sections 9.2(b), (e) and (g) hereof shall not be waived without the consent of the Secured Lender Agent and Secured Lenders that hold the number and amount of Secured Lender Claims required to accept a plan pursuant to section 1126(c) of the Bankruptcy Code (as if, for purposes of this paragraph, such Secured Lender Claims were impaired). The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Plan Proponents. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

        **9.4**    *Consequences of Non-Occurrence of Effective Date*. In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court

directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void. In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

**ARTICLE X**

**EFFECT OF PLAN CONFIRMATION**

      10.1    *Binding Effect.* This Plan, and all compromises and settlements contemplated hereby or incorporated by reference herein, shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors and any Chapter 7 trustee appointed to administer any of the Estates.

      10.2    *Releases.*

      (a)    *Releases by the Debtors and RCM.* **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM, their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties. For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claim and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.**

      (b)    *Releases by Holders of Claims and Interests in Respect of Released Parties.* **On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the**

Plan - 55

Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.

        (c)    *Releases and Subordination by Holders of Claims and Interests in Respect of Contributing Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.* On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate; *provided, however,* that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in this section 10.2(c) to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.

        (d)    *Qualifying Plan Releases.* In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, any Secured Lender Released Claims not previously released under the Early Payment Order are hereby fully, finally and forever released as of the Effective Date. For the avoidance of doubt, the releases provided under this section 10.2(d) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.

        (e)    *Releases by Recipients of BAWAG Proceeds.* On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (I) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way arising from or relating to Refco or the RGHI Entities (each as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Parties (as defined in the BAWAG Settlement); *provided however,* that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this subparagraph.

        (f)    *Injunction Related to Releases.* The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any

claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this section of the Plan. For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims.  Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in this Plan or the transactions approved hereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.

    **10.3    *Exculpation and Limitation of Liability*.**  To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities, (n) the Ad Hoc Equity Committee, (o) the Ad Hoc Committee of Senior Subordinated Note Holders. (p) the Senior Subordinated Note Indenture Trustee in its role of effectuating Distributions to Holders of Senior Subordinated Notes nor (q) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

    **10.4    *No Discharge of Claims; Injunction*.**

        (a)    Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no holder of a Claim against or Interest in any Contributing Debtor, FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided herein.  Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and (y) the preliminary injunction of actions against the Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs.  Notwithstanding anything to the contrary set

forth in this Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in this section or section 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.

(b)    By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in this Article X.

10.5    *Term of Bankruptcy Injunction or Stays*.    All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed and the Contributing Debtors and the Reorganized Debtors have been merged into the Reorganized Debtors, dissolved or otherwise liquidated, as the case may be, in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties; *provided, however,* that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in this Plan.

10.6    *Continuation of Forex Adversary*.    Notwithstanding any provision herein to the contrary, neither this Plan nor any contract, instrument, release, agreement or document executed or delivered in connection therewith, nor the occurrence of the Effective Date (i) shall release, waive or discharge any of the claims or causes of action asserted in that certain adversary proceeding styled Forex Trading, LLC and The Ad Hoc Refco F/X Customer Committee v. Refco F/X Associates, LLC and Refco Capital Markets, Ltd., Adv. Proc. No. 06-01748 (RDD) (the "Forex Adversary") against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property, and/or (ii) shall permanently or preliminarily enjoin, prohibit or prevent in any way the continuation and/or prosecution of the Forex Adversary and the claims and causes of action asserted therein against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property; and all such claims and causes of action, as well as any and all defenses and counterclaims of FXA and RCM (including, without limitation, FXA's right to argue that the constructive trust claim asserted against RCM in the Forex Adversary belongs to FXA and not Forex Trading LLC or the Ad Hoc Refco F/X Customer Committee, as defined in the Forex Adversary), are hereby expressly preserved.

## ARTICLE XI

## RETENTION OF JURISDICTION

11.1    *Exclusive Jurisdiction of the Bankruptcy Court*.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases, this Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Allowed Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(c)    Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or RCM is a party or with respect to which any Debtor or RCM may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)    Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the RCM Settlement Agreement, as applicable;

(e)    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors or RCM that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(f)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the RCM Settlement Agreement and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the RCM Settlement Agreement, the Disclosure Statement or the Confirmation Order;

(g)    Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or the RCM Settlement Agreement or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan the RCM Settlement Agreement or any entity's rights arising from or obligations incurred in connection with this Plan the RCM Settlement Agreement;

(h)    Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any other Plan Document, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(i)    Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Confirmation Date the payment of fees and expenses of the Reorganized Debtors and the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j)    Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(k)    Hear and determine causes of action by or on behalf of the Contributing Debtor, FXA, RCM, the Reorganized Debtors, the Litigation Trustee, the Private Actions Trustee or Post-Confirmation RCM;

(l)    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to this Plan are enjoined or stayed;

(n)    Determine any other matters that may arise in connection with or relate to this Plan, the RCM Settlement Agreement, the Disclosure Statement, the Confirmation Order or any other Plan Document;

(o)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or any subsequent chapter 7 case, as applicable (which jurisdiction shall be non-exclusive except as otherwise provided by Titles 11 and 28 of the United States Code);

(p)    Hear and determine all matters related to (i) the property of the Estates of the Reorganized Debtors and Post-Confirmation RCM from and after the Confirmation Date, (ii) the winding up of the Debtors' and RCM's affairs, and (iii) the activities of the Plan Administrator and the RCM Trustee, including (A) challenges to or approvals of the Reorganized Debtors', the Plan Administrator's, the RCM Trustee's or Post-Confirmation RCM's activities, (B) resignation, incapacity, or removal of the Plan Administrator or the RCM Trustee and selection of a successor, (C) reporting by, termination of, and accounting by the Reorganized Debtors, the Plan Administrator, the RCM Trustee and Post-Confirmation RCM, and (D) release of the Plan Administrator or the RCM Trustee from their duties;

(q)    Hear and determine disputes with respect to compensation of (i) the Reorganized Debtors' and Post-Confirmation RCM's professional advisors and (ii) the Plan Administrator, the RCM Trustee, the Litigation Trustee, the Private Actions Trustee and their professional advisors;

(r)    Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(s)    Enter an order closing the Chapter 11 Cases or chapter 7 case of RCM, if any, as applicable.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1    *Effectuating Documents and Further Transactions*.** Each of the Debtors, RCM, the Plan Administrator on behalf of the Reorganized Debtors and the RCM Trustee on behalf of Post-Confirmation RCM shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**12.2    *Corporate Action*.** Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

**12.3    *Bar Dates for Certain Claims*.**

(a)    *Administrative Claims*. The Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims against all Debtors and RCM which date shall be thirty (30) days after the Effective Date. Holders of asserted Administrative Claims not paid prior to the Confirmation Date shall submit requests for the payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so. The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) shall set forth such date and constitute notice of this Administrative Claims Bar Date. The Reorganized Debtors and the RCM Trustee shall have until the Administrative Claims Objection Deadline to object to such claims.

(b)    *Professional Fee Claims*.  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 328, 330, or 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate.  Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

(c)    *Professional Fee Holdback*.  Within 10 calendar days prior to the Confirmation Hearing, each Professional shall provide to the Plan Proponents (with a copy to the Fee Committee) a notice of Professional Fee Claim containing (i) a disclosure of fees and expenses incurred, unbilled and unpaid in the Chapter 11 Cases, including any amounts that may be sought by any Professional as an enhancement of the fees billed by it in the Chapter 11 Cases based on the results achieved in the Chapter 11 Cases  and (ii) an estimate of additional fees and expenses expected to be incurred by each such Professional through the Effective Date (in the aggregate, the "Professional Fee Claims").  On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM shall fund an escrow account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts and (y) the amount of the Professional Fee Claims estimated in (ii) of the first sentence of this subparagraph 12.3(c).  Amounts held in such escrow account shall be used to pay amounts not previously paid and subsequently allowed by the Bankruptcy Court following compliance with the interim compensation procedures established by the Bankruptcy Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications.  When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM.

**12.4    *Payment of Statutory Fees*.**  All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date.  The Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such dates that their respective Chapter 11 Cases are converted to cases under chapter 7, dismissed, or closed.

**12.5    *Amendment or Modification of the Plan*.**  Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however,* that no such alteration, amendment or modification shall conflict with any Final Order (including, without limitation, the Early Payment Order).  A Holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.6    *Severability of Plan Provisions*.**  If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.7**    *Successors and Assigns.*  This Plan shall be binding upon and inure to the benefit of the Debtors, RCM, and their respective successors and assigns, including, without limitation, any chapter 7 trustee subsequently appointed. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**12.8**    *Revocation, Withdrawal, or Non-Consummation.*  The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) except as provided in sections 12.15 and 12.16 of the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Proponents or any other Person, (B) prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents, or (C) constitute an admission of any sort by the Plan Proponents or any other Person.

**12.9**    *Notice.*  All notices, requests, and demands to or upon the Reorganized Debtors and Post-Confirmation RCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SKADDEN, ARPS, SLATE, MEAGHER
> & FLOM LLP
> Four Times Square
> New York, New York  10036-6522
> Telephone:  (212) 735-3000
> Facsimile:  (212) 735-2000
> Att'n:    J. Gregory Milmoe, Esq.
>              Sally McDonald Henry, Esq.
>              J. Gregory St. Clair, Esq.
>
> Attorneys for Debtors and Debtors-in-Possession
>
>
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Att'n:    Luc A. Despins
>              Susheel Kirpalani
>              Dennis C. O'Donnell
>
> Counsel for the Official Committee of Unsecured Creditors of Refco Inc., *et al.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:
Att'n:    David S. Rosner
          Andrew K. Glenn
          Jeffrey R. Gleit

Counsel for Additional Committee of Unsecured Creditors of Refco Inc., *et al.*


BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
Att'n:    Tina L. Brozman
          Timothy B. DeSieno
          Mark W. Deveno

Counsel for the Chapter 11 Trustee for Refco Capital Markets, Ltd.

**12.10    *Governing Law*.** Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

**12.11    *Tax Reporting and Compliance*.** The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**12.12    *Filing of Additional Documents*.** On or before substantial consummation of this Plan, the Plan Proponents shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**12.13    *Limit on Precedential Effect*.** The structure of this Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect if the such Plan is not confirmed and consummated.

**12.14    *Claims Preserved Pending Consummation*.** Except as provided in the Early Payment Order and the RCM Settlement Agreement, in the event this Plan is not consummated, all parties-in-interest expressly reserve their claims and rights, as well as all defenses to such claims and rights and causes of action against such other parties, including, without limitation, (i) the subrogation claim of any Debtor that is a Guarantor under the Credit Agreement against any other Debtor that is a Loan Party under the Credit Agreement, arising out of the payment to the Secured Lenders, (ii) all claims of RCM and Holders of RCM Customer Claims and RCM FX/Unsecured Claims against the Contributing Debtors, Refco LLC and other third parties, (iii) all claims of the Contributing Debtors and Refco LLC, and their respective creditors, against RCM and other third parties and (iv) avoidance actions and other causes of action against creditors of RCM and the Contributing Debtors.

**12.15    *Continuation of RCM Settlement Agreement*.** Neither any term or provision of this Plan, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11

Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

        **12.16**   *Continuation of Early Payment Order.*  Neither any term or provision of this Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

Dated:   New York, New York  .
         December 14, 2006

                REFCO INC.
                   (for itself and on behalf of the Affiliate Debtors other than Refco Finance Inc. and Refco Global Finance Ltd.)

                By: _____/s/ Harrison J. Goldin_____
                  Name:   Harrison J. Goldin
                  Title:    Chief Executive Officer

                REFCO FINANCE INC.

                By: _____/s/ Harrison J. Goldin_____
                  Name:   Harrison J. Goldin
                  Title:    President

                REFCO GLOBAL FINANCE LTD.

                By: _____/s/ Harrison J. Goldin_____
                  Name:   Harrison J. Goldin
                  Title:    Executive Vice President

                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                   Attorneys for Refco Inc. and the Affiliate Debtors

                By: _____/s/ J. Gregory Milmoe_____
                   J. Gregory Milmoe (JGM 0919)
                   Sally McDonald Henry (SMH 0839)
                   J. Gregory St. Clair (GS 8344)
                   Four Times Square
                   New York, New York 10036-6522
                   (212) 735-3000

REFCO CAPITAL MARKETS, LTD.


By: _____ /s/ Marc S. Kirschner _____
  Name: Marc S. Kirschner
  Title: Chapter 11 Trustee for Refco Capital Markets, Ltd.


RCM Trustee


By: _____ /s/ Marc S. Kirschner _____
  Name: Marc S. Kirschner
  Title: Chapter 11 Trustee for Refco Capital Markets, Ltd.


BINGHAM McCUTCHEN LLP
 Attorneys for Marc S. Kirschner, the Chapter 11 Trustee for
 Refco Capital Markets, Ltd.


By: _____ /s/ Tina L. Brozman _____
 Tina L. Brozman
 Timothy B. DeSieno
 Mark W. Deveno
 399 Park Avenue
 New York, NY 10022
 (212) 705-7000


MILBANK, TWEED, HADLEY & McCLOY LLP
 Attorneys for the Official Committee of
 Unsecured Creditors of Refco Inc., *et al.*


By: /s/ Susheel Kirpalani _____
 Luc A. Despins
 Susheel Kirpalani
 Dennis C. O'Donnell
 One Chase Manhattan Plaza
 New York, New York 10005
 (212) 530-5000

KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
    Attorneys for the Additional Committee of
    Unsecured Creditors of Refco Inc., *et al.*

By: /s/ David S. Rosner
    David S. Rosner
    Andrew K. Glenn
    Jeffrey R. Gleit
    1633 Broadway
    New York, New York 10019
    (212) 506-1700

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                           :

In re:                                 :     Chapter 11
                                           :

Refco Inc., et al.,                :     Case No. 05-60006 (RDD)
                                         :

                        Debtors.      :     (Jointly Administered)
                                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE MODIFIED JOINT CHAPTER 11 PLAN OF REFCO INC. AND CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

WHEREAS, (i) Refco Inc. ("Refco" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),[1] (ii) the Official Committee of Unsecured Creditors of Refco Inc., et al. (the "Creditors' Committee"), (iii) the Additional Committee of Unsecured Creditors of Refco Inc., et al. (the "Additional Committee" and, together with the Creditors' Committee, the "Committees"), and (iv) Marc S. Kirschner, the chapter 11 trustee for Refco Capital Markets, Ltd. (the "RCM Trustee" and, collectively with the Debtors and the Committees, the "Plan Proponents") filed the Disclosure Statement With Respect to the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated as of October 20, 2006 (the

---

[1] The following entities are Debtors in these Chapter 11 Cases: Bersec International LLC; Kroeck & Associates, LLC; Lind-Waldock Securities LLC; Marshall Metals, LLC; New Refco Group Ltd., LLC; Refco Administration, LLC; Refco Capital Holdings, LLC; Refco Capital LLC; Refco Capital Management, LLC.; Refco Capital Trading LLC; Refco Finance Inc.; Refco Financial, LLC; Refco Fixed Assets Management, LLC; Refco F/X Associates, LLC; Refco Global Capital Management LLC; Refco Global Finance Limited; Refco Global Futures, LLC; Refco Global Holdings, LLC; Refco Group Ltd., LLC; Refco Inc.; Refco Information Services, LLC; Refco Managed Futures, LLC; Refco Mortgage Securities, LLC; Refco Regulated Companies, LLC; Summit Management, LLC; and Westminster-Refco Management LLC. Refco Capital Markets, Ltd. is a debtor in these chapter 11 cases, and is included within the definition of "Debtor" in this Order, but not a debtor-in-possession.

"Disclosure Statement")[2] and the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated as of October 20, 2006, as modified by the Modified Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries dated December 4, 2006 (as subsequently amended, modified or supplemented, the "Plan"); and

WHEREAS, following the hearing to approve the Disclosure Statement held on October 16, 2006 (the "Disclosure Statement Hearing"), the Court entered an Order Under 11 U.S.C. §§ 105, 502, 1125, 1126 and 1128 and Fed. R. Bankr. P. 2002, 3003, 3107, 3018 and 3020 (A) Scheduling Hearing on Confirmation of Plan; (B) Establishing Deadlines and Procedures for (I) Filing Objections to Confirmation of Plan, (II) Claim Objections, and (III) Temporary Allowance of Claims for Voting Purposes; (C) Determining Treatment of Certain Unliquidated, Contingent or Disputed Claims for Notice, Voting and Distribution Purposes; (D) Setting Record Date; (E) Approving (I) Solicitation Packages and Procedures for Distribution, (II) Form of Notice of Hearing on Confirmation and Related Matters, and (III) Forms of Ballots; (F) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (G) Granting Related Relief (the "Disclosure Statement Order"); and

WHEREAS, the Plan Proponents filed on December 12, 2006, the Certification of Jane Sullivan With Respect to the Tabulation of Votes on the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries (the "Sullivan Certification") and the Certification of Brian Osborne of Omni Management Group, LLC With Respect to the Tabulation of Votes on the Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order (defined below), but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

Indirect Subsidiaries (the "Osborne Certification", and together with the Sullivan Certification, the "Voting Certifications"); and

WHEREAS, the Court established December 15, 2006 at 10:00 a.m. (Eastern Time) as the date and time of the hearing pursuant to section 1129 of the Bankruptcy Code to consider Confirmation of the Plan (the "Confirmation Hearing"); and

WHEREAS, affidavits of service have been executed by and filed with the Court (the "Affidavits of Service"), with respect to the mailing of a notice of the Confirmation Hearing and the other solicitation materials in respect of the Plan in accordance with the Disclosure Statement Order; and

WHEREAS, affidavits of publication have been filed with the Court (the "Affidavits of Publication") with respect to the publication of the notice of the Confirmation Hearing in the national and global editions of USA Today, The Wall Street Journal, The Financial Times, and the national edition of The New York Times, the Times of London, and the Singapore Straits Times; and

WHEREAS, the Plan Proponents caused the Disclosure Statement, and the appropriate form of Ballot (the Disclosure Statement, the Plan and the Ballot, collectively, the "Solicitation Materials") to be distributed to the Holders of the following Claims to solicit votes to accept or reject the Plan: (i) with respect to the Contributing Debtors, Class 4 Senior Subordinated Note Claims, Class 5(a) Contributing Debtors General Unsecured Claims, Class 5(b) Related Claims and Class 6 RCM Intercompany Claims, (ii) with respect to FXA, Class 4 FXA Senior Subordinated Note Claims, Class 5(a) FXA General Unsecured Claims, Class 5(b) Related Claims and Class 6 FXA Convenience Claims, and (iii) with respect to RCM, Class 3 RCM FX/Unsecured Claims, Class 4 RCM Securities Customer Claims, Class 5 RCM Leuthold

3

Metal Claims, Class 6 RCM FX/Unsecured Convenience Claims, Class 7 RCM Securities Customer Convenience Claims and Class 8 Related Claims against RCM (collectively, the "Holders of Impaired Claims"); and

WHEREAS, the Plan Proponents filed with the Court certain exhibits to the Plan on November 27, 2006 (as subsequently amended, modified or supplemented, the "Exhibits")

WHEREAS, 16 objections to Confirmation of the Plan (the "Objections") were filed and served; and

WHEREAS, the Plan Proponents filed the Memorandum of Plan Proponents in Support of Confirmation of the Modified Joint Chapter 11 Plan of Refco, Inc. and Certain of Its Subsidiaries (the "Memorandum") on December 11, 2006; and

WHEREAS, the Confirmation Hearing was held on December 15, 2006 at 10:00 a.m. (Eastern Time); and

WHEREAS, based upon the legal authority set forth in the Memorandum and the record of the Confirmation Hearing, including the Court's bench rulings the Objections that have not been consensually resolved are overruled on the merits pursuant to this order (the "Confirmation Order").

NOW, THEREFORE, the Court having reviewed the Plan, the Disclosure Statement, the Disclosure Statement Order, the Voting Certifications and the December 14, 2006 Supplement thereto )the "Supplement"), the Affidavits of Service, the Affidavits of Publication, the Objections, the Memorandum and the other papers before the Court in connection with the confirmation of the Plan; the Court having heard the statements of counsel in support of Confirmation at the Confirmation Hearing, as reflected in the record at the Confirmation Hearing; and the Court having considered all testimony presented and evidence admitted at the

4

Confirmation Hearing and the representations by the parties on the record with respect to certain settlements, clarifications and non-material modifications of the Plan; the Court having taken judicial notice of the papers and pleadings on file in these Chapter 11 Cases; and the Court finding that (i) notice of the Confirmation Hearing and the opportunity of any party in interest to object to Confirmation were adequate and appropriate, in accordance with Bankruptcy Rule 2002(b) and the Disclosure Statement Order, as to all parties to be affected by the Plan and the transactions contemplated thereby and (ii) the legal and factual bases set forth at the Confirmation Hearing and as set forth in this Confirmation Order establish just cause for the relief granted herein; the Court hereby makes the following Findings of Fact, Conclusions of Law and Order.[3]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)). This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.    Plan Modification. On December 4, 2006, the Plan Proponents filed a modification (the "Modification") to the Plan and served such Modification on the master service list, the Bankruptcy Rule 2002 service list and all parties that filed an Objection to the Disclosure

---

[3]    Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

Statement and/or the Plan. The Modification does not materially adversely affect or change the treatment of any Holders of Claims or Interests. Accordingly, pursuant to Bankruptcy Rule 3019, the Modification does not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of acceptances or rejections under section 1126 of the Bankruptcy Code, nor does the Modification require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Disclosure of the Modification in the filing and service on December 4, 2006 and in the record at the Confirmation Hearing constitutes due and sufficient notice thereof under the circumstances of the Chapter 11 Cases.

C.    Judicial Notice. This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered or adduced at, the hearings held before the Court during the pendency of the Chapter 11 Cases.

D.    Burden of Proof. The Plan Proponents have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

E.    Transmittal and Mailing of Materials; Notice. The Solicitation Materials were transmitted and served upon all interested parties in compliance with the Disclosure Statement Order and in compliance with the Bankruptcy Rules, and such transmittal and service was adequate and sufficient. Notice of the Confirmation Hearing and all deadlines in the Disclosure Statement Order was given in compliance with the Bankruptcy Rules and the Disclosure Statement Order and was good and sufficient notice in accordance with Bankruptcy

6

Rules 2002(b) and 3020(b)(2), and no other or further notice is required. Votes for acceptance or rejection of the Plan were solicited in good faith, after transmittal of a disclosure statement containing adequate information, and otherwise in compliance with Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3017 and 3018.

F.    Impaired Classes Voting to Accept the Plan. As evidenced by the Voting Certifications and suplement, which certified both the method and results of the voting, Classes 4, 5 and 6 of each of the Contributing Debtors, FXA Classes 4 and 6 and RCM Classes 3, 4, 5, 6, 7, and 8 are each impaired and have each voted to accept the Plan pursuant to the requirements of sections 1124 and 1126 of the Bankruptcy Code. Thus, at least one impaired class of Claims has voted to accept the Plan in respect of each Debtor.

G.    Classes Deemed To Accept the Plan. Classes 1, 2 and 3 of each of the Contributing Debtors and FXA as well as RCM Classes 1 and 2 are not impaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

H.    Classes Voting to Reject the Plan or Deemed to Reject the Plan. Holders of Class 7 Subordinated Claims against one or more of the Contributing Debtors and Class 8 Old Equity Interests, Holders of Class 7 FXA Subordinated Claims against FXA and Holders of Class 9 RCM Subordinated Claims against RCM are deemed to have rejected the Plan (the "Rejecting Classes") pursuant to section 1126(g) of the Bankruptcy Code because such Holders are not entitled to receive or retain any Distribution or property under the Plan on account of such Claims or Interests. Holders of FXA Class 5(a) Claims voted to reject the Plan (while the numerosity requirement of section 1126(c) was satisfied, the requirement that at least two-thirds in voting amount of allowed claims in a class vote to accept the Plan was not satisfied).

7

I.    Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

(i)    Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). In addition to Administrative Claims and Priority Tax Claims, which need not be classified, the Plan designates separate Classes of Claims and Interests for each of the twenty-seven (27) Debtors, with such Debtors categorized into one of three (3) groups, including the Contributing Debtors, FXA and RCM.[4] The Claims and Interests placed in each Class are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)    Specify Unimpaired Classes (11 U.S.C. § 1123(a)(2)). Articles II and III of the Plan specify that the following classes are unimpaired under the Plan—Contributing Debtors Classes 1, 2, and 3; FXA Classes 1, 2 and 3; and RCM Classes 1 and 2—thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(iii)    Specify Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles II and III of the Plan designate the following classes as impaired under the Plan—Contributing Debtors Classes 4, 5(a), 5(b), 6, 7 and 8; FXA Classes 4, 5(a), 5(b), 6 and 7; RCM Classes 3, 4, 5, 6, 7, 8 and 9—and specify the treatment of

---

[4]    In addition, the Plan creates sub-Classes corresponding to each of the Contributing Debtors for Class 4 Senior Subordinated Note Claims, Class 5(a) General Unsecured Claims and Class 5(b) Related Claims.

Claims and Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(iv)     No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v)     Implementation of Plan (11 U.S.C. § 1123(a)(5)). Article V of the Plan, entitled "Means for Implementation of the Plan," sets forth numerous provisions to facilitate implementation of the Plan, including, but not limited to, (i) the continued corporate existence and dissolution of the Reorganized Debtors, (ii) the filing of corporate governance documents that will govern the Reorganized Debtors after the Effective Date; (iii) the designation of directors, managers and officers of the Reorganized Debtors; (iv) the designation of the Plan Administrator pursuant to section 5.5 of the Plan and the Plan Administrator Agreement; (v) the administration of post-Confirmation RCM; (vi) the creation of a Litigation Trust pursuant to the Litigation Trust Agreement; (vii) the creation of a Private Actions Trust in accordance with the terms set forth in the Private Actions Trust Agreement; (viii) the preservation of certain rights of action by the Reorganized Debtors; (ix) the dissolution of the Committees and creation of a Plan Committee; (x) the role of the Fee Committee subsequent to the Confirmation Date; (xi) the cancellation of existing securities and agreements;  (xii) ensuring that the Plan will not impair the Examiner's investigation and the filing of the Examiner's report in accordance with the provisions of the Examiner Order and the additional directions

given by this Court at the June 21, 2006 hearing; and (xiii) the sources of Cash available

for Plan Distribution. The Plan provides adequate and proper means for its

implementation, thereby satisfying section 1123(a)(5) of the Bankruptcy Code.

   (vi)  Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).

Section 5.3 of the Plan provides that the corporate governance documents of Reorganized

Refco and Reorganized FXA, inter alia, shall be restated to prohibit the issuance of non-

voting equity securities to the extent required by the Bankruptcy Code. In addition, to the

extent the Plan Administrator decides it necessary, the corporate governance documents

of the Affiliate Debtors that will continue in existence following the Effective Date

pending the wind up of their businesses shall be restated to prohibit the issuance of non-

voting equity securities to the extent required by the Bankruptcy Code. The form of each

restated corporate governance document attached as Exhibit C to the Plan includes a

provision prohibiting the issuance of non-voting equity securities. Thus, the

requirements of section 1123(a)(6) of the Bankruptcy Code are satisfied.

   (vii)  Selection of Officers, Directors and the Trustee (11 U.S.C. §

1123(a)(7)). Pursuant to Section 5.4 of the Plan, the Plan Administrator shall serve as the

sole officer and director or manager of the Reorganized Debtors and the RCM Trustee

shall serve as the sole representative of RCM. This manner of selection satisfies section

1123(a)(7) of the Bankruptcy Code because the Plan Administrator will be appointed by

the Joint Sub-Committee comprised of the Committee and the Additional Committee and

the RCM Trustee was appointed pursuant to a March 22, 2006 order issued by this Court

authorizing the appointment of one disinterested person as a Chapter 11 trustee for the

Estate of RCM. The RCM Trustee is to wind down the RCM Estate in accordance with

the terms and conditions set forth in the RCM Settlement Agreement. Thus, the Plan is

consistent with the interests of creditors and equity security holders and with public

policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(viii)    Additional Plan Provisions (11 U.S.C. § 1123(b)). The

Plan's permissive provisions are appropriate, authorized by section 1123(b) of the

Bankruptcy Code, and not inconsistent with the applicable provisions of the Bankruptcy

Code.

(ix)    RCM's Chapter 11 Case (11 U.S.C. § 1112). The Court has

ruled that RCM's case should proceed under subchapter III of chapter 7 of the

Bankruptcy Code, although the Court has deferred the effect of that ruling, permitting

RCM to remain in chapter 11 proceedings. In deferring the ruling, the Court found that

RCM's case presents unusual circumstances within the meaning of Bankruptcy Code

section 1112(b), which have permitted RCM's case not to be converted to chapter 7.

Further, the Court directed that RCM work toward a global chapter 11 plan of

reorganization with the other Debtors. Accordingly, RCM's inclusion in the Plan,

whether as a chapter 11 Plan Proponent, or as a chapter 7 party in interest to the

settlements embodied in the Plan, is in compliance with the Bankruptcy Code.

J.    Compliance with Bankruptcy Rule 3016. The Plan is dated and identifies

the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the

Disclosure Statement with the Court satisfies Bankruptcy Rule 3016(b). The Plan describes in

specific and conspicuous language all acts to be enjoined under the Plan and identifies all entities

that are subject to the injunctions set forth in Article X of the Plan in accordance with

Bankruptcy Rule 3016(c).

K.    Compliance with Bankruptcy Rule 3018.  The solicitation of votes to accept or reject the Plan satisfies Bankruptcy Rule 3018.  The Solicitation Materials, including the Plan, were transmitted to all creditors entitled to vote on the Plan (i.e., Holders of Impaired Claims, other than those in Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code), sufficient time was prescribed for such creditors to accept or reject the Plan, and the Solicitation Materials and related solicitation procedures comply with section 1126 of the Bankruptcy Code, thereby satisfying the requirements of Bankruptcy Rule 3018.

L.    Plan Proponents' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically:

(i)    Each of the Debtors is a proper debtor under section 109 of the Bankruptcy Code.  As set forth above, the Court has ruled that RCM's case should proceed under subchapter III of chapter 7 of the Bankruptcy Code, although the Court has deferred the effect of that ruling, permitting RCM to remain in chapter 11 proceedings. In deferring the ruling, the Court found that RCM's case presents unusual circumstances within the meaning of Bankruptcy Code section 1112(b), which have permitted RCM's case not to be converted to chapter 7.  Further, the Court directed that RCM work toward a global chapter 11 plan of reorganization with the other Debtors.  Accordingly, RCM, whether as a chapter 11 Plan Proponent, or as a chapter 7 party in interest to the settlements embodied in the Plan, is in compliance with the Bankruptcy Code.

(ii)    The Plan Proponents have complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court.

12

(iii)    The Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order in transmitting the Plan, the Disclosure Statement, the Ballots and related documents and notices and in soliciting and tabulating votes on the Plan.

M.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. The Plan Proponents have proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, this Court has examined the totality of the circumstances surrounding the formulation of the Plan. The Plan provides for the liquidation and distribution of the Debtors' assets and the wind-down of the Debtors' corporate affairs. The Plan Proponents involved various creditor constituencies throughout the Plan formulation process. Key Settlements reached with the RCM Trustee, the Committees, the Ad Hoc Equity Committee, the Secured Lender Agent, the Indenture Trustee and certain Holders of Secured Lender Claims and Senior Subordinated Note Claims have paved the way for the Plan, which will enable maximum distributions to all of the Debtors' creditors, without the cost and delay of litigation.

N.    <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by the Plan Proponents, the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

O.    <u>Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Plan complies with section 1129(a)(5) of the Bankruptcy Code. Pursuant to Section 5.4 of the Plan,

the Plan Administrator shall serve as the sole officer and director or manager of the Reorganized

Debtors and the RCM Trustee shall serve as the sole representative of RCM. This manner of

selection satisfies section 1123(a)(7) of the Bankruptcy Code because the Plan Administrator

was appointed by the Joint Sub-Committee comprised of the Committee and the Additional

Committee and the RCM Trustee was appointed by order of this Court. The RCM Trustee is to

wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM

Settlement Agreement. The appointment to, or continuance in, such offices of all such persons is

consistent with the interests of Holders of Claims against and Interests in the Debtors and with

public policy. No insider is proposed to serve as an officer or director of the Reorganized

Debtors.

   P.  <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. After confirmation of the Plan,

the Debtors' businesses will not involve rates established or approved by, or otherwise subject to,

any governmental regulatory commission. Thus, section 1129(a)(6) of the Bankruptcy Code is

not applicable in these Chapter 11 Cases.

   Q.  <u>Best Interests Test (11 U.S.C. § 1129(a)(7))</u>. The Plan satisfies section

1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached as Exhibit B to the

Disclosure Statement and other evidence proffered or adduced at the Confirmation Hearing (a)

are persuasive and credible, (b) have not been controverted by competent evidence and (c)

establish that each Holder of an Impaired Claim or Interest either has accepted the Plan or will

receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of

the Effective Date, that is not less than the amount that such Holder would receive or retain if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

R.     Acceptance or Rejection by Certain Classes (11 U.S.C. § 1129(a)(8)).

Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are

Unimpaired by the Plan and, thus, are conclusively presumed to have accepted the Plan under

section 1126(f) of the Bankruptcy Code.  Classes 4, 5, and 6 of each of the Contributing Debtors,

FXA Classes 4 and 6, and RCM Classes 3, 4, 5, 6, 7, and 8 have voted to accept the Plan in

accordance with sections 1126(c) and (d) of the Bankruptcy Code.  FXA Class 5(a) voted to

reject the Plan.  As set forth above, the Rejecting Classes are deemed to reject the Plan and,

therefore, the Debtors were not required to solicit votes to accept or reject the Plan from Holders

of Claims or Interests in such Classes.  Although section 1129(a)(8) has not been satisfied with

respect to FXA Class 5(a) and the Rejecting Classes, the Plan is confirmable because the Plan

satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.  As set forth in the

Voting Certifications, the percentages of Holders of Claims in Classes entitled to vote that voted

to accept the Plan are attached hereto as Exhibit C.

S.     Treatment of Administrative, Priority and Tax Claims (11 U.S.C. §
1129(a)(9)).  The treatment of Administrative Claims, Priority Tax Claims and Non-Tax Priority

Claims pursuant to Sections 3.1, 3.2 and 3.3 of the Plan satisfies the requirements of sections

1129(a)(9)(A), (B) and (C) of the Bankruptcy Code.

T.     Acceptance By Impaired Class (11 U.S.C. § 1129(a)(10)).  Classes 4, 5,

and 6 of each of the Contributing Debtors, FXA Classes 4 and 6, and RCM Classes 3, 4, 5, 6, 7,

and 8 are Impaired Classes of Claims that have voted to accept the Plan with respect to all of the

Debtors, and, to the Debtors' knowledge, do not contain insiders whose votes have been counted.

Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code that at least one Class

of Claims against or Interests in the Debtors that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, has been satisfied.

U.     Feasibility (11 U.S.C. § 1129(a)(11)).  The Plan provides for the liquidation of the Debtors' remaining assets and a distribution of Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan.  The Plan also provides for the payment in full of all Allowed Administrative Expenses.  Therefore, the Plan is feasible and meets the requirements of section 1129(a)(11) of the Bankruptcy Code.

V.     Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under section 1930 of title 28, United States Code, as determined by this Court, have been paid or will be paid on the Effective Date pursuant to Section 12.4 of the Plan, thus satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.

W.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  All retiree benefits will be treated as executory contracts that are subject to rejection pursuant to section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).  Thus, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

X.     Principal Purpose (11 U.S.C. § 1129(d)).  The principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e et seq.), and no governmental unit has objected to the Confirmation of the Plan on any such grounds.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

Y.     No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).

Holders of Claims and Interests in the Rejecting Classes are Impaired and deemed to have

rejected the Plan. The Plan Proponents presented uncontroverted evidence at the Confirmation

Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to the

Rejecting Classes as required by the "cramdown" requirements of section 1129(b)(1) of the

Bankruptcy Code. Thus, the Plan may be confirmed notwithstanding the Debtors' failure to

satisfy section 1129(a)(8) of the Bankruptcy Code. Upon Confirmation and the occurrence of

the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes and

FXA Class 5(a).

Z.     Good Faith Solicitation (11 U.S.C. § 1125(e)). Based on the record before

the Court in these Chapter 11 Cases, the Plan Proponents and each of their respective directors,

officers, employees, shareholders, members, agents, advisors, accountants, investment bankers,

consultants, attorneys, and other representatives have acted in good faith within the meaning of

section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the

Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities

relating to the solicitation of acceptances of the Plan and their participation in the activities

described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by

section 1125(e) of the Bankruptcy Code and the exculpation and injunctive provisions set forth

in Article X of the Plan.

AA.     No Objection to Assumed Contracts and Leases. No non-Debtor party to

any executory contract or unexpired lease to be assumed pursuant to Article VII of the Plan has

objected to the assumption thereof or any such objections have been withdrawn.

BB.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and the conditions to confirmation set forth in section 9.1 of the Plan.

CC.    <u>Retention of Jurisdiction</u>.  Subject to the provisions of this Order, the Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the Bankruptcy Code.

DD.    <u>Rule 9019 Settlements; Releases and Discharges</u>.  The Plan is premised on a series of interdependent settlements and compromises (each, a "Settlement" and, collectively, the "Settlements") of various debtor-creditor, inter-debtor, and inter-creditor disputes (each, a "Dispute" and, collectively, the "Disputes").  The Settlements among the Debtors, the RCM Trustee, the Committees, the Ad Hoc Equity Committee, the Secured Lender Agent, the Indenture Trustee, certain Holders of Secured Lender Claims and Senior Subordinated Note Claims, certain customers of RCM, and other creditors of RCM and the Debtors (collectively, the "Settlement Negotiation Parties") and their respective financial and legal professionals are reflected in the relative recoveries of the various creditor groups under the Plan and are designed to achieve a global, consensual resolution of these Chapter 11 Cases.  The Disputes being resolved by the Settlements are adequately described in Article II of the Disclosure Statement, the Memorandum and by the testimony adduced at the Confirmation Hearing.  Pursuant to Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided under the Plan, the Settlements constitute good faith compromises and settlements of all disputes among the Settlement Negotiation Parties.  The proposed recoveries reflect a fair and reasonable allocation of the aggregate value of the Debtors, and the recoveries provided to Holders of Claims of the Contributing Debtors, RCM and FXA under the Plan are substantially higher than

the lowest point in the range of reasonable litigation outcomes in the absence of the Settlements, based on the assets and liabilities of the Contributing Debtors, RCM and FXA on a stand-alone basis. In addition, the releases and discharges described in Article X of the Plan constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interest of the Holders of Claims and Interests, are within the range of possible litigation outcomes, are fair, equitable, reasonable and are integral elements of the restructuring and resolution of the Chapter 11 Cases in accordance with the Plan. Each of the release, indemnification and exculpation provisions set forth in the Plan:

(i)    falls within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), (b) and (d);

(ii)    is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code;

(iii)    is an integral element of the Settlements embodied in the Plan;

(iv)    confers material benefit on, and is in the best interest of, the Debtors, their Estates and creditors;

(v)    is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization to the extent provided in the Plan; and

(vi)    is consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

EE.     The failure to effect the release, indemnification and exculpation provisions of the Plan would seriously impair the Debtors' ability to confirm the Plan. Accordingly, the compromises and settlements embodied in the release, discharge, indemnification and exculpation provisions described in Article X of the Plan are approved.

FF.     The administration of the RCM Estate in accordance with the Plan and the RCM Settlement Agreement by the RCM Trustee, whether in chapter 11 or chapter 7, is consistent with the requirements of Bankruptcy Code section 748.

GG.     The Plan is, as to the RCM Estate, consistent with the requirements of Bankruptcy Code sections 726 and 752, taking into account the settlements contained in the RCM Settlement Agreement.

## DECREES

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     Solicitation Procedures.  Votes for the acceptance or rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code and all other rules, laws and regulations, and the solicitation procedures and solicitation are hereby approved.

2.     Confirmation.  The Plan, attached hereto as Exhibit A, is approved and confirmed under section 1129 of the Bankruptcy Code.  The terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.

3.     Objections.  All Objections that have not been withdrawn, waived or settled are overruled on the merits.

4.    Provisions of Plan and Order Non-Severable and Mutually Dependent.
The provisions of the Plan and this Confirmation Order, including the findings of fact and
conclusions of law set forth herein, are non-severable and mutually dependent.

5.    Claims Bar Dates for Administrative Claims.  As set forth in Section 12.3
of the Plan, unless previously paid prior to the Confirmation Date, all requests for payment of
Administrative Claims against all Debtors and RCM that were not previously filed pursuant to
prior orders of the Court must be filed no later than thirty (30) days after the Effective Date or be
forever barred.  The Reorganized Debtors and the RCM Trustee shall have until the
Administrative Claims Objection Deadline to object to such claims.

6.    Plan Classification Controlling.  The classifications of Claims and Interests
for purposes of the Distributions to be made under the Plan shall be governed solely by the terms
of the Plan.

7.    Binding Effect.  The Plan, and all compromises and settlements
contemplated thereby or incorporated by reference therein, shall be binding upon and inure to the
benefit of the Debtors, all present and former Holders of Claims and Interests, and their
respective successors and assigns, including, but not limited to, the Reorganized Debtors and any
Chapter 7 trustee appointed to administer any of the Estates.  If the Chapter 11 Case of RCM is
converted to a case under Chapter 7 of the Bankruptcy Code, all aspects of the Plan relating to
RCM, including all settlements, compromises and releases, shall nonetheless be and remain
binding with full force and effect as a settlement between the RCM Chapter 7 estate and the
estates of the Debtors enforceable among the Debtors' estates and against all parties in interest in
the Chapter 11 Cases.  The Effective Date shall constitute the effective date of the settlement
between the RCM Chapter 7 estate and the Estates of other Debtors.  The conversion of the RCM

21

Chapter 11 Case prior the Effective Date shall not impair the Effective Date occurring with

respect to the other Debtors. Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code

and the provisions of this Confirmation Order, the Plan, and all Plan related documents shall

apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

        8.    <u>No Revesting of Assets (11 U.S.C. § 1141(b) and (c))</u>.  Other than as set

forth herein, or in the Litigation Trust Agreement, the remaining property of the respective

Estates, other than the Contributed Claims, which shall be transferred to and vest in the

Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date

or Effective Date, but shall remain property of the respective Estates and continue to be subject

to the jurisdiction of the Court until distributed to Holders of Allowed Claims in accordance with

the provisions of the Plan, this Confirmation Order and the RCM Settlement Agreement.  From

and after the Effective Date, all such property shall be distributed in accordance with the

provisions of the Plan, this Confirmation Order and the RCM Settlement Agreement, without

further order of the Court (except as specifically required).  For the avoidance of doubt, the

Debtors' or RCM's insurance policies shall remain property of their respective Estates in

accordance with section 5.9 of the Plan, and shall not be subject to the rejection provisions of

section 7.1 of the Plan.

        9.    <u>Merger of Subsidiaries into Refco Inc</u>.  In the event that, after the Effective

Date, the Plan Administrator determines that it is appropriate, each of the Affiliate Debtors shall

be dissolved or merged with and into Refco Inc., with Refco Inc. as the surviving entity.

Notwithstanding anything to the contrary in section 5.1 of the Plan, any mergers in fact of each

of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section

shall occur no earlier than the Effective Date.  Upon the occurrence of any such merger, the Plan

Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required

documentation with applicable state governmental agencies to reflect the occurrence of such

mergers.

       10.    <u>Continued Corporate Existence and Dissolution of Reorganized Debtors.</u>

FXA and, until they are wound up and potentially merged with and into Refco Inc. pursuant to

section 5.1 of the Plan, the Affiliate Debtors shall continue to exist as Reorganized Refco,

Reorganized FXA and/or the applicable Reorganized Affiliate Debtor, respectively, after the

Effective Date pursuant to the certificate of incorporation, certificate of formation or other

corporate governance document, as applicable, and by-laws, operating agreement or other

corporate governance document in effect prior to the Effective Date, except to the extent that

such corporate governance documents are amended under the Plan, for the limited purposes of

liquidating all of the assets of each of the Estates, and making Distributions in accordance with

the Plan.  As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of

assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan,

the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in

consultation with the Plan Committee, (i) provide for the retention and storage of the books,

records, and files that shall have been delivered to or created by the Plan Administrator until

such time as all such books, records, and files are no longer required to be retained under

applicable law (except for those books, records and files turned over to the Litigation Trustee in

accordance with the terms of the Litigation Trust Agreement), and file a certificate informing the

Court of the location at which such books, records, and files are being stored, (ii) file a

certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets

of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file

23

the necessary paperwork with the applicable office of the secretary of state to effectuate the

dissolution of the Reorganized Debtors in accordance with the laws of the applicable state, and

(iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors.

Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the

Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any

other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be

made in connection therewith.  The RCM Trustee shall have sole discretion with respect to

determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with

the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

   11. <u>Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))</u>.  On

the Effective Date, all executory contracts or unexpired leases of the Debtors shall be deemed

rejected in accordance with, and subject to, the provisions and requirements of sections 365 and

1123 of the Bankruptcy Code, except those executory contracts and unexpired leases that (i)

previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (ii)

previously shall have expired or terminated pursuant to its own terms before the Effective Date,

(iii) are the subject of a pending motion to assume or reject on the Confirmation Date, or (iv) are

identified in Exhibit D to the Plan as a contract or lease to be assumed.  Entry of the

Confirmation Order by the Court shall constitute approval of such rejections and assumptions

pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

   12. <u>Effectuating Documents and Further Transactions</u>.  Pursuant to the Plan,

the Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of

Post-Confirmation RCM, shall be authorized to execute, deliver, file, or record such documents,

instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

13.    Corporate Action. Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

14.    Plan Documents. There being no objections to any of the Plan Documents contemplated by the Plan, and any amendments, modifications and supplements thereto, and all documents and agreements introduced therein or contemplated by the Plan (including all exhibits and attachments thereto and documents referred to therein) the execution, delivery and performance thereof by the Reorganized Debtors are authorized and approved, without need for further corporate action or further order or authorization of the Court. The Debtors and the Reorganized Debtors, as appropriate, are authorized and empowered to make any and all modifications to any Exhibits that may be agreed to by the parties thereto and are consistent with the Plan.

15.    No Discharge of Claims; Injunction. Pursuant to section 10.4 of the Plan, Confirmation shall not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no Holder of a Claim against or Interest in any Contributing Debtor,

FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other

Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or

RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their

respective properties, except as expressly provided in the Plan. Accordingly, except as otherwise

provided in the Plan, from and after the Confirmation Date all Persons who have held, hold, or

may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from

taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM,

the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or

any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined

from taking any of the following actions against any of the Contributing Debtors, FXA, RCM,

the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims

or Interests: (A) commencing or continuing, in any manner or in any place, any action or other

proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment,

award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D)

commencing or continuing, in any manner or in any place, any action that does not comply with

or is inconsistent with the provisions of the Plan; *provided, however*, that (x) nothing contained

in the Plan shall preclude such Persons from exercising their rights pursuant to and consistent

with the terms of the Plan and (y) the preliminary injunction of actions against the Contributing

Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property

(if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized

Debtors and Post-Confirmation RCM and completion of the winding up of their affairs.

Notwithstanding anything to the contrary set forth in the Plan, creditors' rights of setoff and

recoupment are preserved, and the injunctions referenced in sections 10.4 and 10.5 of the Plan

shall not enjoin the valid exercise of such rights of setoff and recoupment. By accepting

Distributions pursuant to the Plan, each Holder of an Allowed Claim or Allowed Interest shall be

deemed to have specifically consented to the injunctions set forth in Article X of the Plan.

      16.   <u>Cancellation of Securities, Instruments, and Agreements Evidencing</u>

<u>Claims and Interests</u>. With the exception of the equity interests of any Refco Entity held by any

Debtor, RCM or Non-Debtor Affiliate pending wind-up and dissolution of such entities pursuant

to this Plan, on the Effective Date and concurrently with the applicable Distributions made

pursuant to Article V of the Plan, the promissory notes, share certificates (including treasury

stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls,

rights, puts, awards, commitments, or any other agreements of any character to acquire such

Interests shall be deemed canceled and of no further force and effect, without any further act or

action under any applicable agreement, law, regulation, order, or rule, and the obligations of the

Debtors or RCM under the notes, share certificates, and other agreements and instruments

governing such Claims and Interests shall be discharged; *provided, however,* that the Senior

Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the

Senior Note Indenture Trustee to enforce the indemnity provisions of the Senior Subordinated

Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the

Plan Committee, to effectuate the Distributions to be made on account of Senior Subordinated

Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note

Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall

be cancelled and discharged. The Holders of or parties to such canceled notes, share certificates,

and other agreements and instruments shall have no rights arising from or relating to such notes,

share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

17.    Exemption from Certain Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer, or in connection with, the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer tax, or other similar tax.

18.    Final Fee Applications.  All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Court.  Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such other period as may be allowed by order of the Court) after the date on which the applicable request for compensation or reimbursement was served.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327, 328, 330, 331 or 1103 of the Bankruptcy Code in seeking retention or

compensation for services rendered after such date shall terminate. Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

19.    Professional Fee Claims Escrow Account. On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event that the RCM Chapter 11 Case previously has been converted to a case under subchapter III of chapter 7) shall fund a segregated bank account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts, *provided, however*, that the 10% holdback of fees pursuant to the December 7, 2006 Order Granting Professionals' Applications for Allowance of Interim Compensation and Reimbursement of Expenses (June 1, 2006 Through September 30, 2006) is hereby released and may be remitted to the following Professionals: (i) Bingham McCutchen LLP, (ii) FTI Consulting, Inc., (iii) Houlihan Lokey Howard & Zukin Capital, Inc., (iv) Kasowitz, Benson, Torres & Friedman LLP, (v) Milbank, Tweed, Hadley & McCloy LLP, and (vi) Skadden, Arps, Slate, Meagher & Flom LLP and (y) the amount of estimated additional fees and expenses expected to be incurred by each Professional through the Effective Date in accordance with section 12.3(c) of the Plan. Amounts held in such segregated account shall be used by the Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event of conversion) to pay amounts not previously paid by the Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event of conversion) and subsequently allowed by the Court following compliance with the interim compensation procedures established by the Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications. When all Professional Fee Claims have been paid in full, amounts remaining in the segregated

account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM (or the RCM Trustee in the event of conversion).

20.    Termination of Injunctions and Automatic Stay.  Pursuant to Section 10.5 of the Plan, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties, or as soon after the Effective Date that the Plan Administrator may determine that it is appropriate for each of the Affiliate Debtors to be merged with and into Refco Inc., with Refco Inc. as the surviving entity; *provided, however*, that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in the Plan.

21.    Injunction.  Except as otherwise expressly provided in the Plan, this Confirmation Order, or a separate order of this Court, the injunctions set forth in Section 10.4 of the Plan are approved.

22.    Settlements, Compromises and Releases.  All Settlements of Disputes embodied in the Plan, are approved as fair, equitable, reasonable and in the best interests of the Debtors, the Reorganized Debtors and their Estates, and creditors and interest holders, and shall be, and hereby are, effective and binding on all persons and entities who may have had standing to assert such claims or causes of action, and no person or entity shall possess such standing to

assert such claims or causes of action after the Effective Date. Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019(a) the settlements, compromises, releases, discharges, exculpations, and injunctions set forth in the Plan, including, but not limited to, the releases set forth in Section 10.2 of the Plan and implemented by this Confirmation Order shall be, and hereby are, approved as fair, equitable, reasonable and in the best interests of the Debtors, the Reorganized Debtors and their estates, creditors and interest holders.

23.     Litigation Trust.  The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as set forth in Section 5.7 of the Plan and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement.  On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, except as otherwise provided in the Litigation Trust Agreement, the Debtors, RCM, the Reorganized Debtors, Post-Confirmation RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust; *provided, however*, that, notwithstanding such transfer to the Litigation Trust, such claims shall not be merged into a single entity but shall be deemed asserted on behalf of each applicable Estate holding such claim immediately prior to contribution, and shall remain separate and distinct from other Estates in connection with the prosecution thereof.  Pursuant to section 1123(b)(3) of the Bankruptcy Code and in accordance with section 5.7(a) of the Plan, Marc S. Kirschner is hereby appointed the Litigation Trustee as a representative of each of the Estates, and the Litigation Trustee shall be deemed the successor-in-interest to each of the Contributing Debtors, FXA, and the RCM

Trustee, a "similar official duly appointed with respect to the Company," and/or a "comparable authority of the Company," for purposes of any applicable directors and officers insurance policy, including, without limitation, with respect to (i) the Exclusion F to the Directors, Officers and Corporate Liability Insurance Policy issued to Refco Inc. by U.S. Specialty Insurance Company (Policy No. 24-MGU-05-A10821) (the "U.S. Specialty Policy"), together with the excess policies that follow form to the U.S. Specialty Policy issued by Lexington Insurance Company (Policy No. 1620294), Axis Reinsurance Company (Policy No. RNN 506300), Allied World Assurance Company (U.S.), Inc. (Policy No. AW0418197), and Arch Insurance Company (Policy No. 24-MGU-05-A10821); and (ii) Exclusion G to the Management Liability and Company Reimbursement Insurance Policy issued to Refco Inc. by XL Specialty Insurance Company (Policy No. ELU091406-06). The terms of the Litigation Trust Agreement are hereby approved.

24.    <u>Private Actions Trust</u>. The Private Actions Trust shall become effective on the Effective Date as set forth in section 5.8 of the Plan and in accordance with the terms and conditions set forth in more detail in the Private Actions Trust Agreement to hold certain claims and causes of action against third-parties owned by Holders of Claims or Interests against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates. The appointment of Marc S. Kirschner as Private Actions Trustee is hereby approved. The terms of the Private Actions Trust Agreement are hereby approved.

25.    <u>Plan Administrator; Plan Administrator Agreement</u>. Pursuant to section 5.5.(a) of the Plan, the Joint Sub-Committee has designated RJM, LLC, a New Jersey limited liability company, as Plan Administrator. The appointment of RJM, LLC as Plan Administrator is hereby approved. The Plan Administrator shall serve until resignation or discharge and the

appointment of a successor Plan Administrator. The terms of the Plan Administrator Agreement are hereby approved.

26.    Non-Occurrence of Effective Date. If the Effective Date has not occurred within the time period provided in Section 9.2 of the Plan, the Plan Proponents reserve all rights to seek an order from the Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void. In the event that the Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.

27.    Authorization to Consummate Plan. Notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry and the Debtors are authorized to consummate the Plan immediately after entry of this Confirmation Order in accordance with Section 9.2 of the Plan.

28.    Notice of Entry of Confirmation Order and the Effective Date. Within five (5) Business Days of the Effective Date, the Debtors shall serve a notice (the "Confirmation and Effective Date Notice") in substantially the form attached hereto as Exhibit B (the form of which is hereby approved), pursuant to Bankruptcy Rules 2002(f)(7), 2002(k) and 3020(c) on all parties that received notice of the Confirmation Hearing; provided, however, that the Debtors or the Reorganized Debtors shall be obligated to serve the Confirmation Notice only on the record holders of Claims or Interests as of the Confirmation Date. The Debtors shall also publish the Confirmation and Effective Date Notice in the national and global editions of USA Today, The

Wall Street Journal, The Financial Times, and the national edition of The New York Times, the Times of London, and the Singapore Straits Times.

29.    Continuation of RCM Settlement Agreement.  Neither any term or provision of the Plan, nor any failure of such Plan to proceed or be confirmed or consummated, nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

30.    Continuation of Early Payment Order.  Neither any term or provision of the Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

31.    Voting Deadline and Procedures for Tabulation of Votes.  Any Ballot received after the Voting Deadline, to the extent otherwise valid under the Disclosure Statement Order, shall be effective to effect any applicable Ballot elections.

32.    Contributing Non-Debtor Affiliate Trigger Date.  For the avoidance of doubt, the term "positive Cash" contained in section 1.62 of the Plan shall mean, as to each Non-Debtor Affiliate, an amount not less than 90% of the amount projected to be received from such Non-Debtor Affiliate in the Houlihan Contributing Debtor Projections, which projections were prepared in accordance with section 9.1(f) of the Plan.

33.    Old Equity Interest Forms.

(a)    The Private Actions Trust Election for Holders of Old Common Stock of Refco Inc. (the "Common Stock Election Form") and the Private Actions Trust Election

for Holders of Certain Subordinated Claims (the "Subordinated Claim Election Form" and,

together with the Common Stock Election Form, the "Old Equity Interest Forms"), substantially

in the forms attached to the Plan as Exhibit M, are hereby approved.

(b)    The Common Stock Election Form and the Plan (with exhibits F and

G only) shall be mailed, within ten business days after entry of this Order, to (i) each holder of

record of Refco Inc. common stock as of December 20, 2006; and (ii) each broker, commercial

bank, transfer agent, trust company, dealer or other intermediary or nominee (each, a "Nominee")

identified by Financial Balloting Group as an entity through which beneficial owners indirectly

hold Refco Inc. common stock.

(c)    The Subordinated Claim Election Form and the Plan (with exhibits

F and G only) shall be mailed, within ten business days after entry of this Order, to (i) each

holder of a timely-filed claim in the Refco Inc. chapter 11 case arising from rescission of a

purchase or sale of Refco Inc. common stock, for damages arising from the purchase of sale of

such stock, or for reimbursement or contribution allowable under section 502 of the Bankruptcy

Code on account of such claim (all such holders, the "Subordinated Claimants"), at the address

listed on such holder's claim, and (ii) the lead plaintiffs (the "Lead Plaintiffs") and their counsel

in the securities class action styled In re Refco Inc. Securities Litigation, Case No. 05 Civ. 8626

(GEL) (S.D.N.Y.).

(d)    The record date for purposes of determining creditors entitled (i) to

receive the Subordinated Claim Election Form and related materials; (ii) to make the Private

Actions Trust Election; and (iii) to receive distributions, if any, on account of such election, shall

be December 8, 2006 (the "Subordinated Claim Record Date"). While the Common Stock

Election Form shall be mailed to holders of record as of December 20, 2006, there shall be no

record date for determining holders of Refco Inc. common stock entitled to make the Private Actions Trust Election.

(e)    If a holder's Private Action Trust Election is not received by Financial Balloting Group (for holders of section 510(b) subordinated claims) or effectuated through the electronic delivery of Old Equity Interests to the account established for that purpose (for holders of Refco Inc. common stock) on or before 5:00 p.m. Eastern Time on January 30, 2007, such holder's Private Actions Trust Election shall not count or be effective.

34.    Resolution of Certain Director and Officer Indemnification Objections.

(a)    In accordance with section 6.4 of the Plan, timely filed Claims arising in favor of present or former officers or directors under contract, statute, or entity governance documents of any of the Debtors, by reason of such officer or director actually being an officer or director of a Debtor, (collectively, "Officer and Director Claims") shall be entitled to be asserted against the estate of each and every such Debtor to the same extent as provided for under applicable law.  To the extent that an officer or director has a Claim against more than one Debtor based on the foregoing sentence, each such Claim, shall, without regard to their multiple or counterpart nature, be allowed or disallowed and shall be entitled to such payment as is provided for in their respective class of claims, until the underlying liability is fully satisfied.

(b)    Further, nothing in the Plan or Confirmation Order shall permit Officer and Director Claims to be treated as Subordinated Claims or otherwise subordinated, except in the manner and to the extent the Bankruptcy Code and Rules and decisional law, including applicable nonbankruptcy law (both substantive and procedural), would otherwise allow absent the particular provisions of this Plan.  Neither the Plan nor the Confirmation Order makes any finding as to whether any Officer and Director Claims are subject to subordination

36

and there are no pending actions to subordinate any of the Officer and Director Claims. To the extent that any such action is commenced, nothing in either the Plan or the Confirmation Order shall affect the rights of the Plan Proponents or any other party in interest to object to or seek subordination of such claims or the rights and defenses of the directors and officers in opposing such subordination actions, it being the intent of the parties that such rights and defenses are expressly preserved.

(c)    Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order, including, but not limited to, the injunction provisions, shall be construed to prevent present or former directors and officers of the debtors from seeking and obtaining coverage and payments from insurance policies of Refco Inc. or from insurance policies of any other Refco Entity, including, but not limited to, in the case of such directors or officers who have previously commenced such litigation, by litigation against relevant insurance companies, nor to prevent insurance companies from making such payments. Nothing in the previous sentence, however, shall be construed to grant relief (retrospective or prospective) from any stay or injunction that is not contained in the Plan to permit the directors and officers of the debtors from seeking and obtaining coverage and payments from insurance policies of Refco Inc. or from insurance policies of other Refco Entities.

(d)    Notwithstanding anything in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order constitutes a judgment or finding as to the appropriateness of the Private Actions Trust or Trustee acting as a plaintiff in any given action which the Trust or Trustee may bring, nor does it constitute a judgment or finding as to the personal or subject matter jurisdiction of any court in which such an action may be brought, all standing and jurisdictional defenses of defendants to such actions being hereby expressly

preserved; *provided, however,* that, to the extent any Private Actions may not be maintained by the Private Actions Trust or Trustee, such actions shall revert to the grantors of such Non-Estate Refco Claims.

35.    Resolution of Objections of New York Financial and Hillier Capital Management.

(a)    On the Effective Date, RCM shall transfer to the FXA Estate the sum of $2.0 million.

(b)    The Plan Administrator shall form a committee of FXA customers who did not do business with FXA in Japan (the "Non-Japan FXA Customer Committee") to oversee and direct the litigation involving FXA assets in Japan. New York Financial shall serve as the chair of the committee and Hillier Capital Management shall be appointed to the committee as a member. The Non-Japan FXA Customer Committee shall have consent rights with respect to any settlement regarding the litigation involving FXA assets in Japan. Furthermore, all reasonable expenses born in connection with the role of chair of the Non-Japan FXA Customer Committee shall be born by the FXA Estate.

(c)    Upon the later of the Effective Date or the presentment of a statement indicating the amount of such Claim, New York Financial LLC and Hillier Capital Management shall be granted an Allowed Administrative Expense Claim against the FXA Estate pursuant to section 503(b) of the Bankruptcy Code in an aggregate collective amount not to exceed $200,000.

36.    Resolution of Objections of West Loop Associates, LLC.

(a)    Pursuant to an order entered on the date hereof in the chapter 7 case of Refco LLC, West Loop Associates, LLC ("West Loop") shall be paid the sum of $3.75 million in cash by Refco LLC on or before the Effective Date.

(b)    West Loop shall release all claims against the Debtors and against Refco LLC. In addition, West Loop shall be barred from bringing any action against any third party as to the potential matters set forth in Exhibit K of the Plan, *provided, however*, that West Loop shall expressly retain all rights to bring actions against the following: Mark Goodman & Associates, 550 West Jackson Associates Limited Liability Company, Mark Goodman, Phillip R. Bennett, Santo Maggio, and Grant Thornton.

(c)    West Loop shall have an Allowed Claim against RGL in the amount of $20 million, but such Claim shall be satisfied in full by distribution of the Litigation Trust Interests allocable to such Claim; *provided, however*, any and all Litigation Trust Interests distributable on account of such Allowed Claim shall be deemed to have been assigned by West Loop to the Contributing Debtors for distribution to Holders of Allowed Contributing Debtors General Unsecured Claims.

(d)    The Contributing Debtors shall transfer $1.875 million from Contributing Debtors Cash Distribution to the RCM Trustee for addition to the RCM Cash Distribution.

37.    <u>Retention of Jurisdiction</u>. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, the

Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, but not limited to, the matters set forth in Article XI of the Plan.

        38.    Resolution of Securities Plaintiff's Objection.

        (a)    Nothing contained in the Plan or any Order confirming the Plan shall be deemed to release, enjoin or bar any claims, or the prosecution of any claims, asserted or to be asserted in the Securities Litigation, entitled In re Refco Securities Litigation, Case No. 05 civ 8626 (SDNY), by or on behalf of the Lead Plaintiffs as defined therein or putative class members therein, against (i) any of the Secured Lender Releasees that acted as an underwriter, book running manager or initial purchaser in connection with the underwriting, offering, distribution, or sale of the 9% Senior Subordinated Notes due 2012 issued by certain of the Debtors or of any equity securities of Refco Inc., with respect to any act or failure to act by any such Secured Lender Releasee, in its capacity as underwriter, book running manager or initial purchaser, in connection with the underwriting, offering, distribution, or sale of the 9% Senior Subordinated Notes due 2012 issued by certain of the Debtors or of any equity securities of Refco, Inc. and (ii) such other non-Debtor defendants, who are named or to be named in the Securities Litigation, including, without limitation, certain of the Debtor's non-Debtor affiliates, current or former officers and directors, underwriters, audit committee members, Thomas H. Lee Partners affiliates, Grant Thornton and BAWAG, but not including the Released Parties (other than in such capacities as described in (i) above), the Contributing Non-Debtor Affiliates identified on Exhibit L to the Modified Plan, as of December 4, 2006, and the Contributing Non-Debtor Affiliate Management identified in Schedule 1.56 of the Modified Plan, as of December 5, 2006, to the extent that the Lead Plaintiffs or the putative class members receive a distribution under the Modified Plan.  To the extent either Exhibit L or Schedule 1.56 is modified subsequent

to December 4 or 5, 2006, respectively, Lead Plaintiffs and the Plan Proponents reserve their

rights with respect to the release afforded to any additional Contributing Non-Debtor Affiliates

or Contributing Non-Debtor Affiliate Management under the Modified Plan or any amendments

thereto.

      (b)    Notwithstanding anything in the Plan or this Confirmation Order to

the Contrary, in making the Private Actions Trust Election, the transfer of (i) Non-Estate Refco

Claims or (ii) the proceeds of any Class Action Claims by any of the plaintiffs in the Securities

Litigation described in paragraph 38(a) hereof shall not include the transfer of any recovery

received by such plaintiffs in any pending action against BAWAG.

      39.    <u>Resolution of Objection of the FXCM Parties.</u>

      (a)    Nothing in the Plan, including Article 10 of the Plan, shall impair

the right of FXCM Sellers (as defined in that certain Limited Objection of the FXCM Parties to

Confirmation of Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect

Subsidiaries (docket no. 3649) (the "FXCM Objection")) from arguing that they are entitled to an

equitable remedy of rescission of RGL's purchase of the FXCM Equity Stake (as defined in the

FXCM Objection); *provided, however,* any action seeking such a remedy will be heard by this

Court unless this Court has permitted the FXCM Sellers to bring such an action in a different

forum.

      40.    <u>Extension of Certain Plan Provisions to RCM Trustee</u>.  The provisions set

forth on <u>Exhibit D</u> hereto shall govern and pertain in the RCM Trustee's administration of Post-

Confirmation RCM and the RCM Estate in the event that RCM's Chapter 11 Case is not

converted to a chapter 7.

41.    <u>BAWAG Allocation Order and BAWAG Proceeds</u>.  The BAWAG Allocation Order, as defined in the Plan, includes this Order.  The Debtors are hereby authorized to utilize the BAWAG Proceeds in accordance with the Plan and the BAWAG Allocation Order after giving effect to this Order and, specifically, the BAWAG Proceeds may be used to pay the obligations owing to RCM under the Cash Management Advance Agreement dated as of October 16, 2006, and to implement the other Distributions contemplated in the Plan.  In addition, without altering the deemed allocation of BAWAG Proceeds set forth in the Plan, for purposes of making Cash Distributions, the BAWAG Contingent Proceeds shall be used to satisfy the Senior Subordinated Note Distribution to the extent such funds are available to the Estates prior to the payment in full of the Senior Subordinated Note Distribution.

42.    <u>Exemption from Securities Laws</u>.  The exemption from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, exchange or transfer of a security provided for in the Plan, including, without limitation, the distribution and subsequent transfer of Litigation Trust Interests and Private Actions Trust Interests, or registration or licensing of an issuer of, underwriter of, or broker dealer in, such security is authorized by section 1145 of the Bankruptcy Code and shall apply to the extent set forth in the Plan.

43.    <u>References to Plan Provisions</u>.  The failure to specifically include or reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.

42

44.    <u>Confirmation Order Controlling</u>.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and conditions contained in the Confirmation Order shall govern.

45.    <u>Applicable Non-Bankruptcy Law</u>.  Pursuant to section 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.


Dated: New York, New York
       December 15, 2006



                         /s/Robert D. Drain
                         UNITED STATES BANKRUPTCY JUDGE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

KENNETH M. KRYS and CHRISTOPHER
STRIDE, as JOINT OFFICIAL LIQUIDATORS
of SPHINX LTD., SPHINX STRATEGY FUND
LTD.;
SPHINX PLUS SPC LTD., SPHINX
DISTRESSED LTD., SPHINX MERGER
ARBITRAGE LTD.; SPHINX SPECIAL
SITUATIONS LTD., SPHINX MACRO LTD.;
SPHINX LONG/SHORT EQUITY LTD.;
SPHINX MANAGED FUTURES LTD.; SPHINX
EQUITY MARKET NEUTRAL LTD.; SPHINX
CONVERTIBLE ARBITRAGE LTD.; SPHINX
FIXED INCOME ARBITRAGE LTD.; SPHINX
DISTRESSED FUND SPC; SPHINX MERGER
ARBITRAGE FUND SPC; SPHINX SPECIAL
SITUATIONS FUND SPC; SPHINX MACRO
FUND SPC; SPHINX LONG/SHORT EQUITY
FUND SPC; SPHINX MANAGED FUTURES
FUND SPC; SPHINX EQUITY MARKET
NEUTRAL FUND SPC; SPHINX
CONVERTIBLE ARBITRAGE FUND SPC;
SPHINX FIXED INCOME ARBITRAGE FUND
SPC; PLUSFUNDS MANAGED ACCESS FUND
SPC LTD.; KENNETH M. KRYS and
CHRISTOPHER STRIDE as assignees of claims
assigned by MIAMI CHILDREN'S HOSPITAL
FOUNDATION, OFI, GREEN & SMITH
INVESTMENT MANAGEMENT LLC, THALES
FUND MANAGEMENT LLC, KELLNER
DILEO & CO., LLC, MARTINGALE ASSET
MANAGEMENT LP, LONGACRE FUND
MANAGEMENT LLC; ARNHOLD & S.
BLEICHROEDER ADVISERS LLC, PICTET &
CIE, RGA AMERICA REINSURANCE
COMPANY, DEUTSCHE BANK (SUISSE) SA,
ARAB MONETARY FUND, HANSARD
INTERNATIONAL LTD., CONCORDIA
ADVISORS LLC, GABELLI SECURITIES, INC.,
CITCO GLOBAL CUSTODY; and JAMES
P. SINCLAIR as Trustee of the SPHINX TRUST,

                              Plaintiffs,

        -against-

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Index No.    C 8 6 0 0 6 5 3

Date purchased

Plaintiff's designates New York
County as the place of trial.

The basis of venue is CPLR
503(a), (c) and (d)

**SUMMONS**



FILED

MAR 05 2008

COUNTY CLERK'S OFFICE
NEW YORK

CHRISTOPHER SUGRUE; MARK
KAVANAGH; BRIAN OWENS;
PRICEWATERHOUSECOOPERS L.L.P.; MARI
FERRIS; PRICEWATERHOUSECOOPERS
CAYMAN ISLANDS; GIBSON, DUNN &
CRUTCHER LLP; REFCO ALTERNATIVE
INVESTMENTS LLC; GRANT THORNTON
LLP; MARK RAMLER; ERNST & YOUNG U.S.
LLP; MAYER BROWN LLP f/k/a MAYER
BROWN ROWE & MAW LLP; JOSEPH
COLLINS; EDWARD S. BEST; PAUL KOURY;
PHILLIP R. BENNETT; ROBERT C. TROSTEN;
TONE GRANT; SANTO MAGGIO; THOMAS
HACKL; DENNIS KLEJNA; BAWAG P.S.K.
BANK FUR ARBEIT UND WIRTSCHAFT UND
OSTERREICHISCHE POSTPARKASSE
AKTIENGESELLSEHAFT; JP MORGAN
CHASE & CO.;
CREDIT SUISSE SECURITIES
(USA) LLC f/k/a CREDIT SUISSE FIRST
BOSTON LLC; BANC OF AMERICA
SECURITIES LLC; THOMAS H. LEE
PARTNERS, L.P.; THOMAS H. LEE
ADVISORS, LLC; THL MANAGERS V, LLC;
THL EQUITY ADVISORS V, L.P.; THOMAS H.
LEE EQUITY FUND V, L.P.; THOMAS H. LEE
PARALLEL FUND V, L.P.; THOMAS H. LEE
EQUITY (CAYMAN) FUND V, L.P.; THOMAS
H. LEE INVESTORS LIMITED PARTNERSHIP;
1997 THOMAS H. LEE NOMINEE TRUST;
THOMAS H. LEE; DAVID V. HARKINS;
SCOTT L. JAECKEL; SCOTT A. SCHOEN;
WILLIAM T. PIGOTT; LIBERTY CORNER
CAPITAL STRATEGIES, LLC; EMF
FINANCIAL PRODUCTS LLC; EMF CORE
FUND LTD.; DELTA FLYER FUND LLC; ERIC
M. FLANAGAN; INGRAM MICRO, INC.; CIM
VENTURES, INC.; BECKENHAM TRADING
CO., INC.; ANDREW KRIEGER; COAST
ASSET MANAGEMENT, LLC, f/k/a COAST
ASSET MANAGEMENT LP; CS LAND
MANAGEMENT LLC; CHRISTOPHER
PETTIT; and REFCO GROUP HOLDINGS,
INC.; and REFCO ASSOCIATES, INC.,

                    Defendants

---------------------------------------------------------------------------X

(Each line of the caption is followed by a colon ":" in the right margin.)

**TO THE ABOVE-NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's undersigned attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:      New York, New York
            March 5, 2008

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
      David Molton, Esq.
      Andrew Dash, Esq.
    Seven Times Square
    Times Square Tower
    New York, New York 10036
    Telephone: (212) 209-4800
    Facsimile: (212) 209-4801

and

BEUS GILBERT PLLC

Leo R. Beus, Esq.
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100

Attorneys for Plaintiffs
Kenneth M. Krys and Christopher Stride as Joint Official Liquidators of the SPhinX Funds and James P. Sinclair, as Trustee of the SPhinX Trust

Defendants' addresses:

See attached Rider

## Rider to Summons

Defendants:

Christopher Sugrue
Address Unknown

Mark Kavanagh
Address Unknown

Brian Owens
Address Unknown

PricewaterhouseCoopers L.L.P.
300 Madison Avenue
24th Floor
New York, New York 10017

Mari Ferris
Address Unknown

PricewaterhouseCoopers Cayman Islands
Address Unknown

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166-0193

Refco Alternative Investments LLC
c/o CT Corporation System
111 Eighth Avenue
New York, New York 10011

Grant Thornton LLP
666 Third Avenue
New York, New York 10017

Mark Ramler
Address Unknown

Ernst & Young U.S. LLP
5 Times Square
New York, New York 10036-6430

Mayer Brown LLP f/k/a Mayer Brown Rowe & Maw LLP
1675 Broadway
New York, New York 10019

Joseph Collins
1190 Oakley Ave
Winnetka, Illinois 60093-1438

Edward S. Best
Address Unknown

Paul Koury
Address Unknown

Phillip R. Bennett
Address Unknown

Robert C. Trosten
Address Unknown

Tone Grant
Address Unknown

Santo Maggio
Address Unknown

Thomas Hackl
Address Unknown

Dennis Klejna
Address Unknown

BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postparkasse
Aktiengesellsehaft
Seitzergasse 2-4
A-1010 Vienna Austria

JP Morgan Chase & Co.
270 Park Avenue
New York, New York 10017

Credit Suisse Securities (USA) LLC f/k/a Credit Suisse First Boston LLC
11 Madison Avenue
New York, New York 10010

8178873

Bank of America Securities LLC
9 West 57th Street
New York, New York 10019

Thomas H. Lee Partners, L.P.
100 Federal St., 35th Floor
Boston, Massachusetts 02110

Thomas H. Lee Advisors, LLC
Address Unknown

THL Managers V, LLC
Address Unknown

THL Equity Advisors V, L.P.
Address Unknown

Thomas H. Lee Equity Fund V, L.P.
Address Unknown

Thomas H. Lee Parallel Fund V, L.P.
Address Unknown

Thomas H. Lee Equity (Cayman) Fund, L.P.
Address Unknown

Thomas H. Lee Investors Limited Partnership
Address Unknown

1997 Thomas J. Lee Nominee Trust
Address Unknown

Thomas H. Lee
Address Unknown

David V. Harkins
Address Unknown

Scott L. Jaeckel
Address Unknown

Scott A. Schoen
Address Unknown

William T. Pigott
Address Unknown

8178873

Liberty Corner Capital Strategies, LLC
47 Maple Street, Suite 101
Summit, New Jersey 07901

EMF Financial Products LLC
675 Third Avenue, Suite 2800
New York, New York 10017

EMF Core Fund Ltd.
Address Unknown

Delta Flyer Fund LLC
Address Unknown

Eric M. Flanagan
Address Unknown

Ingram Micro, Inc.
Address Unknown

CIM Ventures, Inc.
Address Unknown

Beckenham Trading Co., Inc.
Address Unknown

Andrew Krieger
Address Unknown

Coast Asset Management, LLC, f/k/a Coast Asset Management LLP
Address Unknown

CS Land Management LLC
Address Unknown

Christopher Pettit
Address Unknown

Refco Group Holdings, Inc.
Address Unknown

Refco Associates, Inc.
Address Unknown

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

KENNETH M. KRYS and CHRISTOPHER STRIDE,
as JOINT OFFICIAL LIQUIDATORS of SPHINX
LTD., SPHINX STRATEGY FUND LTD.;
SPHINX PLUS SPC LTD., SPHINX DISTRESSED
LTD., SPHINX MERGER ARBITRAGE LTD.;
SPHINX SPECIAL SITUATIONS LTD., SPHINX
MACRO LTD.; SPHINX LONG/SHORT
EQUITY LTD.; SPHINX MANAGED
FUTURES LTD.; SPHINX EQUITY MARKET
NEUTRAL LTD.; SPHINX CONVERTIBLE
ARBITRAGE LTD.; SPHINX FIXED INCOME
ARBITRAGE LTD.; SPHINX DISTRESSED
FUND SPC; SPHINX MERGER ARBITRAGE FUND
SPC; SPHINX SPECIAL SITUATIONS FUND SPC;
SPHINX MACRO FUND SPC; SPHINX
LONG/SHORT EQUITY FUND SPC; SPHINX
MANAGED FUTURES FUND SPC; SPHINX
EQUITY MARKET NEUTRAL FUND SPC; SPHINX
CONVERTIBLE ARBITRAGE FUND SPC; SPHINX
FIXED INCOME ARBITRAGE FUND SPC;
PLUSFUNDS MANAGED ACCESS FUND SPC
LTD.; KENNETH M. KRYS and CHRISTOPHER
STRIDE as assignees of claims assigned by MIAMI
CHILDREN'S HOSPITAL FOUNDATION, OFI,
GREEN & SMITH INVESTMENT MANAGEMENT
LLC; THALES FUND MANAGEMENT LLC,
KELLNER DILEO & CO., LLC, MARTINGALE
ASSET MANAGEMENT LP, LONGACRE FUND
MANAGEMENT LLC, ARNHOLD & S.
BLEICHROEDER ADVISERS LLC, PICTET & CIE,
RGA AMERICA REINSURANCE COMPANY,
DEUTSCHE BANK (SUISSE) SA, ARAB
MONETARY FUND, HANSARD INTERNATIONAL
LTD., CONCORDIA ADVISORS LLC, GABELLI
SECURITIES, INC., CITCO GLOBAL CUSTODY;
and JAMES P. SINCLAIR as Trustee of the SPHINX
TRUST,

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

                                        Plaintiffs,

:
:
:
:
:

                        -against-

:

Index No.

**COMPLAINT**

**Jury Trial Demanded**

08600653



8179130

CHRISTOPHER SUGRUE; MARK KAVANAGH;  :
BRIAN OWENS; PRICEWATERHOUSECOOPERS  :
L.L.P.; MARI FERRIS;  :
PRICEWATERHOUSECOOPERS CAYMAN  :
ISLANDS; GIBSON, DUNN & CRUTCHER LLP;  :
REFCO ALTERNATIVE INVESTMENTS LLC;  :
GRANT THORNTON LLP; MARK RAMLER;  :
ERNST & YOUNG U.S. LLP; MAYER BROWN LLP  :
f/k/a MAYER BROWN ROWE & MAW LLP;  :
JOSEPH COLLINS; EDWARD S. BEST; PAUL  :
KOURY; PHILLIP R. BENNETT; ROBERT C.  :
TROSTEN; TONE GRANT; SANTO MAGGIO;  :
THOMAS HACKL; DENNIS KLEJNA; BAWAG  :
P.S.K. BANK FUR ARBEIT UND WIRTSCHAFT  :
UND OSTERREICHISCHE POSTPARKASSE  :
AKTIENGESELLSEHAFT; JP MORGAN CHASE &  :
CO.; CREDIT SUISSE SECURITIES (USA) LLC f/k/a  :
CREDIT SUISSE FIRST BOSTON LLC; BANC OF  :
AMERICA SECURITIES LLC; THOMAS H. LEE  :
PARTNERS, L.P.; THOMAS H. LEE ADVISORS,  :
LLC; THL MANAGERS V, LLC; THL EQUITY  :
ADVISORS V, L.P.; THOMAS H. LEE EQUITY  :
FUND V, L.P.; THOMAS H. LEE PARALLEL FUND  :
V, L.P.; THOMAS H. LEE EQUITY (CAYMAN)  :
FUND V, L.P.; THOMAS H. LEE INVESTORS  :
LIMITED PARTNERSHIP; 1997 THOMAS H. LEE  :
NOMINEE TRUST; THOMAS H. LEE; DAVID V.  :
HARKINS; SCOTT L. JAECKEL; SCOTT A.  :
SCHOEN; WILLIAM T. PIGOTT; LIBERTY  :
CORNER CAPITAL STRATEGIES, LLC; EMF  :
FINANCIAL PRODUCTS LLC; EMF CORE FUND  :
LTD.; DELTA FLYER FUND LLC; ERIC M.  :
FLANAGAN; INGRAM MICRO, INC.; CIM  :
VENTURES, INC.; BECKENHAM TRADING CO.,  :
INC.; ANDREW KRIEGER; COAST ASSET  :
MANAGEMENT, LLC, f/k/a COAST ASSET  :
MANAGEMENT LP; CS LAND MANAGEMENT  :
LLC; CHRISTOPHER PETTIT; REFCO GROUP  :
HOLDINGS, INC.; and REFCO ASSOCIATES, INC.,  :

Defendants.  :

:

:

----------------------------------------------------------------X

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION. ................................................................................ 1

    A.   Overview. ............................................................................. 2

    B.   Fiduciary Duties. ................................................................. 7

II.  PARTIES. ......................................................................................... 11

    A.   Plaintiffs. ........................................................................... 11

    B.   Defendants. ........................................................................ 13

    C.   Non-Parties. ....................................................................... 27

III. JURISDICTION. ................................................................................ 28

IV.  VENUE ............................................................................................ 31

V.   THE SPHINX FUNDS AND PLUSFUNDS ........................................... 31

    A.   History. ............................................................................... 31

    B.   The SPhinX Funds. ............................................................. 32

    C.   Segregated Portfolio Companies. ....................................... 33

    D.   Customer Segregation. ....................................................... 35

    E.   Connections and Providers. ................................................ 40

        1.   PlusFunds' Role as Investment Manager. ................. 40

        2.   Refco's Role. ........................................................... 41

        3.   DPM's Role. ............................................................ 45

VI.  DIVERSION OF SMFF'S EXCESS CASH. ........................................ 46

    A.   Robert Aaron Signs the July 31, 2002 Document. ............... 47

    B.   SPhinX and PlusFunds Monitored Their Exposure at Refco. ... 49

    C.   Diversion of SMFF Cash to RCM. ...................................... 51

    D.   Interest at Refco on SMFF Cash. ........................................ 52

VII. THE REFCO FRAUD. ....................................................................... 52

    A.   The Refco Entities. ............................................................. 56

    B.   Overview of Refco's Business. ............................................ 57

    C.   The Refco Fraudulent Scheme. ........................................... 58

Part One – Fraudulently Misrepresenting Refco's Financial Statements. ..................... 58

Refco's Trading Losses..................................................................................... 59

Concealing Refco Operating Expenses.............................................................. 60

Inflating RGL's Revenues with Phantom Income. ............................................ 60

Part Two - Keeping the Illusion Going Long Enough to Cash-out. ................... 61

    D.    RTL Transactions.......................................................................... 61

    E.    Looting RCM's Assets.................................................................. 63

VIII.    THE 2004 LBO AND 2005 IPO.............................................................. 65

    A.    The LBO. ...................................................................................... 67

    B.    The IPO. ....................................................................................... 71

IX.    SUFFOLK LOANS. .................................................................................. 74

    A.    Bousbib Investigates Relationship with Refco. ........................... 74

    B.    Refco Extends Loans to Suffolk Entities to Buy Out Bousbib, Morriss, and Wehrle................................................................... 76

    C.    Discovery of Refco's Role in Suffolk Transactions. .................... 79

X.    REFCO'S BANKRUPTCY FILING. ........................................................ 80

XI.    INDIVIDUAL ROLES. ............................................................................. 83

    A.    SPhinX/PlusFunds Agents. ........................................................... 83

        1.    Aaron.................................................................................. 83

        2.    Sugrue. .............................................................................. 85

        3.    Kavanagh. ......................................................................... 88

        4.    Owens. .............................................................................. 90

    B.    Refco Agents.................................................................................. 92

        1.    Bennett. ............................................................................. 92

        2.    Tone Grant. ....................................................................... 96

        3.    Trosten. ............................................................................. 97

        4.    Maggio. ............................................................................. 99

        5.    Hackl. ................................................................................ 102

        6.    Klejna. .............................................................................. 103

XII.    PROFESSIONAL DEFENDANTS' ROLES. .......................................... 106

    A.    Lawyers......................................................................................... 106

        1.    Gibson Dunn & Crutcher. ................................................. 106

2.      Mayer Brown, Collins, Best, and Koury................................................. 109

    (a)     Awareness of Refco's Trading Losses and Balance
        Sheet Problems........................................................................... 111

    (b)     The RTL Transactions. ............................................................... 112

    (c)     Maintaining the Fraudulent Business Model. ............................. 114

    (d)     Conduct in the LBO. .................................................................. 116

    (e)     Conduct Before and After the IPO............................................. 118

B.     Accountants.................................................................................................... 119

   1.      PwC and Mari Ferris...................................................................... 119

    (a)     PwC's Role as Refco Accountant and Consultant....................... 120

    (b)     PwC Identified Numerous Material Weaknesses in
        Internal Controls, Which Should Have Prompted
        PwC to Audit with Heightened Skepticism and
        Enhanced Audit Procedures. ....................................................... 137

    (c)     PwC Failed to Conduct its Audits of SPhinX and
        PlusFunds in Accordance with GAAS.......................................... 143

    (d)     By Issuing Unqualified Audit Opinions, PwC Made
        Affirmative Misrepresentations to Innocent
        Decision-Makers Within SPhinX and PlusFunds. ....................... 147

    (e)     Innocent Decision-Makers of SPhinX and
        PlusFunds Reasonably Relied On PwC's
        Misrepresentations. .................................................................... 150

   2.      Grant Thornton and Mark Ramler. ................................................ 151

    (a)     The RTL Transactions. ............................................................... 159

    (b)     Maintaining the Fraudulent Business Model. ............................. 162

   3.      Ernst & Young. .............................................................................. 170

    (a)     Ernst & Young's Role in the Fraudulent Scheme........................ 170

    (b)     Knowledge of Refco's Trading Losses and Balance
        Sheet Problems........................................................................... 173

    (c)     The RTL Transactions. ............................................................... 174

    (d)     Maintaining the Fraudulent Business Model. ............................. 175

C.     Underwriters: Credit Suisse and Banc of America Securities. ........................... 179

   1.      Knowledge of the Looting of RCM Assets..................................... 182

   2.      The Investment Banker Defendants' Motivations. ................................. 185

   3.      Investment Bankers' Use of Patently Unreasonable
    Projections.................................................................................... 186

|   |   | 4. | Impact on RCM Was Actively Concealed by Investment Banker Defendants. | 187 |
|   |   | 5. | The Harm of the IPO to Refco Inc. | 189 |
|   | D. | | JP Morgan Chase & Co. | 189 |
|   | E. | | RTL Participants. | 196 |
|   |   | 1. | BAWAG P.S.K. | 196 |
|   |   | 2. | Other RTL Participants. | 206 |
|   | F. | | Administrator. | 210 |
|   |   | 1. | DPM. | 210 |
|   | G. | | Others. | 212 |
|   |   | 1. | RAI. | 212 |
|   |   | 2. | Refco Associates Inc. | 214 |
|   |   | 3. | THL Defendants. | 215 |
| XIII. | | | CAUSES OF ACTION. | 221 |

COUNT I BREACH OF FIDUCIARY DUTY (Against Sugrue, Kavanagh and Owens) ........ 221

COUNT II AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Sugrue, Kavanagh and Owens) ........ 224

COUNT III FRAUD (Against Sugrue, Kavanagh and Owens) ........ 226

COUNT IV AIDING AND ABETTING CONVERSION (Against Sugrue, Kavanagh and Owens) ........ 228

COUNT V OFFICER/DIRECTOR LIABILITY (Against Sugrue, Kavanagh and Owens) ........ 229

COUNT VI ACCOUNTANT MALPRACTICE (Against PwC and Ferris) ........ 230

COUNT VII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against PwC and Ferris) ........ 232

COUNT VIII NEGLIGENT MISREPRESENTATION (Against PwC and Ferris) ........ 234

COUNT IX FRAUD (Against PwC and Ferris) ........ 239

COUNT X BREACH OF FIDUCIARY DUTY (Against Gibson Dunn) ........ 244

COUNT XI CONSPIRACY (Against Sugrue, Kavanagh, Owens, Bennett, and Hackl) ........ 245

COUNT XII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Gibson Dunn) ................................................................................... 247

COUNT XIII FRAUD/NEGLIGENT MISREPRESENTATION (Against Gibson Dunn) ........................................................................................................ 247

COUNT XIV FRAUD (Against Bennett, Trosten, Maggio, Grant, and Hackl) ........................ 248

COUNT XV BREACH OF FIDUCIARY DUTY (Against Bennett, Trosten, Maggio, Grant, Hackl, and Klejna) .......................................................... 250

COUNT XVI CONVERSION (Against Bennett, Trosten, Maggio, Grant, and Hackl) ........................................................................................................... 252

COUNT XVII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Bennett, Trosten, Maggio, Grant, Hackl, Klejna, and Chase) ......................... 252

COUNT XVIII AIDING AND ABETTING FRAUD (Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase) ................................................................................................. 253

COUNT XIX AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, and Mayer Brown) ......................................................................................... 255

COUNT XX AIDING AND ABETTING CONVERSION (Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase) ......................................................................... 258

COUNT XXI AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against RAI and Refco Associates Inc.) ................................................................. 260

COUNT XXII AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (Against Credit Suisse and Banc of America Securities) ................................................ 261

COUNT XXIII AIDING AND ABETTING FRAUD (Against Credit Suisse and Banc of America Securities) ........................................................................ 263

COUNT XXIV CONSPIRACY (Against BAWAG, Bennett, Trosten, Hackl, Grant, Maggio, Chase, and the RTL Participants) ........................................... 264

COUNT XXV AIDING AND ABETTING FRAUD (Against BAWAG and RTL Participants) ................................................................................................ 265

COUNT XXVI BREACH OF FIDUCIARY DUTY/AIDING AND ABETTING (Against THL Defendants) ...................................................................................... 266

COUNT XXVII INTERFERENCE WITH CONTRACT/PROSPECTIVE CONTRACT (Against All Defendants) ............................................................... 268

Plaintiffs Kenneth M. Krys and Christopher Stride as Joint Official Liquidators (the "JOLs") of SPhinX, Ltd., SPhinX Macro Fund SPC, SPhinX Macro, Ltd., SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, SPhinX Equity Market Neutral Fund SPC, SPhinX Strategy Fund, Ltd., SPhinX Plus SPC, Ltd., SPhinX Managed Futures, Ltd., SPhinX Long/Short Equity, Ltd., SPhinX Convertible Arbitrage, Ltd., SPhinX Fixed Income Arbitrage, Ltd., SPhinX Distressed, Ltd., SPhinX Merger Arbitrage, Ltd., SPhinX Special Situations, Ltd., SPhinX Equity Market Neutral, Ltd., and PlusFunds Managed Access Fund SPC, Ltd. (collectively, "SPhinX" or the "SPhinX Funds"), Kenneth M. Krys and Christopher Stride as assignees of claims assigned by Miami Children's Hospital Foundation, OFI, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co., LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, PicTet & Cie, RGA America Reinsurance Company, Deutsche Bank (Suisse) SA, Arab Monetary Fund, Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities, Inc., Citco Global Custody (the "SPhinX investors") and James P. Sinclair, as Trustee of the SPhinX Trust (the "Trustee") created by the Fifth Amended Plan of Liquidation of PlusFunds Group, Inc., by and through their undersigned counsel, for their claims against Defendants, allege as follows:

## I.    **<u>INTRODUCTION.</u>**

1.    This is an action to recover (i) damages suffered by the SPhinX family of hedge funds, and (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., arising from the diversion of hundreds of millions of dollars of SPhinX's cash from protected, customer-segregated accounts to

unprotected offshore accounts, where those assets were ultimately lost in the Refco scandal. Unbeknownst to innocent decision-makers at SPhinX and PlusFunds, culpable Defendants allowed SPhinX's cash to be used to support a massive fraud orchestrated by Phillip Bennett, the President and CEO of Refco Group Ltd. LLC ("Refco Group" and, collectively with affiliated entities, "Refco"). The discovery of the Refco fraud and crash of Refco in October 2005 resulted in the loss of approximately $263 million in SPhinX cash wrongfully deposited at an offshore affiliate of Refco. These losses caused the collapse of both the SPhinX Funds and PlusFunds.

**A.    Overview.**

2.    On December 20, 2001, PlusFunds entered into an exclusive license contract with Standard & Poor's to create and market investment products designed to achieve returns consistent with the Standard & Poor's Hedge Fund Index, a composite index measuring major hedge fund strategies. Several months later, PlusFunds created the SPhinX Funds, a family of Cayman Islands hedge funds specifically designed to offer full "transparency" to investors – *i.e.*, SPhinX offered investors daily net asset value ("NAV") reports reflecting the value of investments on a real-time basis.

3.    A central and crucial component of SPhinX's business plan was the use of segregated portfolio companies ("SPCs") under Cayman Islands law. The Cayman SPC structure mandated segregation of assets and liabilities into separate portfolios. According to SPhinX's organizational documents and offering and marketing materials, SPhinX's customer assets were required to be protected in customer-segregated accounts, "ring-fenced" from claims against the other segregated portfolios and immune from claims of creditors of the prime broker or custodian of SPhinX's customer assets. Thus, the SPhinX Funds were structured to preserve and protect assets for the benefit of SPhinX and its investors in the event of the insolvency of other segregated portfolios or of the custodian or prime broker.

2

4.     The SPhinX Funds were almost immediately successful.   Assets under management ("AUM") increased steadily, rising to over $3 billion in 2004 and 2005. PlusFunds' business plan was to increase AUM to over $15 billion, and in October 2005, PlusFunds had negotiated a relationship with Lehman Brothers that would have brought in an additional $500 million-plus in AUM.

5.     However, unknown to innocent members of the SPhinX and PlusFunds Boards of Directors and management teams, certain SPhinX and PlusFunds agents/fiduciaries allowed cash belonging to SPhinX Managed Futures Fund SPC ("SMFF"), a SPhinX portfolio fund SPC, to be diverted from protected, customer-segregated accounts to non-regulated accounts where those assets were commingled and exposed to the risk of the custodian's insolvency.   These agents/fiduciaries acted contrary to the interests of SPhinX and PlusFunds in violation of the explicit requirement that SPhinX's assets must be protected in customer-segregated accounts.  In fact, these agent/fiduciary wrongdoers acted for their own exclusive interests.

6.     As a result, hundreds of millions of dollars of SMFF's excess cash was swept on a regular basis from Refco LLC, a regulated entity where SPhinX's assets were maintained in customer-segregated accounts, to non-segregated, commingled accounts at Refco Capital Markets, Ltd. ("RCM"), Refco LLC's unregulated Bermuda affiliate.

7.     Once SMFF's cash was moved to RCM, Refco-related parties and conspirators used RCM's customer assets for their own personal benefit and contrary to the interest of SPhinX or PlusFunds in fraudulent activities designed to conceal Refco losses, bolster Refco's financial statements, and enrich individuals.  In late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, those losses amounted to hundreds of millions dollars.  Refco's CEO and

President, Phillip Bennett, caused the hundreds of millions of dollars in uncollectible customer accounts to be transferred to Refco Group Holdings, Inc. ("RGHI"), an entity owned and controlled by Bennett, to remove those losses from Refco's financial statements. A corresponding receivable of several hundred million dollars from RGHI (the "RGHI Receivable") was recorded on Refco's books.

8.    To conceal the RGHI Receivable and bolster Refco's financials, Bennett diverted customer assets held at RCM, including SMFF's cash, to fund a series of "round-trip loan" transactions ("RTLs") at the end of each of Refco's financial reporting periods. In each of these round-trip loan transactions, RCM assets were transferred by a Refco entity to an unaffiliated third party, who in turn extended a loan to RGHI. RGHI used the amount to pay down the RGHI Receivable just before the end of the reporting period so that Refco's financials appeared to show the satisfaction of the RGHI Receivable. Days after the end of each reporting period, the round-trip loans were unwound, and the RGHI Receivable reappeared on Refco's books.

9.    In exchange for their participation in the Refco fraud, certain culpable PlusFunds insiders were enriched by Refco, using SMFF's customer assets that had been wrongfully diverted to RCM. On or about March 29, 2005, Refco used RCM assets (including SPhinX's commingled cash) to fund in excess of $204 million in loans to several "Suffolk" entities controlled by Defendants Christopher Sugrue, Brian Owens and Mark Kavanagh (three members of PlusFunds' Board of Directors), purportedly to purchase outstanding minority shares of PlusFunds stock. The Suffolk loans were non-recourse and secured by all shares of PlusFunds stock owned or controlled by Sugrue, Kavanagh, and Owens. The Suffolk loans were a disguised acquisition by Refco of the PlusFunds shares owned by Sugrue, Kavanagh and Owens, and the *quid pro quo* to those individuals for participating in the Refco scheme.

4

10.    The true nature and source of funds for the Suffolk loans was concealed from innocent members of the SPhinX Board and PlusFunds' Board and management, who would have opposed such a transaction if its terms were not concealed. The Suffolk loans evidence the relationship and agreement among Sugrue, Kavanagh, Owens, Refco, and Bennett, who negotiated and executed the Suffolk loans documentation on behalf of Refco.

11.    During 2004 and 2005, as much as $560 million of SMFF's cash was held at RCM in non-segregated accounts. As of October 10, 2005, approximately $312 million of SMFF's cash was held at RCM. On that date, Refco announced that it had "discovered" a $430 million receivable owed to it by an entity controlled by Bennett (*i.e.*, the RGHI Receivable) and that Refco's financial statements could no longer be relied upon. Although Bennett repaid the RGHI Receivable with an emergency $400 million loan from his co-conspirator BAWAG P.S.K. Bank Fur Arbeit Und Wirtschaft Und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG"), Refco was irreparably damaged. A week later on October 17, 2005, RCM and 23 Refco subsidiaries and affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York.

12.    On October 11, 2005, just days before Refco's bankruptcy petition, Sugrue demanded the return of the $312 million of SMFF's cash held at RCM to SMFF's segregated accounts at Refco LLC. Because it had diverted SMFF's cash elsewhere, RCM lacked the liquidity to return SMFF's cash. On or about October 12, 2005 (after the disclosure of the Refco fraud), JP Morgan Chase & Co. ("Chase") loaned $201 million to RCM on a day's notice to fund part of RCM's return of the $312 million to SMFF's Refco LLC accounts. On or about October 14, 2005, $312 million was transferred from SMFF's accounts at RCM to Refco LLC. Two months later, RCM's Official Committee of Unsecured Creditors commenced an adversary

proceeding against SMFF to recover the $312 million as a preferential transfer from RCM's estate. On December 15, 2005, the court in the preference action entered a temporary restraining order freezing SMFF's $312 million. A flood of redemptions by SPhinX investors followed.

13.    The redemptions from the SPhinX Funds and the resulting drop in AUM caused a sharp decline in PlusFunds' revenues, leading to PlusFunds' Chapter 11 bankruptcy petition in the Southern District of New York on March 6, 2006.

14.    On April 26, 2006, SPhinX settled the preference litigation with RCM's Bankruptcy Trustee Marc Kirschner. As part of that agreement, SMFF agreed to relinquish approximately $263 million of the $312 million and agreed to release certain claims against the Refco estate with respect to those funds.

15.    Two months later, on June 30, 2006, SPhinX was placed into voluntary liquidation in the Cayman Islands by resolution of its management shareholder. The JOLs sought and obtained court supervision of the SPhinX Funds in the Grand Court of the Cayman Islands on July 28, 2006, and August 8, 2006.

16.    By reason of Defendants' wrongdoing, SPhinX was damaged in an amount to be proven at trial, including but not limited to: (i) the $263 million of SMFF's cash that was paid to the RCM bankruptcy estate; (ii) other SPhinX funds, including the Suffolk loans, that were misappropriated by Defendants in conducting their fraudulent schemes; (iii) all fees SPhinX paid to its agents, including SPhinX's auditors and other Defendants for their services; (iv) lost income, profits and other actual damages; (v) punitive damages; (vi) attorneys' fees; (vii) costs of administration and liquidation of the SPhinX estates; and (viii) pre-judgment interest.

17.    PlusFunds, by reason of Defendants' wrongdoing, was injured in an amount to be proven at trial, including lost enterprise value, deepening insolvency damages, lost profits and other damages and punitive damages, attorneys' fees, and pre-judgment interest.

**B.    Fiduciary Duties.**

18.    The losses suffered by SPhinX and PlusFunds were caused by the Defendants' breaches of duty.  At all relevant times, the agents, and fiduciaries of SPhinX and PlusFunds all understood that SPhinX's assets were to be protected in customer-segregated accounts as described in SPhinX's offering materials and Cayman Islands law.  By allowing or participating in the movement of SPhinX's assets to non-segregated accounts at RCM, Defendants breached their own fiduciary and contractual duties to SPhinX and PlusFunds, and/or knowingly aided and abetted the breaches of others.  Other Defendants knowingly participated in Refco's fraud and breaches of fiduciary duty and/or aided and abetted those breaches.

19.    As PlusFunds Directors at all relevant times, Sugrue, Kavanagh, and Owens owed direct fiduciary duties to SPhinX and PlusFunds that required each of them to safeguard customer assets and place the interests of SPhinX and PlusFunds ahead of his own.  Owens also owed direct fiduciary duties to SPhinX because he sat on SPhinX's Board beginning in September 2004.  Sugrue, Kavanagh, and Owens breached these duties by allowing SMFF's cash to be exposed in non-segregated accounts at RCM in exchange for a payoff from Bennett and Refco in the form of the Suffolk loans.  At all material times, Sugrue, Kavanagh, and Owens knew SMFF's cash was held at RCM but allowed it to occur contrary to the interests of SPhinX and PlusFunds.  Defendant Gibson Dunn & Crutcher aided and abetted the breaches of fiduciary duty by Sugrue, Kavanagh, and Owens by concealing the terms of the Suffolk loans and Refco's involvement from innocent members of the Boards and management of SPhinX and PlusFunds.

20.    Beginning in 2002, the Derivatives Portfolio Management ("DPM") entities and Robert Aaron owed SPhinX and PlusFunds fiduciary duties.   As discussed in greater detail below, DPM agreed to provide accounting and financial services to SPhinX and PlusFunds, specifically including treasury functions and the investment of excess cash.   DPM was responsible to protect SPhinX's assets and ensure segregation.   DPM also owed SPhinX fiduciary duties because DPM had the contractual right to fill one seat on SPhinX's board of directors, and DPM's Chief Executive Officer, Robert Aaron, filled that seat as DPM's representative.

21.    As DPM's CEO, Robert Aaron not only shared DPM's fiduciary duties to SPhinX and PlusFunds, but owed his own duties as well.   He served on SPhinX's Board from inception in 2002 until 2006.   As a director, he owed direct fiduciary duties to the Funds.   Aaron actually executed the Refco account opening documentation for the SPhinX Funds, and he had a fiduciary duty to ensure SPhinX's assets were invested properly and were protected as described in SPhinX's organizational documents and offering materials.

22.    SPhinX and PlusFunds relied upon PricewaterhouseCoopers ("PwC"), SPhinX's auditor, to identify irregularities relating to SMFF's business and assets.   PwC breached its professional duties by failing to conduct GAAS audits and to disclose that SMFF's cash was exposed in non-segregated accounts at RCM.   From its engagements as auditor of the SPhinX Funds and other funds that invested in the SPhinX Funds, PwC knew there were significant problems with SPhinX's internal controls and cash (mostly problems with DPM's accounting), but failed to report SMFF's cash in unregulated accounts at RCM.   PwC represented that it had conducted a GAAS audit and that SPhinX financial statements "fairly presented" the Funds' financial position, statements that were both false.   In fact, beginning in May 2004, PwC served

as Refco's *de facto* Chief Accounting Officer and knew that customer assets, including SMFF's cash, were diverted to fund Refco's operations and fraudulent activities. PwC breached its duties to SPhinX and PlusFunds by failing to disclose SMFF's assets exposed at RCM and by aiding and abetting Refco's fraud and breach of fiduciary duties.

23.     Once SPhinX's assets were placed with Refco, additional fiduciary relationships were created, which should have protected SPhinX's assets. Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation. Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's true financial condition.

24.     Similarly, RCM owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to RCM. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets and to disclose to its customers information relevant to their assets, including accurate facts about RCM's financial condition. The officers, directors, and agents of Refco LLC and RCM, including Bennett, Santo Maggio, Robert Trosten, Thomas Hackl, and Tone Grant, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

25.     In addition to fiduciary duties arising out of Refco's role as custodian, Refco's officers and directors owed direct fiduciary duties to Refco's customers and creditors because Refco was insolvent as of August 2004, the date of the Refco leveraged buyout transaction ("LBO"), in which Refco borrowed hundreds of millions of dollars to cash out the interests of Defendants Tone Grant and BAWAG. In fact, Refco had been insolvent at least since December

2002. Refco, by its Trustee, Marc Kirschner, has filed suit on behalf of certain RCM customers, alleging and admitting that Refco was insolvent as of August 2004, and that it and its officers and directors owed fiduciary duties to Refco's customers arising from Refco's insolvency and its role holding customer assets. Refco and its officers breached these duties by stealing RCM customer assets, including SPhinX cash.

26.    The existence of so many parties with fiduciary duties to SPhinX should have prevented the diversion and misuse of SPhinX's assets. Not only did the fiduciaries of SPhinX and PlusFunds fail to safeguard SPhinX's assets, other culpable parties actively and knowingly aided and abetted those breaches of fiduciary duty. Refco's officers, directors, agents, lawyers, financial advisors, banks, auditors, and underwriters actively and knowingly helped Refco misuse RCM customer assets to fund Refco's fraudulent business operations and concealed Refco losses and true financial condition. Other parties, including BAWAG and the Thomas H. Lee Defendants, owned and exercised controlling interests in Refco and helped conceal Refco's insolvency and ongoing fraud in an effort to cash out their interests while Refco misused customer assets to stay afloat.

27.    Other Defendants aided and abetted Refco's breaches of fiduciary duty and fraud by knowingly helping Refco conceal its losses and distort its financial reporting through the round-trip loan transactions. These Defendants understood that the RTLs were designed fraudulently to improve Refco's financial position, but readily participated in exchange for quick profits earned in the RTLs.

28.    Each of the Defendants is liable for breaching fiduciary and contractual duties, intentionally aiding and abetting the breach of fiduciary duties owed to SPhinX and other tortious wrongdoing.

## II.    PARTIES.

### A.    Plaintiffs.

29.    Plaintiffs Kenneth Krys and Christopher Stride are the Joint Official Liquidators of each of the SPhinX Funds appointed by the Grand Court of the Cayman Islands.

30.    SPhinX Macro Fund SPC, SPhinX Managed Futures Fund SPC, SPhinX Long/Short Equity Fund SPC, SPhinX Convertible Arbitrage Fund SPC, SPhinX Fixed Income Arbitrage Fund SPC, SPhinX Distressed Fund SPC, SPhinX Merger Arbitrage Fund SPC, SPhinX Special Situations Fund SPC, and SPhinX Equity Market Neutral Fund SPC are each segregated portfolio companies organized and incorporated under Cayman Islands law.  Each of the SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

31.    SPhinX Managed Futures, Ltd., SPhinX Long/Short Equity Ltd., SPhinX Convertible Arbitrage Ltd., SPhinX Fixed Income Arbitrage Ltd., SPhinX Distressed Ltd., SPhinX Merger Arbitrage Ltd., SPhinX Special Situations Ltd., SPhinX Equity Market Neutral Ltd., PlusFunds Manager Access Fund SPC Ltd., SPhinX Ltd., SPhinX Macro Ltd., SPhinX Strategy Fund Ltd. and SPhinX Plus SPC Ltd. are each limited liability companies organized and incorporated under Cayman Islands law.  Each of the SPhinX companies has its registered address at c/o Krys & Associates, Governor's Square, Building 6, 2nd Floor, 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands.

32.    Kenneth M. Krys and Christopher Stride are assignees of claims assigned by Miami Children's Hospital Foundation, OFI, Green & Smith Investment Management LLC, Thales Fund Management LLC, Kellner Dileo & Co., LLC, Martingale Asset Management LP, Longacre Fund Management LLC, Arnhold & S. Bleichroeder Advisers LLC, Pictet & CIE, RGA America Reinsurance Company, Deutsche Bank (Suisse) SA, Arab Monetary Fund,

Hansard International Ltd., Concordia Advisors LLC, Gabelli Securities, Inc., and Citco Global Custody.

33.     On June 30, 2006, each of the SPhinX companies entered into voluntary liquidation by resolution of its management shareholder, and Messrs. Krys and Stride were appointed Joint Voluntary Liquidators for each of the SPhinX companies. On July 4, 2006, the Joint Voluntary Liquidators filed, on behalf of each of the SPhinX companies, except SMFF, petitions for court supervision in the Grand Court of the Cayman Islands (the "Cayman Court"). On July 28, 2006, the Cayman Court entered orders (the "Winding Up Orders") providing for the winding up of the SPhinX companies (other than SMFF), subject to the supervision of the Cayman Court. Pursuant to the Winding Up Orders, Messrs. Krys and Stride were appointed as the Joint Official Liquidators of each of the SPhinX companies other than SMFF. With respect to SMFF, a petition seeking court supervision was filed with the Cayman Court on June 5, 2006. On July 28, 2006, the Cayman Court entered an order appointing Messrs. Krys and Stride to serve as Joint Provisional Liquidators of SMFF, and subsequently on August 8, 2006, the Cayman Court entered an order appointing Messrs. Krys and Stride to serve as SMFF's Joint Official Liquidators. Messrs. Krys and Stride are authorized to bring each of the SPhinX Funds' claims in this litigation and will be referred to as the "JOLs."

34.     PlusFunds Group, Inc. ("PlusFunds") was organized and incorporated as a Delaware corporation on or about March 25, 2002. PlusFunds was a New York based, United States registered investment advisor that offered investment vehicles to qualified investors.

35.     On March 6, 2006, PlusFunds initiated Chapter 11 bankruptcy proceedings by filing a voluntary petition for relief in the Southern District of New York. On August 7, 2007, Bankruptcy Judge James M. Peck entered an order confirming PlusFunds' Fifth Amended Plan

of Liquidation. As contemplated and authorized under the Plan and the Confirmation Order, third-party litigation claims formerly belonging to the PlusFunds estate were assigned to the SPhinX Trust pursuant to a September 20, 2007 Assignment and Assumption Agreement and SPhinX Funds Trust Agreement, with James P. Sinclair acting as Trustee. Mr. Sinclair is authorized to bring claims assigned to the SPhinX Trust in this litigation. The JOLs are the beneficiaries of recoveries obtained by the SPhinX Trust.

**B.    Defendants.**

36.    Defendant Christopher Sugrue ("Sugrue") co-founded PlusFunds and owned PlusFunds stock. At all times relevant, Sugrue served as Chairman of the Board and director of PlusFunds. Sugrue owed SPhinX and PlusFunds contractual and fiduciary duties as an officer and director of PlusFunds and as the founder of the SPhinX Funds. Sugrue solicited investors using SPhinX's Offering Memoranda and marketing materials and represented to investors that assets would be maintained in customer-segregated accounts. SPhinX and PlusFunds both reposed confidence and trust in Sugrue. Sugrue also served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times relevant, Sugrue acted entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Sugrue is a United States citizen and at all times relevant resided in New York. Sugrue caused certain events, which are the subject of this litigation, to occur in New York. Upon information and belief, Sugrue has fled the United States and currently resides in Angola.

37.    Defendant Mark Kavanagh ("Kavanagh") is an individual who served as a director of PlusFunds and owned PlusFunds stock. As a PlusFunds director, Kavanagh owed fiduciary and contractual duties to SPhinX and PlusFunds. Kavanagh served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times

relevant, Kavanagh was acting entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Kavanagh is Sugrue's brother-in-law. He is an Irish citizen and is believed to reside in Dublin, Ireland. Kavanagh caused certain events, which are the subject of this litigation, to occur in New York.

38.    Defendant Brian Owens ("Owens") is an individual who served as a director of PlusFunds and director of SPhinX. As a director of SPhinX and PlusFunds, Owens owed fiduciary and contractual duties to PlusFunds and SPhinX. Owens served as an officer and/or director of Suffolk LLC, MKK LLC, Suffolk KAV LLC, and/or Suffolk SUG LLC. At all times relevant, Owens was acting entirely for his own personal benefit, contrary to the interests of SPhinX and PlusFunds and with intent to conceal the truth from SPhinX's and PlusFunds' innocent officers and directors. Owens is an Irish citizen and is believed to reside in Ireland. Owens caused certain events, which are the subject of this litigation, to occur in New York.

39.    Defendant Phillip Bennett ("Bennett") is an individual residing in the State of New York. Bennett was the Chairman of the Board, CEO, and President of Refco Group Limited ("RGL"), which was formerly the parent holding company for the various Refco entities prior to Refco's IPO in August 2005. Thereafter, Bennett held the same positions with Refco, Inc. Bennett was also a director and shareholder of Refco and an investor in the SPhinX Funds and served as an officer and director of other Refco entities, including RGHI and RCM. Bennett has been indicted in the Southern District of New York and recently pleaded guilty to criminal conspiracy and fraud charges in connection with his role in the Refco fraud. Bennett caused certain events, which are the subject of this litigation, to occur in New York.

40.     Defendant PricewaterhouseCoopers L.L.P. ("PwC") is a Delaware limited liability partnership headquartered in New Jersey. PwC has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. PwC was retained as the auditor for the SPhinX entities' and for PlusFunds' year 2003-2005 financial statements. PwC performed its audits of SPhinX primarily at the offices of DPM and DPM-Mellon in Somerset, New Jersey. PwC owed professional and contractual duties to SPhinX and PlusFunds arising out of its engagement as auditor to SPhinX and PlusFunds. PwC also performed tax and consulting work for PlusFunds and SPhinX and therefore owed fiduciary duties to PlusFunds and SPhinX. PwC also served as a financial consultant to the Refco entities and functioned as Refco's *de facto* Chief Accounting Officer.

41.     Defendant Mari Ferris ("Ferris") is an individual residing in the State of New York. Ferris was the engagement partner for PwC's 2003, 2004, and 2005 audits of the financial statements of the SPhinX Funds, and signed PwC's unqualified audit opinions on the financial statements of SPhinX for the fiscal years 2003 and 2004. Ferris was also the engagement partner for PwC's 2004 audit of the financial statements of PlusFunds, on which financial statements PwC issued an unqualified audit opinion. Ferris was also the engagement partner on PwC's audits of the financial statements of certain Refco funds, including SPhinX Managed Futures Index Fund LP, S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Fund Ltd., and Refco Advantage Multi Manager Fund, among others, for the years 2003, 2004, and 2005. Ferris was intimately familiar with the business affairs and organizations of SPhinX, PlusFunds, and Refco.

42.     Defendant PricewaterhouseCoopers (Cayman Islands) ("PwC Cayman Islands") is a Cayman Islands resident company organized under the laws of the Cayman Islands. PwC

Cayman Islands entered into audit engagements with, and provided audit services to, the SPhinX Funds for at least the years 2003, 2004, and 2005.

43.     PwC LLP and PwC Cayman Islands provided audit and other professional services jointly, under the control of a common engagement partner of PwC LLP, to the SPhinX Funds for at least the years 2003, 2004, and 2005. In connection with these joint engagements, PwC LLP and PwC Cayman Islands are hereafter referred to collectively as "PwC."

44.     Defendant Grant Thornton LLP ("Grant Thornton") is an Illinois limited liability partnership. Grant Thornton has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. Grant Thornton was retained as Refco's auditor for Refco's financial statements since approximately 2002. Grant Thornton issued clean and unqualified audit opinion letters on Refco's financial statements for fiscal years 2003, 2004 and 2005. Grant Thornton also served as the purportedly independent auditor for RCM.

45.     Defendant Mark Ramler ("Ramler") is an individual residing in New York. Ramler was the engagement partner for Grant Thornton on its engagement as Refco's auditor. Prior to working for Grant Thornton, Ramler was the engagement partner on the Refco account at Arthur Andersen. Ramler was intimately acquainted with Refco's business affairs and oversaw all of Grant Thornton's services as Refco's auditor. Ramler caused certain events, which are the subject of this litigation, to occur in New York.

46.     Defendant Ernst & Young U.S. LLP ("Ernst & Young") is a Delaware limited liability partnership. Ernst & Young has offices located in New York and regularly provides auditing, accounting, and financial services in the State of New York. Ernst & Young served as Refco's tax accountant and provided accounting and advisory services from approximately 1991

through the 2002 tax year, and continued to provide tax advice and assistance to Refco Group Ltd., LLC thereafter until 2005 on a worldwide basis.

47. Defendant Gibson, Dunn & Crutcher LLP ("Gibson Dunn") is a Delaware limited liability partnership providing legal services and advice in the United States and internationally. Gibson Dunn has offices located in a number of states, including the State of New York. Gibson Dunn served as legal counsel to PlusFunds and SPhinX at relevant times. Gibson Dunn owed professional, fiduciary, and contractual duties to PlusFunds and SPhinX. Gibson Dunn also served as legal counsel to Mark Kavanagh, Chris Sugrue, Brian Owens, Suffolk LLC, Suffolk SUG LLC, MKK LLC, Suffolk KAV LLC, and Hardwicke, Ltd.

48. Defendant Mayer Brown LLP, f/k/a Mayer Brown Rowe & Maw LLP ("Mayer Brown") is an Illinois limited liability partnership providing legal services and advice in the United States and internationally. Mayer Brown has offices located in a number of states, including the State of New York. Mayer Brown served as legal counsel to Refco at all relevant times. Mayer Brown is a global legal services organization comprising legal practices that are a combination of three limited liability partnerships: Mayer Brown LLP, a limited liability partnership established in the United States; Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales; and JSM, a Hong Kong partnership, and its associated entities in Asia.

49. Defendant Joseph P. Collins ("Collins") is an individual residing in Illinois. Collins is or, at least from 1994 through October 2005, was a partner at Mayer Brown and was the supervising partner on all services provided by Mayer Brown on behalf of Refco. Collins had done work for Refco for nearly ten years prior to 1994 while with another law firm and brought Refco as a client when he joined Mayer Brown in 1994. Collins is reputed to have

expertise in law related to securities and commodity trading. Collins has been indicted in the Southern District of New York and awaits criminal trial in connection with his actions regarding Refco.

50.     Defendant Edward S. Best ("Best") is an individual who, upon information and belief, resides in Illinois. At all times relevant, Best was a partner at Mayer Brown and, together with Collins, was a supervising attorney on Mayer Brown's Refco engagement. Best is the co-leader of Mayer Brown's Capital Markets and Financial Institutions groups and holds himself out as having expertise in securities and corporate law.

51.     Defendant Paul Koury ("Koury") is an individual who, upon information and belief, resides in Illinois. At all times relevant, Koury was an attorney at Mayer Brown who worked personally on the Refco engagement.

52.     Defendant Refco Alternative Investments LLC ("RAI") is a Delaware limited liability company. RAI is or was a commodity pool operator located in the State of New York. RAI was retained to execute trades and provide clearing services on behalf of the SPhinX Funds. RAI owed contractual and fiduciary duties to SPhinX and PlusFunds.

53.     Defendant Tone Grant ("Grant") is an individual residing in the State of Illinois. Up through 1998, Grant was President and CEO of RGL. Prior to August 2004, through his ownership interest in RGHI, Grant held a significant ownership stake in Refco. From 1999 through August 2004, Bennett and Grant each held a 50% interest in RGHI. In or around August 2004, concurrently with the Refco leveraged buy-out (the "August 2004 LBO" or the "LBO"), Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI. Grant has been indicted in the Southern District of New York and awaits trial on criminal conspiracy and

fraud charges in connection with his actions at Refco. Grant caused certain events, which are the subject of this litigation, to occur in New York.

54. Defendant Robert Trosten ("Trosten") is an individual residing in the State of Florida. Trosten was a member of Refco's corporate finance team from 1997 to 2001, and Refco Group's Chief Financial Officer from 2001 to October 2004. Trosten was intimately familiar with all details of the fraud he, Bennett, Maggio, and Grant perpetrated at Refco. Trosten has been indicted in the Southern District of New York and recently pleaded guilty to criminal fraud and conspiracy charges in connection with his actions at Refco. Trosten caused certain events, which are the subject of this litigation, to occur in New York.

55. Defendant Santo Maggio ("Maggio") is an individual residing in the State of Florida. Maggio joined Refco in 1985, and held executive positions with various Refco entities until he was forced to resign in October 2005, following the disclosure of the massive fraud, he, Bennett, Trosten and Grant perpetrated at Refco. Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM. Maggio also ran the brokerage operations of RSL and RCM and directed, orchestrated and supervised the diversion of RCM assets alleged herein. On December 19, 2007, Maggio pleaded guilty to securities fraud, wire fraud, bank fraud, money laundering, securities fraud and wire fraud charges in connection with the Refco fraud. Maggio caused certain events, which are the subject of this litigation, to occur in New York.

56. Defendant Thomas Hackl ("Hackl") is an individual, who, on information and belief, resides in New York. From 1991 to 2002, Hackl served as the head of treasury and investment banking for BAWAG. From 2002 to 2004, Hackl served as executive vice-president of Refco Group and as a member of Refco's management committee. Hackl is Sugrue's close

19

friend and the godfather to one of Sugrue's children. Hackl negotiated interest rates and certain transactions between Refco and SPhinX and made false representations to PlusFunds' President that SMFF's assets were maintained in customer-segregated accounts at Refco. Hackl has been identified as an unindicted co-conspirator in the federal prosecution of Bennett, Trosten, and Grant in the Southern District of New York. Hackl caused certain events, which are the subject of this litigation, to occur in New York.

57. Defendant Dennis Klejna ("Klejna") was an Executive Vice President and General Counsel of Refco Group from 1999 until Refco's collapse. Upon information and belief, Klejna was also an Executive Vice President and General Counsel of Refco LLC and RCM. Prior to joining Refco, Klejna was in private law practice where his practice focused on derivatives trading regulations and prior to that he was Director of the Division of Enforcement of the Commodity Futures Trading Commission. As General Counsel of Refco Group, his duties included supervising the Company's outside legal counsel on all significant legal matters, and reviewing and approving bills received from outside counsel that described the legal work performed. Klejna was directly involved in Refco's day-to-day operations, including its financial reporting and accounting functions. Klejna prepared and approved the Offering Memorandum for the Bonds, and Refco's fiscal year 2005 Form 10-K and Form 10-K/A. Klejna also prepared, approved and signed the Refco's October 12, 2004 Bond Registration Statement (including subsequent amendments), and Refco's August 2005 IPO Registration Statement.

58. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") f/k/a Credit Suisse First Boston LLC is a Delaware limited liability company with its headquarters in the State of New York. Credit Suisse is an investment banking firm that provides securities underwriting, financial advisory, sales and trading, and financial products and services. Credit

20

Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO and the lead joint book-running manager and lead underwriter of Refco's August 2005 initial public offering (the "August 2005 IPO" or the "IPO"). Credit Suisse was also the exclusive financial advisor to Bennett and/or RGHI and/or RGL.

59.     Defendant Banc of America Securities LLC ("Banc of America Securities"), a subsidiary of Bank of America Corporation, is a Delaware limited liability company with its headquarters in the State of New York. Banc of America Securities is an investment banking firm that provides securities underwriting, financial advisory, sales and trading, and financial products and services. Banc of America Securities was a financial advisor, joint book-running manager, underwriter and/or initial purchaser for the bond offering made as part of the LBO and was a joint book-running manager of the August 2005 IPO.

60.     Defendant BAWAG P.S.K. Bank Fur Arbeit Und Wirtschaft Und Osterreichische Postparkasse Aktiengesellschaft ("BAWAG") is a banking and financial services corporation organized and existing under the laws of Austria with its principal place of business in Wien, Austria.

61.     Defendant JP Morgan Chase & Co. ("Chase") is a Delaware corporation providing banking and financial services throughout the United States. Chase has offices and regularly transacts business in the State of New York and caused certain events, which are the subject of this litigation, to occur in New York.

62.     Defendant Thomas H. Lee Partners, L.P. ("THLP"), a Delaware limited partnership, is a private equity investment firm headquartered in Boston, Massachusetts, with

21

approximately $12 billion of capital under management.    THLP's business focuses on the acquisition of substantial equity stakes in mid-to-large capitalization companies.

63.    In June 2004, THLP and its affiliates purchased a controlling 57% equity state in Refco for approximately $507 million.  As a result, THLP held a majority stake in Refco and had de facto control over its operations.  As detailed below, in addition to having voting control over Refco, THLP and related THL entities had a variety of contractual rights that provided them with additional cover over, and access to information about, Refco's affairs.  The THL entities involved with Refco include:

- Thomas H. Lee Equity Advisors V, L.P. ("Equity Advisors V"), a Delaware limited partnership owned and controlled by THLP with its principal office in Boston, Massachusetts;

- THL Managers V, LLC ("Managers V"), a Delaware limited liability company with its principal office in Boston, Massachusetts of which all time THLP was the managing and controlling member;

- Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., each a Delaware limited partnership with its principal office in Boston, Massachusetts owned and controlled by Equity Advisors V and Managers V;

- Thomas H. Lee Equity (Cayman) Fund V, L.P., an exempted limited partnership formed under the laws of the Cayman Islands, owned and controlled by Managers V and Equity Advisors V (registered in the Cayman islands as a foreign company) (together with Thomas H. Lee Equity Fund V, L.P. and Thomas H. Lee Parallel Fund V, L.P., the "Fund V Entities");

- Thomas H. Lee Advisors, LLC ("THL Advisors"), a Delaware limited liability company with its principal office in Boston, Massachusetts, and general partner of THLP;

- Thomas H. Lee Investors Limited Partnership, a Massachusetts limited partnership controlled by Thomas H. Lee; and

- The 1997 Thomas H. Lee Nominee Trust, a trust over which Thomas H. Lee has voting and investment control.

64.    THLP, THL Advisors, Managers V, Equity advisors V, Fund V Entities, Thomas H. Lee Investors Limited Partnership, and the 1997 Thomas H. Lee Nominee Trust are

collectively referred to herein as the THL Entities. As discussed in more detail below, the THL

Entities always acted in concert. They owned a majority stake in Refco from the date of THL's

leveraged buyout of Refco (the "LBO") until Refco's IPO. Additionally, from the date of the

LBO until Refco's bankruptcy filing, the THL Entities controlled and directed Refco and

exercised discretion over its affairs.

65.     THL held their interests in Refco through the Fund V Entities.

66.     Defendant Thomas H. Lee ("Lee") was at all relevant times subsequent to the

LBO a director of Refco. Lee founded the Thomas H. Lee Company, the predecessor of THLP,

in 1974 and served as its Chairman and CEO from its inception until reportedly leaving that

entity after October 2005. As a director of Refco and as Chairman and CEO of THLP, Lee was

actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its

investment. Lee is a resident of the state of New York, caused certain events, which are the

subject of this litigation, to occur in the state of New York.

67.     Defendant David V. Harkins ("Harkins") was at all relevant times subsequent to

the LBO a director of Refco. Harkins also served on Refco's nominating and governance

committee. Harkins is Vice Chairman and Managing Director of Private Equity Funds of THLP,

and has also served as President of THLP. As a director of Refco and as Chairman and a top

executive at THLP, Harkins was actively involved in the decision to invest in Refco and THLP's

subsequent monitoring of its investment.

68.     Defendant Scott L. Jaeckel ("Jaeckel") was at all relevant times subsequent to the

LBO a director of Refco. Jaeckel also served as treasurer of New Refco, treasurer of Refco

Finance Holdings, LLC, and treasurer of Refco Finance Inc., a co-offeror in Refco's Bond

Offering of May 2004. Jaeckel is a Managing Director of THLP. Jaeckel previously served as

Vice President of THLP from 2001 until December 2004, and as an Associate from 1994 to 1996 and from 1998 to 2001. Jaeckel holds an M.B.A. from Harvard University and his extensive experience in corporate finance includes previous employment in the Corporate Finance Department of Morgan Stanley & Co. As a director and officer of Refco and a top executive at THLP, Jaeckel was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Jaeckel also attended meetings of the audit committee of Refco's Board of Managers.

69. Defendant Scott A. Schoen ("Schoen") was at all relevant times after the LBO a director of Refco. Schoen served as President of New Refco; President of Refco Finance, Inc., a co-offeror in Refco's Bond Offering of May 2004; and sole director of Refco Finance, Inc. Schoen also served on Refco's nominating and governance committee as well as its compensation committee. Schoen joined THLP in 1986 and currently serves as its Co-President. He previously served as a Managing Director of THLP from 1992 to 2004 and as Vice President from 1988 to 1992. Schoen received an M.B.A. and law degree from Harvard University and, prior to joining THL, was in the private finance department of Goldman, Sachs & Co. As a director and officer of Refco and a top executive at THLP, Schoen was actively involved in the decision to invest in Refco and in THLP's subsequent monitoring of its investment. Defendant Thomas H. Lee Partners, L.P.

70. Lee, Harkins, Jaeckel, and Shoen are collectively referred to herein as the "THL Individuals."

71. The THL Entities and THL Individuals are collectively referred to herein as the "THL Defendants."

72.    Defendant Liberty Corner Capital Strategies, LLC ("Liberty Corner") was a hedge fund management company located in the state of New Jersey and organized under the laws of Delaware.  At all relevant times, Liberty Corner was wholly owned and controlled by Defendant William T. Pigott.  As described below, Pigott, through the instrumentality of Liberty Corner, agreed to serve as a conduit for over $5 billion of fictitious loan transactions through which substantial Refco trading losses and operational expenses were concealed.  Liberty Corner and Pigott caused certain events, which are the subject of this litigation, to occur in New York.

73.    Defendant EMF Financial Products LLC ("EMF Financial") is a Delaware corporation headquartered in New York that was at all relevant times controlled by Defendant Eric M. Flanagan.  Flanagan directed two entities affiliated with EMF Financial, Defendants EMF Core Fund, Ltd. ("EMF Core Fund") and Delta Flyer Fund, LLC ("Delta Flyer"), to serve as the conduit for $575 million in fictitious loan transactions through which the RGHI Receivable was concealed from February 2000 to February 2003.  EMF Financial, EMF Core, Delta Flyer and Flanagan caused certain events, which are the subject of this litigation, to occur in New York.

74.    Defendant Ingram Micro, Inc. ("Ingram Micro") is a Delaware corporation with offices in New York.  Ingram Micro is the world's largest technology distributor and a leading technology sales, marketing and logistics company.  Ingram Micro agreed to use its subsidiary, defendant CIM Ventures, Inc. ("CIM Ventures"), to participate in two fictitious loan transactions with Refco in 2000 and 2001 through which $400 million of the RGHI Receivable was concealed.  Ingram Micro and CIM caused certain events, which are the subject of this litigation, to occur in New York.

75.     Defendant Beckenham Trading Co., Inc. ("Beckenham") is a New Jersey corporation wholly owned and operated by defendant Andrew Krieger. Beckenham engaged in a $125 million fictitious loan transaction with Refco in February 2002, designed to conceal the RGHI Receivable. Beckenham and Krieger caused certain events, which are the subject of this litigation, to occur in New York.

76.     Defendant Coast Asset Management, LLC (f/k/a Coast Asset Management LP) ("Coast"), a Delaware limited liability company, is a hedge fund manager based in the State of California. At the time of the RTLs, Defendant Christopher Petitt was the CEO of Coast. In February 2000, Coast's subsidiary, defendant CS Land Management, LLC ("CS Land"), entered into a $110 million fictitious loan transaction with Refco designed to conceal the RGHI Receivable. Coast, CS Land and Petitt caused certain events, which are the subject of this litigation, to occur in New York.

77.     Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt are collectively referred to as the "RTL Participants."

78.     Defendant Refco Group Holdings, Inc. ("RGHI") is a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant. In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI. From 1999 until the LBO, RGHI held a 90% interest in Refco Group. The remaining 10% in RGL was controlled by BAWAG. RGHI caused certain events, which are the subject of this litigation, to occur in New York.

79.     Refco Associates, Inc. was at all relevant times an entity used by Refco to hold and move cash. Refco Associates, Inc. had an account at Chase that held large amounts of

money for short periods of time for use in the round-trip loan transactions and cash sweeps described herein. The address for Refco Associates Inc. listed on the Chase account is nonexistent. Plaintiffs have been unable to locate a valid address or service agent for Refco Associates Inc. It is unknown whether Refco Associates, Inc. is a citizen of any state of the United States or a foreign jurisdiction, or whether Refco Associates Inc. is a properly organized entity. The ownership of Refco Associates Inc. is also unknown.

### C.   Non-Parties.

80.    Robert Aaron ("Aaron") was a director of SPhinX from 2002 until 2006. In this capacity, Aaron owed fiduciary and contractual duties to SPhinX and PlusFunds. Aaron was the founder and owner of Derivatives Portfolio Management LLC and Derivatives Portfolio Management Ltd. (collectively, "DPM"), the administrator of the SPhinX Funds. Aaron resides in New Jersey.

81.    Derivative Portfolio Management LLC ("DPM LLC") is a Delaware limited liability company with its principal place of business located in New Jersey. DPM LLC served as SPhinX's administrator and owed fiduciary and contractual duties to SPhinX and PlusFunds. The assets and liabilities of DPM LLC were acquired by Mellon Financial Corporation in February 2005, after which DPM LLC operated as DPM-Mellon.

82.    Derivative Portfolio Management Ltd. ("DPM Ltd.") is a Cayman Islands entity with its principal place of business located in the Cayman Islands. With DPM LLC, DPM Ltd. served as SPhinX's administrator and owed fiduciary and contractual duties to SPhinX and PlusFunds. The assets of DPM Ltd. were acquired by Mellon Financial Corporation in February 2005, after which DPM Ltd. operated as DPM-Mellon.

83.    Bank of New York Mellon Corporation f/k/a Mellon Financial Corporation ("Mellon") is a Delaware company with its principal place of business in Pennsylvania. In

February 2005, Mellon acquired the assets and liabilities of DPM LLC and DPM Ltd. After that date, the DPM entities operated as DPM-Mellon within Mellon's financial services division. Mellon is liable for the acts and omissions of DPM. Mellon owed contractual and fiduciary duties to SPhinX and PlusFunds.

84.     DPM-Mellon LLC and DPM-Mellon Ltd. (collectively, "DPM-Mellon") are, respectively, a Delaware limited liability company and a Cayman Islands entity. After Mellon acquired the assets and liabilities of DPM in early 2005, DPM continued to provide administration services to SPhinX and PlusFunds as DPM-Mellon, the successor entity to DPM. Mellon was the sole owner of DPM-Mellon and exercised control over DPM-Mellon through the right to appoint four of six board members. Mellon held complete control over DPM-Mellon and used DPM-Mellon to serve Mellon's own purposes. DPM-Mellon owed fiduciary and contractual duties to SPhinX and PlusFunds.

## III.    JURISDICTION.

85.     Plaintiff, the SPhinX Trust, was created in New York and its Trustee, James Sinclair, is a New York resident. The SPhinX entities, which will be beneficiaries of any recovery by Plaintiff the SPhinX Trust, are Cayman Islands companies and, more specifically, Cayman Islands segregated portfolio companies. The JOLs of the SPhinX entities, as so designated by the Grand Court of the Cayman Islands in the pending SPhinX insolvency proceedings, are Kenneth Krys and Christopher Stride, who are, respectively, resident in the Cayman Islands and the British Virgin Islands.

86.     PlusFunds Group, Inc., the transferor of all interests designated in the PlusFunds Plan of Liquidation to the SPhinX Trust, is a Delaware corporation, with its principal place of business in New York. By reason of the Fifth Amended Plan of Liquidation of PlusFunds, approved by the United States Bankruptcy Court for the Southern District of New York on

August 7, 2007, PlusFunds retains no interest in the assets, or proceeds of those assets, transferred by PlusFunds to the SPhinX Trust, as reflected in the Court's confirmation order of August 7.

87.    This action does not arise under or arise in a Title 11 proceeding.

88.    The Bankruptcy Court of the United States District Court for the Southern District of New York, as noted, confirmed the plan of liquidation of PlusFunds by order of August 7, 2007. PlusFunds, the debtor in that proceeding, is not a plaintiff in this action. The Bankruptcy Court for the Southern District of New York did not retain jurisdiction over any of the claims or causes of action transferred by PlusFunds to the SPhinX Trust, the Plaintiff herein.

89.    Any recoveries herein by the SPhinX Trust will redound only to the benefit of the SPhinX Trust and its beneficiaries.

90.    In the PlusFunds Fifth Amended Plan of Liquidation, filed on June 28, 2007, and subsequently confirmed by the Bankruptcy Court, that court retained jurisdiction to hear avoidance actions and preference claims on behalf of PlusFunds.

91.    There is no retention of jurisdiction, either general or specific, by the Bankruptcy Court with respect to causes of action brought by the SPhinX Trust against third parties, as is present here.

92.    By the PlusFunds Plan of Liquidation, the causes of action transferred to the SPhinX Trust are prosecuted for the sole and exclusive benefit of the JOLs on behalf of the SPhinX Funds (and, ultimately, the creditors and interest holders of the SPhinX Funds). Neither PlusFunds nor the PlusFunds General Trust created by the Liquidation Plan retained any interest in any assets transferred to the SPhinX Trust.

93.    The PlusFunds Plan of Liquidation also provided that the SPhinX Trustee has the absolute discretion to pursue or not to pursue the causes of action which were vested in the Trust in the exclusive best interests of the SPhinX Funds.  The PlusFunds Bankruptcy Court did not retain any approval power with respect to any action brought by the SPhinX Trustee to compromise, prosecute, or settle any objections to the causes of action which were transferred by PlusFunds to the SPhinX Trust.  As stated by the Bankruptcy Court, the SPhinX Trust "shall have the absolute discretion to investigate, pursue or not to pursue, or to settle, consistent with the SPhinX Trust Agreement, any and all causes of action vested in the SPhinX Trust as the SPhinX Trustee determines is in the best interests of the SPhinX Funds."

94.    The PlusFunds Liquidation Plan also provided that "neither the General Trust [nor] the SPhinX Trust shall be deemed a successor-in-interest of the debtor for any purpose other than as specifically set forth in the plan." (Article VI(C)).

95.    By the PlusFunds Liquidation Plan, the only assets which PlusFunds retains are its own proofs of claim filed in an unrelated bankruptcy, as well as certain PlusFunds claims against its agents.  These claims, which are not part of the present case, include certain avoidance actions or preference actions against XRoads Solutions Group, LLC or Curtis, Mallet-Prevost, Colt & Mosle, LLP, or any claim arising after PlusFunds' petition date that PlusFunds may have against any of its officers, directors, employees, agents, representatives, attorneys, accountants, experts, professionals or agents for any action taken or omitted to be taken arising out of or relating to the following: (i) PlusFunds' operations and/or administration of its bankruptcy case after the petition date; (ii) PlusFunds' Chapter XI case; or (iii) the formulation, preparation, pursuit, etc. or consummation of the Plan and Disclosure Statement.

96.    The Refco Plan was approved by the Bankruptcy Court on December 15, 2006.

97. Neither the SPhinX Trustee, James Sinclair, nor the Joint Official Liquidators appointed by the Cayman Islands Court, Kenneth Krys, and Christopher Stride, have any relation to the Refco bankruptcy or to the Refco estates. Nor will any recovery in the present action by Plaintiffs in any way benefit, augment, or enhance the Refco estate. Recoveries in this action will redound only to the benefit of the Plaintiffs and their beneficiaries, the SPhinX Funds.

98. Equally, no recovery by Plaintiffs herein will deplete, diminish, or adversely impact the Refco bankruptcy estates.

## IV. **VENUE**

99. Venue is proper in this county pursuant to CPLR 503(a), (c) and (d) in that, *inter alia*, certain of the defendants, including Ernst & Young LLP maintain their principal offices in New York County.

## V. **THE SPHINX FUNDS AND PLUSFUNDS.**

### A. **History.**

100. Diego Winegardner and Defendant Chris Sugrue founded PlusFunds Ltd. as a Cayman Islands corporation in or about 1998. From inception, the PlusFunds business model included business technology and infrastructure to provide a hedge fund platform with transparency and real-time valuation capability. PlusFunds Ltd. sought to provide investors with accurate valuations of their investments on a daily basis, a feature that was then unavailable.

101. By late 2001, PlusFunds Ltd. had developed intellectual property and technology including a comprehensive valuation and risk management platform for the hedge fund industry.

102. In 2001, PlusFunds Ltd. established a relationship with Standard & Poor's, a division of the McGraw Hill Companies ("S&P"). S&P and PlusFunds Ltd. envisioned a new composite hedge fund index that would represent the primary strategies of the hedge fund industry. S&P agreed to publish the hedge fund index and identify and monitor individual

portfolio managers for inclusion in the index. The portfolio managers were to be identified and selected based upon a track record of investments in particular strategies represented in the S&P Hedge Fund Index.

103.    On December 20, 2001, PlusFunds Ltd. entered into an exclusive license agreement with S&P that entitled PlusFunds Ltd. to develop and market hedge fund investment products designed to track the S&P Hedge Fund Index. The licensing agreement provided PlusFunds Ltd. with the right to use the S&P and S&P Hedge Fund Index marks to market the new PlusFunds Ltd. platform.

104.    In March 2002, after an infusion of new capital from investors, PlusFunds Group, Inc. ("PlusFunds") was organized as a Delaware corporation, and the S&P License was assigned to this new entity.

### B.    The SPhinX Funds.

105.    Beginning in the spring of 2002, PlusFunds created the SPhinX Funds, deriving the name from the S&P Hedge Fund Index. The SPhinX Funds were designed to achieve returns consistent with the performance of the S&P Hedge Fund Index.

106.    The initial Board of Directors for the SPhinX Funds included Robert Aaron, Stuart Drake, and Martin Grennell. Subsequent directors included Brian Owens, Patrina Khoo Farquharson, and Andrew Feighery.

107.    The SPhinX Funds were a group of investment vehicles designed to address a broad range of investor needs. The Funds were comprised of separate investment portfolios corresponding to the investment strategies represented in the S&P Hedge Fund Index.

108.    The various SPhinX Funds entities, which were collective investment vehicles, were divided into three categories: (1) Feeder Funds, designed to support investments and issue subscriptions; (2) Master Funds, designed to capture operational efficiencies; and (3) Portfolio

Funds, segregated portfolio companies organized under Cayman Islands law in which portfolio managers trade in securities and commodities.

### C. Segregated Portfolio Companies.

109.    Cayman Islands law provides for a segregated portfolio company ("SPC") to segregate assets and liabilities within an SPC.    Within each SPhinX Portfolio Fund were a number of segregated portfolios.    Under Cayman law, customer assets within each segregated portfolio, or "cell," within an SPC are protected from cross-liability; *i.e.*, the assets maintained in one portfolio are protected from creditors of another cell or the general creditors of the SPC in the event of insolvency.

110.    Cayman Islands Companies Law, referenced in SMFF's Articles of Association and SPhinX's offering materials, provides:

> A segregated portfolio company may create one or more segregated portfolios in order to segregate the assets and liabilities of the company held within or on behalf of the portfolio from the assets and liabilities of the company held within or on behalf of any other segregated portfolio of the company or the assets and liabilities of the company which are not held within or on behalf of any segregated portfolio of the company.

111.    Cayman Islands Companies Law further provides:

Segregated portfolio assets-

(a)    shall only be available and used to meet liabilities to the creditors of the segregated portfolio company who are creditors in respect of that segregated portfolio and who shall thereby be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio for such purposes; and

(b)    shall not be available or used to meet liabilities to, and shall be absolutely protected from, the creditors of the segregated portfolio company who are not creditors in respect of that segregated portfolio, and who accordingly shall not be entitled to have recourse to the segregated portfolio assets attributable to that segregated portfolio.

112.   The actual trading and investment activities of the SPhinX SPCs were performed by independent portfolio managers, with each portfolio manager directing investment activity within a single segregated portfolio. Each of the individual portfolio managers was identified by S&P as representative of strategies represented on the S&P Hedge Fund Index.

113.   Among the various Portfolio Funds was SMFF, which at various times was comprised of 14 or 15 segregated portfolios, each managed by a separate portfolio manager.

114.   The relationship among the portfolio manager, the relevant SPhinX Funds and PlusFunds was governed by a Discretionary Investment Management Agreement ("DIMA").

115.   Under the DIMAs, PlusFunds delegated certain of its investment management authority over the cell to the portfolio manager, who invested capital in accordance with one of nine hedge fund strategies. SMFF portfolio managers, for example, pursued strategies represented in S&P's Managed Futures Index, a subset of the S&P Hedge Fund Index.

116.   This unique structure, coupled with the exclusive S&P license, proprietary computer software and business practices, allowed PlusFunds and SPhinX to offer an array of investment products on a cost-optimized basis.

117.   An investor in SPhinX was issued shares in one of the Feeder Funds, and the proceeds of the investment flowed through one or more Master Funds to one or more SPC, where the proceeds were then allocated among different segregated portfolios or cells within the SPC, according to the investment strategy selected by the investor.

118.   Thus, an investor who elected to invest in SPhinX Ltd. or SPhinX Strategy Fund Ltd., two feeder funds, could elect to have a portion of the invested proceeds flow into SMFF, where those proceeds would be allocated among the 14 or 15 segregated portfolios within SMFF, each managed by a separate portfolio manager.

### D.   Customer Segregation.

119.   The SPC structure and customer-segregation requirements were key components of the SPhinX Funds and were prominent in SPhinX's marketing materials, organizational documents, and Offering Memoranda.

120.   SMFF's Articles of Association provide:

> The Company may create one or more Segregated Portfolios in order to segregate the assets and liabilities of the Company held within or on behalf of a Segregated Portfolio from the assets and liabilities of the Company held within or on behalf of any other Segregated Portfolio or the General Assets.
>
> Each Segregated Portfolio shall be separately designated or identified in accordance with Part XIV of the Law and shall include in its name the words 'Segregated Portfolio'.

121.   The Cayman Islands Companies Law provides:

> It shall be the duty of the directors of a segregated portfolio company to establish and maintain (or cause to be established and maintained) procedures –
>
> (a)   to segregate, and keep segregated, portfolio assets separate and separately identifiable from general assets;
>
> (b)   to segregate, and keep segregated, portfolio assets of each segregated portfolio separate and separately identifiable from segregated portfolio assets of any other segregated portfolio;
>
> (c)   to ensure that assets and liabilities are not transferred between segregated portfolios otherwise than at full value.

122.   In addition to protection from cross liability, the SPC business structure and SPhinX business plan required customer assets to be maintained in customer-segregated accounts so that the segregated portfolios were protected from the potential insolvency of the custodian or prime broker holding the assets. SMFF's Articles of Association provide:

> The assets held in each Segregated Portfolio shall be held, subject to the provision of the Law and these Articles, for the benefit of the holders of the relevant Common Shares attributed to such

35

Segregated Portfolio and applied solely in respect of the liabilities of such Segregated Portfolio in accordance with the provision of the Law.

123.    The Offering Memoranda of SPhinX Ltd. and SPhinX Strategy Fund Ltd. represented:

> That portion of a Portfolio Fund Series' assets which are fully paid and not Margin Securities may be physically commingled with other customer assets but will be properly identified in the name of the Portfolio Fund Series in a separate customer account on the prime broker's official books and records ("Customer Assets"). Customer Assets are held by the prime broker with the assets of other customers on a segregated basis from the prime broker's assets and are not subject to the claims of the prime broker's creditors. Additionally, in order to ensure that assets of a prime broker's customers are not used by the prime broker to fund the prime broker's proprietary business operations, the prime broker is required to maintain a special segregated bank account for free cash balances (i.e., cash not subject to the claims of the prime broker) and must periodically post its own cash (or other qualified securities) in such account equal to the Margin Securities used to generate cash in excess of any loan to a Portfolio Fund Series. In the event of insolvency of the prime broker, all customer assets will be for the exclusive benefit of the Portfolio Fund Series and other customers of the prime broker for whose benefit the accounts have been established, and will be unavailable to the creditors of the prime broker. [Emphasis added.]

124.    SPhinX marketing materials emphasized that SPC assets would be "ring-fenced" and maintained in customer-segregated accounts to protect those assets. "Ring fencing" specifically referred to the protection of segregated portfolios from cross-liability. Assets of segregated Portfolio A could not be used to satisfy claims against Portfolio B. In general terms, ring fencing also refers to the fact that SPC assets are protected by Cayman Islands law and by contract as provided in the Offering Memorandum and organizational documents.

125.    Marketing and promotion materials PlusFunds provided to potential investors, and available for review by Defendants herein, touted the protection from credit risk afforded SPhinX Funds assets. For example, a PlusFunds document entitled "Frequently Asked

36

Questions By Investors About SPhinX Products", dated May 24, 2004, stated among other things:

### 2.    What is a SPC?

*Segregated Portfolio company ("SPC") is an exempted company which is registered under section 233(1) of the Companies Law (2002 Revision) and which, as a result, is able to separate its assets into general and portfolio assets, rather than having said assets commingled as was traditionally done in the past.*

General assets, as the name suggests, are the general assets of the SPC (which is usually a nominal amount) that are subject to cross liability by all creditors of the SPC. However, the *portfolio assets are protected from claims of creditors in other portfolios. Therefore, only creditors of a particular portfolio can bring a claim against the assets of that specific portfolio, and if the assets therein are insufficient to extinguish the claim that creditor can proceed against the general assets of the company.*

\* \* \*

### 4.    Are the assets of each Portfolio Fund Series (PFS) commingled?

*No. The Portfolio Fund Series are separate and distinct entities with all assets segregated at various Prime Brokers or Futures Commission Merchant for each Portfolio Manager.* The Portfolio Manager has full discretion to invest and trade those assets generally in accordance with the strategies they employ on behalf of their other accounts.

### 5.    If a manager is unable to meet the liabilities to its creditors, do the creditors have recourse to other assets within that SPC?

No. By Cayman Law definition, the general assets and the assets of that Portfolio Fund Series of a Segregated Portfolio Company shall only be used to satisfy liabilities to the Creditors of that Portfolio Fund Series. *PlusFunds also goes one step further. To assure nor recourse, we also include specific naming conventions and ring fencing language in our counterparty and Prime Brokerage Documentation.*

\* \* \*

PlusFunds Group, Inc. plans to report credit risk exposure to provide investors with more information.

* * *

### 1.   Are any of the SPhinX Products listed on an Exchange?

Yes, SPhinX, Ltd. and SPhinX Strategy Fund Ltd. are listed on the Irish Stock Exchange.

(Emphasis added.)

A PlusFunds' marketing brochure entitled "The SPhinX Investment Program: A Prudent Path to Hedge Fund Investing" further stated:

> PlusFunds, a SEC-registered investment advisor, serves as investment manager of the SPhinX Investment Program and provides investors:
>
> > Effective Legal Structure on Operational Control – Participating managers trade within separate accounts established by PlusFunds and provide investors the benefits of their investment expertise. PlusFunds, however, protects investors by establishing custody arrangements, counterparty agreements and cash movement controls that manage operational risk. In addition, each separate account is legally and contractually ring-fenced to prevent cross-liability.
>
> > * * *
>
> > Central to PlusFunds' intelligent approach to hedge fund investing is the requirement that PlusFunds' assets are held in a separate account and not commingled with the assets of other fund investors.

126.   The DIMAs executed by SMFF, PlusFunds and the individual portfolio managers bolstered the customer segregation requirements. The relevant DIMAs represent that SMFF assets "including any uninvested cash" would be maintained at Refco's regulated affiliate, Refco LLC, acting as the "Settlement and Custody Agent."

127.   On or about November 19, 2002, SMFF opened customer-segregated accounts for each of its cells at Refco LLC, Refco's regulated affiliate.  The account opening documentation provided:

> All property carried for Customer [SMFF] by Refco shall be segregated as required by the Commodity Exchange Act and the rules of the Commodity Futures Trading Commission (CFTC).

128.   The Refco LLC account opening documents for SMFF further stated:

> If your security futures positions are carried in a futures account, they must be segregated from the brokerage firm's own funds and cannot be borrowed or otherwise used for the firm's own purposes. If the funds are deposited with another entity (e.g., a bank, clearing broker, or clearing organization), that entity must acknowledge that the funds belong to customers and cannot be used to satisfy the firm's debts.  Moreover, although a brokerage firm may carry funds belonging to different customers in the same bank or clearing account, it may not use the funds of one customer to margin or guarantee the transactions of another customer.  As a result, the brokerage firm must add its own funds to its customers' segregated funds to cover customer debits and deficits.  Brokerage firms must calculate their segregation requirements daily.

129.   Thus, Refco LLC assumed a duty to maintain SPhinX's assets in segregated accounts.  Refco LLC also, in accepting custody of SPhinX assets, assumed fiduciary duties to safeguard such assets and not to use them for Refco's own purposes or business operations.

130.   The customer-segregation requirement was essential to the SPhinX Funds, as mandated under Cayman law and relied upon by SPhinX investors.  Safeguarding the segregated nature of the assets provided a crucial level of protection to SPhinX's assets against the bankruptcy or insolvency of other investors, brokers, custodians, and service providers.

131.   Investors relied on the representations contained in the marketing materials and Offering Memoranda, and financial statements and based their decision to invest on those representations.  The materials relied on by the investors reflected current materials available at the time of the investors respective investment in the funds.  Those who invested in 2003 for

example, would have reviewed the financials from 2003 as well as the marketing materials and Offering Memoranda provided to them at that time. Investors in 2004 would have, for example, received the 2004 financials. Investors were unaware that those representations regarding segregated funds were false and misleading.

132.    The SPhinX investors reasonably relied on those representations.

133.    In just a short time after their inception, the SPhinX Funds succeeded in attracting an impressive level of AUM. AUM approached $1 billion by the end of 2003 and peaked at over $3 billion in 2004 and 2005.

134.    Investors, including the assignors of claims referenced herein, were provided with and reviewed SPhinX marketing materials and Offering Memoranda. These materials discussed, in detail, the nature of the funds and, in particular, the special requirements relating to the segregation of investor funds that is discussed in greater detail herein.

E.    **Connections and Providers.**

1.    **PlusFunds' Role as Investment Manager.**

135.    On or about July 12, 2002, SPhinX Ltd. entered into an Investment Management Agreement ("IMA") with PlusFunds. Various SPhinX Funds thereafter entered into identical IMAs with PlusFunds.

136.    Under the IMAs, PlusFunds was the exclusive investment manager for SPhinX. PlusFunds was given broad authority and discretion to run SPhinX's daily operations, as well as the responsibility to allocate assets, transfer and hold cash balances, open and maintain bank accounts, make distributions of assets, borrow and pledge funds, hire service providers and professionals and execute documents for and on behalf of SPhinX.

137.   PlusFunds and its management and Board of Directors owed the SPhinX Funds contractual and fiduciary duties, including duties to exercise due care and to manage SPhinX's funds for the sole benefit of SPhinX.

138.   At relevant times, PlusFunds' directors included Christopher Sugrue, Mark Kavanagh, Brian Owens, Diego Winegardner, Randall Yanker, Doug Morriss, and John Wehrle.

139.   Under the IMAs, PlusFunds received a management fee equal to a percentage of AUM as of the beginning of each month.  PlusFunds typically collected approximately 1.7% of AUM in the aggregate for management fees.  Approximately 97% of PlusFunds' 2005 revenues derived from SPhinX management fees.

140.   SPhinX had no employees or physical facilities.  Meetings of SPhinX's Board of Directors took place in New York at the offices of PlusFunds, with some SPhinX directors attending in person and others participating by telephone.  PlusFunds' representatives were present at meetings of SPhinX's board, and a PlusFunds' employee acted as the secretary for the SPhinX board meetings and prepared the board minutes.

141.   Although PlusFunds and the various SPhinX entities maintained their separate legal existence, the business and operations of SPhinX and PlusFunds were closely intertwined. Service providers, contract parties, and investors dealing with the SPhinX Funds generally communicated with PlusFunds agents and understood that PlusFunds acted as the investment manager for the SPhinX Funds.

### 2.   Refco's Role.

142.   Beginning in the 1990s, Refco Group Ltd. LLC, its successor entity, Refco Inc., and affiliated subsidiaries (collectively, "Refco Group") provided execution and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and

foreign exchange markets. At all relevant times, Refco LLC and Refco Capital Markets, Ltd. ("RCM") were two of Refco Group's three operating subsidiaries.

143.    As of the July 12, 2002 execution of the IMA, PlusFunds had agreed to retain Refco LLC to act for SPhinX's benefit and on its behalf, Refco LLC provided execution, clearing, and margin services in connection with futures and commodities trading activities.

144.    Refco LLC held customer assets belonging to SMFF. Refco LLC owed SMFF contractual and fiduciary duties in connection with SMFF's cash and assets, including duties to hold SMFF's assets and execute trades for SMFF's benefit, and not to use those assets for the benefit of Refco LLC or its principals and affiliates. Refco LLC also owed a duty to disclose facts relevant to the assets entrusted to Refco.

145.    As a regulated entity, Refco LLC maintained its customer assets in customer-segregated accounts at Harris Bank, such that these assets were protected in the event of Refco LLC's insolvency.

146.    PlusFunds also arranged for Refco Alternative Investments ("RAI"), a regulated commodity pool operator located in New York, to execute trades for SPhinX at the direction of PlusFunds. RAI also managed several external funds, including the S&P Managed Futures Index Fund LP that invested in the SPhinX program. RAI likewise owed contractual and fiduciary duties with respect to SPhinX's assets, including duties to use and hold those assets for SPhinX's benefit and not to use those assets for the benefit of RAI or its principals and affiliates.

147.    SMFF's segregated portfolios also held foreign currency exchange accounts with RCM, a non-regulated Bermuda entity. RCM was an offshore securities and foreign exchange broker. RCM also assumed fiduciary and contractual duties in connection with SMFF's assets,

including duties not to use those assets for the benefit of RCM or Refco and to disclose facts and information relevant to SMFF's assets entrusted to RCM.

148.   Refco made substantial investments in SPhinX.  As a SPhinX investor, Refco received SPhinX's Offering Memoranda and other materials.   Accordingly, Refco fully understood the SPhinX SPC business structure and the customer segregation requirements.

149.   Refco's President and CEO, Bennett, also invested in SPhinX, as did BAWAG, a controlling shareholder in Refco.  PlusFunds' chairman, Sugrue, had close relationships with Refco and Bennett, who were well acquainted with the SPhinX Funds.  Another PlusFunds director, Kavanagh, was also well connected with Refco, which employed Kavanagh's son, Michael.

150.   Refco also acted as a distributor for the SPhinX Funds, creating and marketing its own funds that invested in SPhinX.  In this role, Refco used SPhinX and PlusFunds' marketing materials and made representations to investors regarding SPhinX's structure and customer segregation requirements.

151.   As a result of the totality of the facts and circumstances surrounding the relationship between SPhinX and Refco, Refco and its directors and officers owed fiduciary duties to SPhinX with respect to investment funds entrusted to Refco.  These facts and circumstances included, among others and without limitation:

    (a)    Refco's acceptance of responsibility to act at all times on SPhinX's behalf and in its best interest;

    (b)    the custodial and entrustment nature of the relationship between Refco and SPhinX with respect to SPhinX customers' funds;

    (c)    the fact that SPhinX entrusted its funds to Refco with the reasonable expectation that the funds would be returned to SPhinX and SPhinX customers on their instruction;

(d)    Refco's decision to make use of SPhinX customer funds for purposes unrelated to Refco's ability to service its customers, including SPhinX, and without any benefit to the SPhinX funds;

(e)    the undisclosed facts and risks to which SPhinX customer funds were exposed by virtue of the undisclosed, unsecured, uncollateralized transactions alleged herein;

(f)    the concealed fact that Refco and RCM were insolvent beginning no later than December 2002;

(g)    the lack of deposit or similar insurance protecting the SPhinX customer funds transferred to RCM;

(h)    Refco's public statements concerning, among other things, its "focus on acting as an agent," its "customer-oriented philosophy," its appeal to "customers concerned about potential conflicts of interest," and its efforts to "avoid potential conflicts with [its] customers";

(i)    Refco's public statements, designed to foster greater trust and confidence with customers, that the business of Refco did not involve proprietary trading for Refco's account but rather involved acting as an agent and executing customer instructions;

(j)    Refco's statements to the effect that the relationships between Refco and other Refco entities were structured in such a way as to ensure that Refco would be able to satisfy its obligations to its customers before funds from Refco could be made available to other Refco entities for other corporate purposes, such as discharging obligations under notes issued by other Refco entities on which Refco was not obligated and which Refco did not guarantee;

(k)    the lack of indicia that the relationship between Refco and SPhinX was a debtor/creditor relationship, in which the SPhinX funds were lenders to or investors in Refco or any other Refco entity;

(l)    Refco's failure to disclose to SPhinX or PlusFunds the existence, nature, and extent of the massive intercompany transfers alleged herein;

(m)    the lack of any communications from Refco to SPhinX or PlusFunds that would have suggested to SPhinX or PlusFunds that SPhinX customer funds were being deposited in unregulated, non-segregated accounts where they were subject to the risk of loss to Refco's creditors, and that neither Refco nor RCM could be relied upon to return their funds when instructed to do so; and

(n)    Refco's superior knowledge of all of the underlying facts and the fraud alleged herein.

152.    The nature of the relationship between Refco on the one hand, and SPhinX and PlusFunds on the other, was such that innocent decision-makers at SPhinX and PlusFunds had every reason to expect that SPhinX funds in accounts at Refco would be held in regulated, customer-segregated accounts and would be returned to them on their instructions.

### 3.    DPM's Role.

153.    Under the Investment Management Agreement, PlusFunds was authorized and required to engage professionals and service providers necessary to operate the SPhinX Funds. Pursuant to this authority, PlusFunds engaged Derivatives Portfolio Management LLC ("DPM LLC") and its subsidiary, Derivatives Portfolio Management Ltd. ("DPM Ltd."), (collectively "DPM") to serve as the SPhinX Funds' administrator. The relationship among the SPhinX Funds, PlusFunds, and DPM was governed by a Service Agreement dated July 9, 2002, and amended on May 1, 2003, and June 30, 2004.

154.    In February 2005, Mellon acquired the assets and assumed the liabilities of DPM, which continued to provide administration services as DPM-Mellon. DPM-Mellon succeeded to the interests and obligations of DPM under the Service Agreement.

155.    Under the Service Agreement, DPM, as administrator to the SPhinX Funds, was obligated to perform financial and accounting services on behalf of SPhinX and PlusFunds. SPhinX and PlusFunds relied upon DPM to perform the services necessary for the administration of the SPhinX companies, including recordkeeping, accounting, financial reporting and cash management functions.

156.    SPhinX and PlusFunds reposed confidence and trust in DPM by delegating important duties to DPM. DPM owed fiduciary duties to SPhinX and PlusFunds.

157.    The Service Agreement required DPM to perform all services necessary for administration and reconciliation of the SPhinX Funds, including, but not limited to, providing:

daily activity and portfolio reports; daily reconciliations; daily and monthly valuations and NAV reports; reconciliations of marketable instruments, cash and security positions; monthly reports, including gains and losses, accrued dividend and interest analysis; market and credit risk reports; corporate secretarial functions; and quarterly unaudited financial statements.

158.   Among other things, the Service Agreement required DPM to:

> Fulfill one board of director position of the SPhinX Ltd., SPhinX Strategy Fund Ltd., Portfolio Funds, SPhinX Plus SPC, Ltd. and Strategy Master Funds.

159.   DPM's CEO and owner, Robert Aaron, sat on the Board of Directors of the various SPhinX Funds, including SMFF, as the representative of DPM and DPM-Mellon.  At all times relevant, DPM and, thereafter, DPM-Mellon and Mellon, had a duty to supervise and manage the activities of Robert Aaron, and are responsible for his actions.

160.   In exchange for providing its services under the Service Agreement, DPM was paid an administration fee calculated as a percentage of assets under management.

161.   DPM and Aaron owed fiduciary duties to both SPhinX and PlusFunds arising out of DPM's role as administrator of the funds.

## VI.   DIVERSION OF SMFF'S EXCESS CASH.

162.   Beginning in the late 1990s and continuing through the end of 2005, Refco was involved in a massive scheme to conceal hundreds of millions of dollars in unrecoverable customer and proprietary losses and falsify Refco's financial statements.  Essential to this scheme was ready access to cash, which was necessary to fund Refco's operations and conceal Refco's losses.

163.   As discussed in greater detail below, Refco had three primary operating subsidiaries, Refco Securities, LLC ("RSL"), Refco LLC and RCM.  The first two units were

regulated entities bound by restrictions on treatment of customer assets, including segregation requirements and the obligation not to use customer assets to fund operations.

164.    The third branch of Refco's operations, RCM, was an unregulated Bermuda entity without the strict regulatory obligations. In order to free up cash to fuel the Refco fraud, Refco funneled as many assets to RCM as possible, where those assets could be used to fund Refco's operations and conceal Refco's losses.

## A.    Robert Aaron Signs the July 31, 2002 Document.

165.    On or about July 31, 2002, Aaron signed a document (the "July 31, 2002 Document") on Refco stationery and at Refco's request that provided Refco with the authority to transfer SMFF's cash and other assets interchangeably among Refco entities without regard to segregation or protection of assets.

166.    Specifically, the July 31, 2002 Document stated:

> You are hereby authorized at any time and from time to time, in your sole discretion and without prior authorization from or notice to the undersigned entities, to transfer monies, securities, commodities or other property, for purposes of satisfying margin obligations, the production or satisfaction of any debit balance, or the satisfaction of any other commitments of the undersigned parties, interchangeability [sic] among and between the accounts of the undersigned maintained at one or more of the above entities (together or separately, 'Refco'). Such transfers may include transfers from a regulated commodity interest or securities account to any other account (including an unregulated account) of the undersigned entities.

167.    The document also included a prominent acknowledgement that segregation and protection of funds might be lost:

> CERTAIN REFCO ENTITIES ARE SUBJECT TO LAWS AND REGULATIONS WHICH MAY REQUIRE SEGREGATION OF THE UNDERSIGNED'S FUNDS AND PROPERTY AND ENTITLE THE UNDERSIGNED'S PROPERTY TO PREFERENTIAL TREATMENT IN THE UNLIKELY EVENT OF THE INSOLVENCY OF A PARTICULAR REFCO ENTITY.

BY PERMITTING THE TRANSFER OF FUNDS AND
PROPERTY AMONG THE UNDERSIGNED'S ACCOUNTS,
THE UNDERSIGNED ACKNOWLEDGES THAT SUCH
SEGREGATION AND PREFERENTIAL TREATMENT MAY
NOT BE RECEIVED.

168.    There was no legitimate business justification for Aaron to execute the July 31,

2002 Document. As Aaron knew and understood, SMFF's assets were required to be maintained

in customer-segregated accounts, protected from the insolvency of the prime broker or custodian

of the assets. His decision to sign the July 31, 2002 Document destroyed the protections in place

to preserve SMFF's assets for its investors.

169.    Aaron signed the July 31, 2002 Document to further his own interests. From his

role at DPM and his role on SPhinX's Board, Aaron understood that PlusFunds director Chris

Sugrue had a close relationship with Refco. He understood that challenging Refco or refusing to

accommodate Refco could jeopardize DPM's relationship with PlusFunds and the SPhinX

Funds, the major client of DPM.

170.    Aaron signed the July 31, 2002 Document at Refco's request with full knowledge

of the document's effect.

171.    Aaron's actions were in breach of duties imposed on SPhinX's directors to

establish and maintain procedures to identify and segregate assets. Aaron's actions were adverse

to the interests of PlusFunds and SPhinX, and PlusFunds and SPhinX in no way benefited from

them.

172.    Aaron has testified and admitted that he understood that the July 31, 2002

Document permitted the transfer of funds among Refco LLC and RCM accounts. Aaron

understood that the transfer of SMFF funds among Refco accounts might result in the loss of

segregation and preferential treatment relating to those funds. Aaron understood when he signed

the July 31, 2002 Document that he was placing SPhinX assets at risk and that protection and

segregation might be lost. He understood that keeping cash at RCM exposed SMFF's cash to an insolvency risk.

173.    Aaron did not consult or notify innocent SPhinX Board Members or PlusFunds before or after signing the July 31, 2002 Document. In fact, the existence and terms of the July 31, 2002 Document were concealed from innocent decision-makers at SPhinX and PlusFunds, including the SPhinX Board and the PlusFunds Board and management.

174.    Innocent members of SPhinX's Board and PlusFunds' management and/or board were unaware of the July 31, 2002 Document and that SPhinX's assets might be removed from regulated, protected, customer-segregated accounts. They were further unaware that SPhinX's funds at Refco might be subject to the claims of Refco's creditors in the event of insolvency.

175.    Although certain members of PlusFunds' management team were aware that SMFF's cash was swept from Refco LLC accounts to RCM, PlusFunds' management was unaware that RCM was an unregulated entity that commingled customer assets and could not provide customer segregation or protection from claims of RCM's creditors. Innocent members of PlusFunds' Board and management and the SPhinX Board were unaware that hundreds of millions of dollars of SMFF's cash were not maintained in customer-segregated accounts at a regulated entity or were exposed to the risk of RCM's insolvency.

176.    Had the innocent decision-makers at SPhinX and/or PlusFunds understood that SMFF's cash was exposed in unregulated, non-segregated, commingled accounts, they would have caused SMFF's assets to be moved to regulated, customer-segregated, protected accounts.

B.    **SPhinX and PlusFunds Monitored Their Exposure at Refco.**

177.    Although the SPhinX Funds had contracted to use Refco LLC, RAI and RCM for various services, innocent members of PlusFunds' management team were cautious about the Funds' relationship with Refco and monitored the Funds' exposure at Refco.

178.    Throughout the existence of the SPhinX Funds, PlusFunds' management and S&P convened a risk committee that analyzed the SPhinX Funds' risk exposure to trading counterparties and providers, including Refco-related entities.

179.    Because Refco did not have a credit rating from a recognized credit agency, PlusFunds' risk committee conducted an analysis of Refco's financial position and calculated a "shadow rating" designed to estimate Refco's approximate credit rating.  PlusFunds relied upon publicly available information, including Refco's financial statements and public filings to generate the shadow rating.

180.    Based upon PlusFunds' shadow rating of Refco, PlusFunds calculated guidelines to limit SPhinX's exposure on transactions with or assets entrusted to Refco.

181.    Innocent members of PlusFunds' Board and management were also aware of significant Refco transactions, including the August 2004 LBO transaction and August 2005 IPO for Refco stock, and the fact that those transactions were negotiated and underwritten by prominent and reputable law firms and banks, including Mayer Brown, Banc of America and Credit Suisse.  SPhinX and PlusFunds relied upon publicly available information, including Refco's financial statements and public filings that suggested that Refco's financial position was strong.

182.    Had the PlusFunds risk committee been aware that Refco's financial position was far worse than what Refco represented to the public, or that Refco was actively concealing in excess of $400 million in uncollectible losses, PlusFunds and SPhinX would have refused to do any business with Refco or allow any of SPhinX's assets, cash or securities to be maintained in Refco accounts.

**C.    Diversion of SMFF Cash to RCM.**

183.    SMFF's portfolio managers traded in futures and commodities on behalf of SMFF's Portfolio Funds.  SMFF's portfolio managers often utilized margin trading in these accounts, such that SMFF was only required to post a percentage of the value of the positions in cash.  The remaining free cash balance, or excess cash, could be used to generate additional returns for the SPhinX Funds.

184.    Beginning in December 2002, SMFF's excess cash was moved on a regular basis from segregated accounts at Refco LLC to accounts at RCM, where SMFF's cash was commingled with assets belonging to other RCM customers and RCM's own assets.

185.    Each week, RAI agents monitored the amount of cash necessary to satisfy margin requirements on SMFF's investments at Refco LLC, and, in conjunction with DPM and PlusFunds agents, caused excess cash to be moved to RCM.

186.    Aaron and DPM knew that the majority of SMFF's cash was maintained at RCM.  Aaron and DPM understood that SMFF's excess cash was moved from Refco LLC accounts to RCM accounts on a regular basis, and DPM was aware from its Service Agreement that it was responsible for the proper and secure investment of excess cash.

187.    Neither PlusFunds nor any of the SPhinX entities entered into an account agreement with Refco to provide for the maintenance of SMFF's excess cash at RCM.  The only account opening documents executed by SMFF for accounts at RCM were designated as foreign currency exchange accounts.

188.    Although certain PlusFunds agents were aware of the arrangement by which SMFF's cash was moved between the Refco LLC and RCM accounts, the true nature of the RCM accounts as unregulated, commingled accounts was not known to innocent PlusFunds

agents. Innocent members of SPhinX's Board were unaware that SMFF cash was moved to RCM or that SMFF's cash was not protected in customer-segregated accounts.

189. Similarly, although the individual portfolio managers were informed that cash would be moved to RCM, none of the portfolio managers was informed or understood that RCM was not a regulated entity and that funds maintained at RCM were commingled and therefore at risk.

**D.    Interest at Refco on SMFF Cash.**

190. More than 70 percent of SMFF's cash was held at RCM at most times relevant, but there was no *bona fide* business reason for allowing SPhinX's assets to be maintained or exposed at RCM.

191. From the time customer money first came into SMFF in December 2002, until late 2003, SMFF cash held at RCM did not yield interest income for the benefit of SPhinX. SMFF did not benefit at all from moving cash to RCM.

192. Beginning in or about December 2003, cash held with RCM yielded income at the rate of one month LIBOR minus 35 basis points. Beginning in or about October 2004, cash held with RCM yielded interest at the rate of 90% of the 90-day Treasury Bill rate.

**VII.    THE REFCO FRAUD.**

193. The motivation to move SMFF's cash to unregulated accounts was to provide easy access to cash for Refco. At all relevant times, Refco and its agents were involved in a scheme to conceal massive losses from Refco's books and records and enrich Refco insiders – a scheme that required ready access to cash to succeed. The diversion of SMFF assets to RCM, where cash could be channeled to fund Refco's operations and fraud, was part of that scheme.

194. The Refco entities, as the custodians of SMFF's cash, owed fiduciary duties not to convert or misuse those assets. Refco itself invested in the SPhinX Funds and created and

advised several funds that invested in the SPhinX Funds. As a result, Refco possessed and read the SPhinX offering materials. Refco's agents were familiar with the SPhinX Funds' structure and the Cayman SPC regime and understood that the SMFF funds were to be maintained in customer-segregated accounts. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of Refco's fiduciary duties.

195.    Refco and its co-conspirators, including Bennett, BAWAG, and others, devised and implemented an elaborate scheme through which Refco maintained the illusion that it was a highly successful, financially secure broker-dealer. The illusion of a thriving company enabled Refco to steal billions of dollars by positioning Refco for, and ultimately carrying out, what appeared on the surface to be a legitimate "buy-out" of insiders' interests in RGL.

196.    To maintain the illusion of financial and operational strength and stability, Refco and its agents, professionals and advisors conspired to conceal Refco's trading losses, operating expenses and true financial condition by fraudulently inflating Refco's revenues and funding virtually every aspect of Refco's operations and expenses with assets belonging to customers of RCM, including SMFF.

197.    Refco created the illusion that it was financially solid by concealing trading losses and operating expenses from Refco's financial statements, recording them as receivables owed by RGHI (a related-party company owned and controlled by Bennett and, prior to the LBO, by Bennett and Grant), and inflating Refco's revenues by recording hundreds of millions of dollars in accrued interest income on these phantom receivables.

198.    Once these losses and operating expenses were concealed, Refco and its lawyers, Mayer Brown, carefully designed and implemented a series of fraudulent RTLs to conceal the RGHI Receivable. The RTLs purported to be loan transactions involving third parties, but only

served to pay down the RGHI Receivable at the end of Refco's reporting periods in an effort to conceal the Receivable from Refco's books. Defendants Liberty Corner, Pigott, EMF Financial, EMF Core Fund, Delta Flyer, Flanagan, Ingram Micro, CIM Ventures, Beckenham, Krieger, Coast, CS Land, and Petitt each helped conceal Refco's true financial condition by participating in RTLs in exchange for a fee. SMFF's assets were diverted to RCM to be used in the RTLs and other Refco operations.

199.    At the same time that the RGHI Receivable was concealed through fraudulent RTLs, Refco funded its operations by diverting RCM customer assets (including SMFF cash) and using them to finance Refco Group and affiliates that had no ability and no intention of returning the RCM customer funds.

200.    Refco's auditors, lawyers, and financial advisors actively assisted in manufacturing and maintaining this illusion by lending their reputations and an aura of respectability to Refco's finances and operations and by actively participating in the fraud. Indeed, the Refco scheme only could have worked with the active assistance of Refco's professionals and advisors.

201.    Having successfully maintained the illusion of Refco's financial health, Refco borrowed $1.4 billion of bank and bond debt to fund the August 2004 LBO that enriched Refco's insiders at the expense of its customers and creditors. RCM was left insolvent and unable to repay the customers, including SMFF, from whose accounts assets had been stolen to fund Refco's business.

202.    As of the date of the LBO, Refco and RCM were insolvent. As a result, Refco's officers and directors owed fiduciary duties to Refco's creditors and customers, including SMFF.

203.    A year later, as was always the plan, the LBO was followed up with an initial public offering (the "IPO") that further impaired Refco's assets.  The IPO (i) impaired Refco Inc.'s financial condition through the fraudulent sale of more than $583 million of shares of common stock, (ii) caused Refco Inc. to pay down over $230 million of RGL's LBO debt (despite the fact that RGL was insolvent), approximately $40 million in underwriting fees and expenses, and more than $80 million in the form of a "greenshoe" dividend, for which it received no value, and (iii) thereby allowed Refco insiders to strip out all of Refco's remaining assets.

204.    Given Refco's true financial state, as the Company's auditors, legal advisors, and financial advisors knew and/or consciously avoided knowing, neither the LBO nor the IPO served any legitimate purpose.  Refco was insolvent and its attention should have turned to its customers.  The LBO and IPO were only entered into to allow Refco's insiders, including BAWAG and Grant, to cash-out their interests at inflated values that bore no relationship to Refco's true financial condition.

205.    Refco's auditors, Grant Thornton, issued unqualified, clean audit opinions on Refco's fraudulent financial statements with knowledge of the nature and massive extent of the Refco fraud.  The illusion of Refco's financial stability and health could not have been maintained without the complicity of Mayer Brown, Refco's attorneys.  Over the course of more than five years, Mayer Brown attorneys documented and facilitated fraudulent RTLs at the end of each relevant reporting and audit period and misallocated operating expenses and fictitious accrued interest on the RGHI Receivable.  Nor could the RTLs have occurred without the complicity of the other RTL Participants.  Similarly, the fraudulent hoax could not have been maintained if Ernst & Young had not willingly generated false Refco tax returns or if PwC had not validated Refco's deficient internal controls throughout the LBO and IPO process.  Further,

55

Credit Suisse and Banc of America Securities structured and facilitated the lucrative cashing-out of Refco's insiders' interests through the LBO transactions. Each of these Defendants received significant fees and other payments in return for their support and participation in the Refco fraud.

### A.   The Refco Entities.

206.   With the exception of RAI and RGHI, the Refco entities have not been named as Defendants because they have received a discharge of claims in their bankruptcy case. The specific Refco entities include the following:

(a)   Refco Group Ltd., LLC – Before the LBO, RGL was the corporate parent of Refco.

(b)   Refco Capital Markets, Ltd. – Before the LBO, RCM was an indirect subsidiary of RGL. RCM was organized and existed under the laws of Bermuda. At all relevant times, RCM was an unregulated securities broker and foreign exchange broker, and one of three principal operating subsidiaries of Refco.

(c)   Refco Inc. – Refco Inc., a Delaware corporation, was the corporate parent of both RGL and RCM. Refco Inc. was a publicly traded holding company that, through its subsidiaries, provided securities brokerage, execution, and clearing services for exchange-trade derivatives and prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. was formed in connection with Refco's August 2005 IPO, and was the issuer of the stock sold in the August 2005 IPO.

207.   Further, the relevant affiliates and subsidiaries of Refco Inc. include:

(a)   At all relevant times, Refco Securities, LLC ("RSL") was a non-debtor, indirect Refco Inc. subsidiary. At all relevant times, RSL was a Delaware limited liability company and registered broker-dealer.

(b)   At all relevant times, Refco Global Finance Ltd. ("RGF") was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. RGF filed for bankruptcy protection under Chapter 11 on October 17, 2005.

(c)   At all relevant times, Refco Capital LLC ("RCC") was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware. As detailed below, Bennett and others used RCC as the

"treasury" and "disbursing agent" through which RCM's assets were diverted and distributed to fund the operations of the other Refco entities. RCC filed for bankruptcy protection under Chapter 11 on October 17, 2005.

(d)     At all relevant times, Refco LLC was an indirect subsidiary of Refco Inc. organized and existing under the laws of Delaware.  Refco LLC was along with RSL and RCM, was one of three primary Refco operating subsidiaries.  Refco LLC filed for bankruptcy protection under Chapter 7 on November 25, 2005.

208.     At all relevant times, Defendant RGHI was a Delaware, subchapter S corporation that, before the LBO, was owned 50% by Bennett and 50% by Grant.  In connection with the LBO, Bennett acquired Grant's interest in RGHI and became the sole owner of RGHI.  From 1999 until the LBO, RGHI had a 90% interest in RGL.  The remaining 10% in RGL was controlled by BAWAG, a foreign financial institution closely tied to Bennett.

209.     Although it was not a Refco entity, Defendant BAWAG was closely intertwined with Refco going back at least until the early 1990s, but particularly during the period leading up to the LBO in August 2004.  In a 1999 transaction brokered by Sugrue and Thomas Hackl, acting respectively for Refco and BAWAG, BAWAG acquired a ten percent equity interest in Refco as well as an additional undisclosed 27% interest.  BAWAG also loaned undisclosed amounts to Refco such that BAWAG exercised actual influence and control over Bennett and Refco's business.  As discussed in greater detail below, BAWAG and Refco conspired to help each other conceal losses from the respective books and records of Refco and BAWAG.

**B.     Overview of Refco's Business.**

210.     Before its implosion, Refco was one of the world's largest providers of brokerage and clearing services in the international derivatives, currency, and futures markets.

211.     Refco had three major operating subsidiaries through which its services were provided:

(a)  RSL was a registered broker-dealer through which Refco offered prime brokerage services. RSL was a registered broker-dealer regulated by the SEC and the NASD.

(b)  Refco LLC, a regulated futures commission merchant through which Refco executed and cleared customers' orders for exchange-traded derivatives. Refco LLC was regulated by, among other entities, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), and was subject to the net capital and other regulatory requirements of those entities.

(c)  RCM, a Bermuda entity was at all relevant times "unregulated." In December 2001, Refco shut down RCM's Bermuda operations and "repatriated" all of RCM's operations to the United States.

## C.  The Refco Fraudulent Scheme.

212.  Beginning in late 1997, Refco initiated a three-part fraudulent scheme through which it concealed trading losses and operating expenses, inflated revenues, and hid the manipulation of Refco's financial statements through the fraudulent RTLs, all the while funding Refco's operations with customer assets – including SMFF cash – looted from RCM.

## Part One – Fraudulently Misrepresenting Refco's Financial Statements.

213.  Refco avoided writing off hundreds of millions of dollars in trading losses and misallocated operating expenses and inflated Refco's revenue with phantom interest income, by booking these amounts as receivables owed by RGHI (a related-party company owned and controlled by Bennett and Grant) resulting in a massive related-party receivable owed to various Refco entities. This, in turn, concealed Refco's true financial results, and allowed Refco (i) to overstate assets, understate liabilities, and overstate profit and loss statements, and (ii) fraudulently to project an illusion of financial health and strength—falsely securing customer confidence and ensuring the continued deposits of cash and securities from customers, including SPhinX, needed to facilitate and fund the Refco scheme.

**Refco's Trading Losses**.

214.    As part of its trading business, Refco regularly extended credit to customers who engaged in securities, commodities, and futures trades.  As a result, when markets fluctuated, as they did during the 1997 Asian market collapse, Refco customers trading on credit could not cover their losses, and Refco was forced to assume those losses.

215.    Refco's customer and proprietary trading losses in 1997-1999 alone amounted to hundreds of millions of dollars.  If disclosed, trading losses of this magnitude would have caused Refco to shut down, and customers such as SPhinX and PlusFunds would never have done business with Refco at all.  Refco knew that it would lose customers and considerable goodwill if the public did not believe that Refco had sound internal risk management controls, was appropriately capitalized, and was financially healthy.

216.    Facing debilitating losses, Refco set out to prop up its reputation and perceived strong financial condition through fraud.  Instead of disclosing and writing off its losses as bad debts, Refco caused its losses and uncollectible obligations to be transferred to RGHI and acknowledged a receivable owed to Refco by RGHI.  This was done without appropriate reserves and thus overstated the overall enterprise's financial results.

217.    These trading losses were converted to a receivable owed to Refco through one of three mechanisms:  (i) the obligation to repay Refco for covering a customer's bad trade was transferred from the customer to RGHI; (ii) the obligation to repay money loaned to a Refco customer (where the customers' devalued collateral did not cover its obligation to Refco) was transferred from the customer to RGHI; or (iii) in Refco's own proprietary trading, Refco booked its trading losses at RGHI, creating a receivable owed by RGHI (the "RGHI Receivable").

218.    Instead of being written off as bad debt, hundreds of millions of dollars in customer and proprietary trading losses were "converted" into what appeared to be a legitimate

and collectible receivable from RGHI—a related party whose principal asset was Refco stock. If the truth had been disclosed, Refco would have violated its debt covenants with its lenders, would have had to report its insolvency and would have had insufficient regulatory capital to continue to do business.

**Concealing Refco Operating Expenses.**

219.    Further perpetuating the illusion that Refco was in healthy financial condition, Refco also hid tens of millions of dollars of Refco expenses (and thereby fraudulently increased Refco's apparent profits) by transferring them to RGHI, even though these expenses were incurred and paid by Refco.

220.    Through this scheme, tens of millions of dollars in expenses unrelated to RGHI, including tens of millions in computer systems expenses and millions more in payroll and outside professional expenses, were moved off Refco's books and concealed as a receivable owed to Refco by RGHI. As the Examiner appointed in the Refco Chapter 11 case determined, Refco's operating expenses were "transferred to RGHI and added to the [RGHI R]eceivable balance," thereby overstating the earnings capability of RGL.

**Inflating RGL's Revenues with Phantom Income.**

221.    Refco also fraudulently inflated its income as a result of "transactions" with RGHI. On January 28, 2004, for example, the RGHI Receivable was increased by two entries totaling approximately $13 million, both of which resulted in the recording of income at Refco.

222.    Refco further fraudulently inflated its revenues and financial results by charging RGHI usurious interest of as much as 35% on the RGHI Receivable. This was fictitious income recorded (but not paid) on the hundreds of millions of dollars in trading losses, operating expenses and other transactions that comprised the RGHI Receivable. For example, on or about January 28, 2004, Refco increased its receivable from RGHI by $62.75 million through a

transaction described as "Compound Interest To Principal." The $62.75 million of interest had been recorded as income by Refco.

223.    Between 2001 and 2005 alone, fictitious recorded interest on the RGHI Receivable amounted to at least $250 million.

224.    Between the trading losses, operating expenses and other transactions that made up the RGHI Receivable, and the accrued interest on the RGHI Receivable, just prior to the LBO, the RGHI Receivable ballooned to nearly $1 billion.

**Part Two - Keeping the Illusion Going Long Enough to Cash-out**.

225.    After losses and operating expenses were moved from Refco's books, Refco had to conceal the fictitious nature of the RGHI Receivable and Refco's true financial condition. Refco accomplished this through fraudulent "round trip loan" transactions and by funding Refco's operations with RCM customer assets, which included SMFF's cash.

226.    A large receivable owed to Refco by a related-party, which was owned by its current and former chief executive officer, would have to be disclosed on Refco's financial statements, and would have invited scrutiny and skepticism. To conceal the magnitude and related-party nature of this receivable, Refco devised and implemented a series of sham "loans" timed to straddle Refco's financial reporting and audit periods.

**D.    RTL Transactions.**

227.    The round trip loan transactions—*i.e.*, the RTLs—enabled Refco temporarily to remove related-party receivables off of Refco's books by shifting them between wholly-owned Refco subsidiaries, RGHI, and several third-party Refco customers (or their affiliates) who agreed to serve, for a fee, as conduits in the deceptive RTLs.

228.    The RTLs were implemented at the end of each fiscal year starting in 1998 (and also, beginning in 2004, at the end of each fiscal quarter) to "pay-down" temporarily the RGHI

Receivable and replace it on Refco's books with a receivable purportedly owed by an unrelated third-party customer of Refco. In order to conceal the size of the RGHI Receivable, a number of RTLs were often employed, temporarily replacing the nearly $1 billion RGHI Receivable with a number of smaller third-party receivables.

229. Thus, at the end of every relevant reporting and audit period, a Refco entity (sometimes RCM) would "loan" up to $720 million to a third-party with no apparent relation to Refco, Bennett, or RGHI. That third-party entity would then "loan" the same amount to RGHI (typically via a transfer to one of RGHI's accounts at Refco). The RTL was completed when RGHI used the "loan" to pay down the debt it owed Refco (typically via a credit to one of RGHI's accounts at Refco). Thus, on Refco's financial statements, the RGHI Receivable was transformed into a payable on a loan owed to Refco from an unrelated third-party.

230. Right after the start of each new reporting or audit period, the RTL was "unwound" by reversing the entire process. As the temporary pay-down of the RGHI Receivable was reversed, RGHI returned the funds it had "borrowed" from the RTL Participants, and the RTL Participants in turn paid back the money they had borrowed from Refco. Once the transaction was unwound, the RGHI Receivable was restored to its full value.

231. For agreeing to participate in the RTLs and conceal the related-party nature of the RGHI Receivable, the RTL Participants received payment of the "spread" between the interest rates of the two "loans." In this manner, for example, Pigott received, either through direct personal payments or through payments to Liberty Corner, at least $1.1 million in interest charges as a reward for his participation in the RTL scheme. The other RTL Participants also received fees for their participation in the RTL scheme.

232.    In addition, for many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the supposed "third-party lenders" on RGHI's behalf, again despite the fact that the RTLs provided no benefit to RGL.  Thus, the RTL Participants knew and/or consciously avoided knowing that the transactions involved risk-free transfers of large round-dollar amounts days before the end of Refco's reporting periods, and that these transfers would be unwound days after the start of the new reporting or audit periods.

233.    Refco, with the active assistance of Mayer Brown and the RTL Participants, engaged in these RTLs at least 18 times from 2000 through 2005.

234.    In addition, from 2000 through 2005, Refco engaged in approximately 12 additional wire transfer RTLs with, among others, Refco's conspirator and 10% equity owner, BAWAG.  These loans involved transfers of amounts from BAWAG to RGHI in late February, with those transactions reversed in early March.  BAWAG has admitted its role in these transactions, as well as its knowledge that Refco was engaged in RTLs to fraudulently improve its financial statements.

235.    In this manner, at the end of each relevant reporting or audit period, Refco, with the active assistance of Mayer Brown, BAWAG and the RTL Participants, falsified Refco's financial statements to suggest that the RGHI Receivable had been repaid or never existed. Refco concealed the magnitude and related-party nature of the RGHI Receivable at the end of each relevant reporting and audit period and thereby concealed Refco's trading losses, its true operating expenses, and the fictitious nature of hundreds of millions of dollars in revenue.

### E.    Looting RCM's Assets.

236.    In order to keep Refco appearing to be a fast-growing group of companies, and to maintain the illusion that Refco was highly profitable, healthy, and able to satisfy its substantial working capital needs from what it called its "internally generated cash flow and available

funds," Refco needed cash.  As Refco itself stated, "[r]eady access to cash is essential to our business."

237.   Because its other operating units were regulated entities, RCM became Refco's source of cash to fund its operations.  The movement of customer assets to RCM became crucial to Refco's ongoing operations.

238.   Instead of owning up to its true financial condition and borrowing the money it needed as part of an overall restructuring of operations, Refco stole it from RCM and its customers, including SMFF.  In violation of its fiduciary duties, Refco simply took the money and property entrusted to RCM by its customers, including SPhinX and PlusFunds, and sent the funds to other Refco entities.

239.   On a daily basis, RCM customers' assets, commingled in one account at Chase Bank, were transferred out of RCM to other Refco entities.  Refco caused RCM to keep as little cash as possible on hand.  In fact, even though RCM purported to hold billions of dollars of customer cash and securities entrusted to it, RCM in fact maintained only about $50 million in cash and those securities it did not need to fund the current operations of RGL and its affiliates.

240.   The diverted RCM customer assets were used for a wide variety of general and specific funding purposes by various Refco affiliates that would not have been able to sustain their operations without RCM customer funds.  Another use for the RCM customer assets was to fund the RTLs described above.

241.   These transfers, which purportedly took the form of unsecured "intercompany loans" from RCM to other Refco entities, often occurred without any "loan" documentation between RCM and the Refco entities that received the funds.

242.    Because Refco's overall financial health and strength depended on a constant influx of RCM assets, Refco kept careful track of the intercompany transactions and of the customer funds that were available for diversion at RCM at any given time. Refco created daily "cash flow" statements identifying customer assets available at RCM for diversion, which were circulated at least to Bennett, Maggio, and Trosten.

243.    The fraudulent scheme perpetrated on RCM's customers, including SPhinX and PlusFunds, was so fundamental to the operation and financing of Refco that it was or should have been apparent to Grant Thornton, PwC, Ernst & Young, and Mayer Brown. The volume and size of the transfers involved, on many occasions hundreds of millions of dollars each, ensured that the amounts stolen in RCM customer assets outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible RCM transfers totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004 and only $150 million in 2005.

## VIII.   THE 2004 LBO AND 2005 IPO.

244.    The purpose of the entire scheme was to allow Refco's insiders, including Bennett, Grant, BAWAG and others, to sell their interests in Refco at a fraudulently inflated price. Indeed, in the years before the LBO, Refco made a number of attempts to sell:

- At the end of 1998, with Mayer Brown's assistance, Bennett, Maggio, and Grant sold a 10% ownership interest in RGL to BAWAG for $95 million and received an additional $85 million for granting BAWAG an option to purchase an additional 10% interest in the company.

- In 2001 and 2002, Refco, with Ernst & Young's assistance, explored the possibility of selling substantial portions, and perhaps all, of Refco to BAWAG or to third parties in ways that maximized the tax benefits of any such sale.

- In 2001 and 2002, Refco hired Credit Suisse to try to find a major investment bank or commercial bank to purchase Refco outright. Credit Suisse was unable to identify a suitable purchaser.

245.    Through these and other attempted transactions, each of Refco's professional advisers became aware that Refco's insiders intended to sell their interests in Refco.

246.    As the court-appointed Examiner observed, Grant Thornton "was aware as early as 1998 of Bennett's plan to sell," when Bennett informed Grant Thornton that he "intended to restructure Refco over the next 3-10 years" and "to increase earnings and maintain RGL's book value," because he and others working with him wanted "to liquidate their positions."

247.    The Examiner concluded that "E&Y understood since before . . . January 1, 1997 that the goal of Refco's owners was to sell the entire [company]." In mid-2001, Refco Insiders specifically asked Ernst & Young to develop a "tax free" way of selling all or part of Refco. Although Refco considered an outright sale of a portion of Refco to BAWAG in 2001-2002, a satisfactory structure that addressed the various tax considerations raised by Ernst & Young could not be developed and an outright sale to BAWAG was abandoned in 2002.  While no outright sale to BAWAG was realized in 2002, BAWAG entered into or contemplated entering into a "Proceeds Participation" agreement prepared by Mayer Brown, pursuant to which a BAWAG affiliate ("DF1") made three payments to RGL in exchange for the right to participate in the proceeds of a future sale of RGL.

248.    The Examiner also observed that "no later than February 6, 2002," and possibly long before that, "[Mayer Brown] knew that the ultimate goal of . . . Bennett and other [Refco employees] . . . was to sell RGL."

249.    Similarly, Credit Suisse knew no later than 2001 that Bennett and the other Refco Insiders wished to cash-out their interests in Refco.  In June 2003, Bennett hired Credit Suisse as Refco's exclusive financial advisor to assist in, among other things, selling Refco.  After efforts

to sell Refco outright failed, Credit Suisse devised other ways through which the Refco Insiders could sell all or a portion of Refco.

### A.   The LBO.

250.   In November 2003, Refco began negotiations with THL, a private equity firm headquartered in Boston, regarding a possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.

251.   The LBO was ultimately carried out on August 5, 2004. THLP, through affiliates, purchased 57% ownership interest in Refco for approximately $507 million; Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks. As a result of the LBO, Bennett and others acting in concert received $106 million, with at least $25 million going to Bennett personally. In addition, hundreds of millions of dollars were transferred to RGHI.

252.   In or about July 2002, BAWAG and Refco entered into a Proceeds Participation Agreement, pursuant to which BAWAG acquired rights to participate in the proceeds of any sale of Refco in exchange for certain payments. Going into the LBO, Refco had significant obligations to BAWAG, and a substantial part of the proceeds of the LBO was used to redeem BAWAG's interest in Refco and to repay BAWAG's loans to Refco. At the closing of the LBO, BAWAG received in excess of $950 million directly or through its subsidiaries.

253.   By the time of the LBO, the trading losses and operational expenses that had been pushed onto RGHI's books and hidden through the RTLs had grown to over $700 million and the diversion of RCM property had grown to approximately $2 billion.

254.   Even though this was well known to Refco and its legal and financial advisors and auditors involved in the LBO, Refco Group borrowed $1.4 billion of bank and bond debt to fund THLP's buyout of RGHI's control of Refco. The LBO proceeds were not used to retire the full

amount of the RGHI Receivable, pay the operating expenses that had been concealed on RGHI's books or repay any of the loans owed to RCM. Instead, Refco used the proceeds to cash-out its insiders, including Bennett, BAWAG, Tone Grant, and others.

255. Refco's auditors and legal advisors each played key roles in addressing and allaying THLP's concerns in connection with entering into the LBO. Nowhere in the LBO Offering Circular was Refco's use of RCM's assets or the RGHI Receivable disclosed. Thus, Refco's auditors and legal advisors concealed from the world both: (1) the misuse of RCM customer assets (including SPhinX cash), and (2) the jeopardy that Refco's precarious financial condition caused to customers of Refco and RCM.

256. Nowhere did the Offering Circular explain: (i) that RCM customer assets (including SPhinX's cash) were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; (ii) that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and other Refco affiliates who were obligated to repay the LBO borrowings; (iii) that Refco's business plan did not provide for repayment of these receivables; and (iv) that the LBO transactions resulted in "priming" these receivables with $1.4 billion of new bank and bond debt without regard for the interests of RCM.

257. Instead, the Offering Circular falsely stated that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." Similarly, the Offering Circular stated elsewhere that "[t]he effect of this subordination is that, in the event of a bankruptcy ... , the assets of [RCM] could not be used to pay you [bondholders] until after all other claims against [RCM], including trade payables, have been fully paid." These and similar statements describe how the LBO should

have been structured so as to be consistent with the duties the directors of RGL had to RGL and

RCM—*i.e.*, ensuring that any obligations incurred by any Refco affiliate in connection with the

new LBO debt would not be satisfied until after all of RCM's intercompany obligations were

satisfied.

258.    Refco's professionals working on the LBO, Mayer Brown, PwC, Grant Thornton,

and Ernst & Young, each knew and/or consciously avoided knowing the magnitude and

significance of Refco's financial problems.  Each of these Defendants reviewed, helped prepare

and, or was aware of the following information set forth in the "payable to customers" line of the

condensed consolidating balance sheet to Note 0 of the financial statements attached to the LBO

Offering Circular, which is labeled Condensed Consolidating Financial Information:

| Condensed consolidating balance sheet | | | | | |
|---|---|---|---|---|---|
| February 29, 2004 | | | | | |
| | Parcel (RGL) | Guarantor Subsidiaries [Includes RCC] | Non-Guarantor Subsidiaries [Includes RCM and RGF] | Consolidation Adjustments | Consolidation Totals |
| Liabilities (in thousands) Payable to customers | $465,681 | $1,556,629 | $6,647,453 | ($3,573,946) | $5,095,717 |

259.    By performing professional services for the Company and/or performing detailed

due diligence of the Company in connection with the LBO, each of Refco's professionals was

familiar with Refco's corporate structure and its operations.  They knew that Refco and RCM

held funds belonging to customers, including SPhinX, and therefore owed fiduciary and

contractual duties with respect to those funds.  While an outsider would have been unable to

discern from the condensed consolidating information the full extent to which RCM funds had

been siphoned off to RGL and its other affiliates, these professionals understood, at least, the

following:

    (a)    that in order to obfuscate Refco's financial statements and conceal the fraudulent scheme, Refco's financial statements misleadingly referred to intercompany and related-party obligations as receivables and payables owed to and from "customers";

    (b)    as a result, when the condensed consolidating financial statement referred to RGL's liabilities of approximately $465,681,000 as a "Payable to customers," these Professional Defendants knew and/or consciously avoided knowing that this $465,681,000 liability represented RGL's payable on intercompany obligations to its subsidiaries because RGL was a parent holding company with no trading operations and no "customers";

    (c)    RCC, the principal guarantor of the LBO debt, and the other guarantor subsidiaries could not have had $1.556 billion of payables to "customers" because RCC did not have any significant customer obligations and the other guarantors did not engage in business that had the potential to generate that magnitude of customer payables; and

    (d)    that only RCM had the volume of non-segregated customer assets necessary to fund billions of dollars in intercompany loans.

260.    Furthermore, as Defendants Mayer Brown, PwC, Grant Thornton, and Ernst &

Young knew, each intercompany transfer by RCM to RCC was booked in a back-to-back fashion

through a non-Guarantor Subsidiary, Refco Global Finance, Ltd. ("RGF"). Thus, these

Defendants knew and/or consciously avoided knowing that the $3.573 billion in consolidation

adjustments were the result of eliminating the approximately $465,681,000 of RGL's

intercompany debt owed to RCM, the approximately $1.556 billion of RGF's intercompany debt

owed to RCM, and the approximately $1.556 billion of RCC's intercompany debt owed to RGF,

and that RCM was thus owed $2 billion ($465 million owed from RGL and $1.556 billion owed

from RCC, which when booked in a back-to-back fashion through RGF, added another $1.556

billion to the consolidation adjustment).

261.   Given their due diligence, detailed in-depth understanding of Refco's financial structure and operations, and access to and preparation of the type of condensed consolidating financial information set forth in Note 0, each of the above Defendants who assisted and advised the company in connection with the LBO was fully aware of the massive $2 billion payable owed by RGL and its affiliates to RCM.   Refco's professionals knew that RCM's customers, including SPhinX, could not be returned.

262.   The ultimate effect of the LBO was to pledge RGL's and RCM's asset base in favor of bank and bond lenders, leaving RCM without assets to satisfy its outstanding obligations to its customers and creditors, including SPhinX.

263.   Furthermore, as these Defendants knew and/or consciously avoided knowing, this LBO was atypical because RGL went into the LBO with hundreds of millions of dollars of concealed trading losses, misallocated operating expenses, phantom revenues, and unpaid billions owing to RCM, whose assets had been used to fund Refco's entire operations.

264.   Given Refco's true financial condition, the LBO irreparably undermined Refco's already precarious financial condition.   Refco and RCM had been insolvent at least as of the consummation of the LBO.

**B.      The IPO.**

265.   Less than one year after the LBO, Refco, and THL led Refco through an initial public offering of its stock.   In the IPO, Bennett sold approximately 7 million shares for a total price of approximately $146 million.   THLP and its affiliates sold approximately 10 million shares of Refco common stock for approximately $223 million.

266.   A "greenshoe" option was also exercised whereby Credit Suisse, Banc of America Securities and other investment bankers agreed to purchase approximately 4 million shares of

71

Refco common stock for over $80 million. The proceeds from the over allotment sale were used to pay an aggregate dividend to Refco's pre-IPO shareholders.

267.    As evidenced by this dividend, the IPO was structured with the principal goal of allowing Refco's insiders to cash-out, as opposed to raising funds for Refco to reduce Refco's enormous debt. Furthermore, because Refco and RCM were insolvent at the time of the LBO, the $231 million in proceeds from the IPO that Refco Inc. used to retire part of RGL's LBO debt was wasted; Refco spent over $200 million dollars on RGL – an insolvent subsidiary that filed for bankruptcy merely weeks later.

268.    As a result of the IPO, Refco faced hundreds of millions of dollars in liabilities to the purchasers of Refco stock in the IPO who had claims against Refco based on its false and misleading registration statement and prospectus. The IPO forced Refco deeper into insolvency.

269.    The professionals who advised the company in connection with the IPO knew and/or consciously avoided knowing that Refco was in no state to undertake an IPO and that the IPO as structured would cause irreversible harm to Refco's customers, including SPhinX.

270.    Indeed, the most blatant indication that Grant Thornton, Mayer Brown and PwC understood that Refco was hiding hundreds of millions of dollars in undisclosed related-party receivables was the conscious editing of SEC disclosure documents to conceal the RGHI Receivable.

271.    Given the planned IPO, Refco had to file an S-4 with the SEC to register the $600 million of senior subordinated notes issued in the LBO. In early drafts of the S-4 registration statement, which were reviewed and commented on by Grant Thornton, Mayer Brown, and PwC and subsequently submitted to the SEC for comment, the S-4 disclosed a $105 million receivable owed from RGHI to Refco, which was characterized as a "customer receivable." As this was a

related-party receivable owed to Refco from RGHI, the SEC questioned the characterizing of "amounts due from equity members (RGHI) as receivable from customers." Given the SEC's comment, Grant Thornton, Mayer Brown, and PwC were forced to amend subsequent drafts and the final October 12, 2004 version of the S-4 registration statement to falsely reflect that the receivables were due from "equity members," not customers.

272. The professionals involved in the LBO thus substantially assisted Refco in trying to deceive the SEC and the investing public about the RGHI Receivable. Furthermore, those that were aware of the full massive size of the RGHI Receivable and/or that RTLs were used to reduce the RCM Receivable at the end of reporting periods, such as Mayer Brown, Grant Thornton and PwC, also knew and/or consciously avoided knowing that the actual amount due from "equity members" was well above the $105 million amount reported in the S-4 and that the S-4 was, therefore, still materially false.

273. Despite being aware of these related-party receivables, none of Refco's professionals disclosed the RGHI Receivable in Refco's IPO S-1 registration statement.

274. The S-1 was reviewed by and prepared in consultation with Grant Thornton, Mayer Brown, PwC, and Refco's investment bankers. While early drafts of the S-1 included the $105 million intercompany receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted any reference to any portion of the RGHI Receivable, despite the fact that none of Refco's professionals received, or sought, any confirmation that even the limited $105 million portion receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other related-party receivables owed by RGHI to Refco.

275.  The final S-1, reviewed by Grant Thornton, Mayer Brown, PwC and Refco's investment bankers, was signed by Bennett and publicly filed with the SEC on August 8, 2005, and failed to disclose:  (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) that the RTLs used to hide the RGHI Receivable and temporarily pay down RGHI's debt to Refco at year-end and quarter-end financial reporting periods.  Nevertheless, the IPO went forward on August 10, 2005.

276.  In hopes of concealing the fraud and maintaining the illusion of Refco's financial health for as long as possible, in late August 2005, after the IPO was completed, Refco, with the active participation and assistance of Mayer Brown, carried out yet another $420 million RTL with Liberty Corner to, once again, conceal the RGHI Receivable.

## IX.  SUFFOLK LOANS.

277.  Sugrue, Kavanagh, and Owens were complicit in the placement of SMFF's cash and other SPhinX assets with Refco, and they protected their relationship with Refco by forcing out PlusFunds agents who questioned the use of Refco as a provider of services to SPhinX and custodian of its assets.

278.  As the *quid pro quo* for the support of Sugrue, Kavanagh, and Owens, Refco extended approximately $200 million in "loans" to entities controlled by Sugrue, Owens, and Kavanagh, transactions that in fact were payments to Sugrue, Owens, and Kavanagh for their assistance.  These payments were, perversely, funded from SPhinX moneys held at RCM.

### A.  Bousbib Investigates Relationship with Refco.

279.  In 2004, PlusFunds' then CEO and President, Gabriel Bousbib, became concerned that SPhinX assets held by Refco entities were not earning sufficient interest and that Refco's transaction fees were excessive.  SMFF, in particular, had an unusually high proportion of excess cash that was not earning adequate interest.

280.    Bousbib instructed PlusFunds' agents to conduct an analysis to determine what fees were appropriate in the market for the types of transactions provided by Refco. Bousbib also approached Refco to re-negotiate the interest on SMFF cash held at Refco.

281.    In the fall of 2004, Bousbib negotiated an increase in interest earned on SMFF cash at Refco. Thomas Hackl, on behalf of Refco, agreed that effective December 1, 2004, "Refco" would pay SMFF 90 percent of the three-month T-Bill rate, adjusted on a daily basis.

282.    Hackl, who represented Refco in the negotiations with Bousbib, was at all relevant times a close friend of Sugrue, and is the godfather to Sugrue's children. Hackl had met Sugrue while Sugrue was at Refco and Hackl at BAWAG. Hackl and Sugrue brokered BAWAG's purchase of an ownership interest in Refco.

283.    In the course of the negotiation of interest rates, Hackl told Bousbib that he could not pay a higher rate because the funds at Refco were held in customer-segregated accounts. Bousbib did not question this representation. He believed at all times that SMFF's assets were in customer-segregated accounts and that Refco was financially responsible.

284.    Still not satisfied that SPhinX assets were receiving adequate interest, Bousbib proposed to Sugrue that PlusFunds institute a new cash management program to maximize returns on SPhinX cash and suggested that SPhinX's assets should be removed from Refco.

285.    Sugrue became incensed by this suggestion and indicated that he believed such a program was a consideration for the PlusFunds Board, not for management. Accordingly, Bousbib prepared a proposal for submission to the PlusFunds Board. As part of his proposal, Bousbib suggested that cash be removed from Refco.

286.    Sugrue, Kavanagh, and Owens opposed Bousbib's proposal and explicitly instructed him not to take any further action regarding SPhinX cash held at Refco.

287.   Bousbib continued to pursue the issue, causing dissension among the PlusFunds Board and management team.   Sugrue and Kavanagh concluded that Bousbib could no longer serve as PlusFunds' CEO and President, and began to consider their alternatives.

288.   Two members of the PlusFunds Board of Directors, Morriss and Wehrle, were responsible for Bousbib's appointment as PlusFunds' CEO and President and were therefore aligned with Bousbib.   Had Morriss, Wehrle or Bousbib known that SMFF's assets were not maintained in regulated, protected, customer-segregated accounts, they would have taken steps to protect SMFF's assets.   Similarly, if they had known Refco was insolvent, they would have ended SPhinX's relationship with Refco.

289.   The two factions on the PlusFunds Board, one comprised of Sugrue, Kavanagh, and Owens, and the other comprised of Morriss and Wehrle, began discussions regarding the buyout of the others' interests.   Morriss and Wehrle initially offered to purchase the interests of Kavanagh, Sugrue, and Owens in or about December 2004.

290.   In or about January 2005, Kavanagh, Sugrue, and Owens switched course and offered to purchase the ownership interests of Morriss and Wehrle.   Bousbib had been forced to resign in late 2004, and Sugrue, Kavanagh, and Owens agreed to purchase the PlusFunds ownership interests of Morriss, Wehrle, and Bousbib with financing provided by Refco through the "Suffolk loans," described below.

**B.   Refco Extends Loans to Suffolk Entities to Buy Out Bousbib, Morriss, and Wehrle.**

291.   In March 2005, RCC, extended a series of loans to Suffolk LLC, Suffolk SUG LLC, Suffolk KAV LLC and MKK LLC (collectively, the "Suffolk Entities"), entities owned and controlled by Sugrue, Kavanagh and Owens.

292.    Refco Capital funded the Suffolk loans with cash provided by RCM.    Thus, Sugrue, Kavanagh, and Owens used SMFF's cash, diverted to RCM, to finance their purchase of minority PlusFunds shares and eliminate PlusFunds agents who questioned the relationship with Refco.

293.    In Phase I of the Suffolk loans, on March 29, 2005, RCC provided $158 million to Suffolk LLC pursuant to a credit agreement for the purchase of outstanding equity of PlusFunds held by minority shareholders.    Bennett signed the credit agreement as president of Refco Capital.

294.    Suffolk LLC secured the $158 million loan by pledging to Refco Capital all of the equity that Suffolk LLC intended to acquire with the proceeds of the loan.    Suffolk LLC also granted Refco Capital call rights to purchase all of the equity of PlusFunds held by Suffolk LLC or to be acquired with the proceeds of the loan.    The call exercise price was based, in substantial part, on a fixed percentage of AUM by PlusFunds.    Suffolk LLC used a portion of the proceeds of the $158 million loan to purchase the minority interests in PlusFunds, including those controlled by Bousbib, Morriss, and Wehrle.

295.    Also on March 29, 2005, in Phase II, Refco loaned $19.4 million to an entity controlled by Sugrue known as Suffolk-SUG LLC.    Sugrue was the sole member of Suffolk-SUG LLC.

296.    Suffolk-SUG LLC secured the $19.4 million loan by pledging all of Sugrue's shareholder interests in the equity of PlusFunds.    As with the loan to Suffolk LLC, Sugrue also granted RCC call rights to his PlusFunds shares at a price based on a fixed percentage of AUM.

297.    RCC made additional "loans" of approximately $11.35 million and $19.25 million to Suffolk-KAV LLC and Suffolk-MKK LLC, two entities owned and controlled by Kavanagh.

As with the loans to Suffolk LLC and Suffolk-SUG LLC, Suffolk-KAV LLC pledged all of Kavanagh's shareholding interests in the equity of PlusFunds, and Kavanagh granted RCC call rights to his PlusFunds shares at a priced based upon a fixed percentage of AUM.

298.    The non-recourse Suffolk loans were sham transactions intended to disguise the transfer of control of PlusFunds to Refco.

299.    At or about the same time that Sugrue and Kavanagh purchased the minority shareholders' shares in PlusFunds and pledged those shares to RCC, RCC extended a $25 million standby credit facility dated April 13, 2005, to PlusFunds, purportedly to be used to provide SPhinX investors with interim secondary market liquidity on securities held pursuant to their investment in the SPhinX Funds.  In reality, it tied PlusFunds to Refco.  As part of the *quid pro quo* for the loans from RCC, Sugrue, Owens, and Kavanagh pledged to RCC that PlusFunds would continue to use Refco's services, ensuring that SPhinX assets would remain at RCM for Refco's use.

300.    While negotiating the Suffolk loans with Refco, Sugrue, Kavanagh, and Owens took steps to prevent PlusFunds and SPhinX from discovering Refco's role in the transactions. Indeed, Sugrue, Kavanagh and Owens did not disclose that Refco was involved at all, and innocent decision-makers at SPhinX and PlusFunds did not discover this fact until after the transactions had been consummated.

301.    Specifically, Sugrue, Kavanagh, and Owens had identified Bousbib's replacement as CEO and President as early as December 2004 or January 2005.  Paul Aaronson, one of PlusFunds' primary contacts at S&P, was familiar with PlusFunds and SPhinX, and agreed to replace Bousbib in December or January.  However, Sugrue, Kavanagh, and Owens conspired to delay the start of Aaronson's employment until April 2005 – after the consummation of the

Suffolk loans. Until Aaronson's hire, Owens acted as the interim CEO of PlusFunds. As a result, the Suffolk loans were negotiated and consummated during a time when PlusFunds had no independent CEO or president in place.

302.   On May 4, 2005, Suffolk LLC used the amounts provided by RCC to issue a tender offer to purchase outstanding shares of PlusFunds. PlusFunds used all or a portion of the proceeds of the $158 million loan to purchase the outstanding shares of PlusFunds held by a number of shareholders, including entities controlled by Morriss and Wehrle. Morriss and Wehrle resigned from their roles as PlusFunds directors on or about March 29, 2005.

303.   The additional loans to the other Suffolk entities controlled by Kavanagh, Owens, and Sugrue constituted disguised payments for cooperation. As a result, Sugrue and Kavanagh each received in excess of $20 million.

304.   Kavanagh and Sugrue stood to earn an additional $100 million if RCC exercised its call rights. The *quid pro quo* for those potential gains was participating in the scheme to divert SPhinX's money to RCM.

**C.     Discovery of Refco's Role in Suffolk Transactions.**

305.   The true nature of the Suffolk loans, as a disguised acquisition of PlusFunds by Refco, and the payoff of Sugrue, Kavanagh, and Owens, was concealed from PlusFunds and SPhinX management. The Suffolk loan documentation was not maintained in PlusFunds' offices, and none of the members of PlusFunds' management was aware that Refco loaned the amounts used by the Suffolk entities to purchase outstanding PlusFunds stock.

306.   Sugrue, Kavanagh, and Owens, in violation of their fiduciary duties to PlusFunds and SPhinX, concealed the true nature of the Suffolk transactions from PlusFunds' management and the SPhinX Funds. Sugrue, Kavanagh, and Owens conspired with their legal counsel, Gibson Dunn, to conceal Refco's role in the Suffolk loans. At the request of Sugrue, Kavanagh,

Owens, and Bennett, Gibson Dunn advised that the loans did not have to be disclosed as related party transactions and concealed Refco's role from innocent PlusFunds directors and management. In violation of its ethical and professional duties, Gibson Dunn also purported to represent PlusFunds at the time.

307.   Sugrue, Kavanagh, Owens, and Gibson Dunn concealed the true nature of the Suffolk loans until after the Refco fraud became public on October 2005. Innocent members of PlusFunds' management team, including Aaronson, became aware of Refco's role in the Suffolk transactions only after the SEC requested Suffolk loan documentation in connection with an investigation of PlusFunds.

308.   When the facts regarding the Suffolk transactions were disclosed to PlusFunds' management, Aaronson and other members of management were deeply concerned, and they took action. The extension of hundreds of millions of dollars in loans from a service provider, Refco, to members of PlusFunds' board of directors, without full disclosure, was a violation of trust. The fact that the transaction was intended to transfer effective control of PlusFunds to Refco made it worse.

309.   After discovering the facts of the Suffolk loans, Aaronson, and several other members of PlusFunds' senior management announced in writing their intention to resign. After attempting to negotiate the removal of Sugrue, Kavanagh, and Owens from the board of directors, Aaronson, CFO Chris Aliprandi, general counsel Patrick McMahon, and other PlusFunds agents resigned in December 2005.

## X.    REFCO'S BANKRUPTCY FILING.

310.   During 2004 and 2005, RCM held as much as $560 million of SPhinX's cash in non-segregated accounts. As of October 10, 2005, approximately $312 million of SPhinX's cash was deposited at RCM.

311.   Approximately two months after consummation of the IPO, Refco's entire fraudulent scheme fell apart when a non-conspiring Refco employee discovered a $430 million receivable owed to Refco from RGHI.  Refco demanded repayment of the debt by Bennett, who tried unsuccessfully to cover up the fraud by turning to his co-conspirator, BAWAG.  In early October 2005, BAWAG extended an emergency loan in excess of $400 million, which Bennett used to repay the RGHI Receivable.

312.   In a press release issued October 10, 2005, Refco announced that it had discovered, through an internal review, a $430 million receivable from an entity controlled by Bennett and that the receivable, "which may have been uncollectible," was not shown on the company's balance sheet as a related-party transaction.  As a result, Refco announced that "its financial statements, as of and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd., LLC and Refco Finance, Inc. should no longer be relied upon."

313.   On Tuesday, October 11, 2005, after news of Refco's "discovered" receivable became public but before the Refco bankruptcy, Sugrue visited Refco's headquarters to demand that SMFF's cash held at RCM be immediately transferred to Refco LLC.  Approximately $312 million of SMFF's assets held at RCM were transferred to Refco LLC pursuant to Sugrue's demand within days.  PlusFunds then moved those assets to accounts at Lehman Brothers and elsewhere.

314.   On October 11, 2005, Bennett was arrested.  He was indicted on or about November 10, 2005, and pleaded guilty to criminal conspiracy and fraud charges on February 15, 2008.

315.    On October 12, 2005, Refco issued a second press release announcing that the $430 million RGHI obligation (the "RGHI Receivable") had remained concealed as a result of the actions of Bennett and others, who had caused Refco to engage in a series of transactions designed to hide and otherwise disguise the nature and extent of the RGHI Receivable.

316.    Once the fraud was revealed, the market for Refco stock plummeted, leading to well over $1 billion in lost market capitalization. Refco's stock was delisted by the New York Stock Exchange, and the Company – along with its subsidiaries, including RCM – was forced into bankruptcy.

317.    On October 17, 2005, RCM and 23 of its subsidiaries and affiliates filed Chapter 11 bankruptcy petitions in the Southern District of New York.

318.    Between October 25, 2005 and the filing of the preference action in December 2005, Refco-related funds advised by RAI redeemed approximately $110 million of investments made in SPhinX Funds. On or about October 26, 2005, Bennett redeemed all or part of his personal investment in one of the SPhinX Funds. Furthermore, after disclosure of the Refco fraud on October 10, 2005, BAWAG redeemed approximately $50 million of its investment in the SPhinX Funds, including approximately $3.3 million from SMFF.

319.    On December 16, 2005, the Official Committee of Unsecured Creditors of Refco commenced an adversary proceeding against SMFF and other SPhinX entities seeking avoidance of the $312 million transfer from RCM to SMFF's accounts at Refco LLC, in order to recover that property for the benefit of RCM's bankruptcy estate. Also on that date, the bankruptcy court issued an order of attachment and temporary restraining order freezing assets of SPhinX valued at $282 million, pending resolution of the adversary proceeding.

320.     On or about April 21, 2006, SPhinX entered into a settlement agreement resolving the adversary proceeding.  As part of that agreement, SPhinX agreed to relinquish approximately $263 million of the $312 million that had been transferred from RCM to Refco LLC and further agreed to release certain claims against the Refco bankruptcy estate with respect to those funds.

## XI.   INDIVIDUAL ROLES.

### A.     SPhinX/PlusFunds Agents.

#### 1.     Aaron.

321.     Robert Aaron was the CEO and owner of DPM.

322.     Aaron served on the board of directors of the various SPhinX entities as DPM's representative, and as a result owed fiduciary and contractual duties to each of the SPhinX Funds.  Each of the SPhinX Funds and PlusFunds reposed confidence and trust in Aaron, delegating financial and accounting responsibilities and relying upon Aaron's superior knowledge and expertise in connection with DPM's role as administrator.  As a result, Aaron owed fiduciary and contractual duties to the SPhinX Funds and PlusFunds.

323.     At all times relevant, Aaron was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

324.     Aaron understood the SPhinX business model, including the Cayman SPC regime, customer segregation requirement, and NAV reporting obligations of the Funds.

325.     Aaron was personally involved in setting up the customer-segregated accounts for the SMFF segregated portfolios.  Aaron signed the Refco LLC account opening documentation on behalf of the SMFF entities.  He was familiar with SPhinX's Offering Memoranda, organizational documents, DIMAs and marketing materials, which provided for customer segregation.

326.    Before money ever came into SMFF, Aaron authorized the movement of SMFF's assets from customer-segregated accounts at Refco LLC to non-segregated accounts at RCM. He accomplished this by signing, at Refco's request, the July 31, 2002 Document authorizing the interchangeable movement of SMFF assets between Refco LLC and RCM.

327.    Aaron testified and admitted that he understood the import of the July 31, 2002 Document when he signed it. He understood when he signed the document that SMFF assets might be placed in non-regulated accounts where "segregation and preferential treatment [might] not be received." Aaron understood that he was authorizing the movement of SMFF assets to accounts where they would be placed at risk in the event of the bankruptcy of the custodian.

328.    Aaron did not discuss the terms of the July 31, 2002 Document with innocent decision-makers at PlusFunds or SPhinX or the fact that SMFF's assets might be exposed in non-segregated accounts.

329.    Although Aaron signed documents to set up accounts at RCM to hold SMFF's excess cash, Aaron took no action to assure segregation of those assets. Aaron testified and admitted that he never discussed with anyone at Refco or RCM the requirement that SMFF's assets be maintained in customer-segregated accounts.

330.    Aaron's actions were motivated by a desire to profit from his relationship with the SPhinX Funds, PlusFunds, and Refco. SPhinX was the largest client of DPM and the value of DPM was based, to a large extent, on its relationship with SPhinX. Aaron desired to sell DPM and knew that in order to achieve the highest sales price for DPM, it was critical to maintain his relationship with PlusFunds and SPhinX.

331.    In February 2005, Aaron orchestrated the sale of DPM to Mellon Financial Corporation for an amount in excess of $50 million.

332.    Aaron helped conceal the fact that SMFF's cash was not maintained in regulated, protected, customer-segregated accounts at Refco LLC.  SMFF's June 30, 2005 Financial Statements, issued in or about October 2005, included the representation that SPhinX "historically carried its futures and related cash positions in segregated accounts held at Refco LLC, a regulated Futures Commission Merchant." This statement failed to disclose to SPhinX's and PlusFunds' innocent decision-makers or to their investors that DPM and Aaron had established and maintained an agreement and an arrangement with Refco whereby most of SPhinX's cash position was in fact held at RCM in unregulated, non-segregated accounts, and was therefore false and misleading.  Aaron knew at the time that most of SMFF's cash was maintained at RCM, yet he approved and signed off on the June 30, 2005 Financial Statements.

### 2.    Sugrue.

333.    Christopher Sugrue was a co-founder of PlusFunds and served as a PlusFunds director at all relevant times.  In addition, he is considered the founder of the SPhinX Funds and was at all times involved in the management of the SPhinX Funds as a director of PlusFunds.  As a result, Sugrue owed both PlusFunds and SPhinX fiduciary and contractual duties.

334.    At all times relevant, Sugrue was acting for his own benefit and adversely to the interests of PlusFunds and SPhinX.

335.    Sugrue, as the founder of the SPhinX Funds and PlusFunds, was intimately familiar with the business and operations of the SPhinX Funds.  He understood the Cayman SPC regime, the customer-segregation requirement, and the representations made to the public regarding customer segregation and ring fencing.  Sugrue was actively involved in sales of SPhinX Funds and personally explained the SPC concept to potential investors when he solicited investments in the SPhinX program.  He was familiar with the Offering Memoranda, SPhinX's

financial statements, organizational documents, DIMAs, marketing materials, and contractual relationships with Refco, DPM and other providers.

336.   Sugrue worked at Refco from 1992 until approximately 1998 and maintained close personal relationships with certain Refco agents, including Bennett, Hackl, and others.

337.   While employed at Refco, Sugrue brokered the relationship between Refco and BAWAG, whereby BAWAG acquired a significant interest in Refco.   After moving to PlusFunds, Sugrue negotiated the relationship between SPhinX and the Refco entities, agreeing that Refco entities would act as, among other things, an agent for purposes of SPhinX's trading activities and custodian of its assets.

338.   Sugrue was complicit in the movement of SMFF cash to RCM.   Sugrue understood that SMFF's cash was maintained in non-protected accounts at RCM.   On October 11, 2005, the day after the Refco fraud was disclosed, Sugrue demanded that RCM move all cash to Refco LLC.   Sugrue knew at relevant times that SMFF's cash was at risk at RCM.   Upon information and belief, Sugrue was personally compensated by Refco for creating and maintaining the relationship between Refco and SPhinX.

339.   Sugrue breached his duties to SPhinX and PlusFunds by participating in the fraud at Refco and protecting Refco's interests at the expense of SPhinX and PlusFunds.

340.   Sugrue clashed with Bousbib over a number of issues and forced Bousbib's resignation from the company in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco.

341.   After Bousbib's resignation, Sugrue intentionally delayed the hiring of Paul Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans.   By

doing so, Sugrue and other conspirators ensured that no CEO was in place to question or investigate the Suffolk loans.

342.   Through, among other things, the Suffolk loans, Sugrue was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

343.   Sugrue profited directly from the Suffolk transactions. On information and belief, Sugrue received in excess of $20 million in non-recourse loans from Refco Capital to Suffolk-SUG LLC, an entity wholly owned and controlled by Sugrue.

344.   Sugrue conspired with Kavanagh, Owens, and their lawyers at Gibson Dunn to conceal details and the true nature of the Suffolk transactions from other members of the PlusFunds Board and management and from the Board of the SPhinX Funds in order to assure the consummation of those transactions.

345.   Sugrue is believed to have fled the United States and to currently be residing in Angola. Before leaving the U.S., he caused his e-mail files to be erased from PlusFunds' servers and removed the laptop he used at PlusFunds. He concealed evidence of his wrongdoing and is liable for spoliation.

346.   Sugrue's breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Sugrue's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

347.   Had Sugrue not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Sugrue not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX,

SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

348.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Sugrue. Sugrue should have reasonably foreseen that the placement of assets in non-segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Sugrue also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 3.    Kavanagh.

349.    Kavanagh is Sugrue's brother-in-law and resides in Ireland.

350.    Kavanagh served as a member of the PlusFunds Board at all relevant times and, as a result, owed fiduciary and contractual duties to SPhinX and PlusFunds.

351.    At all times relevant, Kavanagh was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

352.    Kavanagh understood Sugrue's relationship with Refco and took steps to protect Refco's role in connection with the SPhinX Funds. Kavanagh was complicit in the placement of SMFF's cash at RCM.

353.    Kavanagh assisted Sugrue in efforts to force Bousbib from PlusFunds in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco. By doing so, Kavanagh protected Refco's role as custodian of SPhinX's customer assets to the detriment of SPhinX and PlusFunds.

354.    After Bousbib's resignation, Kavanagh intentionally delayed the hiring of Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans. Until Aaronson's hire, Owens acted as interim CEO of PlusFunds. Through this arrangement,

Kavanagh and other conspirators ensured that no independent CEO was in place that would question or investigate the Suffolk loans.

355.    Kavanagh concealed the terms of the Suffolk loans and Refco's true role in the Suffolk loans. Kavanagh understood that Refco's role in the Suffolk loans should have been disclosed but concealed that role because he knew SPhinX and PlusFunds management would oppose the transaction.

356.    Through, among other things, the Suffolk transactions, Kavanagh was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

357.    Kavanagh profited directly from the Suffolk transactions. He is believed to have received in excess of $20 million in non-recourse loans from Refco Capital to Suffolk-KAV LLC, an entity owned and controlled by Kavanagh.

358.    Kavanagh's breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Kavanagh's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

359.    Had Kavanagh not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Kavanagh not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

360.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Kavanagh. Kavanagh should have reasonably foreseen that the placement of assets in non-

segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Kavanagh also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 4. Owens.

361.    Owens is an accountant and works with Kavanagh in Ireland.

362.    Owens served as a member of the PlusFunds Board at all relevant times and served as a member of the SPhinX Board from October 2004, until his resignation in 2006. Owens owed fiduciary and contractual duties to both SPhinX and PlusFunds.

363.    At all times relevant, Owens was acting for his personal benefit and adversely to the interests of PlusFunds and SPhinX.

364.    Owens understood Sugrue's relationship with Refco and took steps to protect Refco's role in connection with the SPhinX Funds. Owens was complicit in the placement of SMFF's cash at RCM.

365.    Owens assisted Sugrue in efforts to force Bousbib from PlusFunds in response to Bousbib's investigation of SPhinX's relationship with Refco and Bousbib's desire to remove SMFF and other SPhinX assets from Refco. By doing so, Owens protected Refco's role as custodian of SPhinX's customer assets to the detriment of SPhinX and PlusFunds.

366.    After Bousbib's resignation, Owens intentionally delayed the hiring of Aaronson as PlusFunds' President and CEO until after completion of the Suffolk loans. Until Aaronson's hire, Owens acted as interim CEO of PlusFunds. By doing so, Owens and other conspirators ensured that no independent CEO was in place that would question or investigate the Suffolk loans.

367.    Owens personally presented the Suffolk loan transactions to the SPhinX Board. In his presentation, Owens omitted the fact that the loans were funded from customer accounts at

RCM, which included large amounts of SPhinX cash.  Owens knew this fact but omitted it from his presentation in order to conceal the true nature of the transactions.

368.    Owens also omitted from his presentation the fact that Gibson Dunn, which at the time purported to represent SPhinX, also represented Sugrue, Kavanagh, Owens, the Suffolk Entities, and Hardwicke Ltd., an entity owned and controlled by Kavanagh, and that Gibson Dunn had documented the Suffolk loans.

369.    At the same time, Owens was involved in the negotiation of the terms of the Suffolk loans in the spring of 2005, Owens met with PlusFunds' counsel to discuss ethics, corporate responsibility, and disclosure obligations.  Owens understood that Refco's role in the Suffolk loans should have been disclosed but concealed that role because he knew SPhinX and PlusFunds management would oppose the transaction.

370.    Owens helped conceal the diversion of SPhinX cash to RCM.  In the wake of Bousbib's inquiry into cash management procedures, Owens stated opaquely to the innocent members of SPhinX's board that "some changes" had been made to cash management procedures but that there was no significant effect on the financial statements.

371.    In fact, when pointedly asked by one of SPhinX's innocent board members whether any event that might have led to Bousbib's departure from PlusFunds would affect SPhinX, Owens responded, "No."

372.    Through, among other things, the Suffolk transactions, Owens was compensated by Refco for participating in the diversion of SPhinX assets and protecting Refco's role in connection with the SPhinX Funds.

373.    Owens breached his contractual and fiduciary duties to SPhinX and PlusFunds.

374.    Owens' breaches of duty proximately caused and were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Owens' actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

375.    Had Owens not conspired to oppose and force out Bousbib, SMFF's cash would have been removed from Refco. Had Owens not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

376.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Owens. Owens should have reasonably foreseen that the placement of assets in non-segregated accounts at RCM exposed the SPhinX Funds in the event of RCM's insolvency. Owens also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

**B.    Refco Agents.**

**1.    Bennett.**

377.    Defendant Phillip Bennett was the highest ranking corporate officer of various Refco entities until he was forced to resign in October 2005, following the disclosure of the massive fraud that he, Maggio, Trosten, and Grant perpetrated. At relevant times, he served as a director and officer of RGL, RCM, and Refco Inc. Before serving as President, Chief Executive Officer, and Chairman of RGL from September 1998, Bennett had been the Chief Financial Officer of RGL.

378.   The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties, by virtue of Refco's role as, among other things, holder of SMFF's assets, not to convert or misuse those assets. Bennett shared in those duties as Refco's officer and director.

379.   In addition, because Refco was insolvent at the time of the LBO and IPO transactions, Bennett owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and SMFF.

380.   Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain these protections.

381.   Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

382.   Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

383.   The officers and directors of Refco LLC and RCM, including Bennett, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

384.   Refco's agents, including Bennett, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. Refco and its agents, including Bennett, understood that the SMFF funds were to be maintained in protected, regulated, customer-

segregated accounts to preserve those assets. Refco and Bennett both invested directly in the SPhinX Funds; therefore, Bennett received and was familiar with the SPhinX Offering Memorandum and other materials and understood the customer-segregation and other requirements designed to protect SPhinX assets. Bennett was a friend of Sugrue and understood PlusFunds' business. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties, as well as Bennett's.

385.    Bennett recently pleaded guilty to criminal conspiracy and fraud charges in connection with the acts alleged herein. He is currently awaiting sentencing.

386.    Bennett orchestrated and choreographed the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements.

387.    Bennett also planned and implemented the diversion of RCM customer assets, including the SPhinX Funds' assets, to fund Refco's business operations and for use in the RTLs and the Suffolk loans.

388.    Bennett directly oversaw the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten. These statements were used to determine what assets were available at RCM for use elsewhere in Refco's operations.

389.    Bennett signed the final S-1 in connection with the IPO on August 8, 2005. The S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements, all of which Bennett knew and participated in. Bennett also helped prepare and signed off on Refco's financial statements and public filings.

390.    Bennett directed and oversaw annual RTLs throughout his tenure at Refco, both before and after the LBO and IPO transactions.

391.    Refco has admitted and alleged in pleadings and other court filings that Bennett conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

392.    Bennett's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds.  Bennett conspired to funnel customer assets, including SMFF assets, held at regulated Refco entities to RCM, where Bennett caused those assets to be used to conceal hundreds of millions of dollars in Refco losses.  But for Bennett's conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely.  Had Bennett properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.  Had Bennett observed his fiduciary duties to Refco's investors and customers, he would have fully disclosed Refco's losses, the details of the RGHI Receivable and Refco's true financial condition and SMFF's assets would never have been entrusted to any Refco entity.

393.    Bennett's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds.  But for Bennett's actions, SMFF's cash would not have been held at RCM and would not have been lost.  Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

394.    Had Bennett not conspired to conceal the Suffolk loans and the true nature of Refco's role in the Suffolk loans from PlusFunds' management and SPhinX, SMFF's cash held at RCM would not have been diverted to fund the Suffolk loans and management would have ended the relationship between SPhinX and Refco.

95

395.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Bennett.  Bennett understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.  Bennett should have reasonably foreseen that movement of SMFF cash to RCM could put both SPhinX and PlusFunds at risk.

### 2.    Tone Grant.

396.    Defendant Tone Grant joined RGL in 1981.  Up through 1998, Tone Grant was President and CEO of RGL.  Prior to August 2004, through his ownership interest in RGHI, Tone Grant held a significant ownership stake in Refco.  From 1999 through August 2004, Bennett and Tone Grant each held a 50% interest in RGHI.  In or around August 2004, concurrently with the LBO, Tone Grant sold his interest in RGHI to Bennett, leaving Bennett the sole owner of RGHI.  Tone Grant has been indicted for, among other things, conspiracy to commit securities fraud, bank fraud, and money laundering.

397.    The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets.  Tone Grant shared in those duties as a Refco officer and director.

398.    Refco's agents, including Tone Grant, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime.  The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

399.    Tone Grant's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds.  Tone Grant conspired to funnel customer assets held at regulated Refco entities to RCM, where Tone Grant caused those assets to be used to conceal hundreds of millions of dollars in Refco losses.  Tone Grant conspired with Bennett, BAWAG and Refco

agents to conceal Refco's losses and distort Refco's financials by moving losses and expenses to the RGHI Receivable and engaging in RTLs.

400.    But for Tone Grant's conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely.  Had Tone Grant properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

401.    Tone Grant's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds.  But for Tone Grant's actions, SMFF's cash would not have been held at RCM and would not have been lost.  Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

402.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Tone Grant.  Tone Grant understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

### 3.    Trosten.

403.    Defendant Robert C. Trosten was a member of Refco's corporate finance team from 1997 to 2001, Executive Vice President and Chief Financial Officer from 2001 to October 2004.  Trosten was intimately familiar with all details of the Refco fraud.  Trosten recently pleaded guilty to criminal fraud and conspiracy charges in the Southern District of New York and awaits sentencing.

404.    The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets.  Trosten shared in those duties as Refco's CFO.

405.   Trosten owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC as, among other things, custodian of SMFF assets.

406.   Also, because Refco and RCM were insolvent, Trosten owed fiduciary duties to Refco and RCM creditors, including SMFF and the other SPhinX Funds.

407.   Refco's agents, including Trosten, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. Refco and its agents, including Trosten, understood that the SMFF funds were to be maintained regulated, protected, in customer-segregated accounts to preserve those assets. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

408.   Trosten's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. Trosten conspired to funnel customer assets held at regulated Refco entities to RCM, where Trosten caused those assets to be used to conceal hundreds of millions of dollars in Refco losses. But for this conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Trosten properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

409.   Trosten's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Trosten's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

410.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Trosten. Trosten understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

411.    Trosten knowingly participated in the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements. As the CFO, Trosten authorized and signed off on the accounting records and financial statements for Refco, including the accounting for the RGHI Receivable, knowing that they misrepresented the nature of the RGHI Receivable.

412.    Trosten also participated in the diversion of RCM customer assets to fund Refco's business operations and for use in the RTLs and the Suffolk loans.

413.    Trosten directly oversaw the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten.

414.    Trosten approved the final S-1 in connection with the IPO on August 8, 2005. The S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements.

415.    Refco has admitted and alleged in pleadings and other court filings that Trosten conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

### 4.    **Maggio.**

416.    Defendant Santo C. Maggio, also known as "Sandy" Maggio, joined Refco in 1985 and held executive positions with various Refco entities until he was forced to resign in October 2005, following the disclosure of the Refco fraud. Among his other positions within Refco, he served as Executive Vice President of RGL and President and a director of RCM. At all relevant times, Maggio ran the brokerage operations of RSL and RCM and directed,

orchestrated, and supervised the diversion of RCM assets alleged herein. According to press reports, Maggio is cooperating with the United States Justice Department and the SEC in relation, inter alia, to his role in various frauds perpetrated during his tenure at Refco. He recently pleaded guilty to criminal fraud and conspiracy charges in connection with his role at Refco.

417.    The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets. Maggio shared in those duties as an officer and director of Refco entities.

418.    Maggio owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC and RCM as, among other things, custodian of SMFF assets.

419.    Also, because Refco Group and RCM were insolvent, Maggio owed fiduciary duties to Refco and RCM creditors, including SMFF and the other SPhinX Funds.

420.    Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation and not to divert customer funds to unregulated accounts to use the funds for its own business purposes and to fraudulently prop up its financial statements.

421.    Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

422.    Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse

customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

423.    The officers and directors of Refco LLC and RCM, including Maggio, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX.

424.    Refco's agents, including Maggio, were familiar with the SPhinX Funds' structure and the Cayman Islands SPC regime. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

425.    Maggio's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. Maggio conspired to funnel customer assets held at regulated Refco entities to RCM, where Maggio caused those assets to be used to conceal hundreds of millions of dollars in Refco losses. But for this conspiracy, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Maggio properly disclosed Refco's customer losses and the details of the RGHI Receivable, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

426.    Maggio's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Maggio's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

427.    The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Maggio. Maggio understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

428.    Maggio was aware of and participated in the transfer of Refco losses to RGHI to remove them from Refco's consolidated financial statements.

429.    Maggio planned and implemented the diversion of RCM customer assets to fund Refco's business operations and for use in the fraudulent RTLs and Suffolk loans. Maggio personally arranged, negotiated, and participated in the documentation of numerous RTLs from 2000 to 2005 with RTL Participants and BAWAG.

430.    Maggio was aware of and directly participated in the diversion of RCM assets to fund Refco's operations. Daily "cash flow" statements setting forth the amount of customer assets available were circulated to Bennett, Maggio, and Trosten.

431.    Maggio was aware of the public filings in connection with the August 2004 LBO and the August 2005 IPO. Maggio understood that the S-1 failed to disclose hundreds of millions of dollars in uncollectible customer losses, the movement of losses to RGHI in the form of the RGHI Receivable, and the concealment of the RGHI Receivable from Refco's consolidated financial statements.

432.    Refco has admitted and alleged in pleadings and other court filings that Maggio conspired and directed a massive fraud to conceal losses from Refco's consolidated financials.

### 5.    Hackl.

433.    Thomas Hackl was employed with BAWAG from July 1991 through May 2002. While at BAWAG, his various responsibilities included senior management in the bank's global treasury and investment banking operations, trading on sales, asset management, and private banking. In 2002 Hackl moved to Refco as part of BAWAG's increasingly active participation in and control of Refco operations. Hackl was directly involved in assisting both Refco and BAWAG hide their respective losses through the operation of the RTLs. For example, BAWAG hid losses by shifting them to Liquid Opportunities, an entity created for the sole purpose of

concealing BAWAG's losses. Hackl was the conduit for the shifting of those losses, by buying worthless investor positions from BAWAG thereby allowing BAWAG to record the loss as an asset. Hackl also had close ties to Sugrue. Each is the godfather to the other's children.

434. Hackl understood that SMFF's cash was exposed in non-segregated accounts at RCM.

435. Hackl made direct misrepresentations to PlusFunds that were intended and actually did serve to conceal the exposure of SMFF's assets in non-segregated accounts at RCM. In the fall of 2004, Hackl negotiated interest rates on SMFF's cash held at Refco with Bousbib. In the course of those negotiations, Hackl falsely stated to Bousbib that the interest rate Refco could pay on SMFF cash was limited because SMFF's cash was maintained in customer-segregated accounts. This statement was false when made and was intended to deceive and mislead Bousbib and PlusFunds.

436. Had Hackl disclosed the truth about SMFF's cash at RCM, Bousbib would have taken steps to move SMFF's cash and SPhinX's losses would have been avoided.

### 6. Klejna.

437. Defendant Dennis Klejna was an Executive Vice President and General Counsel of Refco Group from 1999 until Refco's collapse. Upon information and belief, Klejna was also an Executive Vice President and General Counsel of Refco LLC and RCM.

438. The Refco entities owed the SPhinX Funds and PlusFunds contractual and fiduciary duties by virtue of Refco's role as custodian of SMFF assets. Klejna shared in those duties as Refco's officer.

439. Klejna owed fiduciary duties to SPhinX and SMFF in connection with the roles of Refco LLC and RCM as, among other things, custodian of SMFF assets.

103

440.    In addition, because Refco Group and RCM were insolvent, Klejna owed fiduciary duties to Refco and RCM's creditors, including SMFF and the other SPhinX Funds.

441.    Refco LLC owed fiduciary duties to its customers, including SPhinX. SPhinX and PlusFunds entrusted customer assets to Refco LLC to be maintained in regulated, protected, customer-segregated accounts. Refco LLC was bound by statute and contract to maintain customer segregation and not to divert customer funds to unregulated accounts to use the funds for its own business purposes and to fraudulently prop up its financial statements.

442.    Refco LLC owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. Refco LLC owed a fiduciary duty of disclosure to its customers to disclose facts relating to Refco LLC's financial condition.

443.    Similarly, RCM owed fiduciary duties to its customers, including SPhinX. Because RCM was entrusted with SPhinX assets, RCM owed fiduciary duties not to misuse customer assets or use them to perpetrate fraud. RCM owed a fiduciary duty to disclose to its customers facts relating to RCM's financial condition.

444.    The officers and directors of Refco LLC and RCM, including Klejna, shared in these fiduciary obligations to customers who entrusted assets to Refco LLC and RCM, including SPhinX. The purposeful movement of SMFF cash to RCM for use in the Refco fraud constituted a breach of the Refco entities' fiduciary duties.

445.    Klejna's breaches of duty proximately caused the damages suffered by SPhinX and PlusFunds. The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to Klejna. Klejna understood that Refco and RCM were insolvent and that the placement of customer assets at RCM exposed customers to loss of those assets.

104

446.    But for Klejna's breaches of duty, SMFF's cash would never have been diverted to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely. Had Klejna properly disclosed Refco's customer losses and Refco's insolvency, SPhinX and PlusFunds would never have allowed any customer assets to be held at Refco and their losses would have been avoided entirely.

447.    Klejna's breaches of duty were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for Klejna's actions, SMFF's cash would not have been held at RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

448.    Klejna was aware of, prepared, and approved the public filings in connection with the August 2004 LBO and the August 2005 IPO. Klejna prepared and approved the Offering Memorandum for the Bonds, and Refco's fiscal year 2005 Form 10-K and Form 10-K/A. Klejna also prepared, approved and signed the Refco's October 12, 2004 Bond Registration Statement (including subsequent amendments), and Refco's August 2005 IPO Registration Statement.

449.    The Offering Memorandum and IPO Registration Statement each contained substantially similar discussions of the Officer Defendants', including Klejna's, importance to Refco's affairs. The Executive Employment and Non-Competition Agreements, pursuant to which Klejna was employed, gave him substantial authority over the day-to-day management and operation of Refco. The Agreements explicitly state that he is employed "in a key capacity with the Company," and that he has access to "confidential information regarding the organization, business, and finances of the Company."

450.    As an Executive Vice President and General Counsel, Klejna had power to influence and control, and did influence and control, directly or indirectly, the decision-making

of Refco as evidenced by his direct involvement in the day-to-day operations of Refco including its financial and accounting functions, and his signatures on and participation in the preparation and dissemination of Refco's false financial statements and other public statements.

451.    On January 1, 2004, Klejna and Aaron executed an agreement between SMFF, Refco LLC, and RCM in connection with opening accounts for the Segregated Portfolios of SPhinX SPC. Klejna signed the agreement as Executive Vice President and General Counsel on behalf of Refco LLC and RCM. This agreement was an attempt to remedy a deficiency in the safeguard procedures regarding SMFF Funds with Refco LLC and RCM.

452.    Klejna personally benefited from his breaches of duty receiving $6.5 million in a profit-sharing agreement buyout at the time of Refco's August 2005 IPO.

## XII.    PROFESSIONAL DEFENDANTS' ROLES.

### A.    Lawyers.

#### 1.    Gibson Dunn & Crutcher.

453.    Gibson Dunn & Crutcher ("Gibson Dunn") served as legal counsel to PlusFunds and SPhinX, but also represented Sugrue, Kavanagh and Owens and the Suffolk Entities controlled by Sugrue, Kavanagh, and Owens in connection with the Suffolk transactions.

454.    Additionally, Gibson Dunn represented Hardwicke Ltd., a company owned and controlled by Kavanagh.

455.    Gibson Dunn's simultaneous representation of all these parties was a conflict of interest. Gibson Dunn did not disclose the conflict to either PlusFunds or SPhinX's boards or to PlusFunds' innocent officers. Nor did Gibson Dunn attempt to obtain a conflict waiver. Even if it had attempted to obtain a waiver, the conflict was unwaivable.

456.    As a result of Gibson Dunn's attorney-client relationship, Gibson Dunn owed PlusFunds fiduciary, professional and contract duties. Gibson Dunn's fiduciary duties to

PlusFunds included duties of loyalty, duties of care, duties of disclosure, and duties to place the interests of PlusFunds ahead of the duties of Gibson Dunn. Gibson Dunn also owed PlusFunds and SPhinX a duty not to aid and abet the fraud or breaches of fiduciary duties of others, including Refco, Sugrue, Kavanagh, and Owens.

457.    The Suffolk transactions were designed to compensate Sugrue, Kavanagh and Owens for their participation in the Refco fraudulent scheme – specifically, for Sugrue, Kavanagh and Owens' participation in the movement of SMFF cash from Refco LLC to RCM, where the cash could be used to fund the fraudulent RTLs and conceal Refco's insolvency. The Suffolk loans were also designed to transfer control and indirect ownership of PlusFunds to Refco without revealing the nature of the transaction to innocent members of PlusFunds or SPhinX management and other interested parties, including S&P.

458.    The Suffolk loans were a sham and were fraudulent on their face. Gibson Dunn understood that Refco, Kavanagh, Owens, and Sugrue owed fiduciary duties to SPhinX and PlusFunds and that by participating in the Suffolk loans they were violating those fiduciary duties. Gibson Dunn knew that the source of the funds was Refco. Gibson Dunn also knew that SPhinX cash was required to be segregated in regulated accounts because Gibson Dunn possessed SPhinX's Offering Memoranda and marketing materials. Gibson Dunn proceeded to document the Suffolk loans and tender offer anyway.

459.    Gibson Dunn assisted Sugrue, Kavanagh, and Owens in documenting the Suffolk loans with knowledge that PlusFunds and SPhinX's innocent decision-makers would object if it were disclosed that Refco had extended $200 million in non-recourse loans to PlusFunds directors with the majority of PlusFunds' outstanding stock pledged to secure those obligations.

460.    Gibson Dunn intentionally concealed Refco's role in the Suffolk transactions from innocent decision-makers at PlusFunds and SPhinX. Had Gibson Dunn told the innocent decision-makers that the source of the funds for the Suffolk loans was Refco and that Refco sought to exercise control over PlusFunds through the transactions, they would have precluded the transactions, thus preventing the buyout of Doug Morriss, Gabriel Bousbib, and John Wehrle, preventing further involvement with Refco, and preventing the payout of SPhinX cash to the disloyal Sugrue, Kavanagh, and Owens.

461.    Gibson Dunn understood that Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds and SPhinX. Gibson Dunn knew and understood that Sugrue, Kavanagh, and Owens wanted to conceal the nature of the Suffolk transactions from PlusFunds, in violation of their fiduciary duties to PlusFunds.

462.    Gibson Dunn wrongly and intentionally advised Sugrue, Kavanagh, and Owens that the Refco-Suffolk relationship did not have to be disclosed as a related-party transaction. Gibson Dunn became a coconspirator and substantially assisted the breach of fiduciary duties.

463.    Gibson Dunn's legal advice and services in connection with the Suffolk transactions were compromised by the aforementioned conflict of interest – Gibson Dunn represented SPhinX, PlusFunds, several of its board members, and the Suffolk Entities at the same time, in a transaction in which these parties had competing interests. At no time did Gibson Dunn ever consult any member of PlusFunds management or board other than Sugrue, Kavanagh, or Owens relating to the terms of the Suffolk transactions or this conflict of interest.

464.    Had innocent members of SPhinX or PlusFunds management understood the true nature of the Suffolk transactions or Refco's role and interest in the Suffolk transactions, they would have opposed and prevented the Suffolk loan transactions. If the true relationship

108

between Refco and Sugrue, Kavanagh and Owens had been known, innocent members of SPhinX and PlusFunds management would have removed SPhinX assets from Refco and SMFF's losses would have been avoided.

### 2.    Mayer Brown, Collins, Best, and Koury.

465.    Mayer Brown and its attorneys, Collins, Koury, and Best, served as Refco's legal counsel.  As a result, they each owed fiduciary and professional duties to Refco.  They each owed SPhinX and PlusFunds duties not to aid and abet the breaches of fiduciary duty and fraud of Refco.

466.    Mayer Brown, Collins, Koury, and Best owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting any breach of duty, including fiduciary duties, owed by any other person or entity to SPhinX and/or PlusFunds.

467.    In the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best knew and understood that Refco owed fiduciary duties to Refco's customers, including SMFF, arising out of Refco entities' roles as custodians of customer assets.  By virtue of their role as counsel to Refco, Mayer Brown, Collins, Koury, and Best understood Refco's relationship with the SPhinX Funds and knew that Refco held customer assets, including assets belonging to SPhinX, and knew and understood all the facts alleged herein giving rise to the fiduciary duties Refco owed to SPhinX and PlusFunds.

468.    In the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best understood that Refco was insolvent.  Accordingly, they knew that Refco's officers and directors owed fiduciary duties to creditors and customers, including SPhinX and SMFF.

469.    As described herein, in the course of their representation of Refco, Mayer Brown, Collins, Koury, and Best became aware of the Refco fraud and were direct and knowing participants in it.  Through their active participation, Mayer Brown, Collins, Koury, and Best

substantially assisted Refco's fraud, breach of fiduciary duties and other wrongdoing alleged herein.

470.    Until October 2005, Mayer Brown was Refco's primary law firm, and Collins was Refco's primary outside legal counsel, with legal bills, on average, of approximately $4 million a year. Mayer Brown provided a broad range of legal services to Refco—representing Refco in responding to SEC investigations, drafting profit sharing plans for key executives, advising Refco on corporate governance issues and United States and foreign regulations regarding its operations and activities, drafting Refco's customer agreements, providing Refco with tax advice, leading financings for senior note and loan agreements, and drafting and negotiating the RTLs. Mayer Brown was thoroughly familiar with Refco's business, including Refco's relationship with SPhinX and PlusFunds.

471.    The vast majority of important transactions and deals at Refco, including the LBO and IPO, were cleared through Collins and Best or attorneys working under their direct supervision, including Koury, and Collins was aware of all work done for Refco by virtue of his review of Refco's legal bills.

472.    As the Court-appointed Examiner found, Mayer Brown was aware of the Refco fraud and aided and abetted it:

- Mayer Brown was aware of Refco customer losses and helped the Refco Insiders hide these losses by transferring them to RGHI. By June 2002, Mayer Brown knew that RGHI owed a related party debt to RGL of at least $350 million.

- Mayer Brown drafted the RTL documents on 18 separate transactions, negotiated the terms of the RTLs with the RTL Participants, and fully understood the nature of the RTLs. Mayer Brown knew that the loans were risk-free to the RTL Participants and served no legitimate business purpose.

- Because Mayer Brown documented the RTLs, Mayer Brown knew they were tied to Refco's financial reporting periods. Mayer Brown knew that the RTLs straddled Refco's financial reporting and audit periods and occurred only at those times (with one exception).

- Mayer Brown drafted guarantees and indemnities on behalf of RGL in favor of the RTL Participants to guarantee RGHI's repayment obligation. Mayer Brown knew that Bennett signed the guarantees and indemnities on behalf of RGL or RCM and the loan documents on behalf of RGHI. Mayer Brown knew and/or consciously avoided knowing that the guarantees and indemnities violated the terms of other loan agreements that Mayer Brown had prepared for Refco.

473.  Joseph Collins was recently indicted for his actions in connection with his representation of Refco.

(a)  **Awareness of Refco's Trading Losses and Balance Sheet Problems.**

474.  Starting in 1997, Mayer Brown, Collins, and Best provided legal services to Refco in connection with various transactions involving "bad debts" incurred by Refco. In those cases, the "bad debts" were assigned to RGHI or related entities. For example, in late 1997, a group of Refco customers to whom Refco had extended credit sustained large losses, some in connection with the Asian debt crisis. By the end of 1998, those losses amounted to hundreds of millions dollars. Mayer Brown attorneys were involved in the resolution of Refco's claims against those customers, which debts later became part of the RGHI Receivable.

475.  For example, in October 1997, a Refco customer named Victor Neiderhoffer lost more than $90 million (the "Neiderhoffer Loss"). Instead of disclosing the losses in its financial statements – losses which Neiderhoffer could not cover – Refco, with Mayer Brown's assistance, transferred this receivable to an RGHI subsidiary and subsequently to the RGHI Receivable. Because Mayer Brown, Collins, and Best were advising both RGHI and Refco throughout the relevant time, Mayer Brown was aware that Refco used RGHI as a repository for bad debts.

476.  In a letter dated October 15, 1999, Bennett wrote to Collins estimating the apparent net worth of RGHI as the value of its investment in RGL. Collins, aware of the RGHI Receivable, jotted in his handwritten notes: "Minus loans to RGH[I]." These handwritten notes show that Collins knew RGHI owed money to RGL.

111

477.    By June 2002, Mayer Brown, Collins, and Best were aware that the RGHI Receivable totaled at least $350 million.  On June 11, 2002, Mayer Brown revised legal documents that included a "Letter Agreement" to be signed by, among others, RGL and RGHI, in which RGL agreed that "$350 million" would be used "for the retirement of related party debt of [RGHI]."

### (b)    The RTL Transactions.

478.    Mayer Brown drafted and negotiated the RTLs to hide the RGHI Receivable.  For five years, Mayer Brown drafted virtually all documents for at least 18 RTLs collectively totaling billions of dollars in fraudulent loans.  The drafting and negotiating for each of those transactions were personally supervised by Collins and Best.

479.    Koury personally drafted the documentation for at least the RTLs involving Liberty Corner which, as described in further detail below, were fraudulent on their face.  Koury did his work under the direct supervision of Collins and Best.

480.    Mayer Brown employed the same loan structure for each of the RTLs and drafted (at times even negotiated) RTLs with Flanagan's EMF Financial and Delta Flyer entities, with Coast (through its subsidiary CS Land), with Krieger (through his Beckenham entity), and with Ingram Micro (through its subsidiary CIM Ventures),

481.    Although the loan structure—whereby a loan at the close of a financial reporting period was unwound shortly after Refco's financial reporting and audit periods—was suspicious on its face, Mayer Brown, Collins, Best, and Koury drafted and negotiated nearly identical loan documents at least an additional 14 times.

482.    No later than June 2002, Mayer Brown, Collins, Best, and Koury knew that RGHI owed a receivable of at least $350 million to RGL but continued to facilitate additional RTLs.

483.   Mayer Brown, Collins, Best, and Koury not only continued their work on the RTLs, but escalated it, as RTLs began to occur on a quarterly basis right before the LBO.  The RTLs straddled the end of Refco's financial reporting periods (with one exception).  Despite this obvious sign that the RTLs were intended to manipulate Refco's financial statements Mayer Brown, Collins, Best, and Koury continued to participate.

484.   Additionally, Mayer Brown, Collins, Best, and Koury knew and/or consciously avoided knowing that the RTLs had no legitimate purpose.  The RTLs were uncollateralized, short-term loans of hundreds of millions of dollars by one Refco entity through a third party to a Refco related-party (RGHI), with guarantees and indemnities by RGL to eliminate any risk to the RTL Participants.  The transactions, which Mayer Brown knew to be risk-free lacked economic substance and were inherently suspicious.

485.   Moreover, Mayer Brown, Collins, Best, and Koury's awareness of the impropriety of the RTLs is obvious from the fact that certain RTL Participants backed out of the deals based on their concerns over the propriety of the transactions.  In early 2002, Ingram Micro was prepared to go forward with a third RTL, sending a mark-up of its 2001 loan documents to Collins.  However, on January 30, 2002, Ingram Micro withdrew due to then-recent news about the Enron scandal.  Later that same day, Ingram Micro sent Refco an email backing out of the proposed RTL, referencing the Enron debacle and heightened scrutiny from the SEC.

486.   As the Examiner concluded, "there is significant evidence that Mayer Brown ... assisted Refco by drafting and negotiating documents in connection with the Round Trip Loan transactions, which Mayer Brown knew or should have known were fraudulent and undertaken for the purpose of manipulating Refco's financial statements," and "there is evidence showing that Mayer Brown knew that the Round Trip Loans were a scheme to avoid disclosure of the

113

RGHI Receivable on Refco's audited financial statements in order to fraudulently bolster Refco's financial appearance to lenders and investors."

(c)    **Maintaining the Fraudulent Business Model.**

487.    Refco facilitated its fraudulent scheme to attract and siphon RCM assets by continuing to maintain RCM as an unregulated, offshore broker-dealer despite the fact that it conducted substantial activity in the United States and did not even maintain any Bermuda operations after 2001. Mayer Brown, Collins, and Best advised Refco and RCM on their efforts to misappropriate customer funds beginning no later than October 1996, and continuing through October 2005.

488.    In 2001, in furtherance of the scheme described herein, Refco decided to close down RCM's Bermuda operations and to "repatriate" RCM to the United States. Bennett enlisted the assistance of Mayer Brown, Collins, and Best which advised RCM on the implications of repatriating to the United States. As reflected in, among other things, a June 24, 2002 Mayer Brown memorandum, Mayer Brown became intimately familiar with the business and operations of RCM through discussions with Maggio and others. As reflected in an August 3, 1998 Mayer Brown memorandum, Mayer Brown was aware when it did this work that RCM was engaging in repurchase agreements, or "repos," and buying and selling customer securities "for its own account." In connection with the repatriation of RCM to the United States, Mayer Brown advised RCM on, among other things, ways to structure its business to avoid treatment as a regulated broker-dealer subject to segregation and regulatory requirements.

489.    According to a January 31, 1999 memorandum from Refco to Mayer Brown, Mayer Brown also was involved in and familiar with various other "projects underway with respect to Refco's FX business," which caused Mayer Brown to be aware of the diversion of RCM FX customer-entrusted assets to other Refco entities.

490.    In June 2004, questions were raised by THL's counsel concerning Refco's "average cash on hand." THL inquired about "house cash," which Mayer Brown characterized as "a difficult concept." In response to a question regarding having Grant Thornton provide a better explanation in future filings of Refco's "average cash on hand" and the distinctions between "house cash," "customer cash," and "regulated cash," Mayer Brown noted emphatically, "No! ! Impossible to breakout. Too restrictive operationally *i.e.* funding." Mayer Brown was fully aware that Refco was siphoning RCM customer funds to finance Refco's operations and to dress up Refco's financials.

491.    Mayer Brown's knowledge of and participation in the overall scheme is clearly shown through emails from Refco employee Thomas Yorke to Collins in January 2005. In those emails, Yorke sought advice from Mayer Brown on impending regulatory changes that "could mean an extremely large asset transfer away from RCM," how to avoid the potential impact of those changes and how to minimize "the cash transfer" from customer accounts at RCM to customer accounts at other Refco entities. As Mayer Brown, Collins, and Best were aware, Yorke wanted to keep cash at RCM because Refco used RCM customer accounts to fund Refco's operations. Mayer Brown's proposed solutions included "stall" and "avoid immediate application" of the new rule and "convince the adviser that its clients' assets . . . are beyond the scope" of the new rule.

492.    A Mayer Brown draft memorandum conveniently dated October 11, 2005, (just as the massive fraud at Refco was unraveling), shows that Mayer Brown was aware that as a result of the repatriation of RCM to the United States:

(a)    RCM's activities were actually conducted by RSL, and RCM had no personnel available to look out for the interests of its customers;

(b)    "RCM no longer maintains any personnel or operations in Bermuda, and .
. . all of its functions and operations are performed by RSL personnel that
are located in the United States";

(c)    While assets in RCM customer accounts were "carried on the books of
RCM," those assets were in fact not held by RCM;

(d)    RCM engaged in "significant" conduct in the United States, had structured
its activities to "avoid U.S. regulatory requirements" and could not
properly claim to be exempt from United States regulatory requirements;
and

(e)    RCM was not in fact a "foreign broker-dealer."

493.    Mayer Brown's preparation of such a memorandum in October 2005, at precisely

the same time as the public disclosure of the Refco fraud, is inherently suspicious.  By preparing

to advise RCM that it should consider changing the way it conducted its business after the fraud

had already been disclosed and RCM had been effectively shut down, Mayer Brown, Collins,

and Best were simply trying to "paper the file," "cover its tracks," and create the appearance

after the fact that it had rendered appropriate advice to RCM.  In fact, Mayer Brown, Collins, and

Best had advised RCM on its repatriation from Bermuda to the United States at a time when the

law was no different than it was in October 2005.  Indeed, all of the authorities cited in that draft

Mayer Brown memorandum pre-dated the advice rendered by Mayer Brown in 2001 and 2002

with respect to RCM's repatriation.

494.    Mayer Brown, Collins, Best, and Koury knew that Refco's activities were

fraudulent and actively aided and abetted the fraud.

### (d)    Conduct in the LBO.

495.    Further evidence that Mayer Brown participated in Refco's scheme to hide the

RGHI Receivable is Mayer Brown's conduct in the LBO.  Mayer Brown, Collins, Best, and

Koury represented both Refco Group and RGHI in connection with the LBO and, according to

116

the Examiner, were "deeply involved" in the LBO process, negotiating the agreement with THL and handling the Refco side of THL's due diligence.

496.    The Equity Purchase and Merger Agreement underlying the LBO transaction, a document negotiated and reviewed by Mayer Brown, Collins, Best, and Koury represented that there were no undisclosed intercompany loans between Refco and RGHI, and specifically required that Refco not assume or guarantee any indebtedness in excess of $5 million. The representation was false and Mayer Brown, Collins, Best, and Koury knew that the guarantee requirement would immediately be breached. There were, in fact, massive related-party loans between Refco and RGHI that had not been disclosed, but rather had been hidden by the RTLs documented by Mayer Brown, Collins, Best, and Koury. Moreover, at the same time Mayer Brown, Collins, and Best were reviewing these provisions in the Equity Purchase and Merger Agreement, they were also preparing documents for a $720 million RTL in which a Refco entity — RGL — was guaranteeing the debt.

497.    Mayer Brown, Collins, Best, and Koury affirmatively participated in a scheme to hide the RGHI Receivable. Mayer Brown, Collins, Best, and Koury reviewed the LBO prospectus and issued a legal opinion in connection with the LBO. The Offering Circular: (a) did not mention the existence of RTLs; (b) stated that $105 million owed to RGHI as of February 28, 2003, had been received as of February 29, 2004; (c) did not disclose the guaranty—that Mayer Brown itself had prepared — to a RTL Participant for a $720 million RTL that would come due a week later; (d) did not disclose that repayment of that RTL would result in an increase in the RGHI Receivable in that amount; and (e) falsely stated that the LBO bond debt was effectively junior to the payables owed to RCM.

### (e)    Conduct Before and After the IPO.

498.    After the LBO closed, Refco began the process of registering the Senior Subordinated Notes so that they could become publicly traded and also began preparing a prospectus that would lead to an IPO. Mayer Brown, Collins, Best, and Koury were involved with both processes.

499.    During this time, Mayer Brown, Collins, Best, and Koury continued to prepare documents for RTLs ($485 million in August 2004, $545 million in November 2004, and $550 million in December 2004, $345 million in February 2005, and $450 million in May 2005). In addition, Mayer Brown, Collins, Best, and Koury continued to receive and respond to periodic requests for audit response letters—keyed to Refco's relevant reporting periods. Mayer Brown, Collins, Best, and Koury therefore knew that the RTLs straddled Refco's reporting periods and that the round-trip loans were intended to falsify Refco's financial statements.

500.    As the disclosure process with the SEC moved forward, Mayer Brown, Collins, Best, and Koury reviewed Refco's S-1 registration statements, including the final S-1 which failed to disclose (a) the existence of the multi-million dollar RGHI Receivable reflecting debt owed by RGHI to Refco; and (b) the RTLs used to hide the RGHI Receivable and temporarily pay down its debt to Refco at year-end and quarter-end financial reporting periods.

501.    On August 16, 2005 – the day the IPO was completed – Mayer Brown issued its opinion letter in connection with preparation and filing of the S-1 that made limited representations similar to those it had made in its August 5, 2004 legal opinion included in the LBO Offering Circular. The prospectus was misleading in substantially the same manner as the previous Offering Circular.

502.    In late August 2005, after the IPO was completed, Mayer Brown, Collins, Best, and Koury assisted Refco in engaging in another $420 million RTL designed to cover the existence of the RGHI Receivable.

503.    Mayer Brown, Collins, Best, and Koury understood that Refco's continued operation, despite its massive losses, required a continuous infusion of cash. Mayer Brown, Collins, Best, and Koury knew that the only sources of cash available to Refco were its three principal operating entities—RSL, Refco LLC, and RCM—and that only RCM was purportedly unregulated and had no segregation or net capital requirements. Mayer Brown, Collins, Best, and Koury thus understood that Refco was diverting and consuming RCM customer assets, which included SMFF assets, to support the fraud.

504.    Mayer Brown, Collins, Best, and Koury further understood that the goal of both the RTLs and the theft of RCM customer funds was to misrepresent Refco as being financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. By their actions, Mayer Brown, Collins, Best, and Koury not only violated applicable ethical rules, it substantially assisted and participated in the fraud and breach of fiduciary duty of Refco and its agents.

**B.    Accountants.**

**1.    PwC and Mari Ferris.**

505.    PwC owed to SPhinX and PlusFunds the duty to refrain from engaging in conduct that PwC knew or should have known would be harmful to SPhinX and/or PlusFunds.

506.    PwC owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting any breach of duty, including fiduciary duties, owed by any other person or entity to SPhinX and PlusFunds.

119

507.   PwC owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting fraud perpetrated on SPhinX or PlusFunds.

508.   During the years 2003, 2004, and 2005 PwC also provided tax consulting and other advisory services to SPhinX. As such, PwC owed SPhinX fiduciary duties, including the duties of due care, loyalty, and full disclosure of all facts known by PwC that were material to the business and best interests of SPhinX.

(a)   **PwC's Role as Refco Accountant and Consultant.**

509.   PwC was engaged by numerous Refco portfolio funds, including SPhinX Managed Futures Index Fund LP, S&P Managed Futures Index Fund LP, Refco SPhinX Managed Futures Fund Ltd., and Refco Advantage Multi Manager Fund, among others, to audit the financial statements of those funds for the fiscal years 2003 through 2005.

510.   PwC partner Defendant Mari Ferris was the engagement partner on the Refco fund audits referenced above. As such, Ferris was in a unique position to gain knowledge of Refco's business operations and structure. At the same time PwC was conducting those Refco fund audits, Mari Ferris was also serving as engagement partner on the 2003, 2004, and 2005 PwC audits of the annual financial statements of the SPhinX funds.

511.   On May 5, 2004, PwC was engaged by Refco in connection with the LBO bond offering to provide advisory services, including (a) helping Refco to plan and prepare for the LBO and (b) advising Refco with "accounting and financial reporting matters" relevant to the offering, including the contents of the offering documents.

512.   On June 7, 2004, PwC's engagement was broadened to include analyzing the planned LBO by performing a Transaction Costs Analysis intended to optimize the tax treatment of professional fees (accounting, financial, legal, etc.) associated with the LBO. As part of that

analysis, PwC was authorized to conduct "interviews with the outside service providers," as well as "internal personnel involved in the transactions."

513.    After the LBO, PwC's engagement was broadened to cover two additional areas. On September 28, 2004, PwC's role was extended to include "advice and assistance related to the accounting and financial reporting matters for the quarter ended August 31, 2004." On November 10, 2004, PwC's engagement was further extended to helping "improve bottom line performance" by proposing alterations to Refco's "commissions and payouts" in numerous lines of business, including foreign exchange and prime brokerage services.

514.    In response to the disclosure that there were accounting control deficiencies at Refco, PwC also became the *de facto* Chief Accounting Officer for Refco and was charged with "assisting in the initial planning and staffing of audits" and implementing improved accounting controls.

515.    Furthermore, on March 8, 2005, PwC was engaged by RGL to provide an assortment of services in connection with Refco's preparation of the Form S-1, including (a) assistance in drafting and reviewing the Form S-1, (b) "consultation on disclosures within the Form S-1 and the Company's financial statements," (c) providing Refco's "management" with support in preparing any "Underwriters' comfort letter," and (d) assisting Refco with draft responses to SEC comments.

516.    PwC was also engaged by RGL in the summer of 2004 to provide tax-consulting services and, on April 1, 2005, was engaged to prepare Refco's 2004 state and federal tax returns.

517.    As a result of the various auditing, advisory, and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and

became aware of all the facts alleged herein giving rise to fiduciary duties owed by Refco and its agents, including Defendants Bennett, Grant, Trosten, Hackl and Maggio, to SPhinX and PlusFunds, including but not limited to the fact that Refco was acting as custodian of SPhinX customer funds, which were required to be held in customer-segregated accounts. In this same manner PwC became aware and knew of each of these Defendants' breaches of fiduciary duty described herein and provided substantial assistance to those breaches as described herein.

518.   As a result of these auditing, advisory and tax services and the unfettered access PwC had to Refco personnel and accounting systems, PwC was in a unique position and became aware and knew of Refco's fraudulent scheme and, more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets (including SPhinX customer funds) to fund Refco and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

519.   Through its provision of various auditing, advisory and tax services, PwC knowingly participated and substantially assisted in the fraud alleged herein. Without these services, Refco would have been unable to continue hiding its true financial condition long enough to complete its fraudulent scheme.

520.   Through the due diligence undertaken as Refco's principal advisor concerning accounting and financial reporting in connection with the LBO and the IPO and its role as the *de facto* Chief Accounting Officer for Refco, PwC learned of and/or consciously avoided knowledge of the existence of both the RGHI Receivable and the RTLs.

521.   Indeed, an email exchange between PwC and Victor Zarate, Assistant Controller of New Refco Group Ltd., LLC ("New Refco Group"), establishes that PwC was fully aware of the wire transfer RTLs in which BAWAG served as the conduit.

522.    On November 22, 2004, Zarate sent Henri Steenkamp, manager of Global Capital Markets at PwC, a schedule of the BAWAG RTLs, referred to as "BAWAG deposits." The schedule listed the exact sum of money Refco deposited in BAWAG to fund the fraudulent wire transfer RTLs. The "deposits" were each made at the end of Refco's fiscal year—*i.e.*, the last day of February – for the years 2001, 2002, 2003 and 2004, and also around the time of the LBO, in July and August of 2004.

523.    Evidencing that PwC understood that those "deposits" related to improper RTLs, PwC responded to the Zarate email listing the BAWAG deposits by asking for "the RGHI loan balances as well for th[ose] periods . . . ."

524.    Given PwC's knowledge and familiarity with Refco's financial reporting periods, PwC knew or consciously avoided knowing that at the end of each annual reporting period, and just before the LBO, Refco was "depositing" money with BAWAG and that, concurrently, the RGHI Receivable was being reduced by a like amount.

525.    As Refco's principal advisor on accounting and financial reporting matters in connection with the LBO and the IPO, PwC knew, or consciously avoided knowing, that there was no legitimate business purpose for these wire transfer RTLs, except to conceal the RGHI Receivable before the end of each relevant reporting and/or audit period.

526.    As Refco's 2004 tax year preparer, PwC also carefully reviewed Refco's prior tax returns and Refco's financial statement as of each *calendar*, not fiscal, year-end. As the RTLs were used to conceal the RGHI Receivable in *fiscal* year reporting and audit periods, PwC discovered, or consciously avoided knowledge of, the full extent of the RGHI Receivable.

527.    Furthermore, because PwC knew the wire transfer RTLs reduced the RGHI Receivable balance, it also knew that the $105 million receivable from RGHI disclosed on

Refco's financial statements did not reflect the full amount of the related-party receivable owed by RGHI to Refco.

528.    If PwC had fulfilled its professional obligations, it would have investigated the wire transfer RTLs and the RGHI Receivable, uncovered the full scope and nature of both the RGHI Receivable and the RTLs, and advised Refco's innocent directors, officers, agents and others of the Refco Insiders' fraudulent scheme.  Instead, PwC chose to substantially assist the Refco fraudulent scheme.

529.    Despite the fact that PwC knew or consciously avoided knowing that Refco was concealing the full amount of the RGHI Receivable, PwC actively assisted Refco in mischaracterizing the $105 million receivable from RGHI that was, in fact, disclosed.

530.    PwC knew or consciously avoided knowing that Refco routinely referred to intercompany and related-party obligations as receivables and payables owed to and from "customers."  As PwC knew, given its understanding of Refco's operations and accounting, the reason Refco sought to mischaracterize intercompany and related-party transactions as "customer" activity was to obfuscate and conceal improper intercompany and related-party transactions from regulators and customers, including SPhinX and PlusFunds.

531.    Nonetheless, in its role as Refco's principal adviser in connection with accounting and financial reporting matters, PwC prepared and/or reviewed and commented on Refco's initial S-4 registration statement which mischaracterized the $105 million receivable from RGHI as a "customer receivable."  It was this misleading language in the S-4 that prompted the SEC to question why related-party transactions with equity members should be booked as receivables from "customers."  While the SEC forced Refco to change the S-4 registration statement to reflect that the receivables were due from "equity members," the final S-4 did not disclose the

wire transfer RTLs, that part of the receivable owed by RGHI was concealed by the RTLs and that the $105 million was only a portion of the overall amount owed by RGHI to Refco.

532.    Furthermore, PwC chose not to require disclosure of any portion of the RGHI Receivable in the S-1 registration statement prepared and filed with the SEC in connection with Refco's IPO.  While early drafts of the S-1 included the $105 million related-party receivable reflected in the S-4 and the reference to the receivable being owed by "equity members," the final version of the S-1 filed with the SEC omitted reference to any portion of the RGHI Receivable despite the fact that PwC, even knowing about the wire transfer RTLs, did not receive, or seek, any confirmation that the $105 million receivable from RGHI disclosed in the S-4 had, in fact, been paid down, or that there were no other material related-party receivables due from RGHI and others.

533.    Similarly, in connection with commenting on the consolidated financial statements that would be attached to the offering prospectus, it was PwC that edited Note K- Related Party Transactions and characterized the $105 million receivable from RGHI as a receivable "from customers."  PwC thus intentionally sought to conceal from the public, the related-party nature of even the small amount of the receivable from RGHI that was disclosed.

534.    PwC also knew and/or consciously avoided knowing that Refco was looting the assets of RCM's customers, including SPhinX, in order to satisfy Refco's substantial working capital needs and to create the perception that Refco was an appropriate candidate for the LBO and IPO.

535.    Indeed, the fraudulent scheme perpetrated through RCM was so fundamental to the operation and financing of Refco that it had to be apparent to PwC.  The volume and size of the transfers from RCM customer accounts, involving, on many occasions, hundreds of millions

of dollars each, ensured that the amount of RCM funds that were "loaned" to other entities substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, the net uncollectible transfers totaled $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005.

536.    Furthermore, PwC was responsible for assisting Refco with the LBO offering materials, the IPO offering materials and the financial reports and registration statements that had to be prepared and filed in connection with both the LBO and the IPO, including the S-1 and the S-4 registration statements. PwC was thus fully familiar with and helped prepare and/or received and commented on the "payable to customers" line item on the condensed consolidated financial information.

537.    Based on PwC's involvement in preparing and/or reviewing and commenting on these condensed consolidated financial statements, PwC knew that the "payable to customer" line item referred to intercompany loans and that there were approximately $2 billion in payables owed by RGL and its affiliates to RCM as of the time of the LBO and that these amounts were not repaid in the LBO.

538.    Indeed, one of PwC's comments to Refco's consolidated financial statements was to eliminate from the Summary of Significant Accounting Policies (Note B) -- Receivable From And Payable To Brokers, Dealers and Customers and move to Related Party Transactions (Note K) the following language: "In the normal course of business, a member of the Group engages in customer-related activities which result in receivable from or payable to customer balances, which change daily." The only reason PwC would have moved this language to the related-party section of the financials was because PwC understood that these "payables to customer balances"

126

referenced RCM customer assets that were being siphoned to fund the operations of other Refco related entities.

539.    As PwC knew, or consciously avoided knowing, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the incurrence of $1.4 billion of debt by RGL and RCC in the LBO would have a devastating impact on RCM and its customer accounts, including SPhinX accounts.

540.    Underscoring PwC's willingness to aid and abet Refco at the expense of adhering to their professional standards, on October 12, 2005, two days after the RGHI Receivable had been publicly disclosed, PwC agreed to allocate BAWAG's 10% distributive share of RGL's 2004 income to RGHI based on Bennett's oral representation that the BAWAG affiliate that held a 10% interest in RGHI had merged into RGHI.  Even a minimal investigation, however, would have caused PwC to conclude that the merger of this BAWAG affiliate into RGHI occurred on August 5, 2004, eight months into the tax year, making redistribution of BAWAG's 10% share for the entire tax year inappropriate.

541.    By relying on the oral instructions of Bennett, who was on indefinite leave from Refco at the time, without undertaking any investigation of its own, PwC violated required standards of professional conduct.

542.    Moreover, PwC further provided substantial assistance to the Refco fraud and breaches of fiduciary duty by issuing unqualified or "clean" audit opinions on the 2003 and 2004 financial statements of SPhinX when, as described in detail below, PwC knew or was reckless in *not* knowing that those financial statements were grossly and materially misstated and misleading due to their misrepresentation and concealment of the fact that hundreds of millions

of dollars of SPhinX assets had been wrongfully transferred from customer-segregated accounts to non-segregated accounts where those funds were placed at substantial and material risk of loss. Had these material facts been disclosed to innocent decision-makers of SPhinX and PlusFunds, those innocent decision-makers could and would have taken immediate action to protect the SPhinX assets by demanding their immediate return from RCM, and deposit in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets.

(i)    **PwC and Ferris' Professional Duties as Auditor of SPhinX's and PlusFunds' Financial Statements.**

543.    Defendants PwC and Ferris served as outside auditor of SPhinX's financial statements for the years 2003-2005. PwC and Ferris owed SPhinX and PlusFunds professional duties of care in connection with the audits of SPhinX's financial statements.

544.    Defendants PwC and Ferris served as outside auditor of PlusFunds' financial statements for at least the years 2003 and 2004. PwC owed SPhinX and PlusFunds professional duties of care in connection with the audits of PlusFunds' financial statements.

545.    Defendants PwC and Ferris knew, by virtue of the services they provided to SPhinX and PlusFunds that the vast majority of PlusFunds' revenues and net income were generated from PlusFunds' engagement as funds manager of the SPhinX Funds. It was thus reasonably foreseeable to PwC and Ferris, and in fact highly probable that a business failure of SPhinX would result in the business failure of PlusFunds.

546.    By no later than the time it conducted its audits of SPhinX's financial statements for the fiscal year 2004, PwC was aware and knew of the Refco fraud, including the use of RCM customer assets (including SPhinX Funds) to fund Refco and its fraudulent schemes.

128

547.    On or about December 29, 2003, PwC LLP and PwC Cayman Islands separately executed and issued engagement letters memorializing their agreements with SPhinX and PlusFunds to audit the 2003 financial statements of the various SPhinX entities, including SMFF. PwC LLP and PwC Cayman Islands estimated their audit fees would be $252,000 and $213,000 (plus expenses), respectively, but Ferris testified the actual fees totaled at least "nine hundred to a million" due the additional time required to obtain the necessary documents and information and to perform additional audit procedures in excess of what had been planned. Although a significant portion of the SPhinX audits was performed by PwC Cayman Islands, the PwC Cayman Islands engagement was placed under the control of the PwC LLP engagement partner, Michael Greaney. Both PwC LLP and PwC Cayman Islands agreed to conduct audits of SPhinX's financial condition in accordance with auditing standards generally accepted in the United States. Both PwC LLP and PwC Cayman Islands represented that they would plan and perform their audits to obtain reasonable assurance that SPhinX's statements of financial condition were free of material misstatement.

548.    PwC LLP and PwC Cayman Islands executed and issued similar engagement letters, dated November 8, 2004 and November 9, 2005, respectively, memorializing their agreements with SPhinX and PlusFunds to audit the 2004 and 2005 financial statements of the various SPhinX entities, including SMFF. PwC LLP and PwC Cayman Islands estimated their audit fees for 2004 would be $1,729,000 and $774,000 (plus expenses), respectively, and for 2005, $3,223,000 combined. Ferris testified the significant increase in audit fees was "based on our expectation around the quality of the information [and] the time it would take to get the information that we needed [and] there were also more entities in '04." PwC Cayman Islands,

129

which again performed a significant portion of the SPhinX audits, ceded control of the audits to PwC LLP's engagement partner, Mari Ferris.

549.    On or about December 31, 2003, PwC LLP issued an engagement letter memorializing PwC LLP's agreement with PlusFunds to audit the 2003 financial statements of PlusFunds.

550.    PwC was similarly engaged to audit PlusFunds' 2004 financial statements.

551.    In or about March 2004, various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF, issued their financial statements for 2003, in connection with which PwC issued clean and unqualified audit opinions on March 30, 2004.

552.    Note 1 to SMFF's Notes to Financial Statements for 2003 recognizes that SMFF is organized under the Cayman Islands Companies Law and that SMFF's assets are segregated and insulated:

> [SMFF] was organized on June 6, 2002 as a Cayman Islands Exempted Segregated Portfolio Company ("SPC") and operates pursuant to Part XIV of the Companies Law (2002 Revision). Under Cayman law, an SPC may create segregated portfolios. The assets of each segregated portfolio are insulated from the claims of creditors and liabilities of the other segregated portfolios.

553.    Note 8 to SMFF's Notes to its 2003 annual Financial Statements represents that PlusFunds, as Investment Manager, had procedures in place to control market risk exposure. These procedures focus primarily on monitoring the trading of the Portfolio Managers and calculating the Net Asset Value of each class of the Company's shares as of the close of business each day.

554.    In or about March 2005, various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF, issued their financial statements for 2004, in connection with which PwC issued clean and unqualified audit opinions on March 30, 2005.

555.    Note 1 to SMFF's Notes to its 2004 Financial Statements recognizes that SMFF is organized under the Cayman Islands Companies Law and that SMFF's assets are segregated and insulated:

> [SMFF] was organized on June 6, 2002 as a Cayman Islands Exempted Segregated Portfolio Company ("SPC") and operates pursuant to Part XIV of the Companies Law (2002 Revision). Under Cayman law, an SPC may create segregated portfolios. The assets of each segregated portfolio are insulated from the claims of creditors and liabilities of the other segregated portfolios.

556.    Note 9 to SMFF's Notes to its 2004 annual Financial Statements represents that PlusFunds, as Investment Manager, had procedures in place to control market risk exposure. These procedures focus primarily on monitoring the trading of the Portfolio Managers and calculating the Net Asset Value of each class of the Company's shares as of the close of business each day. In addition, each Portfolio Manager applies market risk controls to its portfolio.

557.    In or about February 2004, PlusFunds issued its financial statements for the fiscal year ended December 31, 2003, in connection with which PwC issued a clean and unqualified audit opinion on February 2, 2004. Those financial statements contained no disclosure regarding any aspect of the Refco fraud, including the RGHI receivable or the RTL's. Nor did those financial statements contain any disclosure of the fact that hundreds of millions of dollars of SPhinX cash was exposed to the insolvency and credit risk of Refco and RCM.

### (ii)    PwC and Ferris' Duties Pursuant to Professional Auditing Standards.

558.    PwC and Ferris owed to SPhinX and PlusFunds the duty to perform their audits in accordance with the Standards promulgated by the American Institute of Certified Public Accountants ("AICPA").

131

559.    There are ten generally accepted auditing standards ("GAAS") promulgated by the AICPA: three General Standards, three Standards of Field Work, and four Standards of Reporting. Those standards are as follows:

(a)    **General Standards**.

1.    The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.

2.    In all matters relating to the assignment, an independence of mental attitude is to be maintained by the auditor or auditors.

3.    Due professional care is to be exercised in the performance of the audit and the preparation of the report.

(b)    **Standards of Field Work**.

1.    That the work is to be adequately planned and assistants, if any, are to be properly supervised.

2.    That sufficient understanding of internal control is to be obtained to plan the audit to determine the nature, timing, and extent of tests to be performed.

3.    Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmation to afford a reasonable basis for an opinion regarding the financial statements under audit.

(c)    **Standards of Reporting**.

1.    The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles.

2.    The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.

3.    Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.

4.    The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an

assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking.

560.    The requirement of independence embodied in the second general standard requires that "the auditor must be intellectually honest; to be recognized as independent, he must be free from any obligation to or interest in the client, its management, or its owners." AU § 220.03.

561.    Moreover, "[a]n audit of financial statements in accordance with generally accepted auditing standards should be planned and performed with an attitude of professional skepticism." AU § 316.16.

562.    In addition, in conducting an audit in accordance with generally accepted auditing standards, the auditor must recognize that "[m]anagement integrity is important because management can direct subordinates to record transactions or conceal information in a manner that can materially misstated financial statement. When approaching difficult-to-substantiate assertions, the auditor should recognize the increased importance of his consideration of factors that bear on management integrity." AU § 316.17.

563.    "The auditor should assess the risk that errors and irregularities may cause the financial statements to contain a material misstatement. Based on that assessment, the auditor should design the audit to provide reasonable assurance of detecting errors and irregularities that are material to the financial statements." AU § 316.05.

564.    GAAS requires that the auditor "be aware of the possible existence of material related party transactions ... ," AU § 367.04, and that the auditor "place emphasis on testing material transactions with parties he knows are related to the reporting entity." AU § 367.07.

565.   GAAS requires that the auditor audit material related-party transactions with heightened skepticism because such transactions are presumed to not be arms-length transactions.

566.   With respect to related-party transactions, GAAS requires that the auditor apply procedures necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. Such procedures "should extend beyond inquiry of management." AU § 367.09.

567.   According to GAAS, "[u]ntil the auditor understands the business sense of material transactions, he cannot complete his audit." AU § 367.09, n. 6.

568.   In its audits of SPhinX's financial statements and in its audits of PlusFunds' financial statements PwC was obligated by GAAS " to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited... ." AU § 341.02.

569.   PwC also had a duty to comply with all of the Statements on Auditing Standards (SAS), which are issued by the Auditing Standards Board (ASB) of the AICPA and incorporated into GAAS.

570.   GAAS required that PwC obtain an understanding of the business organization and operating characteristics of SPhinX and PlusFunds sufficient for PwC to conduct its audits in accordance with GAAS.

571.   As part of its audits, PwC was thus required to read and become familiar with SPhinX's and PlusFunds' organizational documents, Offering Memoranda pertaining to the SPhinX Funds, and promotional materials provided to potential investors pertaining to the

SPhinX Funds in order to familiarize itself with the business of SPhinX and PlusFunds. PwC was also required to read and understand the prior year's financial statements of SPhinX and Plus Funds, and the prior year auditor's working papers pertaining to the audits of those financial statements. PwC and Ferris thus knew, or consciously disregarded, that SMFF's assets were to be maintained in customer-segregated accounts at a regulated entity, and that those assets were to be protected from the insolvency or claims of creditors of the custodian of those assets.

572.    The maintenance and protection of SPhinX's customer assets in customer-segregated accounts, "ring-fenced" from claims against the other segregated portfolios and claims of creditors of the prime broker or custodian of SPhinX's customer assets, as represented in SPhinX's PwC-audited financial statements, was material to the fair presentation of SPhinX's financial condition. A failure to maintain this segregation of customer accounts would make the representations regarding segregated accounts false and would place those assets at substantial risk of loss, a fact that would have to be disclosed in SPhinX's financial statements. Thus, GAAS required that PwC plan and perform its audits of SPhinX's financial statements in such manner as to obtain reasonable assurance that SPhinX's customer assets were in fact maintained and protected in such segregated and protected accounts.

573.    Explanatory notes to the financial statements are an integral part of the financial statements, AU § 551.02. GAAS thus requires that the auditor implement sufficient audit procedures and obtain sufficient competent evidential matter to give the auditor reasonable assurance of the accuracy of representations and assertions made in the notes to the financial statements. In the case of its audits of the SPhinX Funds' financial statements, PwC was thus obligated by GAAS to implement audit procedures and obtain sufficient competent evidential matter to give PwC reasonable assurance of the accuracy of, among other representations and

assertions, the assertion in Note 1 to SPhinX's financial statements that SPhinX Funds assets were in fact held in customer-segregated accounts.

574.    GAAS further required that PwC evaluate the impact on the SPhinX financial statements of any failure of the SPhinX Funds to comply with investment restrictions imposed by contract or by governmental regulation.    AICPA Audit and Accounting Guide, Audits of Investment Companies ("AIC"), § 5.72 – 5.75.  Among other things, a failure to comply with governmentally imposed investment restrictions or requirements could constitute an illegal act (AIC, § 2.140) and must be disclosed in the financial statements.

575.    As disclosed in the Offering Memorandum of the SPhinX Funds, reviewed by PwC, SPhinX's securities were registered with the Irish Stock Exchange.  As also disclosed in the Offering Memorandum, reviewed by PwC, the SPhinX Funds were thus subject to investment restrictions and diversification requirements imposed by the Irish Stock Exchange. Those regulations required that:

- no more than 20% of the value of the gross assets of each Portfolio of the Company may be lent to or invested in the securities of any one issuer or may be exposed to the creditworthiness or solvency of any one counterparty and no more than 20% of the assets of a Series of a Class in respect of "hot issues" may be invested in the securities of any one issuer of "hot issues or exposed to the creditworthiness or solvency of any one counterparty;"

* * *

- the Company must observe the general principle of diversification of risk in its derivatives trading.

576.    The accumulation of hundreds of millions of dollars of SPhinX Funds' assets in the cash account at RCM, exposed to the risk of insolvency and claims of creditors of Refco and/or RCM, all of which facts PwC and Ferris were at all relevant times either actually aware or knowingly failed to observe, constituted violations of the investment restrictions and diversification requirements imposed by the Irish Stock Exchange.  The SPhinX Funds' non-

compliance with the rules of the Irish Stock Exchange should have been, but was not, disclosed in SPhinX's and PlusFunds' PwC-audited financial statements for the fiscal years 2003 and 2004.

577.    PwC partner Mari Ferris has testified that she was actually aware at the time of PwC's audit work that hundreds of millions of dollars of SPhinX Funds' cash was concentrated and exposed to credit risk at RCM. Nonetheless PwC failed to require disclosure of this material fact in the SPhinX and PlusFunds' financial statements, or in the notes to those financial statements, thus rendering the financial statements materially misleading, and failed to otherwise disclose it to the innocent decision-makers of SPhinX and PlusFunds despite the duties PwC owed to SPhinX and PlusFunds.

**(b)    <u>PwC Identified Numerous Material Weaknesses in Internal Controls, Which Should Have Prompted PwC to Audit with Heightened Skepticism and Enhanced Audit Procedures.</u>**

578.    Before accepting the engagement to audit the financial statements of SPhinX for the fiscal year 2003, PwC was required by GAAS to communicate with Deloitte & Touche as predecessor auditor of SPhinX financial statements, and to inquire of Deloitte & Touche as to, among other things:

(a)    disagreements with management regarding accounting principles, auditing procedures, or similar significant matters;

(b)    management integrity;

(c)    communications to audit committees or others with equivalent authority and responsibility regarding fraud, illegal acts by clients, and internal-control related matters; and

(d)    the reason for the change of auditors.

AU § 315.09.

579.    GAAS further required that PwC request to, and actually, review the working papers of Deloitte & Touche as predecessor auditors, at least those working papers including documentation of planning, internal control, audit results, and other matters of continuing accounting and auditing significance.  AU § 315.11.

580.    Had PwC properly conducted the communication with and inquiry of the predecessor auditor, as required by GAAS, PwC would have known even before beginning its audit work of serious internal control deficiencies at DPM.

581.    As part of its planning for each of its audits of the annual financial statements of SPhinX and PlusFunds, PwC was required by GAAS to consider and evaluate the existence, operation, and effectiveness of internal controls.  In the case of SPhinX, those controls included, but were not limited to, cash and securities reconciliations of customer accounts, and the maintenance and protection of those assets in segregated accounts.

582.    GAAS also required that PwC report to SPhinX's and PlusFunds' Audit Committee and/or Board of Directors any material weaknesses in internal controls identified during the audit.  These weaknesses are known as "reportable conditions" and consist of "significant deficiencies in the design or operation of the internal control structure, which could adversely affect the organization's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements."  AU § 325.02.

583.    In the course of its audit of SPhinX's 2003 financial statements, PwC and Ferris identified numerous and extensive internal control weaknesses and deficiencies in DPM's performance as funds administrator.

584.    On or about August 16, 2004, PwC and Ferris issued a letter to the Boards of Directors of PlusFunds (the "2003 Material Weakness Letter") relating to the 2003 audits of the

SPhinX Funds, "for which PlusFunds is the Investment Manager." The letter indicated that PwC had "rendered unqualified reports that these financial statements are fairly stated in accordance with accounting principles generally accepted in the United States of America."

585.    The letter further indicated that PwC had "considered the Funds' internal controls over financial reporting" and "noted matters . . . involving internal control and its operation that we [PwC] consider to be material weaknesses . . ."

586.    Appendix B to the 2003 Material Weakness Letter identified numerous "Internal Control Deficiencies" relating to the SPhinX Funds.

587.    PwC and Ferris found numerous deficiencies in DPM's work as fund administrator including, but not limited to:  (1) DPM's failure to reconcile adequately cash balances of portfolio managers, (2) DPM's inability to reconcile DPM's records with the records maintained by SPhinX's prime brokers, (3) DPM's failure to reconcile intercompany and intracompany accounts and (4) DPM's failure to perform adequately monthly reconciliations of cash and securities.

588.    The 2003 Material Weakness Letter identified an extensive list of serious control deficiencies, including but not limited to the following:

- "Use of cash as a suspense account."

- "DPM did not have a complete list of brokerage accounts and accordingly not all accounts were reconciled."

- "Explanations provided for reconciling items were not always sufficient to understand the nature of the item."

- "Explanations were not always accurate."

- "Generally, the reconciliations did not contain sufficient support from which to verify the explanation provided."

- "Instances where the reconciliation was incomplete."

- "The accurate performance and timely clearance of cash and securities reconciliations is a key control to ensure the accuracy of financial records and ensure the ownership and existence of assets. During the course of the 12/31/03 audits, DPM was required to reperform the monthly reconciliations in order for us to gain assurance that the financial statements were not materially misstated."

- "Prior to our request as part of the 12/31/2003 audits, the intercompany accounts were not reconciled. The subsequent performance and audit of such reconciliations resulted in numerous reclassification entries (generally involving subscriptions received in advance) made late in the financial reporting process."

- "There is currently no policy and no established practice to ensure that interest accruals are stopped on instruments when the receipt of such interest is determined to be unlikely, or to write off the portion of interest accrued that is determined unlikely to be collected. Such omission could lead to overstatement of income and assets."

- "There is no complete listing of all brokerage accounts for the Funds, and it took an inordinate amount of time to create a simple list of the accounts maintained for each entity."

589.    In addition to the material weaknesses in internal control identified in the August 16, 2004 letter, PwC was also aware of or consciously failed to know of the accumulation of hundreds of millions of dollars of SPhinX Funds cash at RCM, an unregulated entity, where that cash was subject to and exposed to the insolvency and credit risk of Refco and RCM was a substantial and material weakness in internal control. In breach of its contractual and fiduciary duties and professional duties pursuant to GAAS, PwC failed to inform the Boards of Directors of SPhinX and PlusFunds of this material internal control weakness.

590.    In the course of auditing SPhinX's and PlusFunds' 2004 financial statements, PwC and Ferris again identified numerous and extensive internal control weaknesses and deficiencies in DPM's performance as fund administrator.

591.    In or about July 2005, PwC and Ferris issued a letter to the Boards of Directors of the SPhinX Funds relating to the 2004 audits (the "2004 Material Weakness Letter"). The letter indicated that PwC had "rendered unqualified reports that these financial statements are fairly

stated in accordance with accounting principles generally accepted in the United States of America."

592.    The letter further indicated that PwC had considered the Funds' internal controls and "noted matters . . . involving internal control and its operation that we [PwC] consider to be material weaknesses ...."

593.    Appendix B to the 2004 Material Weakness Letter identified numerous "Internal Control Deficiencies," which were similar if not identical to the internal control deficiencies described in the 2003 material weakness letter, relating to the SPhinX Funds.

594.    The 2004 Material Weakness Letter identified the following internal control deficiencies relating to monthly reconciliations:

- "Reconciliations were not completed prior to DPM reporting final NAV."

- "Topsides on the reconciliation did not agree with the topside posted to the general ledger or were not booked."

- "Reconciliations were not performed adequately at the time of the 12/31/04 final close. . ."

- "Reconciling items were not being cleared on a timely basis."

- "DPM was unable to reconcile cash . . ."

- "Explanations provided for reconciling items were not always sufficient to understand the nature of the item."

- "Instances where the reconciliation was complete."

- "DPM did not have a complete list of brokerage accounts and accordingly not all accounts were reconciled."

- "There is no review by a supervisor / manager of the reconciliations once they have been performed. The accurate performance and timely clearance of cash and securities reconciliations is a key control to ensure the accuracy of financial records and ensure the existence and ownership of assets."

595.    In addition to the material weaknesses in internal control identified in the July 29, 2005 letter, PwC was also aware or consciously failed to know that the accumulation of hundreds of millions of dollars of SPhinX Funds cash at RCM, an unregulated entity, where that cash was subject and exposed to the insolvency and credit risk of Refco and RCM was a substantial and material weakness in internal control.    In breach of its contractual, fiduciary, and other professional duties pursuant to GAAS, PwC failed to inform the Boards of Directors of SPhinX and PlusFunds of this material internal control weakness.

596.    In addition to its role as the SPhinX Funds' auditor, PwC was retained by Rydex Partners, a fund that invested directly in a number of the SPhinX Funds, to audit or review the SPhinX Funds in connection with Rydex's investment in the SPhinX Funds.

597.    In the course of its review, PwC issued a report titled, "Rydex Capital Partners SPhinX Funds Audit Committee Report Resolution and Completion" (the "PwC Rydex Report") dated August 30, 2004.

598.    In the PwC Rydex Report, PwC indicated that it undertook procedures to "gain an understanding of key controls employed by DPM" in connection with its role as administrator of the SPhinX Funds.    The PwC Rydex Report noted a number of "documentation deficiencies" regarding DPM's services, including but not limited to the following:

- "There was no clear evidence of supervisory review of cash/position reconciliations (e.g. signatures)."

- "In certain instances, no formal documentation existed evidencing that reconciliation of certain security types (swaps, treasury securities and bank debt) had occurred."

- "In certain instances, explanations for reconciling items descriptions were incomplete and support was unavailable and had to be re-researched upon audit."

599.    Rydex retained PwC to conduct a similar review of the SPhinX Funds in 2005.

600.    As a result of its investigations on behalf of Rydex, PwC also became aware of severe internal control deficiencies at DPM relating to the accounting of the SPhinX Funds.

(c)    **PwC Failed to Conduct its Audits of SPhinX and PlusFunds in Accordance with GAAS.**

601.    PwC failed to conduct its audits of SPhinX and of PlusFunds with heightened professional skepticism as required by GAAS in light of PwC's knowledge of the Refco fraud and the fact that hundreds of millions of dollars of SPhinX Funds cash was deposited in an unprotected RCM account, and in light of the numerous material weaknesses in, and consequent unreliability of, internal controls as discussed above.

602.    PwC failed to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding SPhinX and PlusFunds' financial statements. Specifically, PwC failed to obtain sufficient competent evidential matter to support the representation in SPhinX's financial statements that SMFF's assets were, in fact, maintained in customer-segregated accounts. Had it done so, PwC would have known that the representation was false. PwC would also have known that the financial statements of PlusFunds were materially false and misleading by failing to disclose the insolvency and credit risk to which the SPhinX Funds assets at RCM were exposed.

603.    In light of the numerous and severe internal control deficiencies at DPM and failures by DPM as administrator, PwC could not rely on internal controls in the conduct of PwC's audits of SPhinX's financial statements.

604.    Due to the ineffectiveness and unreliability of internal controls of DPM as Fund Administrator, GAAS required that PwC conduct "substantive" audits of the financial statements of SPhinX. A substantive audit requires statistically sampling transactions to establish a demonstrably and scientifically representative list of transactions the auditor must then audit in

accordance with GAAS. Without such statistical sampling, a substantive audit requires that the auditor audit *every* transaction impacting the financial statements.

605. If an auditor cannot rely on internal controls and does not perform a substantive audit, then the auditor cannot complete an audit in accordance with GAAS, and must refrain from issuing an unqualified audit opinion.

606. Mari Ferris has testified that due to the internal control deficiencies at DPM, PwC did not rely on internal controls in the conduct of its audits at the financial statements of the SPhinX Funds. Although PwC recognized the need to conduct substantive audits, Ferris admitted that PwC's SPhinX audits were not based on a statistical sampling of transactions. Nor did PwC audit every transaction impacting SPhinX's financial statements. For these reasons alone, PwC had no reasonable basis upon which to represent it had conducted a GAAS audit or to issue unqualified audit opinions on either the 2003 or 2004 financial statements of SPhinX.

607. In light of the material weaknesses identified by PwC in the internal controls of DPM, PwC should not have issued unqualified audit reports on either the SPhinX or PlusFunds financial statements.

608. In light of the material weaknesses identified by PwC in the internal controls of DPM, and PwC's failure to perform substantive audits of the SPhinX funds, PwC's representations in its audit reports on the financial statements of SPhinX and PlusFunds that it had conducted GAAS audits were false and known to be false by PwC.

609. As discussed more fully herein, PwC failed to maintain independence in mental attitude in the conduct of its audit work. Moreover, PwC conducted its audits despite a clear conflict of interest.

610.    PwC's services as the SPhinX Funds' independent auditors were compromised by a conflict of interest arising from PwC's role as Refco's *de facto* Chief Accounting Officer" beginning in or about May 2004.

611.    By virtue of its role as consultant to Refco, PwC was aware of the wrongdoing by Refco and its agents and/or consciously avoided knowledge of it. By its actions, PwC actively participated in and substantially assisted Refco in carrying out the scheme detailed herein.

612.    Despite its knowledge of the Refco fraud and other misconduct, and despite its own flagrant breaches of its professional obligations pursuant to GAAS, PwC nonetheless issued unqualified audit opinions on the 2003 and 2004 financial statements of SPhinX Funds and PlusFunds.

613.    PwC and Ferris failed to exercise due professional care in the course of the PwC audits of SPhinX's financial statements and of PlusFunds' financial statements, and as a result breached its contractual and professional obligations to PlusFunds and the SPhinX Funds, including SMFF. PwC failed to adequately plan and conduct its audits so as to obtain reasonable assurance that SMFF assets were held in properly-segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets. In fact, PwC partner Mari Ferris has admitted that she was aware at the time of the PwC audits that the hundreds of millions of dollars of SPhinX fund assets held at RCM were subject to credit risk.

614.    PwC partner Mari Ferris has testified that PwC did not implement audit procedures to obtain reasonable assurance of the accuracy of the representations and assertions in the notes to the SPhinX financial statements, including the assertion in Note 1 that SPhinX Funds' assets were held in protected, customer-segregated accounts. She has also testified that

PwC did not implement any audit procedures designed to determine whether SPhinX Funds assets were in fact held in protected and segregated accounts.

615.    PwC failed to identify, or knowingly disregarded, and failed to require disclosure in the financial statements of the fact that hundreds of millions of dollars of SMFF assets had been diverted to unprotected, unregulated accounts at RCM, an offshore entity where customer segregation and other protections were unavailable. Without this disclosure, the disclosures in Note 1 to the financial statements were false and misleading.

616.    PwC failed to adequately plan and conduct its audits so as to obtain reasonable assurance that the SPhinX Funds were in compliance with applicable investment restrictions and requirements imposed by contract or governmental regulation, including the rules of the Irish Stock Exchange, failed to evaluate the impact of the SPhinX Funds' non-compliance with the rules of the Irish Stock Exchange on the financial statements of SPhinX, and failed to require disclosure of that non-compliance in the PwC-audited financial statements of SPhinX, all in violation of GAAS.

617.    Despite its knowledge and knowing audit failures described herein, PwC, in violation of its obligations pursuant to applicable professional standards, failed to require disclosure in the SPhinX Funds and PlusFunds financial statements of the material facts that hundreds of millions of dollars of SPhinX Funds cash, an unquestionably material amount of the SPhinX Funds' total assets:

    (a)    had been swept into and were on deposit at RCM, which was an unregulated Bermuda entity;

    (b)    was not being held in segregated customer accounts;

(c)     was exposed and subject to the insolvency and credit risk of Refco and

        RCM;

(d)     was concentrated in, and exposed to the credit risk of, a single entity in

        such manner as to constitute violations of the investment restrictions and

        diversification requirements of the Irish Stock Exchange; and

(e)     was in fact being utilized to fund the round trip loans and the Suffolk

        loans, and to otherwise finance and perpetrate the fraudulent schemes of

        Bennett and others described herein.

As a result, the 2003 and 2004 financial statements of SPhinX and of PlusFunds were grossly

and materially misstated and misleading, and PwC was obligated to, but did not, refrain from

issuing unqualified audit opinions thereon.   PwC was obligated to, but did not, inform the

innocent decision-makers of SPhinX and PlusFunds of the facts listed in subparagraphs (a)

through (e) above.

618.    PwC failed to properly evaluate or consciously disregarded its duty to evaluate the

ability of SPhinX and PlusFunds to continue in operation as going concerns for a reasonable

period of time.

(d)     **By Issuing Unqualified Audit Opinions, PwC Made
        Affirmative Misrepresentations to Innocent Decision-Makers
        Within SPhinX and PlusFunds.**

619.    On or about March 30, 2004, PwC issued its "report of independent auditors"

regarding its audit of SMFF's 2003 financial statements.   In this report, PwC issued an

unqualified, or "clean," audit opinion on the financial statements of SMFF for the fiscal year

2003. Defendant Ferris signed the report in the name of PwC.

620.    The following year, on or about March 30, 2005, PwC issued its "report of

independent auditors" regarding its audit of SMFF's 2004 financial statements.   In this report,

147

PwC issued an unqualified, or "clean," audit opinion on the financial statements of SMFF for the fiscal year 2004. Defendant Ferris signed the report in the name of PwC.

621.    On or about February 2, 2004, PwC issued its "Report of Independent Auditors" regarding its audit of PlusFunds' 2003 financial statements. In this report, PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2003.

622.    On or about February 14, 2005, PwC issued its "Report of Independent Auditors" regarding its audit of the 2004 financial statements of PlusFunds. In this report, PwC issued an unqualified or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2004. On information and belief, Defendant Ferris signed the report in the name of PwC.

623.    PwC's audit reports and unqualified audit opinions contained affirmative misrepresentations to the innocent decision-makers of SPhinX and PlusFunds.

624.    In both its March 30, 2004 and March 30, 2005 audit reports of the financial statements of SPhinX and the February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC and Ferris represented that PwC was "independent." In fact, as alleged herein, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of SPhinX.

625.    In its audit reports, PwC and Ferris represented that PwC had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged above, PwC and Ferris knew at the time they made these representations that PwC had knowingly and repeatedly violated GAAS in the conduct of its audits.

626.    In its audit reports, PwC and Ferris represented that they believed that PwC's audits "provide a reasonable basis for our opinions." As alleged above, PwC and Ferris had no

reasonable basis for its unqualified audit opinion, and PwC and Ferris actually knew or were reckless in not knowing as much.

627.    In the audit reports on SPhinX financial statements, PwC and Ferris represented that in their opinion the financial statements of SMFF, "present fairly, in all material respects, the financial position" of the various entities constituting SMFF at December 31, 2003, and December 31, 2004, and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for the years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF were not fairly presented in conformity with GAAP and PwC and Ferris had no reasonable basis for representing otherwise. Rather, they were, as discussed above, grossly and materially misstated and misleading.

628.    In the audit reports on the financial statements of PlusFunds, PwC and Ferris represented that in their opinion the financial statements of PlusFunds present fairly in all material respects the financial position of PlusFunds at December 31, 2003 and December 31, 2004 and the results of its operations, the changes in net assets, cash flows, and financial highlights for the year ended in conformity with accounting principles generally accepted in the United States of America. As alleged above, PwC and Ferris knew or were reckless in not knowing that PlusFunds' financial statements were not fairly presented in conformity with GAAP, and PwC and Ferris had no reasonable basis for representing otherwise. Rather, those financial statements were grossly and materially misstated and misleading.

629.    In light of the substantial and material amount of SPhinX Funds cash exposed to credit risk at RCM, and in light of the fact that virtually all of PlusFunds revenues were derived

from its services as manager of the SPhinX Funds, and in light of PwC's knowledge of these facts, PwC was obligated to, but did not, include "going concern" qualifications in its audit opinions on the financial statements of SPhinX and PlusFunds expressing substantial doubt as to the ability of SPhinX and PlusFunds to continue operations as going concerns for a reasonable period of time.

(e)  **Innocent Decision-Makers of SPhinX and PlusFunds Reasonably Relied On PwC's Misrepresentations.**

630.  PwC and Ferris knew that PwC's audit reports on the financial statements of SPhinX and the unqualified audit opinions therein would be, and in fact were, distributed to innocent decision-makers within SPhinX and PlusFunds, who would use and rely upon PwC's opinions in making significant business decisions for SPhinX.

631.  PwC and Ferris knew that PwC's audit reports on the financial statements of PlusFunds and the unqualified audit opinions therein would be, and in fact were, distributed to innocent decision-makers within SPhinX and PlusFunds who would use and rely upon PwC's opinions in making significant business decisions for SPhinX and PlusFunds.

632.  PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SMFF for the fiscal years ended December 31, 2003, and December 31, 2004.

633.  PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions thereon would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2003 and December 31, 2004.

634.  PwC and Ferris intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to

allow deposit of SPhinX assets in Refco accounts and to allow DPM to continue to administer SPhinX assets.

635.    Innocent decision-makers of SPhinX and PlusFunds in fact relied upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return or the immediate segregation and credit-risk protection of SPhinX Funds' assets in the RCM account.  As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

636.    Had the innocent decision-makers of SPhinX and PlusFunds known that material amounts of SPhinX Funds' assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demanding their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets. Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX Funds' assets at issue in this case, and the demise of SPhinX and PlusFunds.

**2.    Grant Thornton and Mark Ramler.**

637.    Grant Thornton issued audit reports on the consolidated financial statements of Refco Group for the fiscal years ended February 2002 through 2005 certifying: (1) that it had audited Refco Group's financial statements in accordance with GAAS; (2) that it had planned and performed its audits "to obtain reasonable assurance about whether the financial statements are free of material misstatements"; and (3) that, in its opinion, Refco's financial statements "present fairly, in all material respects, the financial position" of Refco in conformity with

GAAP; and (4) that is audits provided "a reasonable basis for [its] opinions." Grant Thornton provided accounting services for Refco prior to and in connection with the company's August 2004 9% Notes Offering and August 2005 stock IPO, which included the issuance of "clean" or "unqualified" opinions on Refco's fiscal year 2003-2004 financial statements. Grant Thornton also reviewed the approved Refco's interim financial statements included in the 9% Notes Offering and IPO Registration Statement.

638.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from engaging in conduct that Grant Thornton knew or should have known would be harmful to SPhinX and/or PlusFunds.

639.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting Refco's breach of duties to its customers, including SPhinX and PlusFunds.

640.    Grant Thornton owed to SPhinX and PlusFunds the duty to refrain from aiding and abetting the Refco fraud.

641.    Grant Thornton replaced Arthur Andersen as auditor for Refco and RCM for audits after 2002. After it took over the Refco engagement, Grant Thornton provided auditing and accounting services to Refco and issued clean and unqualified audit opinions with respect to Refco's financial statements for fiscal years 2003, 2004 and 2005. As Grant Thornton knew, the financial statements it audited were also included in Refco's various registration statements filed in connection with the LBO and IPO.

642.    Refco's financial statements were audited by Grant Thornton on a consolidated basis under RGL's name. RGHI's financial information was not consolidated with Refco Group. As a result, as Grant Thornton knew, the RGHI Receivable was hidden from the public in order

to preserve Refco's reputation with its customers, including PlusFunds and SPhinX, and to conceal millions of dollars in Refco losses.

643.    Grant Thornton's longstanding relationship with Refco through Mark Ramler (the former AA partner who took Refco's business to Grant Thornton) gave it a complete picture of the finances, operations, and business of RCM, RGHI and the rest of Refco. Grant Thornton had access to all material information, Refco's third-party transactions with RGHI and the RTLs. Given its intimate familiarity with Refco's finances, Grant Thornton knew or consciously avoided knowing the details of the Refco fraud and substantially assisted Refco's fraud and breaches of fiduciary duty against Refco's customers, including PlusFunds and SPhinX, who had deposited assets with Refco.

644.    Grant Thornton became aware and knew of and/or consciously avoided knowledge of the Refco fraud and, more specifically, the RGHI Receivable, the RTLs, the use of RCM customer assets (including SPhinX customer funds) to fund Refco and the inappropriateness of the LBO and IPO in light of Refco's true financial condition.

645.    Through its provision of auditing and accounting services, Grant Thornton knowingly participated and substantially assisted in the fraud alleged herein. Without such participation and assistance, Refco would have been unable to continue hiding its true financial condition long enough to complete its fraudulent scheme.

646.    Grant Thornton knew and understood or consciously avoided knowing that Refco Group and RCM were insolvent at least as of December 2002. Accordingly, Grant Thornton understood that Refco's officers and directors owed fiduciary duties to Refco's creditors, including SPhinX and SMFF.

647.    In violation of the duties it owed to SPhinX and PlusFunds, Grant Thornton actively participated and substantially assisted Refco's fraud and breach of fiduciary duties to its customers as well as the breach of Refco's officers' and directors' breach of fiduciary duties and fraud.

648.    As described in more detail below, Grant Thornton substantially assisted Refco's tortious conduct, by, among other things: ignoring numerous and substantial red flags that alerted Grant Thornton to the existence of accounting fraud; knowingly issuing unqualified opinions on Refco's consolidated financial statements for each of fiscal years 2003, 2004 and 2005, all of which materially misrepresented Refco's financial condition; opining separately on the financial statements of RCM; and continuing to act as Refco's auditor despite its knowledge of fraud.

649.    As Grant Thornton knew, clean audit opinions were essential to Refco's continued functioning and ability to retain for its own use the assets of customers, including PlusFunds and SPhinX.

650.    As the Refco examiner concluded, Grant Thornton learned first-hand of the fraud and then aided and abetted that fraud by continuing to provide clean audit opinions in the face of "grotesque accounting manipulations." Grant Thornton was aware of, or consciously avoided knowledge of, all aspects of the scheme to prop up Refco's finances, from the fraudulent RTLs to the theft of RCM customer funds.

651.    Before 2002, AA served as Refco's auditor. The lead partner on the engagement, Ramler, had abandoned any pretense of independence and objectivity. While at AA, Ramler once boasted that he had such a close relationship with Refco that its management did not engage in any transactions without his input. Ramler also bragged that Bennett and other senior Refco management called him daily to discuss transactions and business issues.

652.   After AA collapsed, Ramler moved to Grant Thornton, taking the Refco account with him. Refco was a marquee client for Grant Thornton. Refco stood to be an even better client for Grant Thornton if, as Grant Thornton anticipated, Refco went public. Grant Thornton's hope in the wake of the collapse of Arthur Andersen was that, by collecting former Arthur Andersen partners, such as Ramler, and their clients, such as Refco, Grant Thornton could rise in stature and compete with the remaining "big four" accounting firms for major national and international clients. Grant Thornton had substantial motives to perpetuate Refco's façade of solvency.

653.   During the course of the Refco engagement, Grant Thornton earned over $9 million in fees.

654.   Based on his long experience with Refco, Ramler brought to Grant Thornton knowledge of the following facts:

- As early as May 1998, Bennett desired to sell a significant portion of RGHI's interest in Refco over the next three to ten years.

- Refco's internal accounting controls were deficient, and readily capable of being overridden by Refco's management, including Bennett.

- As of February 28, 2002, RGHI was a shell entity with no operations that owed RGL approximately $170 million, and whose financial results were not included in RGL's consolidated financial statements.

- Refco was engaging in substantial and complex related-party transactions with RGHI, and there was a high risk of material misstatement arising from related-party transactions between Refco and RGHI.

- Bennett had promised AA that the RGHI Receivable would no longer increase and would be paid down, and that $35 million of the receivable would be paid off in fiscal year 2003.

- In 2001 Bennett improperly recorded a $43 million arbitration award against Refco LLC, over the CFTC's objections, and ultimately transferred the expense to RGHI's books.

655.    Grant Thornton was thus aware from the outset of the Refco engagement that Bennett had a motive to manipulate Refco's financial results, that Refco's books were susceptible to manipulation, and that the RGHI Receivable, which was not reflected in RGL's consolidated financial statements, was a viable tool—and in fact had been used—for accomplishing such manipulation.  Grant Thornton was also aware of the inherently high audit risk that related-party transactions represent, and the mandate from applicable professional standards of the need to apply far more scrutiny to related-party transactions than to arm's length transactions, when conducting an audit.  Accordingly, Grant Thornton internally categorized Refco as a "high-risk" client in part because it engaged in significant and complex related-party transactions, lacked an internal audit function, and was dominated by a limited number of senior executives and managers who had a direct financial interest in maximizing Refco's apparent financial condition and operating results.

656.    Transactions among entities consolidated on Refco's financial statements, as well as transactions between these entities and RGHI (which was not consolidated with Refco's financial statements), were related-party transactions within the meaning of GAAS.  Therefore, GAAS required, as explained above, heightened scrutiny of these transactions by Grant Thornton when conducting its audits of Refco's financial statements.

657.    Nevertheless, Grant Thornton failed to audit Refco's related-party transactions.  As a result, even though Grant Thornton knew or consciously avoided knowing that the RGHI Receivable was used to inflate Refco's operating results and learned of the RTLs, it continued to issue clean audit opinions for Refco.

658.    Grant Thornton's work papers from the 2003 audit demonstrate that Grant Thornton contemplated steps to scrutinize related-party transactions, but simply chose not to

156

implement them. For example, in conducting its audit of RCC in 2003, Grant Thornton told Refco that it needed to see certain loan receivables to RCC on the books of the affiliate owing the money. When making this inquiry, Grant Thornton specifically requested the information about a loan from RCC to RGHI purporting to have a balance of approximately $71 million, including documents to verify the existence and terms of the loan and ensure that RGHI was actually making payments that were received by RCC and reflected in its bank statements. In violation of Grant Thornton's own practices, as well as GAAS as outlined above, Grant Thornton never carried out these procedures. Had it done so, Grant Thornton would have quickly exposed the fraud and customers, including PlusFunds and SPhinX, would not have continued to entrust their assets with Refco.

659.   Grant Thornton's audit plan for 2003 also called for Grant Thornton to review loan documents concerning the receivable balance in RCM's account at RCC and to perform an assessment of the interest income represented by Refco to have accrued on this balance. Grant Thornton failed to perform either procedure. The substantial accrued interest income associated with the RGHI Receivable indicated to Grant Thornton that the receivable was far greater than the $105 million falsely disclosed by Bennett.

660.   In fact, after the 2003 audit Grant Thornton failed to perform any procedures whatsoever to test the RGHI Receivable at RCC. One glaring omission in Grant Thornton's work papers after 2003 is the absence of a document called "Schedule of Loans to Stockholders and Unconsolidated Affiliates." This document, which Grant Thornton had obtained and reviewed as part of every Refco audit from 1996 to 2003, detailed Refco's related-party receivables. Grant Thornton failed to require Refco to provide it with this critical document for the 2004 and 2005 audits and did nothing to investigate this change in documentation, even

though the customer statements for RGHI's account at RCC during the 2004 and 2005 audits made clear that RGHI still had a large debt balance in favor of RCC. Grant Thornton intentionally turned a blind eye to this issue.

661.   Similarly, Grant Thornton failed to examine the RGHI balances at RCM. Though Ramler knew that RGHI historically owed substantial sums of money to Refco through an account at RCM, Grant Thornton failed to perform even the simplest procedure to ensure that this related-party account was being properly recorded in Refco's books. Had Grant Thornton looked at the RGHI customer statement at RCM for February 2003 (Refco's fiscal year-end), Grant Thornton would have seen the following:

- The debit balance in the account as of February 1, 2003, was approximately $150 million.

- On February 7, 2003, an adjustment was made to credit the account for approximately $150 million, leaving a small debit balance on February 28, 2003, of approximately $70,000.

Scanning the customer statement for later financial reporting periods would have shown similar manipulations of RGHI's account at RCM.

662.   Grant Thornton's failure to examine the customer account statements of the related-party RGHI was so obviously a violation of its own policies, and so clearly a violation of GAAS, that it can only be evidence of a willful blindness and an intentional effort to avoid exposing evidence of the accounting fraud at Refco.

663.   Following the disclosure of the RGHI receivable and the collapse of Refco, Grant Thornton actually withdrew its certification and unqualified audit opinions on the financial statements of Refco back to early 2002.

(a)    **The RTL Transactions.**

664.    The RTLs during the periods audited by Grant Thornton were accomplished by RCM falsely recording loans as "reverse repos" or "time deposits" in the RTL Participant's customer account. (A "reverse repo" is a securities sale and repurchase agreement executed between two parties, and "time deposit" is a loan extended to a customer for purposes of trading.) Both "reverse repos" and "time deposits" require the posting of collateral, and, because both involve agreements with third parties who may fail to perform, both kinds of transactions raise serious financial statement risks, and warrant heightened scrutiny by auditors. Professional audit standards advise that when confirming high-risk transactions such as these, the auditor should confirm the terms of the transactions, and not merely their amount.

665.    Grant Thornton ignored these standards and deliberately failed to inquire into the obviously suspicious circumstances of these transactions.    As Grant Thornton knew or consciously avoided knowing, the RTLs were not actually "reverse repos" or "time deposits." The RTLs lacked the hallmark of both transactions—collateral. Nor did the RTL Participants' total capital provide Refco with adequate security for these substantial advances. Nevertheless, Grant Thornton accepted at face value Refco management's characterization of these transactions despite clear evidence that they were not what they purported to be.

666.    For example, during its audit of RCM for 2003, Grant Thornton noted large, period-end, round-dollar "reverse repo" transactions between RCM and two RTL Participants (Liberty Corner and Delta Flyer) totaling $650 million. The transactions were timed just before and unwound just after Refco's fiscal year-end. On April 16, 2003, Grant Thornton sent simple confirmation requests to these two RTL Participants, which were signed and returned. Although Grant Thornton performed additional balance sheet testing on other RCM customer accounts for 2003, Grant Thornton did not conduct additional credit risk testing on these RTL Participants'

159

accounts, and Grant Thornton did not inquire into the circumstances of these transactions, despite the fact that the amount of the transaction dwarfed each RTL Participant's total capital.

667.    In the 2004 audit, for example, Grant Thornton noted a $720 million period-end transaction characterized as a "reverse repo" with Liberty Corner. As in 2003, Grant Thornton sent a request to Liberty Corner to confirm the account balance, which Liberty Corner did. This year, however, Grant Thornton took the additional step of reviewing the potential credit risk from the transaction. Grant Thornton noted that the entire amount of Liberty Corner's debit balance -- $720 million -- was at risk, meaning that no collateral secured it. However, Grant Thornton did not identify the account as a credit risk and ignored the fact that a real "reverse repo" transaction is secured by collateral.

668.    As these examples illustrate, in every review and every audit that it conducted of Refco, Grant Thornton received information that RCM was engaging in large, period-end, unsecured credit transactions, purported "reverse repo" or "time deposit" transactions with the RTL Participants for hundreds of millions of dollars. Yet in each case, Grant Thornton declined to investigate further based on information – often merely a representation from management – that the unsecured balance had been repaid. Moreover, despite being engaged for years as Refco's auditors, Grant Thornton never questioned why Refco entered into these unusual, uncollateralized transactions straddling every relevant reporting and audit period.

669.    Further evidence that Grant Thornton understood that the RTLs were used to hide the RGHI Receivable comes from Ramler himself. In Ramler's own handwritten notes, Ramler writes the words "$450,000 million" and "contract loan," with a line drawn between "$450,000 million" and the words "Liberty Corner Capital Strategy Fund LLC" (one of the RTL Participants). Next to the name of Liberty Corner appear the words "mature transaction" and

below it are the words "clean-up of interco accounts." During the quarter ended May 31, 2005, there was in fact a $450 million "loan" characterized on Refco's books as a "reverse repo" that was used to "clean up" Refco's intercompany accounts. These handwritten notes demonstrate that Ramler and Grant Thornton had actual knowledge of the fraud.

670.    Records of internal communications within Grant Thornton's management show that Grant Thornton understood that Refco was not an appropriate candidate for an IPO and that Grant Thornton could be subject to liability for its conduct with respect to Refco. In late December 2004, Ramler had a conversation with a member of Grant Thornton's Professional Standards Group regarding Refco's response to an SEC inquiry regarding the IPO. The note states, in part: "Atty called – also this AM – Refco makes Firm uncomfortable . . . issue is sig. def. . . . Issue is no CFO. Probably had weak one before. We might not want to participate in IPO once this S-4 is done." The note goes on to demonstrate Grant Thornton's concerns about Refco and the upcoming IPO: "They are moving very fast – too fast for comfort... what to do – we would be sued."

671.    Grant Thornton knew or consciously avoided knowing that Refco was misappropriating RCM customer assets. Grant Thornton also knew, or consciously avoided knowing, that Refco engaged in the RTL scheme in order to hide massive losses from uncollectible receivables, and that RGL was saddled with guarantees of the RTLs. In sum, Grant Thornton knew, or consciously avoided knowing, that Refco was fraudulently "dressing up" its books using these schemes. Grant Thornton was a sophisticated audit and accounting firm that, when faced with knowledge of the Refco fraud, chose to look the other way to keep a marquee customer happy. Grant Thornton not only knowingly violated the governing standards of GAAS, it substantially assisted and participated in Refco's fraud and the breach of Refco's

161

officers' and directors' fiduciary duties to Refco's customers, including PlusFunds and SPhinX, who relied on Refco's financial statements and reputation in deciding whether to place funds in Refco's care.

672.    As the Examiner concluded, Grant Thornton was "in possession of a series of 'red flags' that should have alerted a properly skeptical auditor to the fraud," yet it "failed to adequately test high-risk related party transactions, failed to approach [its] audits with the appropriate degree of skepticism, and failed to adequately consider and evaluate the potential for fraud within Refco, a company controlled by a few individuals who could override controls and who intended to sell the company."

**(b)    Maintaining the Fraudulent Business Model.**

673.    Each year, Grant Thornton issued, among other things, unqualified audit opinions claiming that RCM's financial statements fairly presented its financial condition in accordance with Generally Accepted Accounting Principles ("GAAP").    In addition, Grant Thornton consented to the incorporation of its audit opinion in RCM's financial statements.

674.    The RCM financial statements for years 2003, 2004 and 2005 were false and misleading and failed to state material facts necessary to make the statements contained therein not misleading.    In particular, the RCM financial statements were false because they failed to disclose that the enormous "loans" RCM had made to other Refco affiliates were uncollectible and should have been written off in their entirety—a fact which would have shown RCM's net income, net assets, and stockholders equity were negative; in other words, RCM, the unregulated entity holding SPhinX's assets, was insolvent.

675.    For example, RCM's 2003 financial statements failed to recognize losses with respect to approximately $275 million in uncollectible obligations the financial statements falsely characterized as "receivable from customers."    In fact, as Grant Thornton was aware,

these were simply RCM customer-entrusted assets, which had been improperly diverted to other Refco entities and were not properly characterized as "receivable from customers." Moreover, had Grant Thornton properly audited the 2003 financial statements, it would have recognized the need to write off approximately $650 million in uncollectible payables owed to RCM by Refco affiliates that were used to finance RTLs at the end of the 2003 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

676. The 2004 RCM financial statements again failed to recognize losses with respect to approximately $1 billion in uncollectible related party obligations which the financial statements falsely characterized as "receivable from customers." Again, as Grant Thornton was aware, these were simply RCM customer assets which had been improperly diverted to other uncreditworthy Refco entities and were not properly characterized as "receivable from customers." Had Grant Thornton properly audited the 2004 financial statements, it would have recognized the need to write off approximately $720 million in uncollectible payables owed to RCM by Refco affiliates used to finance RTLs at the end of the 2004 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

677. The 2005 RCM financial statements, once again, failed to recognize losses with respect to the now $2 billion in uncollectible obligations which the financial statements falsely characterized as "receivable from customers." As Grant Thornton was aware, these were simply RCM customer assets that had been improperly diverted and were not properly characterized as

"receivable from customers." Had Grant Thornton properly audited the 2005 financial statements, it would have recognized the need to write off approximately $345 million in uncollectible payables owed to RCM by Refco affiliates used to finance RTLs at the end of the 2005 fiscal reporting period. SPhinX's and PlusFunds' innocent decision-makers relied on these financial statements and the reported solvency and financial strength of RCM in deciding whether to allow and continue to allow Refco to hold SPhinX assets in RCM.

678. Grant Thornton knew, or consciously avoided knowing, that these assertions in the RCM financial statements were false because it not only had access to, but actually audited and analyzed material information concerning RCM and the intercompany transfers of RCM customer assets. Grant Thornton knowingly or recklessly failed to take the required steps to obtain audit evidence verifying the nature and accounting treatment of these assets or ignored the resulting audit evidence. At all relevant times, the affiliated companies lacked the financial intent and/or wherewithal to repay RCM, the loans had no legitimate business purpose for RCM, the loans were falsely documented as "customer" receivables, RCM's board of directors never approved the transactions and no collateral or security existed of any value. Each of these facts constituted a huge red flag which was known or consciously avoided by Grant Thornton; together, they are evidence of Grant Thornton's willfulness.

679. Further evidence of Grant Thornton's knowledge of fraud, and Grant Thornton's active assistance in covering up the fraud, comes from a management deficiency letter (the "Management Letter") prepared by Grant Thornton following the February 29, 2004 year audit which raised significant "internal control" and accounting deficiencies at Refco. As set forth in this letter, among the categories of accounting irregularities and deficiencies known by Grant Thornton were: "Consolidation Process," "Formalized Reporting and Closing Process,"

"Internal Audit Function," "Accounting Procedures and Policies," "Accounting Function," "RCM Custody Reconciliations," "Audit Coordination," and "IT Environment Deficiencies."

680.    As the Management Letter revealed, Grant Thornton was aware that Refco's internal accounting and auditing functions were deficient, that there was no internal audit function, there was insufficient audit coordination, and that there were deficiencies in accounting procedures and functions and in the consolidation processes.    Despite these numerous longstanding problems, Grant Thornton provided Refco with clean audit opinions for each audit from 2003 through 2005.

681.    Even after belatedly presenting the Management Letter to Bennett in October, 2004, Grant Thornton failed to follow-up with Bennett or anyone else at the Company regarding the numerous deficiencies until early 2005, when Gerald Sherer, the new Refco CFO, was appointed.    Even then, Grant Thornton modified its findings at Refco's instruction and affirmatively lied about the letter's existence when Grant Thornton was asked by THL whether any such management letter existed.

682.    In late March 2005, after THL had consummated the LBO, THL learned of the existence of the Management Letter.    In an April 1, 2005 internal email, a THL executive expressed his anger that neither Refco nor Grant Thornton had provided the Management Letter to THL during the due diligence leading up to the LBO.

683.    The same day, in another internal email, another THL executive explained his discovery that at or about the time that Grant Thornton provided the Management Letter to the company, members of Refco management had pressured Grant Thornton to change or retract many of its conclusions in an effort to avoid taking appropriate steps to remedy the significant deficiencies identified by Grant Thornton:

> These are the facts as I've heard them . . . . A draft of the letter was first issued in October. Gerry [Sherer, Refco's new Chief Financial Officer] received it when he first got there [in early 2005] and "tore Grant Thornton a new one" for using the words "significant deficiency" with regard to the systems. Grant Thornton printed a revised version of the letter omitting those words and without management's response on March 29th and gave to Gerry. Gerry responded in writing two days ago with regard to the systems comment.

684.    A few days later, another internal THL email discussed the fact that Weil Gotshal & Manges, THL's lawyers during due diligence, believed they had asked both Refco and Grant Thornton if there were any management letters and were told there were none:

> [W]e wanted to chat about 2 issues raised by Weil. First is the Grant Thornton management letter. As we discussed on Monday neither the company nor Grant Thornton shared this letter with us, the audit committee or Weil. Weil believes they asked both the company and Grant Thornton if there were management letters and was told no.

685.    In sum, Grant Thornton not only knew of and left unaddressed numerous accounting and controls deficiencies at Refco, Grant Thornton eagerly softened its findings to please Refco management and later lied about the existence of the Management Letter. These facts demonstrate both Grant Thornton's knowledge of and substantial assistance in the fraud and breaches of fiduciary duty by Refco and its management.

686.    Ramler not only took Bennett and other Refco employees at their word, he personally vouched for their trustworthiness. Ramler's motivation for doing so was obvious; Refco was an extremely valuable account that he himself managed, and keeping the account through a successful IPO would constitute a coup both for Grant Thornton and for Ramler. In a conscious attempt to maintain the illusion that Refco was financially solid, Grant Thornton routinely issued unqualified audit opinions following a procedure that amounted to no audit at all.

687.    By choosing not to apply appropriate auditing standards, Grant Thornton allowed Refco to loot RCM customer accounts, including SPhinX accounts.  Similarly, Grant Thornton failed to examine the legitimacy of related-party transactions and thinly-concealed related-party transactions (the RTLs), despite professional obligations to ascertain the financial capability of other parties to repay balances owed, to review the agreements and other pertinent documents associated with the transactions, to inspect or confirm and obtain satisfaction concerning collateral for the transactions, and most importantly, to understand the business purpose for the transactions. None of these steps was taken for the RTLs, despite the fact that they were unusual and large-scale, related-party transactions repeatedly timed to coincide with the close of every relevant reporting and audit periods and despite the fact that they lacked any legitimate business purpose.

688.    An audit properly performed in accordance with GAAS easily would have uncovered the fraud alleged herein.  Grant Thornton's auditors, including Ramler, knew that the RTLs and other suspicious transactions were evidence of ongoing and massive financial manipulation. Grant Thornton's repeated failure to conduct an appropriate audit and its decision to ignore innumerable red flags requiring a high degree of skepticism and a rigorous examination of Refco's books and records, demonstrates that Grant Thornton and Ramler made the conscious decision to conceal the massive ongoing fraud in order to keep Bennett happy, boost the profile of Grant Thornton and continue collecting professional fees.

689.    Despite its knowledge of the fraud and breaches of fiduciary duty of the Refco defendants described herein, Grant Thornton participated and substantially assisted Refco by issuing unqualified "clean" audit opinions on the financial statements of Refco for each of the

years 2003, 2004 and 2005. These audit opinions hid Refco fraud and breaches of fiduciary duty and Refco's true financial condition.

690.    Grant Thornton knew and intended that its audit reports on the financial statements of Refco and the unqualified audit opinions contained therein would be, and in fact were, incorporated in Refco's financial statements and distributed to Refco's customers, including SPhinX and PlusFunds.

691.    Grant Thornton knew and intended that Refco's customers, including SPhinX and PlusFunds, would use and rely upon Grant Thornton's audit report and the unqualified audit opinions therein in deciding to maintain and continue to maintain customer accounts at Refco. Without the funds deposited into these accounts, the Refco defendants would have been unable to fund and continue their fraudulent scheme.

692.    In each of its audit reports and the unqualified audit opinions contained therein on the financial statements of Refco for the years 2003, 2004 and 2005, Grant Thornton made misrepresentations that had the effect of hiding Refco's true financial condition, fraud, breaches of fiduciary duty and other tortious conduct.

693.    In each of its audit reports Grant Thornton represented that it was "independent." In fact, as described herein, Grant Thornton knew that it was not independent and knew that it did not maintain an independence in mental attitude in the conduct of its audits. Rather, Grant Thornton chose to participate in and substantially assist the Refco defendants' fraud and breaches of fiduciary duty.

694.    In each of its audit reports on the financial statements of Refco, Grant Thornton represented that it had conducted its audits in accordance with GAAS. In fact, as alleged above, Grant Thornton knowingly and repeatedly violated GAAS in the conduct of its audits.

695.    In each of its audit reports on the financial statements of Refco, Grant Thornton represented that it believed that its audits provided a reasonable basis for its opinions.  As alleged, above, however, Grant Thornton had no reasonable basis for its unqualified audit opinions, and Grant Thornton actually knew or was reckless in not knowing as much at the time it issued its audit reports.

696.    In each of its audit reports on the financial statements of Refco, Grant Thornton represented that in its opinion the financial statements of Refco for the annual reporting period then ending present fairly, and in all material respects, the financial position of Refco and the results of its operations in conformity with GAAP.  As alleged above, Grant Thornton knew or consciously avoided knowing that the financial statements of Refco were not fairly presented in conformity with GAAP.  Rather, those financial statements were grossly and materially false and misleading in that, among other things, they concealed the Refco fraud, including the RGHI receivables and the sham and related-party nature of the RGHI receivables, the RTLs and the Suffolk loans described herein.

697.    Innocent decision-makers within SPhinX and PlusFunds actually and reasonably relied upon Grant Thornton's unqualified audit opinions in deciding to maintain and continue to maintain and fund with SPhinX assets accounts at Refco.

698.    By inducing such reasonable reliance on the part of innocent decision-makers within SPhinX and PlusFunds, Refco was able to misappropriate and misuse SPhinX customer funds, ultimately resulting in the loss of those funds.

699.    As the direct and proximate result of their reasonable reliance on the misrepresentations of Grant Thornton, SPhinX and PlusFunds sustained damages.

3.    **Ernst & Young**.

(a)    **Ernst & Young's Role in the Fraudulent Scheme**.

700.    Ernst & Young provided Refco with tax advice on numerous issues, served as Refco's independent registered tax accounting firm, prepared tax returns for Refco and RGHI from 1991 through 2002, and continued to provide tax advice and assistance to Refco from 2002 until 2005. As Refco's tax accountant, Ernst & Young owed a duty not to aid and abet Refco or others in fraud, breaches of fiduciary duties, and other torts directed at Refco's depositors, including PlusFunds and SPhinX.

701.    Ernst & Young was aware of Refco's activities alleged herein and/or consciously avoided knowledge of them. By its actions, Ernst & Young actively participated in and substantially assisted Refco and others in carrying out the scheme detailed herein.

702.    Ernst & Young began working for Refco around 1991 with the understanding that its client was RGHI and all of the subsidiaries below it, including RGL and Refco, Inc. (which became Refco, LLC). In 1993 or 1994, Ernst & Young began preparing tax returns and later helped with IRS, state and municipal tax audits. In 2001-2002, Ernst & Young provided Bennett with tax advice and proposed structures through which a partial sale of Refco could be effectuated with favorable tax treatment. During this time period, Ernst & Young also prepared tax returns for RGL and its subsidiaries and affiliates, including RGHI, through the tax year 2002. Ernst & Young and its affiliates continued to provide advice and services to Refco through as late as 2005, including preparing RGL's New York City tax returns.

703.    Ernst & Young was not simply a tax preparer for Refco, but provided tax consulting and advice with respect to numerous Refco transactions, including corporate restructurings among the various Refco entities, proposed sales and acquisitions by Refco, and

potential third-party investments involving Refco. Ernst & Young thus assisted and enabled Refco insiders to monetize and cash-out their interests in Refco.

704.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that Refco was insolvent as of August 2004 and that its officers and directors owed fiduciary duties to customers and creditors, including SPhinX and PlusFunds.

705.    As a result of Ernst & Young's tax consulting advice and involvement in Refco's schemes and attempts to sell the insiders' interests in Refco, Ernst & Young knew and understood all facts establishing that Refco owed fiduciary duties to customers like SPhinX.

706.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that Refco and its agents, including Bennett and Maggio, were engaging in the massive fraudulent scheme described herein, including the RGHI Receivable, the round-trip loans and the misuse of customer funds, including the funds of customers of SPhinX.

707.    As a result of Ernst & Young's consulting advice, Ernst & Young knew and understood that the Refco defendants were breaching the fiduciary duties they owed to SPhinX and PlusFunds as described herein.

708.    Despite its knowledge of the Refco defendants' fraud and breaches of fiduciary duties, Ernst & Young knowingly participated and substantially assisted Refco's fraud and breaches of fiduciary duty as described herein by hiding the Refco defendants' wrongdoing through the preparation and dissemination of Refco's tax returns.

709.    Ernst & Young understood no later than 2001 that Refco's insiders were seeking to achieve a lucrative cashing-out of their interests in Refco.

710.    From 2001 to 2002, Ernst & Young performed a substantial amount of work for Refco in connection with proposals to sell all or part of Refco to BAWAG or another third party.

During the course of this work, Trosten asked Ernst & Young to assume the existence of a receivable owed by RGHI to RGL in the amount of $720 million. Ernst & Young's advice on this issue ultimately led Bennett to structure Refco's proposed July 2002 transaction with BAWAG as a Proceeds Participation Agreement in which a BAWAG affiliate made payments to Refco in exchange for the right to participate in the proceeds of a future sale of RGL. Ernst & Young understood that certain senior Refco executives stood to profit directly and considerably by a sale of the company and had a corresponding incentive to manipulate Refco's financial statements and related disclosures in addition to its tax returns.

711.    Through rendering advice to Refco, Ernst & Young also learned that Refco, aided by Grant Thornton and Mayer Brown, was falsifying Refco's financial statements. In 1999, Ernst & Young provided advice in connection with the structuring of BAWAG's purchase of a 10% interest in RGL. In connection with this process, Ernst & Young reviewed and commented on the deal documents that Mayer Brown drafted. An Ernst & Young internal memorandum shows that Ernst & Young disagreed with representations contained in these draft documents to the effect that there were no undisclosed liabilities on the audited RGL financial statements and that all tax returns had been filed and withholding taxes had been repaid. In fact, the RGL financial statements were false because they did not disclose the RGHI Receivable being masked by the RTLs.

712.    Moreover, as a result of its work for Refco, Ernst & Young was aware that the RGHI Receivable was not a bona fide debt, but was a sham, based on, among other things, the following:

- Ernst & Young knew and/or consciously avoided knowing that the RGHI Receivable consisted, at least in part, of bad debts of Refco customers that were "sold" or assigned to RGHI for a price that vastly exceeded fair market value, and that RGHI lacked the ability to pay off the RGHI Receivable;

- Ernst & Young knew and/or consciously avoided knowing that Refco's officers were using the RGHI Receivable to manipulate Refco's balance sheet and operating results for the purpose of bolstering the financial appearance of the company;

- By as early as September 2001, Ernst & Young understood the RGHI Receivable was approximately $720 million to $900 million and that these receivables were concealed on Refco's audited financial statements;

- As early as February 2002, Ernst & Young knew and/or consciously avoided knowing about the RTLs to pay down the RGHI Receivable. Ernst & Young also knew and/or consciously avoided knowing that these transactions occurred in late February and would be reversed in early March, straddling the end of Refco's financial reporting fiscal year;

- Ernst & Young knew and/or consciously avoided knowing that at least one purpose of the RTLs was to improve Refco's balance sheet by concealing the RGHI Receivable.

713.    Based on Ernst & Young's knowledge of the Refco fraud, the senior Ernst & Young advisor on the Refco engagement decided in late 2003 that Ernst & Young should resign from its engagement with Refco.  Nevertheless, Ernst & Young continued to work for Refco through as late as 2005, several months after the LBO, and carried out its withdrawal from Refco assignments in such a way as to allow the fraudulent scheme to continue.

(b)    **Knowledge of Refco's Trading Losses and Balance Sheet Problems.**

714.    As early as 1998, Ernst & Young was aware of a related-party receivable owed by RGHI to Refco that was created when RGHI purchased "bad debt receivables" for full face value from Refco.  Ernst & Young was also aware that this receivable had been sitting on RGL's books accruing interest "for years" while a corresponding payable grew on RGHI's books.

715.    Ernst & Young also knew and/or consciously avoided knowing that Bennett had a practice of allocating vaguely described expenses—often listed as IT and computer expenses — to RGHI, but having RGL actually pay the expense and then book them as part of the RGHI Receivable.

716.    Ernst & Young clearly understood that the purpose of the RGHI Receivable was to improve the financial appearance of RGL.  In an email dated August 8, 2001, an Ernst & Young partner observed that a write-off of the RGHI Receivable would have a deleterious effect on RGL's earnings, which were "protected and buffered" by RGHI.

717.    In addition, Ernst & Young was fully aware that the RGHI Receivable was a sham based on the following evidence:

- Ernst & Young never saw a written agreement evidencing the RGHI debt, never knew the terms and conditions of the debt or its repayment schedule, and never knew of any valuable consideration for the debt;

- Ernst & Young never received a requested confirmation directly from Refco's counsel that the debt was valid;

- Other than the sham RTLs, RGHI never made a payment to service or pay down its debt during Ernst & Young's engagement;

- RGHI never made interest payments on its debt and instead simply added accrued interest to the outstanding receivable balance; and

- RGHI never expressed an intention to repay the debt and, never could repay the debt, because, as Ernst & Young knew, RGHI was "basically insolvent."

### (c)    The RTL Transactions.

718.    In approximately September 2001, Ernst & Young discovered that the receivable owed by RGHI to RGL was much larger than what appeared on RGL's audited financial statements.  While the financial statements reported a related-party receivables of approximately $219 million, the RGHI Receivable was in the range of at least $700 to $900 million.  When Ernst & Young asked a Refco officer about the discrepancy, Ernst & Young was told directly that Refco utilized the RTLs at fiscal year end in order to "clean up" the balance sheet and, for that reason, the related-party receivable balances did not appear on RGL's financial statements.

174

719.  Ernst & Young has admitted to the Examiner that by no later than February 28, 2002, it knew that at the end of every Refco's fiscal year, RGHI would borrow funds from a third party to pay down the RGHI Receivable and the transaction would be reversed a few days later.

720.  Ernst & Young also knew and/or consciously avoided knowing that the source of the third-party funds in these annual fraudulent transactions was actually RCM.  Several Ernst & Young documents refer to "circular flows of cash" in the context of discussions of pay down of the RGHI Receivable at fiscal year-end.  For example, a November 6, 1997, Ernst & Young handwritten memo regarding the Neiderhoffer Loss (which Ernst & Young knew to be part of the RGHT Receivable) states, in part, "Did RCM advance funds.  Circular flow of cash."  The handwritten notes of an Ernst & Young partner dated March 4, 2002, contains the phrases "borrowed cash from RGL," "third-party customer," and "Neiderhoffer."  In other words, the third-party customer had actually borrowed funds from RGL (via its subsidiary, RCM) to in turn loan to RGHI to hide the RGHI Receivable.

### (d)  Maintaining the Fraudulent Business Model.

721.  Ernst & Young's own documents demonstrate that as early as 1997, Ernst & Young had significant concerns about potential fraud at Refco and Ernst & Young's own potential liability arising out of its involvement with Refco.

722.  In November 1997, Kurt Neidhardt, the Ernst & Young partner handling the Refco engagement, was concerned about how Refco had treated the Neiderhoffer Loss.  Concerned that Ernst & Young could be viewed as "being an accessory to some type of fraud," Neidhardt met with the head of Ernst & Young's Financial Services Department, Jerry Goldman.  Instead of advising Neidhardt to alert the public to the Refco accounting fraud or withdraw from representing Refco, Goldman informed Neidhardt that so long as Ernst & Young prepared

Refco's tax returns correctly and never gave Refco any accounting advice, Ernst & Young should not be concerned.

723. Ernst & Young continued to have concerns about Refco, specifically about Refco's use of the sham RGHI Receivable to hide losses and other expenses. In 2001 through 2003, Ernst & Young sent Refco a letter asking Refco to provide, inter alia: (a) a representation from Refco's legal counsel that the related-party receivable payable from RGHI to RGL was a legally enforceable obligation; (b) a schedule of any expenses that RGL allocated to RGHI per a "5/12/99 Certification and Assumption by RGHI'; and (c) an analysis of related-party accounts. Despite these requests, Ernst & Young never received a written or oral representation directly from Refco's legal counsel that the related-party payable was a legally enforceable obligation. Instead, Ernst & Young accepted a representation from a Refco officer to that effect without demanding anything further. In addition, Ernst & Young never received the requested schedule of expenses or analysis of related-party accounts.

724. On July 8, 2002, Neidhardt met with the number two partner in Ernst & Young's tax department, Mile Kelley, to discuss Ernst & Young's knowledge that RGHI owed RGL a payable of $750 million, that RGL's audited financial statements reflected a related-party receivable of only around $225 million, and that RGHI would borrow money to reduce this receivable just before fiscal year-end and reinstate it just afterwards so that only $225 million would be reflected on RGL's audited financial statements. Ernst & Young also prepared tax returns for RGHI and knew it was unaudited. Echoing Goldman's earlier reaction, Kelley concluded that this was not a tax return issue, despite the obvious manipulation of the audited financial statements.

725.    On January 16, 2003, Neidhardt met again with Kelley to discuss concerns over Refco. This time, Neidhardt described another RGHI transaction in which a third party would allow RGHI to pay down the RGHI Receivable at fiscal year-end in a manner that would hide the related party nature of the receivable and improve the balance sheet without disclosing why the balance sheet improved. Once again, the number two partner in Ernst & Young's tax department chose to ignore this obviously fraudulent manipulation of Refco's audited balance sheet because he believed that as long as Ernst & Young got Refco's tax returns correct, the fraud was not Ernst & Young's concern.

726.    Refco's Fraud Examiner concluded that Ernst & Young knew that Refco's officers were intentionally manipulating Refco's balance sheet for the purpose of bolstering the financial appearance of the company.

727.    In or about November 2003, Ernst & Young purported to resign from the Refco engagement based in large part on its concerns over potential liability for aiding and abetting the Refco fraud as a result of its knowledge of the massive RGHI Receivable and the fiscal year-end paydown and reinstatement of the RGHI Receivable.

728.    Although Ernst & Young did not prepare Refco's federal 2003 tax returns, Ernst & Young continued to perform tax services for Refco through at least 2005, preparing, among other things, misleading New York City tax returns for RGL. Moreover, despite its concerns, Ernst & Young did not tell Refco's subsequent tax accountants (or anyone else) the true reasons for its decision to resign its concerns about Refco.

729.    Ernst & Young continued to be nervous about its relationship with Refco. In October 2005, Rory Alex, an Ernst & Young accountant who did not work on the prior Refco engagement, sent Neidhardt an email asking about the possibility of doing work for RGL. The

next day, Neidhardt sent an email to another Ernst & Young tax partner who had worked on the Refco account previously, saying "we need to be very careful here. I left [Rory Alex] all my numbers . . . anything [sic] we tell him must be strictly confidential. I may have Nancy Altobello shut him down."

730.    Ernst & Young was clearly aware that the RGHI Receivable was a sham transaction and not a bona fide debt on which interest income could properly accrue for tax purposes. Accordingly, the RGL tax returns reflected interest income associated with the RGHI Receivable that Ernst & Young knew and/or consciously avoided knowing was partially or entirely inaccurate. Ernst & Young also knew and/or consciously avoided knowing that the RGL tax return balance sheets (Schedule L) included as assets the RGHI Receivable. Thus, the Schedules showed an erroneous and inflated income for tax reporting purposes by RGL. These falsehoods substantially assisted Refco's efforts to create the illusion that it was profitable and financially healthy.

731.    Ernst & Young also understood that Refco's continued operation, despite the losses reflected in the RGHI Receivable, required a continuous infusion of cash. Ernst & Young knew and/or consciously avoided knowing that the only sources of cash available to Refco were its three principal operating entities – RSL, Refco LLC, and RCM – and that only RCM was unregulated and had no net capital requirements. Ernst & Young thus understood that Refco was consuming RCM customer funds.

732.    Ernst & Young further understood that the goal of both the RTLs and the theft of RCM customer funds and the hiding of losses was to falsely portray Refco as financially strong and healthy, growing quickly, yet with a low-risk, high profit business model. By its actions,

Ernst & Young substantially assisted and participated in the Refco and in the breaches of fiduciary duty by Refco and its officers and directors.

733.    By its conduct described above, Ernst & Young knowingly participated in and substantially assisted the Refco Defendants' breaches of the fiduciary duties they owed to SPhinX.  As alleged in detail herein the breaches of those fiduciary duties directly and proximately caused SPhinX and PlusFunds' damages.

734.    Ernst & Young substantially assisted the Refco fraud by preparing and filing tax returns that Ernst & Young knew and/or consciously avoided knowing were inaccurate or false and that effectively concealed the Refco fraud and by otherwise assisting in the concealment of the fraud through its tax and advisory services, Ernst & Young knew those tax returns would be reviewed by RGL's innocent directors, officers and agents and presented to lenders, potential investors, underwriters, and other third parties in connection with Refco insiders' continuous efforts to get financing for Refco and, ultimately, to facilitate a lucrative cashing out of their interests in Refco.  The Refco fraud alleged herein directly and proximately caused SPhinX and PlusFunds' damages.

C.    **Underwriters:  Credit Suisse and Banc of America Securities.**

735.    Credit Suisse served as a financial advisor to Refco in connection with the LBO and IPO transactions.  Specifically, Credit Suisse was a lead financial advisor, joint book-running manager, underwriter, and/or initial purchaser for the bond offering made as part of the LBO, and was the lead, joint book-running manager and lead underwriter of the August 2005 IPO.  Credit Suisse acted as the exclusive financial advisor to Bennett and/or RGHI and/or RGL.  By assuming these roles in connection with Refco's LBO and IPO transactions, Credit Suisse assumed due diligence and disclosure obligations in connection with Refco's public filings related to those transactions.

179

736.     Credit Suisse received $15.5 million in fees and a share of over $70 million in fees paid to the investment banking professionals.

737.     Credit Suisse knew that Refco was insolvent at least as of December 2002. Credit Suisse also knew that Refco's business model centered around performing transactions and holding assets for its customers, including SPhinX. As a result, Credit Suisse knew or should have known that Refco and its management owed fiduciary duties to Refco's creditors and customers, including SPhinX. As with other Defendants, Credit Suisse owed a duty not to aid and abet Refco, its officers, and affiliates in fraud and breach of fiduciary duty.

738.     Banc of America Securities' position is very similar to Credit Suisse's position. Banc of America Securities served as a financial advisor to Refco in connection with the LBO and IPO transactions. Specifically, Banc of America Securities acted in roles as a financial advisor, joint book-running manager, underwriter and/or initial purchaser for the bond offering made as part of the LBO and as a joint book-running manager for the IPO.

739.     Banc of America Securities received $125,000 in fees and a share of over $70 million in fees paid to the investment banking professionals. Like the other Defendants, Banc of America Securities owed a duty to not aid and abet Refco's fraud and breach of fiduciary duty. In addition, Banc of America Securities was aware that Refco was insolvent and that its business model centered around performing transactions and holding assets for its customers and, as a result, owed fiduciary duties to SPhinX and other customers and creditors of Refco. By virtue of Banc of America Securities' role as financial advisor in connection with the LBO and IPO transactions, it assumed due diligence responsibilities and disclosure obligations in connection with Refco's public filings.

740.    Each of the investment banker Defendants knew and/or consciously avoided knowing that a broker-dealer such as Refco was an inappropriate candidate for a leveraged buy-out.  Based on their experience and expertise, they knew and/or consciously avoided knowing that LBOs required real cash flows to service such a large amount of debt, and that broker-dealers such as Refco typically did not have sufficient unencumbered cash flows of their own to service such debt loads.

741.    However, Credit Suisse and Banc of America Securities quickly recognized that they could use the RCM funds being siphoned by Refco as a proxy for the cash flows that they would need to pitch the LBO.

742.    Tellingly, neither Credit Suisse nor Banc of America Securities was comfortable putting its own money into the LBO, and at least one of the investment banker defendants' internal credit departments denied approvals to do the same.  It was only after senior executives at Credit Suisse and Banc of America Securities overrode these denials and concerns based on the fees that could be earned, the opportunity to do a deal with THL and Refco and the small amount of investment (in exchange for sizeable fees) that would be required by the investment banker Defendants themselves, that they agreed to facilitate the deal.

743.    As Credit Suisse and Banc of America Securities conducted due diligence to justify the LBO, they strived for ways to show that Refco had free cash flow that could be used to service the LBO debt.  They discovered that they could not recreate management's projected free cash flows and that they could not rely on cash distributions from the regulated subsidiaries.  Fortunately for those with a stake in the LBO, Refco had been and would continue to make RCM's customer assets available to RGL and its affiliates for cash flow purposes.  Although they knew and/or consciously avoided knowing that a credit risk like Refco was not a good

candidate for leverage, they allowed the transaction to proceed because of the ready availability of RCM's cash.

744.    The investment banker Defendants irreparably damaged RCM by arranging $1.4 billion of LBO financing that "primed" RCM's pre-existing receivables due from RGL and the guarantors on the LBO debt. And, despite the fact that they found management, and particularly Refco's CFO, to be dishonest, they blindly accepted and endorsed management's unreasonable projections to service the LBO debt – projections which never even took into account the $2 billion owed to RCM.

1.    **Knowledge of the Looting of RCM Assets.**

745.    Through the due diligence undertaken in connection with the LBO, the investment banker Defendants learned that Refco was illicitly funding its operations with RCM customer assets, that RCM held between $1 and $2 billion in worthless intercompany IOUs, and that the LBO would altogether foreclose the Refco affiliates' ability to pay down their debt to RCM and jeopardize customer assets held by RCM, including SMFF's cash.

746.    However, as soon as Banc of America Securities and Credit Suisse were offered the prospect of earning lucrative fees in the LBO and IPO, they ignored their concerns.

747.    Credit Suisse and Banc of America Securities were always more concerned about upsetting Refco's management than they were about the potential harm to pre-existing creditors (like RCM and its customers, including SPhinX) who would be devastated by layering $1.4 billion of "senior" debt onto Refco. The investment banker Defendants remained completely focused on securing a lead role and the related fees in the transaction and even when they had concerns about Refco's financial condition. As one investment banker internally noted, the strategy always was to "keep the list [of due diligence] very short," as "[w]e didn't want to frighten management with a 4-page list"

748.    As early as May 2004, senior Banc of America Securities employees were questioning "how Refco use[d] its capital and how the company's net capital change[d] from period to period." After undertaking a review of RGL's intercompany receivables and obtaining a schedule from Trosten, Banc of America Securities concluded that it "need[ed] more information to be able to answer what Refco is doing with their capital and why."

749.    Before the LBO closed, employees for the investment banker Defendants continued to question how "money flow[ed] into and out of the regulated entities" and the magnitude of "affiliate loans to regulated entities . . . ." Banc of America Securities employees, for example, sought an explanation of capital flows over "eight quarters between regulated and non-regulated entities. What is the driver of capital movements and where is capital being used (besides what is in the regulated entity) and for what purpose?"  And, in connection with determining how Bennett could legitimately request a pre-closing dividend of $500 million from Refco, Banc of America Securities senior executive William Coupe noted that "[e]xcess capital to pay $500 MM pre-closing dividend also resides outside the regulated entities and consolidates up through Refco Capital Holdings, LLC." Given Banc of America Securities' particularized knowledge of Refco's corporate structure, Banc of America Securities knew and/or consciously avoided knowing that RCM was the purportedly unregulated subsidiary that consolidates up through Refco Capital Holdings, LLC, whose customers' money was constantly being used by the holding company.

750.    Indeed, the investment banker Defendants were keenly aware of the difference between how Refco used cash at RCM and its regulated subsidiaries.  They knew that SEC regulations limited the cash that Refco could have moved from its regulated operations and that Refco had to be drawing on customer assets from Refco's other operations—namely, RCM—to

cover its operational expenses. Yet they did not consider how and when RCM's IOUs would ever be repaid given that the investment banker Defendants were subordinating those IOUs to $1.4 billion in additional LBO debt. Indeed, none of the projections used by the investment banker Defendants even factored this into the cash needs of Refco's LBO debt parties—despite the fact that RCM's largest receivables came from RGL and RCC, both of which were guarantors on the LBO debt.

751.    As the investment banker Defendants knew but failed to disclose, to make the LBO work, Refco had to draw on RCM money to fund Refco's operations because the "Customer-Segregated Funds" in the regulated entities were off limits and had to be accounted for separately on Refco's balance sheet. Indeed, in response to inquiries as to why certain customer assets were not being used to "pay down debt," one senior Credit Suisse executive explained that it is "[b]ecause it is restricted customer cash that must be held for regulatory purposes *i.e.* it is not the company's cash." In stark contrast, the investment banker Defendants were elated that Refco did not restrict access to and regularly drew on RCM customer funds that could be used to pay down Refco's LBO debt. As one Banc of America Securities employee proclaimed in an email, "FYI . . . looks like Refco Capital Markets isn't regulated . . . that's good for us!"

752.    In reviewing and commenting on the condensed financial information attached to the LBO offering prospectus, the S-4, the S-1 and the IPO prospectus, the investment banker Defendants understood that at the time of the LBO there was over a billion dollars in payables owed to RCM by RGL and other guarantors on the LBO debt and that as of the IPO, the siphoned amount had climbed to over $2 billion.

753.    As the investment banker Defendants recognized, given their detailed knowledge of Refco, the enormous "payables to customers" that were eliminated in consolidation were actually intercompany payables owed to RCM and, accordingly, the assumption (in order to pay Refco's insiders) of $1.4 billion of new debt by RGL and RCC would have a devastating impact on RCM and its customers, including SPhinX. Indeed, the investment banker Defendants understood, as referenced in their own documents, that "payables to customers" constituted "obligations of Refco subsidiaries to repay client monies" and that, therefore, the intercompany loans made by RCM to RGL and its affiliates were comprised of RCM customer funds.

754.    The fraudulent scheme perpetrated on RCM was fundamental to the operation and financing of Refco, and each of the investment banker Defendants was fully aware and/or consciously avoided knowing that the LBO and IPO only worked by robbing RCM and leaving its receivables unpaid and unrecoverable, this virtually assuring that customer funds, including those of SPhinX, would be lost.

755.    Indeed, as the investment banker Defendants knew and/or consciously avoided knowing, the amounts stolen from RCM substantially outsized Refco's total capital. By the time Refco filed for bankruptcy, RCM's net uncollectible receivables totaled over $2 billion, while RGL claimed only $515 million in capital in 2002, $566 million in 2003, $616 million in 2004, and only $150 million in 2005. As the investment banker Defendants knew, and as their own projections showed, there was no cash to pay down the receivable to RCM and even Refco's projected "goodwill," which was entirely illusory given the Refco fraud, was insufficient to meet RGL and its affiliates' obligations to RCM.

2.    **The Investment Banker Defendants' Motivations.**

756.    Despite this knowledge, the investment banker Defendants, preoccupied with the lucrative fees they expected to make on the LBO and IPO, prepared the misleading offering

documents needed to facilitate the LBO and ignored the impropriety of the LBO for RCM and RGL.

757.    On July 22, 2004, Refco Finance Holdings LLC and Refco Finance Inc. issued an Offering Circular regarding the $600 million of senior subordinated notes, with Credit Suisse and Banc of America Securities as "joint book-running managers." Thus, the investment banker Defendants overcame their credit concerns about Refco motivated by the lucrative fees and opportunity to get close to THL and Refco for future business, including the IPO.

### 3.    Investment Bankers' Use of Patently Unreasonable Projections.

758.    The investment banker Defendants never trusted Refco. Indeed, one Banc of America Securities employee noted in an email dated April 23, 2004, that he could not "look at the CFO [Trosten] without thinking of [John] Lovitz and his pathological liar routine on [Saturday Night Live]." Nevertheless, the investment banker Defendants were all too willing to adopt and use patently unreasonable projections prepared by management in arranging and facilitating the LBO and IPO. None of the projections used by the investment bankers included any repayment of RCM's pre-existing receivables. The investment bankers who had been studying Refco's cash flows knew and/or consciously avoided knowing that significant cash was historically taken and could still be taken from RCM, and yet never took into account how the $1.4 billion of additional leverage on Refco or the payout of RGL's assets to Refco would impact RCM's ability to be repaid. Unlike a properly executed leveraged buy-out, the investment bankers knowingly left behind over a billion dollars of unpaid debts owed to RCM.

186

4.    **Impact on RCM Was Actively Concealed by Investment Banker Defendants.**

759.    The April 16, 2004 letter of intent regarding the LBO sent to Refco expressly advised the company that all debt would be paid down in the LBO except "secured" financing used for customer related activity:

> Our proposal is for a debt-free Company. Accordingly, we would expect that the Sellers would fund from their cash proceeds (or cause the Company to fund at Closing with a concomitant reduction in cash proceeds paid to the Sellers) all of the Company's indebtedness for borrowed money . . . . We understand that the secured financing (if any) used principally for customer related activity in the ordinary course of business will not be repaid.

760.    Similarly, the LBO Offering Circular, jointly prepared by the investment banker Defendants falsely states that the LBO bond debt was "effectively junior to all existing and future liabilities of our subsidiaries [including RCM] that have not guaranteed the notes." This was simply not true. As Credit Suisse and Banc of America Securities knew, the LBO layered on $1.4 billion in debt that would have to be paid off before RCM's intercompany loans could be paid. Nowhere did the Offering Circular explain that the RCM assets were routinely diverted from RCM and distributed to other Refco entities without security or collateral and without regard for RCM's obligations to its customers; that RCM's most significant assets were approximately $2 billion of undocumented, uncollateralized receivables from RGL and RCC – two of the entities obligated to repay the LBO borrowings; and that the LBO transactions resulted in "priming" these receivables with $1.4 billion of third-party bank and bond debt without regard for the interests of RCM.

761.    Despite the statements in the Offering Circular to the effect that RCM would not be harmed by the LBO, Section 7.03 of the Credit Agreement dated as of August 5, 2004, states that if Refco incurs "Indebtedness" that constitutes an "Investment" (which is defined to include

an intercompany payable), then "all such Indebtedness" by any Refco entity obligated to repay the bank debt owing to a Refco entity that is not obligated (i.e., RCM) "must be expressly subordinated to the Obligations" to repay the bank debt. In other words, the investment banker Defendants knew and/or consciously avoided knowing that the borrower and guarantors on the LBO bank debt were also obligated to pay RCM back for the use of RCM's cash, but they insisted that RCM's right to be repaid must be subordinated to their right to repayment.

762.    Similarly, Section 4.04(b)(15) of the bond debt Indenture allowed RGL and the guarantor subsidiaries to repay "intercompany Indebtedness . . . provided that no Default has occurred and is continuing or would result therefrom." Thus, as long as the LBO bond debt was not in default, RGL and RCC could – although they were not required to do so and arguably were precluded from doing so by the bank debt subordination requirements – repay the billions of dollars owed to RCM. But if ever the bond debt were in trouble, RCM's right to be repaid would be trumped by the LBO debt, which is what ultimately happened following Refco's bankruptcy.

763.    Pursuant to a July 22, 2004 Purchase Agreement, Credit Suisse (as representative of itself and Banc of America Securities) agreed that Credit Suisse, Banc of America Securities and non-party Deutsche Bank would severally purchase – at 97.5% of the principal amount of the notes – the $600 million of senior subordinated notes. Credit Suisse agreed to purchase $270 million (or 45%) of the notes, and Banc of America Securities and Deutsche Bank each agreed to purchase $165 million (or 27.5% each) of the notes. As the Notes were issued pursuant to SEC Rule 144A, they did not have to be registered.

764.    Nonetheless, Refco agreed to file a registration statement with the SEC and then to conduct an "Exxon Capital exchange" of registered notes for the Rule 144A Notes so that the

investment bankers would be permitted to resell the Refco notes to others. Credit Suisse took the lead in drafting the risk factors for the SEC filings that facilitated the resale of the LBO notes and the subsequent IPO.

### 5.    The Harm of the IPO to Refco Inc.

765.    The IPO Registration Statement became effective on August 10, 2005. In connection with the IPO, Refco Inc. issued 26,500,000 shares of common stock to the public at $22/share The offering consisted of 12,500,000 initial shares by Refco Inc. and 14,000,000 shares of a secondary offering by THL, RGHI, Bennett and others. An additional 3.975 million shares in overallotment were also issued. The offering generated $258.5 million in proceeds for Refco Inc., approximately $289,520,000 in proceeds for the selling shareholders and $82.2 million in greenshoe dividend.

766.    As the investment banker Defendants had contemplated, and as was set forth in the IPO prospectus, on September 16th, 2005, Refco Inc. used the vast majority of its IPO proceeds to pay $231,262,500 towards the redemption of $210 million of the principal amount of RGL's senior subordinated notes plus $18.9 million in accrued interest and prepayment penalty. As RGL was insolvent at the lime, Refco Inc. was induced to make a $231 million contribution to RGL for no consideration.

767.    The investment banker Defendants received their share of approximately $45 million in fees in connection with the LBO. The investment banker Defendants further received their share of approximately $40 million more in fees in connection with the IPO.

768.    Refco was forced to file for bankruptcy mere weeks after the IPO.

### D.    JP Morgan Chase & Co.

769.    JP Morgan Chase & Co. ("Chase") aided and abetted the breach of fiduciary duty by SPhinX's fiduciaries, including Refco and its agents, by substantially assisting Refco in

maintaining SPhinX money in non-segregated accounts at RCM, extending credit, providing underwriting services and otherwise participating in Refco's and Bennett's business, all with knowledge that RCM's customer assets, including SMFF's cash, were at risk in non-segregated RCM accounts in spite of representations that SPhinX money was held in segregated accounts.

770.    Chase owed duties not to aid and abet fraud, breaches of fiduciary duty or other torts against SPhinX, PlusFunds, and SPhinX investors.

771.    At all relevant times, Chase understood that SMFF customer assets should have been maintained in customer-segregated accounts.  Chase was thoroughly familiar with the SPhinX/PlusFunds platforms and business from Chase's own business dealings with SPhinX.  In or about 2004, Chase invested approximately $200 million in the SPhinX Funds.  In connection with that investment, Chase received and reviewed SPhinX's Offering Memoranda, informational and marketing materials, and corporate documents which discussed the SPhinX platform, the Cayman Islands SPC structure, and the customer segregation requirements.  As a result, Chase understood the SPhinX customer segregation requirements.  Chase also understood that SMFF's assets were maintained at Refco LLC and that SMFF's assets were being swept back and forth between customer-segregated Refco LLC accounts at Harris Bank and RCM's non-segregated account at Chase because the wire transfers clearly identify SPhinX as the beneficiary.  Chase knew that SMFF's assets were not held in customer-segregated accounts as they were required and represented to be under the Offering Memoranda, marketing materials, corporate documents and Cayman Islands law.  Chase knew that Refco and Refco's officers and directors were breaching their fiduciary duties to Refco's customers, including SPhinX.

772.    In 2005, Chase investigated the opportunity of creating its own managed account platform that would directly funnel investors' money into the various SPhinX funds.  In

connection with this opportunity, Chase conducted substantial due diligence into the operations of SPhinX and PlusFunds. According to PlusFunds e-mails, Chase's "detailed due diligence on PlusFunds" began on March 7, 2005.

773.   To coordinate Chase's due diligence efforts, PlusFunds presented to Chase a January 26, 2005 summary of discussion points emphasizing the SPC structure requirements under Cayman Islands law and the requirement for "ring fence accounts." The presentation indicated that ring fencing "allows for the use of a single legal entity for multiple accounts whilst ring fencing each account from a point of view of a counterparty credit risk." The presentation detailed the need to "implement and maintain all allocation rules for all feeder, SMF and SPCV vehicles." The presentation also highlighted the need to "implement and enforce cash management policies" and contained a comprehensive analysis of risk management issues.

774.   In an e-mail dated February 22, 2005, from Chris Rose to PlusFunds' management and board of directors, Rose discussed Chase's due diligence, indicating that "the other people that they need to see and understand are Tia [Urban] and Ricardo [Mosquera] since they are the ones that supervised the various functions that make the platform less risky, e.g., cash management, portfolio, p&l, capital flows." Chase was clearly focused on cash management issues in its investigation of the SPhinX Funds. Chase knew that SPhinX money was being moved from Refco LLC to RCM where it was no longer protected. Chase knew that this was inconsistent with the legal requirements imposed by Cayman Islands law and contrary to the express representation in the Offering Memorandum, marketing materials and corporate documents.

775.   On February 28, 2005, Roslyn Kelly, the due diligence project manager at Chase, e-mailed the list of Chase attendees who would be participating in Chase's investigation of

PlusFunds. In that same e-mail, Kelly indicated "our objective is to gain a thorough understanding of your platform in terms of infrastructure (operations, information feeds, legal setup, etc.), risk management (operations, credit and market), and third party relationships where services are outsourced."

776. The preparatory work culminated in a comprehensive presentation on the "SPhinX Investment Program" given to Chase in March 2005. Contained in that presentation was a detailed analysis of the structure and operations of the SPhinX Funds. As a result of Chase's own investment in the SPhinX Funds and its due diligence in connection with their efforts to establish a managed account platform, Chase fully understood the SPhinX business structure and knew that SMFF's cash was required to be segregated. Chase also knew that money that should have been held in Refco LLC was in fact moved to unregulated, non-segregated accounts at RCM.

777. Chase knew and understood that the officers and directors of SPhinX, PlusFunds and DPM owed fiduciary duties to SPhinX and to SPhinX Funds investors, and that these included the duties to take reasonable steps to ensure that investors received a reasonable return on their investment and that SPhinX Funds assets be maintained in customer-segregated accounts protected from the insolvency and credit risk of the custodian of those assets.

778. At all relevant times, Chase knew that RCM commingled its proprietary and customer assets, including SPhinX assets, in a single bank account at Chase including hundreds of millions of dollars of cash. Chase initially paid no interest to RCM and therefore no interest to SPhinX on customer assets held in that account, although the amounts held totaled in the hundreds of millions of dollars. Chase therefore had access to hundreds of millions of dollars – essentially free.

779. Chase understood that the money held in RCM's Chase Account represented customer assets, including SPhinX assets, entrusted to RCM, and Chase understood that it was not a customer-segregated account. Chase actively promotes a commodity customer-segregated account service to provide customer segregation for cash related to commodities trading, and so understands regulatory requirements and customer segregation issues relevant to such accounts.

780. Not only was Chase knowledgeable about SPhinX and PlusFunds business, Chase also fully understood Refco's business. It possessed this knowledge because it served as one of Refco's underwriters on the IPO and acquired that knowledge via due diligence. Chase also had direct business dealings with Refco and direct connections with Bennett and other Refco officers and agents because of their former employment at and their ongoing business relations with Chase.

781. Chase had a long history of dealings with Bennett and other Refco officers. Bennett was employed at Chase as a commodity and commercial lender from 1972 to 1982. In 1982, Bennett moved from Chase to Refco. During his employment at Chase, Bennett established and developed critical relationships with former and current Chase personnel and maintained those relationships after moving to Refco.

782. After his departure, Bennett maintained part of his personal fortune in Chase accounts. For example, at the time of his indictment, Bennett, through RGHI, maintained at least $111 million in Chase account number 066-636752. Bennett and his wife also maintained at least $15.5 million in Chase account number 024-302791 as well as an additional $13.6 million in a Bennett Family Trust in Chase account number 51605-00-7.

783. Other Refco officers also had connections to Chase. William Sexton, Refco's Executive Vice President and Chief Operating Officer, was employed at Chase from 1991

through 1997. Joseph Murphy, Refco's Executive Vice President and Refco Global Futures' President and CEO, was previously employed at Chase. Both of these individuals were recently identified by the U.S. Attorney General as unindicted co-conspirators in the federal prosecution of Trosten and Grant. Thomas H. Lee, a director of Refco after the LBO in 2004 and a principal of the THL Defendants, is also affiliated with Chase.

784.    Beginning in or about August 2004, Chase extended an $800 million line of credit to Refco secured by Refco's deposits at Chase, including SPhinX assets in RCM's accounts. Chase undertook due diligence of Refco and its business in connection with Chase's decision to extend hundreds of millions of dollars of credit to Refco, and thus understood Refco's business structure and financial condition.

785.    The ongoing relationship between Refco and Chase continued with Chase's participation in the Refco IPO. JP Morgan Securities, Inc., a Chase subsidiary, acted as a co-underwriter and co-manager on the August 2005 IPO. By participating as an underwriter, Chase undertook additional due diligence obligations and again investigated Refco to ensure that the IPO offering materials were accurate and that Refco's financial condition was suitable for an IPO. As a result of all of these connections, Chase understood the business dealings and relationship between Refco, SPhinX and PlusFunds.

786.    Chase knew and understood that the Refco Defendants owed fiduciary duties to SPhinX and SPhinX Funds investors.

787.    Chase knew and understood that certain officers and/or directors of SPhinX, PlusFunds, and DPM, named as Defendants herein, and that the Refco Defendants, all breached the fiduciary duties they owed to SPhinX by causing, assisting, or knowingly allowing the

transfer of SPhinX assets to RCM's non-segregated account at Chase, where those assets were exposed and subject to the insolvency and credit risk of Refco and RCM.

788.    Despite its understanding that SMFF's assets were to be maintained in customer-segregated accounts and its understanding that SMFF assets were moved back and forth between Refco LLC's regulated accounts at Harris Bank and RCM's non-segregated accounts at Chase, Chase remained silent.  By doing so, Chase understood that fiduciaries charged with the protection of SMFF's assets were violating their duties and placing SMFF assets at risk.  Chase actively aided and abetted those breaches of fiduciary duty.

789.    Chase aided and abetted Refco because of its profitable relationship with Refco. Refco maintained hundreds of millions of dollars at Chase for which Chase initially paid no interest.

790.    The intimate relationship between Chase and Refco is further demonstrated by Chase's willingness to assist Refco—to the tune of $201 million—even after the disclosure of the Bennett fraud.  On or about October 12, 2005, in response to Sugrue's demand that SMFF's cash be removed from RCM and transferred to SMFF's customer-segregated accounts at Refco LLC, Bennett turned to Chase to provide the liquidity necessary to transfer cash back to Refco LLC.  Because RCM's assets had been diverted to fund Refco's business operations elsewhere, RCM did not have sufficient assets to cover Sugrue's demand for the withdrawal of SMFF's cash from RCM.

791.    On one day's notice, Chase provided a $201 million loan to Refco *after* the disclosure of the $400 million Refco fraud.  Refco used the proceeds of the Chase loan to satisfy Sugrue's demand that SMFF's cash to be transferred to Refco LLC.

792.   After disclosure of the Refco fraud, Chase redeemed approximately $176 million of its investment in the SPhinX Funds, including approximately $10 million from SMFF.

793.   By facilitating transactions, extending credit, promoting the Refco IPO and otherwise participating in Refco's business and operations, Chase aided and abetted Refco's fraud and breach of fiduciary duty.   Chase was fully aware of Refco's obligations to its customers in general and to SPhinX in particular, and was aware that Refco was in breach of those obligations.   By remaining silent and by actively participating in and profiting from Refco's business, Chase caused damages to SPhinX and PlusFunds.

**E.**   **RTL Participants.**

**1.**   **BAWAG P.S.K.**

794.   Defendant BAWAG is a banking and financial services corporation organized and existing under Austrian Corporate Code Governance ("ACCG") and law of Austria.   BAWAG is Austria's fourth largest bank.

795.   BAWAG owed to SPhinX and PlusFunds duties not to aid and abet fraud, breach of fiduciary duty or other tortuous conduct by Refco or its officers, directors or agents.

796.   The relationship between BAWAG and Refco dates back until at least the early 1990s when BAWAG's long time chairman and CEO Walter Flottl used approximately $2 billion in BAWAG funds to help his son, Wolfgang Flottl, establish a Bermuda based hedge fund.   That hedge fund, Ross Capital, used Refco as its primary broker and upon information and belief was one of the Refco customers that suffered trading losses that were not properly disclosed and accounted for by Refco.

797.   In 1998, BAWAG and Refco expanded their relationship with a joint venture to provide clearing services for futures and options traded on European exchanges.   Bennett's close relationship with BAWAG also resulted in the company's hiring of Thomas Hackl who was head

of investment banking at BAWAG from 1991 to 2000, as executive vice president in charge of global asset management of Refco Group. Hackl is also believed to be a director of Bank Frick & Company in which BAWAG holds a 26% stake and Refco Global Finance Ltd. holds a 4% stake.

798. BAWAG had the power to dominate, influence, control, and did dominate, influence and control directly and indirectly Bennett and Refco. In a 1999 transaction brokered by Sugrue on behalf of Refco and Hackl on behalf of BAWAG, BAWAG acquired a significant equity interest in Refco, including (i) BAWAG's publicly disclosed 10% equity stake in Refco (that BAWAG held through its affiliates Alinea Holding, GmBH, and BAWAG Overseas, Inc.); and (ii) BAWAG's undisclosed additional 27% or more equity stake in Refco. By virtue of these transactions and other substantial loans between BAWAG and Refco, BAWAG exercised actual control over Bennett and Refco.

799. In 2001 and 2002, Refco explored the possibility of selling substantial portions and perhaps all of Refco to BAWAG.

800. In or about June 2002, BAWAG and Refco executed a Proceeds Participation Agreement, which provided BAWAG with rights to participate in the proceeds of any sale of the equity of Refco in exchange for a series of payments from BAWAG and/or its affiliates.

801. As a result of these transactions, BAWAG also enjoyed a position of influence and control at Refco. As part of its close relationship with Refco, BAWAG and Refco helped each other conceal trading losses and fraudulently improve their respective financial statements.

802. As a result of its close relationship to, and substantial interests in Refco, BAWAG had an intimate knowledge of Refco and its affiliated entities, including RCM.

803.    As a result of BAWAG's close relationship with, and interests in, Refco, and its ability to and actual exercise of influence and control over Bennett and Refco, Refco was at all relevant times acting as an agent of BAWAG.  BAWAG is thus vicariously liable for the acts of Bennett and the Refco entities alleged herein.

804.    Both BAWAG and Refco have admitted that BAWAG directly and knowingly participated in the Refco fraud and helped Refco to conceal the RGHI Receivable by participating in RTLs.  BAWAG has also been named as an unindicted co-conspirator in the Bennett/Trosten/Grant criminal proceedings.

805.    Beginning as early as 2000, BAWAG acted in concert with Bennett and Refco-related entities to convert and misappropriate RCM customer assets to offset and conceal the RGHI Receivable.

806.    BAWAG participated with Bennett in covering up the RGHI Receivable.  In each of February 2000, February 2001 and February 2002, BAWAG loaned Refco approximately $300 million dollars to be used by Refco in conducting RTLs.  In February of 2003 and February of 2004, BAWAG loaned Refco an additional $250 million dollars for RTLs.  BAWAG knew that the proceeds of these loans would be, and were, used by Refco to engage in RTLs.

807.    In an April 21, 2006 pleading, Refco disclosed that BAWAG was among the entities that entered into RTLs designed to conceal the RGHI Receivable.

808.    BAWAG itself has admitted in a June 2, 2006 Non-Prosecution Agreement with federal prosecutors that it intentionally assisted Refco's efforts to conceal the RGHI Receivable by participating in RTLs.  BAWAG entered into the non-prosecution agreement in order to mitigate its potential criminal and civil exposure for its activities involving its participation in the Refco round trip transactions, including its work with, and knowledge of Refco's efforts to

conceal its losses. As part of its settlement, BAWAG agreed to guarantee at least $506 million dollars in cash to be paid to the Refco estate. In addition, BAWAG agreed to waive a total of $480 million dollars in claims in the Refco bankruptcy. In connection with the settlement, Refco made a series of admissions concerning its conduct and knowledge relating to the round trip transactions.

809.    BAWAG admitted, "in or about the fiscal year end for Refco beginning in 2000 and concluding in February of 2005 with the approval and authorization of the chairman of the bank in each year, and in the years 2000 through 2002, ... the bank made short term loans of hundreds of millions of dollars to RGHI so that RGHI could manipulate certain inter-company accounts in order to deceptively 'improve Refco's balance sheet'."

810.    BAWAG admitted that the Bank made short term loans to RGHI spanning Refco's financial statement year end in the following amounts for the following years: February year end 2000, $300 million dollars; February year end 2001, $300 million dollars; February year end 2002, $300 million dollars; February year end 2003, $250 million dollars; February year end 2004, $250 million dollars; and February year end 2005, $250 million dollars.

811.    BAWAG admitted that, "these loans were secured in substantial part by temporary deposits by Refco Capital Markets at the Bank."

812.    BAWAG admitted, "from in or about 1999 through 2004, the Bank made direct and indirect equity investments and loans to Refco Group Ltd., LLC and ("RGL"), the holding company for Refco, a privately held New York based commodity brokerage with which the Bank also did substantial trading business."

813.    BAWAG admitted, "in 1999, the Bank indirectly through a Delaware holding corporation, paid approximately $95 million dollars for a 10% ownership interest in RGL."

814.   BAWAG admitted, "the Bank's senior officers understood that Phillip R. Bennett, the President and Chief Executive Officer of Refco, had a substantial ownership interest in RGHL."

815.   BAWAG admitted that "also in 1999, the Bank made a subordinated loan of $85 million dollars indirectly to RGL, and was entitled to receive interest and indirectly approximately 10% of RGL's net income."

816.   BAWAG admitted that "as of in or about 2000, certain former senior officers of the Bank, including the then-Chairman of the Bank and a member of the Managing Board who would succeed to the Chairmanship of the Bank in or around 2003, knew that Bennett and/or RGHI wanted to manipulate certain intercompany balances. In fact, Bennett was secretly hiding amounts RGHI owned to Refco."

817.   BAWAG admitted, "in 2002, certain former senior officers of the Bank, including the then-Chairman of the Bank's Supervisory Board and Managing Secretary of the OGB, utilized [sic] a second Delaware corporation ("Corporation 1") to enter into a proceeds participation agreement ("PPA") with RGL a Delaware corporation ("Corporation 1") indirectly owned by OGB."

818.   BAWAG admitted that "under the PPA, Corporation 1, which was indirectly owned through a Liechtenstein-based foundation by the OGB, entered into a proceeds participation agreement ("PPA") with RGL, under which it would be entitled to a share of the proceeds of any sale of RGL in stated proportions linked to the total amount of its investment in RGL."

819.   BAWAG admitted that "under the PPA, Corporation 11 [sic] made two contributions to RGL. One of these contributions was made using the proceeds of a loan from

the Bank of approximately $220 million.  The other contribution to RGL was made by Corporation 1.1. [sic]."

820.   BAWAG admitted that "as of year-end 2003, Corporation 1 had purchased, for a total of approximately $475 million, the right to share in approximately 27.2% of the proceeds of a sale of RGL."

821.   BAWAG admitted that "in or about August 2004, Thomas H. Lee Partners purchased 57% of Refco in a leveraged buyout transaction.  All participants in that leveraged buyout transaction (including Thomas H. Lee Partners; the purchasers of $600 million in bonds sold by Refco; and the banks that lend Refco $800 million as part of the transaction) relied on Refco's financial statements, which did not disclose the existence of Bennett's related party debt to Refco.

822.   BAWAG admitted that upon closing of the transaction, "the Bank received, directly or indirectly, a total of approximately $952 million.   These payments included repayment of various loans made directly and indirectly to Refco and Corporation 1 by the Bank and payments to Corporation 11."

823.   BAWAG admitted that on or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock."

824.   BAWAG admitted that "on or about 2000, the Bank, through the purchase of certain bonds, entrusted approximately €350 million to a company controlled by Wolfgang Floettl to finance Floettl's trading investments, with the Bank entitled to a portion of any gain on such trading."

825.  BAWAG admitted that "by December 2000, Floettl reported to the Bank's Managing Board . . . that he had lost substantially all of the €350 million."

826.  BAWAG admitted that "in order to disguise this loss on its balance sheet, the former Managing Board directed that the bonds representing the now worthless obligations of Floettl's company to the Bank ('Impaired Assets') be sold via a set of circular transactions to an investment fund that would be owned by the Bank."

827.  BAWAG admitted that "the fund would then be carried on the Bank's books at the original asset value, and would appear to be a legitimate and liquid investment. The Bank also obtained a guarantee of the Impaired Assetsse assets from the President of the ÖGB, backed in part with the assets of the ÖGB's strike fund."

828.  BAWAG admitted, "At the end of December 2000, the Bank sold the bonds representing the Impaired Assets, through Refco, to the Liquid Opportunities-Plus Fund Ltd., a British Virgin Islands mutual fund. The Bank received $338.5 (€364) million for these bonds. Simultaneously, the Bank invested $338.5 million in the Liquid Opportunities-Plus Fund Ltd., becoming its principal owner."

829.  BAWAG admitted, "in particular, on or about December 28, 2000, the Bank wired $338.5 million via intermediary banks to a Liquid Opportunities-Plus Fund Ltd. account at Refco in New York to pay for the Bank's ownership interest in the Liquid Opportunities fund."

830.  BAWAG admitted that "the same day, Liquid Opportunities-Plus Fund Ltd. Wired $338.5 million to the Bank to pay for the bonds purchased from the Bank."

831.  BAWAG admitted that "the Bank's $338.5 million paid for both its interest in the Liquid Opportunities fund and that funds' purchase of the bonds from the Bank. The bonds sold to the Liquid Opportunities-Plus Fund, Ltd. were named York Capital Limited, Fordham Capital

Limited, Columbia Capital Limited, Huntington Capital Limited, Pace Capital Limited, West End Capital Holdings, Ltd., and Madison Capital Limited (the 'Bonds')."

832.    BAWAG admitted, "Liquid Opportunities-Plus Funds, Ltd. was managed by SIAM Capital Management, of Orlando, Florida.  SIAM Capital Management was responsible for the 'independent pricing' of the Liquid Opportunities-Plus Fund, Ltd. and the Bonds.  At various times between 2001 and 2004, share of Liquid Opportunities-Plus Fund, Ltd. were listed on the Bermuda and Irish Stock Exchanges."

833.    BAWAG admitted, "during the period from the end of 2000 through in or about November 2004, the Bank held substantially all of the shares of Liquid Opportunities-Plus Fund, Ltd. (for most of that time in an account at Refco), and the Liquid Opportunities-Plus Fund, Ltd. held the Bonds in its account at Refco."

834.    BAWAG admitted, "in or about November 2001, shares of 'CAP' stock were purchased by the Liquid Opportunities-Plus Fund, Ltd. account at Refco for no value.  The CAP stock represented an investment made indirectly by the Bank in a casino that, as of in or about 2004, had ceased all business operations."

835.    BAWAG admitted, "At November 2001 month end, the Liquid Opportunities-Plus Fund, Ltd. account at Refco was valued at €470 million.  During this entire period, the Bonds were carried in the Refco accounts at or close to par, with a total value of approximately €350 million."

836.    BAWAG admitted, "Also, beginning in or about March 2002, the Liquid Opportunities-Plus Fund, Ltd. shares held by the Bank at Refco, which were purportedly valued based on the value of the Bonds and CAP stock held by Liquid Opportunities-Plus Fund, Ltd. were carried at a total value of between approximately €494 and €514 million."

837.    BAWAG admitted, "From in or about November 2001 through August 2005, the Bank held approximately 49,416,269 shares of the Liquid Opportunities-Plus Fund, Ltd. in its account at Refco. In or about November 2004, the Bank restructured the manner in which it held the Bonds and the CAP stock."

838.    BAWAG admitted, "In particular, the Bank caused the Bonds and the CAP stock to be transferred from the Liquid Opportunities-Plus Fund, Ltd. account at Refco to accounts in the name of seven Anguillan companies, of which the Bank was the beneficial owner. These companies were Bettio Asset Investment, Tuvalu Holding Company, Chaco City Investments, Monte Brook Corp, Catamarca Assets, Tecka Asset Holdings and Rabaul Holdings."

839.    BAWAG admitted, "After the restructuring, the Bank's holdings of the Bonds and the CAP stock were valued at approximately €370 million, plus approximately €85 million in accrued interest. The shares of the seven Anguillan companies were carried on the Bank's account at Refco and valued at approximately €513 million."

840.    RTLs involving BAWAG occurred at each fiscal year end for the years 2000-2005 and involved loans of over $1 billion.

841.    In exchange for its participation in the Refco fraud, BAWAG "sought and obtained Bennett's assistance in disguising on the Bank's balance sheet the existence of approximately €350 million of investment losses sustained by the Bank."

842.    In addition to complete knowledge of, and participation in, the Refco fraud, BAWAG fully understood the SPhinX program and platform. BAWAG and affiliated entities invested millions in the SPhinX Funds, and therefore received and reviewed SPhinX's Offering Memoranda and informational materials. BAWAG understood the Cayman SPC structure, the

customer segregation requirement of the SPhinX Funds, and the requirement that the SPhinX Funds' assets be protected from the insolvency and credit risk of the custodian of those assets.

843.    BAWAG thus also knew and understood the fiduciary duties owed to SPhinX and PlusFunds by Bennett and the Refco entities and by the officers and director Defendants of SPhinX, PlusFunds, and DPM described herein, and further knew that the deposit of SPhinX cash in the non-segregated, unprotected RCM account and use of that cash for the fraudulent purposes described herein constituted breaches of those fiduciary duties.

844.    As a result of its close relationship with, and interest in Refco, BAWAG also understood that SPhinX assets were entrusted to Refco and that substantial and material amounts of SPhinX cash was deposited with RCM, where it was subject to the insolvency and credit risk of Refco and RCM.  BAWAG also knew and understood that SPhinX Funds cash, which had been commingled with assets of RCM, was being used to fund the fraudulent activities of Bennett and the Refco entities described herein, including the RTL's in which BAWAG itself participated.

845.    In October and November 2005, after disclosure of the Refco fraud but before the preference litigation against SPhinX was initiated, BAWAG redeemed at least $50 million of its investment in the SPhinX Funds, including $3.3 million invested in SMFF.

846.    As detailed above, BAWAG was an active and knowing participant in the Refco fraud.  BAWAG conspired with Refco and Bennett to conceal Refco's losses, loot RCM customer assets and misstate Refco's financials.  BAWAG was a primary beneficiary of the Refco fraud, receiving hundreds of millions in connection with the LBO.  BAWAG conspired and directly aided and abetted the Refco fraud and is liable for damages caused to Refco's customers, including SPhinX and PlusFunds.

2.    **Other RTL Participants.**

847.    Each of the RTL Participants owed duties not to aid and abet the fraud and breach of fiduciary duty of Refco and its officers and directors.

848.    Liberty Corner, which was owned and managed by Pigott, engaged in the largest number of RTLs. In February 2002, Pigott arranged for Liberty Corner's first RTL with Refco for $325 million. Demonstrating Piggott's awareness that the RTLs were improper, Pigott rejected using an active fund he managed as the RTL conduit, and instead substituted Liberty Corner because Liberty Corner was a personal management company that would take all actions directed by Pigott.

849.    Over the next three years, Pigott and Refco engaged in nine additional RTLs, concealing hundreds of millions of dollars in related-company receivables owed to Refco. Liberty Corner, Pigott's alter ego (and at times Pigott directly, with no corporate intermediary) received $1.1 million in "fees" for serving as the conduit in these RTLs. Underscoring that Pigott understood that the sole purpose of the RTLs was to "dress up" Refco's financial statements, Pigott had RGL guarantee each of the Liberty Corner RTL loans. These guarantees were signed solely by Bennett.

850.    Defendant EMF Financial (managed by Flanagan) was a hedge fund that used Refco as the prime broker for its funds. Like Liberty Corner, EMF Financial repeatedly authorized and arranged for its affiliates, Defendants EMF Core Fund and Delta Flyer, to engage in RTLs with Refco.

851.    The transactions Flanagan arranged through EMF Financial, and affiliated entities EMF Core Fund and Delta Flyer, concealed $575 million in related-party receivables over the course of Refco's fiscal year-end reporting periods in 2000, 2001, 2002 and 2003. Flanagan, like Pigott, was a sophisticated fund manager. As such, Flanagan (and by extension EMF Financial)

would have known and understood that: (i) Refco's year-end reporting period ended February 28; (ii) no cash moved as a result of these transactions (except for the payment to EMF Financial for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

852.   Indeed, in the wake of the Enron financial scandal, one RTL participant, Defendant Ingram Micro, having previously served as a conduit in $400 million of RTLs in 2000 and 2001, opted to cease participating in the RTLs precisely because of concerns about their propriety.  Before entering into a February 2002 RTL, Ingram Micro sent an email to Maggio advising him that its participation with the planned third RTL was too risky because "the Enron debacle is putting pressure on the SEC to increase the level of financial disclosure by large companies like [Ingram Micro]."

853.   Similarly, Defendants Petitt (using Coast's subsidiary CS Land) and Krieger (who used his Beckenham Trading entity as his RTL conduit) were both sophisticated parties that used Refco as a prime broker.  Thus, at the time of their RTL participation, both Petitt and Krieger knew and/or consciously avoided knowing (like Pigott and Flanagan) that: (i) Refco's year-end reporting period ended February 28; (ii) no cash moved as a result of these transactions (except for the payments to third parties for agreeing to serve as a conduit in the transactions); and (iii) Refco was using these transactions to manipulate its financial statements and misreport its financial condition.

854.   The RTL Participants thus directly and knowingly participated in and facilitated the RTLs, knowingly helping Refco manipulate its financial statements and conceal Refco's losses.

855. The RTL Participants had existing business with Refco and/or a personal relationship with Bennett and each had an incentive to further their relationship with Bennett and Refco by agreeing to serve as conduits in the RTLs.

856. The RGHI Receivable, RTLs, and other fraudulent actions alleged herein, were at all times unknown to innocent SPhinX and PlusFunds directors, officers, and agents, who would have ceased doing business with Refco had they been aware of the Refco fraud.

857. The RTL Participants engaged in RTL's including at least the following:

| Start Date | End Date | RTL Participant | Amount |
|---|---|---|---|
| 02/25/2000 | 03/09/2000 | CIM Ventures, Inc. | $150,000,000 |
| 02/25/2000 | 03/03/2000 | EMF Core Fund Ltd. | $50,000,000 |
| 02/25/2000 | 03/03/2000 | CS Land Management, LLC | $110,000,000 |
| **2000 TOTAL** | | | **$310,000,000** |
| 02/23/2001 | 03/06/2001 | CIM Ventures, Inc. | $250,000,000 |
| 02/26/2001 | 03/02/2001 | Delta Flyer Fund, LLC | $200,000,000 |
| **2001 TOTAL** | | | **$450,000,000** |
| 02/25/2002 | 03/04/2002 | Liberty Corner Capital Strategies, LLC | $325,000,000 |
| 02/25/2002 | 03/04/2002 | Delta Flyer Fund, LLC | $175,000,000 |
| 02/25/2002 | 03/04/2002 | Beckenham Trading Company, Inc. | $125,000,000 |
| **2002 TOTAL** | | | **$625,000,000** |
| 02/21/2003 | 03/04/2003 | Liberty Corner Capital Strategies, LLC | $500,000,000 |
| 02/21/2003 | 03/04/2003 | Delta Flyer Fund, LLC | $150,000,000 |
| **2003 TOTAL** | | | **$650,000,000** |
| 02/20/2004 | 03/04/2004 | Liberty Corner Capital Strategies, LLC | $720,000,000 |
| 05/27/2004 | 06/07/2004 | Liberty Corner Capital Strategies, LLC | $700,000,000 |
| 08/25/2004 | 09/07/2004 | Liberty Corner Capital Strategies, LLC | $485,000,000 |
| 11/26/2004 | 12/03/2004 | Liberty Corner Capital Strategies, LLC | $545,000,000 |
| 12/30/2004 | 01/05/2005 | Liberty Corner Capital Strategies, LLC | $550,000,000 |
| **2004 TOTAL** | | | **$3,000,000,000** |
| 02/23/2005 | 03/08/2005 | Liberty Corner Capital Strategies, LLC | $345,000,000 |
| 05/25/2005 | 06/06/2005 | Liberty Corner Capital Strategies, LLC | $450,000,000 |
| 08/26/2005 | 09/06/2005 | Liberty Corner Capital Strategies, LLC | $420,000,000 |
| **2005 TOTAL** | | | **$1,215,000,000** |

858. The RTL Participants were a crucial participant in the Refco scheme to hide the RGHI Receivable. From 1999 to 2005, each of the RTLs was designed to, and in fact did, conceal the nature and extent of the RGHI Receivable.

859.   As each of the RTL Participants knew, the RTLs did not serve any legitimate business purpose for RCM, RGL, or for any other Refco affiliate.

860.   By agreeing to act as a conduit for these fraudulent transactions, the RTL Participants substantially assisted in the execution of the fraudulent scheme. Indeed, without the RTL Participants' active assistance, it would have been impossible for Refco to conceal the RGHI Receivable or to facilitate the cashing-out of insiders' interests in Refco.

861.   Each of the RTL Participants knew and/or consciously avoided knowing, among other things, the following facts:

(a)   First, that the timing of the RTLs was designed to manipulate Refco's financial condition during its fiscal year-end or quarter-end financial or audit reporting periods. The RTL Participants did business with Refco and were each aware that Refco's annual reporting year closed at the end of February and that the RTLs were designed to occur at the end of this fiscal year and were unwound shortly after the new reporting period began.

(b)   Second, that the RTLs were not isolated transactions; they were systematic elements in a large-scale fraud, necessitating their use at the end of financial reporting periods. Moreover, at least Liberty Corner (and Pigott) were well aware that the RTLs were occurring with more frequency as Refco's LBO and IPO approached.

(c)   Third, the size of the RTLs was suspicious. Each RTL was for a specific and extremely large dollar amount. Moreover, the RTL Participants who participated in multiple RTLs year after year, such as Liberty Corner (and Pigott), were aware that the annual aggregate amount of the RTLs was increasing.

(d)   Fourth, the RTLs were without any legitimate business purpose. The RTLs provided the RTL Participants with lucrative interest payments (in Pigott's case, more than $1.1 million) in exchange for their participation in a risk-free transaction. Moreover, the RTL Participants knew and/or consciously avoided knowing that they had been selected to provide large-figure loans despite the fact that the RTL Participants lacked the financial wherewithal to receive loans of such magnitude on an uncollateralized basis. Similarly, the RTL Participants whose transactions were guaranteed by RGL knew and/or consciously avoided knowing that the loan transactions were guaranteed by the corporate subsidiary of an insolvent parent.

(e)    Finally, the RTL loan documents indicated that each RTL Defendant was bound to act as a conduit for transfers from a Refco entity to RGHI just before the end of the relevant period, and that these "loans" were unwound just after the beginning of the new period.

862.    Given the sophistication of the RTL Participants, each knew and/or consciously avoided knowing that the RTLs were designed to conceal a significant related-party receivable at the end of Refco's reporting and audit periods.    The RTL Participants knew Refco was manipulating its financials and intentionally participated.

F.    **Administrator.**

1.    **DPM.**

863.    DPM and DPM-Mellon acted as administrator of the SPhinX Funds.  Pursuant to the Service Agreement, the DPM parties provided accounting services and were responsible for preparing financial statements for each of the Companies, calculating NAVs, reconciling cash and security positions reported by the prime brokers and custodians, maintaining a general ledger, processing subscription and redemptions and acting as registrar and transfer agent maintaining share register.

864.    DPM and DPM-Mellon owed fiduciary duties to SPhinX and PlusFunds arising out of DPM's role as administrator and the terms of the Service Agreement.  It was DPM's fiduciary duty to understand and monitor SPhinX's assets, oversee the investment of SMFF's cash and reconcile all of SPhinX's positions.

865.    DPM's fiduciary and contract duties ran both to SPhinX and PlusFunds. PlusFunds made the decision to retain DPM as the Funds' administrator, and the majority of DPM's interactions as administrator took place with PlusFunds agents.  PlusFunds delegated authority and important tasks to DPM as the administrator, including the reconciliation of assets,

producing the NAVs and investing cash. PlusFunds was a signatory on the 2004 Amended Service Agreement.

866.    DPM owed additional fiduciary duties to SPhinX and PlusFunds arising out of Aaron's role as a SPhinX director. Aaron sat on the SPhinX Board as DPM's representative; accordingly, DPM is responsible for Aaron's actions.

867.    As discussed in specific detail above, DPM's Service Agreement required DPM to provide services to the SPhinX Funds including but not limited to the following:

- Generate daily and monthly accounting and financial reports;

- Monitor, calculate and reconcile all cash and security positions;

- Produce daily, monthly and final NAV reports;

- Support the companies' risk committee;

- Maintain records of the general ledger, FCMs' and brokers' statements, trader reports and other relevant reports;

- Perform treasury functions, including "investment of excess cash;"

- Prepare complete financial statements in conformity with US GAAP; and

- Fulfill one board of director position for the SPhinX Funds.

868.    The Service Agreement expressly required DPM to review the Funds' subscription documents. DPM was fully aware and understood the SPC structure and customer segregation requirements of the SPhinX Funds. DPM and its agent, Aaron, reviewed and signed off on SPhinX's various Offering Memoranda, which identified DPM as the administrator and discussed the customer segregation requirements. DPM's role as administrator required DPM to understand the business of the SPhinX Funds.

869.    The DPM parties breached their fiduciary duties to SPhinX and PlusFunds. DPM, through Aaron, authorized the movement of SMFF cash to non-segregated accounts at RCM and understood the impact of the movement of those assets. The authorization to move SMFF's cash to non-segregated accounts completely undermined the SPhinX business model, put SMFF's cash at risk and led directly to the loss of SMFF's cash in RCM's bankruptcy.

870.    Understanding that assets at RCM were at risk, DPM authorized and facilitated the regular movement of SMFF's excess cash to RCM. DPM was in breach of its fiduciary duties from the inception of SMFF and continuing until 2006.

**G.    Others.**

**1.    RAI.**

871.    RAI at all material times was a commodity pool operator and provided a number of services to the SPhinX Funds at PlusFunds' request. Specifically, as discussed above, RAI's agents monitored margin requirements in SMFF's Refco LLC accounts and determined how much excess cash would be transferred between the Refco LLC and RCM accounts.

872.    RAI also managed a number of external funds, such as S&P Managed Futures Index Fund LP, that invested in the various SPhinX Funds. S&P Managed Futures Index Fund LP invested directly in SMFF.

873.    By virtue of its role as an advisor to external funds with investments in SPhinX in general and SMFF in particular, RAI understood the importance of the Cayman SPC structure and the customer segregation requirements to the SPhinX Funds. RAI was in possession of SPhinX's Offering Memoranda and marketing materials at all relevant times.

874.    As a result, RAI knew that SMFF's customer assets were required to be held in customer-segregated accounts to protect SMFF's assets. RAI owed contractual and fiduciary

duties with respect to SPhinX's assets, including duties to use and hold those assets for SPhinX's benefit and not to use those assets for the benefit of RAI or its principals and affiliates.

875.  RAI knew, at all relevant times, that Refco LLC, RCM, PlusFunds, DPM and their respective officers and directors owed fiduciary duties to the SPhinX Funds in general and SMFF in particular to protect and safeguard assets in customer-segregated accounts.

876.  RAI substantially assisted in the breach of Refco LLC, RCM, PlusFunds, and DPM's fiduciary duties by causing, in conjunction with DPM and PlusFunds agents, excess cash to be moved from SMFF's customer-segregated accounts at Refco LLC to RCM.

877.  RAI understood that Refco LLC, RCM, PlusFunds and DPM owed fiduciary duties to SMFF, and that the movement of SMFF assets out of customer-segregated accounts constituted a breach of their fiduciary duties.

878.  At all relevant times, RAI knew and understood that RCM was not a regulated entity and that it did not offer customer segregation of customer assets.  At all relevant times, RAI knew and understood that SMFF's assets maintained by RCM were not protected in customer-segregated accounts.

879.  Notwithstanding this knowledge, RAI participated in and enabled the transfer of SMFF's cash from Refco LLC to RCM.

880.  In the weeks after the disclosure of the Refco fraud in October 2005, but before the temporary restraining order in December 2005, the RAI-advised funds with investments in the SPhinX Funds redeemed approximately $100 million.  The redemption requests were signed by Richard Butt on behalf of RAI.

881.  In causing and allowing the commingling of SPhinX account monies, RAI breached fiduciary duties to SPhinX and PlusFunds.

882.   The movement of SMFF's cash to RCM placed those assets at risk, and SMFF's cash was lost because it was moved to RCM.

883.   RAI's breaches of duty and its aiding and abetting in others' breaches of fiduciary duties proximately caused the damages suffered by SPhinX and PlusFunds. Had RAI fulfilled its responsibilities, SMFF's cash would never have been swept to RCM, and the SPhinX Funds and PlusFunds would have avoided their losses entirely.

884.   RAI's breaches of duty and its aiding and abetting in others' breaches of fiduciary duties were a substantial factor in causing the losses suffered by SPhinX and PlusFunds. But for RAI's actions, SMFF's cash would not have been moved to RCM and would not have been lost. Both SMFF and PlusFunds would have avoided the losses they suffered and would have continued in business.

885.   The losses suffered by SPhinX and PlusFunds were reasonably foreseeable to RAI. RAI could have foreseen, and in fact did foresee, that its actions would result in the loss of SMFF assets because RAI knew that the placement of assets at RCM exposed RAI to the risk of RCM's insolvency. RAI also understood that PlusFunds' primary business was the management of the SPhinX Funds, and that the collapse of the SPhinX Funds would destroy PlusFunds' business.

### 2.   Refco Associates Inc.

886.   Refco used Refco Associates Inc. as a conduit for cash transfers from unregulated accounts to Refco, primarily for purposes of the RTLs. Based on the unusually large and infrequent nature of the transfers, Refco Associates Inc. would have been on notice that the transfers were for an improper purpose. Between October 2004 and October 2005, 62% of the dollar amount of the transfers from SMFF accounts at RCM that were over $20 million passed through Refco Associates Inc.

3.    **THL Defendants.**

887.    In June 2004, THLP and related entities acquired a 57% equity stake in Refco for approximately $507 million. As a result, THLP held a majority stake in Refco and exercised control over its operations from the date of the LBO until the Refco IPO in August 2005.

888.    After the IPO, THLP continued to own approximately 42.7% of Refco and continued to exercise control over the company.

889.    The THL Defendants exercised control over Refco in the following ways: (1) THL owned a controlling majority interest in Refco; (2) THL was granted contractual rights, including a August 2004 Management Agreement, that gave THL additional control and access to information; (3) THL appointed four of the new Refco entity's eight directors and jointly appointed a fifth with another shareholder; (4) THL appointed three of the eight directors of Refco Inc. and jointly appointed a fourth with another shareholder; (5) THL was represented on key Refco committees, including the audit committee; (6) THL's agents Schoen, Jaeckel and George Taylor became President, Treasurer and Secretary of Refco.

890.    The Offering Memorandum for Refco's bonds issued in connection with the LBO indicated that the THL entities would "have the ability to control all aspects of [Refco's] business."

891.    The THL entities exercised actual control over the Refco entities after the LBO.

892.    In the course of THL's due diligence in connection with the LBO, THL became aware of various problems at Refco. THL's due diligence professionals were stonewalled when they tried to obtain key information from Refco agents. Specifically, Refco withheld key financial information regarding the nature of receivables owed to Refco and other data underlying certain Refco reports.

215

893.    Later in THL's due diligence, THL discovered that Refco's management had withheld material information regarding a number of transactions. Specifically, THL discovered that Refco had attempted to conceal a significant legal obligation to Edward McElwreath, who demanded a commission from introducing Refco to THL, and attempted to conceal information regarding litigation with Tradewinds Financial.

894.    Also toward the end of THL's due diligence, THL learned of a Refco insider (called "Deep Throat" by KPMG) who had reported that Refco had sloughed off trading losses into a Refco subsidiary. KPMG proposed a number of procedures to investigate the Deep Throat allegations, but THL failed to follow KPMG's advice and instead relied upon a verbal explanation from Bennett.

895.    By the time of the IPO, the THL Defendants were well aware that Refco's existing management was dishonest and had lied to THL and others at the time of the THL Defendants' investment in Refco. THL also had ample reason and red flags that should have alerted THL to potential financial and accounting problems at Refco, if not fraud.

896.    After the LBO but before the IPO, the THL Defendants discovered that Refco's financial condition and internal and external accounting functions and controls were poor, and that Refco should never have been taken public.

897.    Post-LBO, THL appointed four members of Refco's board, and Schoen, Jaeckel and Taylor became President, Treasurer and Secretary, respectively. In addition, Refco's amended LLC agreement provided that the company's affairs would be controlled by a board of managers, which included THL appointees Harkins, Lee, Jaeckel, and Schoen.

898.    After the LBO, one of the THL entities, THL Managers V LLC ("Managers V"), entered into an August 5, 2004 Management Agreement, which provided for Managers V to

216

provide financial advisory services to Refco in exchange for millions of dollars in fees. On the date the Management Agreement was executed, Managers V received in excess of $30 million in an initial payment.

899.    After taking control of Refco, THL discovered that Refco's auditing and accounting functions were a disaster.

900.    THL's executives openly discussed whether Refco should replace Grant Thornton as its auditors and bring in a Big Four firm, acknowledging that Grant Thornton was not providing adequate services. The THL Defendants elected not to replace Grant Thornton because it might result in a restatement of Refco's financials and a re-audit. The THL Defendants recognized that Refco's financial statements might be materially misstated, but pressed forward regardless with an eye toward profiting from Refco's IPO.

901.    In March 2005, as THL prepared for the IPO, THL learned that Refco executives had lied to THL to conceal a "horrendous" letter to Refco's management from Refco's auditors. The letter discussed significant accounting deficiencies at Refco in connection with Grant Thornton's audit of Refco's fiscal year ending February 29, 2004, but was withheld from THL.

902.    The Grant Thornton letter listed nine broad categories of "Internal Control Deficiencies" at Refco, including RCM "Custody Reconciliations." Grant Thornton's letter commented that Refco "could not produce any custody reconciliations at or around year end for EQ." Had the THL parties asked for RCM's custody reconciliations, they would have discovered that Refco was funding its operations with RCM assets.

903.    Later, THL discovered that Refco executives had lied to THL regarding their participation in a lucrative compensation scheme. In 2001, eight Refco executives entered into an agreement with Refco Group to participate in proceeds of a sale of Refco in excess of $900

million. On the eve of the LBO in 2004, Refco agreed to redeem these interests by paying the executives a portion of the proceeds derived from the sale of Refco in amounts ranging from $2 to $25 million.

904.    None of the eight Refco executives disclosed this arrangement despite specific requests from THL's counsel, Weil Gotshal.  After the closing of the LBO, Weil Gotshal sent identical requests, and this time, in March 2005, Murphy and Sexton disclosed their participation. THL then discovered additional details regarding the arrangement and discovered, once again, that Refco's executives had lied to THL in the course of THL's due diligence.

905.    In March 2005, on the THL Defendants' watch, Refco Capital issued approximately $200 million in the sham Suffolk loans to Sugrue and Kavanagh. The THL entities knew about the Suffolk loans and authorized them.

906.    By the time of the IPO in August 2005, THL knew of numerous problems at Refco that should have prevented the IPO, including:

- indicia of fraud, including repeated dishonesty by Refco and its agents;

- disastrous internal and external auditing; and

- historical financial statements that would likely need to be restated.

907.    Despite knowledge of significant problems at Refco, THL pressed forward and consummated the IPO in order to cash out THL's own interests. THL caused Refco Inc. to issue a Prospectus in connection with the IPO that included Refco's audited financial statements and Grant Thornton's audit opinion, despite the knowledge that those financial statements were inaccurate and would need to be restated.

908.    THL participated in a two-week Refco roadshow in connection with the IPO to market Refco to public investors.  In that roadshow, THL pitched Refco and its financial

viability despite knowledge of Refco's financial troubles and its need to restate its financial statements.

909.    THL received approximately $162.5 million in proceeds from its Refco stock sales in the IPO, while retaining approximately 42.7 percent ownership interest post-IPO.

910.    THL and Bennett agreed to structure the IPO with the principal goal of allowing themselves to cash out, as opposed to raising funds for Refco to reduce the enormous debt assumed by Refco in the LBO.

911.    In addition, THL received additional amounts in connection with the greenshoe dividend.    On August 10, 2005, the Refco board agreed to pay a dividend to pre-IPO shareholders, including THL.    The board determined that after the IPO and the exercise of the underwriters' option to purchase additional shares, Refco would have a "sufficient surplus" of funds to permits payment of the dividend to its shareholders, despite the fact that Refco still held debt exceeding one billion dollars incurred in the LBO.

912.    The THL parties received in excess of $40 million in connection with the greenshoe dividend.

913.    By the date of the IPO, THL was aware of financial and accounting problems at Refco, knew that Refco's executives had lied to THL on numerous occasions, and knew that Refco's financials would likely need to be restated.

914.    By the date of the IPO, the THL parties were aware that Refco and its subsidiaries, including RCM, were insolvent.

915.    In addition, THL was responsible for Refco's finances after assuming control in connection with the IPO.    Refco's RTLs continued after THL assumed control of Refco and after

THL had determined that Refco's financial and accounting controls were inadequate. The RTLs continued after THL was in possession of numerous red flags of fraud at Refco.

916.    Moreover, THL became aware that Refco relied upon the fraudulent conversion of billions of dollars of customer assets—including SMFF's assets—deposited at RCM. The fraudulent scheme and misappropriation of RCM's assets was so fundamental to the operation and financing of Refco that it had to be apparent to each of the THL parties. The volume and size of the transfers involved ensured that the amounts stolen in RCM customer assets substantially outsized Refco's total capital. Without continued access to RCM's customer assets, Refco would not have had sufficient liquidity to continue functioning.

917.    Given the amounts generated for Refco from RCM, the THL parties were well aware that RCM customer funds were not protected and segregated in accordance with US regulatory requirements. While Refco's board papers in the relevant time period monitor segregation and net capital requirements for other Refco entities, those same board papers make clear that no such segregation requirements were observed in relation to RCM.

918.    The Refco conspirators kept careful track of intercompany transactions and customer assets maintained at RCM at any given time. Refco's treasury operations generated regular reports for Refco management showing the amount of customer assets available at RCM. The THL parties had access to these reports in the relevant time period.

919.    While THL was in control of Refco, Refco used converted customer assets to fund business acquisitions, including the Suffolk Loan transactions, including approximately $50 million in payments to Sugrue and Kavanagh.

920.    The THL parties had access to information regarding RCM and intercompany transfers of RCM assets, including presentations regarding Grant Thornton's audits of Refco's

financial statements.    The THL Defendants were aware of RCM's practice of "repo"ing

securities from RCM customer accounts to raise cash for Refco affiliates.    THL understood that

Refco used converted assets from RCM to fund Refco's operations and did nothing to stop it

from occurring.

921.    THL knew that Refco was insolvent.  Because Refco was insolvent as of the LBO

and/or the IPO, THL, as Refco's controlling party, owed fiduciary duties to Refco's creditors,

including the SPhinX Funds.

922.    Had the THL parties disclosed the Refco fraud, the looting of RCM assets, the

RTLs or Refco's insolvency and dire financial situation, PlusFunds and the SPhinX Funds would

not have continued to do business with Refco and could have avoided their losses entirely.

923.    The THL parties knew that Refco was diverting customer assets to support its

fraud and ongoing operations.    The THL parties knew that RCM and Refco in general owed

fiduciary duties to their customers and creditors and that they were breaching those duties by

diverting customer assets to fund operations and continue in business.    It was reasonably

foreseeable to THL that the breach of Refco's fiduciary duties to its customers would cause

customers' losses.

## XIII.  CAUSES OF ACTION.

### COUNT I
### BREACH OF FIDUCIARY DUTY
### (Against Sugrue, Kavanagh and Owens)

924.    Plaintiffs incorporate by reference the allegations set forth above.

925.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's

investment manager and the responsibilities delegated PlusFunds under the Investment

Management Agreement.

926.    Sugrue, Kavanagh and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors and agents.

927.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

928.    Sugrue, Kavanagh and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors and agents.

929.    Each of these Defendants was familiar with the terms of the Offering Memoranda and Articles of Association for each of the SPhinX entities and SMFF, in particular. Each of these Defendants understood that SMFF's customer assets were required to be held in customer-segregated accounts. As fiduciaries of SPhinX, each of these Defendants was responsible for ensuring that SMFF's cash was held and protected in customer-segregated accounts.

930.    Sugrue, Owens and Kavanagh breached their fiduciary duties of care and loyalty to SPhinX and PlusFunds by, among other things, (1) directing or causing Aaron to sign the July 31, 2002 Document; (2) authorizing or allowing the movement of SMFF's cash to unprotected accounts at RCM; (3) concealing the July 31, 2002 Document and the movement of SMFF cash to RCM from one or more innocent SPhinX directors or members of PlusFunds' management and/or board; (4) failing to ensure that SPhinX's assets were maintained in customer-segregated accounts; and (5) approving financial statements on behalf of SPhinX that falsely stated that excess cash was historically held in segregated accounts when they knew such cash was being held in non-segregated accounts at RCM.

931.    Sugrue, Owens and Kavanagh breached fiduciary duties of care and loyalty to SPhinX and PlusFunds because, among other things, they (1) knew that SMFF's cash was held in non-segregated accounts at RCM, but concealed this fact from one or more innocent SPhinX directors and/or PlusFunds' directors and/or management; (2) through entities they owned and

controlled, obtained more than $204 million in loans and/or payments from Refco; (3) concealed the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds; and (4) approved financial statements on behalf of SPhinX that falsely stated that excess cash was historically held in segregated accounts when they knew it was being held in non-segregated accounts at RCM.

932.    Owens' breach of fiduciary duty constituted willful neglect, willful default, fraud, and/or dishonesty.

933.    The breaches of fiduciary duty by Sugrue, Kavanagh, and Owens constituted willful misfeasance, bad faith, gross negligence, and/or reckless disregard of duty.

934.    At all relevant times, there was at least one director of SPhinX and/or one member of PlusFunds' board or management who was unaware that (1) Sugrue, Kavanagh and Owens had breached their fiduciary duties to SPhinX by permitting Aaron to execute the July 31, 2002 Document; (2) SMFF's excess cash was being held in non-segregated accounts at RCM; and (3) Sugrue, Kavanagh and Owens, through entities they owned and/or controlled, had received in excess of $204 million in loans and/or payments from Refco in the Suffolk loans.

935.    At all relevant times, innocent SPhinX directors or members of PlusFunds' board or management, had they known of the breaches of fiduciary duty by Sugrue, Kavanagh and Owens, could have and would have prevented or stopped those breaches by consulting an attorney, by reporting the breach of duty by Sugrue, Kavanagh, and Owens, by causing SPhinX to transfer its cash out of RCM into customer-segregated accounts at Refco LLC or by causing SPhinX to terminate its relationship with Refco and transfer the funds at RCM to a different financial institution.

936.    SPhinX and PlusFunds have been damaged in an amount to be proven at trial.

937.    The breaches of fiduciary duty by Sugrue, Kavanagh, and Owens were the proximate cause of the damages suffered by SPhinX and PlusFunds.

## COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Sugrue, Kavanagh and Owens)

938.    Plaintiffs incorporate by reference the allegations set forth above.

939.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's investment manager and the responsibilities delegated to PlusFunds under the Investment Management Agreement.

940.    Sugrue, Kavanagh, and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors and/or agents.

941.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

942.    Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors and/or agents.

943.    As alleged in greater detail above, Refco LLC owed SPhinX and PlusFunds fiduciary duties by virtue of Refco LLC's role as, among other things, SPhinX's custodian.

944.    As alleged in greater detail above, RCM owed SPhinX and PlusFunds fiduciary duties by virtue of RCM's role as, among other things, SPhinX's custodian.

945.    As alleged in greater detail above, DPM owed SPhinX and PlusFunds fiduciary duties by virtue of DPM's role as SPhinX's administrator and the responsibilities delegated to DPM as part of that relationship and under the DPM Service Agreement.

946.    As alleged in greater detail above, Aaron owed SPhinX and PlusFunds fiduciary duties by virtue of his role as SPhinX's director and agent and by virtue as his role as an officer and agent of DPM.

947.    As alleged in greater detail above, Sugrue, Owens and Kavanagh each breached their fiduciary duties by, among other things, (1) directing, allowing or causing Aaron to sign the July 31, 2002 Document; (2) failing to ensure that SMFF's cash was maintained in customer-segregated accounts; (3) allowing SMFF's cash to be moved from customer-segregated accounts at Refco LLC to unregulated accounts at RCM; (4) approving financial statements on behalf of SPhinX that falsely stated SPhinX's excess cash was historically held in segregated accounts; (5) concealing the movement of SMFF's cash to RCM; (6) through entities they owned and controlled, obtaining more than $204 million in loans and/or payments from Refco; (7) concealing the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds.

948.    As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SPhinX and/or PlusFunds by arranging and participating in the movement of SPhinX assets to unprotected accounts at RCM and the diversion of SMFF assets for use in Refco's business operations, acquisitions, RTLs and fraudulent schemes, including the Suffolk loans.

949.    As alleged in greater detail above, DPM and Aaron breached their fiduciary duties to SPhinX and/or PlusFunds by (1) executing the July 31, 2002 Document; (2) authorizing, allowing and facilitating the movement of SMFF's cash from Refco LLC to RCM; and (3) concealing the July 31, 2002 Document and movement of SMFF's cash to RCM from innocent members of SPhinX's board and PlusFunds' board and management.

950.    Sugrue, Kavanagh and Owens were aware of and understood that the movement of SMFF's cash to RCM constituted a breach of the fiduciary duties owed by Sugrue, Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM and Aaron.    Sugrue, Kavanagh and Owens

understood that each of those entities and individuals breached their fiduciary duties to SPhinX and PlusFunds.

951.   As alleged in greater detail above, Sugrue, Kavanagh and Owens substantially assisted in the breach of the above-described fiduciary duties by authorizing the movement of SPhinX's assets to unprotected, non-segregated accounts at RCM and preventing Bousbib and other innocent PlusFunds agents from removing SMFF's assets from RCM.

952.   As a result of the movement of SMFF's cash to RCM and the breaches of the fiduciary duties owed by Sugrue, Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM and Aaron, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

953.   The damages suffered by SPhinX and PlusFunds were directly and proximately caused by the breaches of fiduciary duty described above.

## COUNT III
### FRAUD
### (Against Sugrue, Kavanagh and Owens)

954.   Plaintiffs incorporate by reference the allegations set forth above.

955.   For the reasons alleged in Count I, Sugrue, Kavanagh and Owens owed fiduciary duties to SPhinX and PlusFunds; therefore, Sugrue, Kavanagh and Owens owed the duty to candidly disclose all material facts to PlusFunds, SPhinX and their innocent decision-makers.

956.   In violation of their duty of disclosure, Sugrue, Kavanagh and Owens each failed to disclose facts that they knew were material to SPhinX and PlusFunds, including the fact that SPhinX cash had been moved from regulated, protected, customer-segregated accounts at Refco LLC to unregulated, unprotected, commingled, offshore accounts at RCM.

957.    Sugrue, Kavanagh and Owens also failed to disclose the fact that SPhinX cash held at RCM was being used to support the fraud at Refco, including the round-trip loan transactions, and to prop up Refco's financial statements.

958.    Sugrue, Kavanagh and Owens further failed to disclose numerous, material facts pertaining to the Suffolk loans, including the fact that the Suffolk loans were funded from customer accounts at RCM and thus were indirectly funded by SPhinX and that the Suffolk loans were part of a *quid pro quo* agreement giving Refco increased influence over PlusFunds and continued access to SPhinX cash in exchange for cash payments to Sugrue, Kavanagh and Owens.

959.    In addition to their non-disclosures, Sugrue, Kavanagh and Owens made numerous statements to the innocent decision-makers of PlusFunds and SPhinX that were false or misleadingly incomplete.

960.    For example, Owens stated to the SPhinX Board that "some changes" had been made to cash management procedures but failed to disclose that SPhinX cash had been, and would continue to be, swept from regulated, protected, customer-segregated accounts at Refco LLC to unprotected, unregulated, non-segregated accounts at RCM or that SPhinX's cash had not been earning interest at RCM.

961.    When asked by an innocent SPhinX board member whether any event that might have led to Bousbib's departure would affect SPhinX, Owens responded, "No." Owens' response was false because Bousbib's departure arose directly out of Bousbib's challenging the Suffolk loans, which affected SPhinX in that the Suffolk loans led to the buyout of three of PlusFunds' innocent board members, were funded by SPhinX money held at RCM, and were

designed to reward Sugrue, Kavanagh, and Owens for allowing SPhinX cash to be taken and misused by Refco.

962.    Plaintiffs relied on the misrepresentations and omissions by Sugrue, Kavanagh, and Owens.

963.    Plaintiffs' reliance was reasonable.

964.    Plaintiffs' reliance directly and proximately caused damages in an amount to be proven at trial.

## COUNT IV
### AIDING AND ABETTING CONVERSION
### (Against Sugrue, Kavanagh and Owens)

965.    Plaintiffs incorporate by reference the allegations set forth above.

966.    Plaintiffs had a right of possession of cash and other assets held by Refco and RCM.

967.    As alleged in greater detail above, Sugrue, Kavanagh and Owens understood the customer segregation requirements set forth in SPhinX's Offering Memoranda, marketing materials and organizational documents, and understood that innocent members of SPhinX's board and PlusFunds' management and board believed at all times that SMFF's assets were maintained in protected, customer-segregated accounts.

968.    As alleged in greater detail above, Refco LLC, RCM, Bennett and other Refco-related parties understood the customer segregation requirements set forth in SPhinX's Offering Memoranda, marketing materials and organizational documents, and understood that innocent members of SPhinX's board and PlusFunds' management and board believed at all times that SMFF's assets were maintained in protected, customer-segregated accounts.

969.    As alleged in greater detail above, Refco LLC, RCM, Bennett, Maggio, Trosten and other Refco-related parties intentionally interfered to the exclusion of SMFF's property rights in its assets by (1) arranging and participating in the movement of SMFF's cash to unprotected accounts at RCM, and (2) diverting SMFF's cash to finance Refco's operations, acquisitions and fraudulent schemes.

970.    As alleged in greater detail above, Sugrue, Kavanagh and Owens, with knowledge of SMFF's property rights and the interference therewith, substantially assisted the conversion of SMFF's cash by allowing and authorizing the movement of SMFF's cash to RCM, by concealing the movement of SMFF cash to RCM from innocent members of SPhinX's board and PlusFunds board and/or management and by preventing Bousbib and other PlusFunds agents from removing SMFF's assets from RCM.

971.    The conversion of SMFF's cash directly and proximately caused the damages suffered by SPhinX and PlusFunds.

972.    As a result of the misconduct by Aaron and the DPM entities, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

### COUNT V
### OFFICER/DIRECTOR LIABILITY
### (Against Sugrue, Kavanagh and Owens)

973.    Plaintiffs incorporate by reference the allegations set forth above.

974.    New York Bus. Corp. Law § 720 provides a cause of action against an officer or director of a corporation for "neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge."

975.   New York Bus. Corp. Law § 720 provides for a cause of action against an officer or director of a corporation for "acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

976.   Sugrue, Kavanagh and Owens each served as an officer and/or director of PlusFunds, which was a corporation doing business in New York.

977.   As alleged in greater detail above, PlusFunds suffered damages caused by the neglect, failure to perform and violation of duties by Sugrue, Kavanagh and Owens.

978.   As alleged in greater detail above, PlusFunds suffered damages caused by the transfer of PlusFunds corporate assets to Refco and to themselves, and the loss and waste of corporate assets as described herein.

979.   The breaches of duty by Sugrue, Kavanagh and Owens directly and proximately caused damages suffered by PlusFunds in an amount to be proven at trial.

## COUNT VI
## ACCOUNTANT MALPRACTICE
### (Against PwC and Ferris)

980.   Plaintiffs incorporate by reference the allegations set forth above.

981.   PwC was retained to act as the auditor for 2003, 2004 and 2005 for various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd. and SMFF.  As a result of this engagement, PwC owed professional duties to SPhinX.

982.   PwC was retained by PlusFunds to conduct the SPhinX audit.  PwC had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits.  PwC understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds.  PwC

dealt directly with PlusFunds in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

983. PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

984. PwC and Ferris owed both the SPhinX Funds and PlusFunds a duty to exercise due professional care in the course of the engagement to audit the SPhinX Funds.

985. As alleged in greater detail above, PwC and Ferris departed from the accepted standard of practice in the accounting industry.

986. As alleged in greater detail above, PwC and Ferris' breach of its duty proximately caused the injuries suffered by SPhinX. Had PwC and Ferris conducted a GAAS audit and fulfilled its responsibilities as SPhinX's auditor, it would have discovered that SMFF's cash was exposed to improper risk in RCM's non-regulated, commingled accounts. Had PwC and Ferris disclosed that SMFF's cash was at risk or simply refused to issue an unqualified audit report, innocent decision-makers at SPhinX and PlusFunds would have caused SMFF's cash and other SPhinX assets to be removed from RCM and Refco.

987. As alleged in greater detail above, PwC's engagement as SPhinX's auditor was compromised by an undisclosed conflict of interest. Beginning in May 2004, at the same time PwC was serving as SPhinX's auditor, PwC served as Refco's *de facto* chief accounting officer. In its relationship with Refco, PwC became aware of the Refco fraud and knew that RCM customer assets (including SMFF's cash) were being diverted to fund Refco's business and conceal Refco's losses and true financial condition. PwC actively assisted Refco's diversion of RCM assets and supported the Refco fraud.

988.    As alleged in greater detail above, PwC's and Ferris' actions, breach of duty, conflict of interest and assistance in the Refco fraud constitute willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds.  Because PwC actively aided and abetted the Refco fraud, PwC's conduct rises to the level of fraudulent behavior.

989.    PwC's breach of duty proximately caused SPhinX and PlusFunds damages in an amount to be determined at trial.

## COUNT VII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against PwC and Ferris)

990.    Plaintiffs incorporate by reference the allegations set forth above.

991.    PlusFunds owed SPhinX fiduciary duties by virtue of its role as SPhinX's investment manager and the responsibilities delegated to PlusFunds under the Investment Management Agreement.

992.    Sugrue, Kavanagh, and Owens shared in PlusFunds' fiduciary duties to SPhinX by virtue of their positions as PlusFunds' officers, directors, and/or agents.

993.    As SPhinX's director and agent, Owens owed fiduciary duties to SPhinX.

994.    Sugrue, Kavanagh, and Owens owed fiduciary duties to PlusFunds by virtue of their roles as PlusFunds' officers, directors, and/or agents.

995.    As alleged in greater detail above, Refco LLC owed SPhinX and PlusFunds fiduciary duties by virtue of Refco LLC's role as, among other things, custodian of SPhinX assets.

996.    As alleged in greater detail above, RCM owed SPhinX and PlusFunds fiduciary duties by virtue of RCM's role as, among other things, custodian of SPhinX assets.

997.   As alleged in greater detail above, DPM, DPM-Mellon, and Mellon owed SPhinX and/or PlusFunds fiduciary duties by virtue of DPM's role as SPhinX's administrator and the responsibilities delegated to DPM as part of that relationship and under the DPM Service Agreement.

998.   As alleged in greater detail above, Aaron owed SPhinX and/or PlusFunds fiduciary duties by virtue of his role as SPhinX's director and agent and by virtue as his role as an officer and agent of DPM.

999.   As alleged in greater detail above, Sugrue, Owens and Kavanagh each breached their fiduciary duties by, among other things, (1) directing, allowing or causing Aaron to sign the July 31, 2002 Document; (2) failing to ensure that SMFF's cash was maintained in customer-segregated accounts; (3) allowing SMFF's cash to be moved from customer-segregated accounts at Refco LLC to unregulated accounts at RCM; (4) approving financial statements on behalf of SPhinX that falsely stated SPhinX's excess cash was historically held in segregated accounts; (5) concealing the movement of SMFF's cash to RCM; (6) through entities they owned and controlled, obtaining more than $204 million in loans and/or payments from Refco; (7) concealing the true nature of the Suffolk loans to innocent officers and/or directors of SPhinX and PlusFunds.

1000.   As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SPhinX and/or PlusFunds by arranging and participating in the movement of SPhinX assets to unprotected accounts at RCM and the diversion of SMFF assets for use in Refco's business operations, acquisitions, RTLs and fraudulent schemes, including the Suffolk loans.

1001.   As alleged in greater detail above, DPM and Aaron breached their fiduciary duties to SPhinX and/or PlusFunds by (1) executing the July 31, 2002 Document; (2) authorizing,

allowing and facilitating the movement of SMFF's cash from Refco LLC to RCM; and (3)

concealing the July 31, 2002 Document and movement of SMFF's cash to RCM from innocent

members of SPhinX's board and PlusFunds' board and management.

1002.   By virtue of knowledge gained by PwC and Ferris as SMFF's auditor and as

auditors for an advisory to Refco, PwC and Ferris were aware of and understood that the

movement of SMFF's cash to RCM constituted a breach of the fiduciary duties owed by Sugrue,

Kavanagh, Owens, PlusFunds, Refco LLC, RCM, DPM, and Aaron.  PwC understood that each

of those entities and individuals breached their fiduciary duties.

1003.   As alleged in greater detail above, PwC and Ferris substantially assisted in the

breach of the above-described fiduciary duties by issuing unqualified audit opinions and failing

to disclose the movement of SMFF's cash to unprotected, non-segregated accounts at RCM.

1004.   As a result of the movement of SMFF's cash to RCM and the breaches of the

fiduciary duties owed by Sugrue, Kavanagh, Owens, Refco LLC, RCM, DPM and Aaron,

SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1005.   The damages suffered by SPhinX and PlusFunds were directly and proximately

caused by the breaches of fiduciary duty described above.

## COUNT VIII
### NEGLIGENT MISREPRESENTATION
### (Against PwC and Ferris)

1006.   Plaintiffs incorporate by reference the allegations set forth above.

1007.   PwC was retained to act as the auditor of the financial statements of various

SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF for 2003, 2004,

and 2005.  As a result of this engagement, PwC owed professional duties to SPhinX.

1008. PwC was retained by PlusFunds to conduct the SPhinX audit. PwC and Ferris had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits. PwC and Ferris understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds. PwC and Ferris dealt directly with PlusFunds and DPM in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

1009. PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

1010. PwC was also retained by PlusFunds to audit the financial statements of PlusFunds for the years 2003, 2004, and 2005.

1011. As alleged in greater detail above, PwC issued in the course of its business its "report of independent auditors" in connection with its audit of SMFF's 2003 financial statements on or about March 30, 2004. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2003.

1012. As alleged in greater detail above, PwC in the course of its business issued its "report of independent auditors" in connection with its audit of SMFF's 2004 financial statements on or about March 30, 2005. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2004.

1013. PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SPhinX,

including SMFF, for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers.

1014. As alleged in greater detail above, on or about February 2, 2004, PwC issued in the course of its business its audit report in connection with its audit of PlusFunds' 2003 financial statements. In this report PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year ended December 31, 2003.

1015. As alleged in greater detail above, on or about February 14, 2005, PwC issued in the course of its business its audit report in connection with the audit of PlusFunds' 2004 financial statements. In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year 2004.

1016. PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers within PlusFunds and SPhinX.

1017. As alleged in greater detail above, PwC and Ferris knew and intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to deposit SPhinX assets in Refco accounts and to allow DPM to continue to manage SPhinX assets.

1018. PwC's audit reports and unqualified audit opinions on the financial statements of PlusFunds and SPhinX, including SMFF, contained affirmative misrepresentations to the innocent decision-makers of SPhinX and PlusFunds.

1019.  In both its March 30, 2004 and March 30, 2005 audit reports on the financial statements of SMFF and in its February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC represented that it was "independent." In fact, as alleged in greater detail above, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of SMFF.

1020.  In its audit reports, PwC represented that it had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged in greater detail above, PwC and Ferris knowingly and repeatedly violated GAAS in the conduct of its audits, and were aware of these audit failures at the times the unqualified reports were issued.

1021.  In its audit reports, PwC represented that it believed that its audits "provide a reasonable basis for our opinions." As alleged in greater detail above, PwC and Ferris had no reasonable basis for its unqualified audit opinions on the financial statements of SPhinX, including SMFF, or of PlusFunds, and PwC actually knew or reckless in not knowing as much.

1022.  In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX, including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other

SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1023. In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1024. PwC and Ferris failed to exercise reasonable care and competence in obtaining and communicating the representations included in its audit reports and opinions on the financial statements of SPhinX, including SMFF, and PlusFunds described above.

1025. As alleged in greater detail above, innocent decision-makers and SPhinX and PlusFunds actually relied upon and were deceived by PwC's false and misleading audit opinions in making significant business decisions for SPhinX and for PlusFunds, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return or the immediate segregation and credit risk protection of SPhinX Funds assets on deposit at RCM. Such reliance was reasonable. As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

1026.   Had PwC and Ferris refused to issue unqualified audit opinions or disclosed to the innocent decision-makers of SPhinX and PlusFunds that material amounts of SPhinX Funds' assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demanding their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets.  Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX funds assets at issue in this case, and the demise of SPhinX and PlusFunds.

1027.   As alleged in greater detail above, PwC's and Ferris' misrepresentations, breach of duty, conflicts of interest and assistance in the Refco fraud evidence willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds.  Because PwC and Ferris actively aided and abetted the Refco fraud and breaches of fiduciary duty, PwC's conduct rises to the level of fraudulent behavior.

1028.   As a direct and proximate result of PwC's and Ferris' misconduct, and the reasonable reliance of the innocent decision-makers of SPhinX and PlusFunds on PwC's and Ferris' negligent misrepresentations, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT IX
### FRAUD
### (Against PwC and Ferris)

1029.   Plaintiffs incorporate by reference the allegations set forth above.

239

1030.  PwC was retained to act as the auditor of the financial statements of various SPhinX entities, including SPhinX Ltd., SPhinX Strategy Fund Ltd., and SMFF for 2003, 2004, and 2005.  As a result of this engagement, PwC owed professional duties to SPhinX.

1031.  PwC was retained by PlusFunds to conduct the SPhinX audit.  PwC and Ferris had direct communication with PlusFunds agents, including PlusFunds' CFO Chris Aliprandi among others, in the course of performing the SPhinX audits.  PwC and Ferris understood that PlusFunds was SPhinX's investment manager and conducted the daily business of the SPhinX Funds.  PwC and Ferris dealt directly with PlusFunds and DPM in performing its audits and directed correspondence relating to the audits, including the material deficiency letters, directly to PlusFunds on behalf of SPhinX.

1032.  PwC and Ferris understood that PlusFunds would utilize PwC's audit opinions to market and sell investments in the SPhinX Funds.

1033.  PwC was also retained by PlusFunds to audit the financial statements of PlusFunds for the years 2003, 2004, and 2005.

1034.  As alleged in greater detail above, PwC issued its "report of independent auditors" in connection with its audit of SMFF's 2003 financial statements on or about March 30, 2004.  In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2003.

1035.  As alleged in greater detail above, PwC issued its "report of independent auditors" in connection with its audit of SMFF's 2004 financial statements on or about March 30, 2005.  In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean," audit opinion on the financial statements of SPhinX, including SMFF, for the fiscal year 2004.

1036.   PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of SPhinX, including SMFF, for the fiscal years ended December 31, 2003 and December 31, 2004, and distributed to innocent decision-makers within SPhinX and PlusFunds.

1037.   As alleged in greater detail above, on or about February 2, 2004, PwC issued its audit report in connection with its audit of PlusFunds' 2003 financial statements.   In this report PwC issued an unqualified, or "clean," audit opinion on the financial statements of PlusFunds for the fiscal year ended December 31, 2003.

1038.   As alleged in greater detail above, on or about February 14, 2005, PwC issued its audit report in connection with its audit of PlusFunds' 2004 financial statements.   In this report, signed by Ferris in PwC's name, PwC issued an unqualified, or "clean" audit opinion on the financial statements of PlusFunds for the fiscal year 2004.

1039.   PwC and Ferris knew that PwC's audit reports and the unqualified audit opinions therein would be, and in fact were, incorporated into the financial statements of PlusFunds for the fiscal years ended December 31, 2004, and distributed to innocent decision-makers within PlusFunds and SPhinX.

1040.   As alleged in greater detail above, PwC and Ferris knew and intended that innocent decision-makers within SPhinX and PlusFunds would use and rely upon PwC's audit reports and the unqualified audit opinions therein in making significant business decisions for SPhinX, including decisions to continue to deposit SPhinX assets in Refco accounts and to allow DPM to continue to manage SPhinX assets.

1041.  PwC's audit reports and unqualified audit opinions on the financial statements of PlusFunds and of SPhinX, including SMFF, contained affirmative misrepresentations to the innocent decision-makers of SPhinX and PlusFunds.

1042.  In both its March 30, 2004 and March 30, 2005 audit reports on the financial statements of SMFF and in its February 2, 2004 and February 14, 2005 audit reports on the financial statements of PlusFunds, PwC represented that it was "independent." In fact, as alleged in greater detail above, PwC and Ferris knew that PwC was not independent in connection with its audit of the 2003 or 2004 financial statements of PlusFunds or of SPhinX, including SMFF.

1043.  In its audit reports, PwC represented that it had conducted its audits "in accordance with auditing standards generally accepted in the United States of America." In fact, as alleged in greater detail above, PwC and Ferris knowingly and repeatedly violated GAAS in the conduct of its audits, and were aware of these audit failures at the times the unqualified audit reports were issued.

1044.  In its audit reports, PwC represented that it believed that its audits "provide a reasonable basis for our opinions." As alleged in greater detail above, PwC and Ferris had no reasonable basis for its unqualified audit opinions on the financial statements of SPhinX, including SMFF, or of PlusFunds, and PwC actually knew or was reckless in not knowing as much.

1045.  In its audit reports on the financial statements of SPhinX, including SMFF, PwC represented that in its opinion the financial statements of SMFF and the other SPhinX entities, "present fairly, in all material respects, the financial position" of SPhinX including the various entities constituting SMFF at December 31, 2003 and December 31, 2004 and the results of each of their operations, the changes in each of their net assets, their cash flows and their financial

highlights for those years then ended, "in conformity with accounting principles generally accepted in the United States of America." As alleged in greater detail above, PwC and Ferris knew or were reckless in not knowing that the financial statements of SMFF and the other SPhinX entities were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1046. In its audit reports on the financial statements of PlusFunds, PwC, and Ferris likewise represented that in its opinion the financial statements of PlusFunds at December 31, 2003 and December 31, 2004 presented fairly, in all material respects, the financial position of PlusFunds, the results of its operations, changes in net assets, its cash flows, and financial highlights for the years then ended in conformity with accounting principles generally accepted in the United States of America. As alleged in greater detail in above, PwC and Ferris knew or were reckless in not knowing that the financial statements of PlusFunds were not fairly presented in conformity with GAAP. Rather, they were, as discussed above, grossly and materially misstated and misleading.

1047. As alleged in greater detail above, innocent decision-makers and SPhinX and PlusFunds actually relied upon and were deceived by PwC's false and misleading audit opinions in making significant business decisions for SPhinX and for PlusFunds, including the decision to continue to retain DPM as administrator of the SPhinX Funds, and the decision not to demand the return on the immediate segregation and credit risk protection of SPhinX Funds assets on deposit t RCM. Such reliance was reasonable. As a result of this reasonable reliance, both SPhinX and PlusFunds sustained damages.

1048. Had PwC and Ferris refused to issue unqualified audit opinions or disclosed to the innocent decision-makers of SPhinX and PlusFunds that material amounts of SPhinX Funds'

assets were on deposit in an unregulated and non-segregated cash account at RCM, exposed and subject to the insolvency and claims of creditors of Refco and/or RCM, those innocent decision-makers could have and would have taken action to protect those assets by demand their immediate return from RCM and deposited in properly segregated accounts, protected from the insolvency and claims of creditors of the custodian of those assets. Such action on the part of the innocent decision-makers of SPhinX and PlusFunds would have prevented the loss of the SPhinX funds assets at issue in this case, and the demise of SPhinX and PlusFunds.

1049.    As alleged in greater detail above, PwC's and Ferris' misrepresentations, breach of duty, conflicts of interest and assistance in the Refco fraud evidence willful and/or intentional neglect, misconduct or wrongdoing or at least gross negligence reflecting a reckless indifference to the rights of SPhinX and PlusFunds. Because PwC and Ferris actively aided and abetted the Refco fraud and breaches of fiduciary duty, PwC's conduct rises to the level of fraudulent behavior.

1050.    As a direct and proximate result of PwC's and Ferris' misconduct, and the reasonable reliance of the innocent decision-makers of SPhinX and PlusFunds on PwC's and Ferris' fraudulent misrepresentations, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT X
## BREACH OF FIDUCIARY DUTY
### (Against Gibson Dunn)

1051.    Plaintiffs incorporate by reference the allegations set forth above.

1052.    Gibson Dunn owed a fiduciary duty to PlusFunds by virtue of their attorney-client relationship.

1053.  As alleged in greater detail above, Gibson Dunn breached its fiduciary duties to PlusFunds by documenting the Suffolk loan transactions, concealing the substance of the Suffolk Loan transactions from PlusFunds' innocent officers and directors and advising Sugrue, Kavanagh, Owens and the Suffolk entities not to disclose the Suffolk loans as related party transactions.

1054.  As alleged in greater detail above, Gibson Dunn breached its fiduciary duties to PlusFunds by representing Sugrue, Kavanagh, Owens, and the Suffolk entities to the detriment of PlusFunds.

1055.  Gibson Dunn's breach of fiduciary duty directly and proximately caused PlusFunds damages in an amount to be proven at trial.

## COUNT XI
## CONSPIRACY
### (Against Sugrue, Kavanagh, Owens, Bennett, and Hackl)

1056.  Plaintiffs incorporate by reference the allegations set forth above.

1057.  As alleged in greater detail above, Defendants Sugrue, Kavanagh and Owens entered into a corrupt agreement with parties at Refco, including Refco LLC, RCM, Bennett, Hackl and others, to place SMFF's cash in unprotected accounts at RCM, where those assets were diverted and misappropriated by RCM and Refco insiders, including Bennett, Trosten, Maggio, Hackl and others.  In exchange for their participation in the placement of SMFF's cash at RCM, Sugrue, Kavanagh, and Owens received in excess of $204 million in loans and/or payments in the Suffolk loans.

1058.  As alleged in greater detail above, Sugrue, Owens and Kavanagh committed overt acts in furtherance of the conspiracy by (1) authorizing and/or allowing the movement of SMFF's cash to RCM; (2) preventing Bousbib and other innocent members of PlusFunds'

management from removing SPhinX's assets, including the SMFF cash, from RCM and Refco; and (3) removing innocent members of PlusFunds board and management by buying out their interests with proceeds of the Suffolk loans.

1059.  As alleged in greater detail above, Sugrue, Kavanagh and Owens intended to participate in the plan and intended to ensure that SMFF cash remained at Refco.  Sugrue, Kavanagh, and Owens each personally benefited from their participation because they received millions of dollars from Refco in the Suffolk Loan transactions.

1060.  As alleged in greater detail above, Bennett committed overt acts in furtherance of the conspiracy by (1) arranging and/or facilitating the movement of SMFF's cash to RCM; (2) negotiating and agreeing to provide in excess of $204 million to entities controlled by Sugrue, Owens and Kavanagh to buy out the interests of innocent members of PlusFunds' board and management for the purpose of keeping SMFF's cash at RCM; (3) diverting RCM's customer assets, including SMFF's cash for use in the Refco fraud.

1061.  As alleged in greater detail above, Hackl committed overt acts in furtherance of the conspiracy by informing Bousbib in the fall of 2004 that SMFF's cash was held in customer-segregated accounts.

1062.  The conspiracy and the wrongful conduct committed pursuant to the conspiracy directly and proximately caused injury to the plaintiffs.

1063.  By virtue of their conspiracy, Sugrue, Kavanagh, Owens, Bennett, and Hackl are liable for the breaches of fiduciary duty, conversion and other torts committed by members of the conspiracy, including themselves, Refco LLC and RCM.

## COUNT XII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Gibson Dunn)

1064.  Plaintiffs incorporate by reference the allegations set forth above.

1065.  As alleged in greater detail in, Sugrue, Kavanagh and Owens owed fiduciary duties to PlusFunds and SPhinX by virtue of their roles as PlusFunds and SPhinX officers and directors.

1066.  Gibson Dunn understood the relationship among Sugrue, Kavanagh, Owens, PlusFunds, and SPhinX and understood that Sugrue, Kavanagh, and Owens owed fiduciary duties to both SPhinX and PlusFunds.

1067.  As alleged in greater detail above, Gibson Dunn knew and understood that Sugrue, Owens, and Kavanagh breached their fiduciary duties to SPhinX and PlusFunds by participating in the Suffolk loans.

1068.  As alleged in greater detail above, Gibson Dunn gave substantial assistance to Sugrue, Owens and Kavanagh by documenting the Suffolk loan transactions, improperly and intentionally advising Sugrue, Owens and Kavanagh that the Suffolk loans did not need to be disclosed and concealing the Suffolk loans from PlusFunds and SPhinX.

1069.  Gibson Dunn's actions directly and proximately caused SPhinX and PlusFunds damages in an amount to be determined at trial.

## COUNT XIII
### FRAUD/NEGLIGENT MISREPRESENTATION
### (Against Gibson Dunn)

1070.  Plaintiffs incorporate by reference the allegations set forth above.

1071.  As alleged in greater detail above, Gibson Dunn owed PlusFunds fiduciary duties as its counsel, including a fiduciary duty of disclosure of facts relating to PlusFunds' interests and a duty of loyalty.

1072.  As alleged in greater detail above, Gibson Dunn knowingly or recklessly failed to disclose and affirmatively concealed the facts and details of the Suffolk loans from PlusFunds' innocent officers and directors.

1073.  Gibson Dunn owed PlusFunds a duty to disclose the true nature of the Suffolk loans to PlusFunds.

1074.  Had Gibson Dunn disclosed or refrained from concealing the terms of the Suffolk loans from innocent PlusFunds officers and directors, PlusFunds would have opposed the Suffolk transactions and would have removed its assets from Refco.

1075.  Gibson Dunn's negligent misrepresentation directly and proximately caused PlusFunds damages in a mount to be proven at trial.

## COUNT XIV
### FRAUD
### (Against Bennett, Trosten, Maggio, Grant, and Hackl)

1076.  Plaintiffs incorporate by reference the allegations set forth above.

1077.  As alleged in greater detail above, Bennett, Maggio, Grant, and Trosten were the masterminds of the Refco fraud, controlling and directing every aspect of the fraud.  Each has pleaded guilty to criminal fraud and conspiracy charges in the Southern District of New York and awaits sentencing.

1078.  Bennett, Maggio, Grant, and Trosten, and persons or entities acting in concert or participation with them made, directed, or are otherwise responsible for all of the fraudulent statements and omissions of Refco and RCM alleged herein.

1079. As a result of the Refco fraud, RCM was able to continue its business model and remain available to receive and maintain customer cash and securities, including SMFF's cash, despite the fact that RCM and Refco were insolvent. Absent the fraud, RCM would not have been able to attract, receive, and retain cash and securities from customers, and SPhinX would not have placed and held its property in accounts at RCM, where it was available to be improperly siphoned by Refco, Bennett, Maggio and Trosten, and persons and entities acting in concert or participation with them.

1080. One of the individuals acting in concert with Bennett, Maggio, Grant, and Trosten was Thomas Hackl. In the fourth quarter of 2004, in connection with negotiations regarding interest rates earned on SMFF's cash, Hackl misrepresented to PlusFunds' President Bousbib that SMFF's cash was maintained in customer-segregated accounts. Hackl made this representation to ensure that SMFF's cash remained at Refco, with knowledge of its falsity. Hackl has been identified as an unindicted co-conspirator in the criminal proceedings against Bennett, Trosten, and Tone Grant.

1081. Bennett, Maggio, Trosten, Grant, and Hackl and persons or entities acting in concert or participation with them were in a position of unique and superior knowledge regarding the true facts concerning the siphoning of RCM customers' cash and securities, the manner in which the siphoning was concealed and the fact that the appearance of Refco's financial health and strength were the product of fraud and were false.

1082. As expected and anticipated by Bennett, Maggio, Trosten, Grant, and Hackl, RCM customers, including SPhinX, placed and maintained cash and securities into RCM accounts in ignorance of the Refco fraud. Had the facts been fully disclosed, RCM's customers, including SPhinX, would not have done business with RCM, and their cash and securities would

not have been available to be diverted by Bennett, Maggio, Trosten, Grant, and Hackl or others acting in concert or participation with them.

1083.   SPhinX and PlusFunds relied upon the fraudulent appearance of Refco's health created by Bennett, Maggio, Grant, Trosten, Grant, and Hackl.   PlusFunds' risk committee monitored publicly available information to limit its exposure to trading counterparties, including Refco.  In addition, innocent decision-makers at SPhinX and PlusFunds were aware of the LBO and IPO transactions and relied upon public statements made by Refco in connection with those transactions regarding Refco's financial position.  In placing and maintaining funds in accounts at RCM, SPhinX relied to its detriment on the appearance of financial health and strength fraudulently created by Bennett, Maggio, Trosten, Grant, Hackl and other Refco insiders acting in concert with them, and on SPhinX's ignorance of the facts with respect to the improper diversion and conversion of funds from SMFF's accounts at RCM.

1084.   PlusFunds relied upon Hackl's statement that SMFF's cash was maintained in customer-segregated accounts as a basis for leaving SMFF's assets at RCM.

1085.   As a result of the Refco fraud perpetuated by Bennett, Maggio, Trosten, Grant, Hackl and others, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT XV
### BREACH OF FIDUCIARY DUTY
### (Against Bennett, Trosten, Maggio, Grant, Hackl, and Klejna)

1086.   Plaintiffs incorporate by reference the allegations set forth above.

1087.   As alleged in greater detail above, Refco and RCM were insolvent as of August 2004.  Accordingly, at all relevant times, Bennett, Maggio, Trosten, Grant, Hackl, and Klejna as officers and directors of Refco and RCM, owed fiduciary duties of loyalty, care, honesty, good

faith, disclosure, and trust to RCM and its customers, including SMFF, who were creditors of RCM.

1088.  At all relevant times, RCM owed fiduciary duties to its customers, including SMFF, the discharge of which was under direction and control of Bennett, Maggio, Trosten, Grant, Hackl, Klejna, and other parties acting in concert or participation with them.

1089.  As alleged in greater detail above, Bennett, Trosten, Hackl, Klejna, Grant, and Maggio breached their fiduciary duties to SMFF by diverting RCM customer assets, including SMFF's cash, to fund Refco business, acquisitions, RTLs and fraud, including the Suffolk loans. Bennett, Maggio, Trosten, Grant, Hackl, and Klejna were aware of those duties and actively participated in and assisted the breach of those duties.

1090.  As alleged in greater detail above, Bennett, Trosten, Hackl, Klejna, Grant and Maggio breached their fiduciary duties to SMFF by failing to disclose the true financial condition of Refco and RCM and by actively concealing it.

1091.  As alleged in greater detail above, the breaches of fiduciary duty by Bennett, Trosten, Hackl, Klejna, Grant, and Maggio caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

1092.  As alleged in greater detail above, the damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Bennett, Trosten, Hackl, Klejna, Grant, and Maggio.  Each of these Defendants should have reasonably foreseen that RCM's customers, whose assets were diverted to fund the Refco fraud, would be unable to recover their assets as a result of the Refco fraud.

## COUNT XVI
## CONVERSION
**(Against Bennett, Trosten, Maggio, Grant, and Hackl)**

1093.  Plaintiffs incorporate by reference the allegations set forth above.

1094.  Plaintiffs had a right of possession of cash and other assets held by Refco and RCM.

1095.  As alleged in greater detail above, SMFF entrusted assets to Refco for specific, limited purposes, and the amounts entrusted to Refco were reflected on periodic account statements from Refco.

1096.  By the actions alleged herein, Bennett, Maggio, Trosten, Grant, and Hackl, and persons or entities acting in concert with them, wrongfully converted funds that had been entrusted to Refco for specific limited purposes by SMFF.

1097.  In the alternative, Bennett, Maggio, Hackl, Grant, and Trosten are liable for aiding and abetting RCM's and/or Refco's conversion of SMFF's funds that had been entrusted to Refco because, among other things, they were aware of the conversion and actively participated in and substantially assisted the conversion.

1098.  As a result of the conversion alleged herein, SMFF was damaged in an amount to be proved at trial.

## COUNT XVII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Bennett, Trosten, Maggio, Grant, Hackl, Klejna, and Chase)**

1099.  Plaintiffs incorporate by reference the allegations set forth above.

1100.  As alleged in greater detail above, Refco LLC and RCM, as the custodians of SMFF's assets, owed fiduciary duties to SMFF.

252

1101. As alleged in greater detail above, Refco LLC and RCM breached their fiduciary duties to SMFF by diverting RCM customer assets, including SMFF's cash, to fund Refco business, acquisitions, RTLs, and fraud, including the Suffolk loans. Refco LLC and RCM breached their fiduciary duties to SMFF by failing to disclose the true financial condition of Refco and RCM and by actively concealing it.

1102. As alleged in greater detail above, Bennett, Maggio, Trosten, Grant, Hackl, Klejna, and Chase knew about and understood these breaches and gave substantial assistance to the breaches of fiduciary duty by the other defendants by participating in the movement and diversion of RCM customer assets and by concealing the Refco fraud.

1103. Hackl gave substantial assistance to the breaches of fiduciary duty by the other defendants by making misrepresentations to PlusFunds to keep SMFF's assets at RCM. Specifically, in the fourth quarter of 2004, Hackl informed PlusFunds' President Bousbib that SMFF's cash was maintained in customer-segregated accounts.

1104. As alleged in greater detail above, the breaches of fiduciary duty by Refco LLC and RCM caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

1105. As alleged in greater detail above, the damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Refco LLC and RCM. Each of these Defendants should have reasonably foreseen that RCM's customers, whose assets were diverted to fund the Refco fraud, would be unable to recover their assets as a result of the Refco fraud.

## COUNT XVIII
### AIDING AND ABETTING FRAUD
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase)**

1106. Plaintiffs incorporate by reference the allegations set forth above.

1107.  As alleged in greater detail above, Refco LLC, RCM, Bennett, Trosten, Maggio, Grant, and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1108.  Mayer Brown, Collins, Best, Koury, Ernst & Young, PwC, Ferris, Grant Thornton, Ramler, and Chase had actual knowledge of the fraud alleged herein.  In the alternative, Mayer Brown, Collins, Ernst & Young, PwC, Ferris, Grant Thornton, Ramler, and Chase each intentionally and consciously avoided the truth regarding the Refco fraud.

1109.  Notwithstanding their knowledge of the Refco fraud, Mayer Brown, Collins, Best, Koury, PwC, Ernst & Young, Ferris, Grant Thornton, and Ramler substantially assisted in the Refco fraud.

1110.  As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the Refco fraud by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

1111.  As set forth in greater detail above, Ernst & Young gave substantial assistance to the Refco fraud by helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers assets.

1112.  As set forth in greater detail above, PwC gave substantial assistance to the Refco fraud by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1113.  PwC and Ferris further gave substantial assistance to the Refco fraud by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial

statements concealed and failed to disclose the Refco fraud and the diversion and use of SPhinX cash at RCM to fund that fraud.

1114. As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the Refco fraud by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

1115. SPhinX and PlusFunds' innocent decision-makers reasonably relied on the misstatements of Refco's financial condition, as set forth in greater detail above.

1116. As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1117. The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud. The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Grant Thornton, Ferris, Ramler, Ernst & Young, and Chase who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

## COUNT XIX
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, and Mayer Brown)**

1118. Plaintiffs incorporate by reference the allegations set forth above.

1119. As alleged in greater detail above, Refco LLC and RCM owed fiduciary duties to SPhinX arising out of their roles as among other things, custodian of assets

1120.  As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004.

1121.  Because Refco, Refco LLC, and RCM were insolvent, the officers and directors of Refco, Refco LLC, and RCM owed fiduciary duties to those entities' creditors and customers, including SMFF and PlusFunds.

1122.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood the fiduciary relationship between Refco, Refco LLC, and RCM and their customers.

1123.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood that Refco, Refco LLC and RCM were insolvent, and that as a result, their officers and directors owed fiduciary duties to their creditors and customers, including SPhinX and PlusFunds.

1124.  As set forth in greater detail above, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Mayer Brown, Collins, Best, and Koury each understood that Refco, RCM and Refco's officers and directors were causing customer assets at RCM to be converted and used in the furtherance of Refco's fraudulent scheme, all in violation of their fiduciary duties to RCM's customers, including SPhinX and PlusFunds.

1125.  As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

1126.  As set forth in greater detail above, Ernst & Young gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by

helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers' assets.

1127.  As set forth in greater detail above, PwC and Ferris gave substantial assistance to the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1128.  PwC and Ferris further gave substantial assistance to the breaches of fiduciary duty be Refco, Refco LLC, RCM, and their offices and directors by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial statements concealed and failed to disclose the Refco fraud, and the deposit of substantial and material amounts of SPhinX assets in a non-segregated and unregulated account at RCM where they were exposed to the insolvency and credit risk of Refco and RCM, and the use of those assets to fund the Refco fraud.

1129.  As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the breaches of fiduciary duty by Refco, RCM and their officers and directors by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

1130.  As a direct and proximate result of the breaches of fiduciary duty by Refco, Refco LLC, and RCM and their officers and directors, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1131.   The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the breaches of fiduciary duty by Refco, Refco LLC, and RCM.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Grant Thornton, Ramler and Ernst & Young, who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

## COUNT XX
### AIDING AND ABETTING CONVERSION
**(Against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase)**

1132.   Plaintiffs incorporate by reference the allegations set forth above.

1133.   Plaintiffs had a right of possession of cash and other assets held by Refco, Refco LLC, and RCM.

1134.   Refco, Refco LLC, RCM and Refco's officers and agents converted customer assets held at RCM, including SMFF's cash by intentionally interfering with those assets to the exclusion of SMFF's property rights.

1135.   As alleged in greater detail above, Mayer Brown, Collins, Best, Koury, Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, and Chase had actual knowledge of the conversion of customer assets from SMFF as alleged herein.  Alternatively, Mayer Brown, Best, Koury, Grant Thornton, Ernst & Young, PwC, Ferris, and Chase consciously avoided knowledge of the conversion.

1136.   As set forth in greater detail above, Grant Thornton and Ramler gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by issuing clean audit opinions on Refco's books and records and helping conceal the Refco fraud.

1137.   As set forth in greater detail above, Ernst & Young gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by helping conceal the Refco fraud, preparing Refco's tax statements and providing tax and financial consulting and advisory services, despite knowledge that Refco was misappropriating its customers assets.

1138.   As set forth in greater detail above, PwC and Ferris gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC, RCM and their officers and directors by concealing the Refco fraud, advising Refco on financial matters and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1139.   PwC and Ferris further gave substantial assistance to the conversion of SMFF assets by issuing unqualified audit opinions on the financial statements of SPhinX and PlusFunds, which financial statements concealed and failed to disclose the Refco fraud and the deposit of substantial and material amounts of SMFF's assets in non-segregated and unregulated account at RCM where they were opposed to the insolvency and credit risk of Refco and RCM, and the use of those assets to fraud the Refco fraud.

1140.   As set forth in greater detail above, Mayer Brown, Collins, Best, and Koury gave substantial assistance to the conversion of SMFF's customer assets by Refco, Refco LLC RCM and their officers and directors by advising Refco in connection with its financial affairs; documenting transactions and transfers to RGHI in connection with the RGHI Receivable; concealing the RGHI Receivable; preparing, negotiating and documenting the RTLs; and advising Refco and preparing fraudulent public filings in connection with the LBO and IPO transactions, among other things.

1141.  As a direct and proximate result of the conversion of SMFF customer assets by Refco LLC and RCM and their officers and directors, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1142.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Mayer Brown, Collins, Best, Koury, PwC, Ferris, Grant Thornton, Ramler Ernst & Young, and Chase who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

## COUNT XXI
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against RAI and Refco Associates Inc.)

1143.  Plaintiffs incorporate by reference the allegations set forth above.

1144.  As alleged in greater detail above, Refco, Refco LLC and RCM and their officers and directors owed fiduciary duties to their customers, including SPhinX.

1145.  As alleged in greater detail above, DPM and Aaron owed fiduciary duties to SPhinX and PlusFunds, which included the obligation to maintain SMFF's assets in regulated, protected, customer-segregated accounts.

1146.  As alleged in greater detail above, Sugrue, Kavanagh and Owens owed fiduciary duties to SPhinX and PlusFunds, which included the obligation to maintain SMFF's assets in regulated protected, customer-segregated accounts.

1147.  RAI and Refco Associates Inc. knew and understood that SMFF's assets were to be maintained in regulated, protected, customer-segregated accounts.  RAI advised funds that invested in the SPhinX Funds, including SMFF.  RAI received and was familiar with SPhinX's offering materials, which included the requirement that assets be maintained in regulated, protected, customer-segregated accounts.

260

1148.  RAI and Refco Associates Inc. knew that SMFF's excess cash was swept on a weekly basis to unregulated, unprotected, non-segregated accounts at RCM.  RAI and Refco Associates Inc. knew and understood that assets placed at RCM were commingled in a single RCM account with other customer assets and with RCM's own assets.  RAI and Refco Associates Inc. knew that RCM was unregulated and did not provide customer-segregation, as required in SPhinX's Offering Memoranda and materials.

1149.  RAI and Refco Associates Inc. knew and understood that Refco, Refco LLC, RCM, DPM, Aaron, Sugrue, Kavanagh, and Owens were breaching their fiduciary duties by allowing SMFF's excess cash to be placed in non-segregated accounts at RCM.

1150.  RAI and Refco Associates Inc. substantially assisted the breach of fiduciary duty by monitoring SMFF's margin cash requirement at Refco LLC and facilitating the movement of SMFF cash from Refco LLC to RCM.

1151.  As a direct and proximate result of the breaches of fiduciary duty by RCM, Refco LLC, Aaron, DPM, Sugrue, Kavanagh and Owens, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

## COUNT XXII
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
#### (Against Credit Suisse and Banc of America Securities)

1152.  Plaintiffs incorporate by reference the allegations set forth above.

1153.  As alleged in greater detail above, Refco, Refco LLC and RCM owed fiduciary duties to their customers, including SPhinX and PlusFunds, arising out of Refco's roles as, among other things, custodian of customer assets.

1154.  As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004.  As a result, Refco, Refco LLC, RCM and their officers and directors owed direct fiduciary duties to creditors and customers, including SPhinX and PlusFunds.

1155.  As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities became aware that Refco, Refco LLC, and RCM were insolvent and therefore knew and understood that Refco, Refco LLC and RCM, and their officers and directors, owed fiduciary duties to creditors and customers, including SPhinX and PlusFunds.

1156.  As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities knew and understood that (1) Refco, Refco LLC, and RCM were insolvent and in no financial position to conduct the LBO and/or IPO transactions; and that (2) Refco was diverting customer assets from RCM to fund its business and fraud.  As alleged in greater detail above, Refco, Refco LLC, RCM and their officers and directors breached their fiduciary duties to customers of RCM.

1157.  Credit Suisse and Banc of America Securities knew and understood that Refco, Refco LLC RCM and officers and directors were in breach of their fiduciary duties to customers, including SPhinX and PlusFunds.

1158.  Notwithstanding this knowledge, As alleged in greater detail above, Banc of America Securities and Credit Suisse substantially assisted the fraud and breaches of fiduciary duty by Refco; Refco LLC, RCM and their officers and directors by underwriting and providing services in connection with Refco's LBO and IPO transactions and concealing the nature and extent of the Refco fraud, the breaches of fiduciary duty by Refco, Refco LLC, RCM and their officers and directors and by preparing and approving false and misleading public offering materials submitted by Refco in connection with the IPO and LBO transactions.

1159.   The breaches of fiduciary duty by Refco and its agents proximately caused damages to SPhinX and PlusFunds in an amount to be determined at trial.

## COUNT XXIII
### AIDING AND ABETTING FRAUD
#### (Against Credit Suisse and Banc of America Securities)

1160.   Plaintiffs incorporate by reference the allegations set forth above.

1161.   As alleged in greater detail above, Refco, Refco LLC, RCM, Bennett, Trosten, Grant, Maggio and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1162.   As alleged in greater detail above, Defendants Credit Suisse and Banc of America Securities knew and understood that (1) Refco and RCM were insolvent and in no financial position to conduct the LBO and/or IPO transactions; and that (2) Refco was diverting customer assets from RCM to fund its business and fraud.

1163.   Credit Suisse and Banc of America Securities had actual knowledge of the fraud alleged herein.   In the alternative, Credit Suisse and Banc of America Securities each intentionally and consciously avoided knowledge of the truth regarding the Refco fraud.

1164.   Notwithstanding their knowledge of the Refco fraud, Credit Suisse and Banc of America Securities substantially assisted in the Refco fraud.

1165.   As set forth in greater detail above, Credit Suisse and Banc of America Securities gave substantial assistance to the Refco fraud by helping conceal the Refco fraud, providing underwriting, financial consulting and advisory services and preparing and approving Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1166.   SPhinX and PlusFunds received and reasonably relied on Refco's financial statements and public filings in connection with the LBO and IPO offerings.

1167.  As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1168.  The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud.  The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to Credit Suisse and Banc of America Securities, who understood that Refco was insolvent and that its customers would be unable to recover their assets deposited with RCM.

### COUNT XXIV
### CONSPIRACY
**(Against BAWAG, Bennett, Trosten, Hackl, Grant, Maggio, Chase, and the RTL Participants)**

1169.  Plaintiffs incorporate by reference the allegations set forth above.

1170.  As alleged in greater detail above, Refco, Bennett, BAWAG, Trosten, Grant, Hackl, Maggio, Chase, RGHI, and the RTL Participants entered into a corrupt agreement to conceal hundreds of millions of trading losses from Refco's financial statements by transferring losses and expenses to RGHI via the RGHI Receivable and concealing the RGHI Receivable through the RTLs.

1171.  As alleged in greater detail above, each member of the conspiracy knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

1172.  As alleged in greater detail above, Bennett, Trosten, Grant, Hackl, Maggio, RGHI, and Chase committed overt acts in furtherance of the conspiracy by coordinating, negotiating, and/or executing documentation to effectuate the RTLs.

1173.  As alleged in greater detail above, BAWAG committed overt acts in furtherance of the conspiracy by advancing funds and directly participating in RTLs designed to conceal

Refco's losses. BAWAG has admitted its participation and knowledge of the purpose of the loans to conceal Refco's losses and manipulate its financial statements.

1174. As alleged in greater detail above, each of the RTL Participant Defendants and Chase committed overt acts in furtherance of the conspiracy by participating in and profiting from RTLs and commingling of customer funds.

1175. The conspiracy and the wrongful conduct committed pursuant to the conspiracy directly and proximately caused injury to the plaintiffs.

1176. By virtue of their conspiracy, Bennett, Maggio, Grant, Trosten, BAWAG, Hackl, Chase, RGHI, and the RTL Participants are liable for the breaches of fiduciary duty, conversion and other torts committed in furtherance of the conspiracy, including themselves and Refco.

## COUNT XXV
### AIDING AND ABETTING FRAUD
### (Against BAWAG and RTL Participants)

1177. Plaintiffs incorporate by reference the allegations set forth above.

1178. As alleged in greater detail above, Refco, Refco LLC, RCM, Bennett, Trosten, Maggio and Hackl, and others acting in concert with them, committed fraud in connection with the misrepresentation of Refco's financial condition.

1179. As alleged in greater detail above, an important part of the Refco fraud was the concealment of the RGHI Receivable by temporarily paying it down at the end of reporting periods through the RTLs.

1180. As alleged in greater detail above, BAWAG gave substantial assistance to the Refco fraud by participating in a series of RTLs. BAWAG knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

265

1181. As alleged in greater detail above, each of the RTL Participant Defendants and RGHI gave substantial assistance to the Refco fraud by participating in RTLs. RGHI and each of the RTL Participants knew and understood that the purpose of the RTLs was to fraudulently manipulate Refco's financial statements.

1182. SPhinX and PlusFunds received and reasonably relied on Refco's financial statements.

1183. As a direct and proximate result of the Refco fraud, SPhinX and PlusFunds were damaged in an amount to be proven at trial.

1184. The damages suffered by SPhinX and PlusFunds were a direct and proximate result of the Refco fraud. The damages suffered by SPhinX and PlusFunds were reasonably foreseeable to RGHI, BAWAG, and the RTL Participants, who understood that Refco's financial statements were fraudulent and that investors and customers would rely on Refco's financial condition in deciding to do business with Refco and entrust assets to Refco's custody.

## COUNT XXVI
### BREACH OF FIDUCIARY DUTY/AIDING AND ABETTING
### (Against THL Defendants)

1185. Plaintiffs incorporate by reference the allegations set forth above.

1186. As alleged in greater detail above, Refco, Refco LLC and RCM owed fiduciary duties to their customers, including SPhinX and PlusFunds, arising out of Refco's roles as, among other things, custodian of customer assets.

1187. As alleged in greater detail above, Refco, Refco LLC and RCM were insolvent as of August 2004. As a result, Refco, Refco LLC, RCM and their officers and directors owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and PlusFunds.

1188.  As alleged in greater detail above, the THL Defendants became aware that Refco, Refco LLC, and RCM were insolvent and therefore knew and understood that Refco, Refco LLC and RCM, and their officers and directors, owed fiduciary duties to Refco's customers, including SPhinX and PlusFunds.

1189.  As alleged in greater detail above, as officers and directors of Refco, the THL Individuals owed direct fiduciary duties to Refco's creditors and customers, including SPhinX and PlusFunds.  As alleged in greater detail above, Refco, Refco LLC, RCM and their officers and directors breached their fiduciary duties to customers of RCM.

1190.  As alleged in greater detail above, the THL Defendants exercised actual control over Refco and its business activities after the LBO transaction in August 2004 by virtue of their majority interest in Refco and representation on and control on Refco's board and management committees.

1191.  As alleged in greater detail above, the THL Defendants knew and understood that (1) Refco, Refco LLC, and RCM were insolvent and in no financial position to conduct the IPO transaction; and (2) Refco was diverting customer assets from RCM to fund its business operations and fraudulent activities, including the RTLs.

1192.  As alleged in greater detail above, the THL Defendants knew and understood that Refco, Refco LLC, RCM and their officers and directors were in breach of their fiduciary duties to customers, including SPhinX and PlusFunds.

1193.  Notwithstanding this knowledge, As alleged in greater detail above, the THL Defendants breached their fiduciary duties to Refco's creditors and customers by authorizing the RTLs after assuming control of Refco, by concealing Refco's insolvency and the Refco fraud

from creditors and customers (including SPhinX) and by allowing and authorizing the continuing diversion of RCM assets to fund Refco's operations and fraud.

1194.   In the alternative, the THL Defendants aided and abetted the breaches of fiduciary duty by Refco, Refco LLC and RCM and their officers and directors by allowing and participating in the diversion of RCM assets and RTLs and concealing Refco's insolvency from Refco's creditors and customers, including SPhinX and PlusFunds, after assuming control of Refco.

## COUNT XXVII
## INTERFERENCE WITH CONTRACT/PROSPECTIVE CONTRACT
### (Against All Defendants)

1195.   Plaintiffs incorporate by reference the allegations set forth above.

1196.   As alleged in greater detail above, there was a valid contractual relationship between SPhinX and PlusFunds as evidenced by the IMA.

1197.   As alleged in greater detail above, Defendants intentionally interfered with the performance of the IMA by, among other things, causing the IMA to be breached by allowing cash balances to be invested improperly, allowing SPhinX money to be moved from Refco LLC to RCM, allowing SPhinX money to be commingled, participating in and allowing SPhinX money to be used for the RTLs, and concealing these facts from SPhinX, PlusFunds, and SPhinX investors.

1198.   Defendants' intentional interference with the IMA was without justification or excuse.

1199.   Defendants' intentional interference caused the breach of the IMA and the loss of the contract by also driving SPhinX and PlusFunds into bankruptcy.

1200. Defendants' intentional interference with the IMA resulted in damage to PlusFunds and SPhinX.

1201. As alleged in greater detail above, there was a valid contract between SPhinX and DPM, DPM-Mellon, and Mellon, as evidenced by the Service Agreement.

1202. As alleged in greater detail above, Defendants interfered with the performance of the Service Agreement by, among other things, causing DPM, DPM-Mellon and Mellon to breach the Service Agreement as a result of misstatements of cash, receivables, and payables; failure to maintain SPhinX assets in segregated accounts; allowing the movement of SPhinX cash from Refco LLC to RCM; failure to provide accurate financial statements; allowing SPhinX money to be commingled; participating in and allowing SPhinX money to be used for the RTLs; and concealing the truth from SPhinX, PlusFunds, and SPhinX investors.

1203. Defendants' intentional interference with the Service Agreement was without justification or excuse.

1204. Defendants' intentional interference caused the breach of the Service Agreement by also driving SPhinX into bankruptcy.

1205. Defendants' intentional interference with the Service Agreement resulted in damage to SPhinX.

1206. As alleged in greater detail above, each investor in SPhinX executed a valid contract with SPhinX regarding the handling of their invested cash.

1207. As alleged in greater detail above, Defendants interfered with the performance of each of those investor contracts by, among other things, causing the breach of each of those contracts by allowing SPhinX cash to be moved from Refco LLC to unregulated and non-segregated accounts to RCM; allowing SPhinX money to be commingled; participating in and

allowing SPhinX money to be used for the RTLs; and concealing the truth from SPhinX, PlusFunds and SPhinX investors.

1208. Defendants' intentional interference with each of the investor contracts was without justification.

1209. Defendants' intentional interference with each of the investor contracts resulted in damage to SPhinX by, among other things, causing investors to redeem their investments once the Refco scheme was disclosed. This in turn also damaged PlusFunds by driving down the AUMs. The SPhinX investors were also damaged because they were unable to redeem their shares in SPhinX.

1210. As alleged in greater detail above, there was a valid contractual relationship between SPhinX and PlusFunds and each portfolio manager, as evidenced by the DIMAs.

1211. As alleged in greater detail above, Defendants intentionally interfered with the performance of each DIMA by causing SPhinX and PlusFunds to be damaged by the movement of funds from protected accounts at Refco LLC to unprotected, non-segregated accounts at RCM, thereby causing SPhinX and PlusFunds to file bankruptcy.

1212. Defendants' intentional interference with the DIMAs was without justification or excuse.

1213. Defendants' interference with the DIMAs caused the loss of contract between SPhinX/PlusFunds and the portfolio managers.

1214. As alleged in greater detail above, there was a prospective contract among PlusFunds, SPhinX, and Lehman Brothers that would have resulted in an additional $500 million plus in AUM. As a direct and proximate result of the disclosure of the Refco scheme and the

exposure of Defendants' complicit conduct involving that scheme, Lehman Brothers declined to execute their agreement with SPhinX and PlusFunds, thereby damaging SPhinX and PlusFunds.

1215.    Defendants were aware of the negotiations with Lehman Brothers and were aware of the potential $500 million increase in AUM.

1216.    Defendants intentionally interfered with that prospective contractual relationship.

1217.    Defendants' intentional interference with that prospective relationship was without justification or excuse.

1218.    Defendants' interference with that prospective contractual relationship caused the loss of the contract among PlusFunds, SPhinX, and Lehman Brothers.

1219.    Defendants' interference with the contracts resulted in damage to PlusFunds and SPhinX. Further, punitive damages are warranted based on Defendants conduct.

WHEREFORE, Plaintiffs respectfully request judgment as follows:

i.    on the First Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

ii.    on the Second Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iii.    on the Third Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

iv.    on the Fourth Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

v.    on the Fifth Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, and Owens in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

vi.    on the Sixth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

vii.    on the Seventh Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

viii.    on the Eighth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

ix.    on the Ninth Cause of Action, compensatory and punitive damages against PwC and Ferris in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

x.    on the Tenth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xi.    on the Eleventh Cause of Action, compensatory and punitive damages against Sugrue, Kavanagh, Owens, Bennett, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xii.    on the Twelfth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xiii.    on the Thirteenth Cause of Action, compensatory and punitive damages against Gibson Dunn in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xiv.    on the Fourteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xv.    on the Fifteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, Klejna, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xvi.    on the Sixteenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, and Hackl in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xvii.    on the Seventeenth Cause of Action, compensatory and punitive damages against Bennett, Trosten, Maggio, Grant, Klejna, Hackl, and Chase in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xviii.    on the Eighteenth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Collins, Best, Koury, Mayer Brown, and Chase

in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xix.    on the Nineteenth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, and Mayer Brown in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xx.    on the Twentieth Cause of Action, compensatory and punitive damages against Grant Thornton, Ramler, Ernst & Young, PwC, Ferris, Collins, Best, Koury, Mayer Brown, and Chase in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxi.    on the Twenty-First Cause of Action, compensatory and punitive damages against RAI and Refco Associates Inc. in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxii.    on the Twenty-Second Cause of Action, compensatory and punitive damages against Credit Suisse and Banc of America Securities in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxiii.    on the Twenty-Third Cause of Action, compensatory and punitive damages against Credit Suisse and Banc of America Securities in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxiv.    on the Twenty-Fourth Cause of Action, compensatory and punitive damages against BAWAG, Bennett, Trosten, Hackl, Grant, Maggio, Chase, RGHI, and the RTL Participants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxv.    on the Twenty-Fifth Cause of Action, compensatory and punitive damages against BAWAG, RGHI, and the RTL Participants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxvi.    on the Twenty-Sixth Cause of Action, compensatory and punitive damages against the THL Defendants in an amount to be established at trial, together with interest, costs, and attorneys' fees as allowed by law;

xxvii.    for such other and further relief as the Court deems just and proper.

Dated: New York, New York
      March 5, 2008

**BROWN RUDNICK BERLACK ISRAELS LLP**

By_____
        David Molton, Esq.
        Andrew Dash, Esq.
        Steven B. Smith, Esq.

Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

- and -

**BEUS GILBERT PLLC**
Leo Beus, Esq.
Dennis Blackhurst, Esq.
4800 North Scottsdale Road
Suite 6000
Scottsdale, AZ 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100

Attorneys for Plaintiffs

M 10-450

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
FILED
JUL 11 1984
S. D. OF N.Y.

Pursuant to Section 157(a) of the Bankruptcy

Amendments and Federal Judgeship Act of 1984, any or all

cases under title 11 and any or all proceedings arising

under title 11 or arising in or related to a case under

title 11 are referred to the bankruptcy judges for this

district.

So Ordered,

ROBERT J. WARD
Acting Chief Judge

July 10, 1984

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Susheel Kirpalani (SK 8926)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
Counsel for Official Committee
of Unsecured Creditors
of Refco Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REFCO INC., et al.,<br><br>                     Debtors. | Chapter 11<br><br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| BAWAG P.S.K. BANK FÜR ARBEIT UND WIRTSCHAFT UND ÖSTERREICHISCHE POSTSPARKASSE AKTIENGESELLSCHAFT,<br><br>                     Plaintiff,<br><br>      - against -<br><br>REFCO INC., et al.,<br><br>                     Defendants,<br><br>      - and -<br><br>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF REFCO INC. ET AL., on behalf of REFCO GROUP LTD., LLC,<br><br>                     Intervenor-<br>                     Defendant and<br>                     Counterclaim<br>                     Plaintiff. | Adv. Pro. No. 05-03161 (RDD)<br><br><br><br><br><br>**<u>AMENDED ANSWER,</u>**<br>**<u>AFFIRMATIVE DEFENSES,</u>**<br>**<u>AND COUNTERCLAIMS</u>**<br><br>**[REDACTED]** |

The Official Committee of Unsecured Creditors (the "Committee") of Refco Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), on behalf of Intervenor-Defendant and Counterclaim Plaintiff Refco Group Ltd., LLC ("RGL" or "Counterclaim-Plaintiff RGL"), by and through its undersigned counsel, Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), in response to the Complaint filed by BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG" or "Counterclaim-Defendant BAWAG"), files this Amended Answer, Affirmative Defenses, and Counterclaims as follows:

## AMENDED ANSWER

1.      States that the allegations set forth in Paragraph 1 of the Complaint are conclusions of law to which no answer is required. To the extent the allegations in Paragraph 1 constitute allegations of fact, they are denied.

2.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of the first sentence of Paragraph 2 of the Complaint. Denies the allegations contained in the second sentence of Paragraph 2 of the Complaint.

3.      Admits that on October 10, 2005, Refco Inc. issued a press release. The press release speaks for itself. Denies the remaining allegations contained in Paragraph 3 of the Complaint in all other respects, except states that the trading prices of Refco Inc.'s stock is a matter of public record.

4.      States that the allegations set forth in Paragraph 4 of the Complaint are conclusions of law to which no answer is required. To the extent the allegations in Paragraph 4 constitute allegations of fact, they are denied.

1

## PARTIES

5.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 5 of the Complaint.

6.      Denies the allegations contained in Paragraph 6 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Refco Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One World Trade Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281 and is a debtor and debtor-in-possession in a bankruptcy proceeding jointly administered under Case No. 05-60006 (RDD).  By way of further response, Counterclaim-Plaintiff RGL admits that the businesses of the Refco Defendants included a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base, and that certain worldwide subsidiaries are members of principal U.S. and international exchanges.

7.      Admits the allegations contained in Paragraph 7 of the Complaint.

8.      Admits the allegations contained in Paragraph 8 of the Complaint.

9.      Admits the allegations contained in Paragraph 9 of the Complaint.

10.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 10 of the Complaint.

11.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 11 of the Complaint.

12.      Denies the allegations in Paragraph 12 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Mr. Bennett was at one time the President, Chief Executive Officer and Chairman of Refco Inc.  As to the allegations regarding Mr. Bennett's residences, Counterclaim-Plaintiff RGL lacks knowledge or information sufficient to form a

2

belief as to the truth or falsity of those allegations.

13.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 13 of the Complaint.

### JURISDICTION AND VENUE

14.    Denies the allegations contained in Paragraph 14 of the Complaint, except as they set forth legal conclusions as to which no response is necessary, and except that Counterclaim-Plaintiff RGL admits that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and that this is a core proceeding pursuant to 28 U.S.C. § 157.

### FACTUAL BACKGROUND

15.    Admits the allegations contained in Paragraph 15 of the Complaint.

16.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 16 of the Complaint, except that Counterclaim-Plaintiff RGL admits that on October 10, 2005, Refco Inc. issued a press release, which press release speaks for itself.

17.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 17 of the Complaint, except that Counterclaim-Plaintiff RGL admits that on October 10, 2005, Refco Inc. issued a press release, which press release speaks for itself.

18.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 18 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Refco Group Holdings, Inc. and certain of the Refco Defendants had a World Financial Center mailing address.

19.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 19 of the Complaint.

20.    Denies knowledge or information sufficient to form a belief as to the truth

or falsity of Paragraph 20 of the Complaint.

      21.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 21 of the Complaint.

      22.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 22 of the Complaint.

      23.    Denies the first and second sentences of Paragraph 23 of the Complaint, except to the extent those sentences are conclusions of law to which no answer is required. Denies knowledge or information sufficient to form a belief as to the truth or falsity of the third sentence of Paragraph 23 of the Complaint.

      24.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 24 of the Complaint.

      25.    Admits the allegations contained in Paragraph 25 of the Complaint.

      26.    Admits that Mr. Dispenza communicated with BAWAG on a number of occasions on the morning of October 10, 2005 regarding the wiring of the proceeds of the Loan.

      27.    Denies the allegations contained in Paragraph 27 of the Complaint.

      28.    Denies the allegations contained in Paragraph 28 of the Complaint, except that Counterclaim-Plaintiff RGL admits that BAWAG wired funds to an account at Refco Capital Markets, Ltd. By way of further response, Counterclaim-Plaintiff RGL denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 28 concerning BAWAG's reliance on representations made by Mr. Bennett.

      29.    Admits that Refco Inc. issued a press release on October 10, 2005. The press release dated October 10, 2005 speaks for itself.

      30.    Denies the allegations contained in Paragraph 30 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

4

31.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 31 of the Complaint.

32.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 32 of the Complaint.

33.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 33 of the Complaint, except that Counterclaim-Plaintiff RGL denies the allegations in the final sentence of paragraph 33 to the extent those allegations relate to Counterclaim-Plaintiff RGL.

34.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 34 of the Complaint.

35.    Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 35 of the Complaint.

36.    For its response to Paragraph 36 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 35 of the Complaint, as if fully set forth herein.

37.    Denies the allegations contained in Paragraph 37 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

38.    Denies the allegations contained in Paragraph 38 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

39.    For its response to Paragraph 39 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 38 of the Complaint, as if fully set forth herein.

40.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 40 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff

RGL and because Paragraph 40 sets forth legal conclusions. To the extent the allegations in paragraph 40 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

41.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 41 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 41 sets forth legal conclusions. To the extent the allegations in paragraph 41 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

42.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 42 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 42 sets forth legal conclusions. To the extent the allegations in paragraph 42 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

43.    For its response to Paragraph 43 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 42 of the Complaint, as if fully set forth herein.

44.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 44 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 44 sets forth legal conclusions. To the extent the allegations in paragraph 44 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

45.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 45 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 45 sets forth legal conclusions. To the extent the allegations in

paragraph 45 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

46.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 46 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 46 sets forth legal conclusions.  To the extent the allegations in paragraph 46 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

47.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 47 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 47 sets forth legal conclusions.  To the extent the allegations in paragraph 47 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

48.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 48 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 48 sets forth legal conclusions.  To the extent the allegations in paragraph 48 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

49.     For its response to Paragraph 49 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 42 of the Complaint, as if fully set forth herein.

50.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 50 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 50 sets forth legal conclusions.  To the extent the allegations in paragraph 50 constitute allegations of fact that require a response from Counterclaim-Plaintiff

RGL, denies.

51.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 51 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 51 sets forth legal conclusions. To the extent the allegations in paragraph 51 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

52.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 52 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 52 sets forth legal conclusions. To the extent the allegations in Paragraph 52 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

53.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 53 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 53 sets forth legal conclusions. To the extent the allegations in Paragraph 53 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

54.     For its response to Paragraph 54 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 53 of the Complaint, as if fully set forth herein.

55.     Denies the allegations contained in Paragraph 55 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

56.     Denies the allegations contained in Paragraph 56 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

57.     Denies the allegations contained in Paragraph 57 of the Complaint, except

as they set forth legal conclusions as to which no response is necessary.

58.    For its response to Paragraph 58 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 57 of the Complaint, as if fully set forth herein.

59.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 59 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 59 sets forth legal conclusions. To the extent the allegations in Paragraph 59 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 59 of the Complaint.

60.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 60 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 60 sets forth legal conclusions. To the extent the allegations in Paragraph 60 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 60 of the Complaint.

61.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 61 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 61 sets forth legal conclusions. To the extent the allegations in Paragraph 61 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 61 of the Complaint.

62.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 62 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff

9

RGL and because Paragraph 62 sets forth legal conclusions. To the extent the allegations in Paragraph 62 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 62 of the Complaint.

63.    For its response to Paragraph 63 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 62 of the Complaint, as if fully set forth herein.

64.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 64 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 64 sets forth legal conclusions. To the extent the allegations in Paragraph 64 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

65.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 65 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 65 sets forth legal conclusions. To the extent the allegations in Paragraph 65 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

66.    Counterclaim-Plaintiff RGL asserts that no response to Paragraph 66 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 66 sets forth legal conclusions. To the extent the allegations in Paragraph 66 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

## AFFIRMATIVE DEFENSES

67.    The following Affirmative Defenses are raised without waiver of any

10

defenses which may become available to Counterclaim-Plaintiff RGL, and Counterclaim-Plaintiff RGL expressly reserves the right to raise and rely on any and all defenses available, including any defenses which may be revealed through discovery, pretrial or trial proceedings. In addition, Counterclaim-Plaintiff RGL incorporates all defenses raised by other defendants in this adversary proceeding, to the extent they are applicable to Counterclaim-Plaintiff RGL.

### FIRST AFFIRMATIVE DEFENSE

68.    The Complaint, and each cause of action thereof, fails to state a cause of action against Counterclaim-Plaintiff RGL upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

69.    BAWAG's claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches and in pari delicto.

### THIRD AFFIRMATIVE DEFENSE

70.    BAWAG's claims are barred, in whole or in part, by the doctrines of unclean hands and BAWAG's inequitable conduct.

### FOURTH AFFIRMATIVE DEFENSE

71.    BAWAG's claims are barred, in whole or in part, because BAWAG suffered no cognizable injury as a result of any conduct of Counterclaim-Plaintiff RGL.

### FIFTH AFFIRMATIVE DEFENSE
(Equitable Subordination)

72.    BAWAG's claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.

### SIXTH AFFIRMATIVE DEFENSE
(Reservation Of Rights)

73.    Counterclaim-Plaintiff RGL presently lacks sufficient knowledge or information to form a belief as to whether it may have additional affirmative defenses and expressly reserves any and all rights to assert additional affirmative defenses in the event

Counterclaim-Plaintiff RGL discovers facts supporting such defenses. Moreover, Counterclaim-Plaintiff RGL adopts and incorporates by reference the affirmative defenses asserted by any other defendant in the above-captioned proceeding to the extent any such affirmative defense applies to Counterclaim-Plaintiff RGL.

   74. Counterclaim-Plaintiff RGL also expressly reserves any and all rights to amend, supplement or modify this Answer to assert additional affirmative defenses that may become available or be discovered by Counterclaim-Plaintiff RGL during the course of discovery or otherwise.

## RGL'S COUNTERCLAIMS

The Committee, by its counsel, Milbank, on behalf of Intervenor-Defendant and Counterclaim-Plaintiff Refco Group Ltd., LLC ("RGL" or "Plaintiff RGL"), as and for its counterclaim against BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG" or "Defendant BAWAG"), alleges, upon information and belief, as follows:

## INTRODUCTION

1. Plaintiff RGL's former Chairman and CEO, Phillip Bennett, presently awaits trial on criminal charges arising out of his scheme, over the course of many years, to hide the existence of a multi-hundred million receivable owed by Refco Group Holdings, Inc. ("RGHI" and the "RGHI Receivable"), the personal holding company that he controlled, to one or more of the Debtors.

2. Within a week of the partial public disclosure on October 10, 2005 of the existence of the RGHI Receivable, Plaintiff RGL and the other Debtors went into a whirlwind tailspin that led to the Debtors' filing for bankruptcy on October 17, 2005.

3. Phillip Bennett did not act alone in the perpetration of his scheme to hide the existence of the RGHI Receivable (the "Bennett Receivables Scheme"). To hide the RGHI Receivable, Bennett needed willing co-conspirators who would enter into financial transactions that allowed him to hide the existence of RGHI's receivable at critical quarter-end and year-end periods.

4. BAWAG was one of those co-conspirators, year after year, between 2000 and 2005. To date, defendant BAWAG has successfully hidden from public view its participation in the Bennett Receivable Scheme. As detailed herein, financial records establish that at the end of each February between 2000 and 2005, BAWAG provided Bennett's company,

13

RGHI, with substantial loans, ranging in size from $250 to $300 million, while simultaneously accepting loans from the Debtors. These round-trip, triangular transactions served no proper commercial purpose and did little more than circulate money from the Debtors to BAWAG to RGHI for the sake of appearances at the end of an accounting period.

5.      BAWAG's knowledge of, and participation in, these transactions gave BAWAG knowledge that many of the Debtors' other counterparties lacked. BAWAG knew that Bennett was hiding the substantial RGHI receivable, that the Debtors' financial statements were inaccurate, and that there was something seriously amiss at the Debtors.

6.      Until August 2004, BAWAG was also a large equity holder in Plaintiff RGL. In addition to the 10% equity stake that BAWAG disclosed publicly, BAWAG entered into a complex maze of transactions with certain of its own offshore affiliates, which transactions were designed to allow BAWAG to participate in any sale of Plaintiff RGL, while at the same time publicly disclaiming that it owned any more than a 10% stake. In fact, BAWAG's maze of transactions gave it a far greater stake in Plaintiff RGL, along with a much larger degree of control over its affairs, than has been publicly disclosed to date.

7.      The scope of BAWAG's fraudulent activities with Bennett was not limited to transactions that affected the Debtors' financial statements. BAWAG has recently admitted that it hid over one billion euros of losses it incurred between 1996 and 2000. Reflecting their collective willingness to engage in criminal and fraudulent conduct to suit their own purposes, BAWAG perpetrated this deception with the active assistance of Phillip Bennett.

8.      Fully aware of its own facilitation of the Bennett Receivables Scheme, in August 2004, BAWAG assisted Bennett in consummating a leveraged recapitalization of Plaintiff RGL through which both Bennett and BAWAG cashed out, while at the same time, increasing Plaintiff RGL's debt obligations to $1.4 billion. In connection with the leveraged

14

recapitalization transactions, on or about August 5, 2004, Plaintiff RGL made transfers to RGHI

totaling $1.325 billion (which transfers are referred to herein as the "Fraudulent Transfers").

        9.    In addition, Plaintiff RGL distributed an asset management business with

substantial economic value to RGHI.  And RGHI also sold a significant interest in Plaintiff RGL

to new investors, thereby pocketing an addition $511 million for itself as a result of the

transaction.

        10.    After receiving the Fraudulent Transfers from Plaintiff RGL, RGHI

subsequently transferred $1.325 billion (the "Subsequent Transfers") to Defendant BAWAG.

Prior to the Fraudulent Transfers and Subsequent Transfers, Plaintiff RGL's financial condition

can be illustrated as follows:

### RGL Immediately Prior to Fraudulent Transfers



        11.    Notwithstanding its highly leveraged condition, with the active assistance

of BAWAG, Plaintiff RGL distributed $1.325 billion of the loan proceeds to its shareholders for

15

which RGL received nothing of value. Immediately following the leveraged recapitalization,

Plaintiff RGL's liquid assets were substantially depleted, yet it was left obligated on $1.4 billion

of bank and bond debt, as depicted below:

**The Fraudulent Transfers**

**STEP ONE**



**The Subsequent Transfers**

**STEP TWO**

17

12.    This action is brought to declare the Fraudulent Transfers avoidable under section 544(b), incorporating section 270 et seq. of the New York Debtor and Creditor Law ("N.Y. DCL"), and to recover the Subsequent Transfers from BAWAG pursuant to section 550 of the Bankruptcy Code. Within the meaning of the N.Y. DCL, the Fraudulent Transfers, alternatively, (a) were made by RGL while insolvent, (b) rendered RGL insolvent, or (c) left RGL with unreasonably small capital.

13.    Defendant BAWAG was an immediate or mediate transferee, within the meaning of section 550(a)(2) of the Bankruptcy Code, of the Subsequent Transfers (i.e., $1.325 billion of the $1.342 billion that was received by Defendant BAWAG). Given BAWAG's active participation of, and knowledge concerning, the Bennett Receivables Scheme (along with BAWAG's other misconduct involving its ownership of, and dealings with, the Debtors), BAWAG was not a good faith transferee within the meaning of section 550(b)(2) of the Bankruptcy Code. Plaintiff alternatively seeks to recover the $1.325 billion on an unjust enrichment theory.

14.    In addition, Plaintiff RGL seeks to recover the damages that it incurred as a result of BAWAG's aiding and abetting of Bennett's breach of his fiduciary duties to Plaintiff RGL in connection with the consummation of the leveraged recapitalization. Bennett and BAWAG structured and effected those transactions as a means of stripping billions of dollars in value out of Plaintiff RGL. In doing so, Bennett left Plaintiff RGL with $1.4 billion in debt, as to which it was immediately in default on at least $800 million, if not all of the $1.4 billion (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) because of, among other things, the Bennett Receivables Scheme being perpetuated by Bennett, BAWAG, and others. Thus, BAWAG was fully aware of the harm that Bennett was inflicting on Plaintiff

18

RGL and actively assisted Bennett in consummating the transactions as a means of accomplishing BAWAG's own payday.

15.    To date, BAWAG, through a campaign of stonewalling and foot dragging, has largely resisted, over the course of more than three months, providing documents in response to the Bankruptcy Rule 2004 subpoena issued by the Committee, which sought, among other things, documents relating to BAWAG's relationship with the Debtors and RGHI. Those documents will help to reveal the full extent of BAWAG's participation in Bennett's financial shenanigans, and disclose the full extent of the BAWAG-Bennett relationship. As of the end of March 2006, however, BAWAG had failed to produce a single document to the Committee. As a result, BAWAG's relationship with each of Bennett, RGHI and the Debtors remains shrouded in some mystery that has been purposefully created by BAWAG to conceal the full details of BAWAG's relationship with Bennett, RGHI and the Debtors.

16.    Although discovery may identify additional claims against Defendant BAWAG, as well as other potential defendants, Plaintiff RGL files this Complaint, and seeks temporary and preliminary relief, to ensure the recovery of the Subsequent Transfers received by Defendant BAWAG that are recoverable by Plaintiff RGL under the Bankruptcy Code (which makes the NY DCL applicable to the Fraudulent Transfers) and the common law.

## JURISDICTION, VENUE AND STANDING

17.    On October 17, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"). With the exception of Debtor Refco Capital Markets, Ltd. ("RCM"), for which a Trustee has been appointed, the Debtors, including Plaintiff RGL, continue to manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19

18.    The Committee is a committee duly appointed and organized under section 1102 of the Bankruptcy Code. On October 28, 2005, the United States Trustee appointed the Committee, as reconstituted on March 29, 2006. The Committee was conferred standing to prosecute this action in the name of Plaintiff RGL, for the benefits of RGL's bankruptcy estate.

19.    On November 16, 2005, BAWAG filed an adversary complaint against Bennett, certain of the Debtors, certain John Does, and certain unnamed corporations, alleging that it was fraudulently induced to loan approximately $420 million to one or more of the defendants on October 10, 2005 (the "Adversary Proceeding"). In the Adversary Proceeding, BAWAG is seeking the return of the $420 million or the establishment of a constructive trust over those funds.

20.    This counterclaim is brought pursuant to rule 7001 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules") seeking, among other things, to recover pursuant to section 550 of the Bankruptcy Code, the Subsequent Ttransfers totaling more than $1.325 billion, as set forth below.

21.    This counterclaim is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), and (H).

22.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

23.    Venue over this adversary proceeding resides in this Court pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

24.    Plaintiff RGL. RGL is a corporation organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street,

20

Tower A, New York, NY 10281. RGL is a debtor in the jointly administered chapter 11 cases captioned above.

25.    Defendant BAWAG. BAWAG is a banking and financial services corporation organized and existing under the laws of Austria with its principal place of business at Seitzergass 2-4, A-1010 Vienna, Austria. BAWAG is Austria's fourth largest bank. BAWAG is not authorized to do business in the State of New York. BAWAG has submitted to the jurisdiction of this Court by commencing the Adversary Proceeding against the Debtors.

## THE FACTS GIVING RISE TO THE CLAIMS

### A.    Refco and the Debtors

26.    Plaintiff RGL through its direct and indirect subsidiaries was a provider of execution and clearing services for exchange-traded derivatives and were major providers of prime brokerage services in the fixed income and foreign exchange markets. Many of the Debtors were holding companies for either regulated domestic entities, such as futures commission merchants, or other foreign futures brokerages. Other Debtors, including RCM, a non-regulated entity with operations in New York City, provided clients with access to the foreign exchange markets and other securities markets.

27.    On August 16, 2005, Refco Inc. ("Refco") completed an initial public offering ("IPO").

### B.    The Bennett Receivables Scheme

28.    On October 10, 2005, Refco announced that it had discovered, through an internal review, a previously undisclosed receivable owed to the Debtors by RGHI, an entity controlled by Phillip Bennett, Refco's Chairman and Chief Executive Officer ("CEO"), in the amount of approximately $430 million. The receivable had not been shown as a related-party

21

transaction in Refco's prior financial statements or in the Registration Statement and Prospectus filed in connection with the IPO.

29.    The Debtors subsequently disclosed that the receivable had not been shown as a related-party transaction because Bennett, with the assistance of other persons inside and outside of the Debtors, engaged in a series of transactions designed to disguise the related-party nature of the receivable by temporarily paying off the debt and transferring it from RGHI, the entity controlled by Bennett, to another entity seemingly unrelated to the Debtors. To date, public reports and the criminal indictment filed against Bennett have identified Liberty Corner Capital Strategies, LLC as one of the entities that entered into the transactions with the Debtors and RGHI that facilitated Bennett's deception regarding the receivable. As demonstrated below, BAWAG also entered into transactions with the Debtors and RGHI that actively assisted Bennett in his ability to hide the existence of RGHI's substantial debt to the Debtors.

30.    Bennett took an indefinite leave of absence when the news of the foregoing scheme broke on October 10, 2005. Bennett was arrested on October 11, 2005, after the United States Attorney for the Southern District of New York filed a criminal complaint against him for securities fraud. Bennett was indicted in November 2005. Bennett is currently awaiting trial, after being released on $50 million bail.

31.    On October 17, 2005, the Debtors filed for bankruptcy under chapter 11 of the Bankruptcy Code.

32.    The Debtors have stated publicly that the scheme could have commenced as early as 1998 – at or around the same time Defendant BAWAG acquired a 10 percent interest in Plaintiff RGL – because, at least initially, the obligations related to bad receivables from clients of the Debtors adversely affected by the Asian financial crisis of the late 1990's.

22

33.    Apparently out of concern about the effect of the uncollectible obligations on the Debtors' financial condition (and the value of Bennett's equity interest in Plaintiff RGL), at least as early as February 2000, Bennett caused the uncollectible obligations to be transferred to RGHI. To avoid revealing the debt from RGHI to one or more of the Debtors, toward the end of every relevant reporting period, RCM, or another one of the Debtors, would extend loans of between $175 million and $720 million to entities appearing to have no relation to Bennett or RGHI. Those entities would, in turn, lend funds to RGHI to enable it to pay down the debt it owed to one or more of the Debtors. For many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the "third party" lenders on RGHI's behalf.

34.    A few days following the close of the reporting period, the parties would then unwind the entire transaction. In the case of Liberty Corner, it would receive interest on its loan to RGHI at a rate that was typically 75 basis points higher than the interest rate on the loan from the Debtors to Liberty Corner, thus ensuring a "no-risk" profit for Liberty Corner.

35.    The effect of these transactions (which together comprised the Bennett Receivables Scheme) was to substitute at the end of each accounting period, for bookkeeping purposes only, an obligation owed by RGHI to one or more of the Debtors into an obligation owed by an entity purportedly unrelated to Bennett or RGHI. For the remainder of the accounting period, however, RGHI held the obligation to one or more of the Debtors.

36.    Although not previously the subject of public disclosure, financial records and emails establish that BAWAG was also an active participant in the Bennett Receivables Scheme. The BAWAG transactions are cumulative with the Liberty Corner transactions, thereby making the magnitude of the Bennett Receivables Scheme much greater than has been previously reported.

23

37.    Beginning in February 2000, and at each of the Debtors' fiscal year-ends thereafter, up to and including February 2005, Defendant BAWAG engaged in a series of round-trip loan transactions with RGHI and certain of the Debtors.

38.    For example, at the end of the Debtors' 2004 fiscal year (February and March 2004), less than six months before BAWAG received the Subsequent Transfers, one or more of the Debtors, RGHI and BAWAG completed a series of transactions that had no economic effect other than to allow RGHI to hide the existence of its then-existing multi-hundred million receivable owed to the Debtors.

39.    On or about February 25, 2004, one or more of the Debtors transferred $210 million to BAWAG. On the same day, from its account at Wachovia International NY, BAWAG transferred two amounts to RGHI, one transfer of $210 million, and one of $40 million. RGHI used the $250 million to reduce its outstanding obligation to one or more of the Debtors for a period of approximately one week at the end of the Debtors' fiscal year, which was February 28, 2004.

40.    In effecting these transactions, BAWAG, RGHI and Bennett understood and secretly agreed in advance that the transfers would be reversed on March 4, 2004. The parties also agreed that both of the $210 million transfers – from the Debtors to BAWAG, and from BAWAG to RGHI – would bear an identical rate of interest, thereby ensuring that that portion of the transaction had no economic consequences. For the $40 million transfer, RGHI agreed to pay BAWAG interest at a per annum rate of 1.58%.

41.    On March 4, 2004, the transfers were reversed as had previously been agreed among the parties to the transfers. BAWAG repaid its "loan" to the Debtors at the same time that RGHI repaid its "loans" to BAWAG.

24

42.     Thus, the BAWAG loans had the same effect as the Liberty Corner loans. That is, BAWAG's loans enabled RGHI to substitute at the end of each fiscal year-end, for bookkeeping purposes only, an obligation owed by RGHI to one or more of the Debtors into an obligation owed by BAWAG to the Debtors. A few days after the fiscal year-end, the transactions would be unwound and, for the remainder of the year, RGHI held the obligation to one or more of the Debtors. Through this mechanism, Bennett (with the active assistance of BAWAG) was able to alchemize a receivable from RGHI into a bank deposit with BAWAG.

43.     The BAWAG transactions that took place in February-March 2004 are substantially similar to round-trip transactions effected between RGHI, the Debtors and BAWAG at each fiscal year end for the years 2000, 2001, 2002, 2003, 2004 and 2005. The amounts of the loans at each of those year ends is reflected in the chart set forth below:

| Loan Date | Repayment Date | Debtors' loan to BAWAG ($m) | BAWAG loan(s) to RGHI ($m) |
|-----------|----------------|------------------------------|-----------------------------|
| 02/24/00  | 03/02/00       | $225                         | $225 + $75                  |
| 02/26/01  | 03/05/01       | $225                         | $225 + $75                  |
| 02/25/02  | 03/04/02       | $210                         | $210 + $90                  |
| 02/25/03  | 03/04/03       | $175                         | $175 + $75                  |
| 02/25/04  | 03/04/04       | $210                         | $210 + $40                  |
| 02/23/05  | 03/08/05       | $175                         | $175 + $75                  |

44.     Moreover, the BAWAG transactions were made in addition to the Liberty Corner transactions. Thus, based on available information to date, a more complete picture of the magnitude of the Bennett Receivables Scheme over the Debtors' fiscal year-end is as follows:

| Loan Date | Repayment Date | BAWAG loan(s) to RGHI ($m) | Liberty Corner / Customer Loans ($m) | Total Loans to RGHI |
|-----------|----------------|----------------------------|--------------------------------------|---------------------|
| 02/24/00 | 03/02/00 | $225 + $75 |  | $300 |
| 02/26/01 | 03/05/01 | $225 + $75 | $200 | $500 |
| 02/25/02 | 03/04/02 | $210 + $90 | $325 | $525 |
| 02/25/03 | 03/04/03 | $175 + $75 | $500 | $750 |
| 02/25/04 | 03/04/04 | $210 + $40 | $720 | $970 |
| 02/23/05 | 03/08/05 | $175 + $75 | $345 | $595 |

45.    As co-owner of Plaintiff RGL with RGHI, there can be no dispute that BAWAG had a thorough understanding of the relationship between Plaintiff RGL and RGHI.

46.    To date, the Debtors have been unable to locate any formal loan documents pertaining to BAWAG's multi-hundred million dollar loans. Emails sent between the parties make clear, however, that BAWAG had full knowledge of the scheme in which it was engaging. For example, a February 24, 2004 email between a Refco executive on the one hand and multiple BAWAG representatives on the other hand, describes the proposed transactions as having the following steps:

"1. we take from Refco Capital Bermuda USD 210,000,000, from 25.2. to 4.03.04 . . . .

2. we place on deposit with Refco Group Holding USD 40,000,000 from 25.2. to 4.3.04 . . . .

3. we place on deposit with Refco Group Holding USD 210,000,000 from 25.2. to 4.3.04 . . . .

. . . .

For Repayment value 04.03.2004 . . . ."

26

47.    Likewise, on February 14, 2005, Phillip Bennett wrote a letter to Selcuk Sari of BAWAG in which Bennett confirmed a $250 million loan from BAWAG to RGHI, and a simultaneous loan of $175 million from BAWAG to RCM. The letter further provided that the loan "will be repaid for value Tuesday, March 8, 2005." And Bennett expressly stated in the letter that he understood "that the rate to be paid to Refco Capital Markets will be the same as the rate charged on the deposits placed with Refco Group Holdings, Inc. with a separate rate to be paid by Refco Group Holdings Inc. on the difference of $75 million."

48.    On the following day, Santo Maggio sent a second letter on behalf of RCM to Selcuk Sari of BAWAG referring to the $250 million loan to RGHI and making clear that in the event RGHI failed to repay the loan, "we herewith irrevocably instruct you to transfer an amount up to USD 175 million from our account . . . held with BAWAG to the account . . . of RGHI held with BAWAG in order to balance the said account of RGHI." In other words, the loan to RGHI was a sham and BAWAG had a letter making clear that it was taking no credit risk because it could look to the assets of RCM in the event that RGHI failed to repay the loan.

49.    At the time BAWAG was participating in the Bennett Receivables Scheme, BAWAG was relying on Bennett to help hide BAWAG's own losses. See infra at ¶¶ 105-107.

C.    **The Leveraged Recapitalization and Fraudulent Transfers**

50.    The Debtors' bankruptcy filing followed only fifteen months after a leveraged recapitalization that had allowed RGHI to obtain payments in excess of $1.9 billion, $1.342 billion of which was paid out by RGHI to BAWAG.

51.    In or about July 2004, the Debtors' businesses were owned by, and conducted through, subsidiaries of Plaintiff RGL. At that time, Plaintiff RGL was co-owned by BAWAG Overseas (an affiliate of BAWAG), holding approximately 10 percent of Plaintiff

27

RGL, and by RGHI, holding approximately 90 percent of Plaintiff RGL. RGHI in turn, was co-owned by Bennett, then CEO of Plaintiff RGL, and by Tone Grant, the preceding CEO of Plaintiff RGL.

        52.      In August 2004, through a series of transactions, described in additional detail below, Thomas H. Lee Partners, L.P., with certain affiliates and co-investors, acquired approximately 57 percent of the equity interests in Plaintiff RGL in a leveraged recapitalization (the "Leveraged Recapitalization"). Concurrent with the Leveraged Recapitalization, Bennett purchased Tone Grant's shares of RGHI and became the sole owner of RGHI. Accordingly, starting in August 2004, RGHI was wholly owned by Bennett.

        53.      On August 5, 2004, Refco Finance Holdings LLC ("Refco Finance") and its affiliates, with the approval of RGHI, borrowed a total of approximately $1.4 billion, $800 million pursuant to a senior secured credit facility, and $600 million pursuant to the issuance by Refco Finance and its wholly-owned subsidiary Refco Finance Inc. of unsecured subordinated notes. On the same day, and as part of the same series of transactions, Refco Finance merged with and into Plaintiff RGL with Plaintiff RGL as the surviving entity (the "Refco Finance Merger").

        54.      As described in more detail below, on August 5, 2004, as part of the same series of transactions, Plaintiff RGL and Refco Finance (which was subsequently merged into Plaintiff RGL) transferred more than $1.325 billion through the Fraudulent Transfers to RGHI. As described in more detail below, RGHI then transferred all of the Fraudulent Transfers through the Subsequent Transfers to Defendant BAWAG.

      (1)    The Fraudulent Transfers

        55.      On August 5, 2004, Plaintiff RGL's predecessor in interest, Refco Finance, transferred $825,377,839.76 ███████████████

██████████ – to RGHI's account at JPMorgan Chase in New York (the "$825 Million Fraudulent Transfer").

56.     On August 5, 2004, Plaintiff RGL transferred $500 million from its account at BAWAG in Vienna, Austria, to RGHI's account at BAWAG in Vienna, Austria (the "$500 Million Fraudulent Transfer"). Plaintiff RGL also transferred to RGHI the equity interests in certain asset management companies (which had substantial additional monetary value), as defined by the agreement between the parties, which entities included Forstmann-Leff International Associates, LLC.

(2)     The Subsequent Transfers

57.     Also on August 5, 2004, the same day Plaintiff RGL made or caused to be made Fraudulent Transfers to RGHI in an amount not less than $1.325 billion, RGHI made significant transfers of its own to BAWAG in an amount of $1.342 billion. Those transfers consisted of the following:

(a)     The $191 Million Subsequent Transfer

58.     On August 5, 2004, RGHI transferred $191 million to BAWAG's account ██████████████ (the "$191 Million Subsequent Transfer"). BAWAG had dominion and control over the $191 million during the period that it held the funds in its account ████████████. The payment purported to represent consideration for the merger of BAWAG Overseas with and into a subsidiary of RGHI, and the purported elimination of BAWAG's direct or indirect ownership interest in RGL or its affiliates. Upon information and belief, BAWAG further transferred the $191 Million Subsequent Transfer to an account at BAWAG held in the name of Alinea Holding GmBH ("Alinea"), an affiliate of BAWAG (the "BAWAG-Alinea Transfer").

29

59.      Thereafter, upon information and belief, a substantial portion of the

$191 Million Subsequent Transfer was transferred by Alinea to BAWAG as consideration for

BAWAG's right to repayment of loans owed to it by BAWAG Overseas.

60.      On information and belief, Alinea is a wholly-owned subsidiary of

BAWAG. BAWAG's 2004 annual report described the transaction as follows: "In the course of

a change in the majority ownership of the Refco Group . . . *BAWAG* sold its 10% share. The

agreements to this effect were signed in June. The successful cooperation with the Refco Group

will be continued in the future without an equity stake, so that the BAWAG P.S.K. Group will

continue to benefit from this access route to international customers in the future." (emphasis

added.)

(b)      The $566 Million and $110 Million Subsequent Transfers

61.      In or about August 2004, RGHI also entered into a purchase agreement

("Purchase Agreement") with Desana Foundation ("Desana"), a Liechtenstein Stiftung (a/k/a a

Liechtenstein Foundation), and the sole stockholder of DF Capital, Inc. ("DF Capital"), a

corporation organized under the laws of Delaware. Desana, through DF Capital, owned equity-

like contingent rights in Plaintiff RGL which, upon information and belief, were acquired by DF

Capital with funds borrowed from BAWAG in exchange for a security interest in such equity-

like rights. Upon information and belief, Desana and BAWAG are affiliates and are under

common control. The Purchase Agreement provided that RGHI agreed to purchase from Desana

all of its ownership interests in DF Capital for a purchase price of $676 million.

62.      Pursuant to the Purchase Agreement, upon the closing of the DF Capital

transaction, all outstanding loans owed by DF Capital to BAWAG were to be repaid by Desana

upon receipt of the $676 million from RGHI.

30

63.    On August 5, 2004, RGHI wired $566 million to BAWAG, specifically BAWAG's account at ███████████ (the "$566 Million Subsequent Transfer"). BAWAG had complete dominion and control over the $566 million during the period that BAWAG held such funds in its account at Wachovia International NY.

64.    Upon information and belief, BAWAG subsequently transferred the $566 Million Subsequent Transfer to an account at BAWAG held in the name of its affiliate, Desana (the "BAWAG-Desana Transfer"). Thereafter, upon information and belief, all or a substantial portion of such funds were transferred to BAWAG's control as consideration for BAWAG's right to repayment of loans owed to it by DF Capital, as contemplated by the Purchase Agreement.

65.    Also on August 5, 2004, upon information and belief, RGHI transferred $110 million of the $500 Million Fraudulent Transfer that had previously been disbursed that same day by Plaintiff RGL to RGHI, from an account at BAWAG held by RGHI to an account at BAWAG held by Desana (the "$110 Million Subsequent Transfer"). Thereafter, upon information and belief, all or a substantial portion of such funds were transferred to BAWAG as the balance of consideration for BAWAG's right to repayment of loans owed to it by DF Capital, as contemplated by the Purchase Agreement.

66.    At all relevant times, Desana, BAWAG, BAWAG Overseas, and Alinea were all represented by the law firm of McDermott Will & Emery in connection with the foregoing transactions, thereby reflecting the affiliation of Desana, BAWAG, BAWAG Overseas, and Alinea.

(c)    The $85 Million Subsequent Transfer

67.    On August 5, 2004, RGHI wired $85 million to BAWAG's account at ███████████ (the "$85 Million Subsequent Transfer"). BAWAG had dominion

31

and control over the $85 million during the period that BAWAG held such funds in its account at

████████████████. Upon information and belief, this wire transfer to BAWAG was

made by RGHI to repay a loan of $85 million that BAWAG had previously made to RGHI.

        (d)    <u>The $390 Million Subsequent Transfer</u>

        68.      On August 5, 2004, upon information and belief, RGHI transferred the

$390 million balance of the $500 Million Fraudulent Transfer (net of the $110 Million

Subsequent Transfer, described above), from RGHI's account at BAWAG to RGHI's overdraft

account at BAWAG (the "<u>$390 Million Subsequent Transfer</u>").  Upon information and belief,

the $390 Million Subsequent Transfer was made by RGHI to repay an overdraft facility it had

previously drawn down upon in the amount of $390 million.

        69.      In total, on August 5, 2004, RGHI made transfers totaling $1.342 billion

to Defendant BAWAG.  These transfers were either retained by BAWAG or subsequently

transferred by BAWAG to one of its affiliates.

        70.      At no point in connection with Refco's subsequent Initial Public

Offering did Refco disclose that BAWAG had held any direct or indirect equity interest in Refco

beyond the 10% ownership interest that it held through BAWAG Overseas.  The IPO Prospectus

disclosed the existence of a $861.7 million payment to a former shareholder in connection with

the August 2004 Leveraged Recapitalization.  Nowhere did BAWAG or Refco ever disclose,

however, that such former shareholder had any connection to BAWAG, let alone that such

shareholder was BAWAG or a BAWAG affiliate that acquired its equity interest in RGL with

funds borrowed from BAWAG and in which BAWAG held a security interest.

**D.**      <u>**Precarious Financial Condition of Plaintiff RGL**</u>

        71.      At the time RGL made the $1.325 billion in Fraudulent Transfers to

RGHI, the Bennett Receivables Scheme, the history of uncollectible receivables at one or more

of the Debtors, and the materially misleading nature of the Debtors' financial statements, were being concealed by Bennett and RGHI.

72.    At the time that it received the Subsequent Transfers from RGHI, Defendant BAWAG had been an active participant in that scheme, and Defendant BAWAG's participation in the scheme continued at least through February 2005 after BAWAG had already received the $1.325 billion in Subsequent Transfers.

73.    As a business that depended heavily on winning and keeping the confidence of its customers for its creditworthiness and integrity, the existence of the Bennett Receivables Scheme, and the consequences of disclosure of the Bennett Receivables Scheme to the Debtors' investors, creditors and customers, were catastrophic to Plaintiff RGL's business.

74.    Had the truth been known about the Bennett Receivables Scheme on August 5, 2004 or at any time thereafter, Plaintiff RGL would rapidly have imploded and been forced to file for bankruptcy, as proved to be the case when the Bennett Receivables Scheme was disclosed in October 2005.

75.    Plaintiff RGL's balance sheet reflected that, after the Leveraged Recapitalization, RGL had approximately $81.5 million in shareholders equity. That amount, in turn, depended on the balance sheet's inclusion of more than $1 billion in goodwill and various intangible assets such as customer relationships. In other words, Plaintiff RGL had in excess of $1 billion in **negative** tangible net worth.

76.    Plaintiff RGL's assets were significantly overstated as a result of Bennett's failure to disclose the Bennett Receivables Scheme.

77.    First, through Bennett's financial alchemy, the balance sheet did not take into account the speculative nature of recovery on the RGHI receivable, which through the

33

Bennett Receivables Scheme, was converted into a third-party receivable with no seeming collectability issues.

78.    Second, Plaintiff RGL's valuation of its intangible assets and goodwill was predicated on the false assumptions that: (a) the Debtors had experienced much lower levels of customer losses, and (b) the Debtors would continue, in the future, to enjoy an excellent reputation with their customers. Both those assumptions were false in that (a) Bennett had hidden the Debtors' historical customer losses through the Bennett Receivables Scheme, and (b) the inevitable disclosure of the Bennett Receivables Scheme would irreparably damage its customer relationships.

79.    As a result of Bennett's failure to disclose the Bennett Receivables Scheme, the Debtors were immediately in default (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) on at least $800 million, if not all, of the $1.4 billion in borrowings that were drawn on the eve of the Fraudulent Transfers.

80.    The crisis in confidence that would have ensued had the truth about the Bennett Receivables Scheme been known, combined with the highly leveraged nature of RGL's capital structure and the immediacy of default (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) on at least $800 million, if not all, of its $1.4 billion of debt, rendered Plaintiff RGL undercapitalized for its continuing business. Specifically, at the time of the $1.325 billion in Fraudulent Transfers were made by Plaintiff RGL to RGHI, Plaintiff RGL was engaged or about to engage in a business for which the property remaining in its hands was unreasonably small capital as to creditors and other persons who subsequently became creditors during the continuance of Plaintiff RGL's business.

81.    In the alternative, at or around the time that the $1.325 billion in Fraudulent Transfers were made by Plaintiff RGL to RGHI, and no later than upon their

34

completion, Plaintiff RGL was "insolvent" within the meaning of the New York Debtor and Creditor Law.

**E.    The Disclosure of the Bennett Receivables Scheme and Refco's Collapse**

82.    The Bennett Receivables Scheme allowed Bennett to hide the uncollectible debts and the related-party nature of RGHI's continuing indebtedness to one or more of the Debtors.  For this reason, the Debtors announced on October 10, 2005, that the financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003, February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco, RGL, and Refco Finance, Inc., should no longer be relied upon.

83.    On October 10, 2005, after the Bennett Receivables Scheme was discovered by certain members of Refco's board of directors who had previously, upon information and belief, been unaware of such scheme, RGHI appears to have repaid in full RGHI's indebtedness to one or more of the Debtors.  To finance the repayment Phillip Bennett turned to BAWAG, which in only three business days approved and funded a loan to RGHI of approximately $420 million.  Notwithstanding this repayment, as of October 10, 2005, the damage to the Debtors as a consequence of the alleged fraud had already been done.

84.    BAWAG has filed this adversary proceeding alleging that it was defrauded in to making the $420 million loan to RGHI by virtue of its claimed lack of knowledge regarding the problems at the Debtors.  BAWAG's claim is absolutely false.  The $420 million loan in October 2005 was approved by the same BAWAG executive, Selcuk Sari, who engaged in many of the year-end, round-trip loan transactions that were essential to the Bennett Receivables Scheme over a period of five years.

85.    Disclosure of the existence of the Bennett Receivables Scheme launched the Debtors into a rapid death spiral.  The market price of Refco stock plummeted from

35

approximately $28.56 per share, its closing price on October 7, 2005, to $13.85, its closing price

on October 11, 2005, resulting in a loss of more than $1.5 billion in market capitalization by the

time of Bennett's arrest on October 12, 2005.  Trading in Refco's stock was halted for most of

Tuesday, October 11, 2005.  When trading resumed on October 12, 2005, the stock continued to

fall, closing at $10.85 per share.  On October 13, 2005, trading was again suspended after the

stock dropped an additional 27% in pre-market activity.  Refco stock, which peaked at $30.12 on

Sept. 7, 2005 – and which is now suspended from trading – is currently quoted at approximately

$0.25 per share.  The disclosures also caused the prices of Plaintiff RGL and Refco Finance

Inc.'s publicly traded bonds to collapse.  The bonds declined more than 80% in less than a week,

trading as low as 16% of par on October 14, 2005, down from their close at 108.625% of par on

October 7, 2005.

    86.  The public disclosure of these events precipitated a crisis of confidence

among the Debtors' customers, counter-parties and others with whom the Debtors did business,

resulting in an avalanche of customer defections and massive disruptions in the Debtors'

business.  On October 13, 2005, the Debtors announced that the liquidity within their non-

regulated subsidiary, RCM, which represented a material portion of the business of the Debtors,

was no longer sufficient to accommodate customer withdrawals and imposed a 15-day

moratorium on the withdrawal of customer accounts from RCM.  Four days later, on October 17,

2005, the Debtors filed for bankruptcy, only one week after the public announcement of the

Bennett Receivables Scheme.

**F.**  **The Relationship Between BAWAG and Bennett**

    87.  At all relevant times, BAWAG and Bennett enjoyed a close business

relationship, which included a variety of secret, undisclosed arrangements.  As a result of these

arrangements, BAWAG had substantial control and influence over Plaintiff RGL's affairs prior

to, and at the time of, the August 5, 2004 transfers from Plaintiff RGL to RGHI to BAWAG.

(1)    BAWAG's Disclosed Equity Interest in RGL

88.    In or about 1998 or 1999, BAWAG, through its affiliates Alinea and

BAWAG Overseas, Inc. ("BAWAG Overseas"), became a stockholder of Plaintiff RGL,

acquiring an equity interest of approximately 10 percent. At the time, the remaining 90 percent

stake in RGL was purportedly held by RGHI, a company that was partly, and later wholly,

controlled by Bennett.

(2)    BAWAG's Undisclosed Interest in RGL

89.    BAWAG, RGHI, and Plaintiff RGL were also linked through a company

called DF Capital. DF Capital was originally organized under the laws of Delaware on July 10,

2002 under the name DF Overseas Inc. On July 11, 2002, by amendment to its Certificate of

Incorporation, signed by its Secretary, Phillip Bennett, DF Overseas Inc. changed its name to DF

Capital Inc.

90.    On July 12, 2002, Plaintiff RGL and DF Capital entered into a series of

agreements ██████████████████████████████████████████

████████████" (the "Rights Acquisition"). ████████████████████████

████████████████████████████████████████████████.

91.    Central to the Rights Acquisition was a Proceeds Participation Agreement

between Plaintiff RGL and DF Capital (the "Proceeds Agreement"). The Proceeds Agreement

was amended in part by a Letter Agreement dated the same day, entered into by the shareholders

of Plaintiff RGL, i.e., RGHI, Refco Group Holdings LLC, DF Capital, and BAWAG Overseas.

92.    In essence, the Proceeds Agreement provided that, ████████████████

████████████████████████████████████████████████

37





95.

96.

97.

98.

99.

100. 

101.    Subsequent to the signing of the Proceeds Agreement, in or about November 2003, BAWAG appears to have made a loan of approximately $254 million to DF Capital (the "<u>BAWAG - DF Capital Loan</u>").  BAWAG's loan was secured by a Security Agreement, also dated in or around November 2003, between DF Capital and BAWAG.  In connection with that Security Agreement, a UCC-1 Financing Statement was filed with the Secretary of State of Delaware stating that DF Capital had pledged as collateral to BAWAG, among other things, "all [DF Capital's] rights under the Proceeds Participation Agreement with [Plaintiff RGL]."



102. The BAWAG-DF Capital Loan was also for $254 million.

103. BAWAG lent $254 million to an entity (DF Capital). Because

40

DF Capital had no source for the repayment of the loan to BAWAG other than the Participation

Right, BAWAG was practically guaranteed to get the proceeds from the Participation Right.

(3)    BAWAG's Participation in the Bennett Receivables Scheme

104.    As discussed above in paragraphs 4-5, BAWAG was also an active

participant in the Bennett Receivables Scheme.

(4)    BAWAG's Hidden Losses

105.    On March 24, 2006, BAWAG held a press conference in which it

announced that between 1995 and 2000, BAWAG had suffered losses of approximately one

billion euros in connection with various interest rate and derivative transactions. These losses

were hidden through securities transactions that were run through accounts held by BAWAG-

related entities at Refco.

106.    According to an article by Matthew Goldstein of TheStreet.com:

> … Bawag officials said Friday that by the end of 2000, the bank
> had run up $1.2 billion in losses, much of them stemming from a
> series of bad investments made by a hedge fund run by the son of a
> former CEO.   Vienna-based Bawag shifted the losses to six
> obscure Anguilla-based companies and several brokerage accounts
> at Refco, until it could eventually write off all its bad debts by
> 2005

> … The latest revelation adds a new twist to last year's collapse of
> Refco, in which Bawag continues to be a pivotal player.
> Separately, *TheStreet.com* has learned that Bawag's one-time
> ownership interest in Refco may have been far greater than the
> 10% equity stake that's been previously reported.

> … Indeed, the behind-the-scenes shifting of debt by the bank is
> eerily similar to the scheme hatched by former Refco CEO Phillip
> Bennett, who allegedly hid hundreds of millions of dollars in
> customer trading losses in a series of hedge funds and a private
> company he controlled, Refco Group Holdings Inc.

> … That Bawag was hiding losses in Refco accounts could provide
> new point of inquiry for federal prosecutors, regulators and Refco
> creditors, all of whom are trying to determine just how widespread
> the fraud at Refco extended.

41

... Speaking at a press conference in Vienna, Bawag CEO Ewald Nowotny says the bank might sue Wolfgang Flottl, the former hedge fund manage allegedly responsible for the $1 billion in losses. Nowotny, according to *Bloomberg*, says, "Flottl influenced these investments and he is to be held accountable."

... Bawag always has said it owned 10% of Refco from 1999 to August 2004, when the brokerage was acquired by the private equity firm Thomas H. Lee Partners in a $1.4 billion leveraged buyout. Neither Bawag nor Refco has ever said how much Bawag received in the buyout, a transaction that set the stage for Refco's initial public offering last August.

107.    The Austrian Financial Market Authority ("FMA") is currently investigating BAWAG and its transactions with Refco and the Anguillan entities.

(5)    Other Ties

108.    BAWAG had other business ties with the Debtors as well. In or about 1998, Helmut Elsner, then CEO of BAWAG, established a joint venture between BAWAG and the Debtors. This venture provided the Debtor's futures- and options-clearing services to European exchanges.

109.    BAWAG's purchase in or about 1998 of its stake in the Debtors was coordinated in part by Christopher Sugrue, then a senior vice president at Plaintiff RGL. In or around 1998, Sugrue left RGL to start a hedge fund manager, PlusFunds Ltd.

110.    BAWAG maintained close ties with Sugrue and PlusFunds Ltd. (now PlusFunds Group Inc.) ("Plus Funds"). BAWAG was granted the Austrian distribution rights for a PlusFunds hedge fund index called SPhinX. BAWAG is also listed as a creditor of PlusFunds in the PlusFunds' recent bankruptcy filings and the Anguillan entities used by BAWAG to conceal its losses shared at least one director with certain of the SPhinX entities.

111.    Likewise, the Debtors maintained a close business relationship with Sugrue and PlusFunds. From at least 2002 to October 12, 2005, Refco served as the clearing

42

broker and futures commission merchant for investment vehicles and funds that PlusFunds advised. In addition, PlusFunds was retained by non-Debtor Recount Holdings, LLC in its capacity as general partner of the S&P Managed Futures Index Fund, LP, to be subadvisor to the S&P Managed Fund.

112.    There are also ties between the Debtors, BAWAG, and Bank Frick & Co. Atkiengesellschaft ("Bank Frick"), a Lichtenstein joint stock company. The Debtor Refco Global Finance Ltd. purchased in June 2003, and still holds, a 4% stake in Bank Frick. BAWAG also holds a 26% stake in Bank Frick. Moreover, there are overlapping connections between Bank Frick and DF Capital. ███████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████. In addition, Thomas Hackl, a former executive at BAWAG, and an executive at one of the Debtors through December 2004, is believed to be a director of Bank Frick.

**G.    Bennett's Breach of Fiduciary Duties Owed to Plaintiff RGL**

113.    At all relevant times, Bennett was a director and officer of Plaintiff RGL, and, as such, owed fiduciary duties to act at all times with the utmost good faith and fair dealing, and in the best interests of, Plaintiff RGL and its stockholders. Those duties included duties of loyalty, duties of care, and duties of candor.

114.    In effecting the Leveraged Recapitalization, Bennett acted to benefit himself, and not to benefit Plaintiff RGL. The Leveraged Recapitalization resulted in Plaintiff RGL increasing its debt obligations to $1.4 billion in exchange for cash. Bennett used the proceeds of the Leveraged Recapitalization to effectuate the Fraudulent Transfers to, and to benefit his company, RGHI, thereby obtaining assets with an aggregate value of more than $2 billion.

43

115.    Bennett breached his fiduciary duties to Plaintiff RGL in connection with the Leveraged Recapitalization transactions by effecting the Fraudulent Transfers that were contrary to Plaintiff RGL's best interests.

116.    The series of transactions, including the Leveraged Recapitalization and the Fraudulent Transfers, left Plaintiff RGL engaged in business with unreasonably small capital and/or rendered Plaintiff RGL insolvent.

117.    Plaintiff RGL received no benefit from the series of transactions, including the Leveraged Recapitalization and Fraudulent Transfers, because, in addition to increasing Plaintiff RGL's debt obligations to $1.4 billion in exchange for cash, Bennett caused Plaintiff RGL to immediately distribute the proceeds to Bennett's company, RGHI.  To make matters worse, Plaintiff RGL was immediately in default on at least $800 million, if not all, of the $1.4 billion in debt (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) because of the then undisclosed existence of the Bennett Receivables Scheme, which, *inter alia*, rendered Plaintiff RGL's financial statements materially misleading, thereby constituting an event of default under the agreement governing the bank debt.

118.    Bennett abandoned Plaintiff RGL's interests by going forward with the Leveraged Recapitalization and the Fraudulent Transfers notwithstanding his knowledge of the Bennett Receivables Scheme.  In causing Plaintiff RGL to distribute billions of dollars in assets to RGHI, Bennett failed to advise Plaintiff RGL's Board of Managers (which by the time of the distributions to RGHI included designees of Thomas H. Lee) of the Bennett Receivables Scheme, the material misstatements in Plaintiff RGL's financial statements and/or the fact that the distributions would result in Plaintiff RGL's insolvency.

44

**H.    BAWAG'S Aiding and Abetting of Bennett's Breach of Fiduciary Duties Owed to Plaintiff RGL**

119.    As an active participant in the Bennett Receivables Scheme, BAWAG was well aware that Bennett's consummation of the Leveraged Recapitalization was a breach of Bennett's fiduciary duties to Plaintiff RGL.

120.    BAWAG actively assisted Bennett in his consummation of the Leveraged Recapitalization transactions in a variety of ways, including the following:

(a)    providing Bennett's company, RGHI, with multi-hundred million loans that were outstanding just prior to the consummation of the Leveraged Recapitalization, which loans were paid off with the assets that RGHI/Bennett obtained from Plaintiff RGL through his dishonest conduct; and

(b)    entering into various agreements relating to the Leveraged Recapitalization that were necessary steps to the effectuation of the transaction.

## COUNTERCLAIMS

### COUNT I
**Recovery from Immediate or Mediate Transferee of Fraudulent Transfers
(11 U.S.C. §§ 544(b), 550(a)(2); N.Y. DCL 270 et seq.)**

121.    The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

122.    Pursuant to Bankruptcy Code section 544(b), Plaintiff RGL has the rights of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff RGL to assert claims and causes of action that such a creditor could assert under applicable state law.

45

123.    In or about August 5, 2004, Plaintiff RGL, made or caused to be made, the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer, to or for the benefit of RGHI.

124.    The $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer constituted transfers of interests in property of Plaintiff RGL.

125.    Plaintiff RGL did not receive fair consideration (as that term is defined in NY DCL § 271) in exchange for each of the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer.

126.    Each of the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer were made to or for the benefit of RGHI and/or BAWAG as an initial transferee or beneficiary.

127.    At the time that the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfers were made, Plaintiff RGL (i) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital, or, in the alternative, (ii) was insolvent, or became insolvent as a result of the transfers.

128.    The $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and N.Y. DCL section 270 et seq.

129.    Because the Fraudulent Transfers are avoidable under the Bankruptcy Code and applicable state law, then, pursuant to Bankruptcy Code section 550, Plaintiff RGL may recover from BAWAG, the Subsequent Transfers, as the immediate or mediate transferee, the property transferred, or the value of the property transferred for the benefit of Plaintiff RGL's estate.

46

130.    BAWAG did not take the transfers for value, in good faith, and without knowledge of the voidability of the transfers.

## COUNT II
### Unjust Enrichment

131.    The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

132.    When BAWAG received, either directly or indirectly, the monies described herein, BAWAG was enriched at Plaintiff RGL's expense by receiving something of value that belonged to Plaintiff RGL.

133.    The enrichment violates equity and good conscience.

134.    The enrichment did not result from a valid and enforceable contract between Plaintiff RGL and BAWAG Defendants.

## COUNT III
### Aiding and Abetting Bennett's Breach of Fiduciary Duty

135.    The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

136.    At all relevant times, Bennett owed a fiduciary duty to Plaintiff RGL.

137.    In causing Plaintiff RGL to increase its debt obligations to $1.4 billion in debt, and distribute billions of dollars in cash and assets to Bennett's company, RGHI, Bennett breached his fiduciary duties to Plaintiff RGL. Bennett knew that, in light of the Bennett Receivables Scheme, it was imprudent for Plaintiff RGL to increase its debt obligations to $1.4 billion and at the same time distribute billions of dollars in value to RGHI. Bennett failed to disclose the existence of the Bennett Receivables Scheme, knowing that to have done so would have imperiled his opportunity to effect the Leveraged Recapitalization, and would have thereby

47

left him unable to strip billions of dollars in value out of Plaintiff RGL for the benefit of himself and BAWAG.

138.   At the time of the Leveraged Recapitalization and the Fraudulent Transfers, Defendant BAWAG was aware of, and had actively participated in, the Bennett Receivables Scheme.  Defendant BAWAG was aware that Bennett was breaching his fiduciary duties to Plaintiff RGL in connection with the Leveraged Recapitalization and the resulting distribution of property from Plaintiff RGL to RGHI, much of which ultimately benefited BAWAG.

139.   Defendant BAWAG aided and abetted and gave substantial assistance to Bennett in connection with his effectuation and consummation of the Leveraged Recapitalization and the resulting distribution of property from Plaintiff RGL to RGHI.

140.   As a direct and proximate result of the substantial assistance given by Defendant BAWAG to Bennett in the conduct, acts and omissions set forth above, Plaintiff RGL has been injured and suffered damage in an amount to be proven at trial, but not less than $1.4 billion.

## COUNT IV
### Disallowance of Claims
### (11 U.S.C. § 502(d))

141.   The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

142.   By reason of the foregoing facts, and pursuant to Bankruptcy Code section 502(d), the claims of BAWAG must be disallowed unless and until Defendant BAWAG has turned over to Plaintiff RGL the property transferred, or paid Plaintiff RGL the value of such property, for which Defendant BAWAG is liable under section 550 of the Bankruptcy Code.

WHEREFORE, the Committee respectfully requests entry of judgment as follows:

(a)    Denying all relief requested by BAWAG;

(b)    Entering judgment in favor of Plaintiff RGL and against BAWAG in this action;

(c)    Dismissing the Complaint herein;

(d)    Equitably subordinating BAWAG's claim pursuant to Bankruptcy Code 510(c);

(e)    Declaring that the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfers avoidable pursuant to Bankruptcy Code section 544(b), and N.Y. Debtor and Creditor Law sections 270 *et seq.*;

(f)    Awarding Plaintiff RGL judgment against BAWAG in an amount not less than $1.325 billion, as recovery of the Subsequent Transfers;

(g)    Preserving Plaintiff RGL's transfers or the value thereof for Plaintiff RGL's estate;

(h)    Awarding Plaintiff RGL interest commencing on the date of the transfers;

(i)    Awarding Plaintiff RGL damages in an amount to be determined at trial, but not less than $1.4 billion on each of its Second and Third Causes of Action;

(j)    Awarding to Plaintiff the Committee's attorneys' fees, costs and other expenses incurred in this action; and

(f)    Granting the Committee such other and further relief as the Court considers appropriate.

49

Dated: New York, NY
     April 21, 2006

                    MILBANK, TWEED, HADLEY & McCLOY LLP

                    *Scott A. Edelman*

                    Luc A. Despins (LD 5141)
                    Scott A. Edelman (SE 5247)
                    Susheel Kirpalani (SK 8926)
                    1 Chase Manhattan Plaza
                    New York, NY 10005
                    (212) 530-5000

                    Counsel for Official Committee
                    of Unsecured Creditors
                    of Refco Inc., et al.