**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                         :
In re REFCO INC. SECURITIES LITIGATION    :      Case No. 07-md-1902 (JSR)
                         :
------------------------------------------------------------X

This Document Relates to:

------------------------------------------------------------X
KENNETH M. KRYS, *et al.*,           :    Case No. 08-cv-3065 (JSR)
                         :    Case No. 08-cv-3086 (JSR)
          Plaintiffs,    :
                         :
          -against-    :
                         :
CHRISTOPHER SUGRUE, *et al.*,     :
                         :
          Defendants.    :
------------------------------------------------------------X

## OBJECTION TO REPORT AND RECOMMENDATION OF
## SPECIAL MASTER ON PRICEWATERHOUSECOOPERS (CAYMAN ISLANDS)
## MOTION TO ENFORCE FORUM SELECTION CLAUSE

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 3

ARGUMENT ..................................................................................................................... 6

    I.     PLUSFUNDS IS NOT BOUND BY THE
         FORUM-SELECTION CAUSE ...................................................................... 6

         A.     PlusFunds Does Not Sue as a Party or Third-Party
               Beneficiary to the Engagement Letters .................................................. 7

         B.     The "Closely Related" Test Does Not Apply ....................................... 7

         C.     The "Closely Related" Test Is Not Met Here ..................................... 10

    II.    THE INVESTOR CLAIMS ARE NOT SUBJECT
         TO THE FORUM-SELECTION CLAUSE ...................................................... 13

    III.   TO ENFORCE THE FORUM-SELECTION CLAUSE
         WOULD BE UNREASONABLE AND UNJUST ......................................... 15

    IV.   TO ENFORCE THE FORUM-SELECTION CLAUSE
         WOULD CONTRAVENE STRONG PUBLIC
         POLICY OF THE UNITED STATES ........................................................... 25

CONCLUSION ............................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham Zion Corp. v. Lebow*,
761 F.2d 93 (2d Cir. 1985) ................................................................................. 8, 12

*Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*,
364 F.3d 884 (7th Cir. 2004) ..................................................................................... 10

*Aquas Lenders Recovery Group v. Suez, S.A.*,
__ F.3d __, No. 08-1589-CV, 2009 WL 3403172 (2d Cir. Oct. 23, 2009) ................................ 8, 9

*Ash v. N.Y. Univ. Dental Ctr.*,
164 A.D.2d 366, 564 N.Y.S.2d 308 (1st Dep't 1990) .................................................... 27

*Babcock v. Jackson*,
12 N.Y.2d 473, 240 N.Y.S.2d 743 (1963) ................................................................ 20

*Beilfuss v. Huffy Corp.*,
685 N.W.2d 373 (Wisc. Ct. App. 2004) .................................................................. 25

*Boll v. Sharpe & Dohme, Inc.*,
281 A.D. 568, 121 N.Y.S.2d 20 (1st Dep't 1953),
*aff'd*, 307 N.Y. 646 (1954) ............................................................................ 28, 29

*Bondi v. Grant Thornton Int'l*,
322 B.R. 44 (S.D.N.Y. 2005) ............................................................................ 21

*Bradley v. Earl B. Feiden, Inc.*,
8 N.Y.3d 265, 832 N.Y.S.2d 470 (2007) .................................................................. 31

*Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*,
195 B.R. 971 (Bankr. D. Mass. 1996) .................................................................... 16

*Burrows Paper Corp. v. Moore & Assocs.*,
07-CV-62 (DNH), 2007 WL 2089682 (N.D.N.Y. July 20, 2007) ............................................ 13

*Chem. Carriers, Inc. v. L. Smit & Co.'s Internationale Sleepdienst*,
154 F. Supp. 886 (S.D.N.Y. 1957) ................................................................... passim

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*,
709 F.2d 190 (3d Cir. 1983) ........................................................................... 8, 12

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*,
81 N.Y.2d 821, 595 N.Y.S.2d 381 (1993) ............................................................. 31

*Conklin v. Canadian-Colonial Airways*,
266 N.Y. 244 (1935) ............................................................................................... 28

*Copperweld Steel Co. v. Demag-Mannesmann-Bohler*,
578 F.2d 953 (3d Cir. 1978) .................................................................................. 18

*Creed v. United Hosp.*,
190 A.D.2d 489, 600 N.Y.S.2d 151 (2d Dep't 1993) ........................................... 28

*Cutter v. Scott & Fetzer Co.*,
510 F. Supp. 905 (E.D. Wis. 1981) ...................................................................... 20

*Deloitte & Touche v. Gencor Indus., Inc.*,
929 So. 2d 678 (Fla. Dist. Ct. App. 2006) ........................................................... 13

*DeVito v. N.Y. Univ. Coll. of Dentistry*,
145 Misc. 2d 144, 544 N.Y.S.2d 109 (Sup. Ct., N.Y. Cty. 1989) ................... 26, 27

*Donohue v. Armco, Inc. and Others*,
[2001] UKHL 64 ............................................................................................... 15, 16

*Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*,
650 S.W.2d 378 (Tenn. 1983) .............................................................................. 17

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
269 F.3d 187 (3d Cir. 2001) .................................................................................. 12

*Employers Ins. Co. of Wausau v. Equitas Holdings Ltd.*,
451 F. Supp. 2d 1012 (W.D. Wis. 2006) .............................................................. 10

*Erlich v. First Nat'l Bank of Princeton*,
505 A.2d 220 (N.J. Super. Ct. Law Div. 1984) ................................................... 30

*Evolution Online Sys., Inc. v. Koninklijke PTT
Nederland N.V.*, 145 F.3d 505 (2d Cir. 1998) ....................................................... 9

*Farrell Lines, Inc. v. Columbus Cello-Poly Corp.*,
32 F. Supp. 118 (S.D.N.Y. 1997), *aff'd*,
*Farrell Lines, Inc. v. Ceres Terminals, Inc.*, 161 F.3d 115 (2d Cir. 1998) .......... 14

*H. Rosenblum, Inc. v. Adler*,
461 A.2d 138 (N.J. 1983) ...................................................................................... 30

*Hugel v. Corp. of Lloyd's*,
999 F.2d 206 (7th Cir. 1993) ............................................................................... 7, 10

*Hy-Grade Oil Co. v. New Jersey Bank*,
350 A.2d 279 (N.J. Super. Ct. App. Div. 1975)..................................................... 30

*In re Global Crossing, Ltd. Sec. Litig.*,
311 B.R. 345 (S.D.N.Y. 2003)............................................................................... 22

*In re HA-LO Indus., Inc.*,
No. 02 B 12059, 03 C 2441, 2003 WL 21982145 (N.D. Ill. Aug. 19, 2003) .............. 16

*In re Refco, Inc. Sec. Litig.*,
628 F. Supp. 2d 432 (S.D.N.Y. 2008)................................................................... 22

*In re Worldcom, Inc. Sec. Litig.*,
293 B.R. 308 (S.D.N.Y. 2003)........................................................................ 19, 22

*InterGen N.V. v. Grina*,
344 F.3d 134 (1st Cir. 2003).................................................................................. 12

*John Hancock Life Ins. Co. v. Wilson*,
254 F.3d 48 (2d Cir. 2001)...................................................................................... 9

*Johnston v. Fargo*,
184 N.Y. 379 (1906) ............................................................................................. 27

*Kelly v. Bear, Stearns & Co.*,
No. CONTROL 080832, 2001 WL 1807360 (Pa. Ct. Com. Pl. Dec. 18, 2001),
*aff'd*, 813 A.2d 914 (Pa. Super. Ct. 2002) ............................................................ 13

*Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*,
41 F.3d 861 (2d Cir. 1994)...................................................................................... 9

*Krys v. Sugrue*,
Nos. 08 Civ. 3065 (GEL), 08 Civ. 3086 (GEL), 08 Civ. 7416 (GEL),
2008 WL 4700920 (S.D.N.Y. Oct. 23, 2008) ............................................... 5, 21, 22

*Levine v. Shell Oil Co.*,
28 N.Y.2d 205, 321 N.Y.S2d 81 (1971) ................................................................ 31

*Lucier v. Williams*,
841 A.2d 907 (N.J. Super. Ct. App. Div. 2004)................................................... 30

*M/S Bremen v. Zapata Off-shore Co.*,
407 U.S. 1 (1972)............................................................................................ 16, 25

