**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                               :

In re REFCO INC. SECURITIES LITIGATION   :     Case No. 07-md-1902 (JSR)
                               :

-------------------------------------------------------------X

This Document Relates to:

-------------------------------------------------------------X
                               :

KENNETH M. KRYS, *et al.*,          :     Case No. 08-cv-3065 (JSR)
                               :     Case No. 08-cv-3086 (JSR)

            Plaintiffs,      :

                               :

           -against-        :

                               :

CHRISTOPHER SUGRUE, *et al.*,     :

                               :

           Defendants.     :

-------------------------------------------------------------X

**OBJECTION TO REPORT AND RECOMMENDATION OF**
**SPECIAL MASTER ON GIBSON, DUNN & CRUTCHER LLP, MITCHELL KARLAN**
**AND SCOTT KISLIN MOTION TO COMPEL ARBITRATION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL ALLEGATIONS ...............................................................................3

    1.      The Gibson Dunn Defendants Aided and Abetted Breaches of
             Duty and Fraud by Sugrue, Kavanagh and Owens in Connection
             with the Suffolk Loans in March 2005 ...............................................3

    2.      The Gibson Dunn Defendants Provided Faulty Legal Advice To
             SPhinX and PlusFunds After the Disclosure of the Refco Fraud
             in October 2005 ...................................................................................5

    3.      The Gibson Dunn Fee Agreements ....................................................6

             (i)      The November 2, 2004 Engagement Letter ...........................7
             (ii)     The July 20, 2005 Engagement Letter ...................................7
             (iii)    The October 10, 2005 Engagement Letter .............................8

ARGUMENT ........................................................................................................9

    I.      NO AGREEMENT TO ARBITRATE .............................................9

             A.      There Is No Agreement To Arbitrate That Binds The Assignors ..........9

             B.      There Is No Agreement To Arbitrate That Binds SPhinX ...................11

             C.      There Is No Agreement To Arbitrate That Binds PlusFunds ..............15

             (i)      This Court Should Retain Jurisdiction over this Matter ......................16

             (ii)     In the Alternative, This Court Should Allow All Nonarbitrable Claims
                     Against Gibson Dunn to Continue in the Ongoing
                     Multidistrict Litigation ......................................................................18

    II.     THE NARROW ARBITRATION CLAUSES DO NOT COVER
            PLAINTIFFS' CLAIMS ...................................................................19

             A.      The Arbitration Clauses Include the Limiting Language, "Which You
                   Might Otherwise Have the Right to Arbitrate Under Part 137" ..........19

B.     The Words of Limitation Used in the Arbitration Provision Demonstrate That Arbitration Was Not Meant to Be the Primary Means of Dispute Resolution ..........................................................................26

C.     The Claims Asserted Against the Gibson Dunn Defendants Are Not Within the Purview of the Narrow Arbitration Provision....................28

CONCLUSION.........................................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Ltd. v. CIGNA Corp.*,
No. 00 Civ. 9423, 2001 WL 767015 (S.D.N.Y. July 6, 2001) ............................................. 27, 28

*Adena, Inc. v. Cohn*,
162 F. Supp. 2d 351 (E.D. Pa. 2001) ...................................................................... 23

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)....................................................................................... 19, 20

*Bowmer v. Bowmer*,
50 N.Y.2d 288, 428 N.Y.S.2d 902 (1980) ............................................................ 21

*Bristol-Myers Squibb Co. v. SR Int'l Business Ins. Co. Ltd.*,
354 F. Supp. 2d 499 (S.D.N.Y. 2005)................................................................ 26, 27

*Cont'l Group, Inc. v. NPS Commc'ns, Inc.*,
873 F.2d 613 (2d Cir. 1989)................................................................................... 21

*Cornell Univ. v. UAW Local 2300*,
942 F.2d 138 (2d Cir. 1991)................................................................................... 27

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*,
9 F.3d 1060 (2d Cir. 1993)................................................................................... 23

*Denney v. Jenkens & Gilchrist*,
340 F. Supp. 2d 338 (S.D.N.Y. 2004, *rev'd in part on other grounds*,
*Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58 (2d Cir. 2005)................................................. 26

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995)............................................................................................. 20

*Fuller v. Guthrie*,
565 F.2d 259 (2d Cir.1977).................................................................................... 20

*Hanjin Shipping Co. Ltd v. Union Pac. R.R. Co.*,
No. 05 Civ. 8476, 2006 WL 1096389 (S.D.N.Y. Apr. 26, 2006)........................................... 26

*Haviland v. Goldman, Sachs & Co.*,
947 F.2d 601 (2d Cir. 1991).................................................................................... 20

*In re City of Schenectady v. Schenectady Patrolmen's Benevolent Ass'n*,
138 A.D.2d 882, 556 N.Y.S.2d 259 (3d Dep't 1988)............................................... 18

*In re Refco, Inc. Sec. Litig.*,
   628 F. Supp. 2d 432 (S.D.N.Y. 2008)..................................................................... 16, 17

*In re WorldCom, Inc. Sec. Litig.*,
   293 B.R. 308 (S.D.N.Y. 2003)............................................................................... 16, 17

*Krys v. Sugrue*,
   No. 08 Civ. 3065 (GEL), 08 Civ. 3086 (GEL), 08 Civ. 7416 (GEL),
   2008 WL 4700920 (S.D.N.Y. Oct. 23, 2008) ............................................................. 16

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*,
   252 F.3d 218 (2d Cir. 2001)........................................................................... 26, 27, 28

*McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*,
   858 F.2d 825(2d Cir. 1988).................................................................................... 20, 27

*Mikes v. Strauss*,
   889 F. Supp. 746 (S.D.N.Y. 1995) ............................................................................. 18

*Miner v. Walden*,
   101 Misc. 2d 814, 422 N.Y.S.2d 335 (Sup. Ct. Queens County 1979) ..................... 21

*Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*,
   473 U.S. 614 (1985)................................................................................................... 19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)....................................................................................................... 18

*Motorola Credit Corp. v. Uzan*,
   274 F. Supp. 2d 481 (S.D.N.Y. 2003),
   *aff'd in part, vacated in part*, 388 F.3d 39 (2d Cir. 2004)...................................... 20

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004)................................................................................... 19, 20

*N.Y. News, Inc. v. Newspaper Guild of N.Y.*,
   927 F.2d 82 (2d Cir. 1991)......................................................................................... 20

*Oldroyd v. Elmira Sav. Bank, FSB* ,
   134 F.3d 72 (2d Cir. 1998)......................................................................................... 18

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
   388 U.S. 395 (1967)................................................................................................... 20

*Revson v. Cinque & Cinque, P.C.*,
   221 F.3d 59 (2d Cir. 2000)................................................................................... 14, 25

*Sam Reisfeld & Son Import Co. v. S.A. Eteco*,
  530 F.2d 679 (5th Cir. 1976) .................................................................................. 18

*Shaw Group Inc. v. Triplefine Int'l Corp.*,
  322 F.3d 115 (2d Cir. 2003) ................................................................................... 20

*Shearson Lehman Hutton Inc. v. Wagoner*,
944 F.2d 114 (2d Cir. 1991) .................................................................................... 10

*Singer v. Salomon Bros., Inc.*,
  156 Misc.2d 465, 593 N.Y.S.2d 927 (N.Y. Sup. Ct. 1992) .................................... 18

*Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*,
  85 F.3d 21 (2d Cir. 1996) ....................................................................................... 22

*State of N.Y. v. Oneida Indian Nation of N.Y.*,
  90 F.3d 58 (2d Cir. 1996) ....................................................................................... 22

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*,
  241 F.3d 135 (2d Cir. 2001).................................................................................... 19

*Vargas v. Schweitzer-Ramras*,
  878 So. 2d 415 (Fla. Dist. Ct. App. 2004) ............................................................. 25

*Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ................................................................................................ 20

*Waldron v. Goddess*,
  61 N.Y.2d 181, 473 N.Y.S.2d 136 (1984) .............................................................. 21

## Federal Rules

Fed. R. Civ. P. 53(f)(3)-(4) ......................................................................................... 9

Fed. R. Civ. P. 53(f)(5) ............................................................................................... 9

## State Rules

22 N.Y.C.R.R. § 137................................................................................... 24, 25, 27

## Other Authorities

*Black's Law Dictionary 67* (9th ed. 2009).................................................................. 13

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 7, 1959.  UNCITRAL, "1958 – Convention on the Recognition and Enforcement of Foreign Aribitral Awards – the 'New York' convention," available at http: //www.uncitral.org/uncitral/en/uncitral-texts/arbitration/NY Convention.html/ (last visited Dec. 3, 2009)...................................................................................................................................