*Mahavir Minerals Ltd. v. Cho Yang Shipping Co. (The MC Pearl)*,
[1997] 1 Lloyd's Rep 566................................................................................................ 16

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
858 F.2d 509 (9th Cir. 1988) ................................................................................... 7, 11

*Maritime Ins. Co. v. M/V "Sea Harmony"*,
No. 97 Civ. 3818 (SHS), 1998 WL 214777 (S.D.N.Y. May 1, 1998)...................... 8, 12

*McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
226 A.2d 713 (N.J. 1967)............................................................................................ 29

*McNeill v. Zoref*,
687 A.2d 1052 (N.J. Super. Ct. App. Div. 1997)........................................................ 17

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*,
No. 02 Civ. 0767 (LBS), 2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003).................... 13

*Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*,
*S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001) ................................................................. 12

*Phillips v. Audio Active Ltd.*,
494 F.3d 378 (2d Cir. 2007)................................................................................. 23, 24

*Prows v. Pinpoint Retail Sys., Inc.*,
868 P.2d 809 (Utah 1993) ................................................................................... 16, 23

*Quick Erectors, Inc. v. Seattle Bronze Corp.*,
524 F. Supp. 351 (E.D. Mo. 1981)............................................................................. 25

*Seneca Ins. Co. v. Henrietta Oil Co.*,
No. 02 Civ. 3535 (DC), 2003 WL 255317 (S.D.N.Y. Feb. 4, 2003)........................... 20

*Shea Dev. Corp. v. Watson*,
No. 07 Civ. 11201 (DLC), 2008 WL 762087 (S.D.N.Y. Mar. 24, 2008)............... 8, 12

*Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*,
85 F.3d 21 (2d Cir. 1996) ............................................................................................ 9

*Vanguard Fin. Servs. Corp. v. Johnson*,
736 F. Supp. 832 (N.D. Ill. 1990) .............................................................................. 16

*Viking Yacht Co. v. Composites One LLC*,
496 F. Supp. 2d 462 (D.N.J. 2007) ............................................................................ 12

*Weingard v. Telepathy, Inc.*,
No. 05 Civ. 2024 (MBM), 2005 WL 2990645 (S.D.N.Y. Nov. 7, 2005)...................................... 12

*Wilder v. Absorption Corp.*,
107 S.W.3d 181 (Ky. 2003) ........................................................................................................ 20

**Rules**

Fed. R. Civ. P. 53(f)(5) ................................................................................................................ 6

**Other Authorities**

SEC Codification of Financial Reporting Policies § 602.02.f.i,
Fed. Sec. L. Rep. (CCH) ¶ 73,274 (Nov. 17, 2008)..................................................................... 30

Office of the Chief Accountant: Application of the Commission's Rules on Auditor
Independence: Frequently Asked Questions (Dec. 13, 2004),
http://sec.gov/info/accountants/ocafaqaudind121304.htm ........................................................... 30

Interagency Advisory on the Unsafe and Unsound Use of Limitation of Liability
Provisions and Certain Alternative Dispute Resolution Provisions in External Audit
Engagement Letters, 70 Fed. Reg. 24,576, at 24,577 (May 10, 2005) ........................................ 31

Plaintiffs, the Joint Official Liquidators ("JOLs") of the SPhinX Funds,[1] hereby submit, pursuant to Federal Rule of Civil Procedure 53, their objections to the Report and Recommendation ("Report") of Special Master Ronald J. Hedges on Defendant PricewaterhouseCoopers (Cayman Islands)' Motion to Enforce Forum Selection Clauses.[2]

## BACKGROUND

Plaintiffs' claims against PricewaterhouseCoopers (Cayman Islands) ("PwC Cayman") arise from PwC Cayman's performance – or, more accurately, non-performance – of audit services for SPhinX. SPhinX engaged PwC Cayman because, as an entity organized under Cayman Islands law, it was required by law to have a Cayman Islands-based auditor sign its annual audit certification. *See* Cayman Local Auditor Sign-off Requirement, Dash Decl. Ex. A. However, virtually all of SPhinX's personnel and documentation were located in the United States. *See* Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2. Moreover, SPhinX's investment products were marketed through a United States company subject to United States financial regulations, including regulations promulgated by the Securities Exchange Commission ("SEC") and the United States Commodity and Futures Trading Commission

---

[1] Capitalized terms used herein shall have the same meaning ascribed to them in Plaintiffs' First Amended Complaint ("Am. Compl.").

[2] PricewaterhouseCoopers (Cayman)'s motion was filed with this Court on September 15, 2008 in *Krys et al. v. Sugrue et al.*, No. 08-cv-03086. The motion is Docket No. 120, the memorandum of law in support of the motion is Docket No. 121, the declaration of Savvas A. Foukas in support of the motion (hereinafter "Savvas Decl.") is Docket No. 122, and the declaration of Anthony Travers in support of the motion (hereinafter "Travers Decl.") is Docket No. 123. Plaintiffs filed their opposition on December 5, 2008. Their memorandum of law in opposition is Docket No. 229, the declaration of Andrew Dash in support of Plaintiffs' opposition (hereinafter "Dash Decl.") is Docket No. 230, the declaration of Timothy Ridley in support of Plaintiffs' opposition (hereinafter "Ridley Decl.") is Docket No. 231, and an appendix of foreign authorities cited in the Ridley Declaration is Docket Nos. 232-33 (collectively, "Plaintiffs' Opposition"). PwC Cayman filed its reply memorandum of law, Docket No. 247, on December 31, 2008. Plaintiffs' Opposition is incorporated herein by reference, as are arguments made by Plaintiffs during oral argument before Special Master Hedges on Nov. 6, 2009 (a copy the transcript of which is annexed hereto as Exhibit A) and Plaintiffs' Proposed Findings of Fact and Conclusions of Law Regarding PricewaterhouseCoopers (Cayman Islands) Motion to Enforce Forum Selection Clause and Exhibits A-C thereto (copies of which are collectively annexed hereto as Exhibit B).

("CFTC").  *See* Am. Compl. ¶¶ 36, 123, 642-45, 691.[3]  SPhinX's financial statements were required to be presented according to accounting principles generally accepted in the United States ("US GAAP"), and the engagement letters required that PwC Cayman audit SPhinX's financial statements according to auditing standards generally accepted in the United States ("US GAAS").  *See* Am. Compl. ¶¶ 611-12; Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2.  Consequently, the engagement letters provided that PwC Cayman would delegate its auditing responsibilities to its sister firm in the United States, PricewaterhouseCoopers LLP ("PwC US"):

> Because *the underlying accounting records* of the [SPhinX] Funds *are maintained outside of the Cayman Islands*, as part of the audits referred to above *we shall instruct other firms of PricewaterhouseCoopers in relevant jurisdictions to assist in the audits* of the financial statements of the [SPhinX] Funds and to perform any other procedures which we may deem necessary to allow us to issue our audit reports to the shareholders.

Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2 (emphasis added); *see also* Dash Decl. Ex. B, Transcript of Examination of Mari Ferris ("Ferris Exam.") at 18:18-22:10, Feb. 23, 2008.  Additionally, each PwC Cayman engagement letter concludes by inviting the client, SPhinX, to contact the PwC US engagement partner (either Mari Ferris or Michael Greaney) at a Manhattan telephone number with any questions about the engagement.  *See* Foukas Decl. Ex. B, at 8; *id.* Ex. C, at 8; *id.* Ex. D, at 8; *id.* Ex. E, at 8; Am. Compl. ¶¶ 45, 611-12.  The letters give no such contact information for – or even mention the name of – anyone at the Cayman Islands firm.  PwC Cayman authorized and intended that PwC US act as its agent for purposes of conducting the SPhinX audits.

---

[3] Special Master Hedges assumed the allegations of Plaintiffs' Amended Complaint to be true for purposes of the present motion.  *See* Report 1.

As contemplated by PwC Cayman's engagement letters, each of the annual audits of SPhinX was performed in the United States, primarily in New Jersey, by PwC US auditors, purportedly in accordance with US GAAS. *See* Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2; Am. Compl. ¶¶ 42-45, 611-12. Through its engagement letters, PwC Cayman assumed a non-delegable duty to ensure that PwC US performed appropriate audit procedures.