Plaintiffs Kenneth Krys and Christopher Stride, as Joint Official Liquidators of the SPhinX Funds (the "JOLs") and as assignees of claims by certain SPhinX investors (the "Assignors" or the "Investors"), and James Sinclair, as Trustee of the SPhinX Trust, hereby submit, pursuant to Federal Rule of Civil Procedure 53, their objections to the Report and Recommendation ("Report" or "R&R") of Special Master Ronald J. Hedges on the Motion of Defendants Gibson, Dunn & Crutcher, LLP, Mitchell A. Karlan and Scott A. Kislin to Compel Arbitration (collectively, "Gibson Dunn" or the "Gibson Dunn Defendants"). Plaintiffs incorporate by reference the briefs filed by Plaintiffs (the "Opposition") in connection with the Gibson Dunn Defendants' Motion to Compel Arbitration (the "Gibson Dunn Mot."), Plaintiffs' arguments made to the Special Master (a copy of the transcript of oral argument before the Special Master ("Hr'g Tr.") is annexed hereto as Exhibit A) and Plaintiffs' Proposed Findings of Fact and Conclusions of Law (a copy of Plaintiffs' Proposed Findings of Fact and Conclusions of Law is annexed hereto as Exhibit B).

## PRELIMINARY STATEMENT

Plaintiffs pursue claims belonging to SPhinX, its assigning investors, and PlusFunds. Plaintiffs allege that in March 2005 the Gibson Dunn Defendants advised its clients – who for purposes of that transaction were certain PlusFunds insiders and not SPhinX, its assigning investors, or PlusFunds itself – in connection with the Suffolk Loans, a fraudulent transaction that harmed SPhinX, its assigning investors, and PlusFunds. Despite the fact that Plaintiffs' claims against the Gibson Dunn Defendants in connection with the Suffolk Loans arise from transactions *in which Gibson Dunn did not purport to represent SPhinX, its assigning investors, or PlusFunds*, the Special Master has concluded that Plaintiffs' claims are arbitrable under

engagement letters entered into by PlusFunds – and only PlusFunds – months later.  The Report is in error and should be rejected.

The Special Master erred in his analysis with respect to all three groups of Plaintiffs. First, with respect to the Assignors, the Special Master adopted wholesale a conclusion submitted by the Gibson Dunn Defendants to the effect that the Assignors lack standing to pursue any claims – an issue not mentioned once in the briefing of the Motion or at oral argument.  Because standing issues were not briefed or argued, any recommendation with respect to standing should be stricken.  Furthermore, the Gibson Dunn Defendants in their motion did not articulate *any* basis as to why the assigned investor claims are subject to the arbitration clause.  Therefore, at a minimum, the assigned investor claims must remain in this Court.

With respect to SPhinX, the Special Master enforced an arbitration clause against SPhinX, who never signed any fee agreement with Gibson Dunn at all, let alone an agreement to arbitrate.  The only fee agreement to which SPhinX is arguably a party (as PlusFunds' "affiliate" – a term which does not encompass SPhinX) was not signed until October 2005, months after the Gibson Dunn Defendants aided and abetted the breaches of duty and fraud of defendants Christopher Sugrue, Mark Kavanagh and Brian Owens in connection with the Suffolk Loans in March 2005.

Finally, PlusFunds cannot be held to be obligated to arbitrate its claims arising from the Suffolk Loans for the same reason as SPhinX – Gibson Dunn was representing Sugrue, Kavanagh and Owens, not PlusFunds.  The only claim in this matter that arises during the time PlusFunds had agreed to arbitrate with Gibson Dunn is PlusFunds' claim against Gibson Dunn for malpractice after October 10, 2005.  But even here, the Engagement Letter's own language

restricts the scope of matters to be arbitrated to those the parties "might otherwise have the right to arbitrate under part 137," which refers exclusively to fee disputes.

Based on these errors, Plaintiffs request that this Court reject the Special Master's report and deny the Gibson Dunn Defendants' Motion to Compel Arbitration. At a minimum, the Court should allow Plaintiffs to litigate their claims against the Gibson Dunn Defendants in connection with the Suffolk Loans (transactions in which Gibson Dunn did not purport to represent SPhinX, PlusFunds, or the Assignors).

## FACT ALLEGATIONS

The discovery of a massive fraud orchestrated by Phillip Bennett, the President and CEO of Refco, and Refco's subsequent crash in October 2005, resulted in the loss of approximately $263 million of SPhinX cash wrongfully diverted from protected, customer-segregated accounts at a regulated Refco entity, Refco LLC, to non-customer-segregated, commingled accounts at Refco Capital Markets, Ltd. ("RCM"), a purportedly unregulated offshore affiliate of Refco LLC. These losses suffered by SPhinX led to the collapse of the SPhinX Funds and PlusFunds and massive losses by the investors. *See* Plaintiffs' Amended Complaint ("Am. Compl.") ¶ 1.

Plaintiffs allege two sets of facts that relate to the Gibson Dunn Defendants.

**1.     The Gibson Dunn Defendants aided and abetted breaches of duty and fraud by Sugrue, Kavanagh and Owens in connection with the Suffolk Loans in March 2005.**

Plaintiffs allege that three SPhinX and PlusFunds insiders, Christopher Sugrue, Mark Kavanagh, and Brian Owens, conspired to move SPhinX customer assets to unprotected accounts at Refco, where those assets supported Refco's operations and fraud. *See* Am. Compl. ¶¶ 1, 5-10, 356-407. In exchange, Refco provided a payoff to Sugrue, Kavanagh and Owens in the form of the Suffolk Loans. *See* Am. Compl. ¶ 282. On or about March 29, 2005, Refco used RCM assets to fund in excess of $200 million in nonrecourse "loans" to several "Suffolk" entities

controlled by Sugrue, Kavanagh and Owens. *See id.* ¶ 9. The Suffolk Loans were a disguised acquisition by Refco of the PlusFunds shares owned by Sugrue, Kavanagh and Owens and the *quid pro quo* for their participation in the Refco fraudulent scheme. *See id.* ¶¶ 9, 495. Plaintiffs allege that Sugrue, Kavanagh and Owens defrauded and breached their fiduciary duties to SPhinX and PlusFunds in connection with the Suffolk Loans by, among other things, accepting hundreds of millions of dollars from SPhinX's service provider without disclosing, and affirmatively concealing, Refco's role as lender. *See id.* ¶¶ 282, 310-25, 365-67, 372-74, 381-84, 395-96, 403.