However, as alleged in Plaintiffs' Amended Complaint, the PwC US auditors acting on PwC Cayman's behalf recklessly and repeatedly violated US GAAS and applicable CFTC regulations by, among other things, performing the audit while under a conflict of interest due to its simultaneous engagements with various Refco entities, failing to inform SPhinX's board of directors of PwC US's actual knowledge of Refco management's fraud and improper commingling of funds, and failing to inform SPhinX's board of directors of PwC US's actual knowledge that hundreds of millions of dollars of SPhinX cash was being held in unsegregated and unregulated accounts at Refco Capital Markets, Ltd. ("RCM"). *See* Am. Compl. ¶¶ 567-721. As is evident from the allegations of Plaintiffs' Amended Complaint, the events that proximately caused Plaintiffs' injury occurred in the United States. Indeed, although discovery in this case is not yet complete, Plaintiffs have not found evidence that any substantive audit procedure was performed in the Cayman Islands. *Cf.* Am. Compl. ¶¶ 611-12. PwC US's engagement partner for the SPhinX audits, Mari Ferris, had so little contact with the Cayman Islands firm that, as she confessed in her Rule 2004 examination, she could not remember the name of a single person at PwC Cayman who might have interacted with her in connection with the audits. *See* Dash Decl. Ex. B, Ferris Exam. at 22:16-23:11.

On March 5, 2008, Plaintiffs initiated an action in New York state court against several defendants, including PwC US and PwC Cayman. That same day, Plaintiffs also initiated an action in New Jersey state court against certain other defendants. Various defendants removed these actions to federal court, where they were consolidated with the Refco MDL. The Refco MDL involves well over 100 related cases and at least that many parties. Judge Lynch found, in denying Plaintiffs' remand motion, that these cases "have a common factual core" relating to the Refco fraud. *See Krys v. Sugrue*, Nos. 08-cv-03065 (GEL) 08 Civ. 3086 (GEL), 08 Civ. 7416 (GEL), 2008 WL 4700920, at *10 (S.D.N.Y. Oct. 23, 2008). This commonality undergirded the Court's denial of mandatory or discretionary abstention in connection with both the Refco Trustee's and Plaintiffs' remand motions.

Despite Judge Lynch's decision to retain jurisdiction of this case, despite the fact that Plaintiffs' claims against PwC Cayman are intimately intertwined with many other claims in the Refco MDL – especially the claims against PwC US and Mari Ferris – and are based on events that occurred primarily (if not entirely) in the United States, and despite the fact that the parties are deep into the discovery process, PwC Cayman requests that this Court peel off the claims against it and decline to exercise jurisdiction, based solely on the forum-selection clauses in its engagement letters with SPhinX.

Special Master Hedges heard oral argument on November 6, 2009, during which he asked the parties to submit proposed findings of fact and conclusions of law. He issued his Report on November 20, 2009, recommending that PwC Cayman's motion should be granted and adopting wholesale PwC Cayman's proposed findings. For the reasons set forth herein and in Plaintiffs' other papers, the motion should be denied.

## ARGUMENT

In reviewing the Special Master's Report, this Court must decide *de novo* all objections to findings of fact or conclusions of law made or recommended by the Special Master. Fed. R. Civ. P. 53(f)(3)-(4).[4]

## I.    PLUSFUNDS IS NOT BOUND BY THE FORUM-SELECTION CLAUSE.

The Special Master found that PlusFunds is bound by the forum-selection clause. *See* Report 15-19. This finding is erroneous because (1) PlusFunds is not a party or third-party beneficiary to the PwC Cayman engagement letters, (2) the "closely related" test does not apply in the Second Circuit, and (3) even if the "closely related" test did apply, it is not met here.

### A.    PlusFunds Does Not Sue as a Party or Third-Party Beneficiary to the Engagement Letters.

Each PwC Cayman engagement letter was addressed to the boards of directors of certain of the SPhinX Funds. *See* Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2. All were signed by a director of these SPhinX Funds. *See id.* Ex. B, at 8; *id.* Ex. C, at 8; *id.* Ex. E, at 8. The only exception is the engagement letter of November 8, 2004, which is signed by an officer of PlusFunds. *See id.* Ex. D, at 8. However, PlusFunds simply "hire[d] service providers and professionals and execute[d] documents *for and on behalf of SPhinX*." Report ¶ 4 (emphasis added) (quoting Am. Compl. ¶ 133). That PlusFunds was injured by the torts of PwC Cayman, *see* Am. Compl. ¶¶ 721, 1149-52, 1165-67, does not bind PlusFunds to each and every term of the engagement letters between PwC Cayman and SPhinX. Contrary to the finding implicit in the Report at ¶¶ 48-49, PlusFunds is not suing PwC Cayman for the loss of expected contractual benefits but rather for losses suffered due to its reliance on PwC Cayman's false and fraudulent

---

[4] Any procedural rulings are reviewed under an abuse of discretion standard. Fed. R. Civ. P. 53(f)(5). Special Master Hedges' Report only recommended certain findings of fact and conclusions of law; it made no procedural rulings. Therefore, the recommendations of the Report must be decided *de novo* by this Court.

audit reports.  *See* Am. Compl. ¶¶ 715-21.  PlusFunds is not "seeking to obtain the benefits of a contract" and therefore should not be required to "accept its burdens."  *Cf.* Report ¶ 48.

##### B.      The "Closely Related" Test Does Not Apply.

The Report holds in the alternative that PlusFunds is bound by the forum-selection clause because PlusFunds is "'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."  Report ¶ 50 (quoting *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir. 1983)).)  Whatever the parameters of this amorphous standard, it is doubtful that it applies in the Second Circuit – and certainly not to the extent that PwC Cayman advocates.

The Report cites several District Court cases applying the "closely related" standard.  *See* Report ¶ 51.  However, courts in this Circuit have not consistently followed *Hugel*, *Manetti-Farrow*, or *Coastal Steel*.  For example, in *Maritime Ins. Co. v. M/V "Sea Harmony"*, No. 97 Civ. 3818 (SHS), 1998 WL 214777 (S.D.N.Y. May 1, 1998), the party resisting the forum-selection clause was a subcontractor to a party to the agreement containing the disputed clause. The Court declined to enforce the forum-selection clause against the subcontractor because it, like PlusFunds here, had only a contractual relationship to the signatory.  *See id.* at *2.  The court further held that, even if the subcontractor were a third-party beneficiary of the agreement, the forum-selection clause could not be enforced against the subcontractor.  *See id.* (citing *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103 (2d Cir. 1985)).

Judge Cote has observed that the "closely related" test is "not yet endorsed by the Second Circuit" and explicitly declined to adopt such a test.  *Shea Dev. Corp. v. Watson*, No. 07 Civ. 11201 (DLC), 2008 WL 762087, at *3 (S.D.N.Y. Mar. 24, 2008).  The Report at ¶ 53 suggests, nevertheless, that the Second Circuit in *Aquas Lenders Recovery Group v. Suez, S.A.*, __ F.3d __,

No. 08 Civ. 1589, 2009 WL 3403172 (2d Cir. Oct. 23, 2009), adopted such a test. Even a casual reading of that case reveals the error of that assertion.

*Aguas* does not apply or in any way rely on the "closely related" test, and nowhere does that case confront the issue of whether to adopt such a test. *See id.* The issue in that case was simply whether a successor-in-interest is bound by a forum-selection clause signed by its predecessor-in-interest, and the court held, unremarkably, that it was bound. *See id.* at *1. PwC Cayman seizes upon the *Aguas* court's citation to a case applying the "closely related" test, but the cited case is buried in a string cite and the court relies on it solely for the proposition "that the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." *Id.* at *4. Under any method of legal interpretation, the Court in *Aguas* did not adopt the "closely related" test, nor did it need to, as its decision rested on hornbook principles of successor liability.

Thus, contrary to the contention of the Report, *see* ¶¶ 52-53, it still would be surprising if the Second Circuit were to stray from the contract principles it has long applied and adopt the amorphous "closely related" test. *See, e.g.*, *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) ("look[ing] to general state law contract principles" to determine "whether the parties agreed to arbitrate"); *Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.*, 145 F.3d 505, 509 (2d Cir. 1998) (holding party bound by forum-selection clause only if it entered into contract containing such a clause); *cf. Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 27 (2d Cir. 1996) ("[W]e believe the insurance companies are entitled, as third party beneficiaries of an arbitration agreement, to insist on arbitration."); *Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 864 (2d Cir. 1994) ("Zinsmeyer is entitled to invoke § 12(a), as an intended third-party beneficiary, in its dispute with Kidder."). PwC Cayman has still

not explained why the Second Circuit would or should abandon these principles in the context of a forum-selection clause.