As legal counsel to Sugrue, Kavanagh and Owens and the Suffolk entities, Gibson Dunn structured and negotiated the Suffolk Loans with lawyers from Mayer Brown, who represented Refco. *See id.* ¶ 497. The Gibson Dunn Defendants fully understood every detail of the transactions, including that Refco was the source of the funds, that Refco's role as the lender was not disclosed to innocent members of PlusFunds' management or SPhinX's board, that Refco's only recourse was to shares of PlusFunds stock that would allow it to acquire a controlling stake in PlusFunds, that Refco required a representation that would keep the Refco-SPhinX relationship locked in place, and that a $25 million Standby Credit Facility was designed to maintain SPhinX's relationship with Refco and keep SPhinX cash at RCM. *See id.*

In addition to documenting the Suffolk Loan transactions, Gibson Dunn actively conspired to conceal the true nature and source of funds from innocent members of SPhinX and PlusFunds' board and management. *See id.* ¶ 10. The Gibson Dunn Defendants wrongfully and intentionally advised Sugrue, Kavanagh and Owens that the Refco-Suffolk relationship did not have to be disclosed to SPhinX or PlusFunds' management and that the Suffolk Loans did not have to be disclosed as a related-party transaction. *See id.* ¶ 502.

4

There is no dispute that the Gibson Dunn Defendants did not provide any legal services to or representation of SPhinX or PlusFunds in connection with the Suffolk Loans. According to the Declaration of Scott Kislin, "Gibson Dunn represented only the Suffolk Shareholders, not PlusFunds itself," in connection with the Suffolk buyout transactions. Declaration of Scott A. Kislin in Support of Motion By Defendants Gibson, Dunn & Crutcher LLP, Mitchell A. Karlan and Scott Kislan to Compel Arbitration of All Claims and, in the Alternative, to Stay Remaining Claims. ("Kislin Decl.") ¶ 2; *see id.* ¶ 4 ("Neither PlusFunds nor SPhinX were parties to the loan agreements that financed the Suffolk Transactions").

Beginning in the March 2005 timeframe in which the Suffolk Loans were consummated, Gibson Dunn undertook direct representation of PlusFunds in connection with two matters, the OTC and DeSouza litigations, completely unrelated to the Suffolk transactions. *See* Kislin Decl. ¶ 6. At no time prior to October 2005 did Gibson Dunn actually represent SPhinX. *See id.* ¶ 10.

**2.     The Gibson Dunn Defendants provided faulty legal advice to SPhinX and PlusFunds after the disclosure of the Refco fraud in October 2005.**

Refco affiliates served as a distributor, custodian, and futures commission merchant for SPhinX entities, including SPhinX Managed Futures Fund SPC ("SMFF"). *See* Am. Compl. ¶¶ 144, 148, 152. Sugrue, Kavanagh, Owens, and certain other SPhinX and PlusFunds agents/fiduciaries allowed SMFF cash to be diverted from regulated, protected, customer-segregated accounts at Refco LLC to purportedly non-regulated, non-customer-segregated offshore accounts at RCM, where those assets were commingled with RCM's assets and exposed to the risk of the custodian's insolvency. *See id.* ¶ 5.

On the date the Refco fraud was disclosed to the public, October 10, 2005, approximately $312 million of SMFF cash was held at RCM. *See id.* ¶ 11. On October 11, 2005, the day after the disclosure of the Refco fraud and several days prior to Refco's bankruptcy filing, Sugrue

demanded the transfer of the $312 million of SMFF cash held at RCM to SMFF's customer-segregated accounts at Refco LLC, which occurred on October 12, 2005. *See id.* ¶ 12. On October 17, 2005, RCM and 23 Refco subsidiaries and affiliates filed for bankruptcy protection. *See id.* ¶¶ 11, 338.

On December 16, 2005, RCM's Official Committee of Unsecured Creditors commenced an adversary proceeding to recover the $312 million as a preferential transfer. *See id.* ¶¶ 12, 341. That same day, the bankruptcy court issued an order of attachment and temporary restraining order freezing SMFF's assets. *See id.* ¶ 341. At the time of the Refco fraud disclosure and the initiation of the adversary proceeding, PlusFunds and SPhinX were advised by Gibson Dunn in connection with issues arising from the Refco bankruptcy. *See id.* ¶¶ 340, 514.

Despite Gibson Dunn immediately identifying the potential and likelihood of a preference claim against SPhinX by RCM's estate, Gibson Dunn advised SPhinX and PlusFunds to honor redemption requests. *See id.* ¶¶ 507, 509. In reliance on this flawed legal advice, PlusFunds and SPhinX honored requests to redeem investments, which dissipated part of the $312 million removed from RCM. This, in turn, caused SPhinX to be unable to satisfy a potential $312 million preference judgment. *See id.* ¶¶ 510, 512. Under Section 502(d) of the Bankruptcy Code, SPhinX would then be unable to recover anything as a creditor of RCM's bankruptcy estate. *See id.* ¶ 512. Under the applicable standards of care, Gibson Dunn, Kislin, and Karlan should have advised SPhinX not to honor redemption requests in light of the likely preference claims and the merit of those claims. *See id.* ¶ 514.

3.     **The Gibson Dunn Fee Agreements.**

There are three fee agreements relevant to this dispute. None of them compels arbitration of Plaintiffs' claims here.

### (i)      The November 2, 2004 Engagement Letter

Hardwicke Limited and certain shareholders of PlusFunds, including Kavanagh, Owens, Sugrue, and MKK Limited, retained Gibson Dunn as their legal counsel pursuant to an Engagement Letter dated November 2, 2004. *See* Kislin Decl. Ex. A. Neither PlusFunds nor SPhinX was a party to the November 2, 2004 engagement letter. *See id.* The November 2, 2004 Engagement Letter provided that Gibson Dunn would "provide legal services to Hardwicke and the other Shareholders [defined to include Kavanagh, Owens, Sugrue, and MKK Limited] in connection with the sale of some or all of its interest in PlusFunds Group, Inc. (the 'Sale')." As contemplated in the November 2, 2004 Engagement Letter, Gibson Dunn provided legal representation to Sugrue, Kavanagh and Owens in connection with the acquisition of certain shares of PlusFunds via transactions referred to as the Suffolk transactions. *See* Am. Compl. ¶¶ 310, 497; SAC ¶¶ 314, 507.

### (ii)      The July 20, 2005 Engagement Letter

On or about July 20, 2005, Gibson Dunn issued an Engagement Letter to Hardwicke Limited, Kavanagh, Owens, Sugrue, PlusFunds, and MKK Limited. *See* Kislin Decl. Ex. B. After the completion of the Suffolk Loans in March 2005 and the Suffolk tender offer in May 2005, PlusFunds retained Gibson Dunn as its legal counsel pursuant to an Engagement Letter to PlusFunds, Hardwicke Limited, MKK Limited, Suffolk LLC, Kavanagh, Owens, and Sugrue, dated "[a]s of July 20, 2005." *Id.* According to the Kislin Declaration, this July 20, 2005 Engagement Letter was intended to formalize Gibson Dunn's representation of PlusFunds in connection with the OTC and DeSouza matters, "two litigation matters that were unrelated to the Suffolk Loans." Kislin Decl. ¶¶ 6-7.

The July 20, 2005 Engagement Letter provided:

> The undersigned hereby confirms that the Firm [Gibson Dunn] has been and may in the future be engaged by PlusFunds Group, Inc. and/or Suffolk LLC, as a client, to perform legal services for PlusFunds Group, Inc. and/or Suffolk LLC, that all services previously performed and to be *performed by the Firm for PlusFunds Group, Inc.* and/or Suffolk LLC shall be subject to the terms of the Letter in the same manner as all other signatories as if PlusFunds Group, Inc. and Suffolk LLC had signed the Letter as an additional client of the Firm *on the date when the Firm first performed services for PlusFunds Group, Inc.* and/or Suffolk LLC . . . .

*Id.* (emphasis added).

The July 20, 2005 Engagement Letter does not identify any services previously provided by Gibson Dunn "for PlusFunds" as referenced in the Engagement Letter, nor did it reference SPhinX in any way. *See id.*

### (iii)    The October 10, 2005 Engagement Letter

Sometime after the disclosure of the Refco fraud on October 10, 2005, Gibson Dunn issued an Engagement Letter to PlusFunds dated "as of October 10, 2005." The October 10, 2005 Engagement Letter was directed to "PlusFunds Group, Inc." and was executed by Patrick McMahon, PlusFunds' in-house counsel. *See* Kislin Decl. Ex. C.