Finally, it should be emphasized that the "closely related" test is not ubiquitous as suggested in the Report, and several courts have rejected it or, as discussed below, applied the test narrowly. For discussion of and citations to additional authorities, Plaintiffs respectfully refer the Court to their opposition brief at 14-15.

### C.     The "Closely Related" Test Is Not Met Here.

Even if *Hugel* and other cases applying the "closely related" test were good law in the Second Circuit, they are distinguishable from the present case. In *Hugel*, the parties resisting the forum-selection clause were two corporations owned 99% and 100%, respectively, by an individual who had signed the relevant agreement with Lloyd's and had conducted his business with Lloyd's through those entities. *See Hugel,* 999 F.2d at 207. There is no such ownership overlap between PlusFunds and SPhinX. *See* Am. Compl. ¶¶ 36, 95-103; *cf. Employers Ins. Co. of Wausau v. Equitas Holdings Ltd.*, 451 F. Supp. 2d 1012, 1024 (W.D. Wis. 2006) ("Cases applying the 'closely related' test have almost exclusively involved suits brought by plaintiffs who are bound by a clearly common interest, such as the corporations and plaintiff-owner in *Hugel*, spouses in *Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285, 1299 (11th Cir. 1998), and affiliated companies in *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004)." ).[5]

Further, it was not "foreseeable" within the meaning of *Hugel* that PlusFunds would be bound by the forum-selection clause. The terms of the engagement letters purport to be

---

[5] Notably, in *American Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt.,*, the Seventh Circuit – the same court that issued the *Hugel* opinion – held that, while certain affiliated entities were bound by the forum-selection provision signed by one of the defendant insurance companies, the non-affiliated claims administrator hired by the insurance

"governed by[] and construed in accordance with the laws of the Cayman Islands." Foukas Decl. Ex. B, at 7; *id.* Ex. C, at 7; *id.* Ex. D, at 7; *id.* Ex. E, at 7. Under Cayman Islands law, absent circumstances involving an undisclosed principal, a non-party to a contract is not bound by its terms unless the non-party manifested through its conduct assent to be bound thereby or is estopped from denying that it is bound. *See* Ridley Decl. ¶¶ 19-21. PwC Cayman does not contend that PlusFunds manifested any such assent, that it is estopped, or that SPhinX was an undisclosed principal – nor could PwC Cayman make any such contention. At most, PwC Cayman asserts that PlusFunds participated in the negotiation and execution of the contract, but PlusFunds was clearly acting as a manager and agent on behalf of SPhinX. PwC Cayman also asserts that PlusFunds is suing for breach of duties generated out of the relationship created by the contract, but as explained above, that does not make PlusFunds a party to the contract. PwC Cayman does not even contend that PlusFunds was a third-party beneficiary, and, in any event, Caymans Islands law – which was chosen to govern the contract – does not recognize the third-party beneficiary doctrine. *See* Ridley Decl. ¶ 18.

*Manetti-Farrow* is also distinguishable. In *Manetti-Farrow*, the plaintiff sued the defendant that was a party to the contract containing the forum-selection clause, together with several other defendants. *See Manetti-Farrow,* 858 F.2d at 510-11. One of the other defendants had "entered a separate Consent and Ratification Agreement, consenting to the terms of the contract" and thus was, at least arguably, a party to the contract. *See id.* at 511. The remaining defendants were the parent corporation of the parties to the contract and their principals. *See id.* By contrast, SPhinX and PlusFunds had no such corporate relationship. Moreover, the principal-agent relationship ran the opposite direction: PlusFunds was SPhinX's agent for certain

---

companies to administer the plaintiff's claims was *not* bound by the provision. *See* 364 F.3d 884 889-90 (7th Cir. 2004).

purposes and could bind SPhinX, but the reverse was not true. *See* Am. Compl. ¶¶ 132-38. Thus, SPhinX could not have bound PlusFunds to the terms of the engagement letter. Further, PlusFunds does not bring these claims in its capacity as an agent for SPhinX, but rather in its own capacity for its own damages. In sum, there is no reason to apply the forum-selection clause under any agency theory.

*Coastal Steel* is similarly no help to PwC Cayman. That decision was explicitly premised on the existence of a third-party beneficiary relationship, which PwC Cayman does not contend exists here. *See Coastal Steel*, 709 F.2d at 202-03. Cases similar to the present case have distinguished *Coastal Steel* and limited its applicability to third-party beneficiaries. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001) ("[U]nlike the clear third party beneficiary relationship in *Coastal*, there is no evidence that DuPont was an intended third party beneficiary . . . ."); *InterGen N.V. v. Grina*, 344 F.3d 134, 147 (1st Cir. 2003) ("There is an important distinction between a nonsignatory who may benefit from a signatory's exercise of its contractual rights (because of, say, an equity stake) and a third-party beneficiary . . . . The critical fact is that the purchase orders neither mention nor manifest an intent to confer specific legal rights upon InterGen. Consequently, ALSTOM may not require InterGen to fulfill any corresponding legal duties (such as the duty to arbitrate)."); *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 466 (D.N.J. 2007) ("[B]ecause CCP was neither a party nor a third-party beneficiary to Plaintiff's contracts with RP or C-1, CCP cannot invoke the choice of law clause for its benefit.").

The lower-court decisions relied upon by PwC Cayman are also distinguishable. *Weingard v. Telepathy, Inc.*, No. 05 Civ. 2024 (MBM), 2005 WL 2990645 (S.D.N.Y. Nov. 7, 2005), is distinguishable in that it allowed a non-party to enforce a forum-selection clause,

whereas here, PwC Cayman seeks to enforce the forum-selection clause *against* a non-party. To permit such enforcement against a non-party is at odds with fundamental principles of contract law; the forum-selection clause should not be applied so broadly in this context. Judge Cote recently distinguished *Weingard* on precisely this basis. *See Shea Dev. Corp.*, 2008 WL 762087, at *3; *see also Maritime Ins.*, 1998 WL 214777, at *2 (holding party was not third-party beneficiary but noting that, even if it was, forum-selection clause could not be enforced against it) (citing *Abraham Zion*, 761 F.2d at 103).

Other cases relied upon by PwC Cayman are distinguishable as applying to affiliated entities, officers of the signing party, or third-party beneficiaries – none of which is present here. *See Burrows Paper Corp. v. Moore & Assocs.*, No. 07 Civ. 62 (DNH), 2007 WL 2089682, at *3 (N.D.N.Y. July 20, 2007) ("In this case, plaintiff is a third-party beneficiary of the benchmark agreement and thus was bound by the forum-selection clause."); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767 (LBS), 2003 WL 22882137, at *5-6 (S.D.N.Y. Dec. 4, 2003) (chief financial officer who signed, on behalf of corporation, the agreement containing the forum-selection clause and was involved in making misrepresentations in connection with the agreement, was bound by the forum-selection clause); *Deloitte & Touche v. Gencor Indus., Inc.*, 929 So. 2d 678, 683-84 (Fla. Dist. Ct. App. 2006) (parent corporation bound by forum-selection clause in agreement signed by wholly-owned subsidiary for benefit of parent); *Kelly v. Bear, Stearns & Co.*, No. CONTROL 080832, 2001 WL 1807360, at *2-3 (Pa. Ct. Com. Pl. Dec. 18, 2001) (sole owners of companies that signed engagement letters were third-party beneficiaries of those agreements and bound by their forum-selection clauses), *aff'd* 813 A.2d 914 (Pa. Super. Ct. 2002). In sum, PwC Cayman has presented no authority requiring

this Court to enforce the forum-selection clause against a non-party to the agreement, such as PlusFunds.

## II. THE INVESTOR CLAIMS ARE NOT SUBJECT TO THE FORUM-SELECTION CLAUSE.

PwC Cayman does not contend that the investors were ever bound by the forum-selection clause – nor could it make such a contention. *Cf. Deloitte & Touche,* 929 So. 2d at 684 (relied upon by PwC Cayman; "Had the plaintiff been . . . an investor making an investment decision based on a published audit, the analysis [with respect to application of forum-selection clause] would not be the same."). Nevertheless, the Report inexplicably finds that the investor claims became subject to the forum-selection clause when they were assigned to the JOLs. The Report cites no case enforcing a forum-selection clause under such circumstances, and Plaintiffs' research has uncovered no such case.