The October 10, 2005 Engagement Letter provided:

> We are pleased to continue to have PlusFunds Group, Inc. (including affiliates thereof, other than any shareholders, "PlusFunds"), as a client of Gibson, Dunn & Crutcher LLP (the "Firm"). This letter and the attached Terms of Retention set forth the terms of our engagement, with respect to the matters discussed herein, and effective as of October 10, 2005, replaces that certain letter dated as of July 20, 2005.

*Id.* The October 10, 2005 Engagement Letter further provided:

> You are retaining us to provide legal services to PlusFunds in connection with (1) the DeSouza matter; and (2) issues arising from the bankruptcy of Refco, Inc. and its affiliates and related matters (the "Refco Bankruptcy").

*Id.*  None of the SPhinX Funds is mentioned in the October 10, 2005 Engagement Letter as a current or former client of Gibson Dunn.  The word "SPhinX" does not appear anywhere in the October 10, 2005 Engagement Letter.  *See id.*

## ARGUMENT

In reviewing the Special Master's Report, this Court "must decide *de novo* all objections to conclusions of law made or recommended" by the Special Master.  Fed. R. Civ. P. 53(f)(3)-(4).[1]

## I.    NO AGREEMENT TO ARBITRATE

### A.    There Is No Agreement To Arbitrate That Binds The Assignors.

The JOLs assert claims as assignees of claims from certain SPhinX investors.  *See* Am. Compl. ¶¶ 1, 18, 34.  There can be no dispute that none of the Assignors ever agreed to arbitrate any claims against Gibson Dunn, and Gibson Dunn has not contended otherwise.  Although the Assignor claims were not addressed in Gibson Dunn's Motion or Reply brief, counsel for the JOLs argued that the Assignors are not bound by any agreement to arbitrate.  *See* Ex. A, Hr'g Tr. 21:5-24:4.  Counsel for Gibson Dunn did not object to this line of argument.  *See id.*

Although Gibson Dunn did not request such a finding in its Motion papers, and although the issue was never properly before the Special Master, he adopted wholesale in his Report a footnote finding that the Assignors have no standing to sue.  *See* Report 16 n.6 ("It is black-letter law that individual investors have no standing to pursue a corporate claim . . . .  It clearly cannot be that both SPhinX and its individual investors have standing, because both cannot have suffered the loss").  This issue was never briefed or even mentioned by either side in the papers

---

[1] Any procedural rulings are reviewed under an abuse of discretion standard.  Fed. R. Civ. P. 53(f)(5).  The Report only recommended certain findings of fact and conclusions of law; it made no procedural rulings.  Therefore, the recommendations of the Report must be reviewed *de novo* by this Court.

or at oral argument, and it was error for the Special Master to include such a finding without allowing argument on the issue.

In fact, the Assignors do potentially have standing to sue. Plaintiffs allege a fraud on SPhinX and PlusFunds that Gibson Dunn aided and abetted. A number of the defendants in this litigation have asserted the *Wagoner* rule and *in pari delicto* doctrine against Plaintiffs in this matter, arguing that the knowledge and actions of corrupt insiders must be imputed to SPhinX and PlusFunds. Certainly the Gibson Dunn Defendants will attempt to raise this same defense when the merits of Plaintiffs' claims are decided, whether in this Court or in arbitration. If it is found that the *Wagoner* rule bars the JOLs from asserting aiding and abetting claims, those claims devolve to SPhinX's creditors – the assigning investors. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991) ("A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation."). A decision on this issue is not appropriate until the *Wagoner* defense is decided with respect to the SPhinX and PlusFunds claims.

Additionally, the Gibson Dunn Defendants in their motion and reply brief failed to articulate any basis on which the assigned Investor claims (as opposed to the claims brought by the JOLs on behalf of SPhinX, addressed below) are subject to any arbitration agreement; indeed, they do not specifically address the Investor claims *at all*. The Gibson Dunn Defendants' memorandum of law in support of their motion is directed only to "claims brought against them by Plaintiffs James P. Sinclair, *as trustee of the SPhinX Trust* ('Trustee'), and Kenneth Krys and Christopher Stride *as Joint Official Liquidators* ('JOLs') *of the SPhinX family of hedge funds* ('SPhinX')." Gibson Dunn Mot. at 1 (emphasis added); *see also id.* ("[T]he

JOLs, *as SPhinX's assignees*, are bound by PlusFunds' written agreement to arbitrate ….." (emphasis added)).

### B.    There Is No Agreement To Arbitrate That Binds SPhinX.

SPhinX never signed an agreement to arbitrate any claims against Gibson Dunn.  SPhinX asserts two categories of claims against Gibson Dunn:  (1) aiding and abetting the breaches of duty and fraud of Sugrue, Kavanagh and Owens in connection with the Suffolk transactions (November 2004 to May 2005), *see* Am. Compl. ¶¶ 492, 495-503, 519-21 and (2) legal malpractice in connection with bankruptcy advice rendered after October 10, 2005, *see* Am. Compl. ¶¶ 504-18.

With respect to the Suffolk transactions, there is no question that (a) there was no attorney-client relationship between SPhinX and Gibson Dunn at the time of the Suffolk transactions; (b) there was no agreement to arbitrate between SPhinX and Gibson Dunn at the time of the Suffolk transactions; (c) Gibson Dunn represented and provided services to Sugrue, Kavanagh and Owens in connection with the Suffolk transactions; and (d) Gibson Dunn did not perform any legal services on behalf of SPhinX in connection with the Suffolk transactions.[2]  *See* Kislin Decl. ¶ 2 ("Gibson Dunn represented only the Suffolk Shareholders [Sugrue, Kavanagh, Owens, MKK Limited] not PlusFunds itself, in connection with this [November 2, 2004] engagement letter and in the buyout transactions"); *id.* ¶ 4 ("Neither PlusFunds nor the SPhinX funds were parties to the loan agreements that financed the Suffolk Transactions").  There is simply no basis to conclude that any Gibson Dunn engagement letter bound SPhinX to arbitrate

---

[2] Gibson Dunn argues that SPhinX waived this argument by not raising it in its Opposition brief.  This is incorrect. Plaintiffs argued that SPhinX was a non-signatory to any fee agreement at oral argument, and Judge Hedges heard and considered these arguments without objection from Gibson Dunn's counsel.  *See* Ex. A, Hr'g Tr. 21:5-24:4. Regardless, the fact that SPhinX did not agree to arbitration is certainly implicit in its Opposition. *See* Opposition at 20 ("most of the claims are based on conduct that occurred when no arbitration agreement was in place between Gibson Dunn and Plaintiffs").

claims against Gibson Dunn for transactions in which Gibson Dunn did not purport to represent SPhinX.

Gibson Dunn argues that SPhinX and PlusFunds are retroactively bound to arbitrate claims against Gibson Dunn based on the July 20, 2005 and October 10, 2005 engagement letters executed by PlusFunds. *See* Report ¶¶ 93-100. SPhinX is a party to neither of these letter agreements, but even if it were, the operative language of the July 20, 2005 Engagement Letter does not compel arbitration of claims arising in connection with the Suffolk transactions. The July 20, 2005 Engagement references the November 2, 2004 Engagement Letter:

> The undersigned hereby confirms that the Firm [Gibson Dunn] has been and may in the future be engaged by PlusFunds Group, Inc. and/or Suffolk LLC, as a client, to perform legal services for PlusFunds Group, Inc. and/or Suffolk LLC, that *all services previously performed and to be performed by the Firm for PlusFunds Group, Inc.* and/or Suffolk LLC shall be subject to the terms of the Letter in the same manner as all other signatories as if PlusFunds Group, Inc. and Suffolk LLC had signed the Letter as an additional client of the Firm *on the date when the Firm first performed services for PlusFunds Group, Inc.* and/or Suffolk LLC . . . .