The only case cited in the Report that is even arguably on point is *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118 (S.D.N.Y. 1997), *aff'd, Farrell Lines, Inc. v. Ceres Terminals, Inc.*, 161 F.3d 115 (2d Cir. 1998). However, that case actually *supports*, rather than undermines, Plaintiffs' position here. In *Farrell Lines*, the court held that an insurer, suing on a contract as subrogee, was bound by the forum-selection clause in that contract, which was signed by the subrogor. *See id.* at 126. In other words, the subrogee, "stand[ing] in the shoes of the subrogor," had no greater rights that the subrogor. *Id. Farrell Lines* thus supports Plaintiffs' position here: as stated in the caption of the Amended Complaint, Messrs. Krys and Stride bringing the assigned claims not in their capacities as liquidators of the SPhinX Funds but "as assignees of claims assigned by" the investors. Messrs. Krys and Stide thus stand in the shoes of the *investors* for purposes of the assigned claims and, under *Farrell Lines*, should be subject to exactly the same rights and obligations that the investors had before they assigned their claims.

The notion that the assignment of investor claims to Messrs. Krys and Stride somehow transmogrifies these claims into claims subject to the forum selection clause – merely because Messrs. Krys and Stride are bound by the clause with respect to *separate* claims brought on behalf of the SPhinX Funds – is a non-sequitur that is totally unsupported by the law or by reason and should be rejected.

Therefore, the investor claims herein cannot be dismissed under the forum-selection clause and must remain in this Court.[6]

## III.   TO ENFORCE THE FORUM-SELECTION CLAUSE WOULD BE UNREASONABLE AND UNJUST.

SPhinX and PwC Cayman selected Cayman Islands law to govern their contract. *See* Report ¶ 10. Under Cayman Islands law, a forum-selection clause is presumptively enforceable but, similar to American law, the court has discretion not to enforce if the court finds that there exist "exceptional circumstances or strong reasons not to do so." *See* Ridley Decl. ¶ 6. One common "strong reason" or "exceptional circumstance" under which courts have declined to enforce forum-selection clauses is where, as here, enforcement would result in parallel proceedings in different jurisdictions. *See id.* ¶¶ 7-16. "The most important case in this area of law in recent years" is *Donohue v. Armco, Inc. and Others*, [2001] UKHL 64, wherein the House of Lords of England upheld a decision by the court of first instance not to enforce a forum-

---

[6] The Report can arguably be read as finding that the assignments of investor claims to Messrs. Krys and Stride do not "hav[e] economic substance." Report ¶ 22. Even if the remainder of the Report is adopted, paragraph 22 should be stricken. The argument that the assignments lack economic substance was not pressed by PwC Cayman in its motion, and Plaintiffs lacked a full and fair opportunity to contest it. The argument should therefore be considered waived. Moreover, this proposition is not necessary to support the Report's conclusions. Indeed, if the assignments were a sham, they would still be owned by the investors and thus could not even arguably be subject to the forum selection clause. In any event, there is no basis in fact for the proposition that the assignments lack economic substance. The assignments are valid on their face, *see* Second Foukas Decl. Ex. C, and PwC Cayman has brought forth no evidence suggesting that the assignments were not arms-length transactions, that the investors did not actually intend to give up their rights to the claims, or that Messrs. Krys and Stride did not actually intend to receive and prosecute the claims. The purported fact that the assignments were made to support Plaintiffs' litigation strategy with respect to anticipated *in pari delicto* defenses, *see* Report ¶ 44, does not mean that the assignments lack economic substance.

selection clause where enforcement would force the plaintiff simultaneously to litigate claims against certain defendants in England and related, already-pending claims against other defendants in the United States. Ridley Decl. ¶ 7. Lord Bingham of Cornhill, in his leading judgment in that case, stated:

> It seems to me that so far the plaintiffs have shown strong cause why the jurisdiction clause should not be enforced. This is indeed a paradigm case for the concentration of all the relevant parties' disputes in a single jurisdiction. If in such a case a host of different jurisdiction clauses were to be observed, the casualty at the root of the action would become virtually untriable. The action would fragment and reduplicate, at vast cost . . . .

*Donohue*, UKHL 64 ¶ 27 (quoting *Mahavir Minerals Ltd v. Cho Yang Shipping Co (The M C Pearl)*, [1997] 1 Lloyd's Rep 566). Because the investor and PlusFunds claims against PwC Cayman must remain in this Court, and because all Plaintiffs' claims against other defendants, including PwC US, must remain in this Court, SPhinX's claims against PwC Cayman also should remain in this Court in order to avoid the burden of duplicative litigation and the possibility of inconsistent verdicts.

The result would be no different if United States law is applied. Under the landmark case of *M/S Bremen v. Zapata Off-shore Co.*, 407 U.S. 1, 15 (1972) even a valid forum-selection clause will not be enforced where the court determines that to do so would be "unreasonable and unjust." Under this standard, numerous federal and state courts have refused to enforce forum-selection clauses where to do so would require the parties to split off a piece of already-pending litigation and engage in duplicative litigation in a foreign jurisdiction. *See, e.g.*, *Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971, 988-89 (Bankr. D. Mass. 1996) (following *M/S Bremen* and declining to enforce forum-selection clause where to do so could result in duplicative litigation and some claims being time-barred); *Vanguard Fin. Servs. Corp. v. Johnson*, 736 F. Supp. 832, 839-40 (N.D. Ill. 1990) (declining to enforce forum-selection clause

where not all parties and not all claims were subject to the agreement containing the clause); *In re HA-LO Indus., Inc.*, No. 02 B 12059, 03 C 2441, 2003 WL 21982145, at *3 (N.D. Ill. Aug. 19, 2003) (holding bankruptcy court properly declined to dismiss case under forum-selection clause where non-party witnesses were located within the district and "several other cases arising from" the same transaction were already pending in that court); *Prows v. Pinpoint Retail Sys., Inc.*, 868 P.2d 809, 812 (Utah 1993) (applying *M/S Bremen* and declining to enforce the forum-selection clause where to do so would put the plaintiff "in the position of trying the case in Utah against Flying J and in New York against Pinpoint," holding that "[t]he trial court was appropriately troubled by the prospect of requiring [the plaintiff] to litigate the same case in two different forums" (internal quotation marks omitted)); *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W.2d 378, 381 (Tenn. 1983) (applying *M/S Bremen* and declining to enforce Kentucky choice-of-forum clause where witnesses were located in Tennessee and enforcing forum-selection clause would result in parallel proceedings, noting that "[t]he objective of modern procedure is to litigate all claims in one action if that is possible"); *McNeill v. Zoref*, 687 A.2d 1052, 1055-56 (N.J. Super. Ct. App. Div. 1997) (applying *M/S Bremen* and declining to enforce forum-selection clause where some defendants were not parties to agreement containing the clause and enforcement of the clause would result in parallel litigation).

In *Chem. Carriers, Inc. v. L. Smit & Co.'s Internationale Sleepdienst*, 154 F. Supp. 886 (S.D.N.Y. 1957), a "Liberian corporation controlled by American citizens, with its principal office and place of business in New York City" brought claims in admiralty against a Netherlands corporation based in Rotterdam for damages for breach of the parties' towage contract or in the alternative for a constructive trust for the libelant's share of salvage. The parties' contract contained a provision requiring the application of Netherlands law and requiring

all disputes to be submitted to the courts of the Netherlands.  *See id.* at 888.  The respondent

asked the Court to decline jurisdiction pursuant to the forum-selection clause.  The Court refused

the request to decline jurisdiction, finding the forum-selection clause to be unreasonable under

the circumstances because, among other reasons, a case against a third party involved in the

dispute was pending in the same court and enforcement of the provision would require

duplicative litigation in a foreign jurisdiction:

> [T]here is now pending in this court an action by the libelant
> against the owners of the Helga Bolten, who are German nationals,
> for a share of the salvage money.  This case will doubtless be fully
> litigated here.  A number of the issues in that action are similar to,
> if not identical with, issues involved in the instant case.  It may
> well be that the action against the owners of the Helga Bolten can
> be consolidated with the case at bar.  Much of the proof in the two
> cases will be the same.  *It would be an undue hardship on the
> libelant to compel it to litigate the issues involved in the Helga
> Bolten case in this court and similar issues in the instant case in
> Rotterdam, with probable inconsistent results.*

*Id.* at 889 (emphasis added).[7]

Likewise here, much of the proof of Plaintiffs' case against PwC Cayman will be the

same as the proof for other claims in the Refco MDL.  Indeed, Plaintiffs' claims against PwC

Cayman will almost entirely overlap with its claims against PwC US because PwC US

performed on PwC Cayman's behalf all, or virtually all, of the audit work on SPhinX's financial

statements.