*Id.* (emphasis added).

This language refers to services previously performed or to be performed *by Gibson Dunn for PlusFunds*. None of the services Gibson Dunn performed in connection with the Suffolk Loans was performed for PlusFunds or SPhinX; in fact, Plaintiffs allege that the Suffolk Loans were a fraud against SPhinX aided and abetted by Gibson Dunn. Therefore, none of Plaintiffs' claims in connection with the Suffolk Loans can be considered to be covered by the Engagement Letters or the arbitration clauses. Plaintiffs' claims in connection with the Suffolk Loans relate to services Gibson Dunn provided for Sugrue, Kavanagh, and Owens, not SPhinX or PlusFunds. With respect to those services, claims between Sugrue, Kavanagh, or Owens and Gibson Dunn might be arbitrable, but claims between SPhinX and Gibson Dunn are not.

Gibson Dunn argues that the October 10, 2005 Engagement Letter, with its arbitration provision, is binding upon SPhinX because the Engagement Letter refers to Gibson Dunn's client as PlusFunds, "including affiliates thereof." Accordingly, Gibson Dunn's argument hinges on whether SPhinX is an "affiliate" of PlusFunds.

Black's Law Dictionary defines "affiliate" as a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation." *Black's Law Dictionary* 67 (9th ed. 2009). SPhinX and PlusFunds are not alleged to be related by shareholdings, nor are they alleged to be subsidiary, parent, or sibling corporations. Plaintiffs do not allege that SPhinX and PlusFunds are commonly owned, nor is there a formal corporate relationship between the two entities that would render them "affiliates."

At oral argument, Gibson Dunn contended that SPhinX and PlusFunds are "intertwined," as alleged in Plaintiffs' Second Amended Complaint ("SAC"). *See* SAC ¶ 141. The fact that the businesses of SPhinX and PlusFunds were intertwined does not render SPhinX and PlusFunds "affiliates" or establish a "means of control" sufficient to create an affiliate relationship. The relationship between PlusFunds and SPhinX was governed by contract, the Investment Management Agreement ("IMA") between SPhinX and PlusFunds. *See* IMA (a copy of which is annexed hereto as Exhibit C). The IMA provided for PlusFunds to manage the daily activities of the SPhinX Funds, but at all times PlusFunds was subject to the oversight of SPhinX's board of directors. *See* IMA §§ 1(a), 3(a), 12. Moreover, SPhinX at all times had the power to terminate PlusFunds as its investment manager. *See* IMA § 12.

The IMA further acknowledges the separate nature of SPhinX and PlusFunds, emphasizing that SPhinX and PlusFunds are independent:

> The Investment Manager *shall for all purposes be an independent contractor* and not an employee of the Company, nor shall

> anything herein be construed as making the Company a partner or co-venturer *with the Investment Manager or any of its affiliates* or clients.

IMA § 4 (emphasis added). The IMA's explicit separation of SPhinX from "the Investment Manager [PlusFunds] or any of its affiliates" compels the conclusion that PlusFunds and SPhinX did not consider themselves affiliates.

Moreover, Plaintiffs allege that Gibson Dunn's representation was compromised by a conflict of interest resulting from Gibson Dunn's representation of SPhinX, PlusFunds, and parties with interests adverse to SPhinX. Plaintiffs allege that Gibson Dunn's representation of SPhinX and PlusFunds was compromised by Gibson Dunn's simultaneous representation of SPhinX, PlusFunds, Sugrue, Kavanagh and Owens, among others. *See* SAC ¶ 504. SPhinX should not be bound by an arbitration agreement that SPhinX did not sign, that was not submitted to SPhinX's board, that did not disclose relevant conflicts of interest, and that did not disclose the fact that Gibson Dunn had deliberately withheld relevant information from SPhinX and PlusFunds. This is especially appropriate in light of New York law that "[f]ee arrangements between an attorney and client are scrutinized with particular care, and an attorney who has drafted a retainer agreement ordinarily has the burden of showing that the contract was fair, reasonable, and fully known and understood by the client." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 67 (2d Cir. 2000).

SPhinX's claims against Gibson Dunn arising from Gibson Dunn's bankruptcy advice after October 10, 2005 were performed pursuant to an oral arrangement that did not include an agreement to arbitrate. Accordingly, the SPhinX Funds' claims relating to advice given after October 10, 2005 are not arbitrable.

14

### C.    There Is No Agreement To Arbitrate That Binds PlusFunds

Not only does the arbitration provision at issue here not extend beyond fee disputes, even if it did encompass the claims here, most of the claims are based on conduct that occurred when there was not a written arbitration agreement in place between Gibson Dunn and Plaintiffs. Specifically, there was no written agreement to arbitrate between PlusFunds and Gibson Dunn at the time of the Suffolk Loans. It is the conduct of Gibson Dunn in relation to the Suffolk Loans that forms the basis of Plaintiffs' claims for aiding and abetting breach of fiduciary duty and fraud/negligent misrepresentation. As with SPhinX, there is no dispute that none of Gibson Dunn's services in connection with the Suffolk Loans was performed for PlusFunds.

Moreover, while Gibson Dunn may have been representing PlusFunds around the time of the Suffolk Loans, that representation was pursuant only to an oral agreement and was in relation solely to the OTC and DeSouza matters (*see* Kislin Decl. ¶ 6) – both completely unrelated to the Suffolk Loans. Because Gibson Dunn represented Sugrue, Kavanagh and Owens in connection with the Suffolk Loans, PlusFunds' aiding and abetting claims arising from the Suffolk Loans are not arbitrable.

At no time during the Suffolk transactions did Gibson Dunn represent PlusFunds pursuant to a written engagement letter containing an arbitration provision. In fact, it was not until well after those transactions, in July 2005, that Gibson Dunn first represented PlusFunds pursuant to a written engagement letter. *See* Kislin Decl. Ex. E. Consequently, even if the arbitration provision here is construed to encompass the type of claims asserted against Gibson Dunn, there was no such written agreement in place at the time the conduct complained of occurred. Thus, there was no agreement to arbitrate the claims stemming from the Suffolk Loan transactions. Therefore, Gibson Dunn's Motion should be denied for this reason, as well.

(i)    <u>**This Court Should Retain Jurisdiction over this Matter**</u>

Considerations of comity, avoidance of disparate results, convenience and economy that Gibson Dunn argues support a stay and transfer of all the claims here to arbitration, apply with greater force to Plaintiffs' position that this Court should retain and decide these claims.

In denying the remand motion by the Refco trustee in this MDL, Judge Lynch quoted with approval the following language explaining the benefits of jointly litigating such related cases:

> [I]t is beyond cavil that judicial economy and efficiency are best served by exercising the jurisdiction that so clearly exists. The MDL panel has consolidated scores of cases before this Court to promote the expeditious and efficient resolution of the claims arising from the collapse of WorldCom. The litigation is proceeding apace. Motions to remand … and to dismiss have been fully briefed, and … important discovery issues addressed. With the consolidation of the litigation in one court, the motion practice and discovery process can be managed to protect the rights of all parties and to preserve, to the extent possible, the maximum amount of assets for recovery by plaintiffs with meritorious claims.

*In re Refco, Inc. Sec. Litig.,* 628 F. Supp. 2d 432, 446-47 (S.D.N.Y. 2008) (alterations in original) (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 333 (S.D.N.Y. 2003)). That policy should be applied here. It would be fundamentally unfair to force Plaintiffs to litigate these overlapping claims in arbitration, potentially subjecting Plaintiffs to inconsistent verdicts, duplicative discovery and trial preparation, unnecessary costs, and other disadvantages of parallel litigation in disparate fora.