In denying the remand motion by the Refco trustee in this MDL, Judge Lynch quoted

with approval the following language explaining the benefits of jointly litigating such related

cases:

---

[7] Even though *Chemical Carriers* predated *M/S Bremen* and stated at the outset that forum-selection clauses "are not
looked upon with favor," it followed an analysis identical to that set forth in *M/S Bremen*.  *See id.* at 888; *cf.
Copperweld Steel Co. v. Demag-Mannesmann-Bohler*, 578 F.2d 953, 964-66 (3d Cir. 1978) (upholding pre-*M/S
Bremen* district court decision declining to enforce forum-selection clause, finding district court had applied the

> [I]t is beyond cavil that judicial economy and efficiency are best served by exercising the jurisdiction that so clearly exists. The MDL panel has consolidated scores of cases before this Court to promote the expeditious and efficient resolution of the claims arising from the collapse of WorldCom. The litigation is proceeding apace. Motions to remand . . . and to dismiss have been fully briefed, and . . . important discovery issues addressed. With the consolidation of the litigation in one court, the motion practice and discovery process can be managed to protect the rights of all parties and to preserve, to the extent possible, the maximum amount of assets for recovery by plaintiffs with meritorious claims.

*In re Refco, Inc. Sec. Litig.,* 628 F. Supp. 2d 432, 446-47 (S.D.N.Y. 2008) (alterations in original) (quoting *In re Worldcom, Inc. Sec. Litig.*, 293 B.R. 308, 333 (S.D.N.Y. 2003)). This policy should be applied here. It would be fundamentally unfair to force SPhinX to litigate these overlapping claims in a foreign jurisdiction, potentially subjecting SPhinX to inconsistent verdicts, duplicative discovery and trial preparation, unnecessary costs, and other disadvantages of parallel litigation in disparate jurisdictions.

Additionally, the center of gravity of this case is in the United States. First, the operative transactions and events took place in the United States. All the various facets of the Refco fraud, the audits of SPhinX, SPhinX's solicitation and investment of assets, PlusFunds' operations, the Refco bankruptcy, and the ultimate loss of SPhinX's assets all occurred in the United States. Because these events occurred in the United States, it follows that the majority of the factual witnesses and documentary evidence will be located in the United States. All except one of the Refco MDL depositions conducted or scheduled as of the date of the submission of this memorandum have been the United States.

Moreover, SPhinX's financial statements were supposed to be – and PwC Cayman represented them to have been – presented in accordance with US GAAP and applicable United

---

proper standard even though *M/S Bremen* "has language somewhat different than that relied upon by the district court").

States governmental regulations (as opposed to international or Cayman Islands standards). Am. Compl. ¶¶ 712-13. Likewise, the audits were supposed to be – and PwC Cayman represented them to have been – conducted in accordance with US GAAS (as opposed to international or Cayman Islands standards). Am. Compl. ¶¶ 611-12, 623-38; Foukas Decl. Ex. B, at 2; *id.* Ex. C, at 2; *id.* Ex. D, at 2; *id.* Ex. E, at 2. Thus, any expert witnesses testifying with respect to the propriety of SPhinX's financial statements and PwC's audits thereon will almost certainly be based in the United States.

Also, because all or virtually all of the tortious actions and the eventual loss occurred in the United States, it is likely United States law will apply. *See Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749 (1963) (the law that applies is that of "the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation"). United States courts undoubtedly will be more proficient in applying United States law, as well as United States auditing and accounting standards, than a Cayman Islands court. For these reasons, trial in the United States will be more efficient and fair than a trial in the Cayman Islands. *See, e.g.*, *Chem. Carriers*, 154 F. Supp. at 889 (declining to enforce forum-selection clause because, *inter alia*, "[t]he alleged breach of the contract took place while the Chemical Exporter was still in United States territorial waters and evidence as to the damage suffered by the libelant is more readily available here"); *see also, e.g.*, *Seneca Ins. Co. v. Henrietta Oil Co.*, No. 02 Civ. 3535 (DC), 2003 WL 255317, at *3-4 (S.D.N.Y. Feb. 4, 2003) (applying *M/S Bremen* and declining to enforce New York forum-selection clause where "[t]he only contact with New York is that [the defendant] is headquartered here," "[a]ll the significant contacts were with Texas," "[t]he claim arose in Texas based on activities that took place in Texas, and the rights of a Texas [plaintiff] are at stake");

*Cutter v. Scott & Fetzer Co.*, 510 F. Supp. 905, 908 (E.D. Wis. 1981) (declining to transfer case to Ohio pursuant to forum-selection clause because, *inter alia*, interests of Wisconsin plaintiffs were implicated and the federal court in Wisconsin would be more comfortable interpreting applicable Wisconsin statute); *Wilder v. Absorption Corp.*, 107 S.W. 3d 181, 184-85 (Ky. 2003) (declining to enforce Washington choice-of-forum clause where plaintiffs and most of the evidence were located in Kentucky).

The Report suggests that Plaintiffs would not suffer severe inconvenience because SPhinX is a Cayman Islands entity, the JOLs are located in the Cayman Islands, and the JOLs are conducting the liquidation of SPhinX there. *See* Report ¶¶ 67-71. Such reasoning ignores SPhinX's close ties to the United States, both prior to and after its liquidation. Prior to its liquidation, SPhinX's operations were conducted (through PlusFunds) entirely in the United States. Under analogous circumstances, this District found that a foreign libelant was "essentially an American enterprise":

> While libelant is a Liberian corporation, with a nominal office in Monrovia, Liberia, the majority of its stock is owned by American citizens, and all but one of its officers and directors are citizens of the United States. It conducts its business in New York where its principal office is. It is thus essentially an American enterprise. These are factors in favor of retention of jurisdiction by this court rather than refusal to enforce libelant's rights in this forum.

*Chem. Carriers*, 154 F. Supp. at 889 (citations omitted). With respect to SPhinX's post-liquidation activity, though the JOLs and the liquidation proceedings are in the Cayman Islands, the JOLs have not filed any claims there; rather, the JOLs have hired United States counsel to bring these claims in the United States. Moreover, multiple related cases are already before this Court. The JOLs' claims and related claims in the Refco MDL are already well along the discovery path, and there has already been some motion practice. Judge Lynch observed in denying Plaintiffs' remand motion that "the Refco-related actions," including Plaintiffs' claims

against PwC Cayman, constitute "'but one piece of a much larger, extremely complex litigation puzzle'" in federal court. *Krys,* WL 2008 WL 4700920, at * 9 (quoting *Bondi v. Grant Thornton Int'l*, 322 B.R. 44, 50 (S.D.N.Y 2005)). To force the JOLs to recommence this litigation in the Cayman Islands will hinder the resolution of these consolidated cases and, ultimately, the liquidation of the SPhinX Funds and possibly other entities in bankruptcy here in the United States. This Court recognized as much in denying Plaintiffs' remand motion:

> [P]laintiffs' claims, which in the New York litigation required a nearly 300-page complaint to address, are far from elementary and involve precisely the web of deceit at issue in the Refco Securities MDL. As such, remanding these actions, which have a common factual core, to two different state courts "would simply complicate and slow down the resolution of those claims, as well as of the matters already pending before this Court."

*Krys*, 2008 WL 4700920, at *10 (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 311 B.R. 345, 349 (S.D.N.Y. 2003). Judge Lynch's comments with respect to potential litigation in state court are even more forceful when applied to the issue of whether a piece of this case should be sent to an entirely foreign jurisdiction.

Furthermore, this Court noted, in denying the Refco trustee's remand motion, that an amicable compromise of the pending claims is promoted by keeping the cases in a single jurisdiction: "It is a virtual certainty not only that these matters will, at some point, settle, but that they will necessarily settle by virtue of some comprehensive resolution of all of the claims pending against defendants in this matter, the vast majority of which are pending before this Court." *Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d at 440.