To force Plaintiffs into arbitration with Gibson Dunn would ultimately hinder the resolution of these consolidated cases and, ultimately, the liquidation of the SPhinX Funds and possibly other entities in bankruptcy. This Court recognized as much in denying the Refco trustee's remand motion:

> [P]laintiffs' claims, which in the New York litigation required a
> nearly 300-page complaint to address, are far from elementary and
> involve precisely the web of deceit at issue in the Refco Securities
> MDL. As such, remanding these actions, which have a common
> factual core, to two different state courts "would simply complicate
> and slow down the resolution of those claims, as well as of the
> matters already pending before this Court."

*Krys v. Sugrue*, No. 08 Civ. 3065 (GEL), 08 Civ. 3086 (GEL), 08 Civ. 7416 (GEL), 2008 WL

4700920, at *10 (S.D.N.Y. Oct. 23, 2008).  What Judge Lynch said with respect to potential

litigation in state court is even more forcefully applied to the issue of whether a piece of this

matter should be sent to an entirely different forum without the same procedural protections as a

state or federal court.

Furthermore, Judge Lynch noted in denying the Refco trustee's remand motion that an

amicable compromise of the pending claims is promoted by keeping the cases in a single

jurisdiction:  "It is a virtual certainty not only that these matters will, at some point, settle, but

that they will necessarily settle by virtue of some comprehensive resolution of all of the claims

pending against defendants in this matter, the vast majority of which are pending before this

Court."  *Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d at 440.

In summary, as this Court stated in denying the Refco trustee's remand motion, "The

efficiency gains that result from asserting jurisdiction in this case are particularly striking in light

of the multitude of other Refco-related actions currently pending before this Court, many of

which involve many of the same parties and arise out of the same set of facts as those described

in the Trustee's complaint."  628 F. Supp. 2d at 444; *see also id.* at 446-47 ("[I]t is beyond cavil

that judicial economy and efficiency are best served by" consolidating "scores of cases before

this Court to promote the expeditious and efficient resolution of the claims." (quoting *In re

WorldCom*, 293 B.R. at 333)).  This Court should not erase these "striking" efficiency gains by

sending a small piece of this litigation to arbitration, particularly in light of the parties' narrow agreement about what is to be arbitrated.

### (ii)    In the Alternative, this Court Should Allow All Nonarbitrable Claims Against Gibson Dunn to Continue in the Ongoing Multidistrict Litigation.

If the Court finds that some, but not all, of Plaintiffs' claims against Gibson Dunn are arbitrable, the nonarbitrable claims should continue in the ongoing multidistrict litigation.  If a case involves both arbitrable and nonarbitrable claims, a court must determine whether to stay the nonarbitrable claims pending arbitration.  *See Oldroyd v. Elmira Sav. Bank*, *FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998).  The decision whether or not to stay the nonarbitrable claims is left to the District Court "as a matter of its discretion to control its docket."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 n.23 (1983); *see also Mikes v. Strauss*, 889 F. Supp. 746, 757 (S.D.N.Y. 1995) (exercising its discretion in denying to stay court proceedings of nonarbitrable claims).

The Court has the power to sever arbitrable claims from nonarbitrable ones, allowing nonarbitrable claims to proceed to trial, thus preserving Plaintiffs' right to a jury trial.  *See Sam Reisfeld & Son Import Co. v. S.A. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976) (agreeing with district court's decision to allow nonarbitrable claim to proceed to trial); *In re City of Schenectady v. Schenectady Patrolmen's Benevolent Ass'n*, 138 A.D.2d 882, 883, 526 N.Y.S.2d 259, 260 (3d Dept. 1988) ("It is clear that courts have power . . . to sever arbitrable causes of action from nonarbitrable causes of action.") (citations omitted.); *Singer v. Salomon Bros., Inc.*, 156 Misc. 2d 465, 468, 593 N.Y.S.2d 927, 930 (Sup. Ct. N.Y. County 1992) ("When arbitrable claims may be severed from non-arbitrable ones, they may be separated and the arbitration proceedings may be held.").

As discussed above, Plaintiffs' claims against the Gibson Dunn Defendants revolve in part around Gibson Dunn's conduct in relation to the Suffolk Loans – conduct wholly unrelated to the arbitration provision and transactions that will be central to Plaintiffs' claims in the litigation.  Therefore, Gibson Dunn's request for a stay or dismissal should be denied and Plaintiffs should be allowed to pursue all nonarbitrable claims through litigation.

## II.    THE NARROW ARBITRATION CLAUSES DO NOT COVER PLAINTIFFS' CLAIMS

Even if some or all of the Plaintiffs are bound by the arbitration clauses, the clauses are narrow and do not encompass the claims pending in this litigation.

### A.    The Arbitration Clauses Include the Limiting Language, "Which You Might Otherwise Have the Right to Arbitrate Under Part 137."

The general federal policy favoring arbitration agreements "is at bottom a policy guaranteeing the enforcement of private contractual arrangements."  *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 625 (1985); s*ee also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 146 (2d Cir. 2001) ("Notwithstanding the strong federal policy favoring arbitration as an alternative means of dispute resolution . . . courts must treat agreements to arbitrate like any other contract") (citations omitted).  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted).

While the Federal Arbitration Act ("FAA") applies here, "where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping."  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) [hereinafter *Motorola II*].  "This is especially true of contracts between transnational parties, where applying the parties' choice of law is the only way to ensure uniform application of arbitration clauses within the numerous countries that have

19

signed the New York Convention." *Id.* Moreover, "respecting the parties' choice of law is fully consistent with the purposes of the FAA." *Id.* Here, the parties chose New York state law to govern the agreements. *See* Kislin Decl. Ex. E, at 9.

Because arbitration is "simply a matter of contract between the parties[,] it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see also AT&T Techs., Inc.*, 475 U.S. at 648 ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.") (citation and internal quotations omitted); *Shaw Group Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003). "For all the current 'tilt' in favor of arbitration, it is still a function of what the parties agreed to." *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 508 (S.D.N.Y. 2003) [hereinafter *Motorola I*], *aff'd in part, vacated in part*, 388 F.3d 39 (2d Cir. 2004). It is also important to note that the purpose of the FAA is "'to make arbitration agreements as enforceable as other contracts, but not more so.'" *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12 (1967)). The Second Circuit has repeatedly observed, therefore, that "federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope." *Haviland v. Goldman, Sachs & Co.*, 947 F.2d 601, 605 (2d Cir. 1991) (internal quotations and citations omitted); *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 831 (2d Cir. 1988) (quoting *Fuller v. Guthrie,* 565 F.2d 259, 261 (2d Cir.1977)); *see also N.Y. News, Inc. v. Newspaper Guild of N.Y.*, 927 F.2d 82, 84 (2d Cir. 1991) (federal policy favoring arbitration cannot deprive party of benefit of its bargain to limit circumstances under which it must arbitrate).

Neither the FAA nor the New York Convention[3] "purports to overrule or extend the contractual agreements of private parties, but simply to effectuate what they have agreed to *as determined by ordinary principles of contractual interpretation*." *Motorola I*, 274 F. Supp. 2d at 504 n.13 (emphasis added). Thus, before compelling arbitration on the merits of a dispute, questions regarding whether a dispute is arbitrable must be addressed.

"[T]he rule is clear that unless the agreement to arbitrate expressly and unequivocally encompasses the subject matter of a particular dispute, a party cannot be compelled to forgo the right to seek judicial relief and instead submit to arbitration." *Bowmer v. Bowmer*, 50 N.Y.2d 288, 294-95, , 428 N.Y.S.2d 902, 905 (1980); *see Cont'l Group, Inc. v. NPS Commc'ns, Inc.*, 873 F.2d 613, 617 (2d Cir. 1989) (recognizing that, under New York law, absent a specific commitment to arbitrate a specific dispute, a party may not be compelled to arbitrate) (citations omitted). An arbitration agreement "must be clear, explicit and unequivocal and must not depend upon implication or subtlety." *Waldron v. Goddess*, 61 N.Y.2d 181, 183-84, 473 N.Y.S.2d 136, 137 (1984) (citations omitted); *see also Miner v. Walden*, 101 Misc. 2d 814, 819, 422 N.Y.S.2d 335, 339 (Sup. Ct. Queens County 1979) (noting that "[t]he language whereby a party agrees to or is under a duty to arbitrate should be clear and unequivocal and the burden lies on the party seeking arbitration") (internal quotations and citations omitted).