In summary, as Judge Lynch stated in denying the Refco trustee's remand motion, "The efficiency gains that result from asserting jurisdiction in this case are particularly striking in light of the multitude of other Refco-related actions currently pending before this Court, many of which involve many of the same parties and arise out of the same set of facts as those described

in the Trustee's complaint." *Refco, Inc. Sec. Litig.,* 628 F.Supp. 2d at 444; *see also id.* at 446-47 ("[I]t is beyond cavil that judicial economy and efficiency are best served by" consolidating "scores of cases before this Court to promote the expeditious and efficient resolution of the claims." (quoting *WorldCom*, 293 B.R. at 333)). This Court should not erase these "striking" efficiency gains by sending a small piece of this litigation to the Cayman Islands, when this Court has already held that it has jurisdiction over these claims.

The Report relies heavily on *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir. 2007), for the proposition that it would not be unreasonable or unjust to enforce the forum selection clauses. *Phillips* is distinguishable. *Phillips* was a relatively simple case procedurally, involving a single plaintiff and a group of only four defendants whose interests were aligned and who were represented by a single lawyer. *See id.* at 381-83. By contrast, this case involves hundreds of parties as part of a complex MDL proceeding. Though enforcement of the forum selection clause *in Phillips* resulted in potential parallel litigation, *see id.* at 393, that case did not involve theories of fraud and conspiracy, as here, which are difficult to prove in isolation, especially if one must do so twice. *See Prows*, 868 P.2d at 813.

There are numerous other distinctions between the present case and Phillips:

- Unlike the *Phillips* case, this case involves multiple plaintiffs who would be affected differently by the forum selection clause.

- This case has many more defendants who are not party to the forum selection clause.

- Plaintiffs' claims against PwC Cayman overlap factually and legally with the claims against PwC US. By contrast, the copyright claims in *Phillips* constituted an independent theory of recovery.

- The factual proof in this case is likely much more complex, necessitating many fact witnesses, mountains of documents, and myriad expert witnesses. Because of this and the prior factor, the duplication of effort would be much more severe in this case.

- The legal issues in this case are also likely more complex.

- Much discovery has already been done in this case, and we are now nearing the finish line. It would make little sense, this late in the litigation, to dispatch a subset of claims to the Cayman Islands.

- Plaintiffs' claims are related to bankruptcy proceedings in the United States. *See Krys v. Sugrue*, 2008 WL 4700920, at *5.

- The substantive outcome of this case may be different in the foreign jurisdiction (due to indemnity clauses discussed herein), whereas the court identified no such substantive difference with respect to the breach of contract claims in *Phillips*.

- The JOLs represent the interests of creditors – including Miami Children's Hospital Foundation, Inc. – who are not parties to the engagement letters yet would be injured by the increased costs of multiple proceedings.

Further, although the plaintiff's contract claims were dismissed in *Phillips*, the plaintiff's claims under United States copyright law, under which the plaintiff could achieve a full recovery against the same defendants, remained. *See id.* at 387-92.

The Report finds no "significant risk of 'inconsistent adjudication.'" Report ¶ 69. This finding is incorrect. As set forth above, PlusFunds' and the investors' claims are not subject to the forum selection clause. It would be inconsistent if, for example, PlusFunds were permitted to recover in a United States forum while SPhinX were denied recovery in the Cayman Islands. Moreover, Plaintiffs' claims against PwC Cayman almost completely overlap with their claims against PwC US. Thus, even if all of Plaintiffs' clams against PwC Cayman were sent to the Cayman Islands, it would be inconsistent if Plaintiffs were permitted to recover against PwC US in a United States forum but not against PwC Cayman in a Cayman Islands forum. Additionally, if the litigation is split, every decision in either forum will inevitably give rise to a motion to apply collateral estoppel in the other forum, countered by arguments that collateral estoppel should not apply because the issues or legal standards are different. These motions will in turn

require affidavits from experts on foreign law. Such unnecessary proceedings are precisely what courts try to avoid when parallel litigation is a possibility.

## IV.    TO ENFORCE THE FORUM-SELECTION CLAUSE WOULD CONTRAVENE STRONG PUBLIC POLICY OF THE UNITED STATES.

This Court also should decline to enforce a forum-selection clause because "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *M/S Bremen*, 407 U.S. at 15. Where a forum-selection clause might be used to defeat claims otherwise cognizable in the United States, the courts have refused to enforce such clauses. In *Chemical Carriers*, for example, the court found that the Netherlands courts would not recognize some or all of the libelant's claims and therefore declined to enforce the parties' forum-selection clause:

> In view of what appears to be the Netherlands law, the practical result of compelling libelant to litigate in the Rotterdam courts might well be to deprive it of all remedy. Such a result would not be in accord with the theory of salvage in this country, which is to reward all who have contributed anything to the work of saving the imperiled property and would work an unreasonable hardship upon the libelant.

154 F. Supp. at 889 (citation omitted); *see also, e.g.*, *Quick Erectors, Inc. v. Seattle Bronze Corp.*, 524 F. Supp. 351, 356-57 (E.D. Mo. 1981) (following *M/S Bremen* and declining to enforce New York choice of forum clause because New York courts would enforce contractually shortened limitations period contrary to Missouri public policy); *Beilfuss v. Huffy Corp.*, 685 N.W.2d 373, 377-78 (Wisc. Ct. App. 2004) (following *M/S Bremen* and holding Ohio choice of law and choice of forum clause invalid because Ohio would enforce restrictive employment covenants contrary to Wisconsin public policy).

No doubt PwC Cayman's efforts to try this case in the Cayman Islands arise at least in part because it hopes to enforce the release and indemnification clauses found in its engagement

letters. These provisions each purport to bar, among other things, "any and all claims . . . arising in any way from or connected with fraudulent acts or omissions, misrepresentation or willful default on the part of [SPhinX's] directors, employees or agents." Foukas Decl. Ex. B, at 5; *id.* Ex. C, at 5; *id.* Ex. D, at 5; *id.* Ex. E, at 5. These provisions further purport to bar "consequential, indirect, lost profit or similar damages" against PwC Cayman and require SPhinX to "indemnify and hold harmless [PwC Cayman] and its personnel from any and all third party claims, liabilities, costs and expenses" (except for "willful or intentional neglect or misconduct or fraudulent behavior of [PwC Cayman]"). *Id.* The indemnity clauses in PwC Cayman's engagement letters would likely be enforced in the Cayman Islands. *See* Ridley Decl. ¶ 22. If Plaintiffs' case against PwC Cayman is sent to the Cayman Islands, some of Plaintiffs' claims against PwC Cayman for its misconduct and omissions might be eliminated or severely restricted.

However, the law of New York holds a strong public policy disfavoring such release and indemnity provisions between a professional service provider and its client. Such clauses have routinely been held invalid or at least construed extremely narrowly against the professional defendant. For example, in *DeVito v. N.Y. Univ. Coll. of Dentistry*, 145 Misc. 2d 144, 544 N.Y.S.2d 109 (Sup. Ct., N.Y. Cty. 1989), the court interpreted a provision of a contract between a patient and her dentists purporting to "release . . . and save harmless" the dentists "from any and all liability arising out of, or in connection with, any injuries or damages" in connection with their treatment of the patient. The court stated that "the law frowns upon contracts which seek to exculpate persons from their own negligence, and to the extent such contracts bar suits against willful or gross negligence, they are void." *Id.* at 145-46, 544 N.Y.S.2d at 109-10 (citation omitted). Indemnity provisions may be enforced with respect to ordinary negligence, "but only

after being subjected to intense judicial scrutiny on a variety of issues." *Id.* at 146, 544 N.Y.S.2d at 110. In particular, an indemnity provision will not be enforced where "the parties have a special relationship which would make enforcement of an exculpatory clause between them against the public interest," such as "where the party seeking exculpation is in a business or profession which is either publicly regulated or providing an essential service to members of the public." *Id.* at 145-46, 544 N.Y.S.2d at 110.