The Court's construction of the parties' agreement "must ascertain and implement the reasonable expectations of the parties who undertake to be bound by its provisions. Despite the presumption of arbitrability, the strong federal policy favoring arbitration may not extend the reach of the arbitration beyond the intended scope of the clause providing for it." *Spear, Leeds*

---

[3] The "New York Convention" is the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 7, 1959. UNCITRAL, "1958 – Convention on the Recognition and Enforcement of Foreign Aribitral Awards – the 'New York' convention," available at http: //www.uncitral.org/uncitral/en/uncitral-texts/arbitration/NY Convention.html/ (last visited Dec. 3, 2009).

*& Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 28 (2d Cir. 1996) (citation omitted).  In New York, "a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  *Hanjin Shipping Co. Ltd v. Union Pac. R.R,*, No. 05 Civ. 8476, 2006 WL 1096389, at *3 (S.D.N.Y. Apr. 26, 2006) (internal quotations and citations omitted).  The parties' intent is to be determined in the first instance by looking to the face of the agreement.  *See id.* at *4.  The courts must fully enforce not only the full breadth of an arbitration provision, but also its limitations.  *See State of N.Y. v. Oneida Indian Nation of N. Y.*, 90 F.3d 58, 62 (2d Cir. 1996).

Here, simple conventions of grammar limit the scope of the arbitration provision.  The arbitration provision, drafted by Gibson Dunn, states in its entirety:

> Arbitration
>
> We appreciate the opportunity to serve as your attorneys and look forward to a productive and mutually rewarding relationship. If you become dissatisfied with our charges or services, we encourage you to bring that to our attention immediately.  We believe that most problems of this nature can be resolved through good faith discussion.  In the event that we cannot resolve a dispute through discussion, we believe that binding arbitration offers a more expeditious and less expensive alternative than court action.
>
> *By signing this engagement letter agreement, you agree to binding arbitration in New York City of any dispute, claim or controversy regarding our services as described in the attached Terms of Retention, including any dispute as to the fees for our services, which you might otherwise have the right to arbitrate under Part 137 of the Rules of the Chief Administrator of the Courts.*  You are also agreeing that you are waiving your right to a jury or court trial, and are waiving any right you might have to collect punitive damages.  This waiver of punitive damages applies only to the maximum extent permitted by law.  If you do not wish to agree to arbitration, you should advise us before signing this letter.  If you have any questions or concerns regarding the advisability of arbitration, we encourage you to discuss them with us or your other advisors.

Kislin Decl. Ex. E, at 4-5 (emphasis added) (the italicized sentence will be referred to as the "Operative Sentence").

The Gibson Dunn Defendants argue that the above language constitutes a "broad" arbitration agreement encompassing *any* claim Plaintiffs could bring, and, specifically, *every* claim Plaintiffs have asserted against them (*i.e.*, professional malpractice, fraud/negligent misrepresentation, breach of fiduciary duty and aiding and abetting breach of fiduciary duty). However, looking closely at the Operative Sentence of this arbitration provision (*i.e.*, the first sentence of the second paragraph), and giving every clause its plain meaning, *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1065 (2d Cir. 1993) (construction of a contract resulting in a term or phrase being superfluous is not favored), it is clear that the parties intended to require arbitration only of fee disputes or other non-substantive matters found in the Terms of Retention.

The opening clause of the Operative Sentence is immediately followed by a parenthetical that modifies the opening clause, indicating that the type of disputes to be arbitrated "include any dispute as to the fees for our services." Significantly, the parenthetical does not list legal malpractice or any other substantive tort claim as being subject to the arbitration agreement. *See Adena, Inc. v. Cohn*, 162 F. Supp. 2d 351, 357 (E.D. Pa.. 2001) (a retainer agreement arbitration provision applied only to fee disputes and not to complicated claims such as legal malpractice; "[w]hile the agreement does state that '[a]ny dispute regarding the fee in this matter' is subject to arbitration, it does not specify whether any other types of disputes, such as those involving . . . breach of fiduciary duty, malpractice, . . . must similarly be resolved through arbitration. This notable absence indicates that the parties did not intend that any and all disputes arising out of Cohn's representation would be settled by arbitration.") (citation omitted). The significance of

23

that omission is made abundantly clear from the third clause in the Operative Sentence, which, in further explication of what is to be arbitrated, states, "which you might otherwise have the right to arbitrate under Part 137 of the Rules of the Chief Administrator of the Courts."

Part 137 of the Rules of the Chief Administrator of the Court establishes the New York State Fee Dispute Resolution Program (the "Part 137 Program"). *See* 22 N.Y.C.R.R. § 137.0. The Part 137 Program was established to provide for the "informal and expeditious *resolution of fee disputes* between attorneys and their clients through arbitration and mediation." *Id.* (emphasis added). An attorney must arbitrate a fee dispute under Part 137 when arbitration is requested by a client. *Id.* § 137.2(a). Importantly, a client may consent in advance to arbitration of fee disputes under Part 137 if such consent is stated in a retainer agreement, *id.* § 137.2(b), as was done here.

Fee disputes are the *only* disputes a client "might otherwise have a right to arbitrate" under Part 137. That Part specifically excludes, among other things, "claims involving substantial legal questions, including professional malpractice or misconduct," as well as "claims against an attorney for damages or affirmative relief other than adjustment of the fee." *Id.* §§ 137.1(b)(3) & (b)(4). These are the very claims asserted here against Gibson Dunn.

Gibson Dunn certainly knew that claims for legal malpractice, and claims for damages such as breach of fiduciary duty or aiding and abetting breach of fiduciary duty, were excluded from Part 137 when they drafted the agreement to arbitrate "any dispute, claim or controversy . . . which you might otherwise have the right to arbitrate under Part 137 . . . ." Gibson Dunn also knew that the only way to compel a client to arbitration of fee disputes in advance was by including such an agreement in a written engagement letter. The whole purpose and intent of the

arbitration provision in the Gibson Dunn engagement letters was to compel arbitration of fee disputes – and only fee disputes – pursuant to the Part 137 Program.

Equally important is what the arbitration provision does not say. The provision does not say that the parties agree to arbitrate "any dispute, claim or controversy regarding our services as described in this engagement letter agreement," or "regarding our services as performed hereunder," or "arising from or related to our services as performed pursuant to this engagement letter agreement," or "as described in the attached Terms of Retention *and* this engagement letter agreement," or simply, "regarding our services." Had it been the parties' intention to enter into an arbitration agreement of such broad scope, the foregoing is the type of routinely used language Gibson Dunn would have drafted. Having drafted a narrow arbitration provision, Gibson Dunn must live with the consequences of that language. *See Revson*, 221 F.3d at 67 (ambiguities are construed against the drafter under New York law, particularly where found in retainer agreements drafted by the attorney); *Vargas v. Schweitzer-Ramras*, 878 So. 2d 415, 417 (Fla. Dist. Ct. App. 2004) (finding that client did not agree to arbitrate malpractice claims in retainer agreement and that "the rules of construction require that contracts be construed against the drafter" and, specifically, that "retainer agreements are construed against the attorney and in favor of client[s]".

Gibson Dunn is a large, multinational law firm with a wide-ranging and sophisticated practice. There is no doubt that its lawyers are capable of drafting arbitration provisions as broadly or as narrowly as they perceive necessary for that task at hand. Had the parties intended the arbitration agreement here to extend to "any dispute with Gibson Dunn arising out of the representation," as the Gibson Dunn Defendants argue, they could have drafted the provision using such broad language, and without the limiting references to the Part 137 Program.