Additionally, New York courts will not enforce an indemnity provision unless "its terms are so clear, explicit and unambiguous that it appears certain that the limitation of liability is intended to cover negligent, as well as ordinary, acts of the party seeking to shed responsibility." *Id.* at 147, 544 N.Y.S.2d at 111. "All-encompassing or open-ended phrases such as 'any and all claims' or 'any and all responsibility or liability of any nature whatsoever' and 'all claims and demands whatsoever' are considered insufficient to indicate an intention to waive injury occasioned by fault." *Id.*

The court concluded that the above-quoted indemnity provision "fails, in all particulars, to meet the established standards." *Id.* at 148, 544 N.Y.S.2d at 111; *see also Ash v. N.Y. Univ. Dental Ctr.*, 164 A.D.2d 366, 372-73, 564 N.Y.S.2d 308, 312-13 (1st Dep't 1990) (holding similar indemnity provision unenforceable); *Johnston v. Fargo*, 184 N.Y. 379, (1906) (holding exculpatory contract between employer and employee invalid as contrary to public policy); *Conklin v. Canadian-Colonial Airways*, 266 N.Y. 244, 247-49, (1935) (holding common carrier may not enforce indemnity clause against passenger); *Creed v. United Hosp.*, 190 A.D.2d 489, 492-93, 600 N.Y.S.2d 151, 153 (2d Dep't 1993) (holding indemnity provision in favor of doctor and hospital violates public policy). The indemnity provision at issue here fails for the same reasons: PwC Cayman is a public accountant – a member of a profession that is publicly

regulated and providing an essential service to the public – and the indemnity language is just as broad and open-ended as the language condemned by the court in *DeVito*.

*Boll v. Sharpe & Dohme, Inc.*, 281 A.D. 568, 121 N.Y.S.2d 20 (1st Dep't 1953), *aff'd*, 307 N.Y. 646 (1954), is also on point. There, the court stated "that parties are not construed to have intended to exempt themselves from the consequences of their own negligence in the absence of express language to that effect." *Id.* at 571, 121 N.Y.S.2d at 22. In interpreting a provision in a contract between a blood donor and a physician stating that the physician "shall [not] be in any way responsible for any consequences to [the blood donor] resulting from the giving of such blood" and that the blood donor "discharges 'all claims and demands whatsoever . . . by reason of any matter relative or incident to such donation of blood,'" the court narrowly construed the provision as not explicitly waiving liability for negligence: "It was manifestly not intended that defendant was to be freed from consequences resulting from negligence in its technique in taking blood . . . ." *Id.* at 571, 121 N.Y.S.2d at 23. The contract further provided that the blood donor was "at [his] own risk submitting to the tests, examinations and procedures customary in connection with donations of blood." *Id.* at 573, 121 N.Y.S.2d at 24-25. The court held that this provision affirmed – rather than waived – the physician's duty to exercise reasonable care: "The duty of defendant to employ customary procedures in taking blood is expressly affirmed, which is tantamount to declaring that the duty to use reasonable care shall apply to the procedures in defendant's office." *Id.* at 571-72, 121 N.Y.S.2d at 23. Similarly, each of the contracts between PwC Cayman and SPhinX affirms PwC Cayman's duty to properly exercise its professional duties:

> We will be responsible for performing the audits in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). These standards require that we plan and perform the audits to obtain

reasonable assurance about whether the financial statements are
free of material misstatement . . . .

\* \* \*

We will design our audit to obtain reasonable, but not absolute,
assurance of detecting errors or fraud that would have a material
effect on the financial statements as well as other illegal acts
having a direct and material effect on financial statement amounts.

Foukas Decl. Ex. B, at 2-3; *id.* Ex. C, at 2-3; *id.* Ex. D, at 2-3; *id.* Ex. E, at 2-3.

The waiver clause in the agreement does not contain language explicitly waiving liability

for PwC Cayman's falling below the standard of care. *See* Foukas Decl. Ex. B, at 5; *id.* Ex. C, at

5; *id.* Ex. D, at 5; *id.* Ex. E, at 5 ("In no event shall PwC be liable to the [SPhinX] Funds . . . for .

. . damages relating to PwC's services provided under this engagement letter, except [for] willful

or intentional neglect or misconduct or fraudulent behavior of PwC."). Such a waiver could only

be found by drawing an inference in favor of a broad waiver for PwC Cayman's own negligence,

because negligence is never mentioned. But it would be illogical for PwC Cayman by a single

document to assume the obligation to conduct audits according to applicable standards while

denying any liability for falling below these standards. There can be no doubt, then, that any

defense by PwC Cayman based on waiver or indemnity would be invalid in New York.

Similar policies are followed in New Jersey, the state where the bulk of PwC's audits

were performed. *See, e.g.*, *McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 226 A.2d

713, 714 (N.J. 1967) (holding release of liability between race car driver and racing association

invalid as against public policy); *Lucier v. Williams*, 841 A.2d 907, 914 (N.J. Super. Ct. App.

Div. 2004) ("With professional services, exculpation clauses are particularly disfavored."); *Hy-*

*Grade Oil Co. v. New Jersey Bank*, 350 A.2d 279, 281 (N.J. Super. Ct. App. Div. 1975) ( "It is

clear that where a party to the agreement is under a public duty entailing the exercise of care he

may not relieve himself of liability for negligence . . . ."); *Erlich v. First Nat'l Bank of Princeton*,

505 A.2d 220, 288 (N.J. Super. Ct. Law Div. 1984) (holding exculpatory clause in contract between investment advisor and client "void and unenforceable" as contrary to public policy); *see generally H. Rosenblum, Inc. v. Adler*, 461 A.2d 138, 147-53 (N.J. 1983) (discussing public policy implications of the auditor-client relationship), *superseded on other grounds by statute,* N.J. Stat. Ann. 2A:53A-25b.

Additionally, regulatory bodies charged with oversight of the accounting profession also frown upon waiver and indemnity clauses. The SEC, for example, has promulgated the following regulation:

> When an accountant and his client, directly or through an affiliate, have entered into an agreement of indemnity which seeks to assure to the accountant immunity from liability for his own negligent acts, whether of omission or commission, one of the major stimuli to objective and unbiased consideration of the problems encountered in a particular engagement is removed or greatly weakened. Such condition must frequently induce a departure from the standards of objectivity and impartiality which the concept of independence implies…. Consequently, the accountant cannot be recognized as independent for the purpose of certifying the financial statements of the corporation.

SEC Codification of Financial Reporting Policies § 602.02.f.i, Fed. Sec. L. Rep. (CCH) ¶ 73,274 (Nov. 17, 2008); *see also* Office of the Chief Accountant: Application of the Commission's Rules on Auditor Independence: Frequently Asked Questions (Dec. 13, 2004), http://sec.gov/info/accountants/ocafaqaudind121304.htm; Interagency Advisory on the Unsafe and Unsound Use of Limitation of Liability Provisions and Certain Alternative Dispute Resolution Provisions in External Audit Engagement Letters, 70 Fed. Reg. 24,576, at 24,577 (May 10, 2005). To serve the public policy of New Jersey, New York, and the United States, this action should remain before this Court.

The Report cites New York cases upholding indemnity agreements. *See* Report ¶ 74. However, none of those cases involved claims against professional defendants, such as auditors,

who owe special duties to their clients.  *See Bradley v. Earl B. Feiden, Inc.*, 8 N.Y.3d 265, 274-75, 832 N.Y.S. 2d 470, 474-75 (2007) (claim against manufacturer of defrost timer); *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 822-23, 595 N.Y.S. 2d 381, 382-83 (1993) (claim against alarm company); *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 210-11, 321 N.Y.S. 2d 81, 84-85 (1971) (claim against property owner).

The Report also states that Plaintiffs' reliance on SEC regulations "is misplaced as this case does not involve a publicly-traded company or an SEC registrant."  Report at 25 n.6.  This misses the point.  Plaintiffs cite SEC regulations not because they are binding on PwC Cayman, but because they are an articulation of the public policy of the United States and its rationale.

### CONCLUSION

For the reasons set forth above, PwC Cayman's motion should be denied.  At a minimum, the order should be denied with respect to the PlusFunds and investor claims, and paragraph 22 of the Report should be stricken.

Dated: New York, New York
      December 3, 2009

<div style="margin-left:40%">

Respectfully submitted,

By:     s/  David J. Molton
David J. Molton (DM-1106)
Andrew Dash (AD-7913)
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
adash@brownrudnick.com

Leo R. Beus, *pro hac vice*
Dennis K. Blackhurst, *pro hac vice*
**BEUS GILBERT PLLC**
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251

</div>

Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com