### B.    The Words of Limitation Used in the Arbitration Provision Demonstrate that Arbitration Was Not Meant to Be the Primary Means of Dispute Resolution.

The Second Circuit has adopted a "broad or narrow" test to help determine issues concerning the scope of an arbitration clause.  *See Bristol-Myers Squibb Co. v. SR Int'l Business Ins. Co. Ltd.*, 354 F. Supp. 2d 499, 503 (S.D.N.Y. 2005) (citing and quoting the test from *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 n.23 (2d Cir. 2001). Using this test, a court should first "classify the particular clause as either broad or narrow." *Dreyfus*, 252 F.3d at 224.  Although the *Dreyfus* framework is often employed in the Second Circuit, it is frequently noted, as originally stated in *Dreyfus*, that "[n]o fixed rules govern the determination of an arbitration clause's scope."  *Hanjin Shipping*, 2006 WL 1096389, at *2 (quoting *Dreyfus*, 252 F.3d at 225).[4]

If the clause is narrow, "the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 338, 352 (S.D.N.Y. 2004) (quoting *Dreyfus*, 252 F.3d at 224), *rev'd in part on other grounds*, *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58 (2d Cir. 2005).  "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview."  *Id.* It is only where the clause is broad that the presumption of arbitrability — which is central to Gibson Dunn's position — arises.  *See id*.  "In the end, a court must determine whether, on the one hand, the *language of the clause, taken as a whole*, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the

---

[4] Although *Dreyfus* sets out the general test for the analysis of arbitration clauses, it is ultimately distinguishable from this case in that the Court in *Dreyfus* was dealing with a broad arbitration clause. *See Dreyfus*, 252 F.3d at 224-27.

clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Id.* (quoting *Dreyfus*, 252 F.3d at 225) (emphasis added).

Words of limitation are what distinguish narrow clauses from broad ones. *See Cornell Univ v. UAW Local 2300,* 942 F.2d 138, 139 (2d Cir. 1991) (clause was narrow where it provided for arbitration of "any matter involving the interpretation or application of this Agreement which alleges a violation of the rights of an employee or the Union under the terms of this Agreement"); *McDonnell Douglas*, 858 F.2d at 832 (clause providing for arbitration in the case of disagreement over "computation of the amount of the required indemnity payment or refund thereof" is narrow); *Bristol-Myers*, 354 F. Supp. 2d at 501, 503-07 (finding fraudulent inducement, failure of consideration and mistake claims not arbitrable pursuant to an insurance policy requiring arbitration of "[a]ny dispute arising under this Policy"); *ACE Ltd. v. CIGNA Corp.*, No. 00 Civ. 9423, 2001 WL 767015, at *2-4 (S.D.N.Y. July 6, 2001) (finding that a clause to arbitrate issues pertaining to "the amount of Taxes" and "all points of disagreement concerning Tax matters" was narrow).

The clause here employs limiting language. That limiting language constrains the scope of arbitration to disputes regarding services "which [Plaintiffs] might otherwise have the right to arbitrate under [the] Part 137 [Program]." Claims for legal malpractice or misconduct cannot be arbitrated under Part 137. *See* 22 N.Y.C.R.R. § 137.1(b)(3). Nor can disputes for "damages or affirmative relief," *id*. § 137.1(b)(4), such as claims for fraud/negligent misrepresentation, breach of fiduciary duty or the like. Fee disputes are the *only* disputes a client "might otherwise have a right to arbitrate" under Part 137.

The language crafted by Gibson Dunn does not evidence the parties' intent to have arbitration serve as the primary recourse for disputes connected to the engagement letters.

27

Rather, it shows the intention that arbitration was designed to play a limited role in any future disputes regarding fees.

### C.    The Claims Asserted Against the Gibson Dunn Defendants Are Not Within the Purview of the Narrow Arbitration Provision.

Finally, Gibson Dunn argues that even if the arbitration provision is a narrow one, the claims here are still arbitrable because those claims are "collateral to" or "touch matters" covered by the *engagement letter agreements*. Gibson Dunn Mem. Law 18–20.  However, where the arbitration provision is a narrow one, as it is here, disputes over a "collateral matter will generally be ruled beyond its purview." *Dreyfus*, 252 F.3d at 224; *ACE Ltd.*, 2001 WL 767015, at *3-4.  Thus, arbitration may be compelled here only if the claims asserted are, *on their face*, within the scope of the arbitration provision.  *See Dreyfus*, 252 F.3d at 224; *see also, ACE Ltd.*, 2001 WL 767015, at *3–4 (finding the clause at issue to be a narrow one, applying the general rule that collateral matters are beyond the purview of a narrow clause and testing whether the dispute was "on its face" within the purview of that arbitration clause).

Here, the claims are not, on their face, within the "purview" of the arbitration provision – Plaintiffs allege Gibson Dunn concealed the substance of the Suffolk Loans from PlusFunds' innocent officers and directors and advised Sugrue, Kavanagh and Owens and the Suffolk entities to not disclose the Suffolk Loans as related party transactions.  *See id.* ¶¶ 1190–94. Plaintiffs further allege that Gibson Dunn knew that, by participating in and concealing the Suffolk Loans from innocent officers and directors at PlusFunds, Sugrue, Kavanagh and Owens were in breach of fiduciary duties they owed to SPhinX and PlusFunds, and that Gibson Dunn aided and abetted those breaches of fiduciary duties.  *See id.* ¶¶ 1195–1200.  Finally, Plaintiffs allege that Gibson Dunn engaged in fraud and negligent misrepresentation (and aiding and

abetting the same by Sugrue, Kavanagh and Owens) through their actions as related to the Suffolk Loans.  *See id.* ¶¶ 1201–10.

None of the claims asserted against Gibson Dunn constitute a fee dispute or are otherwise arbitrable under the Part 137 Program.  Consequently, the claims asserted against Gibson Dunn are not within the "purview" of Gibson Dunn's own narrow arbitration provision.

Having unambiguously agreed to arbitrate only fee disputes and matters "which [Plaintiffs] might otherwise have the right to arbitrate under [the New York State mandatory fee dispute program]", Plaintiffs cannot be compelled to arbitrate their complex claims for professional malpractice, fraud/negligent misrepresentation, breach of fiduciary duty and aiding and abetting breach of fiduciary duty.  Consequently, the Gibson Dunn Defendants' motion to compel arbitration and stay these proceedings should be denied.

## CONCLUSION

For the reasons set forth herein, in Plaintiffs' other papers filed in opposition to the motion, and in oral argument, the Gibson Dunn Defendants' motion to compel arbitration should be denied.  In the alternative, only SPhinX's and PlusFunds' malpractice claim should be arbitrated.  At a minimum, the assigned Investor claims should be permitted to go forward in this forum, and footnote 6 of the Report should be stricken, as the recommendations made therein were not briefed or argued by the parties.

Dated: New York, New York
     December 3, 2009

                                      Respectfully submitted,

                                      By: _____ s/  David J. Molton_____
                                      David J. Molton (DM-1106)
                                      Andrew Dash (AD-7913)
                                      **BROWN RUDNICK LLP**
                                      Seven Times Square
                                      New York, New York 10036

Telephone: (212) 209-4800
Facsimile: (212) 209-4801
dmolton@brownrudnick.com
adash@brownrudnick.com

Leo R. Beus, *pro hac vice*
Dennis K. Blackhurst, *pro hac vice*
**BEUS GILBERT PLLC**
4800 North Scottsdale Road, Suite 6000
Scottsdale, Arizona 85251
Telephone: (480) 429-3000
Facsimile: (480) 429-3100
lbeus@beusgilbert.com
dblackhurst@beusgilbert.com